# 15-180(L)

### 15-208 (XAP)

## United States Court of Appeals
## for the Second Circuit

---

MIAMI GROUP, CONSISTING OF THE RETIREMENT SYSTEM FOR GENERAL EMPLOYEES OF THE CITY OF MIAMI BEACH, FRANCOIS R. GERARD, PRIGEST S.A. AND TOCQUEVILLE FINANCE S.A., PEARSON-DONIGER FAMILY, CONSISTING OF TWO SISTERS AND THEIR RESPECTIVE FAMILY MEMBERS BEATRICE DONIGER, GRANDCHILDREN'S TRUST BY BRUCE DONIGER TRUSTEE, ALISON DONIGER, MICHAEL DONIGER, EDWARD B. BRUNSWICK AND RUTH PEARSON TRUST PEARSON TRUSTEE, GAMCO INVESTORS, INCORPORATED, OPPENHEIM KAPITALANLAGEGESELLSCHAFT MBH, PLAINTIFF KBC ASSET MANAGEMENT N.V., CAPITALIA ASSET MANAGEMENT SGR, S.P.A., CAPITALIA INVESTMENT MANAGEMENT S.A., EURIZON CAPITAL SGR S.P.A., BADEN-WURTTEMBERGISCHE INVESTMENTGESELLSCHAFT MBH, BARCLAYS GLOBAL INVESTORS (DEUTSCHLAND),

*[caption continued on next page]*

---

On Appeal From The United States District Court
For The Southern District Of New York, No. 02-cv-05571-SAS

---

**JOINT SPECIAL APPENDIX, VOLUME I OF III, PAGES SA1-SA241**

---

Jeffrey A. Lamken
MOLO LAMKEN LLP
The Watergate, Suite 660
600 New Hampshire Ave., N.W.
Washington, D.C. 20037
(202) 556-2000

*Counsel of Record for*
*Class Plaintiffs*

Miguel A. Estrada
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500

*Counsel of Record for*
*Vivendi S.A.*

*[caption continued]*

COMINVEST ASSET MANAGEMENT GMBH, DEUTSCHE ASSET MANAGEMENT INVESTMENTGESELLSCHAFT MBH, DWS (AUSTRIA) INVESTMENTGESELLSCHAFT MBH, DWS INVESTMENT GMBH, ERSTE-SPARINVEST KAPITALANLAGEGESELLSCHAFT M.B.H., FORSTA AP-FONDEN, FORTIS INVESTMENT MANAGEMENT SA, KBC ASSET MANAGEMENT S.A., LANDESBANK BERLIN INVESTMENT GMBH, LBBW LUXEMBURG S.A., OPPENHEIM ASSET MANAGEMENT SERVICES S.A.R.L., PIONEER INVESTMENT MANAGEMENT LIMITED, PIONEER INVESTMENT MANAGEMENT SGRPA, PIONEER INVESTMENTS AUSTRIA GMBH, PIONEER INVESTMENTS KAPITALANLAGEGESELLSCHAFT MBH, RAIFFEISEN KAPITALANLAGE-GESELLSCHAFT M.B.H., SEB INVESTMENT MANAGEMENT AB, SKANDIA INSURANCE COMPANY LTD., UNION ASSET MANAGEMENT HOLDING AG, UNIVERSAL-INVESTMENT-GESELLSCHAFT MBH, SEB INVESTMENT GMBH, ANDRA AP-FONDEN, BAYERN-INVEST KAPITALANLAGEGESELLSCHAFT MBH, DEKA INVESTMENT GMBH, PRIGEST, S.A., TOCQUEVILLE FINANCE, S.A., ROSENBAUM PARTNERS, L.P., ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, RUTH PEARSON TRUST, DEKA INTERNATIONAL (IRELAND) LIMITED, DEKA INTERNATIONAL S.A. LUXEMBURG, DEKA FUNDMASTER INVESTMENTGESELLSCHAFT MBH, FIDEURAM INVESTIMENTI S.G.R., FIDEURAM GESTIONS S.A., INTERFUND SICA V, FRANKFURT-TRUST INVESTMENT-GESELLSCHAFT MBH, FRANKFURT-TRUST INVEST LUXEMBURG AG, HELABA INVEST KAPITALANLAGEGESELLSCHAFT MBH, HSBC TRINKAUS & BURKHARDT AG, INTERNATIONALE KAPITALANLAGEGESELLSCHAFT MBH, MEAG MUNICH ERGO KAPITALANLAGEGESELLSCHAFT MBH, MEAG MUNICH ERGO ASSET MANAGEMENT GMBH, METZLER INVESTMENT GMBH, METZLER IRELAND LTD, NORDCON INVESTMENT MANAGEMENT AG, NORGES BANK, SWISS LIFE HOLDING AG, SWISS LIFE INVESTMENT MANAGEMENT HOLDING AG, SWISS LIFE ASSET MANAGEMENT AG, SWISS LIFE FUNDS AG, SWISS LIFE (BELGIUM) S.A., SWISS LIFE ASSET MANAGEMENT GMBH, SWISS LIFE ASSET MANAGEMENT (NEDERLAND) B.V., TREDJE AP-FONDEN, WESTLB MELLON ASSET MANAGEMENT KAPITALANLAGEGESELLSCHAFT MBH, ALECTA PENSIONSFORSAKRING, OMSESIDIGT, SJUNDE AP-FONDEN, VARMA MUTUAL PENSION INSURANCE COMPANY, DANSKE INVEST ADMINISTRATION A/S, AFA LIVFORSAKRINGSAKTIEBOLAG, AFA TRYGGHETSFORSAKRINGSAKTIEBOLAG, AFA SJUKFORSAKRINGSAKTIEBOLAG, AMF PENSION FONDFORVALTNING AB, ARBETSMARKNADSFORSAKRINGAR, PENSIONSFORSAKRINGSAKTIEBOLAG, PENSIONSKASSERNES ADMINSTRATION A/S, ARBEJDSMARKEDETS TILLAEGSPENSION, INDUSTRIENS PENSIONSFORIKRING A/S, ARCA SGR S.P.A.,

*[caption continued]*

ILMARINEN MUTUAL PENSION INSURANCE COMPANY, PRIMA SOCIETA' DI GESTIONE DEL RISPARMIO S.P.A., NORDEA INVEST FUND MANAGEMENT A/S, NORDEA FONDER AB, NORDEA INVESTMENT FUNDS COMPANY I.S.A., NORDEA FONDENE NORGE AS, NORDEA FONDBOLAG FINLAND AB, SWEDBANK ROBUR FONDER AB, FJARDE AP-FONDEN, OLIVIER CHASTAN, REED S. CLARK, DAHA DAVIS, COLLEN DODI, RUTH PEARSON TRUST PEARSON TRUSTEE, EDWARD B. BRUNSWICK, MICHAEL DONIGER, ALISON DONIGER, GRANDCHILDREN'S TRUST BY BRUCE DONIGER TRUSTEE, BRUCE DONIGER, BEATRICE DONIGER, JEFFREY KURTZ, PRICE HAL, W. SCOTT POLLAND, JR., NICHOLAS A. RADOSEVICH, CAISSE DE DEPOT ET PLACEMENT DU QUEBEC, AGF ASSET MANAGEMENT, S.A., IRISH LIFE INVESTMENT MANAGERS LIMITED,

*Plaintiffs-Appellees*,

BRUCE DONIGER, GERARD MOREL, OLIVER M. GERARD, THE RETIREMENT SYSTEM FOR GENERAL EMPLOYEES OF THE CITY OF MIAMI BEACH,

*Plaintiffs-Appellees/Cross-Appellants*,

WILLIAM CAVANAGH,

*Cross-Appellant*,

v.

VIVENDI, S.A.,

*Defendant-Appellant - Cross-Appellee*,

JEAN-MARIE MESSIER, GUILLAUME HANNEZO, VIVENDI UNIVERSAL,

*Defendants*.

# TABLE OF CONTENTS

**Description**                                                                     **Page**

## VOLUME I

November 4, 2003 Opinion and Order of Judge Baer (Dkt. 84) ................................. SA1

September 21, 2004 Order of Judge Holwell (Dkt. 165) ........................................... SA41

May 23, 2007 Revised Memorandum Opinion and Order of Judge Holwell,
    signed May 21, 2007 (Dkt. 347) .................................................................... SA42

March 2, 2009 Oral Order of Judge Holwell (Dkt. 752) (excerpt) .......................... SA110

March 16, 2009 Order of Judge Holwell (Dkt. 749) ............................................... SA115

March 31, 2009 Memorandum Opinion and Order of Judge Holwell
    (Dkt. 755) ..................................................................................................... SA118

March 31, 2009 Memorandum Opinion and Order of Judge Holwell
    (Dkt. 758) ..................................................................................................... SA147

April 21, 2009 Revised Memorandum Opinion and Order of Judge Holwell
    (Dkt. 775) ..................................................................................................... SA183

August 18, 2009 Order of Judge Holwell (Dkt. 929) .............................................. SA219

October 13, 2009 Order of Judge Holwell (Dkt. 953) ............................................. SA234

January 4, 2010 Oral Order of Judge Holwell (Dkt. 1001) (excerpt) ..................... SA236

## VOLUME II

February 2, 2010 Jury Verdict Form (Dkt. 998) ..................................................... SA242

September 30, 2010 Order of Judge Holwell (Dkt. 1083) ....................................... SA331

February 22, 2011 Memorandum Opinion and Order of Judge Holwell
    (Dkt. 1084) ................................................................................................... SA332

## TABLE OF CONTENTS
### (continued)

### <u>VOLUME III</u>

February 1, 2012 Memorandum Opinion and Order of Judge Holwell (Dkt. 1114) ................................................................................ SA456

July 5, 2012 Order of Judge Scheindlin (Dkt. 1147) .............................. SA468

August 18, 2014 Memorandum Opinion and Order of Judge Scheindlin (Dkt. 1208) ................................................................................ SA519

November 12, 2014 Order of Judge Scheindlin (Dkt. 1229) ................... SA525

December 22, 2014 Partial Final Judgment Entered by Judge Scheindlin (Dkt. 1231) ................................................................................ SA529

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                    :

IN RE VIVENDI UNIVERSAL, S.A.      :           02 Civ. 5571 (HB)
SECURITIES LITIGATION           :

                                    :          __OPINION & ORDER__
------------------------------------------------------------X
Hon. HAROLD BAER, JR., District Judge:[1]

## I. INTRODUCTION

Plaintiffs[2] allege that defendants sold them Vivendi Universal, S.A. ("Vivendi") common stock or American Depository Shares ("ADSs") at artificially inflated prices as a result of defendants'[3] material misrepresentations and omissions between October 30, 2000 and August 14, 2002, inclusive, (the "class period") in violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"). Furthermore, plaintiffs allege that defendants induced them to purchase or otherwise acquire Vivendi common stock or ADSs (the "merger subclass") pursuant to a registration statement and prospectus dated October 30, 2000 (the "registration statement"), which was issued in connection with the three-way merger of Vivendi, Seagram Company Limited ("Seagram") and Canal Plus, S.A. ("Canal Plus") on December 8, 2000 (the "merger"), in violation of §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "1933 Act"). In addition, plaintiffs allege that they were damaged as a result of the merger (the "proxy subclass") between Vivendi, Seagram, and Canal Plus, in violation of § 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder. Compl. ¶¶ 1, 29, 40. Defendants in this securities class action move to dismiss the Consolidated Class Action Complaint (the "complaint")

---

[1]     Sirimal R. Mukerjee, an intern in my chambers during the summer of 2003 and a second-year law student at Brooklyn Law School, provided substantial assistance in the research and drafting of this opinion.

[2]     "Plaintiffs" refer to the lead plaintiffs (Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust) representing themselves and others similarly situated within the putative class.

[3]     "Defendants" refer to Vivendi Universal, S.A. ("Vivendi"), Jean-Marie Messier and Guillaume Hannezo. Messier and Hannezo will be referred to collectively as the "individual defendants."

pursuant to 15 U.S.C. § 78u-4 (1995), and Rules 8, 9(b), 12(b)(1), 12(b)(6) and 41(b) of the Federal Rules of Civil Procedure. For the reasons stated below, defendants' motion is denied in part and granted in part.

## II. STANDARDS OF REVIEW

When construing a motion to dismiss under the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4, the Court must determine if plaintiffs pled with particularity sufficient facts "to support a reasonable belief as to the misleading nature of the statement or omission." *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 330 (S.D.N.Y. 2003) (quotation marks and citations omitted); *see Novak* v. *Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000); 15 U.S.C. § 78u-4(b)(1). Moreover, the Court must determine if plaintiffs "state[d] with particularity facts giving rise to a strong inference that ... defendant[s] acted with the required state of mind." *In re IPO*, 241 F. Supp. 2d at 330; *see* 15 U.S.C. § 78u-4(b)(2).

Under Rule 8, the complaint merely needs to "afford [the] defendant sufficient notice of the communications complained of to enable him to defend himself." *Kelly* v. *Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986) (quotation marks and citations omitted). Furthermore, the complaint must "be so construed as to do substantial justice." Fed. R. Civ. P. 8(f). The facts alleged must be "simple, concise, and direct." Fed. R. Civ. P. 8(e)(1).

Rule 9(b) adds to the pleading standard of Rule 8, but does not drastically alter it. *See In re IPO*, 241 F. Supp. 2d at 326 (noting that Rules 8's and 9's "pleading requirements only differ in degree, not in kind"). When fraud is alleged, plaintiffs must allege facts with particularity. Particularity "means the who, what, when, where, and how: the first paragraph of any newspaper story." *Id.* at 327 (quoting *DiLeo* v. *Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).

Defendants' motions to dismiss under Rule 12(b)(1) challenges this Court's statutory or constitutional power to adjudicate the case. *Makarova* v. *United States*, 201 F.3d 110, 113 (2d Cir. 2000). When considering a Rule 12(b)(1) motion, the Court construes the complaint broadly and liberally in conformity with the principle set out in Rule 8(f), "but argumentative inferences favorable to the pleader will not be drawn." 5A Charles A. Wright et al., Federal Practice and Procedure 1350, at 218-219 (1990 & Supp.1991). The movant and the

- 2 -

**SA2**

pleader may use affidavits and other materials beyond the pleadings themselves in support of, or in opposition to, a challenge to subject matter jurisdiction. *See Land* v. *Dollar*, 330 U.S. 731, 735 n.4 (1947); *Exchange Nat'l Bank of Chicago* v. *Touche Ross & Co.*, 544 F.2d 1126, 1130 (2d Cir.1976), *cert. denied sub. nom.*, 469 U.S. 884 (1984). Once challenged, the burden of establishing subject matter jurisdiction rests on the party asserting jurisdiction. *See Thomson* v. *Gaskill*, 315 U.S. 442, 446 (1942). Unlike a motion to dismiss under Rule 12(b)(6), however, a dismissal under Rule 12(b)(1) is not based on the claim's merits. *See Exchange Nat'l Bank*, 544 F.2d at 1130-1131.

When considering a motion to dismiss pursuant to Rule 12(b)(6), the Court is required to accept as true all of the facts alleged in the complaint and draw all reasonable inferences in the plaintiffs' favor. *See Krimstock* v. *Kelly*, 306 F.3d 40, 47-48 (2d Cir. 2002). A motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hamilton Chapter of Alpha Delta Phi, Inc.* v. *Hamilton College*, 128 F.3d 59, 63 (2d Cir. 1997) (citations and internal quotations omitted). It is improper, however, "'to assume that the [plaintiffs] can prove facts that it has not alleged.'" *Todd* v. *Exxon Corp.*, 275 F.3d 91, 198 (2d Cir. 2001) (citing *Associated Gen. Contractors of California, Inc.* v. *California State Council of Carpenters*, 459 U.S. 519, 526 (1983)).

The Court has broad discretion to dismiss a complaint under Rule 41(b). *See Joseph Muller Corp. Zurich* v. *Societe Anonyme De Gerance Et D'Armement*, 508 F.2d 814, 815 (2d Cir. 1974). "No one standard or single factor controls a court's determination under Rule 41(b); each case must be examined in its own factual circumstances." *S.E.C.* v. *Everest Mgmt. Corp.*, 466 F. Supp. 167, 171 (S.D.N.Y. 1979) (citing *Michelsen* v. *Moore-McCormack Lines, Inc.*, 429 F.2d 394, 395 (2d Cir. 1970)). "In reaching its conclusion, a court may balance the strong public policy in favor of deciding cases on the merits with the burden on the administration of justice and prejudice to the defendant caused by the delay." *Id.* With these standards in mind, I review defendants' motions to dismiss.

## III. FACTUAL ALLEGATIONS

Vivendi is a global conglomerate comprised primarily of two major divisions: "Media and Communications" and "Environmental Services." Compl. ¶ 30. Beginning in June

- 3 -

**SA3**

1996, Vivendi began an acquisition spree, with Messier, Vivendi's Chief Executive Officer ("CEO") and Chairman until July 3, 2002, and Hannezo, Vivendi's Chief Financial Officer ("CFO") until July 9, 2002, at the helm. This growth strategy resulted in the accumulation of a sizeable debt. After Vivendi acquired Seagram for $36 billion and Canal Plus for $12 billion, Vivendi purchased substantial equity positions in a host of other companies, including Houghton Mifflin Co., Studio Canal and USA Network Entertainment, using Vivendi stock or by borrowing against future earnings. *Id.* ¶¶ 52-53. Pursuant to this growth strategy, plaintiffs allege that "it was crucial for defendants to continue to report favorable financial results in order to keep Vivendi's stock price high and to maintain its favorable credit ratings and access to additional debt financing." *Id.* ¶ 53.

Plaintiffs allege that throughout Messier's and Hannezo's terms at Vivendi, Vivendi and the individual defendants issued public statements indicating that Vivendi's financial results were "better than expected." For example, in a March 9, 2001 and a March 12, 2001 press release, Vivendi reported that its fiscal year 2000 results had exceeded expectations. *Id.* ¶ 58-59. In an April 23, 2001 press release, Vivendi stated that its first quarter 2001 results were "very strong" and that its Media and Communications revenues and Telecoms revenues were up. *Id.* ¶ 61. At a shareholders' meeting held the following day, Messier stated that according to Hannezo's calculations, Vivendi had a "healthy balance sheet" and a "pro forma net debt that [was] practically non-existent." *Id.* ¶ 62. On July 2, 2001 Vivendi filed a Form 20-F for fiscal year 2000, which Hannezo signed and which contained consolidated financial statements for 1998, 1999, and 2000. *Id.* ¶ 66. Subsequently, Messier stated in a press release that Vivendi's earnings before interest, taxes, depreciation, and amortization ("EBITDA") had the "highest growth rate[] of the industry ... [and that its] stock is definitely an attractive investment today." *Id.* ¶ 67-68. Because of such statements, Vivendi's common stock and ADSs increased in price by 5%, *id.* ¶ 70, and securities analysts gave Vivendi high credit ratings, *id.* ¶ 71.

Plaintiffs further allege that in response to market rumors that Vivendi's earnings would be disappointing, defendants "categorically denied any problems." *Id.* ¶ 73. For example, in a September 25, 2001 press release, Messier maintained that "[d]espite the current environment, [Vivendi would] reach all [of its] previously stated revenue/EBITDA objectives for the 2001 year." *See id.* ¶ 74. In an October 30, 2001 press release, Messier proclaimed the strength of Vivendi's reported revenue and EBITDA growth as a testament to Vivendi's

- 4 -

resilience during a tough economy and that he expected 10% revenue growth and 35% EBITDA growth in 2001. *Id.* ¶ 75. Once again, securities analysts responded positively to defendants' statements. *Id.* ¶ 77. During a press conference in connection with Vivendi's $10.3 billion acquisition of USA Networks Entertainment and the creation of Vivendi Universal Entertainment ("VUE"), Messier indicated that the acquisition would not put "pressure" on Vivendi but would allow it to increase its EBITDA, net income and net free cash flow. *Id.* ¶ 81. Moreover, Messier emphasized that despite its global debt ratio, "the balance sheet [was] clean." *Id.* Furthermore, as reported by *AFX News Limited* on February 6, 2002, Messier distributed a company letter noting that "[s]ome global markets, including the music market, declined during this period. But despite the difficulties, we are the only media company not to have issued a profit warning on its operating results and there's no change to that situation … [and that] there are no hidden risks." See *id.* ¶ 83. In a March 5, 2002 press release, Messier stated that Media and Communications, operating free cash flow was "up 2 billion euros" and that defendants "stay fully committed to conveying full transparency in [their] financial results." *See id.* ¶ 89. In response to Moody's issuance of a debt rating one notch above "junk" status, Vivendi issued a press release to mitigate the impact of the rating by claiming that it "ha[d] no impact on Vivendi Universal's cash situation." *Id.* ¶ 100. As a consequence of the press release, plaintiffs assert that defendants were able to "limit the decline in the price of Vivendi's common stock and ADSs." *Id.* On May 28, 2002, Vivendi filed its Form 20-F signed by Hannezo for the 2001 fiscal year. In response to declines in common stock and ADS prices, defendants issued a press release in May 2002 stating that Vivendi "ha[d] no reason to anticipate or fear any further deterioration in its credit rating" and that the "cash situation … [was] comfortable." *Id.* ¶ 103. By June 26, 2002, after a series of negative market rumors, Messier tried to reassure investors in a conference call by claiming that "there [was] no hidden liability." *Id.* ¶ 105. In addition on July 2, 2002, *Bloomberg* reported that Messier sent an e-mail to his employees reiterating that, despite Vivendi's debt being downgraded again and reports that Vivendi was in danger of default, "there [were] no hidden risks in the company's accounting." *Id.* ¶ 109. On July 3, 2002, Messier resigned and Vivendi, through new management, issued a press release acknowledging that it indeed had a short-term liquidity crisis. *Id.* ¶¶ 109-10. Later, the *Associated Press* reported on August 14, 2002 that Jean-Rene Fourtou ("Fourtou"), Vivendi's new CEO, admitted that Vivendi "'was [then] facing a liquidity problem.'" *Id.* ¶ 114.

- 5 -

**SA5**

In addition, plaintiffs allege that during the class period, Vivendi filed financial statements with the SEC that "were materially false and misleading because the financial statements materially inflated and distorted [Vivendi's] true financial performance during the [c]lass [p]eriod." *Id.* ¶ 122. More specifically, Vivendi allegedly failed to timely record goodwill impairments, *i.d.* ¶ 124, and Vivendi improperly applied generally accepted accounting principles ("GAAP") in regard to its acquisition of U.S. Filter, Seagram and Canal Plus. *Id.* ¶ 128.

In regard to Canal Plus, plaintiffs allege that Vivendi valued Canal Plus at €12.5 billion, but reported €12.6 billion as goodwill. *Id.* ¶ 129. By June 2002, under French GAAP, Vivendi had written off approximately 78% of that €12.5 billion acquisition cost, but did not take any write-off for impaired goodwill under U.S. GAAP in 2000 or 2001. *Id.* ¶¶ 130-31. "[B]y refusing to take any goodwill impairment write-offs under U.S. GAAP [on its 2002 Form 20-F, Vivendi] effectively represented to investors that *the cash flows* Vivendi expected to receive from the assets it acquired prior to and during the [c]lass [p]eriod *equaled or exceeded* the carrying value of such assets," *id.* ¶ 132 (emphasis in original), though this allegedly was not in fact the situation, *see id.* ¶¶ 133-38 (referencing the complaint filed by Canal Plus in March 2002 alleging that NDS Group PLC's permitted the "proliferation of counterfeit smart cards that enabled users to circumvent the security measures built into the Canal [Plus's] conditional access system" and resulted in Canal Plus losing over a billion dollars). After Messier and Hannezo left Vivendi, Vivendi recorded an additional €3.8 billion goodwill impairment for Canal Plus in the second quarter of 2002, even though Canal Plus reported revenue growth of 8%—providing "further evidence that the impairment recorded in [Canal Plus's goodwill] . . . should have been taken earlier." *Id.* ¶ 141. In regard to the U.S. Filter acquisition, plaintiffs allege that Vivendi recorded approximately €4.6 billion in goodwill when U.S. Filter's operating results were much less than reported by Vivendi. S*ee id.* ¶¶ 169-77. Because companies similar to U.S. Filter were sold during the class period for less than that paid by Vivendi, plaintiffs contend that defendants knew or recklessly ignored that U.S. Filter's reported goodwill was materially inflated, *id.* ¶¶ 146-47.

Plaintiffs also allege that defendants materially misrepresented Vivendi's financial statements by improperly consolidating the revenues from Cegetel and Maroc Telecom when it held less than a 50% ownership interest in those companies in 1999, 2000 and 2001. *See*

- 6 -

*id.* ¶¶ 148-56. Specifically, plaintiffs allege that Vivendi's "consolidation of Cegetel's 1999-2001 operating results were false and misleading because Vivendi only owned 44% of Cegetel shares and it did not have a sufficient controlling financial interest in Cegetel. *Id.* ¶¶ 158-61. Consequently, "Vivendi's reported revenues were overstated by €3.9 billion, €5.1 billion and €6.4 billion for the years ended 1999, 2000 and 2001, respectively." *Id.* ¶ 162. Similarly, plaintiffs allege that Vivendi's consolidation of Maroc Telecom's 2001 financial results in its 2001 Form 20-F was false and misleading because it only owned 35% of Maroc Telecom. Cegetel's and Maroc Telecom's improper consolidation is purportedly evidenced by Fourtou's statements during a June 26, 2002 conference call that Vivendi, at that time, did "not have access to [cash flow from] Cegetel and Maroc Telecom," and an August 14, 2002 conference call, during which Fourtou revealed that "'Vivendi [could not] access the cash flow generated by the companies it owns less than 50 percent of.'" *Id.* ¶ 167. Vivendi's reported revenues were thus overstated by €1.4 billion in 2001 for Maroc Telecom. *Id.* ¶ 168.

Vivendi's financial results were allegedly further distorted due to its purported improper recognition of revenue from its U.S. Filter subsidiary. *Id.* ¶¶ 169-72. In particular, "Vivendi … [prematurely] recognized anticipated revenue from multi-year public service contracts upon signing on the contracts" in violation of GAAP and its own publicly disclosed revenue recognition policy. *Id.* ¶ 173; *see also id.* ¶¶ 174-80.

Plaintiffs additionally allege that Messier's stock buy-back program—where he clandestinely bought Vivendi stock on the market (approximately 10% of Vivendi's equity) in 2001—"caused [Vivendi] to spend approximately $6.3 ***billion***," *id.* ¶ 183(b) (emphasis in original), thus adding even greater burden to Vivendi's already massive debt. Defendants allegedly did not initially disclose this information and later made inadequate disclosures in regards to Vivendi's sale of put options in 2000 and 2001, which obligated Vivendi to purchase approximately 2% of all of its outstanding stock at an average price of €69, when the actual share price should have been well below this. *Id.* ¶ 183(c). Plaintiffs cite numerous newspaper reports that examined the severity of Vivendi's liquidity crisis. *See id.* ¶¶ 184-88. Notably, an October 31, 2002 *Wall Street Journal* article reported that on December 13, 2001, Hannezo wrote to Messier stating: "I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat . . . . All I ask is that all of this not end in shame." *Id.* ¶ 184. That article also reported that Messier touted the stability of Vivendi's debt-and-liquidity

- 7 -

**SA7**

predicament despite being advised to the contrary by Vivendi's investment bank, Goldman Sachs & Co. ("Goldman Sachs"). *Id.* ¶ 186. At a French parliamentary hearing in September 2002, Fourtou admitted that had Messier remained CEO of Vivendi beyond July 3, 2003, Vivendi would invariably have gone bankrupt "within 10 days." *Id.* Moreover, on December 13, 2002, the *Associated Press* reported that "Hannezo admitted that 2001 was marked by a series of errors, including underestimating the debt problem." *Id.* ¶ 188.

## IV. DISCUSSION

### A. Subject Matter Jurisdiction Over Claims Brought by Foreign Plaintiffs

Defendants assert that this Court lacks jurisdiction over the claims brought by foreign class members who acquired Vivendi ordinary shares traded on the foreign market. Under the "conduct test," which the Second Circuit has adopted to determine when extraterritorial application of the federal securities laws is warranted, this Court has subject matter jurisdiction over the claims of foreign investors abroad (1) "if the defendant's conduct in the United States was more than merely preparatory to the fraud, and particular acts or culpable failures to act within the United States directly caused losses to foreign investors abroad." *Alfadda* v. *Fenn*, 935 F.2d 475, 478 (2d Cir. 1991). Defendants contend that the principal activities complained about by investors abroad were not directly caused by activities in the United States. *Itoba Ltd.* v. *Lep Group PLC*, 54 F.3d 118, 122 (2d Cir. 1995). More specifically, defendants note that Vivendi is a French corporation that is not registered to do business in the United States. Further, defendants note that Vivendi does not make quarterly filings as is required of American corporations by the SEC and had only one corporate officer located in the United States until September 2001, when the individual defendants moved here. Thus, defendants claim that the alleged conduct at issue, namely the creation and dissemination of allegedly fraudulent statements and financial data, was initiated, organized and approved by Vivendi corporate executives in France. Further, defendants assert that Vivendi's filing of the Forms 20-F and 6-K with the SEC and other disseminated materials to shareholders in the United States cannot confer jurisdiction upon the claims of *foreign* purchasers, and that Vivendi's vast domestic presence by virtue of its numerous acquisitions in the United States is irrelevant to evaluating the subject matter jurisdiction over the claims of investors who bought their shares in foreign markets.

- 8 -

**SA8**

Plaintiffs have alleged that Vivendi undertook a scheme to acquire numerous well-known U.S. entertainment and publishing companies, such as Universal Studios, Houghton Mifflin and USA Networks, Compl. ¶ 23, and that to successfully accomplish this plan, it took on a $21 billion debt while fraudulently assuring all investors through false and misleading reports filed with the SEC and news releases that it had sufficient cash-flow to manage its debts, *id.* ¶¶ 24, 54-192. Further, plaintiffs allege that two of the alleged principal actors in this scheme, Messier, Vivendi's former CEO, and Hannezo, Vivendi's former CFO, spent half of their time in the United States from September 2001 through the end of the relevant class period of August 31, 2002, specifically to increase investments by United States investors in Vivendi. *Id.* ¶¶ 69, 77, 90-92, 105. Contrary to defendants' characterization, their conduct can hardly be deemed merely preparatory within the United States. Given Messier's and Hannezo's decision to move to the United States, allegedly to better direct corporate operations and more effectively promote misleading perceptions on Wall Street, which harbors some of the most watched securities exchanges in the world, one can reasonably infer that the alleged fraud on the American exchange was a "'substantial' or 'significant contributing cause' of [foreign investor's] decision[s] to purchase [Vivendi's] stock" abroad. *Itoba Ltd.*, 54 F.3d at 122. *See, e.g.*, Compl. ¶¶ 21-25 (summarizing pervasiveness and coextensiveness of fraud in the United States and abroad to sustain Vivendi stock price and the use of instrumentalities of interstate commerce to promulgate the alleged fraud). Defendants' motion to dismiss claims brought by foreign plaintiffs for lack of subject matter jurisdiction is denied. *Europe and Overseas Commodity Traders, S.A.* v. *Banque Paribas London*, 147 F.3d 118, 130-31 (2d Cir. 1998) (finding "jurisdiction over a predominantly foreign securities transaction . . . when, in addition to communications with or meetings in the United States, there has also been a transaction on a U.S. exchange, economic activity in the U.S., harm to a U.S. party, or activity by a U.S. person or entity meriting redress."); *S.E.C.* v. *Princeton Economic Intern, Ltd.*, 84 F. Supp. 2d 452, 454 (S.D.N.Y. 2000) (assuming subject matter jurisdiction for conduct that was "more than merely preparatory" and was "a substantial or significant contributing cause to the losses"); *In re Gaming Lottery*, 58 F. Supp. 2d at 7 (same); *Leonard* v. *Garantia Banking Ltd.*, 1999 WL 944802, at *4-6 (S.D.N.Y. Oct. 19, 1999) ("[T]his Court finds that the trading of ADRs on the NYSE satisfies the conduct test, and any 'tipping of the scales' which might be required by

**SA9**

[*Europe and Overseas Commodity Traders, S.A.*] is present in the use of United States banks and wire-transfer systems.").

### B. Compliance with Rule 8

Defendants contend that the complaint must be dismissed in its entirety under Rule 8 of the Federal Rules of Civil Procedure because it is an improper "puzzle pleading." In particular, defendants note that plaintiffs broadly allege that the Form F-4 that defendants filed with the SEC misstates the financial condition of Vivendi, but fails to specifically identify the pages containing the false statements in the 700-page document. Further, defendants note that plaintiffs have identified 38 separate statements that are said to be false, but do not identify with particularity what part of the document or quoted paragraph is false. Defendants contention, brought under Rule 8, in reality, seems to be nothing more than a claim under Rule 9(b). The degree of particularity that defendants seek—down to the precise sentence—simply is not mandated by the minimal pleading requirements of Rule 8. The complaint alleges that the Form F-4, signed by the individual defendants and filed by Vivendi, was misleading and improper because Vivendi presented false historical financial statements for fiscal year 1999 and the first half of fiscal year 2000. Compl. ¶ 54, 55. More specifically, the complaint alleges that Vivendi improperly consolidated into its financials, revenue from its Cegetel subsidiary, failed to timely write-down impaired goodwill from previous corporate investments and acquisitions, including U.S. Filter, and overstated the Company's revenue from its environmental division on certain multi-year contracts in violation of GAAP. *Id.* Further, plaintiffs pled facts in detail to support the reasons that the enumerated categories of statements are allegedly false and misleading. *See id.* ¶¶ 119-80. These allegations suffice under the liberal pleading standard of Rule 8 to withstand a motion to dismiss.

### C. Exemption from § 14(a) of the 1934 Act

Section 14(a) prohibits any person from soliciting any shareholder proxy or consent or authorization in violation of SEC rules and regulations. 15 U.S.C. § 78n(a). Plaintiffs contend that the proxy statement included with the registration statement issued by Vivendi was materially false and misleading, and suggest that the falsity of the proxy statement should suffice to impose liability under § 14(a) of the 1934 Act. Rule 240.3a12-b(b), however, exempts

- 10 -

**SA10**

"foreign private issuers" from liability under § 14(a). *Batchelder* v. *Kawamoto*, 147 F.3d 915, 923 (9th Cir. 1998). Vivendi, undisputedly, is a corporation organized under French law, and it is therefore a "foreign issuer" under Rule 240.3b-4(b). 17 C.F.R. § 240.3b-4(b). Plaintiffs cite no authority or factual allegations that shows Vivendi fits within any exception to the definition of "foreign issuer." *See id.* § 240.3b-4(c). Further, plaintiffs fail to present any authority to support its position that liability may be imputed to Vivendi for Seagram's alleged misstatements in Seagram's proxy statements. Because Vivendi is a foreign private issuer, plaintiffs' § 14(a) claim against Vivendi must be dismissed.

### D. Section 11 and 12(a)(2) Claims Under the 1933 Act

Plaintiffs allege in counts I and II that Vivendi violated §§ 11 and 12(a)(2) of the 1933 Act when it submitted a registration statement and prospectus, filed on Form F-4 ("F-4"), dated October 30, 2000, in connection with the merger of Vivendi, Seagram and Canal Plus. Compl. ¶¶ 54-55, 198-215. To state a claim under § 11 of the 1933 Act, plaintiffs need only allege that a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statement therein not misleading." 15 U.S.C. § 77k(a); *Herman & MacLean* v. *Huddleston*, 459 U.S. 375, 381 (1983). Section 12(a)(2) of the 1933 Act attaches liability to "[a]ny person who . . . offers or sells a security . . . by the use of any means or instruments . . . in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l (a)(2). For the following three reasons, defendants' challenges to plaintiffs' claims on these counts must fail.

#### 1. Named Plaintiffs Purportedly Lack Standing

Vivendi claims that none of the named plaintiffs received Vivendi shares pursuant to the allegedly fraudulent October 30, 2000 registration statement, *i.e.* Form F-4, but rather they obtained their shares pursuant to Form F-6, which plaintiffs do not allege to be false. According to plaintiffs, they purchased "Vivendi [American Depositary Shares] in exchange for Seagram stock as set forth in the [F-4] registration statement." Pl. Br. at 25-26. As background, an American Depository Share ("ADS") represents an ownership interest in a foreign deposited

- 11 -

**SA11**

security, much like a share of stock represents an ownership interest in a corporation, that has been deposited with a depository, such as a United States bank or trust company. SEC, *American Depository Receipts*, May 23, 1991, *available at* 1991 WL 294145, at *2. An American Depository Receipt ("ADR") is a physical certificate, akin to a stock certificate, that evidences ownership in one or multiple fractions of an ADS. *Id.* Although the SEC formally differentiates between ADSs and ADRs, participants in the ADR market generally consider the terms to be synonymous, and use the terms interchangeably. *Id.*; *Definition* (visited 8/20/03) <http://www.adr.com/research/about_def.html>. For convenience, the term ADS will be used to refer to either ADSs or ADRs here. ADSs may be traded in the United States in much the same way as equity securities issued by domestic companies. *Id.* at *5. Under the 1933 Act, ADSs and the underlying foreign deposited securities are "considered separate securities, each subject to the registration requirements unless an exemption is available." *Id.* at *10. Thus, when a foreign issuer seeks to make a public offering in the United States of securities in the form of ADSs, both the ADSs and the foreign deposited securities generally must be registered. *Id.* "In 1983, the [SEC] adopted Form F-6 specifically for the registration of ADSs under the Securities Act." *Id.*; *see also* American Depository Receipts, 48 Fed. Reg. 12346-02 (1983) (codified at 17 C.F.R. pts. 200, 230, 239, 240, and 249); 17 C.F.R. § 239.36. Form F-4 registers the foreign deposited securities. *See* 17 C.F.R. § 239.34; *see also American Depository Receipts*, 1991 WL 294145, at *10 n.47.

Here, Vivendi filed a Form F-4, in connection with the merger of Seagram, Vivendi, and Canal Plus into Vivendi Universal. The Form F-4 registered approximately 461 million ordinary shares, *i.e.,* foreign deposited securities, of Vivendi Universal, "represented by an equal number of Vivendi Universal ADSs." Pl. Exh. 2. Plaintiffs contend that Form F-6 "merely filed the Deposit Agreement with The Bank of New York, (which sets forth the terms by which the ADS is represented by ordinary shares or may be exchanged for ordinary shares)," and that Vivendi's argument rests on the faulty premise that Form F-6 "registered" the ADSs that the plaintiffs acquired. I disagree. Plaintiffs cite no authority to support its position that a foreign issuer may register its ADSs with Form F-4, and indeed, such argument appears to run afoul of the SEC's rules, which specifically established the Form F-6 to register ADSs. *See* American Depository Receipts, 48 Fed. Reg. 12346-02 (1983) (codified at 17 C.F.R. pts. 200, 230, 239, 240, and 249); 17 C.F.R. § 239.36. Consistent with the SEC's rules, Form F-4 filed by Vivendi

- 12 -

**SA12**

states that [t]his registration statement relates to the Vivendi Universal *ordinary shares*. . . . A separate registration statement on *Form F-6 will be filed in connection with the Vivendi Universal American Depository Shares.*" Pl. Exh. 2 (emphasis added).

A claim under § 11 may be maintained only by those who specifically received their shares pursuant to the defective registration statement pleaded in the complaint. *Fischman* v. *Raytheon Mfg. Co.*, 188 F.2d 783, 786 (2d Cir. 1951) (Section 11 claim "may be maintained only by one who comes within a narrow class of persons *i.e.* those who purchase securities that are the *direct* subject of the prospectus and registration statement.") (emphasis added)); *Euro Trade & Forfaiting, Inc.* v. *Vowell*, 2002 WL 500672, at *11 (S.D.N.Y. Mar. 29, 2002); *see also Lee* v. *Ernst & Young, LLP*, 294 F.3d 969, 976-77 (8th Cir. 2002) (holding that a cause of action exists under § 11 "so long as the security was indeed issued under *that* registration statement") (emphasis in original); *Joseph* v. *Q.T. Wiles*, 223 F.3d 1155, 1159 (10th Cir. 2000) ("[t]he buyer must have purchased a security issued under the registration statement at issue, rather than some other registration statement."). To the extent that plaintiffs bought Vivendi's ordinary shares pursuant to the allegedly defective Form F-4, *see* Compl. ¶¶ 1, 202, 213, 219, 222, they have standing to bring their § 11 and § 12(a)(2) claims. *See* 15 U.S.C. §§ 77k(a), 77l(a)(2). Further, plaintiffs who acquired their Vivendi ordinary shares after the merger between Vivendi, Seagram and Canal Plus may also have standing under § 11 provided the shares are traceable to the allegedly defective Form F-4. *See DeMaria* v. *Andersen*, 318 F.3d 170, 178 (2d Cir. 2003). Because plaintiffs do not allege defects in the F-6 form, however, and thus, purchasers who bought ADSs pursuant to the F-6 form cannot claim to have standing under § 11 or § 12(a)(2) as to those shares, *id.*, their §§ 11 and 12(a)(2) claims based on the purchase of ADSs are barred.

## 2. Pleading Under § 11 And § 12(a)(2) Are Too Vague To Be Cognizable

Defendants contend that plaintiffs' allegations that Vivendi's financial statements and balance sheets in the F-4 were false and misleading are insufficient because they do not indicate what statements were false, why they were false or to what extent they were false. Defendants cite to a handful of cases that are inapposite because they all relate to the pleading requirement for violations of § 10(b) and Rule 10b-5 under the 1934 Act, which must satisfy the higher pleading standard of Rule 9(b) and the PSLRA. *See, e.g., Decker* v. *Massey-Ferguson, Ltd.*, 681 F.2d 111, 115 (2d Cir. 1982); *Weinstein* v. *Applebaum*, 193 F. Supp. 2d 774, 778-79

- 13 -

(S.D.N.Y. 2002); *In re Health Mgm't Systems, Inc. Sec. Litig.*, 1998 WL 283286, at *2
(S.D.N.Y. June 1, 1998). The allegations deemed inadequate by defendants relate to the 1933
Act, which courts have long held does not have a heightened pleading requirement. *See, e.g., In
re IPO*, 241 F. Supp. 2d 281, 337-42 (S.D.N.Y. 2003); *In re In-Store Adver. Sec. Litig.*, 878 F.
Supp. 645, 650 (S.D.N.Y. 1995); *Nelson* v. *Paramount Communications, Inc.*, 872 F. Supp.
1242, 1246 (S.D.N.Y. 1994); *In re College Bound Consol. Litig.*, 1994 WL 172408, at *3
(S.D.N.Y. May 4, 1994); *In re Ann Taylor Stores Sec. Litig.*, 807 F. Supp. 990, 1003 (S.D.N.Y
1992). Because a "suit under § 11 [and § 12(a)(2)] of the 1933 Act requires no proof of fraud or
deceit," *Fischman* v. *Raytheon Mfg. Co.*, 188 F.2d at 786, the claims must merely meet the basic
pleading standard in Rule 8(a). *In re IPO*, 241 F. Supp. 2 at 338-39; *In re BankAmerica Corp.
Sec. Litig.*, 78 F. Supp. 2d 976, 987 (E.D. Mo. 1999). The allegations that Vivendi improperly
consolidated investments and reported inflated (and therefore misrepresented) revenues in the
October 2000 registration statement and prospectus satisfy the requirements of Rule 8(a) to plead
claims under §§ 11 and 12(a)(2). *See* Compl. ¶¶ 54, 148-180, 208-215.

> ### 3. Defects In Form F-4 Fail To Support Claims Under §§ 11 Or 12(a)(2)
> #### a. Plaintiffs' 1933 Act Claims Are Time Barred

Defendants contend that plaintiffs' 1933 Act claims rest on an alleged "key
clause" in the Cegetel shareholder agreement that was described in Vivendi's 2000 Form 20-F,
filed July 2, 2001. In defendants' opinion, plaintiffs were on inquiry notice at least from July 2,
2001, and the one-year statute of limitations should start to run from that date. Plaintiffs,
however, did not file their complaint until July 18, 2002. Further, defendants contend that once
plaintiffs were allegedly on inquiry notice that the Form 20-F contained one misstatement or
omission, they should be considered on inquiry notice for all claims based on that prospectus,
and that any such claim is now time-barred.

"[C]laims under Sections 11, 12, and 15 of the '33 Act are governed by the statute
of limitations contained in Section 13 of the '33 Act." *Dodds* v. *Cigna Sec., Inc.*, 12 F.3d 346,
349 (2d Cir. 1993) (citing 15 U.S.C. § 77m (1988)).[4] "Broadly speaking, the statutory periods

---

[4]     Section 77m states in pertinent part:
        No action shall be maintained to enforce any liability created under
        section 77k or 77l(a)(2) of this title unless brought within one year

for claims under either ... [the 1933 Act or the 1934 Act] begin to run when the claim accrued or upon discovery of the facts constituting the alleged fraud. Discovery, however, includes constructive and inquiry notice as well as actual notice." *Id.* at 350. The statute of limitations may be triggered "*when*, after obtaining inquiry notice ..., the [plaintiffs], in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." *Rothman* v. *Gregor*, 220 F.3d 81, 96 (2d Cir. 2000) (emphasis in original). "To trigger the underlying duty to inquire ... defendant[s] must establish that plaintiff[s] acquired information that suggested the *probability* and not mere *possibility* that fraud had occurred." *Lenz* v. *Associated Inns and Restaurants Co. of America*, 833 F. Supp. 362, 371 (S.D.N.Y. 1993) (citing *Armstrong* v. *McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983) (emphasis in original)).

The key clause that defendants reference, *see* Compl. ¶ 158, indicates that Vivendi's ability to access Cegetel assets could be blocked if three other minority shareholders dissented (BT, Mannesmann and Transtel). Although the key clause indicates an exception to Vivendi's authority to acquire material amounts of Cegetel's assets, it reveals nothing about whether Vivendi lacked the authority to consolidate Cegetel's revenue. Rather, according to the Form 20-F, Vivendi held the right to consolidate Cegetel's revenues by virtue of a shareholder agreement, which gave Vivendi a majority of the shareholder voting rights. Compl. ¶¶ 157-159. Plaintiffs allege that it was not until a 2002 conference call with investors that Jean-Rene Fourtou finally revealed to the public that the agreement gave Vivendi only limited control over Cegetel, and thus Vivendi could not actually consolidate Cegetel's cash flow. *Id.* ¶ 160. Defendants cite to nothing else, other than the somewhat uninformative clause in the Form 20-F, that would suggest plaintiffs should have been on constructive or actual notice that Vivendi did not wield the authority to access Cegetel's revenue. I find inadequate basis to conclude at this time that plaintiffs were on inquiry notice of their §§ 11 or 12(a)(2) claims on and after July 2, 2001, the release date of the Form 20-F. Defendants' motion to dismiss plaintiffs' claims under § 11 and § 12(a)(2) as time-barred is denied.

---

> after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.
>
> 15 U.S.C. § 77m (1988)).

- 15 -

**SA15**

### b. Vivendi's Lack of Actual Knowledge

Vivendi notes that plaintiffs assert that the Form F-4 was false and misleading because Vivendi had "failed to timely write down impaired goodwill from previous corporate investments and acquisitions, including U.S. Filter." Vivendi Mem. at 10; Compl. ¶ 55. Vivendi contends that all of the facts relied upon by plaintiffs to establish this allegation post-date the Form F-4 filing, and thus, Vivendi argues that plaintiffs cannot establish that Vivendi *knew* it had overstated its reported goodwill in violation of § 11 and § 12(a)(2). Vivendi's argument is without merit.

Actual knowledge is not an element of either § 11 or § 12 claims. As explained by the United States Supreme Court:

> [Section] 11 of the 1933 Act unambiguously creates a private action for damages when a registration statement includes untrue statements of material facts or fails to state material facts necessary to make the statements therein not misleading. Within the limits specified by § 11(e) [, which do not apply here], the issuer of the securities is held *absolutely liable* for any damages resulting from such misstatement or omission.

*Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 207-08 (1976); *see Herman & MacLean* v. *Huddleston*, 459 U.S. 375, 382 (1983) ("Liability against the issuer of a security is virtually absolute, even for innocent misstatements."); *In re IPO*, 241 F.Supp.2d at 396. Similarly, "[w]ith respect to . . . § 12(2) claim[s][5] . . . there need be no showing of knowing misrepresentation or reckless disregard of the truth. Section 12(2) imposes strict liability, subject to the reasonable-care defense. The resulting standard is one of negligence." *Columbia Sav. and Loan Ass'n* v. *American Intern*, 1994 WL 114828, at *4 (S.D.N.Y. Mar. 31, 1994) (quoting *Odette* v. *Shearson, Hammill & Co.*, 394 F. Supp. 946, 956 (S.D.N.Y. 1975)). Despite Vivendi's purported lack of knowledge prior to preparing the Form F-4, it may nonetheless be held absolutely liable for damages resulting from the misstatements therein. The fact that plaintiff relies on evidence that post-date the Form F-4 does not vitiate the false or misleading nature of the registration statement. Defendants' motion to dismiss the § 11 and § 12(a)(2) claims, for

---

[5]     Section 12(a)(2) was known prior to the 1995 PSLRA amendments as Section 12(2). *In re WorldCom, Inc. Securities Litigation*, 2003 WL 21219049, at *12 (S.D.N.Y. May 19, 2003).

- 16 -

failure to allege facts showing Vivendi knew of the allegedly false and misleading statements at or before the time they were made, is denied.

**E. Claims Under § 10(b) and Rule 10b-5**

In count V, plaintiffs allege that the earnings reported by Vivendi during the class period were false, in violation of § 10(b) and Rule 10b-5. To state a cause of action under § 10(b)[6] and Rule 10b-5[7], plaintiffs must allege that "defendant[s], in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff[s'] reliance on defendant[s'] action caused injury to the plaintiff[s]." *Lawrence* v. *Cohn*, 325 F.3d 141, 147 (2d Cir. 2003) (quoting *Ganino*, 228 F.3d at 161). Section

---

[6]     Section 10(b) provides, in pertinent part, that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
                          * * *
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

[7]     Rule 10b-5, the counterpart to § 10(b), describes what constitutes a manipulative or deceptive device and provides that it is unlawful for any person, directly or indirectly:

(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5; *see also Press* v. *Chem. Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999).

- 17 -

**SA17**

10(b) claims sound in fraud, and must satisfy the pleading requirements of Rule 9(b) and the PSLRA. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69-70 (2d Cir. 2001).

### 1. Timely Recordation Of Goodwill Impairment

Defendants contend that plaintiffs "have failed to plead any facts that would support an inference that Vivendi should have determined prior to January 2002" that a recorded impairment under Statements of Financial Accounting Standards ("SFAS") No. 121 should have been made. Vivendi Mem. at 13. According to Vivendi, impairment needs to be reported only when "the sum of the undiscounted future cash flows estimated to be generated from the use and ultimate disposal of the assets [is] less than the net carrying value of those assets." *Id.*

Plaintiffs contend that they have alleged numerous facts in the complaint to demonstrate that the cash flow from Canal Plus was impaired and should have been reported before the end of 2001. Namely, Canal Plus had filed a lawsuit in 1999 against another company for the piracy of its technology in the United States, allegedly giving rise to damages in excess of $1 billion. Compl. ¶¶ 134-36. In addition, Vivendi's new management, after Messier and Hannezo resigned, recorded an additional €3.8 billion impairment for Canal Plus, at the end of the first half of 2002, when under French GAAP, Canal Plus revenue grew by 8%. *Id.* ¶ 141. Plaintiffs allege that the additional impairments, in view of the revenue growth and lack of explanation from Vivendi for the added impairments, evidence the fact that Canal Plus's impairment should have been recorded earlier. *Id.* Furthermore, plaintiffs note that Vivendi prepared a memo shortly after it acquired Canal Plus, detailing that marketing rights to soccer contracts at Canal Plus were not bona fide assets, as originally believed, because they belonged to the football league, and thus they should be written off in Vivendi's year-end statement for the 2000 fiscal year. *Id.* ¶¶ 142-145. Vivendi failed, however, to write off that contract as a mistaken asset in its year-end financial statement. *Id.* ¶ 145. As to U.S. Filter, the complaint alleges that its reported goodwill was inflated, as evidenced by, among other things: (1) U.S. Filter's actual operating results were much less than reported because Vivendi improperly recognized revenue from U.S. Filter, contrary to U.S. GAAP rules, *id.* ¶¶ 146, 169-177, *see also infra* Part IV.E(3), and (2) companies comparable to U.S. Filter that sold during the class period held price-to-earning ratios that were much lower in comparison to the U.S. Filter shares purchased by Vivendi, *id.* ¶ 146. In addition, Vivendi's new management, after Messier and

- 18 -

Hannezo resigned, reported an additional goodwill impairment of €7.2 billion on a French GAAP basis for other entities. *Id.* ¶ 147. In contrast, in the prior quarter, while under former management, Vivendi reported no charge for goodwill impairment. Plaintiffs construe the sizable reported goodwill impairments in the subsequent quarter as an indication that the goodwill impairments recorded by the prior management during the class period was clearly insufficient. *Id.* I find that the facts alleged, which I must presume to be true, support a reasonable belief that the undiscounted future cash flows of Canal Plus, U.S. Filter and other entities, were less than the carrying value of those assets, *see, e.g.,* Compl. ¶¶ 134-36, 141, 145-47, 169-77, and hence their impairments of goodwill should have been reported, but were not. In view of the large impairments taken immediately after the departure of key figures in Vivendi's management, a reasonable inference can be drawn that Vivendi had reasonable grounds to believe the impairments had to be reported and that former management concluded not to do so. *See Novak,* 216 F.3d at 314 n.1.

### 2.    Improper Consolidation Of Maroc Telecom And Cegetel Revenues

Plaintiffs claim that Vivendi had improperly consolidated the financial revenues of Maroc Telecom and Cegetel into its own financial results, Compl. ¶¶ 148-168, and that Vivendi's reported revenues were overstated by an aggregate of €3.9 billion, €5.1 billion and €7.8 billion for 1999, 2000 and 2001, respectively. *Id.* ¶¶ 162, 168. Vivendi contends that it controlled a majority of the shareholder voting rights in Cegetel and Maroc Telecom. Thus, according to Vivendi, it held "exclusive control" over Cegetel and Maroc Telecom under Article L.233-16 of the French Code de commerce, and it "was therefore required to consolidate pursuant to paragraph 1000 of the Appendix to Regulation 99-02 of the French Comité de la Réglementation Comptable ("CRC"). *See* Slifkin Decl. Exh. 8.

Although Vivendi may have had the ability to control a majority of the voting rights, the CEO of Vivendi, Jean-Rene Fourtou, admitted that it did not *own* a majority of the shares of either Cegetel or Maroc, and that it could not access the cash flow from those companies, despite the shareholder voting agreement. Compl. ¶¶ 160, 167. Paragraph 101 of the CRC provides that "[a] company under control or significant influence shall be *excluded from consolidation* if: . . . severe and long-lasting restrictions substantially call into question . . . the possibilities of transfers of financial resources between said company and the other companies

- 19 -

**SA19**

included in the scope of consolidation." Slifkin Decl. Exh. 8 (emphasis added). In view of the exclusion provision of paragraph 101 under the CRC, I disagree with Vivendi that its inability to access the cash flow of Cegetel and Maroc Telecom is inconsequential when it comes to consolidated earnings. Contrary to Vivendi's claim, it would appear, given Fourtou's admission that certain restrictions prevented Vivendi from accessing Cegetel's and Maroc Telecom's cash flow, that under French GAAP, the restrictions arguably place the companies outside the scope of the mandatory consolidation.

Defendants further argue that reconciliation with U.S. GAAP requires that the parent company consolidate enterprises in which it has a controlling financial interest, as represented by a majority voting interest. Vivendi Mem. at 17 (citing SFAS No. 94 ¶ 13 (Slifkin Decl. Exh. 9)). Vivendi notes that the Emerging Issues Task Force (EITF) of the Financial Accounting Standards Board ("FASB") also states that the minority shareholders' ability to block "dispositions of assets greater than 20% of the fair value of the investee's total assets" does not overcome the presumption of consolidation by the majority holder of the shareholder voting interest. *See* Slifkin Decl. Exh. 10 at 4. Whether the rights of a minority shareholder may overcome the presumption of consolidation by the shareholder with a majority voting interest in a company is fact specific, *id.* at 3, and must be decided on a case-by-case basis from the totality of the circumstances. As further noted by the EITF, the rights granted the minority shareholders "may be so restrictive [on the majority shareholders] as to call into question whether control rests with the majority owner." *Id.* at 1. The facts and circumstances that may rebut the presumption of consolidation "should be based on whether the minority rights, individually or in the aggregate, provide for the minority shareholder to ***effectively participate*** in significant decisions that would be expected to be made in the 'ordinary course of business.'" *Id.* at 3 (emphasis added). If a minority shareholder holds "substantive participating rights," then the presumption that the majority shareholder should consolidate the investee's balance sheets is rebutted. *Id.* at 4.

In regards to earnings of a corporation jointly held by majority and minority shareholders, "[t]he rights of the minority shareholder relating to dividends or other distributions may be protective, or participating and should be assessed in light of the available facts and circumstances." *Id.* at 7, ¶ 3. A minority shareholder's right to block customary or expected dividends or other distributions may represent an example of the minority shareholder's substantive participating right. *Id.* Factors that should be weighed in this determination include:

- 20 -

the relative ownership share of the minority shareholders, corporate governance arrangements, relationship between the majority and minority shareholders, and likelihood of the event or transaction that requires minority approval. *Id.* at 5-6.

Thus far, Vivendi has not publicly disclosed the terms of the shareholders agreement. As noted above, Fourtou admitted that during the class period, Vivendi did not have access to either Cegetel's or Maroc Telecom's cash flows. Compl. ¶¶ 160, 167. Given the limited information available at this pre-discovery stage, and the fact-intensive inquiry required to resolve whether the minority interests in Cegetel and Maroc Telecom constitutes sufficient "substantive participating rights" to make consolidation improper under SFAS 94 and EITF 96-16, I am unconvinced that facts could not be proven to demonstrate that Vivendi's consolidation of those companies' revenues were improper under U.S. GAAP, which may give rise to liability under § 10(b) and Rule 10b-5.[8] Drawing all reasonable inferences in favor of plaintiffs, the complaint alleges sufficient facts to show that Vivendi overstated its revenues, in reliance on revenue streams from companies that it had no right to tap.

Lastly, defendants claim that even if consolidation of the subsidiaries were improper, it had no material effect on Vivendi's net income and shareholder equity. Defendants ignore the fact that the reported *€17 billion* in additional revenue impacted other material financial metrics that investors commonly rely on, such as revenue growth and EBITDA. These metrics demonstrate that the overstated revenue may constitute a misrepresented material fact that can support claims under § 10(b) and Rule 10b-5. Accordingly, Vivendi's motion to dismiss

---

[8] Citing *Chill* v. *General Elec. Co.*, 101 F.3d 263 (2d Cir. 1996), Vivendi contends that even if it did not comply with U.S. GAAP, this in and of itself is not sufficient to create § 10(b) liability. Vivendi is mistaken. "[A]llegations of GAAP violations or accounting irregularities ... [when] coupled with evidence of 'corresponding fraudulent intent' ... [are] sufficient." *Novak*, 216 F.3d at 309 (quoting *Chill*, 101 F.3d at 270); *see also Decker* v. *Massey-Ferguson, Ltd.*, 681 F.2d 111, 120-21 (2d Cir. 1982); 17 C.F.R. § 210.4-01(a)(1)("Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided."). Here, "[p]laintiffs have adequately alleged that ... [d]efendants either had actual knowledge of or ready access to facts that contradicted their ... statements" *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 631 (S.D.N.Y. 2003); *see* Compl. ¶¶ 134-38, 142-45, 157-68. Furthermore, plaintiffs have sufficiently alleged facts from which one may reasonably infer that defendants knew or should have known of the accounting impropriety. *See* Compl. ¶¶ 134-36, 141, 145-47, 169-77; *see also infra* Part IV.E(6).

- 21 -

these claims, on the basis that it properly consolidated Cegetel's and Maroc Telecom's revenue or that there have been no misrepresentations of material fact, is denied.

### 3. Improper Recognition Of Revenue From U.S. Filter

Vivendi argues that plaintiffs do not plead sufficient facts to demonstrate the impropriety in its recognition of revenue from U.S. Filter.[9] Accordingly, Vivendi contends that plaintiffs cannot rely upon the revenues recognized by Vivendi from U.S. Filter to demonstrate the falsity of Vivendi's financial statements during the class period. Vivendi contends that such allegations are based on plaintiffs' misunderstanding of "booking to backlog"—a practice that Vivendi asserts is an accepted practice of managerial record-keeping.[10] Vivendi further asserts that plaintiffs' allegation that the reported revenue from Vivendi's Environmental Services division was overstated "by as much as 10 times" due to U.S. Filter's improper accounting is mathematically impossible.

Plaintiffs contend that Vivendi violated U.S. GAAP because it "recognized and reported the entire dollar amount of long-term, fixed priced contracts as revenue upon the signing of the contract," resulting "in improperly recognized anticipated revenue from multi-year public service contracts" and yielding materially overstated operating results during the class period. Compl. ¶ 173-174. Although defendants disagree with plaintiffs' characterization, defendants do not dispute this description of how Vivendi recognized revenue from U.S. Filter. Moreover, plaintiffs contend, and defendants do not dispute, that "U.S. GAAP provides that revenue *should not be recognized* until it is realized or realizable and earned." Compl. ¶ 170 (citing FASB Concepts Statement No. 5, ¶ 83) (emphasis added). In addition, the SEC, FASB, and other accounting advisory sources advise that until services have been rendered, revenues for those services should not be recognized. *Id.* (citing SEC Staff Accounting Bulletin ("SAB") No. 101 (The SEC staff "believes that up-front fees, even if non-refundable, are earned as the products and/or services are delivered and /or performed over the term of the arrangement or the

---

[9]     U.S. Filter is a subsidiary of Vivendi Environmental, which in turn, was a subsidiary of Vivendi during the class period.

[10]     "Backlog" is the "value of unfilled orders placed with a manufacturing company. Whether the firm's backlog is rising or falling is a clue to its future sales and earnings." *Barron's Dictionary of Finance and Investment Terms* 37 (4th ed. 1995).

- 22 -

expected period of performance."); FASB Concept Statement Nos. 2 and 5; Accounting Research Bulletin No. 43, Accounting Principles Board Opinion No. 10. The opinions expressed by the various accounting sources incorporated by reference in the complaint suffice to show that the revenues from U.S. Filter were recognized prematurely. Accordingly, I agree that plaintiffs have pled enough to provide a reasonable basis to infer that Vivendi indeed materially overstated its revenue, in part, through improperly recognizing revenue from U.S. Filter.[11]

### 4. "Growing liquidity crisis"

Vivendi contends that plaintiffs do not allege sufficient facts to show that it failed to disclose adequate evidence of its "growing liquidity crisis." Vivendi asserts that it timely disclosed (1) its impairments to goodwill relating to its prior acquisitions and in accordance with French and U.S. GAAP; (2) its stock repurchase program in 2001 pursuant to French regulations; and (3) the put options sold in 2000 and 2001. Accordingly, Vivendi argues plaintiffs were aware or should have been aware of the purported liquidity crisis. Further, Vivendi asserts that plaintiffs' allegations are insufficient to show that Vivendi was aware of the problem at the times it attested to its alleged financial health.

I find the complaint adequately alleges facts from which I may infer that Vivendi had a liquidity problem, of which it was aware during the class period. For instance, the complaint notes that in December 6, 2001, Messier assured investors that "Vivendi Universal is in a very strong position, with solid performance in virtually every business." Compl. ¶ 8. According to the complaint, Messier further announced that with the sales of Vivendi's $1.5 billion interest in British Sky Broadcasting Plc and $1.06 billion interest in Vivendi

---

[11]     Plaintiffs allege that Vivendi Environmental's revenue was overstated by "as much as ten times" as a result of improper revenue recognition from its subsidiary, U.S. Filter. Defendants note for that allegation to be true, U.S. Filter's revenue would have to amount to about €23.8 billion. U.S. Filter, however, earned only a reported €1.32 billion in 2000. Plaintiffs concede that this was a misstatement on their part and represent that they meant to say that revenue from U.S. Filter, rather than Vivendi Environnement, was overstated by as much as ten times. It appears that plaintiffs' misstatement was a consequence of clerical error. Even if I disregarded plaintiffs' allegations concerning the magnitude of the overstatement, enough factual allegations have been pled to convince me that U.S. Filter's revenue may have been improperly recognized, resulting in inflated reported earnings by Vivendi. I will grant plaintiffs leave to amend their allegation in paragraph 174 of their complaint.

Environnement, Vivendi would have "room to maneuver" for additional acquisitions. *Id.*
Contrary to the rosy picture painted by Messier, Hannezo, a long time friend of Messier and
Vivendi's CFO, allegedly sent a desperate handwritten plea to Messier a week later, stating:
"I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that
I'm in the death seat. . . . All I ask is that all of this not end in shame." *Id.* ¶¶ 9, 184. According
to an investigative report by the Wall Street Journal, entitled, "How Messier Kept Cash Crises at
Vivendi Hidden; Media Giant Was At Risk Well Before Investors Knew," Vivendi,
unbeknownst to investors and Vivendi's board, had "narrowly averted" a downgrade by credit-
rating agencies in December 2001, which would have made it difficult to borrow money and
would have "plunged the company into a cash crisis." *Id.* In the wake of the narrowly averted
downgrade, Hannezo sent his handwritten plea to Messier the same day and "implored [Messier]
to take serious steps to reduce Vivendi's ballooning debt." *Id.* The following day, Messier,
according to two directors who attended the board meeting, "made no mention of the close call
with the rating agencies," and reported that the "company had no problem." *Id.* Accordingly, the
board approved the $10 billion acquisition of USA Networks, unaware that "Vivendi was already
in dire financial straits." *Id.*

   The complaint further alleges that in the first half of 2002, defendants continued
to deny that Vivendi had any liquidity problems. *See id.* ¶ 83 (assuring employees of Vivendi
that "[t]here are no hidden risks" to warrant issue of a profit warning); ¶ 103 (stating that "the
Company has *no reason* to anticipate or fear any further deterioration in its credit rating); ¶ 106
(reporting to investors in June 2002 that "the company has no hidden, off-balance sheet
liabilities," and adding "We feel very confident looking to our debt and cash analysis with all our
commitments of the group for the coming 12 months."). On June 24, 2002, Goldman Sachs
issued a report to Vivendi's top executives and a handful of directors that indicated Vivendi
could face bankruptcy as early as September or October of that year. *Id.* ¶ 186. Reportedly, a
director who attended the meeting with Goldman Sachs advised Messier that he should resign,
"as it was now clear Vivendi faced a severe cash crisis." *Id.* In contrast to the grim prediction by
Goldman Sachs, Messier reported to the Commission des Operations de Bourse ("COB") two
days later, on June 26, 2002, that "Vivendi Universal is confident of its capacity to meet its
anticipated obligations over the next 12 months." *Id.* Contrary to Messier's representation to the
public and public agencies, Jean-Rene Fourtou, Vivendi's new CEO after Messier resigned in

July 2002, stated that when he took over, "if Mr. Messier had stayed, the company would have gone bankrupt within 10 days." *Id.* The December 2001 handwritten note, the report from Goldman Sachs and investigative reports from other news sources, provide sufficient basis to support a reasonable belief that Vivendi had an existing liquidity problem, of which defendants were aware, during 2001 and 2002.

Defendants complain that the numerous news articles reported after the end of the class period cannot establish the fact that Vivendi was aware of its liquidity problems at the time it made the statements at issue, and that plaintiffs seek to prove fraud by hindsight. The Second Circuit has explicitly recognized that plaintiffs may "rel[y] on post-class period data to confirm what a defendant should have known during the class period." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 72 (citing *Rothman*, 220 F.3d at 92; *Novak*, 216 F.3d at 312-13). Defendants provide nothing to impugn the veracity of these post-dated news articles. To accept defendants' reasoning, I should reward them for their successful concealment of their wrongdoing, which for the most part did not come to light until those in control of Vivendi resigned and lost the ability to further conceal the true extent of Vivendi's financial woes. I decline to adopt defendants' reasoning. Defendants further complain that they disclosed sufficient information to allow investors to understand the extent of Vivendi's liquidity problems and true financial condition. Vivendi's purported "truth on the market" defense is "intensely fact-specific" and "rarely an appropriate basis for [dismissal]." *Ganino* v. *Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000). The "truth on the market" defense requires defendants to show that the "corrective information [was] conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements." *Id.* (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)). Defendants certainly cannot meet that burden at this stage of the litigation. *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 482-83 (S.D.N.Y. 1993) ("defendants' burden [of establishing the truth on the market defense is] extremely difficult, perhaps impossible, to meet at the summary judgment stage."). Moreover, defendants' claim that the market knew or should have known of Vivendi's liquidity crisis is belied by the precipitous drop in debt ratings and securities prices that followed immediately after Messier and Hannezo stepped down, and information of Vivendi's actual financial condition started to emerge. *See id.* ¶¶ 109, 115, 184. Indeed, as discussed above, plaintiffs have pled sufficient facts to show that Vivendi appears to have not fully disclosed

- 25 -

impairments to goodwill in accordance with U.S. and French GAAP and moreover, reported inflated cash flow by improperly recognizing revenues from Cegetel, Maroc Telecom, and U.S. Filter. Plaintiffs have alleged sufficient facts, as reviewed above in brief, to provide a reasonable belief that defendants knew that its statements regarding Vivendi's financial health and liquidity were false, and that Vivendi did indeed have a liquidity problem.

### 5. False and Misleading Nature of Vivendi's Other Public Statements
#### a. Inactionable puffery

Vivendi argues that many of the statements alleged to be false either are so vague that they could not mislead a reasonable investor or are merely opinions and, hence, "soft information," which are inactionable as a matter of law. *See* Compl. ¶¶ 57-62, 67-69, 73-75, 79-81, 83, 85, 87-90, 94-96, 100, 103-106. Contrary to defendants' beliefs, they cannot escape liability merely because the opinions "on which liability [is] predicated did not express a reason in dollars and cents, but focused instead on . . . "indefinite and unverifiable" term[s]." *Virginia Bankshares, Inc.* v. *Sandberg*, 501 U.S. 1083, 1093 (1991). "The objection ignores the fact that such conclusory terms in a commercial context [may be] reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Id.* Indeed, "[s]tatements regarding projections of future performance may be actionable ... if they are worded as guarantees or are supported by specific statements of fact, ... *or* if the speaker does not genuinely or reasonably believe them" at the time they were made. *In re IBM*, 163 F.3d at 107 (emphasis added); *Faulkner* v. *Verizon Communications, Inc.*, 156 F. Supp. 2d 384, 398 (S.D.N.Y. 2001); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999). Moreover, "defendants may be liable for misrepresentations of existing facts" if they knew of the falsity of such statements at the time of making them. *Novak*, 216 F.3d at 315. Whether the opinion or "soft information" is indeed actionable "depends on all relevant circumstances of the particular case," *Ganino*, 228 F.3d at 162, and is generally not an appropriate basis on which to dismiss a complaint at this stage of the action. In view of allegations that defendants, such as Messier, continued to represent to the public that Vivendi was financially solid, despite being aware of the financial precipice on which it stood when its debt rating was almost downgraded, Compl. ¶ 184, and the possibility that it would need to declare bankruptcy soon, *id.* ¶ 186, plaintiffs have alleged sufficient facts to show defendants

- 26 -

**SA26**

could not have reasonably believed the statements made to the public. Plaintiffs have plead sufficient facts to show, at this stage, that defendants' statements, which defendants characterize as puffery, are indeed actionable.

### b. Forward-looking statements.

Vivendi contends that many of the alleged statements are forward-looking, and thus, they are inactionable, pursuant to the PSLRA "safe harbor" provision. The PSLRA safe harbor provision has two prongs.

> The first prong provides in relevant part that a securities fraud defendant: "shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."

*Fellman* v. *Electro Optical Sys. Corp.*, 2000 WL 489713, at *4 (S.D.N.Y. Apr. 25, 2000) (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i)). By definition, the safe-harbor provision applies to protect only "forward-looking" statements, and not to misrepresentations of historical or current facts. *In re Oxford*, 187 F.R.D. at 141; *In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001). "[L]inking future success to present and past performance does not render statements immune from liability." *In re APAC Teleservices, Inc.*, 1999 WL 1052004, at *8.

Vivendi contends that paragraphs 58, 61, 80, 85, 88, 89, 94, 95, 100, 103, and 104 in the complaint, for instance, may not serve as an actionable basis for liability under the PSLRA because (1) the paragraphs cite to forward-looking statements, and (2) the paragraphs cite to language that is accompanied by meaningful cautionary statements. The paragraphs cited include Vivendi's announcements of allegedly false financial results from prior quarters or purported opinion as to its cash situation, which are not subject to the safe harbor provision. Although the announcements often further include forward-looking statements and a generic warning that "actual results may differ," the "safe harbor provision . . . requires that defendants identify 'important factors that could cause actual results to differ materially from those in the forward-looking statements.'" *Helwig* v. *Vencor, Inc.*, 251 F.3d 540, 558 (6th Cir. 2001) (citing 15 U.S.C. § 78u-5(c)(1)(A)(i)). "[T]he legislative history makes clear that [such] 'boilerplate

- 27 -

**SA27**

warnings will not suffice. . . .The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements.'" *Id.* 558-59 (quoting H.R. Conf. Rep. No. 104-369, at 43 (1995), U.S. Code Cong. & Admin. News at 742). The generic warning that "actual results may differ," which Vivendi included with its announcement, does not come close to the "cautionary language [needed] to render reliance on the misrepresentation unreasonable." *Steinberg* v. *PRT Group, Inc.*, 88 F. Supp. 2d 294, 301 (S.D.N.Y. 2000). Thus, to the extent the announcements contain forward-looking statements, the cautionary statements do not suffice to place them within the ambit of the safe-harbor provision in the PSLRA.

### c. Statements From Defendants Published By Reporters And An Analyst

Vivendi contends that plaintiffs have failed to plead the necessary facts that would allow them to hold defendants liable for statements reported by six reporters and one analyst. *See* Compl. ¶¶ 59, 79, 83, 87, 106, 109. The challenged paragraphs, in actuality, report ***direct quotes*** and statements made by Messier. Defendants provide no reason why I should believe that the reported quotes and statements were wrongly attributed. It defies common sense to argue that defendants may not be held accountable for their quotes and statements, solely because they were published by a third party. I agree that defendants may be held liable for the statements made to and subsequently published by reporters and analysts that are pled in the complaint.

### d. Failure to plead with particularity under Rule 9(b) and PSLRA

Defendants contend that plaintiffs' § 10(b) allegations were not pled with sufficient particularity under Rule 9(b) and the PSLRA. Rule 9(b) requires that "the circumstances constituting . . . fraud be stated with particularity." Fed. R. Civ. P. 9(b). The particularity requirement of the PSLRA is largely the same as Rule 9(b), except when "plaintiffs allege, on information and belief, that defendants made material misstatements or omissions," in which case, "the complaint must 'state with particularity all facts on which that belief is formed.'" *Novak*, 216 F.3d at 312; *see also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999) (noting that § 78u-4(b)(1) "echoes precisely Fed. R. Civ. P. 9(b)"). Here, to satisfy Rule 9(b) and § 78u-4(b)(1) of the PSLRA, plaintiffs must "specify the statements that . . . were fraudulent, identify the speaker, state where and when the statements were made, and

- 28 -

**SA28**

explain why the statements were fraudulent." *Novak*, 216 F.3d at 306. Section 78u-4(b)(1) requires that "the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Id.* at 314 n.1; *see also See In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 72 (even under Rule 9(b) and the PSLRA, "we do not require the pleading of detailed evidentiary matter in securities litigation.").

   Defendants, for the most part, do not dispute that plaintiffs adequately allege what statements were fraudulent, who made the statements, and the circumstances under which the statements were made. Vivendi Mem. at 25. Rather, defendants attack principally the adequacy of plaintiffs' explanation in their pleading of how defendants' statements were false and misleading. *Id.* Contrary to defendants' argument, I find, as discussed above at length, that plaintiffs adequately allege how defendants' improper accounting practices translated into false and misleading financial statements. *See supra*, Part IV.E(1)-(4). Section 78u-4(b)(2) of the PSLRA further requires that plaintiffs plead with particularity facts giving rise to a "strong inference" that defendants acted with scienter. As discussed below, defendants' argument that scienter has not been adequately pled is also without merit.

### 6. Scienter

   To adequately plead scienter, plaintiffs must allege facts to support a strong inference of "an intent to deceive, manipulate, or defraud." *Ernst & Ernst*, 425 U.S. at 193 n.12; *see Kalnit* v. *Eichler*, 264 F.3d 131, 138 (2d Cir. 2001); 15 U.S.C. § 78u-4(b)(2). "Such intent can be established 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Ganino*, 228 F.3d at 168-69 (quoting *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

#### a. "Motive and Opportunity"

   Vivendi contends that plaintiffs' allegations of motive based on (1) the desire to maintain positive credit ratings, (2) the desire to inflate share prices in order to acquire other companies, (3) the use of put options sold to banks, and (4) executive compensation are all

inadequate.[12] "Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Kalnit*, 264 F.3d at 139 (internal quotations and citations omitted). Here, plaintiffs allege that defendants were motivated to commit fraud so they could acquire and continue acquiring companies, including USA Networks , MP3.com and Multithematicques, by using its artificially inflated stock and ADSs as currency. Comp. ¶ 191. Scienter may be imputed, as is the case here, to defendants when defendants' were motivated to inflate company stock prices as a means to effectuate a specific acquisition that would not otherwise be possible without fraudulently inflating stock prices. *See, e.g., Rothman*, 220 F.3d at 93-94; *Burstyn* v. *Worldwide Xceed Group, Inc.*, 2002 WL 31191741, at *5 (S.D.N.Y. Sept. 30, 2002). Furthermore, Messier was given a "concrete and personal benefit" in the form of a bonus worth more than $3 million, amounting to two and half times his normal salary, for boosting Vivendi's EBITDA by more than 30% in 2001. *Id.* ¶ 193. He therefore had an even greater motive for inflating the appearance of Vivendi's financial performance, from which he derived a specific "concrete benefit by virtue of the false statements and wrongful nondisclosures alleged." *Novak*, 216 F.3d at 307 (quoting *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)). Accordingly, such allegations support a basis sufficient to infer Vivendi, Messier, and Hannezo had one or more motives to promulgate the alleged falsehoods in regard to Vivendi's financial state.

### b. "Conscious misbehavior and recklessness."

Alternatively, Vivendi contends that plaintiffs failed to allege with the requisite particularity facts that evidence defendants' knowledge or recklessness as to the purported fraudulent statements, including (1) the alleged Canal Plus overstatement, (2) the alleged improper inflation of U.S. Filter goodwill, (3) the alleged improper consolidation of revenue from Cegetel and Maroc Telecom, and (4) the alleged liquidity crisis.

Pleading "conscious misbehavior or recklessness" requires plaintiffs to provide factual allegations that support a strong inference that defendants knew, or had a reasonable basis to know, or recklessly disregarded, that the allegedly fraudulent statements were untrue when made. *See Novak*, 216 F.3d at 311; *Cosmas* v. *Hassett*, 886 F.2d 8, 13 (2d Cir. 1989). Here,

---

[12]    Vivendi does not dispute opportunity.

- 30 -

plaintiffs allege that Vivendi narrowly averted a downgrade of its credit in December 2001, which would have plunged it into a cash crisis and made it difficult to borrow additional money for further acquisitions. Compl. ¶ 184. In the wake of the narrowly averted downgrade, Hannezo allegedly sent the now famous or infamous handwritten plea to Messier. *Id.* ¶¶ 9, 184. Messier's fraudulent intent or reckless disregard may be inferred from his alleged failure to mention the narrowly averted disaster when he was urging the board of directors to approve the $10 billion acquisition of USA Network's TV and film business two days later. *Id.* In addition to concealing the narrowly averted downgrade, Messier purportedly attempted to conceal from investors, the board, and even Hannezo, his $6.3 billion stock buy-back to bolster Vivendi's share price. As for Hannezo, he knew, for instance, from a January 29, 2001 memo, which was prepared shortly after Vivendi acquired Canal Plus, that the football marketing rights, originally believed to be an asset of Canal Plus, belonged in fact to the football league. *Id.* ¶ 143. Plaintiffs allege that Hannezo knew or should have known, but recklessly disregarded, the fact that Vivendi took no impairment charge in fiscal year 2001, resulting in Vivendi overstating the value of its subsidiary. *Id.* ¶¶ 133, 139, 144-45. Additionally, Hannezo allegedly became aware that the stock buy back program, which Messier instigated, was a "waste of cash" and that it had taken such a toll on Vivendi's cash flow that "Vivendi was running out of cash," according to a memo prepared by Hannezo. *Id.* ¶ 184(b). In the face of these problems, Hannezo, as Vivendi's CFO, continued to prepare and sign financial statements, which overstated Vivendi's financials, Compl. ¶¶ 54, 62, 66, 102, and advanced the fraud on the plaintiffs by remaining silent about the fraudulent nature of the statements and press releases issued by Vivendi or his "close collaborator," Messier. Drawing all inferences in favor of plaintiffs, these allegations suffice to establish strong circumstantial evidence that "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation . . . [or] failed to review or check information that they had a duty to monitor." *Novak*, 216 F.3d at 308.

### F. Claim Under § 12(a)(2) Against Messier And Hannezo

Messier contends plaintiffs have not adequately pled facts to show that he is a statutory "seller" under § 12(a)(2) of the 1933 Act. More specifically, Messier contends that plaintiffs' claim must fail because they have not pled that he "personally" solicited the securities purchased by plaintiffs, as allegedly required by the United States Supreme Court in *Pinter* v.

- 31 -

*Dahl*, 486 U.S. 622 (1988). The *Pinter* Court defined a "seller" for purposes of § 12(a)(1) to be the person who (1) passes title to the plaintiff, or (2) solicits such security purchases for his financial gain. *Id* at 642, 647. The Second Circuit extended *Pinter*'s definition of "seller" to claims arising under § 12(a)(2) of the Securities Act. *Capri* v. *Murphy*, 856 F.2d 473, 478 (2d Cir. 1988). Since *Capri*, it has become well settled in this Circuit that the seller need not have "personal" contact with the purchaser, contrary to Messier's argument, to be held liable under § 12(a)(2). *See Wilson* v. *Saintine Exploration and Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir. 1989) (holding that "[p]ersons who are not in privity with the plaintiff ... [are] statutory sellers within the meaning of *Pinter* if *they solicited the sales in question for a financial gain*") (emphasis added)); *Dorchester Investors* v. *Peak Trends Trust*, 2003 WL 223466, at *2 (S.D.N.Y. Feb. 3, 2003); *In re Opus360 Corp. Sec. Litig.*, 2002 WL 31190157, at *10 (S.D.N.Y. Oct. 2, 2002); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001); *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 761-62 (S.D.N.Y. 2001); *Griffin* v. *Painewebber, Inc.*, 2001 WL 740764, at *3 (S.D.N.Y. June 29, 2001); *In re APAC Teleservices, Inc. Sec. Litig.*, 1999 WL 1052004, at *11 (S.D.N.Y. Nov. 19, 1999); *Degulis* v. *LXR Biotechnology, Inc .*, 928 F. Supp. 1301, 1315 (S.D.N.Y. 1996).

Against the prevailing weight of authority, Messier relies upon *In re Gas Reclamation, Inc. Sec. Litig.*, 733 F. Supp. 713, 724 (S.D.N.Y. 1990), to show that plaintiffs' claim must still be dismissed. *Gas Reclamation*, however, is inapposite to the case-at-bar. Unlike here, the defendant's efforts in *Gas Reclamation* were largely collateral, assisting those more directly involved with solicitation. *Id.* at 723; *see also Pinter*, 486 U.S. at 650 n.26 (rejecting liability to collateral participants). Given the scarcity of evidence in regard to defendant's direct solicitation activities, the court in *Gas Reclamation* determined that no reasonable juror could find for plaintiffs on their § 12(a)(2) claim, and granted the defendant summary judgment on that claim. *Id.* at 724.

Here, plaintiffs do not simply plead that Messier signed the registration statement, which in itself is particularly "significant for purposes of finding that a [person] is a seller," *In re Opus360*, 2002 WL 31190157, at *10; *see also Degulis*, 928 F. Supp. at 1315. ("signing the registration statement . . . [is] a sufficient allegation to permit Plaintiffs to [withstand a motion to dismiss]")(citing *Capri* v. *Murphy,* 856 F.2d at 478)), but they further plead a number of other facts to show the steps taken personally by Messier to solicit the purchase of Vivendi securities

- 32 -

**SA32**

and to increase the share price of those securities. Namely, the complaint alleges that Messier actively participated in the preparation of the allegedly misleading or false registration statement, Compl. ¶ 38, and regularly appeared before investors and financial news agencies to tout the financial vitality of Vivendi and thereby encourage investors to purchase Vivendi's securities, Compl. ¶¶ 58, 59, 62, 68, 87, 89, 90, 107. Furthermore, Messier stood to financially benefit from the increased sale and share price of Vivendi's securities. *See id.* ¶ 193 (alleging Messier received a $3 million bonus, or two and a half times his salary, for boosting Vivendi's EBITDA by 30%, and that he would have received triple his salary if he boosted the EBITDA by 35%). These allegations suffice to show that Messier was a "seller" under § 12(a)(2) and to withstand a motion to dismiss here. *See In re Opus360 Corp. Sec. Litig.,* 2002 WL 31190157, at *10; *In re Indep. Energy Holdings PLC Sec. Litig.,* 154 F. Supp. 2d at 761-62; *Griffin,* 2001 WL 740764, at *3; *In re Am. Bank Note Holographics, Inc. Sec. Litig.,* 93 F. Supp. 2d 424, 439 (S.D.N.Y. 2000), *Milman* v. *Box Hill Sys.,* 72 F.Supp.2d 220, 230 (S.D.N.Y. 1999).

       Hannezo seeks to rely on the same argument as Messier to show that he is not a statutory seller within the meaning of § 12(a)(2). Like Messier, Hannezo signed the alleged false and misleading registration statement, *id* ¶ 54, and allegedly was a close collaborator of Messier's, *id.* ¶ 33. Although these allegations help establish that Hannezo acted with Messier to solicit the securities purchased by plaintiffs, I do not find facts alleged to show how Hannezo stood to financially gain from his actions. Accordingly, the § 12(a)(2) claim against Hannezo is dismissed.

**G. Claims Under § 15 of 1933 Act Against Messier & Hannezo**

    **1.    Legal Standard To Plead A Section 15 Claim**

       "In order to establish a *prima facie* Section 15 claim, a plaintiff need only establish (1) control, and (2) an underlying violation of Section 11 (or Section 12(a)(2))." *In re IPO,* 241 F. Supp. 2d at 352. The heightened pleading standard under Rule 9(b) or the PSLRA does not apply because fraud and scienter are not necessary elements of the claim. *Id.* Thus, section 15 claims need only satisfy the minimal pleading standards of Rule 8. *Id.* While actual control and not just control status is needed to hold a person liable under § 15, "naked allegations of control … will typically suffice" to plead an adequate § 15 claim to withstand a motion to dismiss under Rule 8. *In re IPO,* 241 F. Supp. 2d at 352; *see also In re Sterling Foster & Co.*

*Sec. Litig.*, 222 F. Supp. 2d 216, 282-83 (E.D.N.Y. 2002). "Because the underlying violation pursuant to section 15 is a violation of sections 11 and 12(a)(2) in which strict liability is imposed (*i.e.*, knowledge of the misrepresentation is not required), this Court agrees with those district courts that have held that [culpable participation is not an element] required to establish a *prima facie* case of control person liability pursuant to section 15." *In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002); *see also Dorchester Investors*, 2003 WL 223466, at *3; *In re Indep. Energy Holdings PLC*, 154 F. Supp. 2d at 770; *Griffin*, 2001 WL 740764, at *3; *Silva Run Worldwide Ltd.* v. *Gaming Lottery Corp.*, 2001 WL 396521, at *4 (S.D.N.Y. April 19, 2001); *In re APAC Teleservices, Inc. Sec. Litig.*, 1999 WL 1052004, at *11; *Degulis*, 928 F. Supp. at 1315. Although a handful of cases hold to the contrary, *Wallace* v. *Buttar*, 2003 WL 103019, at *8 n.1 (S.D.N.Y. Jan. 14, 2003); *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 441 (S.D.N.Y. 2001); *DeMaria* v. *Anderson*, 153 F. Supp. 2d 300, 314 (S.D.N.Y. 2001); *aff'd on other grounds* 318 F.3d 170 (2d Cir. 2003), *Ellison* v. *American Image Motor Co.*, 36 F. Supp. 2d 628, 637-38 (S.D.N.Y. 1999), I concur with Judge Stein's reasoning in *Deutsche Telekom* and the apparent majority of judges in the Southern District that have determined that culpable participation is not an element of § 15.[13]

### 2. Section 15 Claim Against Messier and Hannezo

Messier contends that the plaintiffs have not adequately pled facts to show that he had ***actual control*** over Vivendi—the primary violator—or that he was a culpable participant. As discussed above, plaintiffs do not have to plead culpable participation to sustain their § 15 claim against a motion to dismiss. Messier further argues that merely asserting the power to control by virtue of his status as CEO and chairman of the board for Vivendi is insufficient to plead actual control, as allegedly required by the Second Circuit in *S.E.C.* v. *First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996). *First Jersey* was concerned with the sufficiency of evidence as to control at the conclusion of trial and its holding is inapposite to the situation here, on a motion to dismiss. In any event, *First Jersey* is instructive on what "control" means – it is defined as "'the power to direct or cause the direction of the management and policies of a

---

[13]     The Second Circuit, as far as I am aware, has yet to render a decision on this issue.

person, whether through the ownership of voting securities, by contact, or otherwise'" *First Jersey*, 101 F.3d at 1472 (quoting 17 C.F.R. 240.12b-2). Messier's status as Vivendi's CEO, coupled with his "direct and/or indirect business and/or personal relationships with other directors and/or major shareholders," Compl. ¶ 218, apparent ability to conceal or deflect worries about Vivendi's financial condition until he left while commencing new deals to acquire more assets, *id.* ¶¶ 14, 15, 23, 49-52, 73, 83, 100, 184, and ability to orchestrate, without the full knowledge of the board, a $6.3 billion stock buy-back by Vivendi to help prop up its stock price, *id.* ¶ 183(b), provide sufficient underpinnings from which it may be reasonably inferred that he "had the power to control or influence, directly or indirectly, the corporation or its management." *Jacobs* v. *Coopers & Lybrand, LLP*, 1999 WL 101772, at *17 (S.D.N.Y. Mar. 1, 1999); *see In re IPO*, 241 F. Supp. 2d at 352, n.85 (concluding "by virtue of their positions (*e.g.*, CEO, CFO) and Plaintiffs' specific allegations, ... [the defendants] very likely exercised ... control"); *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 770 (S.D.N.Y. 2001); *Gabriel Capital, L.P.*, 122 F. Supp. 2d at 426-27. Having found sufficient facts pled to show that Vivendi violated §§ 11 and 12(a)(2) and that Messier allegedly exercised control over Vivendi's actions, Messier's motion to dismiss the § 15 claim against him must fail.

Like Messier, Hannezo attempts to conflate the requirements of § 20(a) with the requirements of § 15. Because plaintiffs have adequately alleged a primary violation of the Securities Act, the only issue left to determine with respect to this claim is whether plaintiffs have alleged sufficient facts to establish that Hannezo was a "controlling person" within the meaning of § 15. Here, plaintiffs allege Hannezo served as Vivendi's chief financial officer ("CFO"), who closely collaborated with Messier. Compl. ¶ 33. In addition, Hannezo allegedly signed the Form F-4 that Vivendi issued to solicit approval from Vivendi's shareholders of a 3-way merger with Canal Plus and Seagram. *Id.* ¶ 54. The Form F-4 and the Form 20-F, the contents of which Hannezo apparently approved by signing it, is alleged to be false and misleading because it improperly consolidated financial revenues from various subsidiaries. *Id.* ¶¶ 55, 66, 72. Hannezo's status as CFO combined with allegations of his close collaboration with his long-time friend, Messier, and apparent approval of the allegedly misleading Form F-4 and Form 20-F, suffice to create a reasonable inference that Hannezo very likely exercised control in the actions taken by Vivendi to violate § 11 and § 12(a)(2). *See In re IPO*, 241 F. Supp. 2d at 352, n.85; *see also In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d

- 35 -

SA35

741, 770 (S.D.N.Y. 2001); *Gabriel Capital, L.P.*, 122 F. Supp. 2d at 426-27. Accordingly, defendants' motion to dismiss the § 15 claim against Hannezo is denied.

### H. Claims Under § 20 of the 1934 Act Against Messier & Hannezo

####     1.    Legal Standard To Plead A § 20 Claim

"In order to establish a *prima facie* case of controlling-person liability [under § 20], a plaintiff must [(1)] show a primary violation by the controlled person[,] ... [(2)] control of the primary violator by the targeted defendant, ... and [(3)] show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *First Jersey*, 101 F.3d at 1472 (internal quotation marks and citation omitted). Messier states that plaintiffs fail to allege his culpable participation with particularity for § 20 control liability.

Courts in this district have adopted various standards to plead culpable participation. *See, e.g., Steed Fin. LDC v. Nomura Securities Intern., Inc.*, 2001 WL 1111508, at *10 (S.D.N.Y. Sept. 20, 2001) ("either conscious misbehavior or recklessness"); *Gabriel Capital, L.P. v. Natwest Fin., Inc.*, 122 F. Supp. 2d 407, 426-28 (S.D.N.Y. 2000) ("facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom the person had control, was engaging in fraudulent conduct"); *Mishkin v. Ageloff*, 1998 WL 651065, at *25 (S.D.N.Y. Sept. 23, 1998) ("particularized facts of the controlling person's conscious misbehavior as a culpable participant in the fraud"). At bottom, plaintiffs must plead facts showing either conscious misbehavior or recklessness by the defendant.

The degree of particularity that must be plead as to culpability, however, is not entirely clear. *Compare In re Deutsche Telkom*, 2002 WL 244597, at *7 (finding heightened pleading requirement of the PSLRA applies to § 20(a) claim), *with In re IPO*, 242 F. Supp. 2d at 396 (holding that a § 20(a) claim in complaint must merely comport with Rule 8(a)). When faced with an appeal from a district court decision on a motion to dismiss a § 20(a) claim, the Second Circuit held that allegations of control coupled with an underlying violation sufficed to withstand such a motion. *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001). There, the defendant was alleged to be "an officer of the Bank and that he had primary responsibility for the dealings of that Bank and the other corporate defendants

- 36 -

**SA36**

with SAM Group." *Id.* (internal references omitted). These allegations, although "somewhat broad" according to the Second Circuit, were deemed "sufficient to plead controlling-person liability" under § 20(a). *Id.* Because the plaintiffs' broad allegations were sufficient there to withstand a motion to dismiss without more particularized allegations, I conclude that a § 20(a) claim needs to be pled only in accordance with Rule 8(a). *See also In re IPO*, 242 F. Supp. 2d at 396.

### 2. Section 20(a) Claim Against Messier and Hannezo

Here, plaintiffs allege in numerous places throughout the complaint, how Messier, disseminated false and misleading statements in his capacity as CEO of Vivendi, when he knew of or recklessly disregarded non-public information, which would have shown that his statements were false and misleading. *See* Compl. ¶¶ 38, 59-62, 68, 72, 81-82, 87-89, 93; Part IV.E(6)(b). These allegations suffice to state a claim against Messier under § 20(a). *See Ruskin* v. *TIG Holdings, Inc.*, 2000 WL 1154278, at *7-8 (S.D.N.Y. Aug. 14, 2000); *In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d. 283, 298 (S.D.N.Y. 1999); *In re Leslie Fair Companies, Inc. Sec. Litig.*, 918 F. Supp. 749, 762-63 (S.D.N.Y. 1996).

Hannezo similarly contends that plaintiffs have not adequately pled facts to establish Hannezo's control liability under § 20(a). Like the § 20(a) claim against Messier, I need to determine only whether Hannezo was a culpable participant. Here, plaintiffs have sufficiently pled facts supporting an inference of Hannezo's culpable participation by virtue of his position as CFO and his responsibility for approving Vivendi's false financial statements, when he knew or should have known of facts indicating that these statements were inaccurate and misleading. *See* Compl. ¶¶ 9, 54-55, 66, 72, 102, 108, 141-145, 183(b) & (c)(i), 184, 188. Accordingly, Hannezo's motion to dismiss the § 20(a) claim against him is denied.

### I. Hannezo's Violation of § 10(b) of the 1934 Act and Rule 10b-5

Hannezo contends that the § 10(b) and Rule 10b-5 claims against him must be dismissed because the complaint fails to allege that he made an actionable misstatement or omission. Hannezo does not dispute that he executed Forms 20-F and F-4, which plaintiffs have adequately alleged to contain false and misleading financial statements. *See supra* Part IV.D(1), Compl. ¶¶ 66, 132-38. Accordingly, Hannezo's first ground to dismiss the § 10(b) claim and

Rule 10b-5 claims must be denied. Putting aside the forms executed by Hannezo and filed with the SEC, Hannezo contends that he may not be held liable for the other statements released by other defendants. Plaintiffs assert that Hannezo may be held liable under § 10(b) and Rule 10b-5 under the "group pleading doctrine." Under this doctrine, plaintiffs may "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *Polar Int'l Brokerage Corp.* v. *Reeve*, 2000 WL 827667, at \*8 (S.D.N.Y. June 27, 2000). "The group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint." *Elliott Associates, L.P.* v. *Covance, Inc.*, 2000 WL 1752848, at \*12 (S.D.N.Y. Nov. 28, 2000).

Hannezo argues that this doctrine may not be used to impose liability under § 10(b) or Rule 10b-5, in view of the decisions by the United States Supreme Court in *Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) and the Second Circuit in *Shapiro* v. *Cantor*, 123 F.3d 717 (2d Cir. 1997) and *Wright* v. *Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998). More specifically, defendants contend that plaintiffs, through use of the group pleading doctrine, seek to impose liability on the basis that he allegedly aided and abetted others who manipulated or committed deceptive acts in connection with the purchase or sale of Vivendi securities. The United States Supreme Court, however, held that § 10(b) liability based on aiding and abetting others is not permitted. *See Central Bank*, 511 U.S. at 166, 191. According to Hannezo, the Second Circuit adopted a bright line standard, in which the charged defendant "must actually make a false or misleading statement in order to be held liable under Section 10(b)." *See Shapiro*, 123 F.3d at 720. In *Shapiro*, the Second Circuit held that the plaintiffs' allegations in connection with the failure to disclose material information serve to support only aiding and abetting liability, because the defendant—a non-fiduciary accounting firm—did not have a duty to disclose certain material information. *Id.* at 721. Similarly, the Second Circuit in *Wright* v. *Ernst & Young LLP* affirmed that secondary actors, such as non-fiduciary accountants, who were merely affiliated with the defendant corporation, must actually make a false or misleading statement in order to be held liable under § 10(b). 152 F.3d at 175. Courts after *Central Bank*, *Shapiro* and *Wright*, have recognized that "primary liability under Rule 10b-5 [and section 10(b)] may be imposed 'not only on persons who made fraudulent

- 38 -

**SA38**

misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration.'" *In re Oxford Health Plans, Inc.*, 187 F.R.D. at 142 (quoting *In re Health Management, Inc. Securities Litig.*, 970 F. Supp. 192, 208-09 (E.D.N.Y.1997)); *see also First Jersey*, 101 F.3d at 141-47 (holding that plaintiffs need not allege that a particular defendant made any fraudulent statements to be held liable under § 10(b)). Thus, a member of the upper level management, such as the CEO or CFO, who had knowledge of the fraud, and assisted in its perpetration by failing to disclose or correct the fraud when he had a duty to do so, may be held liable under § 10(b) and Rule 10b-5. *Rich* v. *Maidstone Fin., Inc.*, 2002 WL 31867724, at *8-9 (S.D.N.Y. Dec. 20, 2002); *In re Livent, Inc. Noteholders Sec. Litig.*, 174 F. Supp. 2d 144, 154 (S.D.N.Y. 2001) (citing *First Jersey*, 101 F.3d at 1471 and *Azrielli* v. *Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir. 1994)).

Although the group pleading doctrine was adopted before the PSLRA was enacted, district courts in the Second Circuit have concluded that neither the PSLRA nor *Central Bank* and its progeny affect its vitality. *In re CINAR Corp. Securities Litigation*, 186 F. Supp. 2d 279, 318-19 (E.D.N.Y. 2002); *In re Oxford Health Plans, Inc.*, 187 F.R.D. at 142; *In re Health Management, Inc. Securities Litig.*, 970 F. Supp. at 208-09. Unlike the accountants in *Shapiro* and *Wright*, Hannezo was not a person merely affiliated with the defendant corporation, but rather was a "clearly cognizable corporate insider[] with [an] active daily role[]" as CFO of Vivendi. *Polar Int'l Brokerage Corp.*, 108 F. Supp. 2d at 237; Compl. ¶ 35. I find no reason to preclude plaintiffs from relying on the group pleading doctrine to attribute to Hannezo the allegedly false and misleading press releases and other group-published documents produced by other defendants during Hannezo's tenure as CFO. I agree, however, that oral statements made by other individual defendants do not fall within the ambit of the group pleading doctrine, and hence, oral statements made by Messier may not be attributed to Hannezo. *See Elliott Assocs.*, 2000 WL 1752848, at *12.

## J. Leave to Amend The Complaint

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a pleading "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). "It is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc.* v. *Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). While I find certain elements of plaintiffs'

- 39 -

complaint insufficient, I "cannot determine that the plaintiff could not, under any circumstances, sufficiently allege his claims." *Protter* v. *Nathan's Famous Sys., Inc.*, 904 F. Supp. 101, 111 (E.D.N.Y. 1995). Plaintiffs are granted leave, if they choose to do so, to file an amended complaint within twenty days of the date of this Order with respect to: (1) Vivendi's liability under § 14(a), (2) the clerical error made in paragraph 174 of the original complaint, and (3) the § 12(a)(2) claim against Hannezo.

## V. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss plaintiffs' § 14(a) claim against Vivendi, and § 12(a)(2) claim against Hannezo is granted, with leave to replead within 20 days hereof, if deemed necessary. Additionally, plaintiffs' claim for damages under § 11 and § 12(a)(2) arising from the purchase of Vivendi's ADSs, pursuant to the Form F-6 is barred. Defendants' motion to dismiss plaintiffs' other claims is denied.

**SO ORDERED.**
New York, New York
November 2, 2003

_____
U.S.D.J.

COPY MAILED FAXED TO:

COUNSEL FOR PLTFF(S): ✓
COUNSEL FOR DFT(S): ____
PLTFF PRO SE: ____
DFT PRO SE: ____
DATE: 9/21/04
BY: mlc

U.S. DISTRICT COURT
FILED
SEP 22 2004
S.D. OF N.Y.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE VIVENDI UNIVERSAL, S.A.
SECURITIES LITIGATION

02 Civ. 5571 (RJH) – lead case
<u>also docketed as</u>
03 Civ. 2175 (RJH)
03 Civ. 5911 (RJH)

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>Order</u>

For the reasons stated on the record today, plaintiffs' and defendants' respective motions for reconsideration [87-1, 89-1, and 90-1] are denied. For the reasons stated on the record today, defendant's motion to dismiss the complaint of plaintiff GAMCO [140-1] is denied in part and granted in part.

The parties are directed to submit, by November 4, 2004, a status report regarding the deposition schedule, including dates for the deposition of witnesses who voluntarily agree to be deposed in London. The parties are also directed to provide the Court, by November 18, 2004, supplemental submissions on procedures by which depositions shall be taken.

Finally, the parties are directed to appear for a conference on this matter on December 15, 2004, at 4:30 p.m., in Courtroom 17B, United States Court House, 500 Pearl Street, New York, New York 10007.

SO ORDERED.

Dated: New York, New York
September 20, 2004

Richard J. Holwell
United States District Judge

MICROFILM
12 00 PM
SEP 22 2004

**SA41**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE VIVENDI UNIVERSAL, S.A.
SECURITIES LITIGATION

02 Civ. 5571 (RJH) (HBP)

**REVISED MEMORANDUM
OPINION AND ORDER**[*]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      Plaintiffs bring this securities fraud class action against defendants Vivendi

Universal, S.A. ("Vivendi") and its two most senior former officers, Jean-Marie Messier

(former CEO) and Guillaume Hannezo (former CFO), individually and on behalf of

similarly situated Vivendi security purchasers.  Plaintiffs allege that defendants'

materially false and misleading statements caused Vivendi securities to trade at

artificially inflated prices, and further, that defendants induced them to purchase or

otherwise acquire Vivendi securities pursuant to a registration statement and prospectus

dated October 30, 2000, issued in connection with the December 8, 2000 three-way

merger of Vivendi, Seagram Company Limited ("Seagram") and Canal Plus, S.A.

("Canal Plus"), in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of

1934 ("Exchange Act"), as amended, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated

thereunder, and Sections 11, 12(a) , and 15 of the Securities Act of 1933 ("Securities

Act"), as amended, 15 U.S.C. § 77k, respectively.[1]

---

[*] The Court's Memorandum Opinion and Order entered on March 26, 2007 is hereby revised to correct typographical errors on page two and sixty-eight that incorrectly stated that plaintiff's proposed class period begins on October 20, 2000; plaintiff's proposed class period begins on October 30, 2000.

[1] The Section 12(a)(2) claim as alleged against defendant Hannezo in his individual capacity was dismissed in *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 187 (S.D.N.Y. 2003), and was not repleaded in the first amended consolidated class action complaint. (*See* Stipulation and Order [107] , Dec. 17, 2003.)  The Section 12(a)(2) claim as alleged against defendant Messier remains.

Plaintiffs now move to certify a class pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure consisting of all persons, foreign and domestic, who purchased or otherwise acquired ordinary shares or American Depository Shares ("ADSs") of Vivendi Universal, S.A. between October 30, 2000 and August 14, 2002. For the reasons discussed below, the Court grants plaintiffs' motion [234] in part and denies it in part.

## BACKGROUND

**Prior History**

This litigation was commenced on July 18, 2002 with the filing of the original complaint. On August 19, 2002, plaintiffs filed an amended consolidated complaint. By Order dated October 1, 2002, the Hon. Harold Baer, Jr., to whom this action was originally assigned, consolidated fourteen related actions against Vivendi. On January 7, 2003, plaintiffs filed a consolidated class action complaint. Additional shareholder cases were consolidated herewith by Orders dated July 25, 2003 and September 3, 2003. By notice dated January February 24, 2003, defendants moved to dismiss the consolidated class action complaint arguing, *inter alia*, that the Court lacked subject matter jurisdiction over the claims brought by foreign class members who acquired Vivendi's ordinary shares on foreign exchanges. Applying the "conduct test" to determine whether extraterritorial application of the federal securities laws was warranted, Judge Baer, by opinion dated November 4, 2003, denied defendants' motion to dismiss for lack of subject matter jurisdiction. *See In re Vivendi Universal, S.A.*, 381 F. Supp. 2d at 169. Judge Baer concluded that plaintiffs' complaint adequately alleged that "'defendants' conduct in the United States was more than merely preparatory to the fraud, and

**SA43**

particular acts or culpable failures to act within the United States directly caused losses to foreign investors abroad.'" *Id.* (quoting *Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir. 1991)); *see also id.* at 170 (inferring "that the alleged fraud on the American exchange was a 'substantial' or 'significant contributing cause' of [foreign investor's] decision[s] to purchase [Vivendi's] stock abroad") (bracketed language in original, citation omitted). Plaintiffs filed a first amended consolidated class action complaint ("FACC") on November 24, 2003. Shortly thereafter, on December 4, 2003 this case was reassigned to this Court. Defendants then moved for reconsideration of Judge Baer's order, which this Court denied by order dated September 21, 2004. The Court issued a separate Memorandum Opinion and Order addressing one of the many issues raised in defendants' motions for reconsideration; namely, whether this Court has subject matter jurisdiction over foreign plaintiffs' claims pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. *See In re Vivendi Universal, S.A.*, No. 02 Civ. 5571 (RJH), 2004 WL 2375830 (S.D.N.Y. Oct. 22, 2004). In concluding that the claims of foreign class members who acquired Vivendi's ordinary shares on foreign exchanges were properly before the Court and subject to U.S. federal securities laws, the Court reasoned that the United States–based conduct alleged by plaintiffs "significantly contributed to the alleged fraud and that such conduct directly caused foreign investors' alleged losses." *Id.* at *7 (citing *Europe & Overseas Commodities Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 128–29 (2d Cir. 1998)).

By notice dated July 15, 2005, plaintiffs filed a substituted motion to certify a class pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.[2] As

---

[2] In the First Amended Consolidated Complaint, plaintiffs defined the proposed class as follows:

noted, the proposed class consists of all persons who purchased or otherwise acquired Vivendi ordinary shares or ADSs between October 30, 2000 and August 14, 2002. The motion seeks appointment of plaintiffs Olivier M. Gerard, the Retirement System for General Employees of the City of Miami Beach ("RSMB"), Bruce Doniger, Gerard Morel, Capital Invest Die Kapitalanlagegesellschaft der Bank Austria Creditanstalt Gruppe GmbH (in its capacity as manager of and attorney-in-fact for APK EU-Big Caps Fund) ("Capital Invest"), and William Cavanagh (collectively, "proposed class representatives"), as class representatives, and Milberg, Weiss, Bershad & Shulman LLP and Abbey Gardy, LLP as class counsel. (*Id.*)

**Factual Background**

Vivendi is a corporation organized under the laws of France. It is a global conglomerate engaged in business in two primary areas: "Media and Communications" and "Environmental Services." (FACC ¶ 30.) Throughout the class period, Vivendi's total number of outstanding shares (ordinary shares and ADSs inclusive) was approximately 1.08 billion. (Declaration of François Bisiaux in Support of Vivendi Universal, S.A's Opposition to Plaintiffs' Motion for Class Certification, Sept. 30, 2005

---

(a) on behalf of themselves and all persons who purchased or otherwise acquired the common stock and American Depository Shares ("ADSs") of Vivendi (the "Purchaser Class") between October 30, 2000 and August 14, 2002 inclusive (the "Class Period"), alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act"); (b) on behalf of themselves and all persons who acquired Vivendi's common stock or ADSs (the "Merger Subclass") pursuant to a registration statement and prospectus dated October 30, 2000 issued in connection with the three-way merger (the "Merger") of Vivendi, S.A., The Seagram Company Limited ("Seagram") and Canal Plus, S.A. ("Canal Plus") that created Vivendi Universal, S.A., alleging violations of the Securities Act of 1933 (the "Securities Act"); and (c) on behalf of themselves and all persons who were shareholders of Vivendi or Seagram as of November 25, 2000 and entitled to vote on the Merger (the "Proxy Subclass") pursuant to the Joint Proxy Statement-Prospectus issued in connection with the Merger, alleging violations of the Exchange Act.

(FACC ¶ 1.) Plaintiffs' class certification motion and supporting memoranda do not propose any subclasses for certification.

**SA45**

("Bisiaux Decl."), Exs. 1–5.)  Approximately twenty-five percent of these were held by United States shareholders.  (*Id.*)  Around thirty-seven percent of Vivendi's total shares were held by French shareholders.  (*Id.*)  The remainder of Vivendi's shares were held predominantly by non-French but European persons or entities, and a small percentage (around five percent) was consistently held by shareholders in other unidentified countries.  (*Id.*)  During this time, virtually all of Vivendi's ADSs—which traded on the NYSE—were held by persons or entities in North America, while virtually all of Vivendi's ordinary shares—traded predominantly on the Paris Bourse—were held by persons or entities outside the United States, predominantly in France and the rest of Europe.  (Bisiaux Decl. ¶ 7.)

Beginning in June of 1996, at which time defendant Messier became CEO and defendant Hannezo was CFO, Vivendi (then Générale des Eaux, and later, as of April 1999, Vivendi, S.A.) embarked upon a massive acquisitions venture, which included a number of multi-billion dollar purchases.  (FACC ¶¶ 48–51.)  Vivendi purchased substantial equity positions in several U.S. companies and non-U.S. companies by using Vivendi stock as payment and by borrowing cash against future earnings.  Financing this growth strategy caused Vivendi to accumulate sizeable debt.  (*Id.* ¶ 50.)  Plaintiffs allege that in order to sustain Vivendi's growth strategy, the company was compelled to continue reporting favorable financial results (*see id.* ¶ 53), resulting in a series of false and misleading public statements reporting "better than expected" and "strong" financial results, while consistently denying rumored problems (*see generally id.* ¶¶ 56–113), and the filing of financial statements with the United States Securities and Exchange Commission ("SEC") that were materially false and misleading because, *inter alia*, they

failed to timely record goodwill impairments[3] and improperly applied generally accepted accounting principles ("GAAP") (*see generally id.* ¶¶ 54–55, 119–80).

As discussed in Judge Baer's prior opinion denying defendants' motion to dismiss, 381 F. Supp. 2d 158, and this Court's prior supplemental opinion denying defendants' motion for reconsideration, 2004 WL 2375830, the fraud alleged in the FACC was perpetrated, in important part, in the United States. Vivendi's rapid-expansion scheme involved the acquisition of numerous well-known U.S. entertainment and publishing companies, such as Universal Studios, Houghton Mifflin and USA Networks (FACC ¶ 23), and in order to successfully accomplish this plan, it took on a $21 billion debt while, allegedly, fraudulently assuring all investors through false and misleading reports filed with the SEC and news releases that it had sufficient cash-flow to manage its debts (*id.* ¶¶ 24, 54–192). Significantly, both of the alleged principal actors in this scheme, Messier and Hannezo, moved to the United States during 2001. Messier, in particular, moved his primary residence to New York in September 2001, and spent half of his time in the United States from that time through the end of the class period (August 31, 2002), for the stated purpose of increasing United States investments in Vivendi. (*Id.* ¶¶ 69, 77, 90–92, 105.) Many of the statements alleged to be false and misleading were made by defendant Messier after he had moved to New York. *See* 2004 WL 2375830, at *4; (*see also* FACC ¶¶ 73–76, 81–97.)

Following the December 8, 2000 merger of Vivendi, Seagram, and Canal Plus, Vivendi repeatedly predicted "strong growth prospects" and touted financial results as

---

[3] Goodwill is the excess of the purchase price over the fair market value of an asset. It reflects the value of intangible assets like reputation, brand name, good customer relations, good employee relations, any patents and proprietary technology, and other intangibles that improve a company's business. Goodwill is a value in a company's balance sheet, and is amortized over a period of time.

exceeding even their "too ambitious" expectations. (*Id.* ¶ 57–68.) In September 2001—the same time that Messier and Hannezo moved to the United States—rumors began to circulate that Vivendi's earnings would be disappointing. Messier responded by consistently denying any problems—indeed, until the day before his ultimate resignation he disavowed there was any serious problem—which quelled some of the negative speculation. (*See id.* ¶¶ 73–77.) In late 2001, Vivendi announced its acquisition of USA Networks for $10.3 billion, and reported that the transaction would increase Vivendi's net free cash flow by a projected $350 million. (*Id.* ¶¶ 80–81.) Throughout the spring of 2002, Vivendi (and Messier) continued to make positive statements in the press to "dispel concerns about the Compan[y's] debt levels and accounting practices." (*Id.* ¶83; *see also id.* ¶¶ 84–87, 89, 94–97.) However, on May 3, 2002, Moody's lowered Vivendi's long-term debt rating to one notch above "junk" status assigned to speculative investments, due to concerns that Vivendi "might not be able to reduce debts as quickly and comprehensively as planned." (*Id.* ¶ 99.) In response, Vivendi downplayed the rating and announced it had "no impact on Vivendi Universal's cash situation," which it described as "comfortable" and capable of financing Vivendi's continued debt reduction. (*Id.* ¶¶ 100, 102–03.)

In response to continued concerns about Vivendi's debt levels, a June 25, 2002 press release was issued, noting steps taken to reduce debt and that its cash situation was not precarious, and Messier held a June 26, 2002 conference call to assure investors there was "no hidden liability" and expressing confidence with respect to Vivendi's debt and cash outlook. (*Id.* ¶¶ 104–05.) On July 2, 2002, Messier e-mailed his employees stating that despite reports that Vivendi was in danger of default, there were no hidden risks in

the company's accounting. (*Id.* ¶ 109.) The very next day, however, Messier resigned and Vivendi's securities prices collapsed. (*Id.*) Vivendi issued a press release through new management acknowledging its "short-term liquidity issue," though Messier continued to claim that Vivendi's financial statements were transparent. (*Id.* ¶ 110.) Contrary to Vivendi's numerous press releases, financial statements, and SEC filings throughout the class period, plaintiffs allege that the company was in fact on the brink of financial disaster. At the time of the USA Networks acquisition, announced on December 17, 2001 (*id.* ¶ 8), "Vivendi was already in dire financial straits," despite representations made to the contrary by Messier to investors and the board of directors (*id.* ¶ 184). Vivendi was allegedly on the verge of insolvency by the end of 2001, and had barely enough "cash needed to pay the bills" as of May 2002. (*Id.* ¶ 185.) Nevertheless, Vivendi had continued to reassure investors that it could meet its obligations for the next twelve months, despite being privately advised of its dire financial outlook. (*Id.* ¶ 186.)

On August 14, 2002, new management announced that Vivendi had suffered a €12 billion net loss for the first half of 2002 and would take a €11 billion goodwill write-down of depreciated assets, the same day that Standard & Poor's rated Vivendi's long-term corporate credit at junk status. (*Id.* ¶ 114.) New management later admitted that Vivendi "would have been forced to declare bankruptcy within 10 days if Jean-Marie Messier had not resigned." (*Id.* ¶ 187.)

**SA49**

# DISCUSSION

## I. Legal Standard

A district court's analysis of a class certification request generally proceeds in two steps, both of which are governed by Rule 23 of the Federal Rules of Civil Procedure. As a threshold matter, the court must be persuaded, "after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982). Rule 23(a) provides:

> (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

If a court determines that the Rule 23(a) requirements have been met, it must then decide whether the class is maintainable pursuant to one of the subsections of Rule 23(b), which govern, *inter alia*, the form of available relief and the rights of absent class members. When seeking to certify a class pursuant to Rule 23(b)(3), plaintiffs must meet the following two additional criteria: (1) questions of law or fact common to class members must predominate over any questions affecting individual members; and (2) the class action device must be superior to any other method of adjudication. Fed. R. Civ. P. 23(b)(3). The requirement of "rigorous analysis" to ensure "actual, not presumed conformance" with Rule 23(a) applies with "equal force to all Rule 23 requirements, including those set forth in Rule 23(b)(3)." *Miles v. Merrill Lynch & Co.* (*In re Initial Public Offering Sec. Litig.*), 471 F.3d 24, 33 & n.3 (2d Cir. 2006) (citing *Falcon*, 457

U.S. at 160–61).  Thus it is not sufficient for plaintiffs to make merely "some showing" that the requirements of Rule 23 have been met.  *Id.* at 35–36 (citing and distinguishing *Caridad v. Metro-North Commuter Railroad,* 191 F.3d 283, 292 (2d Cir. 1999) and *In re Visa Check/Master Money Antitrust Litigation,* 280 F.3d 124, 134-35 (2d Cir. 2001)).  To the contrary, the following standard now applies to class certification motions in this circuit:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*In re IPO Sec. Litig.*, 471 F.3d at 41.  With these principles in mind, the Court turns to the Rule 23 analysis.

## II.      Rule 23(a)

### A.      Numerosity

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "Impracticability means difficulty or inconvenience of joinder [not] . . . impossibility of joinder," *In re Blech Sec. Litig.*, 187 F.R.D. 97, 103 (S.D.N.Y. 1999) (citation omitted), and the Second Circuit has

observed that "numerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995), *cert. denied*, 515 U.S. 1122 (1995) (citing 1 *Newberg on Class Actions* § 3.05 (2d ed. 1985)); *see also Presbyterian Church v. Talisman Energy, Inc.*, 226 F.R.D. 456, 466 (S.D.N.Y. 2005) ("Numerosity is presumed when a class consists of forty or more members."). "Precise quantification of the class members is not necessary because a court may make common sense assumptions regarding numerosity." *In re Blech Sec. Litig.*, 187 F.R.D. at 103 (citations omitted); *see also de la Fuente v. DCI Telecomms., Inc.,* 206 F.R.D. 369, 390 (S.D.N.Y. 2002); *Weissman v. ABC Fin. Servs., Inc.*, 203 F.R.D. 81, 84 (E.D.N.Y. 2001).

"In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Teachers' Ret. Sys. of La. v. ACLN Ltd.*, No. 01 Civ. 11814 (LAP), 2004 WL 2997957, at *3 (S.D.N.Y. Dec. 27, 2004) (citations and internal quotation marks omitted)); *see also In re Globalstar Sec. Litig.*, No. 01 Civ. 1748 (PKC), 2004 WL 2754674, at *3–*4 (S.D.N.Y. Dec. 1, 2004) ("[I]t is not unusual for district courts to certify plaintiff classes in securities actions based on the volume of outstanding shares." (citations omitted)); *In re Deutsche Telekom AG Sec. Litig.*, 229 F. Supp. 2d 277 (S.D.N.Y. 2002) ("Class certification is frequently appropriate in securities fraud cases involving a large number of shares traded publicly in an established market."); *In re Frontier Group Ins., Inc. Sec. Litig.*, 172 F.R.D. 31, 40 (E.D.N.Y. 1997). With more than 107 million ADSs and approximately 1 billion ordinary shares outstanding during the relevant class period, plaintiffs have established that joinder is impracticable and that the proposed class

11

**SA52**

satisfies the numerosity requirement.  (*See* FACC ¶ 41; Bisiaux Decl. Ex. 2 (indicating 1.086 billion outstanding Vivendi shares, ordinary shares and ADSs inclusive, as of June 30, 2001).)

> **B.   Commonality**

The class certification prerequisite of commonality requires that "there are questions of law or fact common to the class . . . ."  Fed. R. Civ. P. 23(a)(2); *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (per curiam) ("[P]laintiffs' grievances [must] share a common question of law or of fact.").  Not every "issue[] must be identical as to each [class] member, but . . . plaintiff [must] identify some unifying thread among the members' claims that warrants class treatment."  *Cutler v. Perales*, 128 F.R.D 39, 44 (S.D.N.Y. 1989) (internal quotation marks and citation omitted).  The commonality requirement "has been applied permissively" in securities fraud litigation.  *In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855 (RMB), 2003 WL 22077464, at *3 (S.D.N.Y. Sept. 8, 2003) (internal quotation marks omitted); *see also In re Frontier*, 172 F.R.D. at 40.  Here, plaintiffs allege the following questions of fact or law are common to all members of the proposed class:  (1) whether defendants violated the securities laws by the acts and conduct alleged in the FACC; (2) whether defendants issued false and misleading statements during the class period; (3) whether defendants acted with scienter in issuing materially false and misleading statements; (4) whether the market prices of Vivendi ordinary shares and ADSs during the class period were artificially inflated because of defendants' misconduct, and (5) whether the members of the class sustained damages, and, if so, what is the appropriate measure of damages.  (FACC ¶ 45.)  *Cf. In re Interpublic Sec. Litig.*, No. 02 Civ. 6527 (DLC), 2003 WL 22509414, at *3 (S.D.N.Y.

Nov. 6, 2003) (finding commonality requirement satisfied where plaintiffs raised common issues as to whether defendants' public filings and statements contained material misstatements, whether the defendants acted with scienter in misrepresenting material facts in the company's public filings and press releases, and whether the damages to the investors were caused by the defendants' misstatements); *In re Ashanti Goldfields Sec. Litig.*, No. CV 00-0717 (DGT), 2004 WL 626810, at *12 (E.D.N.Y. Mar. 30, 2004) (finding commonality on similar allegations).  Defendants do not dispute commonality.  Plaintiffs have adequately demonstrated that these claims are common to the members of the proposed class, and the Court finds the commonality requirement is satisfied.

### C.    Typicality and Adequacy

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "While the commonality inquiry establishes the existence of a certifiable class, the typicality inquiry focuses on whether the claims of the putative class representatives are typical of the class sharing common questions."  *In re Frontier*, 172 F.R.D. at 40.  Typicality requires that "the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members."  *Marisol A. v. Giuliani*, 929 F. Supp. 662, 691 (S.D.N.Y. 1996), *aff'd* 126 F.3d 372 (2d Cir. 1997); *see also Robidoux v. Celani*, 987 F.2d 931, 936–36 (2d Cir. 1993) ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims.").  Rule 23(a)(4) requires plaintiffs to

establish that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This showing requires that plaintiffs demonstrate that the proposed class representatives have no "interests [that] are antagonistic to the interest of the other members of the class." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). As many courts have observed, the issues of typicality and adequacy tend to merge because they "serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 157 n.13.

In this case, proposed class representatives argue that the typicality requirement is met because their claims "arise out of the same uniform pattern of conduct—i.e., defendants' failure to disclose that Vivendi's operations and financial condition were dramatically weaker than what their public statements portrayed." (Pls.' Supp. Mem. 11.) In the First Amended Consolidated Complaint, named plaintiffs, like the other purported class members, have asserted that they purchased or otherwise acquired Vivendi securities during the class period, and were injured by defendants' false and misleading representations made throughout the class period in violation of the securities laws. Central to all the proposed class representatives claims is defendants' alleged course of conduct throughout the class period. In prosecuting their case, plaintiffs will necessarily seek to develop facts relating to the alleged accounting irregularities and the dissemination of allegedly false or misleading statements underlying their claims. Such allegations are generally considered sufficient to satisfy the typicality requirement. *See, e.g.*, *In re Interpublic Sec. Litig.*, No. 02 Civ. 6527 (DLC), 2003 WL 22509414, at *3

14

**SA55**

(S.D.N.Y. Nov. 6, 2003); *In re WorldCom Inc. Sec. Litig.*, 219 F.R.D. 267, 280–81

(S.D.N.Y. 2003). Furthermore, defendants' individualized arguments regarding the

adequacy and typicality of the proposed class representatives are unavailing. The Court

will address seriatim the arguments made with respect to the six named plaintiffs.

### 1. Olivier Gerard

Proposed class representative Gerard is a resident of France who, on December

11, 2000, exchanged Vivendi, S.A. shares for Vivendi Universal shares pursuant to the

three-way merger with Seagram and Canal Plus. (*See* Deposition of Olivier Marie-

Guillaume Gerard, June 24, 2005 ("Gerard Dep.") at 81:05–82:13; Gerard Second

Corrected Certification, June 24, 2005 at Schedule A, Zach Decl. Ex. 7.)

Defendants submit that Gerard is not an adequate class representative for two

reasons. First, defendants argue that persons such as Gerard who obtained Vivendi

Universal shares and/or ADSs only in the one-to-one exchange of Vivendi, S.A.

securities may not be properly included in the putative class, because such persons[4] did

not suffer economic damage and cannot prove materiality. (*See* Defs.' Opp'n Mem.

("Opp'n") 21–23, 27.)

Defendants argue that this group of class members, as preexisting Vivendi

shareholders, "cannot show that the alleged misstatement inflating the value of shares or

ADSs that they already owned was material to them or caused them any economic

damage." (Opp'n 21.)

---

[4] Defendants' contention that all foreign persons should be excluded from the proposed class is discussed *infra* in connection with an evaluation of whether a class action including foreign shareholders would be superior to alternative methods of adjudication.

**SA56**

Plaintiffs propose as a solution to defendants' concerns that the words "and were damaged thereby" be inserted into the class definition. Plaintiffs also argue that it would be premature to exclude class members who have exchanged Vivendi S.A. shares for Vivendi Universal shares because the question of whether defendants' misstatements were material to these plaintiffs cannot be determined at the class certification stage.

Given the teaching of *In re IPO Sec. Litig.*, 471 F.3d at 41–42, it is not inappropriate to consider either damages or materiality in assessing the typicality of the individual plaintiffs' claims, even though some assessment of the merits of their claims is required. However, the Court is not persuaded that either issue precludes a finding that the typicality requirement is satisfied here. Materiality for all class members will turn on the nature and accuracy of all defendants public statements including, obviously, those made in connection with the three-way merger of Vivendi, Seagram and Canal Plus in December, 2000. That Vivendi S.A. shareholders received Vivendi Universal shares as a result of the merger does not alter the materiality of defendants alleged misstatements to plaintiff-shareholders' decision to approve the merger and accept shares in a new entity. And to the extent that, as alleged, defendants were constructing an ever-expanding house of cards, old Vivendi S.A. shareholders who accepted shares in Vivendi Universal were likely damaged thereby.[5] Therefore, the Court declines to exclude members of the class

---

[5] In addition to opposing the inclusion of those who acquired Vivendi shares through the one-for-one exchange, defendants oppose the inclusion of so-called in-and-out purchasers in any class certified—i.e., those who purchased shares and sold them during the class period. Defendants do not oppose the appointment of any of the proposed class representatives on this basis. However, even if they did raise such an argument, courts have consistently found that this does not render a representative's claim atypical. *See, e.g.*, *In re Gaming Lottery Sec. Litig.*, 58 F. Supp. 2d 62, 69–71 (S.D.N.Y. 1999) (rejecting defendants' argument that in-and-out purchaser proposed as class representative was inadequate because, *inter alia*, he was not injured because he sold as well as purchased at inflated prices); *Werner v. Satterlee, Stephens, Burke & Burke*, 797 F. Supp. 1196, 1215 (S.D.N.Y. 1992) (rejecting attempt to disqualify proposed class representatives because of the timing of their purchases, and stating that although timing issues could eventually surface differing interests among class members, "the greater weight of recent authority

SA57

who acquired their shares in the one-to-one exchange, including Gerard as class representative, on the basis of defendants' arguments regarding damages or materiality.

Defendants also allege that Gerard is incapable of performing the fiduciary responsibilities as a class representative because Gerard admitted to destroying documents. (Opp'n 27–28 n.23.) The documents to which defendants allude, however, appear to be French and other European newspaper articles relating to the Vivendi scandal, and perhaps some personal notes taken by Gerard during meetings with his French attorney. (Gerard Dep. 28:24–29:16, 30:23–31:02.) Gerard testified that he discarded the news articles because he believed the attorneys in this matter had collected all the relevant documentation and articles published in the press, and there was no reason for him to keep it. (*Id.* at 29:11–30:05.) Defendants cite no authority to support the proposition that such conduct renders Gerard inadequate to represent the interests of the class, and the Court finds Gerard to be an adequate class representative. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 88 (S.D.N.Y. 2004) (rejecting defendants' credibility argument to defeat appointment of named plaintiff as class representative where "[t]here [was] no evidence that any of the conduct here was the result of bad faith or an attempt to deceive defendants or the court").

---

militates denying class certification on that ground" (internal citation omitted)); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85 (S.D.N.Y. 1998) (rejecting defendants' arguments regarding conflicts created by inclusion of in-and-out purchasers in proposed subclasses and noting that "it is well settled in this Circuit that factual differences in the amount of damages, date, size or manner of purchase, the type of purchaser, the presence of both purchasers and sellers, and other such concerns will not defeat class action certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class" (citing *Green v. Wolf*, 406 F.2d 291, 299–301 (2d Cir. 1968), *cert. denied sub nom. Troster, Singer & Co. v. Green*, 395 U.S. 977 (1969))).

## 2.    Gerard Morel

Gerard Morel is also a French resident who exchanged his shares in Vivendi, S.A. and Canal Plus for Vivendi Universal shares after the December 2000 merger. (Declaration of Gerard Morel, Feb. 19, 2005 ("Morel Decl.") at Schedule A, Zach Decl. Ex. 8.)  He also bought and sold Vivendi ordinary shares on the Paris Bourse during the proposed class period.  (*Id.*)  His last transaction in Vivendi securities occurred on January 11, 2002.  (*Id.*)

Defendants argue that Morel only has standing to represent a class including Europeans who purchased Vivendi securities on a European exchange up to the latest date on which he engaged in a transaction involving Vivendi stock.  (Opp'n 28.)  Without an adequate proposed class representative who purchased Vivendi ordinary shares on the Paris Bourse after January 11, 2002, defendants argue, the period of any class including French shareholders cannot extend beyond this date.[6]  Defendants further argue that inconsistencies in Morel's testimony, submissions, and document production on the issue of his transactions in Vivendi securities will become a focal point of cross-examination and unique defenses at trial to the detriment of the class.  (*Id.* at 28 n.25.)

With respect to class representative standing, it is well established that where, as here, plaintiffs allege that their losses were the result of a sustained course of conduct that propped up defendant's stock price throughout the class period, the class may be represented by an individual who purchased his shares prior to the close of the class period.  *See Robbins v. Moore Med. Corp.*, 788 F. Supp. 179, 187 (S.D.N.Y. 1992) (finding class representatives entitled to assert Section 10(b) claims "arising from

---

[6] Defendants, as noted, object to the inclusion of any foreign shareholders in the proposed class.  See *supra*, fn. 5, and the discussion of the issue of superiority, *infra*.

statements made both before and after the purchase date if the statements allegedly were made in furtherance of a common scheme to defraud" (citing *Nicholas v. Poughkeepsie Savings Bank/FSB*, No. 90 Civ. 1607 (RWS), 1990 WL 125154, at *5 (S.D.N.Y. Sept. 27, 1990))); *Zucker v. Sasaki*, 963 F. Supp. 301, 306–07 (S.D.N.Y. 1997) (discussing *Robbins* and noting that where defendants with an identity of interest make a series of "inter-related misstatements" as part of a "common course of conduct," post-purchase statements are relevant to the course of wrongful conduct alleged); *cf. Denny v. Barber*, 576 F.2d 465, 468–69 (2d Cir. 1978) (finding that proposed class representative could not properly represent persons who bought securities in reliance on fraudulent statements where he had purchased before *any* alleged false statements were made). As such, the Court finds that Morel may adequately represent later purchasers. *See Nicholas*, 1990 WL 145154, at *6 (rejecting implication that only someone who bought on the last day of the class period would be able to bring an action on her own behalf or on behalf of the entire class, and stating "there is considerable authority allowing class plaintiffs to represent later purchasers" (internal citations omitted)).

### 3.  Capital Invest

Capital Invest, the fund management company of the Bank Austria Greditanstalt Gruppe GmbH ("Bank Austria"), seeks to represent the claims of APK EU–Big Caps fund ("Big Caps Fund"), in its capacity as manager and attorney-in-fact. (Declaration of Irene Reisenberger, August 30, 2005 ("Reisenberger Decl.") ¶ 2, Zach Decl. Ex. 12.) The sole owner of the shares (i.e., units) in the Big Caps Fund is a large Austrian pension entity known as APK Pensionskasse Aktiengesellschaft ("APK"). The Big Caps Fund obtained Vivendi Universal shares in exchange for previously held Vivendi, S.A. shares,

and also purchased and sold Vivendi Universal shares on foreign exchanges, the last purchase of which occurred on January 21, 2002. (Zach Decl. Exs. 15, 16.) For reasons discussed in greater detail below, Austrian claimants shall be excluded from the class in this action. Therefore, the Court finds it unnecessary to address typicality/adequacy of representation issues as they relate to this plaintiff as it cannot properly serve as a class representative.

### 4. William Cavanagh

William Cavanagh is a United States resident. He purchased 100 Vivendi Universal ADSs on the NYSE on June 13, 2002. (Zach Decl. Ex. 31, at 21; Deposition of William Cavanaugh, July 29, 2005, Parr Decl. Ex. 24 ("Cavanaugh Dep.") at 170:23–171:07.) Defendants dispute Cavanagh's adequacy as a class representative because of his "striking" lack of knowledge regarding his claim. (Opp'n 34.) Defendants cite the following examples in support of this argument: (1) Cavanagh's inability to recall the year the complaint was filed, the relevant dates for the proposed class period, or how he decided to seek to become a proposed class representative, or to articulate key elements of the claims; (2) Cavanagh's similar inability to testify regarding his transactions in Vivendi securities beyond testifying that he sold his 100 Vivendi Universal shares at some point, though he did not know when or at what price (Cavanaugh Dep. 259:23–260:11, 181:14–182:03); (3) Cavanagh's failure to monitor class counsel, as evidenced by his inability to recollect ever meeting or speaking with any attorney associated with the Milberg Weiss law firm, and only works with attorneys from the law firms of Murray Frank and Abbey Gardy (*id.* at 15:25–16:19, 278:25–280:02).

"The Supreme Court . . . expressly disapproved attacks on the adequacy of a class representative based on the representative's ignorance." *Baffa*, 222 F.3d at 61 (citing *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370–74 (1966)). Courts in this district have held that "[p]laintiffs are entitled to rely on the 'expertise of counsel,'" and "a class representative will be found inadequate due to ignorance only when they 'have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *In re Worldcom Inc. Sec. Litig.*, 219 F.R.D. 267, 286 (S.D.N.Y. 2003) (quoting *Baffa*, 222 F.3d at 61); *accord Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077–78 (2d Cir. 1995). "[I]t is well established that 'in complex litigations such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance upon the expertise of counsel is to be expected.'" *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 181 (S.D.N.Y. 2005) (quoting *In re AM Int'l, Inc. Sec. Litig.*, 108 F.R.D. 190, 196–97 (S.D.N.Y. 1985)).

Despite defendants' concerns regarding Cavanaugh's imperfect recollections outlined above, there is nothing in the record to suggest that Cavanaugh is unwilling or unable to pursue the litigation on behalf of the class. Cavanaugh's deposition testimony reflects that he is aware that he is a proposed class representative (Cavanaugh Dep. 97:22–97:24), he understands the role carries an obligation "to represent the class members to the best of [his] ability, in discussions with [his] attorney" and an obligation to supervise class counsel (*id.* at 278:04–278:09, 278:25–279:04), he knows the action is against Vivendi and its former CEO and CFO and is aware of the claims (*id.* at 117:20–

117:25, 254:10–255:22; 306:02–306:08), and expressed a desire to "vigorously" pursue

the case, in consultation with counsel (*id.* at 306:02–306:08). *Cf. Baffa*, 222 F.3d at 62.

Defendants' criticism that Cavanaugh is only in communication with one of the two firms

appointed as class counsel is insignificant. In light of the foregoing, the Court finds

Cavanaugh to be an adequate class representative.

### 5. RSMB

RSMB administers the pension fund of the retirement system for the general

employees of Miami Beach, Florida. In the December 2000 merger, RSMB exchanged

Vivendi, S.A. and Canal Plus ADSs for Vivendi Universal ADSs in the three-way

merger. (Zach Decl. Ex. 33 at 3.) RSMB did not acquire any other Vivendi Universal

securities during the proposed class period. As such, defendants argue that RSMB could

only represent North American residents who acquired Vivendi Universal ADSs as part

of the merger and does not have standing to bring claims based on alleged misstatements

issued after the exchange of shares pursuant to the merger. As discussed *supra* in section

2.C.ii. (discussing adequacy of proposed class representative Gerard Morel), these

arguments are unpersuasive in a case such as this, where a common scheme to defraud

renders later-made statements relevant to the course of wrongful conduct underlying an

earlier purchaser's (or acquirer's) claims.[7]

Defendants further argue that RSMB is an inadequate class representative because

RSMB's "most knowledgeable" representative, Rick Rivera, RSMB's pension

administrator, lacks sufficient knowledge to demonstrate RSMB is an adequate class

---

[7] The Court notes that RSMB stands in a slightly different position from Morel in that it held both Vivendi S.A. and Canal Plus shares at the time of the merger. This distinction does not alter the Court's analysis of materiality, damages, or a shareholder's ability to adequately represent shareholders who purchased later in the class period.

**SA63**

representative.  Defendants contend that Rivera's testimony demonstrates that RSMB does not understand important aspects of this action or the responsibilities attendant to being a class representative.[8]  However, plaintiffs have established that Rivera understands that the pension fund seeks to be appointed a class representative, in which capacity it would seek damages on behalf of the entire class, and that his responsibilities would include following the case, reviewing documents and filings, and consulting with counsel.  (Deposition of Rick Rivera, May 20, 2005 ("Rivera Dep.") 152:21–153:14, 150:02–150:11.)  He also understood that as class representative RSMB would have to represent the best interests of the class, which includes all members who sustained damages as a result of Vivendi's alleged fraud.  (*Id.* at 153:24–154:03, 107:03–108:07.)  He also understood that the complaint alleges that "defendants provided false statements that inflated the stock price."  (*Id.* at 59:15–59:23.)  The Court has been presented with no evidence suggesting that RSMB will be unable or unwilling to adequately represent the class, or that RSMB has interests antagonistic to those of the class as a whole, which are the relevant inquiries at issue here.  The lack of knowledge of which defendants complain does not rise to the sort of ignorance that warrants denial of class representative status.  *See, e.g.*, *In re Worldcom*, 219 F.R.D. at 286.

---

[8] For example, Rivera could not (1) describe the scope of the proposed class (Rivera Dep. 107:15–108:07); (2) identify any document relevant to the action that RSMB has reviewed, or state with any certainty that RSMB reviewed the complaint (or understand the term "complaint") (*id.* at 27:07–27:20, 58:02–58:04); (3) state with any certainty that RSMB read its responses to defendants' interrogatories, though he personally verified the responses (*id.* at 73:08–73:25); (4) identify how many times RSMB has spoken with plaintiffs' counsel, or whether RSMB had ever done so within the last year (*id.* at 57:03–57:25); (5) identify the number of shares RSMB acquired during the proposed class period, or when such shares were acquired or sold (*id.* at 85:14–86:09); (6) state with certainty whether RSMB had disposed of all its Vivendi securities during the proposed class period (*id.* at 185:16–186:02); (7) describe the interests of the class members or how RSMB would determine those interests (*id.* at 124:16–124:10).

### 6.     Bruce Doniger

Bruce Doniger is a resident of the United States.  Doniger acquired Vivendi

Universal ADSs in exchange for his previously held Seagram shares following the

December 2000 three-way merger.  Defendants argue that Doniger lacks standing to

bring claims for alleged misstatements made after he exchanged his shares, and note that

there are no other representatives with standing to represent post–December 2000 claims.

This argument has already been addressed and rejected by the Court.

Defendants also point out that Doniger is a second cousin to Edgar Bronfman, Sr.

and Charles Bronfman (father and uncle, respectively, to Edgar Bronfman, Jr.) and

sponsor of former Vivendi Board member Samuel Minzberg.  Prior to the December

2000 merger, the principal owners of Seagram were Edgar Bronfman, Jr. and the

Bronfman family, which became the largest shareholders of Vivendi following the

merger.  (FACC ¶ 51.)  Edgar Bronfman, Jr. held the position of Executive Vice

Chairman of the Vivendi Board until December 2001, at which time he resigned.  (FACC

¶ 79.)  Defendants further state that Doniger received his Seagram shares because of his

familial relationships.  (Doniger Dep. 20:03–23:10, 38:23–39:08, 101:11–102:11.)  Based

on these relationships, defendants appear to argue that Doniger would be subject to

unique defenses likely to become the focus at trial, rendering him atypical and

prejudicing absent class members.  However, defendants do not point to any evidence

that Doniger is subject to unique defenses concerning, for example, lack of reliance

because of the receipt of nonpublic information obtained by virtue of these relationships.

*Cf. Landry v. Price Waterhouse Chartered Accountants*, 123 F.R.D. 474, 475–76

(S.D.N.Y. 1989) (finding proposed class representatives atypical where their deposition

**SA65**

testimony reflected that they had received nonpublic information and recommendations from friends and associates). Furthermore, the Court does not find that Doniger's familial relationships, without more, are sufficient to conclude that Doniger has interests antagonistic to those of the class, or that he would be unwilling or unable to fairly and adequately represent the class.

## III.    Rule 23(b)(3)

Having addressed the requirements of Rule 23(a), the Court now turns to whether Rule 23(b)(3) has been satisfied. Rule 23(b)(3) requires a court to find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b). A class certified pursuant to Rule 23(b)(3) is sometimes referred to as an "opt-out" class because Rule 23(c)(2) mandates that members of a class certified under Rule 23(b)(3) be afforded an opportunity to "request exclusion" from that class.[9] Particularly relevant to a purported class including foreign purchasers, anyone who does not affirmatively inform the Court that they wish to be excluded from the class is bound by the final disposition of the case.

### A.    Predominance of Common Issues

Rule 23(b)(3) allows for certification of a class where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). This inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy . . .

---

[9] Rule 23(c)(2)(B) provides, in relevant part, that notice to members of "any class certified under Rule 23(b)(3) . . . must concisely and clearly state in plain, easily understood language . . . that the court will exclude from the class any member who requests exclusion."

**SA66**

[and] tests whether proposed classes are sufficiently cohesive to warrant adjudication by

representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997). The Rule

23(b)(3) predominance inquiry "is a more demanding criterion than the commonality

inquiry under Rule 23(a). Class-wide issues predominate if resolution of some of the

legal or factual questions that qualify each class member's case as a genuine controversy

can be achieved through generalized proof, and if these particular issues are more

substantial than the issues subject only to individualized proof." *Moore v. Paine Webber,*

*Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002) (internal citations and quotation marks omitted).

However, the Supreme Court has noted that "[p]redominance is a test readily met in

certain cases alleging . . . securities fraud." *Amchem Prods.*, 521 U.S. at 625 (citing Fed.

R. Civ. P. 23 Advisory Committee Notes, 1966 Amendment, 28 U.S.C.A. Rule 23, at

385).

     In this case, there are common questions of law and fact involving violations of

the securities laws based on a common course of conduct directed at the entire class, and

that predominate over any individualized questions that may exist. The common issues

in this action include whether defendants issued materially false and misleading

statements as to Vivendi's earnings (both in connection with a registration statement and

prospectus dated October 30, 2000, and thereafter), scienter, reliance, and causation. All

plaintiffs will rely on the same or substantially similar documents, statements, and legal

theories to prove the defendants' liability. Defendants do not present any argument that

the claims at issue here may not be largely resolved by class-wide proof. Indeed, they do

not appear to contest that the predominance requirement in met in this case. Because

common factual and legal questions predominate over individual issues, the Court

**SA67**

determines that this requirement has been satisfied.  *See, e.g.*, *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, No. 02 Civ. 5575 (SWK), 2006 WL 903236, at *5 (S.D.N.Y. Apr. 6, 2006) (finding predominance requirement readily met because "allegations of defendants' misrepresentations and the improper inflation of AOL's accounting revenues underlie the factual and legal claims of every Class Member"); *In re Globalstar Sec. Litig.*, No. 01 Civ. 1748 (PKC), 2004 WL 2754674, at *5 (S.D.N.Y. Dec. 1, 2004) (finding predominance prong met where there were common issues with respect to whether defendants issued materially false and misleading statements as to Globalstar's subscription rate and revenues, scienter, reliance, and causation).

### B.    Superiority of Class Action Treatment

The superiority requirement asks courts to balance, in terms of fairness and efficiency, the advantages of a class action against those of alternative available methods of adjudication.  *See* Fed. R. Civ. P. 23 Advisory Committee Notes, 1966 Amendment, 28 U.S.C.A. Rule 23, at 385 ("Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.").  Rule 23(b)(3) identifies several factors to consider in determining whether a class action is in fact "superior to other available methods for the fair and efficient adjudication of the controversy":

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

**SA68**

Fed. R. Civ. P. 23(b)(3).  This list of pertinent factors is nonexhaustive, *see* Fed. R.

Civ. P. 23 Advisory Committee Notes, 1966 Amendment, 28 U.S.C.A. Rule 23, at 386

(1992), "and the purposes of Rule 23 should weigh heavily in this determination," 2 Alba

Conte & Herbert Newberg, *Newberg on Class Actions* § 4:28 (4th ed. 2002).

**1.    Interests in Prosecuting Individual Suits; the Extent and
          Nature of Other Pending Litigation**

As the advisory committee's notes to Rule 23 indicate, "[t]he court is to consider

the interests of the individual members of the class in controlling their own litigations and

carrying them on as they see fit."  Fed. R. Civ. P. 23 Advisory Committee Notes, 1966

Amendment, 28 U.S.C.A. Rule 23, at 386.  In considering this interest, "the court should

inform itself of any litigation actually pending by . . . the individuals," because the

existence of pending actions may reveal that "[t]he interests of individuals in conducting

separate lawsuits [are] so strong as to call for denial of a class action."  *Id.*; *see also In re

"Agent Orange" Prod. Liability Litig.*, 818 F.2d 145, 165 (2d Cir. 1987) ("All plaintiffs

may not desire class certification . . . because those with strong cases may be better off

going it alone.").

As courts have frequently noted, class action treatment is particularly appropriate

when plaintiffs seek redress for violations under the securities laws.  *See Mills v. Elec.

Auto-Lite Co.*, 396 U.S. 375, 382 (1970); *Green v. Wolf Corp.*, 406 F.2d 291, 296 (2d Cir.

1968) ("[A] class action in a federal securities action may well be the appropriate means

for expeditious litigation of issues, because a large number of individuals may have been

injured, although no one person may have been damaged to a degree which would have

induced him to institute litigation solely on his own behalf."); *Eisenberg v. Gagnon*, 766

F.2d 770, 785 (3d Cir. 1985) ("[C]lass actions are a particularly appropriate and desirable

**SA69**

means to resolve claims based on the securities laws, since the effectiveness of the

securities laws may depend in large measure on the application of the class action

device." (internal quotation marks and citations omitted)); *In re Blech*, 187 F.R.D. at 101;

*Baron v. Commercial & Indus. Bank of Memphis*, No. 75 Civ. 1274 (LBS), 1978 WL

168588, at *2 (S.D.N.Y. Aug. 21, 1978) ("Because most securities fraud cases involve

purchasers' claims which might otherwise be too paltry to justify individual litigation,

courts have concluded in securities actions, the class action procedure is not only

superior, but probably indispensable for the vindication of plaintiffs' rights . . . and to

assure that the securities laws will be vigorously enforced." (internal quotation marks and

citation omitted)); 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.03 (3d ed.

2004).  In a case such as this, where each individual plaintiff can only have a fraction of

the interest in the outcome of the litigation as the defendants, any interest the members of

the class might have in individually controlling the prosecution of separate actions is

heavily outweighed by the obvious benefits of pressing their claims as a class.  *See*

*Amchem*, 521 U.S. at 617 ("'The policy at the very core of the class action mechanism is

to overcome the problem that small recoveries do not provide the incentive for any

individual to bring a solo action prosecuting his or her rights.  A class action solves this

problem by aggregating the relatively paltry potential recoveries into something worth

someone's (usually an attorney's) labor.'" (quoting *Mace v. Van Ru Credit Corp.*, 109

F.3d 338, 344 (1997))).

The actions by putative class members currently pending before French courts

against Vivendi do not, in the Court's view, change this calculus.  According to

submissions made by both parties, at present Vivendi is defending two individual

shareholder suits filed in the Paris Tribunal de Grande Instance (trial court) in France, *Société Richard Hugo v. Vivendi Universal, S.A.* and *Courage v. Vivendi Universal, S.A.* (Bisiaux Decl. ¶¶ 12–13 & Exs. 8–9).[10] The pendency of these actions does not persuade the Court that any individual shareholder has an interest in conducting separate lawsuits sufficient to outweigh the advantages to all shareholders of proceeding on a class basis. *See*, Fed. R. Civ. P. 23 Advisory Committee Notes, 1966 Amendment, 28 U.S.C.A. Rule 23, at 386 (noting that even where additional litigation is pending, the interests in conducting separate lawsuits may be "theoretical rather than practical" because, *inter alia*, "the amounts at stake for individuals may be so small that separate suits would be impracticable").

       **2.**      **Desirability or Undesirability of Concentrating the Litigation of the Claims in this Particular Forum**

Plaintiffs' proposed class definition encompasses a significant number of foreign class members; indeed, thirty-seven percent of Vivendi's ordinary shares were held by citizens of France who purchased them on the Bourse, while U.S. investors held twenty-five percent of Vivendi shares in the form of ADSs purchased on the NYSE. (Bisiaux Decl. ¶ 7.) Relying primarily on Judge Friendly's opinion in *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 996 (2d Cir. 1975), defendants argue that all foreign plaintiffs must be excluded from the class because it is a "near certainty" that if this action is dismissed, taken to judgment, or settled, defendants would not be able to assert claim prelusion to bar subsequent actions in the countries in which foreign plaintiffs reside. Although defendants do not consistently characterize their argument as such, the Court will

---

[10] A third action, *Pasturaud v. Vivendi Universal, S.A.*, a suit by ninety-seven individual shareholders, was dismissed without prejudice due to plaintiffs' failure to register the complaint. (Defs.' Sur-Reply Mem. 1 n.1.)

consider this aspect of their opposition to be an attack on the superiority of class action treatment of the claims of foreign purchasers.

(a)    The "Near Certainty" Test

*Bersch* involved an action on behalf of all purchasers of stock in a Swiss-based, Canadian corporation asserting claims for violations of the federal securities laws relating to stock offerings made outside the United States.  The proposed class included approximately 50,000 purchasers of whom 386 were American and the balance of whom were foreigners.  *Id.* at 977–78 n.2.  The Court first determined that federal securities laws did *not* reach losses from sales of securities to foreigners outside the United States because no acts occurred within the United States directly causing such losses, *see id.* at 986–90.  Having dismissed these federal securities law claims for lack of subject matter jurisdiction, the Court then addressed whether the class might still be certified to include foreign purchasers with respect to their state law claims.  The *Bersch* plaintiffs argued that there was pendent jurisdiction over their alleged common law fraud claims and that this would justify the inclusion of foreign purchasers in the proposed class.  *Id.* at 993. The Second Circuit rejected this argument, calling it "ludicrous" to consider the state law claims of foreign purchasers pendent, and finding it would be an abuse of discretion for the district court to exercise pendent jurisdiction over the foreign purchasers' common law fraud claims.  *Id.* at 996 (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726–27 (1960)).  The Court also articulated practical concerns, such as the introduction of complex choice-of-law issues, and the resultant necessity to look at the laws of at least fourteen other countries where sales were made, and the minimal domestic impact of a

**SA72**

Case 15-399, Document 85, 08/12/2015, 1574465, Page78 of 246

substantially foreign transaction, which together also weighed heavily against the exercise of pendent jurisdiction.

While not necessary to its finding of lack of jurisdiction, the Court noted that the management of a class including thousands of foreign purchasers could impose burdens on overtaxed district courts.  In addition, and of critical importance to defendants' argument here, Judge Friendly also considered the likelihood of foreign recognition of any U.S. judgment that might be ultimately entered in the action:  "Also, while an American court need not abstain from entering judgment simply because of a possibility that a foreign court may not recognize or enforce it, the case stands differently when this is a *near certainty*," because, as Judge Frankel had observed in his district court decision certifying a class, "if defendants prevail against a class they are entitled to a victory no less broad than a defeat would have been."  *Id.* (emphasis added).[11]  In light of "uncontradicted affidavits that England, the Federal Republic of Germany, Switzerland, Italy, and France would not recognize a United States judgment in favor of the defendants as a bar to an action by its their own citizens" and an affidavit stating that several hundred individually brought claims were pending in Switzerland and that at least ninety had been settled, the Second Circuit directed the district court to exclude from the class action all foreign purchasers over whose claims—importantly—there was neither federal nor pendent jurisdiction.  *Id.* at 996–97.

### (b)    The Progeny of Bersch

Since *Bersch*, and without the benefit of any further guidance from the Second Circuit, courts in this district and elsewhere have considered, in a somewhat haphazard

---

[11] Judge Frankel's decision of June 28, 1972 was not reported, but it appears that despite his concern about claim preclusion he certified a class of all purchasers, foreign and domestic.  *Id.* at 982.

**SA73**

way, the risk of nonrecognition by a foreign court as a factor relevant to whether, for purposes of satisfying Rule 23(b)(3), class treatment of foreign purchasers' claims is a superior method of adjudication.

Defendants point to three post-*Bersch* cases to support the exclusion of foreign purchasers from the proposed class here. In *CL-Alexanders Laing & Cruickshank v. Goldfeld*, 127 F.R.D. 454, 459 (S.D.N.Y. 1989), Judge Mukasey denied class certification in a securities fraud action because the combination of (1) an uncontested affidavit stating that a British court "will not" recognize a foreign judgment in a U.S. opt-out class action, (2) a class size of only twenty-five members, and (3) atypical claims by the named plaintiff together failed to satisfy the requirements of Rule 23. "[T]he combination of these problems," Judge Mukasey noted, "no one of which standing alone would necessarily require denial of class certification, virtually mandates the rejection of the class action form here." *Id.* at 460. While it is not clear what standard Judge Mukasey applied with respect to the claim preclusion issue, it would appear that he considered an uncontested affidavit stating to a certainty that a British court would not recognize a U.S. judgment insufficient on its own to deny class certification. Similarly in *Ansari v. New York University*, 179 F.R.D. 112 (S.D.N.Y. 1998), Judge Mukasey found that doubts regarding claim preclusion in foreign jurisdictions tipped the scales against an already weak motion for class certification. In *Ansari*, a dentist sued New York University, its college of dentistry, and various university officials, alleging breach of contract and violation of state statutes relating to an alleged failure to provide education services. The proposed plaintiff class included only thirty-five members, some of whom were foreigners, and failed to satisfy Rule 23(a)(1)'s numerosity requirement. *Id.* at 116.

**SA74**

Second, though "not as significant as the failure to satisfy the numerosity requirement," class certification was denied because "limited case law . . . suggests" that at least six of the relevant foreign countries would not accord claim preclusion to an opt-out class action. *Id.* at 117. Judge Mukasey considered this fact "further evidence that class certification is inappropriate," though of course the decision could have rested entirely on plaintiffs' failure to establish numerosity. *Id.*

In *In re Daimler Chrysler AG Securities Litigation*, 216 F.R.D. 291 (D. Del. 2003), on which defendants also rely, plaintiffs asserted securities fraud claims against a German automobile manufacture based on false statements allegedly made in connection with the acquisition of an American automobile manufacturer. The court did not cite *Bersch* but did cite *Ansari* and *CL-Alexanders* for the proposition that class certification may be inappropriate where "obstacles" exist due to the inclusion of foreign class members. *Id.* at 301. Finding "practical difficulties" in maintaining a class with foreign investors, and further that plaintiffs had not adequately addressed manageability and damage issues, the court limited the class to U.S. investors.

Reaching a different result in *Cromer Finance Limited v. Berger*, 205 F.R.D. 113 (S.D.N.Y. 2001), Judge Cote considered the res judicata effect of a class action judgment as "a factor that must be considered in evaluating the superiority of the class action device," but distinguished those cases "in which there is a 'possibility' that a foreign court may not recognize a judgment, and those in which there is 'near certainty' that it will not be recognized." *Id.* at 134–35 (citing *Bersch*, 519 F.2d at 996). Judge Cote concluded, upon review of the competing expert affidavits, that it was "at most a 'possibility'" that foreign courts would not recognize a U.S. judgment, and certified a

class including foreign claimants alleging federal securities fraud against an operator of an offshore investment fund and Bermuda accounting firms. *Id.* at 135. Taking a different tack, Judge Sweet, in *In re Lloyd's American Trust Fund Litigation*, No. 96 Civ. 1262 (RWS), 1998 WL 50211, at *15 (S.D.N.Y. Feb. 6, 1998), read *Bersch* as applying only to whether a class action should proceed under principles of pendent jurisdiction, and emphasized that *Bersch* did not directly address the issue of superiority under 23(b)(3). Without applying the "near certainty" test, Judge Sweet concluded that "a foreign court may look to the results achieved here for guidance, thereby contributing to the superiority of the class action procedure," and certified the class. *Id.*; *see also In re U.S. Fin. Sec. Litig.*, 69 F.R.D. 24, 50 (S.D. Cal. 1975) (stating that defendant's "reliance upon *Bersch* is misplaced because *Bersch* does not preclude foreign nationals from membership in any class alleging violations of the federal securities acts simply because of res judicata problems" and noting that "[a]lthough the res judicata problem is one factor to consider . . . it should not be used to deny [class certification] . . . especially when this Court otherwise has subject matter jurisdiction").

In *Frietsch v. Refco, Inc.*, 92 C. 6844, 1994 WL 10014 (N.D. Ill. Jan. 13, 1994), the district court for the Northern District of Illinois considered a motion to certify a class of investors in commodity pools, including a number of German putative class members. The plaintiffs alleged, *inter alia*, violations of Sections 10(b) and 12(2) of the Exchange Act. *Id.* at *1. There, as here, the defendants argued that the class action device failed under Rule 23(b)(3) because German law would not recognize a judgment in a U.S. class action. *Id.* at *11. In support of this argument, the defendants' German law expert stated that a judgment in defendants' favor would "'most likely' not be given res judicata

**SA76**

effect." *Id.* By contrast, the plaintiffs' German law expert stated that the "issue of res judicata cannot be predicted with certainty because there are no precedents, and any decision by a German court would be fact specific." *Id.* Faced with dueling affidavits, the court concluded that the preclusion issue "remain[ed] an uncertainty that [would] not paralyze the court from making a ruling that will provide all parties with the most efficient tools available to litigate the claims in this case." *Id.* The *Freitsch* court distinguished *CL-Alexanders* and *Bersch*, because in those cases the record contained uncontradicted affidavits that persuaded the respective courts that foreign courts would certainly not afford res judicata effect to a U.S. judgment on behalf of a class. *Id.*

The foregoing cases, regardless of their ultimate outcome, reveal that res judicata concerns have been appropriately grafted onto the superiority inquiry. It does not appear, however, that res judicata concerns should be dispositive without either an evaluation of the likelihood of nonrecognition or a consideration of other factors which impact a determination of the superiority requirement. *Ansari*, 179 F.R.D. at 116 (res judicata is "one of the factors that must be considered."); *Cromer*, 205 F.R.D. at 134; *In re U.S. Fin. Sec. Litig.*, 69 F.R.D. at 49 ("[T]he issue of *res judicata* was *one* of several factors to be considered." (citing *Bersch*, 519 F.2d 974)). With regard to an evaluation of the risk of nonrecognition, the Court does not find the "near certainty" standard to be a particularly useful analytical tool. In *Bersch*, Judge Friendly found, based on unopposed affidavits that nonrecognition was almost certain; however, there is no indication that only this degree of certitude calls into question the superiority of a class action. Nor is it likely that only where nonrecognition is a "mere possibility" ought a court find superiority to be established. It seems more appropriate, instead, to evaluate the risk of

nonrecognition along a continuum. Where plaintiffs are able to establish a probability that a foreign court will recognize the res judicata effect of a U.S. class action judgment, plaintiffs will have established this aspect of the superiority requirement. *See In re IPO Sec. Litig.*, 471 F.3d at 33 (placing burden on plaintiff not just to produce "some evidence" of compliance with Rule 23, but to show that its requirements are met). Where plaintiffs are unable to show that foreign court recognition is more likely than not, this factor weighs against a finding of superiority and, taken in consideration with other factors, may lead to the exclusion of foreign claimants from the class. The closer the likelihood of non-recognition is to being a "near certainty," the more appropriate it is for the Court to deny certification of foreign claimants. With these principles in mind, the Court now turns to the parties' arguments with respect to the degree of risk of foreign nonrecognition in this case.

### (c)    Recognition in France

Both sides have submitted voluminous competing expert declarations on the question of whether foreign courts would grant preclusive effect to a United States judgment or settlement in this action.[12] Because a vast majority of the foreign

---

[12] The following citation conventions will be followed with respect to the parties' competing expert declarations. Declaration of Bernart Audit in Support of Vivendi Universal, S.A's Opposition to Plaintiffs' Motion for Class Certification, Sept. 27, 2005 ("Audit Decl."); Declaration of Guy Carcassonne in Support of Vivendi Universal, S.A's Opposition to Plaintiffs' Motion for Class Certification, Sept. 23, 2005 ("Carcassone Decl."); Declaration of Daniel Cohen in Support of Vivendi Universal, S.A's Opposition to Plaintiffs' Motion for Class Certification, Oct. 3, 2005 ("Cohen Decl."); Declaration of Gérard de Geouffre de la Pradelle in Support of Vivendi Universal, S.A's Opposition to Plaintiffs' Motion for Class Certification, Sept. 29, 2005 ("de la Pradelle Decl."); Declaration of Olivier Renard-Payen in Support of Vivendi Universal, S.A's Opposition to Plaintiffs' Motion for Class Certification, Sept. 27, 2005 ("Renard-Payen Decl."); Declaration of François Terré in Support of Vivendi Universal, S.A's Opposition to Plaintiffs' Motion for Class Certification, Sept. 30, 2005 ("Terré Decl."); Joint Declaration of Daniel Cohen and Géraud de Geouffre de la Pradelle in Support of Vivendi Universal, S.A's Sur-Reply in Opposition to Plaintiffs' Substituted Motion for Class Certification, Feb. 3, 2006 ("Cohen/de la Pradelle Decl."); Declaration of Alexis Mourre in Support of Plaintiffs' Motion for Class Certification, Dec. 6, 2005 ("Mourre Decl."); Declaration of Hélène Gaudemet-Tallon in Support of Plaintiffs' Motion for Class Certification, Dec. 1, 2005 ("Gaudemet-Tallon Decl."); Declaration of Hans Smit in Support of Plaintiffs'

**SA78**

shareholders are French nationals, the Court will address first, and in greater detail, the likelihood of recognition by a French court.

As both parties agree, there is no bilateral (or multilateral) agreement between France and the United States governing the recognition and enforcement of judgments and jurisdictional decisions rendered by their respective courts. (*See* Mourre Decl. ¶ 19; Renard-Payen Decl. ¶ 12; Audit Decl. ¶ 13; de la Pradelle Decl. ¶ 15.) French law also does not follow the condition of reciprocity, whereby a foreign judgment may have effect in France only if the foreign jurisdiction gives effect to French decisions. (*See* Terré Decl. ¶ 14.) Thus the United States's rules for recognition of foreign judgments are not relevant, and French recognition of a United States judgment is determined with reference solely to French law. The issue of whether a United States class action judgment would be recognized and enforced in France has never been directly addressed by French courts. (*See* Mourre Decl. ¶ 17; de la Pradelle Decl. ¶ 35; Gaudemet-Tallon Decl. ¶ 26; Smit Decl. ¶ 91.) However, French decisional law does address in general terms the circumstances in which foreign judgments may be recognized. (*See* de la Pradelle Decl. ¶ 15.)

Under French case law, before a foreign decision may be enforced or recognized (i.e., given preclusive effect) in France, it must first be subjected to the "exequatur" procedure. (Terré Decl. ¶ 15; de la Pradelle Decl. ¶ 30; Mourre ¶ 154.) Exequatur proceedings are concerned with the enforceability of a foreign decision under French law,

---

Motion for Class Certification, Dec. 20, 2005 ("Smit Decl."); Supplemental Declaration of Alexis Mourre in Support of Plaintiffs' Motion for Class Certification, June 22, 2006 ("Mourre Suppl. Decl."); Joint Declaration of Bernard Audit, Guy Carcassonne, Daniel Cohen, Gérard de Geouffre de la Pradelle, and Olivier Renard-Payen Setting Forth Observations with Respect to the Supplemental Declaration of Alexis Mourre and the Decision of the *Cour de Cassation* in *Prieur v. De Montenach*, July 7, 2006 ("Defs.' Suppl. Decl.").

and not with the substance of the underlying dispute.  (Terré Decl ¶ 16; Smit Decl. ¶ 56.)
If exequatur is granted, the underlying judgment is not changed, but rather its content is
incorporated into the exequatur judgment, which then receives enforceability and res
judicata effect in France.  (Terré Decl. ¶ 16; Mourre Decl. ¶¶ 154–56.)  The competing
expert declarations agree that the recognition and enforcement of foreign judgments
(grant of exequatur) in France is primarily governed by the *Munzer* case, decided by
France's highest court, the *Cour de cassation*, in 1964.  (*See, e.g.*, Audit Decl. ¶¶ 14, 16;
Mourre Decl. ¶ 20; de la Pradelle Decl. ¶ 17; Terré Decl. ¶ 19; Renard-Payen Decl. ¶ 13.)
The conditions that must be met under *Munzer* in order to grant exequatur may be
summarized as follows:  (1) the foreign court must properly have jurisdiction under
French law (the "jurisdictional prong"); (2) the foreign court must have applied the
appropriate law under French conflict-of-law principles (the "applicable-law prong"); (3)
the decision must not contravene French concepts of international public policy (the
"public policy prong"); and (4) the decision must not be a result of *fraude á la loi*
(evasion of the law) or forum shopping (the "forum shopping prong").  (*See* Cohen/de la
Pradelle Decl. ¶ 5.)

### (i)    Jurisdictional Prong

Whether this Court would be viewed as having properly asserted jurisdiction over
the French defendants is governed by the *Cour de cassation* case of *Simitch v. Fairhurst*
(Cass. 1e civ. Feb. 6, 1985) (*see* Defs.' Suppl. Decl. ¶ 3; Mourre Decl. ¶ 22; Smit Decl. ¶
58).  The *Simitch* test requires that, in order for a foreign court to have properly exercised
its jurisdiction, the following requirements must be met: (1) the case must not fall within
the exclusive jurisdiction of the French courts, (2) the circumstances of the case or

**SA80**

judgment at issue must be linked in a "characterized manner" to the foreign court, and (3) the choice of the foreign court must not be fraudulent. (*See* Mourre Decl. ¶ 24; *see also* Defs.' Suppl. Decl. ¶ 3.) Defendants' initial submissions relied heavily on the proposition that French courts had exclusive jurisdiction over French defendants under Article 15 of the French Civil Code and that, absent waiver, French courts would never recognize a U.S. judgment entered against a French entity. That position is no longer tenable in light of the recent decision of the *Cour de cassation* in *Prieur v. Montenach* (Cass. 1e civ. May 23, 2006) holding that "Article 15 only provides for an optional jurisdiction of French courts."

The question then becomes whether there is a sufficient or "characterized link" to warrant the exercise of jurisdiction by a U.S. court. Plaintiffs' experts contend that in order to satisfy this requirement, a French court does not need to determine that the foreign court has jurisdiction according to French conflict-of-jurisdictions rules, but rather must find that there were sufficient connections between the case and the foreign court such that its exercise of jurisdiction was not inappropriate. (Mourre Decl. ¶ 76.) Although there are no precise criteria to define what might constitute a "characterized link" (*id.* at ¶ 75), one of plaintiffs' experts, Professor Hans Smit, likens it to the American concept of subject matter jurisdiction. (Smit Decl. ¶ 58). This Court, of course, has determined that subject matter jurisdiction exists based on plaintiffs' allegations that a substantial number of Vivendi's securities were traded in the United States, that individual defendants allegedly moved to the United States to expand Vivendi's presence there, and that a number of the alleged fraudulent acts took place in the United States. (*See* Mourre Decl. ¶ 77.) Based on the foregoing, plaintiffs' experts

**SA81**

conclude that the "characterized link" requirement is "easily met in this case" (*id.* at ¶ 78), and indeed, that "there can be no doubt" of that fact (Smit Decl. ¶ 58).

Defendants' experts, however, express no such sanguine view of the likelihood of the "characterized link" test being met. They are instead "firmly of the view that a French court would reject a U.S. Court's assertion of jurisdiction over those foreign/absent class members as improper." (Defs.' Suppl. Decl. ¶ 5.) Defendants' experts base this conclusion in large part on the circumstances underlying the *Cour de cassation*'s recognition of foreign jurisdiction in the above-mentioned *Prieur* case. There, the French court found that the exercise of jurisdiction by the Swiss courts was appropriate in an annulment proceeding where the husband and wife were both born in Switzerland, married in Switzerland under Swiss law, and established their marital residence in Switzerland. Although the husband was a French citizen, these "ties" to Switzerland, the French court concluded, justified referring the case to Swiss courts to rule on the annulment of the marriage. (*See* Mourre Suppl. Decl. Ex. A, at 3.) Defendants' experts contend that the *Prieur* case shows a French court will require a similar showing of substantial contacts between the parties and the foreign jurisdiction before recognizing a "characterized link." (Defs.' Suppl. Decl. ¶¶ 8–9.) Unlike the parties in the *Prieur* case, the foreign shareholders in the putative class had no direct contacts with the United States, and did not purchase their Vivendi shares in the United States. (*Id.* at ¶ 10.) In addition, the foreign shareholders have not expressly indicated any desire to sue Vivendi—a French corporation with its headquarters in Paris—in the United States or to be included in the putative class here. (*Id.*)

The acknowledged difference in degree of the contacts between the parties and the foreign forum in *Prieur* and in the instant case, however, is not sufficient to persuade this Court that a French court would not find a sufficient characterized link between the alleged fraud in this action and the United States sufficient to support the Court's exercise of jurisdiction. Defendants' experts merely show that where the ties of a case to the foreign jurisdiction are so significant as to be considered near absolute, a characterized link is readily established. It does not follow that the connection between defendants' alleged fraudulent course of conduct, occurring in sufficient part in the United States to warrant a finding of subject matter jurisdiction under our laws, would be insufficient under the "characterized link" standard. The links between the parties and the foreign forum in *Prieur* tend more to establish the paradigmatic case than to illuminate what a French court would decide when faced with the potentially closer question presented here. Upon the record presented, where Vivendi's CEO and CFO moved their operations to the United States and, allegedly, continued their fraudulent scheme there, the Court concludes that a French court would likely find a "characterized link" sufficient to satisfy the second element of the *Simititch* test.

The final element of the *Simititch* test is that plaintiffs' choice of a United States court must not have been fraudulent. This requirement has two different elements. First, the foreign judgment must not have been "obtained through deceitful maneuvers." (Mourre Decl. ¶ 79.) Defendants do not contest this element. Second, the case must not have been brought "in a foreign court in order to obtain a ruling from that foreign court, under foreign law that differs from the law to which a litigant would otherwise be subjected domestically." (Terré Decl. ¶ 45.) That is, plaintiff must not have

**SA83**

manufactured jurisdiction in order to choose a more favorable forum when French law should have applied. Defendants argue that plaintiffs' U.S. action is "engineered" to evade a judgment under French law. In 2002, the "ADAM" association (protecting minority shareholders) along with certain Vivendi shareholders (designated by name) petitioned the Paris Commercial Court to investigate Vivendi during the basic class period. The court found the claim "ill-founded" and dismissed it. The ADAM chairwoman allegedly stated that the dismissal prompted her to introduce a class action in the United States on behalf of French shareholders. Thus, defendants argue, the U.S. action is an attempt to avoid the proper application of French law, and will preclude a grant of exequatur. (Terré Decl. ¶ 46; *see also* Cohen/de la Pradelle Decl. ¶ 21.)

As an initial matter, there is no evidence that the action pending before the Court was in fact brought at the instigation of the ADAM chairwoman. Furthermore, while plaintiffs in this case have clearly come before this Court in order to avail themselves of causes of action and procedural devices unavailable in France, it is by no means a certainty that this alleged forum shopping would form a bar to recognition. Indeed, it is difficult to see how plaintiffs in this case are operating a fraud on the court by bringing U.S. securities law claims that are, in part, based on activities in the United States, and which have been found to be within the Court's subject matter jurisdiction. The Court concludes, therefore, that a French court is unlikely to find that plaintiffs engaged in improper forum shopping in pursuing this action in the United States, and would conclude that the third element of the *Simititch* test (and thereby the jurisdictional prong of *Munzer*) is satisfied.

### (ii)    Applicable-Law Prong

The applicable-law prong asks whether under French choice-of-law principles the application of U.S. law in this action is appropriate.  Although French law recognizes that when a French company trades securities on foreign exchanges it is subject to the laws of those countries (*see* Mourre Decl. ¶ 139), the issue here is whether U.S. law was properly applied with respect to non-U.S. investors who did not purchase Vivendi securities on the NYSE.  Neither party provides guidance on what recognized French choice-of-law principles in fact are, nor what rules of analysis are applied in determining whether, in the French view, the proper law has been applied.

Defendants' expert opinions are not uniform with respect to their analysis of the applicable-law prong.  Two of defendants' experts believe that a French court would determine that the appropriate applicable law would be French law, because the defendants are French, much of the alleged wrongdoing occurred in France, and many of the relevant transactions were made by French investors in France.  (*See* Terré Decl. ¶ 28; Audit Decl. ¶ 25.)  However, Terré and Audit both acknowledge that the application of foreign law may be recognized as appropriate where the doctrine of "equivalence" applies.  (*See* Terré Decl. ¶ 29; Audit Decl. ¶ 26.)  Equivalence exists where the resolution of the matter under French law would have been the same as the one made under the foreign law at issue.  (*See* Terré Decl. ¶ 29.)  Both Terré and Audit argue that the application of U.S. law and French law in these circumstances would not be considered equivalent because of fundamental procedural differences, such as the opt-out

**SA85**

mechanism and the calculation of damages contemplated by Rule 23.[13]  (*See* Terré Decl.

¶¶ 30–31; Audit Decl. ¶ 26.)

Defendants' experts Cohen and de la Pradelle take a slightly different view,

though arriving at the same conclusion that a French court would not consider the

applicable-law prong satisfied.  Under French law, a company whose office is in French

territory is subject to French law.[14]  (*See* Cohen Decl. ¶ 18.)  Cohen and de la Pradelle

conclude that based on the foregoing provisions of French law, any judgment applying

U.S. law to a case involving a French company would not be recognized.  (*See* Cohen/de

la Pradelle Decl. ¶ 15; *see also* Cohen Decl. ¶ 18.)  These provisions standing alone,

however, do not provide any basis for concluding that a company whose registered office

is located on French territory may not, under certain circumstances, be subject to the laws

of any other jurisdiction.  In addition to these provisions of French law, Cohen and de la

Pradelle rely on a 1997 decision by the *Cour de cassation*, *Société Africatours* (Cass. 1e

civ. July 1, 1997).  (*See* Cohen Decl. ¶ 20, Ex. 6.)  A translation of the case was not

provided but the entire summary provided by Cohen reads as follows:

> In [*Société Africatours*], the *Cour de cassation* set aside the decision of the
> Court of Appeal which had declared Senegalese law applicable to a
> company with its registered office in Senegal but had interpreted it from
> the point of view of French law which it had believed was similar:  in
> doing so, it had falsely applied ordinarily applicable law and had
> misinterpreted it.

(Cohen Decl. ¶ 20.)  Although Cohen and de la Pradelle assert that this case "specifically

[rules] that if a company's registered office is located in France, then any legal action

---

[13] Notwithstanding the procedural differences, Terré concedes that substantively the claims in this action and in suits by two shareholders pending actions in France are undeniably similar.  (Terré Decl. ¶ 31; see also Cohen Decl. ¶ 24 regarding similarity of causes of action alleged under French law.)

[14] "According to Article 1837 of the French Civil Code and Article L. 210-3 of the French Commercial Code 'companies whose registered office is located on French territory shall be subject to French law.'" (Cohen/de la Pradelle Decl. ¶ 15; Cohen Decl. Ex. 5.)

**SA86**

against that company brought by shareholders must be conducted according to French law" (Cohen/de la Pradelle Decl. ¶ 16), without more the conclusion simply does not follow from the described reasoning of the *Cour de cassation*.

As with the jurisdictional prong, plaintiffs' experts believe the applicable-law prong is easily met in this case: "[T]he requirement that the foreign court must have applied the law that governs according to French choice of law rule[s] is flexible and . . . it is sufficient if the law applied is substantively equivalent under French choice of law principles. That requirement appears amply met." (Smit Decl. ¶ 87.) More specifically, plaintiffs' expert Mourre argues first that the dominant view among French scholars is that the applicable-law prong should not be applied, and states that in fact the requirement is frequently not applied by courts. (Mourre Decl. ¶ 142.) Under this "dominant view" the proper inquiry asks only whether the foreign judge "seized" jurisdiction with the intent of avoiding the application of French law, or if the application of foreign law would constitute a violation of public policy. (*Id.*) Alternatively, Moure contends that the applicable-law may be met under the doctrine of equivalence, which accepts the application of a law other than that designated by French choice-of-law rules where the application of that foreign law leads to a result equivalent to the result that would have been reached under French law. (*Id.* at ¶ 146.) Considering the elements of plaintiffs' Section 10(b) claim, together with the fact that no punitive or other special or exemplary damages may be awarded in this action, Mourre concludes that the result in this action would be equivalent to that reached under Article L. 465-2 of the *Code monétaire et financier*.[15] (*Id.* at ¶ 148.) This conclusion is supported indirectly by

---

[15] This provision "provides for the liability of any individual or entity who 'disseminates in the public, by any means, false or misleading information on the perspectives of evolution or on the situation of an issuer

**SA87**

Case 15-399, Document 85, 08/12/2015, 1574465, Page93 of 246

defendants' expert, Professor Cohen, who details at great length the substantive
similarities of U.S. and French laws prohibiting the dissemination of false and misleading
information to shareholders.  (Cohen Decl. ¶¶ 27–43).  Defendants' expert Audit opines
that procedural differences between French and U.S. shareholder litigation code preclude
a finding of equivalence, but he provides no basis for his views.  (Audit Dec., ¶ 26).  On
balance, the Court concludes (a) that procedural differences are more properly the subject
of a public policy analysis and (b) that the substantive similarities between U.S. and
French law regarding securities fraud are likely sufficient under the doctrine of
equivalence to meet the applicable-law prong of the *Munzer* test.

### (iii)    Public Policy Prong

This prong of the *Munzer* test requires that the foreign judgment to be recognized
must be in "conformity with international public policy."  (Audit Decl. Ex. 5.)  This
requirement is perhaps the most problematic of all the *Munzer* conditions inasmuch as
French law does not recognize opt-out class actions.  (Cohen Decl. ¶ 49–51; Mourre
Decl. ¶¶ 102–05).  The fact that opt-out class actions are not presently permitted is, of
course, some indication that such actions are contrary to French public policy.  However,
the fact that a particular right is not recognized in France will only lead to nonrecognition
of a foreign judgment where the judgment would "infringe principles of universal
justice."  *Lautour v. Guiraud* (Cass. 1e civ. May 25, 1948) (Mourre Decl, Annex 27)
("[F]oreign rules . . . are not contrary to the French conception of international public
policy merely because they differ from mandatory provisions of French law, but only

---

of securities whose securities are traded on a regulated stock exchange or on the perspectives of evolution
of a financial instrument traded on a regulated market, in a manner that can influence the market value.'"
(Mourre Decl. ¶ 148.)

insofar as they infringe principles of universal justice considered in French conception as having universal value.").)

Defendants contend that an opt-out class action offends such universal principles in three respects.  First, it is an accepted principle of French law that no one may claim in court by proxy.  This principle—in French, *nul ne plaide par procureur*—procedurally requires anyone acting as a plaintiff or defendant in a lawsuit to make his identity known individually in the legal proceedings.  (*See* Terré Decl. ¶ 38.)  As a result, defendants' argue, the fact that not all members of the putative class will be identified by name, but instead represented by court-appointed class representatives, will be fatal to recognition of a U.S. judgment in this case by a French court.  (*See id.* at ¶ 39; Renard-Payen Decl. ¶ 15; de la Pradelle Decl. ¶¶ 40–43; Cohen/de la Pradelle ¶¶ 19–20.)  Defendants further argue that the failure to identify each plaintiff individually contravenes French notions of due process.  (Audit Decl. ¶ 30.)  This is because of a "strong principle" of French law that no one should be a plaintiff without consenting affirmatively to do so.  (Audit Decl. ¶ 31).  Members of an opt-out class, of course, are not required to take any steps to be included in this class.  Defendants also argue that the opt-out class is inconsistent with the fundamental principle of adversarial proceedings, *le principe du contradictoire*, which gives every litigant the "personal freedom" to appear and be heard during any proceeding affecting his rights.  (Cohen/de la Pradelle Decl. ¶ 20; Audit Decl. ¶ 32)  Particularly where individual notice is not required (as is permissible under Rule 23), a class member could be deprived of his fundamental right to appear without ever having received actual notice.  (Cohen/de la Pradelle Decl. ¶ 20.)  Finally, contingency fees are prohibited under French law because such fees reduce the amount of compensation available to plaintiffs,

and, therefore, a U.S. judgment which provided contingent fees "could likely be regarded" as a violation of French public policy. (Audit Decl. ¶ 34.)

Plaintiffs' experts reject the notion that U.S.-style class actions are incompatible with fundamental principles of justice as interpreted by the French courts. (Smit Decl. ¶¶ 85–90; Mourre Decl. ¶¶ 97–105.) Thus, Mourre points out that group actions may be instituted by trade unions on behalf of employees without individual consent, and that associations of copyright holders are permitted to act in court on behalf of the members of their group. (Mourre ¶¶ 99–101.) Furthermore, as one of defendants' own experts points out, shareholder associations have the right to sue companies and their directors, and to solicit a mandate from individual shareholders (using mail and public notice) to act on their behalf. (Cohen Decl. ¶¶ 45–48.) Though these procedures are surely distinguishable from a Rule 23(b)(3) opt-out class, they do not evince a fundamental hostility to the concept of collective actions.

Plaintiffs' experts further argue that defendants misinterpret and misapply the principle of *nul ne plaide par procureur.* In Mourre's view, the principle of *nul ne plaide par procureur* stands for the proposition that a party to a court proceeding cannot appear as acting in its own interest when in reality it exercises the rights of a third party whose identity is concealed. The purpose is to avoid procedural fraud so that a defendant knows about specific defenses. (Mourre Decl. ¶ 131; *see also* Smit Decl. ¶ 74 (opining that the rule is the French equivalent of the real party-in-interest requirement of Rule 17).) In this case, defendants know the plaintiffs represent the absent class members, who are the real parties bound together by Rule 23's requirement of commonality and typicality. (*See* Smit Decl. ¶ 74, Mourre Decl. ¶ 132.) Moreover, Mourre points to case law confirming

49

**SA90**

that *nul ne plaide par procureur* is not part of the French conception of international

public policy and is not a basis to set aside a foreign judgment.  (Mourre Decl. ¶¶ 133–34

(citing *Chenue v. Brachat* (Paris 5e. B, Oct. 24, 1991); Colmar, *Kruger v. Fougerolle*

(Apr. 30, 1996); *Mandel v. Coprim* (Paris 1e. C, Oct. 27, 1998)).

Plaintiffs' experts acknowledge that French citizens have the right as "personal

freedom" to appear and be heard in any action but contend, simply, that Rule 23(b)(3)

honors such rights by providing every class members the opportunity to opt-out of the

class.  (Smit. Decl. ¶ 88; Mourre Decl. ¶¶ 109–10.  Mourre also notes that collective

actions by trade unions have been permitted by French courts on the equivalent of an opt-

out basis, provided that member-employees are given notice of the action.  (Mourre Decl.

¶ 99.)  Thus it may well be that the French courts would enforce a U.S. class action

judgment against a class member who received actual notice and, therefore, had a

meaningful opportunity to exercise his "personal freedom," but decline to enforce the

judgment against a class member who can show that he did not receive actual notice.

Weighing both parties detailed affidavits, the Court concludes that an opt-out

class judgment would not offend French concepts of international public policy.  While it

is clear that such class actions are presently not permitted, it is equally clear that the

ground is shifting quickly.  Defendants' own expert, Professor Cohen, noted this

development:

> French law does not cease to evolve in a direction favorable to
> *class actions*.  Following the practice of the United States, the President of
> the French Republic seriously wished to develop collective actions and put
> in place a commission of study on April 13, 2005 responsible for the
> introduction of a sort of "class action" for relationships with consumers.
> Quite naturally the issue of the introduction into French law of
> "*securities class actions*" was raised in order to more effectively protect
> shareholders and investors. . . .  The least that one can say is that this

> tendency is strongly gaining ground and that the evolution of French law
> seems very rapid.  While not long ago one considered that they seemed far
> from French law, works are multiplying today to attempt to take the exact
> measure and to acclimate them in France. . . .  French law is thus oriented
> toward "class actions" in matters of protection of shareholders and
> investors.

(Cohen Decl. ¶¶ 49–50.)  Defendants are quick to point out that the study referred to by

Professor Cohen observed that most of the study group's members viewed on opt-out

class to be contrary to French law.  (Cohen/de la Pradelle Decl. Ex. D at 32).  On the

other hand, a number of the members of the study recommended legislation establishing

an opt-out class mechanism based on the U.S. and Quebecois models.  (*See, e.g.*, *id.* Ex.

D, Working Group Report, Comment by Jean-Guy Lévy, President of the Bar.)  Of

course, whether or when France adopts class action legislation and whether it includes an

opt-out mechanism cannot be foretold.  However, the expressed views of the French

President, as well as the ongoing debate in legal and business sectors is strong evidence

that the class action model is not so contrary to French public policy that its use would

likely be deemed an infringement of "principles of universal justice" or contrary to

"international public policy."  Accordingly, the public policy prong of the *Munzer* test is

likely satisfied.

### (iv)    Absence of Fraud

The final prong of the *Munzer* test – that the action before the foreign court was

not fraudulent – has been addressed in the course of the Court's consideration of the

*Simitch* decision.  *See discussion supra.*  For the reasons stated above, it appears unlikely

that a French court would find fraud or improper forum shopping in plaintiffs' pursuit in

this Court of claims arising under the U.S. securities laws.

\*       \*       \*

**SA92**

In sum, the Court concludes that plaintiffs' experts have shown a probability that French courts will find that (i) this Court has properly asserted jurisdiction over claims that have a "characterized link" to this jurisdiction; (2) U.S. securities laws satisfy the doctrine of equivalence and are appropriately applied; (3) a judgment herein will not infringe principles of universal justice; and (4) plaintiffs have not engaged in prohibited forum shopping.  Accordingly, a judgment in this case would, more likely than not, be granted recognition at such time as an exequatur proceeding is instituted.

### (d)  Recognition in England

There is no clear authority addressing the res judicata effect of a U.S. class action judgment in England.  As there is no statute or convention at play, the issue is addressed under common law rules.  English common law provides for enforcement of a foreign judgment where the foreign court was "competent."[16]  English authorities consistently discuss the competency of a foreign court in terms of whether there was jurisdiction over the *defendant*.  Thus, a court is competent when (i) the defendant was present within its jurisdiction when proceedings were instituted, or (ii) the defendant submitted to its jurisdiction.  (Declaration of Laurence Rabinowitz in Support of Vivendi Universal, S.A's Opposition to Plaintiffs' Motion for Class Certification, Sep. 29, 2005 ("Rabinowitz Decl."), ¶ 25.)  By this standard, of course, this Court would be competent as Vivendi's extensive U.S. operations place it within the Court's jurisdiction.

Defendants contend, however, that if presented with the issue, English courts would also require that a U.S. court have personal jurisdiction over non-U.S. class

---

[16] The other elements generally required to establish *res judicata* are (i) that the judgement be final, (ii) that there is an identity of parties and (iii) that there is an identity of subject matter.  (Rabinowitz Decl. ¶ 34 (citing *Good Challenger v. Navegante SA v. Metalexportimport SA* [2003] EWCA Civ. 1668).)  The defendants do not argue that these elements would not be met.

members through their individual appearance in the action (Rabinowitz Decl. ¶ 26.)
Some support for this position can be found in dicta in *Campos v. Kentucky & Indiana
Terminal Railroad Company* [1962] 2 Lloyd's Rep. 459 (QB). Therein the court ruled in
favor of defendant on the merits of the case but went on to note that defendant's
alternative defense of res judicata with regard to a favorable U.S. class action judgment
would likely fail because (i) the U.S. action was a "spurious" class action,[17] which did not
bind absent parties even under U.S. law and (ii) in any event, plaintiff was not a class
member at the initiation of the U.S. proceeding. Lastly, the court found "great force" in
the argument that res judicata would not operate in an English court against a party who
has not been served with process in the foreign proceeding. This begs the question of
whether a class member is a party. Thus, it is far from clear how the court's
observation—accurate as far as it goes—would have been applied in the case of a "true"
Rule 23(b)(3) class wherein absent class members are not parties for a variety of
procedural purposes, including service of process. Conte & Newberg, *supra*, § 1.4 n.2.
Defendants' expert simply ignores the issue and assumes, without analysis, that absent
members are subject to the same English common law jurisdictional rules that, as noted,
refer only to the need for service upon, or an appearance by, individual party defendants.
While English courts are not bound thereby, the Supreme Court has explicitly rejected
this reasoning, holding that non-resident class members need not appear individually, and
that adequate notice with an opportunity to opt-out is sufficient to establish a limited
consent to jurisdiction. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 806-14 (1984).
In addition, the inference that an English court would not find a U.S. court competent

---

[17] "[S]purious class action was little more than a permissive joinder device, which would be binding only
on the original parties to the suit and those who might subsequently intervene." 1 Conte & Newberg,
*supra*, § 1:9.

**SA94**

where non-resident class members had not personally been served, appears inconsistent

with English law governing class or "representative" actions which, in fact, allows absent

parties to be bound.  Rule 19.6 of the 1998 Civil Procedure Rules provides as follows:

> (1) Where more than one person has the same interest in a claim –
>   a. the claim may be begun; or
>   b. the court may order that the claim be continued, by or against one or more of the persons who have the same interest as representatives of any other persons who have that interest.
> (2) The court may direct that a person may not act as a representative.
> (3) Any party may apply to the court for an order under paragraph (2).
> (4) Unless the court otherwise directs any judgment or order given in a claim in which a party is acting as a representative under this rule –
>   a. Is binding on all persons represented in this claim; but
>   b. may only be enforced by or against a person who is not a party to the claim with the permission of the court.

(Harris Decl. ¶ 44.)  Thus, English representative actions will bind those on whose behalf

a claim is brought (and, under section 4(b), persons who are not parties to the claim with

the court's permission).  *See generally* Neil Andrews, *Multi-Party Proceedings in*

*England:  Representative and Group Actions*, 11 Duke J. Comp. & Int'l L. 249 (2001).

There is no requirement, express or implied, that class members, foreign or domestic,

must appear or be served in order to be bound.  It is true that the scope of representative

actions relating to claims for damages is considerably narrower in England than in the

United States and that it is unlikely that the present action could proceed as a

representative action in England.  (Declaration of Jonathan Harris in Support of

Plaintiffs' Motion for Class Certification, Dec. 8, 2005, ¶ 45.)[18]  However, this appears to

be more of a procedural distinction than a jurisdictional one, the point being that English

law recognizes the competency of its own courts to bind absent parties in appropriate

situations.  While the issue is hardly free from doubt, based on the affidavits before it, the

---

[18] But defendants' expert notes that "an English court might even entertain a class (or representative) action against Vivendi.  Such a procedure is permitted by CPR Rule 19.6 . . ."  (Rabinowitz Decl. ¶ 23.)

Court concludes that English courts, when ultimately presented with the issue, are more likely than not to find that U.S. courts are competent to adjudicate with finality the claims of absent class members and, therefore, would recognize a judgment or settlement in this action. (Harris Decl. ¶¶ 14–20 and 50–51 (citing John C. L. Dixon, *The* Res Judicata *Effect In England of a US Class Action Settlement*, 46 Int'l & Comp. L.Q. 134, 145–50 (1997)).)[19]

### (e)    Recognition in Germany

Whether a foreign judgment would be recognized in Germany is a matter of German procedural law. Plaintiffs' expert, Dr. Peter Mankowski, and defendants' expert, Dr. Gerhard Herman Otto Wegen, agree that there is no decision by a German court as to whether a judgment in a U.S. class action would be recognized under the German Code of Civil Procedure (Zivilprozessordnung) ("ZPO"). (Declaration of Peter Mankowski in Support of Plaintiffs' Motion for Class Cerification, Dec. 12, 2005 ("Mankowski Decl."), ¶ 8; Declaration of Gerhard Hermann Otto Wegan in Support of Vivendi Universal, S.A's Opposition to Plaintiffs' Motion for Class Certification, Sep. 27, 2005 ("Wegan Decl."), ¶¶ 7–8.) Section 328 of the ZPO provides for the recognition of foreign judgments if five conditions are met:

> (1) if the foreign court was competent for deciding on the claims based on the German provisions on jurisdiction, (2) if the defendant was properly served (in the legal relationships of the United States and Germany according to the Hague Service Convention) in a timely manner enabling defendant to defend itself properly, (3) if the judgment is not inconsistent with an earlier German or foreign judgment which would be itself recognised in Germany, (4) if the contents of the judgment do not infringe the German *ordre public*, i.e. the indispensable provisions of German law

---

[19] As in France, English courts will not recognize foreign judgments that are contrary to "principles of natural justice." Dixon, *supra*, at 148. Significantly, Defendants' expert does not contest this point. (*See generally* Rabinowitz Decl.)

and (5) if reciprocity is guaranteed, i.e. if the foreign court would
recognise a corresponding German judgment.

(Wegen Decl. ¶ 7.)  Defendants' expert does not question the satisfaction of the first,

second, third and fifth conditions.

Dr. Wegen contends, however, that a U.S. class action judgment would violate the

"ordre public."  (Wegen Decl. ¶ 7.)  The constitutional premise for this position is found

in Article 103 of the German Constitution which establishes the right of a citizen to be

heard and to participate in legal proceedings.  (Wegen Decl. ¶ 9; Mankowski Decl. ¶ 36.)

This right, in the nature of a due process protection, is referred to as the right of "correct

representation," (Wegen Decl. ¶ 10), or the "disposition maxim," (Mankowski Decl.

¶ 39).  Interestingly, Dr. Wegen appears to conclude that the right of correct

representation could be satisfied, and a U.S. judgment would be enforced as to absent

class members, provided they were to receive actual notice of the class action and had the

opportunity to opt-out.  (Wegen Decl. ¶ 12.)  However, according to Dr. Wegen, service

of notice must be made "in a manner that strictly complies with the requirements of the

Hague Service Convention."[20]  (Wegen Decl. ¶ 17.)

It is true that service of process in conformity with the Hague Service Convention

would require individual service through the German Central Authority and local German

courts.  (Wegen Decl. ¶¶ 13–14.)  But service of process in this context refers to the

formal delivery of an initial pleading to an *opposing* party, i.e., the defendant.  It cannot

readily be thought of as a means of providing notice by plaintiff to a member of the

plaintiff class.  (Mankowski Decl. ¶¶ 49–54.)  By analogy, in the U.S. context, it makes

little sense to evaluate a class member's due process right to adequate notice in terms of

---

[20] Under German law, German nationals can only be served by foreign claimants in conformity with the
provisions of the Hague Service Convention.

whether the service requirements of Rule 4 of the Federal Rules of Civil Procedure have been satisfied.

Plaintiffs, then, appear to have the better of the argument that compliance with the due process requirements of the German constitution could be satisfied by measures reasonably calculated to give actual notice to class members of their right to opt-out of a U.S. class action and pursue, or decline to pursue, their individual claims. But even under Dr. Mankowski's analysis, it would seem that a U.S. judgment would not be enforced against a class member who did not in fact receive actual notice despite plaintiffs' efforts to broadly disseminate notice.

There is a further concern regarding enforceability of a class action judgment that is not directly addressed by defendants' expert. Leaving aside the question of whether the Hague Service Convention is the exclusive means for notifying absent class members, can it be said that the use of a collective action is so contrary to German public policy that a U.S. class action judgment will not be recognized under any circumstance? In this regard the Court notes that, in contrast to France and England, collective actions remain unknown in Germany. Germany has recently passed the Investor Protection Model Procedure Act which addresses multiple suits by shareholders that allege violations of the capital market laws. (Mankowski Decl. ¶¶ 32–33.) This act provides for the use of test cases whose outcome would be binding in other individual shareholder actions. (*Id.*) However, it is not a collective action in the sense that non-party shareholders are bound by the results. By comparison, both France and England, albeit in limited circumstances, recognize collective actions in which the interests of non-parties are pursued and non-parties are bound by the results. *See discussion supra.* Taking the parties' expert

57

**SA98**

affidavits as a whole, the Court is left with the distinct impression that the formalities of German law may well preclude the recognition of a judgment in the instant case. Indeed, plaintiffs' expert concludes only that "one cannot rule out a U.S. class action settlement or judgment . . . will be recognized or enforced in German." This candid opinion is insufficient on its face and leads the Court to conclude that plaintiffs have not shown a probability that German courts will give res judicata effect to a judgment in this case.

### (f)    Recognition in Austria

With respect to Austrian law, the parties' experts agree that under the current applicable law, there must be "formal reciprocity" between the foreign state and the Republic of Austria as a condition to recognition of a foreign judgment. (Declaration of Christian Herbst in Support of Vivendi Universal, S.A's Opposition to Plaintiffs' Motion for Class Certification, Oct. 1, 2005 ("Herbst Decl."), ¶ 34; Declaration of Leopold Specht in Support of Plaintiffs' Motion for Class Certification, May 12, 2005 ("Specht Decl."), ¶ 23.) Formal reciprocity may be established by a treaty to which the foreign state and the Republic of Austria are a party, or a duly published Austrian decree that states the existence of reciprocity. (Herbst Decl. ¶ 34; Specht Decl. ¶ 23.) The United States and Austria are not party to a reciprocity treaty, nor has an Austrian decree been published that would provided for the enforcement of a U.S. judgment. (Herbst Decl. ¶ 35.) Plaintiffs' expert, in response, provides only the opinions of various Austrian legal scholars that the Austrian law establishing these requirements is unconstitutional. (Specht Decl. ¶¶ 23–24.) These opinions fall far short of establishing a probability that an Austrian court would grant preclusive effect to any judgment or settlement issuing from this action.

**SA99**

### (g)  Recognition in The Netherlands

Plaintiffs have submitted the opinion of Professor Smit that Dutch courts would give binding effect to a judgment in, or settlement of a U.S. class action.  As is true in other European jurisdictions, a shareholder class action does not appear to be available in the Netherlands.  (Smit Decl. ¶ 46).  Nevertheless, the Dutch Legislature has recently enacted class action legislation in other contexts indicating that recognition of a judgment in this case would not be contrary to fundamental principles of fairness in Dutch law (*Id.* ¶¶ 36–39.)  Defendants have offered no evidence to dispute the Smit Declaration.  Based on the record before it, the Court finds plaintiffs have shown a probability that Dutch courts would recognize a judgment or settlement in this action.

### (h)  The Risk of Nonrecognition Does Not Compel Exclusion of All Foreign Class Members

Having considered the arguments presented by both sides on the risk of nonrecognition of a U.S. judgment or settlement abroad, the Court concludes that such concerns, without more, do not warrant exclusion of the citizens of France, England, and the Netherlands, who are otherwise putative members of the proposed class.  If and when the issue is presented to these countries, it is more likely than not that the courts in these countries would recognize the enforceability of a judgment or settlement in the present case.

However, it is more likely than not that German and Austrian courts, at present, will not give res judicata effect to judgments or settlements in a U.S. opt-out class action.  Because lawsuits could be brought by Austrian and German nationals against defendants alleging the same wrongdoing that underlies the allegations in this case, the Court concludes that the adjudication of German and Austrian shareholders' claims in this class

59

**SA100**

action is not necessarily superior. The likelihood of nonrecognition in Germany and Austria raise weightier issues of fairness and lessen, albeit in limited realistic situations, the promise of economy, consistency, and finality made possible when class members are bound to a final judgment or settlement. *See* Fed. R. Civ. P. 23(b)(3)(C); *see also* 7AA Charles Alan Wright et al., Federal Practice and Procedure § 1780 (3d ed. 2005) (noting that Rule 23(b)(3)(C) requires, *inter alia*, a court to "evaluate whether allowing a Rule 23(b)(3) action to proceed will prevent the duplication of effort and the possibility of inconsistent results"); Edward F. Sherman, *American Class Actions: Significant Features and Developing Alternatives in Foreign Legal Systems*, 215 F.R.D. 130, 130 (2003) ("[The American class action] serves the interests of economy by not having to try the same issues again and again in separate cases. It also serves the interests of consistency and finality by avoiding the possibility of inconsistent outcomes in separate trials of similar cases and resolving all claims in a single case that is binding on all class members.").

A countervailing concern, however, is that in a global economy, companies do business across international borders and sell their securities worldwide, and acts of corporate misconduct—whether committed in the United States, abroad, or both—may have substantial effects on the United States market. Where, as here, the Court has determined that significant alleged conduct occurred in the United States warranting application of the federal securities laws to foreign actors, *see In re Vivendi*, 381 F. Supp. 2d at 169, the United States has a strong interest in the enforcement of those laws where applicable. *Cf. Dirienzo v. Philip Servs. Corp.*, 294 F.3d 21, 32 (2d Cir. 2002) (rejecting defendant's *forum non conveniens* arguments in part because of United States' interest in

enforcing its securities laws, and also noting that "[f]or securities markets to function efficiently, securities fraud law must be clear and enforceable"); *Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull, S.A.*, 606 F.2d 5, 9 (2d Cir. 1979) ("Congress did not intend 'to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when they are peddled only to foreigners.'" (quoting *ITT v. Vencap, Ltd.*, 519 F.2d 1001, 1017 (2d Cir. 1975))); Ilana T. Buschkin, Note, *The Viability of Class Action Lawsuits in a Globalized Economy—Permitting Foreign Claimants to be Members of Class Action Lawsuits in the U.S. Federal Courts*, 90 Cornell L. Rev. 1563, 1569 (2005) (arguing in favor of "default presumption in favor of including foreign claimants in small claim securities, class actions law suits," because to do otherwise would lessen the deterrent effect of class adjudication).

Furthermore, in considering whether the threat of nonrecognition defeats the superiority of the proposed class, the Court should not ignore practical realities that reduce the risk that defendants would in fact be prejudiced by any potential nonrecognition in the form of duplication of effort or inconsistent results. *See Cromer*, 205 F.R.D. at 135 n.32;[21] *In re U.S. Fin. Sec. Litig.*, 69 F.R.D. at 48 (noting "that

---

[21] The contingencies that would have to be met before genuine *res judicata* concerns might arise in the context of a judgment were described as follows:

> "[M]any events would have to occur before [defendant] would be prejudiced by an inability to assert the defense of res judicata successfully. Specifically, (1) the class action would have to be tried to judgment, despite the greater likelihood that the case would instead be settled; (2) the class would have to lose on the merits; (3) an absent class member would have to bring a subsequent lawsuit in [a foreign] court, despite such practical deterrents as the unavailability of contingent-fee representation or a class action vehicle in those courts; (4) the absent class member would have to succeed in establishing jurisdiction over the defendants in that foreign court; (5) the foreign class member would have to convince the foreign court to ignore this Court's ruling and render judgment in its favor on the merits; and (6) the absent class member would have to then convince a Bermuda court to enforce the foreign judgment and ignore the judgment rendered by this Court."

practical difficulties in each country make lawsuits by these [foreign plaintiffs] virtually impossible"); *see also* Buschkin, *supra*, at 1597.  In this sense, defendants' res judicata concerns are "more hypothetical than real," since the likelihood of relitigation by absent class members in a European forum is low.  (Pls.' Reply Mem. 11.)  As plaintiffs' expert points out, absent class members who were dissatisfied with an adverse judgment, would be pressing claims (1) already adjudicated against them, (2) without the benefit of contingency fee arrangements, (3) with the added risks of having to pay defendants' counsel fees and costs of litigation.  Further, such plaintiffs would be facing the risk that defendants would be able to successfully invoke this Court's jurisdiction to prevent recovery.  (*See* Smit Decl. ¶ 105)  Similar disincentives would apply to absent class members dissatisfied with a favorable judgment they deemed inadequate.  (*Id.*)  And in the case of a settlement, the Court can fashion a proof-of-claim mechanism intended to bind all participants and discourage relitigation.  *See Cromer*, 205 F.R.D. at 135.  While it could be argued that practical considerations weigh strongly in favor of allowing all foreign purchasers to participate in plaintiffs' proposed class, the Court elects to proceed with caution and limit the class to foreign shareholders whose courts, in the unlikely event of successive litigations, are likely to give *res judicata* effect to any judgment herein.  This double layer of security should allay defendants' legitimate concerns, and argues in favor of including French, British and Dutch shareholders in the proposed class.

### 3.    Manageability

In determining whether a class action is a superior method of adjudication for a particular action, courts must also consider the management difficulties likely to be encountered if the action is continued as a class suit, such as the burden of complying

---

*Cromer*, 205 F.R.D. at 135 n.32.

**SA103**

with Rule 23's notice requirements.  *See* 7AA Charles Alan Wright et al., *Federal Practice and Procedure* § 1780, at 187–90.  The determination of whether a particular action is manageable is "peculiarly" within the discretion of the district court.  *In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001), *cert. denied*, 536 U.S. 917 (2001).

Rule 23(c)(2) requires that "notice must be ordered, and is not merely discretionary, to give the members in a subdivision (b)(3) class action an opportunity to secure exclusion from the class."  Fed. R. Civ. P. 23 Advisory Committee Notes, 1966 Amendment, 28 U.S.C.A. Rule 23, at 388.  Rule 23(c)(2) states that the required notice must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  Further,

> [t]he notice must concisely and clearly state in plain, easily understood language:  the nature of the action, the definition of the class certified, the class claims, issues or defenses, that a class member may enter an appearance through counsel if the member so desires, that the court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded, and the binding effect of a class judgment on class members under Rule 23(c)(3).

*Id.*  Defendants argue that because Vivendi does not keep, does not have access to, and does not have the right to access information that would enable individual notice to shareholders carrying "bearer shares," individual notice would only be possible to a small number of European class members holding "registered shares."  (*See* Bisiaux Decl. ¶ 9; Heiser Decl. ¶¶ 13, 23.)  Publication notice in a number of foreign countries and in a variety of foreign languages, defendants' argue, would be unmanageable and insufficient to comport with due process.

63

**SA104**

While individual notice, where reasonably possible, is required, when class members' names and addresses may not be ascertained by reasonable effort, publication notice has been deemed adequate to satisfy due process. *See Eisen*, 417 U.S. at 173 (requiring individual notice to all class members whose names and addresses may be ascertained through reasonable effort); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) (finding notice by publication constitutionally sufficient as to trust beneficiaries whose names and addresses are unknown). As long as the Court is persuaded that "class counsel acted reasonably in selecting means likely to inform persons affected," notice will be considered adequate. *Denney v. Jenkins & Gilchrist*, No. 02 Civ. 5460, 2005 WL 388562, at *20 (S.D.N.Y. Feb. 18, 2005); *see also In re Western Union Money Transfer Litig.*, No. 01 Civ. 0335 (CPS), 2004 WL 3079932, at *5 (E.D.N.Y. Oct. 19, 2004) (finding, in case involving class partially comprised of foreign class members, that individual notice must be sent to all class members identifiable in defendant's computer database, and requiring publication notice including, *inter alia*, "media outreach in the form of a press release, video news release, and radio news release, to be translated into various foreign languages and distributed internationally"); *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 175 (S.D.N.Y. 2000) (describing notice of settlement to foreign class members as including direct mail notice to ascertainable members, and publication notice including, *inter alia*, a widespread notice campaign in foreign newspapers, promotional announcements in key foreign cities.); *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139, 144 (E.D.N.Y. 2000) (approving multi-faceted notice plan involving direct mail, worldwide publication, public relations, Internet and grass roots community outreach in light of inability to send

**SA105**

notice exclusively by direct mail). Indeed, in a recent class action settlement including

global purchasers of Royal Ahold N.V. American Depository Receipts and/or ordinary

shares, the United States District Court for the District of Maryland found that notice

including direct mailings to all reasonably identifiable persons and entities, posting of

documents on websites, and publication of notice in numerous different countries and

different languages "fully satisfied the requirements of Rule 23 of the Federal Rules of

Civil Procedure and the requirements of due process." *In re Royal Ahold N.V. Sec. &*

*ERISA Litig.*, 437 F. Supp. 2d 467, 472 (D. Md. 2006).

In response to defendants' manageability concerns, plaintiffs have filed a

comprehensive affidavit outlining the effectiveness of its proposed method of providing

notice in foreign countries. (*See* Affidavit of Todd B. Hilsee on Ability to Provide Multi-

National Notice to Class Members, Dec. 19, 2005 ("Hilsee Aff.") ¶ 7.) According to this

affidavit, the following methods of notification will be used to execute the dissemination

of notice required under Rule 23(c)(2): (1) individual mailed notice to all reasonably

identifiable class members; (2) publication notice in appropriate multi-national media to

reach, in combination with direct mailings, a high percentage of the shareholders in each

country; (3) a neutral informational press release, to be approved by the Court in advance,

announcing the commencement of the notice program to increase awareness; (4) notice

through any shareholder communication channel that might exist, including Vivendi's

website; and (5) a neutral website, to be approved by the Court in advance, translated into

all relevant language, posting the notices, the plaintiffs' complaint, defendants' answers,

the class certification order; an exclusion request form, and other relevant documents.

(*Id.* ¶ 11.) Although the issue of executing appropriate notice will necessarily be

revisited, for purposes of considering plaintiffs' motion to certify a class the Court is satisfied that plaintiffs intend to provide individual notice to those class members whose names and addresses are ascertainable, and that plaintiffs' proposed form of publication notice, while complex, will prove both manageable and the best means practicable of providing notice.[22]  At this stage, "the issue of foreign notice is not sufficiently grave to defeat class certification."  *In re Lloyd's*, 1998 WL 50211, at *16; *cf. In re DaimlerChrysler*, 215 F.R.D. at 301 (noting difficulties involved in maintaining class including foreign investors, and observing that lead plaintiffs had not adequately responded to defendants' concerns relating to class management).

## IV.     Subclasses

Defendants argue that there is no single integrated worldwide market for Vivendi ordinary shares and Vivendi ADSs and, therefore, that a single class consisting of holders of both securities cannot be certified.  (Opp'n 4–6).  Implicit in their argument is the contention that if plaintiffs' motion for certification is granted, separate subclasses should be established for purchasers of ADSs and for purchasers of ordinary shares.  The Court has the authority under Rule 23(c)(4)(B) of the Federal Rules of Civil Procedure to divide a class into subclasses.  The existence of divergent interests is the primary reason to establish subclasses.  *See* 1 Conte & Newberg, *supra*, § 8:12.  Defendants argue that a single class cannot be certified because American and European stock markets are not fully integrated and, therefore, each group of purchasers will require separate proof on

---

[22] Defendants' contention that providing notice to foreign class members is unmanageable is further undercut by the recent approval by Judge P. Kevin Castel of a comprehensive program to provide notice to eligible claimants of money received from the settlement between the Securities Exchange Commission and Vivendi, Messier and Hannezo for the violation of securities laws.  *See SEC v. Vivendi Universal, S.A.*, No. 03 Civ. 10195 (PKC) (S.D.N.Y. Dec. 18, 2006).  The notice plan was in many respects similar to the one proposed by Hilsee in this proceeding.  While that decision is of court not binding on the Court, it suggests that it is realistic to provide notice to foreign class members involved in this very case.

the issues of reliance and damages. (Defs.' Sur-Reply Mem. 8-9). According to

defendants' expert, Professor Gompers, there are two district trading markets because (1)

U.S.-based investors faced a foreign exchange risk not faced by foreign investors; and (2)

investors in each security followed different trading strategies and had different trading

opportunities because of the time zone difference between the markets. (Declaration of

Paul A. Gompers in Support of Vivendi Universal, S.A's Opposition to Plaintiffs' Motion

for Class Certification, Oct. 3, 2005, ¶ 6.) The lack of full integration is evidenced by

market metrics that show segmentation and an alleged market lag with news being

incorporated into the price of ordinary shares on the Paris Bourse before impacting the

price of ADSs on the NYSE. (*Id.* ¶¶ 40–44.) Plaintiffs present their own expert, Jane D.

Nettesheim, who opines that the markets for Vivendi ordinary shares and ADSs are

"highly integrated," although concededly not "perfectly integrated." (Declaration of Jane

D. Nettesheim in Support of Plaintiffs' Motion for Class Certification, Dec. 19, 2005, ¶

7.) Analyzing the relative prices of each security during the period where both markets

are trading, Nettesheim finds that prices were "almost always effectively equivalent."

(*Id.* ¶ 8 & Exs. 4, 5.) While the NYSE and the Bourse may not be perfectly integrated,

such that Vivendi ordinary shares and ADSs are perfect substitutes with identical prices

and returns, this distinction does not require creation of subclasses. It is undisputed that

the two markets are highly integrated and nothing in defendants' submission supports the

proposition that such minor inefficiencies between the markets that may exist will have

any impact on class-wide proof of the element of reliance. And small differences in

returns experienced by holders of ADSs and ordinary shares may affect the amount of

damage but are unlikely to alter the methodologies of calculation, at least to a degree
necessary to warrant, at this juncture, the creation of subclasses.

## CONCLUSION

Consistent with the foregoing, plaintiffs' motion to certify the class [234] is
GRANTED in part. A class is hereby certified consisting of all persons from the United
States, France, England, and the Netherlands who purchased or otherwise acquired
ordinary shares or American Depository Shares of Vivendi Universal, S.A. between
October 30, 2000 and August 14, 2002.

SO ORDERED.

Dated: New York, New York
       May 21, 2007

Richard J. Holwell
United States District Judge

**SA109**

# In The Matter Of:

## *IN RE VIVENDI UNIVERSAL*
## *SERCURITIES LITIGATION*

*March 2, 2009*

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 932DVIVf.txt. Pages 1-264

**Word Index included with this Min-U-Script®**

IN RE VIVENDI UNIVERSAL
SERCURITIES LITIGATION

March 2, 2009

Page 1

```
                    932dviv1
[1]   UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
[2]   ------------------------------x
[3]   In re:  VIVENDI UNIVERSAL, S.A.
              SECURITIES LITIGATION,     02 Civ. 5571 (RJH)
[4]   ------------------------------x
[5]
                                         New York, N.Y.
[6]                                      March 2, 2009
                                         10:40 a.m.
[7]   Before:
[8]            HON. ROBERT J. HOLWELL,
[9]                                      District Judge
[10]
[11]  APPEARANCES:
[12]  ABBEY SPANIER RODD & ABRAMS, LLP
           Attorneys for class plaintiffs
[13]  BY:  RICHARD B. MARGOLIES
           ARTHUR N. ABBEY
[14]       JAMES STEPHENSON BURRELL, II
[15]  MILBERG, LLP
           Attorneys for class plaintiffs
[16]  BY:  MICHAEL C. SPENCER
           MATTHEW GLUCK
[17]
[18]  BROWN WOODS GEORGE LLP
           Attorneys for class plaintiffs
[19]  BY:  BRAN C. KERR
[20]  POMERANTZ, HAUDEK, BLOCK, GROSSMAN, BLOCK & GROSS, LLP
           Attorneys for class plaintiffs Stoneridge
[21]  BY:  MARC I. GROSS
[22]  BAKER & BOTTS, LLP
           Attorneys for class plaintiffs Liberty Media
[23]  BY:  R. STAN MORTENSON
           MICHAEL CALHOON
[24]       JEFFREY LAMKEN
           BRYAN A. ERMAN
[25]       ROBERT KELSEY KRY
```

Page 2

```
[1]             APPEARANCES CONTINUED
[2]   ENTWISTLE & CAPUCCI
           Attorneys for plaintiffs Gamco, Jacobs
[3]   BY:  HAROLD McGUIRE
           SEANNON L. HOPKINS
[4]
[5]   MOTLEY RICE LLC
           Attorneys for individual plaintiffs
[6]   BY:  MICHAEL E. ELSNER
[7]   WEIL GOTSHAL & MANGES LLP
           Attorneys for Defendants Vivendi, S.A.
           and Universal Studios, Inc.
[8]   BY:  JAMES QUINN
           PENNY P. REID
[9]        ADAM M. SCHLOSS
[10]  LABATON SUCHAROW LLP
           Attorneys for Capital and Irish Life defendants
[11]  BY:  ANTHONY J. HARWOOD, ESQ.
[12]  GRANT & EISENHOFER, PA
           Attorneys for Individual Plaintiffs
[13]  BY:  JAMES J. SABELLA, ESQ.
[14]  CAPLIN & DRYSDALE, CHARTERED (NYC)
           Attorneys for Certain Instit. Investors
[15]  BY:  NATHAN D. FINCH
           LESLIE M. KELLEHER
[16]
[17]  CRAVATH, SWAINE & MOORE LLP
           Attorneys for Vivendi defendants
[18]  BY:  PAUL C. SAUNDERS
           MICHAEL T. REYNOLDS
[19]       DANIEL SLIFKIN
           TIMOTHY G. CAMERON
[20]       JESSICA R. HOLLOWAY
           MICHAEL PASKIN
[21]  KING & SPALDING LLP (NYC)
           Attorneys for Vivendi defendants
[22]  BY:  PAUL STRAUS
           MICHAEL J. MALONE
[23]
[24]  SCHULTE ROTH & ZABEL LLP
           Attorneys for Defendant Guillaume Hannezo
[25]  BY:  MARTIN L. PERSCHETZ
           MICHAEL E. SWARTZ, EINAT PHILIP
```

Page 3

[1]        **THE CLERK:** In re Vivendi Universal S.A. Securities

[2]  Litigation, 02 Civil 5571, Judge Richard J. Holwell presiding.

[3]        Counsel, ready to proceed?

[4]        **MR. SAUNDERS:** Yes.

[5]        **MR. ABBEY:** Yes.

[6]        **THE COURT:** All right. I have your appearance sheet.

[7]  I don't know that we need to go through noticing your

[8]  appearances at this point in time.

[9]        We are here to address or at least talk about or

[10]  resolve some of the motions that are pending and talk about the

[11]  trial schedule.

[12]        Damian, could you just distribute -- I want to

[13]  distribute a copy of Mr. Saunders' helpful letter of

[14]  January 22nd, which has the list of motions so we can identify

[15]  them.

[16]        Are they numbered?

[17]        **THE LAW CLERK:** Yes.

[18]        **THE COURT:** They are just numbered consecutively 1

[19]  through 23, so that when we discuss a particular motion, we can

[20]  identify it by name and also by number.

[21]        Most of the motions emanate, not unexpectedly, from

[22]  defendants. Mr. Saunders, as I said, when we had a brief

[23]  telephone conference last month, that I had no particular

[24]  order. We can either take it in the order they are on in your

[25]  letter or any particular order you or any of your co-counsel

Page 4

[1]  care to approach.

[2]        **MR. SAUNDERS:** Thank you, your Honor. We have

[3]  discussed that matter with co-counsel, and with your Honor's

[4]  permission, I have a list of the order in which we would

[5]  propose to address the pending motions.

[6]        **THE COURT:** All right.

[7]        **MR. SAUNDERS:** With your Honor's permission, I can

[8]  give this to your clerk.

[9]        **THE COURT:** Sure.

[10]        **MR. SAUNDERS:** As your Honor can see, the first motion

[11]  that we would like to address this morning, the first two

[12]  motions, have to do with loss causation. They are our motions

[13]  for summary judgment and partial summary judgment for failure

[14]  on the part of the plaintiffs to establish loss causation.

[15]        **THE COURT:** All right. That would be I guess number

[16]  10 and 12 in your letter.

[17]        **MR. SAUNDERS:** Yes, your Honor.

[18]        **THE COURT:** OK, 10 and 12. All right.

[19]        **MR. SAUNDERS:** With your Honor's permission,

[20]  Mr. Slifkin, from my firm, will argue first the motion for

[21]  partial summary judgment against the Liberty Media plaintiffs,

[22]  the Gamco plaintiffs and the class for failure to establish

[23]  loss causation, and Mr. Paskin from my firm will present our

[24]  argument with respect to our motion addressed to the individual

[25]  plaintiffs for failure to establish loss causation.

IN RE VIVENDI UNIVERSAL
SERCURITIES LITIGATION

March 2, 2009



Page 137

[1] intent, SLUSA should not be read to cover these claims either.

[2] **THE COURT:** Thank you.

[3]

[4] **MR. McGUIRE:** Harold McGuire for Gamco. I am going to

[5] give you an applause line. All the other counsel have said it

[6] all. I have nothing to add.

[7] **THE COURT:** All right.

[8] **MR. SAUNDERS:** I do, your Honor.

[9] **THE COURT:** All right. I thought you might.

[10] I would like you to address is Liberty Media.

[11] **MR. SAUNDERS:** Yes.

[12] The statute is quite clear.

[13] The Liberty Media case is consolidated today with a

[14] covered class action, with a class action that makes the

[15] Liberty Media case part of a covered class action.

[16] It is consolidated today, and this court does not have

[17] jurisdiction over the state law claims in the Liberty Media

[18] case and this court must dismiss them.

[19] The case has been consolidated. The statute says

[20] consolidated for any purpose. There can be no doubt that the

[21] Liberty Media case has been consolidated with the class action

[22] for the past almost six years for all pretrial discovery. The

[23] statute couldn't be clearer.

[24] Your Honor simply does not have jurisdiction. SLUSA

[25] is a jurisdictional statute. It cannot be cured by



Page 138

[1] deconsolidating the case now, because the case is and has been

[2] for the last six years consolidated for a purpose. That's all

[3] the statute requires.

[4] **THE COURT:** Do I have the authority to vacate my

[5] consolidation order in Liberty Media on the grounds that it was

[6] improvidently granted?

[7] **MR. SAUNDERS:** First of all, your Honor, Judge Baer

[8] made the decision to consolidate. I don't think there would be

[9] any basis for vacating on the ground that it was improvidently

[10] granted.

[11] **THE COURT:** Was this issue addressed at the time by

[12] Judge Baer, the SLUSA issue?

[13] **MR. SAUNDERS:** The SLUSA issue, no, your Honor.

[14] But the notion that somehow the Liberty Media case is

[15] different from the class action makes me think that I'm living

[16] in a parallel universe.

[17] Mr. Lamken is new to the case, but I have been working

[18] on this case for six years. We've seen Liberty Media and the

[19] class plaintiffs cheek by jowl at every single deposition all

[20] over the world, your Honor. The notion that there are no

[21] common questions of law or fact or that common questions of law

[22] and fact do not predominate have -- I will have a word to say

[23] about that in just a minute -- is simply preposterous.

[24] Your Honor heard this morning the discussion of the

[25] damage claim made by Liberty Media and the class. They both

Page 139

[1] retained the very same expert Blaine Nye, who submitted one,

[2] not two, expert reports, and who in his deposition was asked

[3] the following question:

[4] "Q. Despite those differences in the datasets, I take it the

[5] calculation of damages for Liberty Media and the class

[6] plaintiffs are the same?

[7] "A. I believe we used the class inflation on the 16th, right,

[8] to calculate the damages.

[9] "Q. OK. But again I take it you're drawing no distinction in

[10] terms of the quantum of damages on the constant euro method

[11] between the Liberty Media purchasers and those in the class who

[12] purchased on the same day?

[13] "A. That's true."

[14] Of course there are common questions of law and fact

[15] in this case. It may be the case that Liberty Media has a

[16] different legal construct that is breach of a warranty claim

[17] that there would be no MAC, but to say that there are no common

[18] questions of law and fact is simply not to know what this case

[19] is about.

[20] In fact, I was struck when I read the Liberty Media

[21] brief in opposition to our brief, which I suspect was written

[22] by Mr. Lamken when he said Liberty alleges that Vivendi

[23] breached the warranty. The warranty that there would be no

[24] MAC, by, among other things, failing to disclose its

[25] deteriorating liquidity condition. That sounds familiar to me.

Page 140

[1] That's exactly what the class plaintiffs said.

[2] Then he said, indeed, the majority of one of Liberty

[3] Media's expert reports is devoted to claims arising from that

[4] warranty.

[5] That warranty is not at issue in the class action.

[6] The federal securities laws do not impose any general duty to

[7] disclose nonpublic information unless there is a fiduciary

[8] relationship or disclosure is necessary to render another

[9] statement not misleading.

[10] For that reason, the class plaintiffs cannot and do

[11] not seek to hold Vivendi liable for merely failing to disclose

[12] a material adverse change. But the material adverse change

[13] that is alleged is failing to disclose a deteriorating

[14] liquidity condition.

[15] Of course, the cases are the same. Those fundamental

[16] factual allegations are the same. There is, to be sure, a

[17] different legal construct. We have different defenses against

[18] Liberty, some of which you are going to hear about this

[19] afternoon, but there is a central core of the same facts in

[20] this case.

[21] It is not the case that SLUSA requires that the common

[22] questions of law and fact predominate. Liberty Media with

[23] respect is simply making that up.

[24] The word "predominate" does not appear in clause 2 of

[25] the statute. It appears in an earlier clause, but it does not



Page 141

[1] appear in clause 2 of the statute, the clause that is operative
[2] here.
[3]     The Supreme Court has held in the Davit case that
[4] courts may not read into SLUSA requirements that are not
[5] contained in the statute. "It is inappropriate for courts to
[6] create additional implied exceptions. No court has ever held
[7] that for SLUSA to apply the common questions of law and fact
[8] must predominate."
[9]     That is not what the statute says.
[10]    Now, very briefly, with respect to the individual
[11] plaintiffs, the individual plaintiffs make an additional
[12] argument.
[13]    **THE COURT:** I don't think you need to address the
[14] individual plaintiffs.
[15]    **MR. SAUNDERS:** All right, your Honor.
[16]    **THE COURT:** I am going to grant the motion with
[17] respect to Gamco and individual plaintiffs. I am going to,
[18] with respect to Liberty Media vacate the order of
[19] consolidation. I believe it was improvidently granted because
[20] the issue of SLUSA never surfaced by any party at that time.
[21] Certainly Judge Baer didn't have the opportunity to consider
[22] the issue of prejudice resulting from an order of
[23] consolidation.
[24]    I did have that opportunity with respect to the
[25] individual plaintiffs. Gamco probably not in that category but

Page 142

[1] Gamco and the individual plaintiffs stand precisely in the same
[2] shoes as the class members, and I think the prejudice to
[3] Liberty Mutual is of a different degree or caliber than the
[4] other plaintiffs.
[5]     I am going to issue an opinion explaining the Court's
[6] reasoning, but I am ruling from the bench on that motion now.
[7]     **MR. SAUNDERS:** Thank you, your Honor.
[8]     **THE COURT:** All right.
[9]     **MR. SAUNDERS:** The next motion, your Honor, is our
[10] motion for summary judgment against Liberty Media.
[11]    **THE COURT:** What number is that on your letter?
[12]    **MR. SAUNDERS:** On my letter, it is No. 15, your Honor.
[13]    That is going to be argued by Jim Quinn from Weil
[14] Gotshal.
[15]    **THE COURT:** All right.
[16]    **MR. QUINN:** Your Honor, this is unusual that I have
[17] had to wait for six hours before I have had a chance to talk.
[18]    I am not going to deal with a much more mundane issue,
[19] not French constitutional law or U.S. constitutional law or
[20] SLUSA.
[21]    I am going to deal with a much more mundane issue,
[22] which is our motion for summary judgment with regard to Liberty
[23] Media's entire case based on what we believe is a matter of
[24] law, the inability for them to have shown reasonable reliance.
[25]    As your Honor is aware, there are overlaps with regard

Page 143

[1] to these two, the class case and the Liberty Media case, but
[2] there are also are significant differences, particularly with
[3] regard to some of the defenses that Vivendi has asserted in
[4] connection with defending the Liberty Media case.
[5]     Your Honor, I am sure, is aware that Liberty Media
[6] obtained its shares in a far different way than the members of
[7] the class; that in fact, they were a party to a very complex,
[8] heavily negotiated deal in which there was stock that was
[9] swapped. There were companies that were swapped.
[10]    Liberty Media is itself considered to be perhaps the
[11] leading investing company in the media business. They are
[12] today and they were back in 2001 when the transaction took
[13] place.
[14]    John Malone, the CEO of Liberty, has been called a
[15] genius. He has been called by Forbes the Darth Vader of the
[16] media industry not because he is a bad guy, but because he's
[17] extraordinarily sophisticated and experienced in doing deals in
[18] the media business.
[19]    Indeed, your Honor in an earlier decision specifically
[20] held that Liberty Media was a highly sophisticated and
[21] experienced company and that they entered into this transaction
[22] in December of 2001 with that level of sophistication.
[23]    The reason why that's important is that in the context
[24] of reasonable reliance, the courts in this circuit and
[25] elsewhere, and specifically with regard to the Second Circuit

Page 144

[1] in Brown v. E.F. Hutton Group, which we've cited in our briefs,
[2] have held that sophistication and experience are a crucial, if
[3] not the crucial, factor in determining whether or not a
[4] particular plaintiff has reasonably relied.
[5]     What do we know happened here?
[6]     There are really two very important dates that
[7] occurred.
[8]     One was the signing of the merger agreement, December
[9] 16, 2001.
[10]    Then five months later, actually almost six months
[11] later, there was a closing in May of 2002.
[12]    An awful lot happened between December 16, 2001, and
[13] May 2002.
[14]    The record we will submit and we will show you the
[15] evidence that shows undisputedly that in fact by the time
[16] Liberty Media closed they were fully aware of whatever they now
[17] claim was hidden from them. Indeed, their own expert so
[18] admits.
[19]    More importantly, they had on May 7 the ability to get
[20] out of the deal. For their own reasons, and indeed for very
[21] good reasons, they chose not to get out of the deal.
[22] Therefore, under the circumstances and the facts of this case,
[23] they cannot be held to have reasonably relied on whatever the
[24] alleged misrepresentations or omissions, 145 or whatever
[25] number, that they claim took place.



IN RE VIVENDI UNIVERSAL
SERCURITIES LITIGATION

March 2, 2009

Page 145

[1] Your Honor, why would they do that?

[2] Why would they enter into this deal, even though they
[3] had an out, in fact, they had two outs, and even though in the
[4] intervening period of time between December of '01 and May of
[5] '02, a virtual avalanche of bad news came out, even though the
[6] stock of Vivendi had dropped by almost 50 percent during that
[7] intervening period and it lost market cap of something close to
[8] $25 billion.

[9] Notwithstanding all of that, notwithstanding all of
[10] that, they chose to close, even though they had outs in the
[11] contract.

[12] Why?

[13] The reason, your Honor, is because under any
[14] circumstances for Liberty this was still a good deal. It was
[15] still a good deal because they weren't focused on the stock
[16] price.

[17] Indeed, they never even sought to get what is known in
[18] the business as a collar. They didn't get any of the
[19] protections in the December 16 agreement that would have
[20] protected them on the downside because they weren't focused on
[21] the price of the stock. They were focused on other things.

[22] This is the undisputed record, your Honor, that has
[23] come across from the depositions and all of the documents.

[24] Liberty has had five goals they sought to achieve in
[25] this deal.

Page 146

[1] The first was to get a dividend. In fact, two weeks
[2] after they closed they got that dividend.

[3] The second was they were trying to make liquid the
[4] illiquid stock that they held in USA Networks. In fact, they
[5] were able to receive liquid stock from Vivendi which they
[6] eventually sold for $838 million.

[7] The third was they wanted to unload a company called
[8] multiThematique I will to defer to my friend Mr. Saunders.
[9] He's the --

[10] **MR. SAUNDERS:** MultiThematique.

[11] **MR. QUINN:** Merci.

[12] **MR. SAUNDERS:** Rien.

[13] **MR. QUINN:** Liberty, in fact, succeeded in selling its
[14] interest as part of this deal.

[15] Next they were seeking to, and they say this
[16] specifically in their documents and so testified, they were
[17] seeking to maximize their interest in USA Networks, which
[18] eventually would hold, but was the reason for this whole deal
[19] was in the first place, and that is an interest in what became
[20] Vivendi, Vivendi Universal Entertainment. In fact, they were
[21] able to increase the value of their USA stock because of this
[22] deal to the tune of billions of dollars.

[23] Lastly, they wanted a tax-free billion dollar transfer
[24] and they got it.

[25] Each and every thing that they sought in this deal

Page 147

[1] they got. That was the reason why on May 7, 2002, even though
[2] the stock had plummeted, even though both S & P and Moody's had
[3] downgraded only days before, and even though there was an
[4] enormous amount of quote bad news that occurred during those
[5] six months, they chose in fact to close.

[6] The critical thing, your Honor --

[7] **THE COURT:** That goes to a reliance argument --

[8] **MR. QUINN:** Reasonable reliance.

[9] **THE COURT:** But it doesn't go necessarily to the point
[10] I thought you started out with, whether or not they performed
[11] adequate diligence.

[12] **MR. QUINN:** Well, really it is a sum total. We are
[13] going to get to their lack of diligence. We are going to get
[14] to the issue of what they knew and whether or not, based on
[15] what they knew they should have in fact taken additional steps.

[16] We are also going to get to the issue of whether or
[17] not they could have protected themselves in the first place by
[18] entering into a contract with certain protections which they
[19] never sought to do.

[20] Given the level of the sophistication of this
[21] particular company, Liberty Media and Mr. Malone, the fact is
[22] that the notion that on May 7, 2002, given all the facts that
[23] were in the marketplace at that time, they were relying on the
[24] statements that were allegedly false or misleading simply is
[25] 180 degrees from what the reality was.

Page 148

[1] Let's look specifically, as your Honor is aware,
[2] Mr. Saunders pointed out to you, the essence of the claim here
[3] both with regard to the class but also with regard to Liberty
[4] Media is that we, according to Liberty Media, as of December
[5] 16, 2001, had hidden from them the so-called liquidity risk.

[6] Now, time goes by. According to their own expert,
[7] between December 16, 2001 and May 7, 2002, according to their
[8] expert, here are the disclosures that occurred with regard to
[9] this so-called hidden liquidity risk.

[10] This is Blaine Nye testifying both in his report and
[11] elsewhere. He talks about the fact, and we've heard about this
[12] this morning, that on January 7, there was the announcement
[13] that Vivendi was going to be selling stock.

[14] What does he say?

[15] He says that constituted a partial disclosure of
[16] Vivendi Universal's true liquidity condition and was material
[17] to investors.

[18] He goes on in his report and in testimony talking
[19] about analysts talking about the problems, that the treasury
[20] sale would show that there was a problem with Universal's
[21] liquidity situation.

[22] Similarly the S & P downgrade dealt with the company,
[23] i.e., Vivendi's creditworthiness and liquidity condition, and
[24] the fact that it was deteriorating.

[25] And, similarly, with regard to the other downgrade and

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE VIVENDI UNIVERSAL, S.A.
SECURITIES LITIGATION

This Document Relates To:

ALL ACTIONS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/16/09

02 Civ. 5571 (RJH) (HBP)

**ORDER**

1.    Regarding various pending motions before the Court, for the reasons the stated on the record at the conference held March 2, 2009, the following motions are granted or denied respectively:

Defendant Vivendi's objection to Magistrate Judge Pitman's Order of April 14, 2008 [480] is DENIED;

Defendants' motion for judgment on the pleadings [491] is GRANTED with respect to plaintiff GAMCO but DENIED with respect to the Liberty Media plaintiffs; the Court intends to issue an opinion stating its reasons at greater length;

Plaintiffs' motion concerning misleading mass mailing [565] is DENIED;

Defendants' motion to dismiss the complaints of various individual plaintiffs [580] is GRANTED with respect to plaintiffs' state common law claims and Section 14 claims but DENIED with respect to plaintiffs' Section 18 claims and subject matter jurisdiction;

Defendant Hannezo's motion to dismiss the claim against him for unjust enrichment [587] is GRANTED;

**SA115**

Defendants' motion for summary judgment against the Liberty Media plaintiffs [632] is DENIED;

Defendant Messier's motion for partial summary judgment [633] is DENIED;

Defendant Hannezo's motion for partial summary judgment [637] is DENIED;

Defendants' motion for partial summary judgment on certain of plaintiffs' claims [642] is GRANTED;

Defendants' motion for partial summary judgment for plaintiffs' failure to establish reliance [645] is GRANTED;

Plaintiff Liberty Media's motion for partial summary judgment on defendants' waiver defense [648] is GRANTED.

2. The Court has reserved decision on: defendants' motion for reconsideration of the Court's appointment of the Milberg firm as co-lead counsel [370]; defendant Vivendi's motion for partial reconsideration of the Court's order certifying a class [457]; class plaintiffs' motion for approval of class notice [465]; defendants' motion for summary judgment against the class plaintiffs, Liberty Media, and GAMCO for failure to establish loss causation [644]; defendants' motion for summary judgment against GAMCO for lack of standing [643]; defendants' motion for summary judgment against the individual plaintiffs for failure to establish loss causation [646]; defendants' motion for summary judgment against the individual plaintiffs for lack of standing [647]; plaintiffs' motion to strike the expert report of John W. Peavy, III; defendant Hannezo's motion to dismiss [584]; and certain individual plaintiffs' motion to lift stay [603].

**SA116**

3.      The Court concludes that the provisional trial date of May 4, 2009 is unrealistic. Trial is adjourned to September 29, 2009.  The parties, with the exception of Liberty Media, are directed to meet and confer and to propose a schedule for the resolution of all pre-trial matters by July 31, 2009.


SO ORDERED.

Dated: New York, New York
        March 13, 2009

                                            _____
                                            Richard J. Holwell
                                            United States District Judge

**SA117**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE VIVENDI UNIVERSAL, S.A.
SECURITIES LITIGATION

02 Civ. 5571 (RJH) (HBP)

**MEMORANDUM
OPINION AND ORDER**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      This is a securities fraud class action brought on behalf of shareholders of

Vivendi, S.A. ("Vivendi" or the "Company") against the Company and its former Chief

Executive Officer and Chief Financial Officer, Jean-Marie Messier and Guillaume

Hannezo. Vivendi is a limited liability company incorporated in France. Plaintiffs

accuse defendants of concealing a liquidity crisis that, once it became known, caused a

material drop in the price of Vivendi shares traded on the New York and various foreign

stock exchanges, including the Bourse in Paris.

      By opinion dated November 4, 2003, the Court (Baer, J.) denied defendants'

motion to dismiss for lack of subject matter jurisdiction. *In re Vivendi Universal, S.A.*

*Sec. Litig.*, 381 F. Supp. 2d 158, 169 (S.D.N.Y. 2002) ("*Vivendi I*"). By opinion dated

September 21, 2004, the Court (Holwell, J.) denied defendants' motion for

reconsideration, finding that subject matter jurisdiction was properly based on

defendants' alleged conduct, including operation of the Company by the CEO and CFO

from their New York headquarters, which contributed to the alleged fraud and directly

caused injury to both domestic and foreign investors. *In re Vivendi Universal, S.A. Sec.*

*Litig.*, No. 02 Civ. 5571 (RJH), 2004 WL 2375830, at *7 (S.D.N.Y. Oct. 22, 2004)

("*Vivendi II*"). On May 21, 2007, the Court (Holwell, J.) granted plaintiffs' motion for

class certification and included in the class shareholders from the United States, France, England and the Netherlands. *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76 (S.D.N.Y. 2007) ("*Vivendi III*").

Defendants now move for partial reconsideration of the Court's class certification decision, citing "recent" information that allegedly shows that the superiority requirement of Federal Rule of Civil Procedure 23(b)(3) cannot be established as to French shareholders who, defendants maintain, should now be excluded from the class. In short, defendants contend that French courts will never give *res judicata* effect to a judgment in a Rule 23(b)(3) opt-out class action and, therefore, that this action cannot be a superior means of litigating the French shareholders' claims.

Having reviewed the parties' typically comprehensive submissions, the Court concludes that virtually all the "recent" developments cited by defendants reflect the ongoing debate in France and the European Union as to whether class action procedures ought to be adopted, with either an opt-in or opt-out feature. However, the underlying issue—what form or forms of collective actions would be consonant with the French constitution as interpreted by France's high constitutional court, the Conseil Constitutionnel—remains unchanged. This issue, and the more immediate issue of whether a French court would refuse to enforce a U.S. class action judgment as contrary to international public policy, were thoroughly briefed by the parties and considered by the Court in the context of plaintiffs' original motion for class certification. For the reasons set forth in *Vivendi III* and below, the Court denies defendants' motion for reconsideration.

**SA119**

# BACKGROUND

As detailed in *Vivendi III*, the Court found that the prerequisites to class certification set forth in Rule 23(a) had been readily satisfied. The joinder of individual shareholders was "impracticable" in light of the approximately one billion ordinary shares that were outstanding during the relevant class period. The existence of "questions of law or fact common to the class" was undisputed. And the typicality of the named plaintiffs' claims was amply established as to all but one of the proposed class representatives. *Vivendi III*, 242 F.R.D. at 83-90. Nor did defendants seriously question whether, under Rule 23(b)(3), common questions of law or fact predominated over any questions affecting individual members. *Id.* at 90-91. However, defendants did contest whether, with respect to foreign shareholders, plaintiffs had established that a class action was "superior to other available methods for the fair and efficient adjudication of the controversy," as also required by Rule 23(b)(3). In addressing this issue, the Court separately considered the non-exhaustive list of pertinent factors set forth in the Rule:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Id.* at 91.[1]

Regarding the first two factors, the Court concluded that this prototypical securities fraud case was particularly appropriate for class treatment. Thousands of individual shareholders allegedly had been damaged by defendants' fraud, and most of

---

[1] In *Vivendi III*, the Court relied on the 2003 version of Rule 23. Rule 23 has since been amended, as part of the general "restyling" of the Federal Rules of Civil Procedure. Citations in this opinion are to the current version of Rule 23.

3

**SA120**

Case 15-3932, Document 85, 08/12/2015, 1574465, Page126 of 246

them would have claims too small to justify the initiation of an individual action. Moreover, only two individual shareholder lawsuits were pending in France, indicating that individual interest in conducting separate actions was minimal. *Id.* at 92.

Absent a better pigeonhole, the Court considered under the third articulated factor—the desirability of concentrating claims in this forum—the probable *res judicata* effects of a judgment entered by this Court. In particular, the Court analyzed to what extent defendants would be exposed to "second bite" actions in a foreign country that were not barred by the judgment in this case.

Judge Friendly analyzed this issue in *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir. 1975), and stated, in *dicta*, that "while an American court need not abstain from entering judgment simply because of the possibility that a foreign court may not recognize or enforce it, the case stands differently when this is a *near certainty*." *Id.* at 996 (emphasis added). Given uncontradicted affidavits that this was so in the case before it, the Second Circuit directed the District Court to exclude foreign purchasers from the class in *Bersch*. *See Vivendi III*, 242 F.R.D. at 92-93 (summarizing *Bersch*).

Finding the "near certainty" test incomplete as a general guide to decision, the Court evaluated the risk of non-recognition along a continuum. Where a plaintiff cannot show as part of the general showing required by Rule 23, *see In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006), that foreign court recognition is more likely than not, this factor weighs against finding superiority; taken in consideration with other pertinent factors, it may lead to the exclusion of foreign claimants on superiority grounds. Generalizing from *Bersch*, the Court held that "[t]he closer the likelihood of non-

4

**SA121**

recognition is to being a 'near certainty,' the more appropriate it is for the Court to deny certification of foreign claimants." *Vivendi III*, 242 F.R.D. at 95.

After analyzing a veritable mountain of expert affidavits on foreign law, *see id.* at 96 n.12, the Court concluded that German and Austrian courts were not likely to give *res judicata* effect to a judgment entered in this case, while French, English and Dutch courts were likely to do so. With respect to France, the Court applied the test set forth in *Munzer v. Jacoby*, Cass. civ. lre, Jan. 7, 1964, [1964] Juris-Classeur Périodique [J.C.P.] II 13590, which asks, *inter alia*, whether a foreign judgment would violate French concepts of "international public policy."[2] Concluding that it would not, and considering other factors relevant to the issue of superiority, the Court included French shareholders in the class.

The Second Circuit declined to hear an interlocutory appeal, and the Supreme Court declined to issue a writ of certiorari. *In re Vivendi Universal, S.A. Sec. Litig.*, No. 07-1419 (2d Cir. May 8, 2007); *Vivendi S.A. v. Gerard*, 128 S. Ct. 391 (2007).

## DISCUSSION

According to defendants a series of "recent events" in France have "now made it clear beyond any doubt" that opt-out class actions are unconstitutional in France, and that a French court would never recognize a judgment in this case, since to do so would violate "French concepts of international public policy" under *Munzer*. (Vivendi Mem.

---

[2] The four conditions that must be met under *Munzer* in order to grant *exequatur* may be summarized as follows: (1) the foreign court must properly have jurisdiction under French law (the "jurisdictional prong"); (2) the foreign court must have applied the appropriate law under French conflict-of-law principles (the "applicable-law prong"); (3) the decision must not contravene French concepts of international public policy (the "public policy prong"); and (4) the decision must not be a result of *fraude á la loi* (evasion of the law) or forum shopping (the "forum shopping prong"). *See Vivendi III*, 242 F.R.D. at 96.

SA122

1, 5).  Accordingly, defendants contend that as far as its French shareholders are concerned, a class action is not a superior means to achieve the fair and efficient adjudication of this controversy.  (*Id.* at 2-3.)

Pursuant to Rule 23(c)(1)(C), a court may alter or amend a previous order certifying a class.  In exercising its discretion, a court should consider whether a "changed factual situation" renders its original decision unsound.  *In re FleetBoston Fin. Corp. Sec. Litig.*, No. 02 Civ. 4561, 2007 WL 4225832, at *5 (D.N.J. Nov. 28, 2007).  Nevertheless, decertifying or redefining the scope of a class should only be done where defendants have met their "heavy burden" of proving the necessity of taking such a "drastic" step.  *Gordon v. Hunt*, 117 F.R.D. 58, 61 (S.D.N.Y. 1987).

In urging reconsideration, defendants argue that the "legal underpinning" of the Court's opinion—a comment that while opt-out actions are not presently permitted in France, "the ground is shifting quickly"—is no longer correct.  (Vivendi Reply Mem. 2 n.3 (quoting *Vivendi III*, 242 F.R.D. at 101).)  Defendants misread the Court as predicting that France will itself adopt legislation creating a class action procedure with an opt-out mechanism.  This is not so.  As is clear from the remainder of the *Vivendi III* opinion, the Court drew no conclusion as to whether France would ever adopt class action legislation and, if so, whether it would include an opt-out mechanism.  *See Vivendi III*, 242 F.R.D. at 101 ("Of course, whether or when France adopts class action legislation and whether it includes an opt-out mechanism cannot be foretold.").  After reviewing the vigorous debate ongoing in French society, the Court concluded only that the class action model, whether opt-in or opt-out, was not so contrary to French public policy that the inclusion of French shareholders in a U.S. litigation, alleging violations of U.S. securities laws,

SA123

would be deemed contrary to "international public policy." *Id.* The Court will reconsider, then, whether the "recent events" in France alter that conclusion.

## I.     "Recent Events"

### A.     The Guillame/Clément /Fombeur Letters

Understandably displeased with the Court's decision to certify a class of Vivendi shareholders that included residents of France, it appears that Vivendi's General Counsel, Jean-Francois Debos, solicited the views of a member of the Ministry of Justice regarding that aspect of the decision. (*See* Letter from Marc Guillaume, Director of Civil Affairs, to Jean-Francois Dubos, Secretary General, at 1 (April 3, 2007), Cameron Decl. Ex. B.) Mr. Guillame provided a brief memorandum stating an opinion in conclusory form that an opt-out class action would not comply with a 1989 decision by the Conseil Constitutionnel, CC Decision No. 89-257.[3] (*Id.*) The form or content of Mr. Dubos' request is unknown, although it appears the letter may have been solicited in connection with Vivendi's interlocutory appeal of *Vivendi III* to the Second Circuit and its subsequent petition for a writ of certiorari. It is not known whether Mr. Guillame was provided with a copy of *Vivendi III* decision or of the submissions of the parties upon which that decision was based. After plaintiffs lodged complaints that Mr. Guillame's letter was in some manner not authorized, Vivendi submitted a letter from Pascal Clément, the former Minister of Justice, to the effect that it was "worthwhile" to consider Mr. Guillame's "legal arguments" and that he, too, was of the opinion that a U.S. class action mechanism was incompatible with CC Decision No. 89-257. (Letter from Pascal

---

[3] This decision is attached as Exhibit B to the Declaration of Jessica R. Buturla (June 2, 2008).

Clément to Hervé Pisani, at 1 (Jan. 15, 2008), Cameron Decl. Ex. N).[4] Shortly thereafter a confirmatory memorandum was written by Mr. Pascal Fombeur, the successor to Mr. Guillame at the Ministry of Justice, which reiterates Mr. Guillame's previously expressed opinion. (*See* Mem. of Pascal Fombeur, Director of Office of Civil Matters (Jan. 22, 2008), Cameron Decl. Ex. P.)

 The Court respects the opinions of Ministry of Justice officials that were provided subsequent to its issuance of the class certification decision in *Vivendi III*. While the Court has not been provided with the benefit of the analysis underlying their opinions, it can fairly be said that identical, more detailed opinions were submitted by Vivendi's retained experts in connection with Vivendi's opposition to the motion for class certification. Moreover, Mr. Guillame's views concerning the constitutionality of class actions were previously considered by the Court in connection of its review of a report of the Working Group appointed by President Jacques Chirac in 2005, which recommended the adoption of opt-in class actions and questioned the constitutionality of an opt-out class action. Mr. Guillame was co-chairman of that Group.[5]

 While the Court has given careful consideration to Mr. Guillame's opinion, it has also considered the opinion of plaintiffs' experts (as well as one of defendants' own

---

[4] Mr. Clément is currently a lawyer at Orrick, Herrington & Sutcliffe LLP, which is representing Vivendi in a RICO action filed against Deutsche Telekom. *Vivendi S.A. v. T-Mobile, Inc.*, 06 Civ. 1524 (W.D. Wash. 2006).

[5] Mr. Guillame was appointed the Secretary General of the Administrative Services of the Conseil Constitutionnel sometime in 2007. He recently authored another letter in response to another inquiry by Vivendi's General Counsel in which he opined that "French law does not recognize the 'class action' based on 'opt-out' mechanism such as they exist in American law." Mr.Guillame again cites CC Decision No. 89-257 as the basis for this opinion. (*See* Letter from Marc Guillame to Jean-Francois Dubos (Mar. 9, 2009), *available at* Ex. B to Letter from Paul Saunders to Hon. Richard J. Holwell (Mar. 11, 2009).)

**SA125**

experts) who have expressed the opinion that the opt-out class mechanism, found in the
United States as well as several Western European countries, and proposed to the French
National Assembly in 2006, is not inconsistent with French principles of individual
freedom and, indeed, is consistent with Decision No. 89-257 of the Conseil
Constitutionnel.  It is sufficient to note, at this point, that the substantive opinions of
Messrs. Guillame, Clement and Fombeur are therefore known to the Court and do not
constitute new matters that would otherwise warrant reconsideration of the Court's class
certification decision.  *See* Fed. R. Civ. P. 23(c)(1)(C); S.D.N.Y. Local R. 6.3;
*FleetBoston*, 2007 WL 4225832, at *5.  The Court further accepts the conditions under
which Mr. Guillaume provided his opinion to Vivendi, namely, that "it is not up to . . .
the minister of justice, to evaluate a decision handed down by a court, let alone when this
court is in a sovereign foreign State, nor to intervene in a dispute between private
parties."  (Letter from Marc Guillame to Jean-François Dubos, at 1 (Apr. 3, 2007)
(original capitalization), Cameron Decl. Ex. B.)

### B.    The Attali Commission and the Coulon Report

Appointed on August 30, 2007 by President Sarkozy, the Attali Commission
prepared a 242-page report proposing "300 decisions for changing France."  (Cameron
Decl. Ex. Q.)  One of the proposals was to "introduce group actions into French law."
(*Id.*)  The specific proposal was to establish an opt-in class action for consumer frauds.
(*Id.*)  The Report does not mention any opt-out proposals or comment on the
constitutionality of such procedures.

The "Coulon Report," issued by another government-appointed working group in
January 2008, strongly endorses the introduction of consumer class actions in France.

(Cameron Decl. Ex. S ("Coulon Report").)  Interestingly, the Report comments favorably on Quebec's class action model, which it correctly notes is an opt-out system.  (*Id.* at 76.)[6]  The Report ultimately proposes an opt-in model, noting that an opt-out model is "constitutionally uncertain."  (*Id.* at 80.)  The Court agrees on this point and notes that this uncertainty will not be resolved until the Conseil Constitutionnel addresses the constitutional implications of any class action statute adopted by the legislature.[7]  That issue that was only indirectly addressed in Decision No. 89-257, albeit in a manner favorable to the proponents of an opt-out model.  *See* discussion, *infra*, § II.  Of course, the fact that the constitutionality of a newly-adopted procedure may be uncertain does not indicate that it is certainly unconstitutional; similar uncertainty surrounded the adoption of revisions to Rule 23 in 1966.  Marvin E. Frankel, *Some Preliminary Observations Concerning Civil Rule 23*, 43 F.R.D. 39, 44-47 (Sept. 18, 1967); *see generally* Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 1753 (Supp. 2008) ("Wright & Miller").

### C.    MEDEF and the LaTribune Article

At the request of Vivendi, a French business association, MEDEF ("Morivement des Enterprises de France") issued a "certificate" confirming "its firm hostility" to any class actions under French law, including any opt-out procedure.  (Cameron Decl. Ex. U.) In a similar vein, Pierre Simon, the President of the Paris Chamber of Commerce wrote

---

[6] The Report continues to criticize the American class action system, not because of  its opt-out feature but due to the availability of punitive damages, potential abuse of the discovery process and the availability of contingent attorney's fees.  (Coulon Report 78.)

[7] Of course, if a class action statute is not adopted in France, the constitutional issues may not be presented to the Conseil Constitutionnel.  As for enforcement of a class action judgment in this case, the constitutional and international public policy issues may be raised in a trial court such as the Paris Tribunal de Grand Instance.  *See Vivendi III*, 242 F.R.D. at 92.

an opinion piece for the newspaper, LaTribune, entitled "Class Actions, Watch Out!" (Cameron Decl. Ex. T.)  Mr. Simon believes that only an opt-in action should be adopted "from a constitutional viewpoint."  (*Id.*)  The Court finds the views of such business groups as unsurprising as the views of consumer advocates who strongly support the introduction of opt-out legislation in France.  (*Cf.* Mourre Supp. Decl. ¶ 19 (Apr. 11, 2008).)  There are sound social and political reasons both to oppose and support the adoption of class action procedures in France, whether of an opt-in or opt-out nature.  Weighing them, however, is not the province of this Court.

### D.    Commentary in the *Cahiers du Conseil*

Of more interest to the Court is a recent commentary by an unidentified author in the *Cahiers du Conseil* (or *Constitutional Court Journal*) published in 2007.[8] (Commentary No. 23, Cameron Decl. Ex. L ("Commentary 23"). )  The Journal reports and comments upon recent decisions of the Conseil Constitutionnel.  The commentaries are not authored by judges of the Conseil but by its administrative branch.  Thus the commentaries do not bind the Conseil and are presented for information purposes only.  Nonetheless, they may be viewed as persuasive.  (*See* Cameron Decl. Ex. V, at 3 (English translation); Mourre Decl ¶ 24 (Apr. 4, 2008).)

The decision that was subject to commentary, CC Decision. No. 2007-556, involved review of a statutory provision that, petitioners claimed, limited the right of

---

[8] An affidavit filed in a case before Judge Marrero attributes this commentary to Mr. Guillame, who as noted left the Ministry of Justice to become General Secretary of the Administrative Services of the Conseil Constitutionnel sometime in 2007.  (Supp. Decl. of Jean-Paul Béraudo ¶¶ 41-42, *Louisiana State Employees' Retirement System v. Alstom U.S.A., Inc.*, No. 03 Civ. 6595 (VM) (Apr. 12, 2008) ("It is indeed the opt-out that he [Guillaume] targets!").)

workers in the ground transportation industry to strike.[9]  The Conseil found, *inter alia*,
that the lengthening of a cooling-off period between union notification of a decision to
strike and the beginning of a strike did not impose unwarranted restrictions on an
employee's personal freedom to strike.  Moreover, the union representatives' ability to
act on a collective, representative basis in deciding when to issue a strike notice did not
infringe constitutional rights as such notice "leaves every employee free to decide
whether or not to take part in the strike."  (*Id.* ¶¶ 11-13.)

The Conseil did not refer to or discuss its opinion in CC Decision No. 89-257.
Nevertheless, in discussing CC Decision No. 2007-556, the commentator drew a
distinction between a union's right to call a strike, the right to which is specifically
preserved in the Constitution, and other rights such as the right to file a collective action
on behalf of employees.   Quoting from Decision No. 89-257, the commentator noted that
for such an action to be constitutional, the employee had "to give his/her consent with full
knowledge of the case" and had to "maintain the freedom to terminate this action."
(Commentary 23 ¶ III.1.6.)  The commentator then added:  "By failing to comply with
this individualized assent, which does not, for example, exist in Anglo-Saxon opt-out
systems in collective actions, the individual would be unreasonably deprived of a right in
violation of the Constitution."  (*Id.*)

Defendants' experts contend that this sentence confirms their prior legal opinions
that a judgment in a U.S. opt-out class action will not be enforced in France because it
would violate not only the right to "personal freedom" guaranteed by the French

---

[9] This decision is attached as Exhibit K to the Supplemental Declaration of Timothy G.
Cameron (Mar. 17, 2008).

constitution, but also French concepts of international public policy.  Specifically, defendants' experts opine that a class action would not be constitutional in France unless class members received individualized notice, and further, that an opt-in model was employed to establish an individual's actual consent to participate in the action. Defendants then argue that the class certified in this case does not meet this constitutional standard; that standards of international public policy will thereby be violated; that a French court therefore will not give preclusive effect to a U.S. judgment; and finally, that without complete *res judicata* protection, a class action including French shareholders of Vivendi does not meet the superiority requirements of Rule 23(b)(3).  Plaintiffs and their experts, on the other hand, contend that the commentator does not speak for the Conseil Constitutionnel, and has misread CC. Decision No. 89-257, which should be read to permit class actions with an opt-out feature.  Since neither the French Constitution nor French concepts of international public policy are threatened, plaintiffs contend that a French court is likely to give preclusive effect to a judgment in this case.  Taken with the other factors warranting certification, plaintiffs argue that the superiority requirement of Rule 23(b)(3) is therefore satisfied.

## II.    Constitutional Requirements Regarding Notice and Consent

In evaluating the parties' arguments it should be recalled that France has never adopted a class action statute and, perforce, no French court has passed on the constitutionality of any such statute.  Nevertheless, it appears that France is moving in the direction of adopting some form of group action.  (Mourre Add'l Decl. ¶ 9 (June 19, 2008).)  As defendants' Professor Cohen notes:  "French law does not cease to evolve in a direction favorable to class actions."  *Vivendi III*, 242 F.R.D. at 101.  The policy

concerns that underlie this movement are the same that led to the adoption of the modern class action device in the United States in 1966 and, subsequently, in other countries. Thus most participants in the debate recognize the need for collective actions to permit consumers and others to recover for injuries where the amount of any individual's damages are too small to justify the cost of seeking relief. (Coulon Report 74-75.) The modalities proposed in France have included both opt-in and opt-out procedures similar though not identical to Rule 23. These proposals reflect the trend in other countries to adopt collective actions employing both opt-in and opt-out mechanisms. For example, legislation implementing class action procedures, including some form of opt-out mechanism, has been adopted in the Netherlands (Section 3:305 of the Dutch Civil Code), Portugal (law dated August 31, 1995), Ontario (Section 9 of the Ontario Class Proceeding Act of 1992), Quebec (law dated January 23, 1982), Australia (Section 33 E of the Federal Court of Australia Act of 1976), Finland (Group Action Act 444/2007) and Norway (Section 35-7(1) of the Dispute Act). (*See* Mourre Supp. Decl. ¶ 13 (Apr. 11, 2008) (collecting sources).)

The defendants' contention that an opt-out class action "obviously" violates the right of personal freedom and international public policy is surely overstated, if only for the reason that no French court has yet considered the issue. Defendants are correct, however, that an opt-out procedure raises French constitutional concerns that center around the adequacy of notice to absent class members and the individual rights of a class members not to participate in the action. Unsurprisingly, these are the same constitutional due process concerns that are implicated by the application of Rule 23 in the American context. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12

(1985); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313-15 (1950). Central to both American and French legal systems is the concept that resort to the courts should be had to protect individual rights, and that no individual may be bound by a judgment in an action to which he is not a party. *Hansberry v. Lee,* 311 U.S. 32, 40 (1940). A Rule 23(b)(3) class action is a "fundamental departure from the traditional pattern in Anglo-American litigation," Joseph M. McLaughlin, *McLaughlin on Class Actions* § 1:2 (5th ed. Supp. 2008) ("McLaughlin"), as it would be in France should such a mechanism be adopted.

To protect individual due process rights in an American class action, Rule 23 as well as the Due Process Clause require that a representative plaintiff have claims common to the class, and be able to adequately represent the interests of the class. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). This appears to be fully consistent with French constitutional precepts, or at least defendants do not argue to the contrary. As a matter of individual due process, Rule 23(b)(3) further requires that class members have an absolute right to opt out of a class action and, thereby, not be bound by any judgment. *See Shutts*, 472 U.S. at 812 ("[D]ue process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' from the court."); *see also* McLaughlin § 5:75 ("The right to opt out is an individual one that must knowingly be exercised on a class-member-by-class-member basis."). In order to exercise the individual right not to participate, Rule 23(c)(2) requires that notice be sent in a manner reasonably calculated to appraise interested parties of the pendency of the action and their right not to participate. *See generally Mullane*, 339 U.S. at 314. It can be seen that

**SA132**

notice and the right to opt out are separate but intimately-related concepts. Individual notice, generally by first-class mail, is mandated for all class members who can be identified with reasonable efforts. *Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 166-67, 177 (1974). However, where the identification of class members is not possible, courts may approve other methods, including publication, as "the best notice practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B).

While these notice provisions may satisfy the Due Process Clause, defendants' experts contend they infringe on the French concept of personal freedom, which would require as a constitutional matter that each class member receive individualized notice of the pendency of a class action. While conceding that no French court has passed upon this issue, defendants point to CC Decision No. 89-257, wherein the Conseil Constitutionnel assessed the constitutionality of a statute that authorized collective actions brought by unions on behalf of their members. The statute provided that members would be notified by registered mail (return receipt) of the Union's intention to bring a collective action. The member would then have fifteen days to decide whether or not to participate in the proceeding. The Conseil found this procedure consonant with the concept of personal freedom provided that the notice "contain all useful information" about the nature of the proceeding and the individual's right not to participate. (*Id.* ¶ 26). If the employee does not respond within fifteen days "he is deemed to have given his approval." (*Id.* ¶ 25.)

Focusing first on the issue of notice, defendants are correct to note that the Conseil Constitutionnel was upholding a statute that provided for individual notice. Ergo, defendants contend, this is the *only* constitutionally permissible method of

16

SA133

providing notice to collective action members in France.  (Vivendi Reply Mem. 4.)  But the Court sees little justification for this leap of logic in either an American or French context.  Interestingly, if faced with the same class (i.e., one in which all members are identifiable), the U.S. Supreme Court also would insist on individual notice.  *Eisen*, 417 U.S. at 173-75; *Mullane*, 339 U.S. at 319-20.  Thus, contrary to the analysis offered by defendants' Professor Lagarde, Rule 23 is not significantly "less stringent" with respect to notice in such a case.  (*See* Lagarde Decl. ¶ 9 (May 23, 2008), Buturla Decl. Ex. C.)  Moreover, the requirement of individual notice in such a case does not speak to the constitutional adequacy in France (or the United States) of other reasonable forms of notice where individual notice is not possible.  While defendants insist that publication notice would be an affront to the French concept of personal freedom, a number of class action proposals have been made in France that contemplate notice by publication.  Indeed, the Coulon Report, heavily relied on by defendants, proposes adoption of an opt-in class mechanism that explicitly relies on notice by publication.  (Coulan Report 80.)  Under the proposed scheme, a collective action is brought by a representative consumer association.  In the first stage, the court rules on liability; if liability is established, the judge "would order the publication of the declaratory judgment according to the terms and methods he/she deems appropriate."  (*Id.*)  Of course, there are important distinctions between opt-in and opt-out systems that will be discussed below, but proposals such as those made in the Coulon Report are some indication that individualized notice, where such notice is not possible, is not the *sine qua non* of French constitutional law.  As much can be discerned from defendants' own experts.  For example, Professor Lagarde reads Decision No. 89-257 as requiring personal *knowledge* by a union member to satisfy

constitutional requirements for an opt-out situation, as opposed to requiring an exclusive method of establishing knowledge.  (Paul Lagarde Decl. ¶ 9.)  Likewise Michel Verpeaux, upon whose declaration defendants also rely, has elsewhere written that Decision No. 89-257 "far from condemning all reforms . . . simply emphasizes . . . that the issue of *publicity* is fundamental in order to preserve the consumers' liberty to act as an element of personal freedom."  (*See* Michel Verpeaux, *Can the "Class Action" Be Assimilated into the Constitution?*, Recueil Dalloz, at 258 (2007) ("Verpeaux Commentary"), Vasilescu Decl. Ex. 7.).  Indeed, Mr. Verpeux, Professor at the Panthéon-Sorbonne (Paris-1), Director of the Center for Constitutional Law Research, concludes:

> From a constitutional viewpoint, there is . . . no major obstacle on the path of the introduction in France of a class action with an exclusion option, with the only condition that each of the victims included in the action must retain the possibility of opting out in order to respect their personal freedoms to act.  Thus, the Constitution can hardly be invoked as a direct obstacle to the introduction of the class action.

(*Id.*)  Plaintiffs' expert agrees.  (Mourre Decl. ¶ 18 (Apr. 11, 2008).)

It must be kept in mind that the issue here is how a *future* Conseil Constitutionnel might view a *future* French class action statute, or, more precisely, the viability of a *res judicata* defense in a possible *future* action brought in a court of first instance by a French shareholder dissatisfied with a judgment in this case.  As this Court noted in *Vivendi III*, "it may well be that a French court would enforce a U.S. class action judgment against a class member who received actual notice and, therefore, had a meaningful opportunity to exercise his 'personal freedom,' but decline to enforce the judgment against a class member who can show that he did not receive actual notice."  *Vivendi III*, 242 F.R.D. at 101.

18

**SA135**

Turning from notice to consent, certain of defendants' experts insist that individual, actual consent is required by the French Constitution, again citing CC Decision No. 89-257.  But as plaintiffs' expert (as well as one of defendants' experts) correctly point out, the Conseil Constitutionnel actually indicated in that decision that an opt-out mechanism is not constitutionally infirm.  The Conseil noted that the constitutional concept of personal freedom required that an individual must grant his or her consent to participate in the action.  (CC Decision No. 89-257 ¶ 24.)  Importantly, however, the employee was "deemed" to have consented if he or she did not respond to the letter of notice, the employee's silence being deemed "tacit acceptance."  (*Id.* ¶¶ 25-26.)  There is no escaping the conclusion that the statute approved in CC Decision No. 89-257 provided for an opt-out procedure in which informed silence was deemed consent.  Thus it cannot be said, as defendants frequently do, that only an opt-in collective action would be constitutional in France.  It is against this background that one must consider the opinion of the commentator in the *Cahiers du Conseil Constitutionnel*, which states in reference to the same decision, "[i]n the absence of respect for individual consent, which does not exist in Anglo-American 'opt-out' mechanisms in collective agreements [sic—actions], the individual would be unjustly deprived of a right in violation of the Constitution."  Necessarily the "absence of respect for this individual consent" does not refer to the need for actual consent in the form of an opt-in procedure inasmuch as the decision that the commentator cites explicitly endorses implied consent in the form of an opt-out procedure.  Rather it appears likely that the concern with the American form of opt-out (and it is unknown whether this is shared by the Conseil itself) is that individual consent in the American context is implied upon proof of reasonable

notice to, as opposed to proof of actual knowledge by, a putative class member. This appears, in any event, to be the view of one of defendants' experts. (*See* Lagarde Decl. ¶ 27 (noting that an "American judgment would have the consequence, among others, of depriving [French shareholders], who were presumably unaware of the [present] action of their right[s] . . . .").) Such would not be the case, of course, for any French shareholder who actually received adequate notice whether by letter or publication.

As something like a fall-back position, defendants maintain that the American opt-out mechanism would be unconstitutional in France because a class member must have the right to opt out at any time, *including after judgment*. (*See* Carcassone Decl. ¶ 5 (Mar. 13, 2008), Cameron Decl. Ex. V; Verpeaux Decl. ¶ 6 (June 24, 2008).)[10] It is generally true that the opt-out period in a Rule 23(b)(3) class action occurs early in the litigation. In the present case, however, the Court has deferred authorizing notice pending resolution of defendants' motion for reconsideration. As a result, shareholders who receive notice will have an informed opportunity to withdraw from the class up to the eve of trial, a month or two before entry of judgment. The Court also notes that in individual actions the parties generally do not have a right to withdraw after judgment and bring a new action. While Professor Verpeaux may disagree with this principle in the context of the proposed collective action statute he examined (*see* Verpeaux Commentary, at 1), it appears that certain of the legislative proposals for class actions made to the National Assembly provide for opt-outs after judgment for the sensible reason that, under the legislation proposed, the Court would enter a declaratory judgment

---

[10] Interestingly, in his declaration submitted on behalf of defendants, Professor Verpeaux confirms that opt-out actions "could allow compliance with French constitutional principles."

on liability in an initial phase of the litigation, while in the second phase notice to consumers would be provided and consumers would be awarded damages.  In such a system, of course, there is simply no procedure for opting out until after the initial judgment is entered and notice thereof provided.  (*See, e.g.*, Coulon Report 77.)

III.  **Considerations of International Public Policy**

In considering the twin requirements of adequate notice and the opportunity to opt out, it should be kept in mind that there is a fundamental difference between (a) whether a future French (or EU) statute will meet French constitutional requirements and (b) in what situations will it be contrary to "international public policy" for a French shareholder who is a member of a Rule 23(b)(3) class to be barred after judgment from filing a second lawsuit.  It may well be, as defendants assert, that the current political winds in France are blowing in favor of the adoption of an opt-in mechanism, as recommended by the Attali Commission, or indeed, no class action procedure at all.  It may also be that the Conseil Constitutionnel will ultimately conclude that any opt-out mechanism adopted by the legislature that permits class members to be bound even if they have not received notice would be unconstitutional.  It is undisputed, however, that French constitutional law and French concepts of international public policy are not synonymous.  (Seraglini Decl., at 2-8 (Apr. 7, 2008).)  Thus, not every foreign judgment that is inconsistent in some respect with French constitutional principles will be disregarded.  (Mourre Supp. Decl. ¶¶ 9-12).  Rather only foreign judgments that infringe "principles of universal justice," *Lautour v. Guirand*, Cass. le Civ., May 25, 1948, will be found contrary to international public policy.

It also bears noting that whether a foreign judgment is contrary to international public policy will be made on an individualized case-by-case basis, not upon an abstract comparison of U.S. and French law, or upon consideration of an as-yet unenacted French statute. (Mourre Sup. Decl. ¶ 9; Seraglini Decl. ¶ 10). Thus the *res judicata* effect of a judgment as to any particular Vivendi shareholder will await a determination of the facts surrounding the institution of a second action by that shareholder and, thereafter, the assertion by Vivendi of a *res judicata* defense. Where that shareholder received full and fair disclosure of the nature of the present suit and his or her absolute right to opt-out from the litigation, this Court concludes that it is unlikely that a French court will decline to respect a U.S. judgment on the grounds that the form of notice (mail or publication) or the method of consent (opt-in or opt-out) offends constitutional principles, let alone French concepts of international public policy.[11] Similarly, since a shareholder who receives actual notice can fairly be said to have given implied consent to the present action, it also appears unlikely that a French court would find the shareholder's inability under U.S. law to opt-out after judgment to violate either constitutional concepts of personal freedom or principles of international public policy.

The issue would appear to be closer with respect to a shareholder who never received notice of the present action and then sought to bring a post-judgment action in France. On the one hand CC Decision No. 89-257 can be read to hold that implied

---

[11] As indicated by the 1989 Decision, a French court may place the burden of proof regarding notice upon Vivendi. The Court, as a fiduciary for the class, is obligated to approve a plan of notice under which as many French classmembers as possible receive actual notice of this action. Thus, while Vivendi may be forced to defend a notice plan it did not strictly speaking devise, the Court is confident that the plan will be as effective as reasonably possible. In any event, Vivendi will be given the opportunity to offer evidence and argument as to the adequacy of notice.

consent to a collective action is consistent with concepts of personal freedom only if the absent plaintiff has actual knowledge of the nature of the action and his or her right not to participate. On the other hand, a number of the schemes proposed in France and endorsed by French constitutional scholars clearly contemplate notice by publication. (*See* Coulon Report 80 (following test case on liability, court "would order the publication of the declaratory judgment according to the terms and methods he/she deems appropriate"); *see also* Verpeaux Commentary, at 2.) This dissonance is reflected to some degree in U.S. law. While numerous federal court decisions hold that absent class members who do not receive actual notice may be bound in the appropriate case, the Supreme Court has said that a class member "must receive notice" in order to be bound by a class judgment, *Shutts*, 472 U.S. at 813, which has led to some uncertainty. *See* Wright & Miller § 1789.1 ("*Shutts* also may be read to suggest that a class member may appear [after judgment] and claim never to have received notice and thus not to be bound . . . .").

In concluding that a French court is likely to respect a U.S. class judgment, the Court is cognizant of the fact that another Court in this District has come to the contrary conclusion. *See In re Alstrom SA Sec. Litig.*, 253 F.R.D. 266 (S.D.N.Y. 2008) (Marrero, J.). The plaintiffs in *Alstrom* asserted federal securities law violations against Alstrom SA, a French company with operations around the world, including the United States. Plaintiffs sought to certify a class of purchasers of shares in the U.S., Canada, France, England and the Netherlands. *Id.* at 272. Evaluating the superiority requirement of Rule 23(b)(3), the Court applied what it referred to as the "Probability Standard" adopted by this Court in *Vivendi III*. The *Alstrom* court certified a class including U.S. shareholders

as well as Canadian, British and Dutch shareholders, finding that the courts of these countries would likely recognize a judgment entered against certain of the defendants. However, the Court declined to include French shareholders, concluding that plaintiffs had not sufficiently demonstrated that a French court would more likely than not recognize and give preclusive effect to a U.S. judgment involving French class members. *Id.* at 287.

The *Alstrom* court distinguished this Court's decision on the grounds that "recent legal developments" in France, such as the Ministry of Justice letter authored by Mr. Guillame, post-dated the class certification decision in this case. *Alstrom*, 253 F.R.D. at 286-87 n.11. Of fundamental importance to the *Alstrom* decision, however, was the conclusion that this Court does *not* draw, namely, that Decision No. 89-257 holds that a collective action must provide for each member's individual consent in order to pass muster under the French Constitution. *Id.* at 285. ("A French court would likely conclude that any judgment rendered by this Court involving absent French class members offends public policy because absent French investors did not consent to this Court's jurisdiction . . . ."). This conclusion, advanced by defendants in this case as well, is an unsupportable reading of the 1989 Decision which, as noted, actually approves an opt-out type procedure whereby union members were "deemed" to have given "tacit" consent where they received written notice and did not withdraw [i.e., opt-out] within 15 days.[12] (Decision No. 84-257 ¶¶ 25-26.) One can consider, as the Court has, what type of notice might be necessary to give rise in France or, indeed, the United States to an

---

[12] The *Alstrom* opinion misattributes to the Conseil the remarks made by the commentator that "Anglo-Saxon opt-out class actions" would deprive individuals of the right of "individualized consent." The Conseil made no such observation. (*Compare* CC Dec. No. 2007-556 *with* Commentary 23, at 7.)

inference of implied consent, but to simply conflate the issue of notice with that of consent, as defendants have, obscures the analysis. The *Alstrom* court also accepts the defendants' clearly erroneous contention that the Conseil Constitutional Decision No. 2007-556 "expressly rejected opt-out mechanisms of class actions as contrary to French Constitutional principles." *Alstrom*, 253 F.R.D. at 287 n.11. This is not so. Decision No. 2007-556 contains not a single reference to class actions or the conditions under which a class action would offend French constitutional principles. (*See* Decision No. 2007-556, Cameron Decl. Ex. K; *see also* Mourre Supp. Decl. ¶ 22 (Apr. 11, 2008).)[13] Having carefully reviewed translations of both the 1989 and 2007 Decisions, the Court concludes that plaintiffs' readings are persuasive and that neither Decision finds or implies that individualized consent through an opt-in mechanism is constitutionally mandated or, stated in the alternative, that an opt-out procedure based on implicit consent is constitutionally prohibited, much less offensive to "fundamental French constitutional values in accordance with principles of universal justice." (*Compare Vivendi III*, 242 F.R.D. at 100-03 *with Alstrom*, 253 F.R.D. at 287.)

\* \* \*

In conclusion, the Court does not find that "recent events" in France support defendants' motion for partial reconsideration of the Court's prior class certification decision. All of the substantive arguments being made by both parties were made in great detail at the time plaintiffs first moved for class certification. The Court continues to find that as to French shareholders, a class judgment entered in this Court will likely

---

[13] The *Alstrom* opinion attributes the same conclusion to the 2008 Attali Commission Report. *See Alstom*, 253 F.R.D. at 287 n.11. As previously noted, *see supra* p. 9, the Report draws no such conclusion.

**SA142**

operate as a complete bar to the relitigation of claims asserted here, whether a second action is brought in the United States or France.  The Court acknowledges the possibility that some French class members—those who do not receive actual notice of this action—may not be absolutely precluded from relitigating their claims.  Yet this possibility is just that.  For it to materialize, French law must develop in a way that both refuses to give effect to publication notice as a reasonable and necessary backstop to actual notice, (*see* *Mullane*, 339 U.S. at 315; Coulon Report 80), and holds that such notice violates international public policy, *see* discussion *supra*, at 21-23.  In this regard (and despite the novel facts involved), the Court finds itself in substantially the same position as every court called upon to rule on class certification.  Ex ante, "the court conducting the action cannot predetermine the *res judicata* effect of the judgment."  Fed. R. Civ. P. 23, 1966 Advisory Committee Note, 28 U.S.C.A. Rule 23, at 20 (2008).  As a result, Rule 23 requires only that the Court make a reasoned prediction as to the likely preclusive effect of its judgment on absent class members and evaluate the risk of non-recognition together with all factors relevant to determining whether a class action is superior to other available methods for adjudicating the controversy.  *Vivendi III*, 242 F.R.D. at 95.

The fact that a substantial number of French shareholders are likely to be bound strongly argues for certification.  In addition, there would be substantial disincentives to initiating "second bite" litigation, not the least of which would be the adverse decision in this case following full discovery unavailable in France, the risk that the shareholder would lose again and, this time, be required to pay Vivendi's counsel fees, and the present inability to proceed in France on a class basis.  The Court does not treat Vivendi's concerns lightly, but the hypothetical possibility of less than complete *res judicata* effect

**SA143**

is not dispositive in assessing whether a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." *See, e.g., Cromer Fin. Ltd. v. Berger,* 205 F.R.D. 113, 135 (S.D.N.Y. 2001) (Cote, J.) ("Even where all the available evidence indicates that foreign plaintiffs who lose in the United States will be able to sue the defendants a second time in their own country, a class action may remain the superior means for litigating the dispute . . . ."). Here, a class action provides an efficient means whereby the claims of French shareholders arising under U.S. law can be adjudicated in a manner likely to be binding on a broad class of those shareholders who, in the event of judgment adverse to the class, might consider an action in France. *See Vivendi III*, 242 F.R.D. at 106-07. Moreover, it is fair to assume that there are many French shareholders of Vivendi whose claims are too small to justify individual actions and it is surely in their interests to participate in the class. Further, it is in the interest of the United States to provide a forum for individuals, including foreign shareholders, who are alleged to have been injured by the managers of a company operating directly from the United States. *See Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S. A.*, 606 F.2d 5, 9-10 (2d Cir. 1979). Finally, there are no manageability issues that preclude a finding of superiority. The challenges of providing direct and published notice have been met in numerous cases involving foreign class members. *See, e.g.*, *In re Royal Ahold N.V. Sec. & ERISA Litig.*, No 1:03-MD-01539, 2007 WL 3128594 (D. Md. Sept. 26, 2007); *In re Holocaust Victim Assets Litig.*, 314 F. Supp. 2d 155 (E.D.N.Y. 2004). Many French class members have already received some notice of their potential claims against Vivendi by virtue of the SEC's notice and distribution to shareholders of the substantial fines paid by the Company in connection

**SA144**

Case 15-2021, Document 85, 08/12/2015, 1574465, Page150 of 246

with settlement of the SEC's enforcement action.  *Vivendi III*, 242 F.R.D. at 108 n.22.

There is no indication in the record that French shareholder-claimants have had any

difficulties in understanding their rights to a share of that fund or the procedures for filing

a claim thereto.

## CONCLUSION

For the reasons stated above and in the Court's initial decision certifying a class

consisting of shareholders from the United States, France, England and the Netherlands,

Vivendi's motion for partial reconsideration **[457]** is denied.

SO ORDERED.

Dated:  New York, New York
      March 31, 2009

Richard J. Holwell
United States District Judge

29

**SA146**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE VIVENDI UNIVERSAL, S.A.            02 Civ. 5571 (RJH) (HBP)
SECURITIES LITIGATION

This Document Relates To:            **MEMORANDUM OPINION**
                                      **AND ORDER**

ALL ACTIONS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Defendants Vivendi, S.A. ("Vivendi"), Jean-Marie Messier, Guillaume Hannezo, and

Universal Studios, Inc. move for summary judgment against all plaintiffs based on a failure to

prove loss causation.  Loss causation is a necessary element of plaintiffs' claims under Sections

11 and 12(a)(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k(a), 77l(a)(2) (2006), Sections

10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule

10b-5 promulgated thereunder, as well as certain plaintiffs' common law claims for fraud and

negligent misrepresentation.  Defendants make a variety of arguments as to why plaintiffs have

failed to carry their burden on this element but focus largely on plaintiffs' theory that revelations

concerning Vivendi's liquidity problems caused plaintiffs' losses.  In addition to claiming that

plaintiffs' theory of "liquidity" is impermissibly broad, defendants argue that plaintiffs have

failed to establish a sufficient connection between Vivendi's allegedly false or misleading

statements and these revelations, or between the revelations and declines in Vivendi's stock

price.  Defendants also move the Court to rule on whether certain allegations and statements are

actionable against them, as well as on the form of, and method for calculating, damages.  For the

reasons that follow, defendants' motions are denied

# BACKGROUND

The Court here summarizes the plaintiffs'[1] case as set forth in the class plaintiffs' Counterstatement of Material Facts[2] and the expert report of Dr. Blaine Nye.[3]  In these motions, defendants challenge only the sufficiency of plaintiffs' evidence of loss causation, focusing primarily on Dr. Nye's report and testimony.  For the sake of context, however, the Court first describes plaintiffs' allegations concerning the substance of defendants' alleged fraud.  Because defendants were not required to dispute the facts set forth in class plaintiffs' Counterstatement, nothing in this opinion should be construed as deeming admitted or undisputed the facts asserted in that Counterstatement.  In brief, plaintiffs claim that defendants Messier and Hannezo saddled Vivendi with massive amounts of debt and concealed the risk to Vivendi's liquidity through various false and misleading public statements.  When that risk began to materialize in the first half of 2002, Vivendi's stock price declined as a result, causing plaintiffs' losses.

*Defendants' Alleged Fraud*

Vivendi is a publicly-traded French corporation that was known as *Compagnie Générale des Eaux* prior to 1998.  (Class Pl. Counterstatement ¶ 1; Def. 56.1 Statement ¶ 1.)  For the

---

[1] Defendants have traditionally distinguished four categories of plaintiffs:  (1) the class plaintiffs; (2) Liberty Media Corp., LMC Capital LLC, Liberty Programming Co. LLC, LMC USA VI, Inc., LMC USA VII, Inc., LMC USA VIII, Inc., LMC USA X, Inc., Liberty HSN LLc Holdings, Inc., and Liberty Media International, Inc. (collectively "Liberty Media"); (3) GAMCO Investors, Inc. ("GAMCO"); and (4) those plaintiffs who brought separate actions after being excluded from the class (the "Individual Plaintiffs").  Defendants filed two motions for summary judgment based on a failure to prove loss causation, with one motion directed at the class plaintiffs, Liberty Media, and GAMCO, and another motion directed at the Individual Plaintiffs.  The reason for defendants' separate motions appears to be the fact that the class plaintiffs, Liberty Media, and GAMCO submitted the expert reports and deposition testimony of Dr. Blaine Nye as evidence of loss causation, while the Individual Plaintiffs submitted the reports and testimony of Mr. Frank Torchio.  The issues raised by defendants, however, are identical for all plaintiffs except Liberty Media, and even in the case of Liberty Media, the issues are nearly identical.  Accordingly, the Court distinguishes among plaintiffs only as necessary.

[2] The Court cites to Class Plaintiffs Counterstatement of material facts as "Class Pl. Counterstatement ¶___".

[3] Without opining on the sufficiency of Mr. Torchio's report and testimony, the Court concludes that Dr. Nye's report and testimony are sufficient to deny defendants' motions for summary judgment against all plaintiffs and limits discussion accordingly.

newly-minted CEO, defendant Messier, the name change was part of a grand strategy to transform the company from a simple water utility into an international media and telecommunications conglomerate. (Class Pl. Counterstatement ¶¶ 3-5.) Central to that strategy was a series of acquisitions that peaked with a three-way merger with The Seagram Company, Ltd.—a U.S. company that owned both Universal Pictures and Universal Music Group—and Canal Plus S.A.—one of Europe's largest cable television operators. (*Id.* ¶¶ 5-7.) The acquisitions increased Vivendi's media and telecommunications debt from approximately €3 billion in early 2000 to over €21 billion in 2002. (*Id.* ¶ 32.)

Plaintiffs allege that defendants first began to mislead the public when they were promoting the merger to Vivendi's extant shareholders. At a shareholder meeting in anticipation of the merger vote, for example, Messier told shareholders that "[t]hanks to our free net cash flow and the opportunities to dispose of some holdings . . . we will have an additional war chest of 10 billion euros for 2001-2002 before the first euro of debt." (*Id.* ¶ 13.) Plaintiffs allege that Messier knew this statement was false, citing a memo from Hannezo stating that "I believe it is wrong to reason in terms of . . . free cash flow (there won't be any this year) . . . ." (*Id.* ¶ 14.) Nevertheless, Messier continued to tout the "Strength of [Vivendi's] Cash Flow" to shareholders throughout 2001. (*Id.* ¶ 49 (Letter to Shareholders dated June 26, 2001).)

Plaintiffs allege that a large part of defendants' fraud appeared in Vivendi's financial statements, with detailed numbers backing up Messier's rosy descriptions of the company's liquidity position. In particular, plaintiffs allege that defendants used purchase accounting to ensure that Messier's promises that Vivendi's EBITDA[4] would grow at 35% annually. (*Id.* ¶¶ 15-16.) Purchase accounting is typically used at the time of a merger and "allows the

---

[4] EBITDA is defined as Earnings Before Interest, Taxes, Depreciation, and Amortization. (*Id.* ¶ 16.) It is a widely-used measure of a company's earnings and its ability to service debt. (Vasilescu Decl. Ex. 294 (Mintzer Report ¶¶ 150-52).)

acquiring company to provide for cash business expenses by reducing allowances and reserves on the balance sheet." (*Id.* ¶ 18.)  Because expenses accounted for in this way reduced allowances and reserves rather than net earnings, Vivendi's net earnings were correspondingly higher.  (*Id.*)  Plaintiffs allege that Vivendi knew its use of purchase accounting beyond the merger was misleading, citing an e-mail from Hannezo declaring that defendants "will benefit from a maximal flexibility in making the opening balance sheet adjustments, and the analysts will not have it easy to track the purchase accounting benefits." (*Id.* ¶ 23.)  Internally, Vivendi employees referred to purchase accounting or PA as their "profit adder".  (*Id.* ¶ 20.)  Indeed, plaintiffs claim that 50% of Vivendi's reported EBITDA growth in the media and communications group was achieved through purchase accounting.  (*Id.* ¶ 30.)

In 2001, plaintiffs allege, Messier continued to push forward with multiple acquisitions, including a minority stake in Maroc Telecom and a secret deal for an additional stake in 2002. (*Id.* ¶ 31; Nye Report ¶ 61.)  These acquisitions translated to debt levels that began to severely test the company's liquidity.  Moreover, Vivendi's need for cash prompted it to take out large loans on unfavorable terms, including the €608 million loan from Cegetel, the French telecom in which Vivendi owned a large stake, which was repayable on demand.  (Nye Report ¶ 91.)  Other sources of debt included draw-downs on its commercial paper backstops—actions that in themselves potentially put Vivendi in default according to the prudential rules set by the rating agencies.  (Nye Report ¶ 8(f).)  Internally, Vivendi's treasury department stressed that this debt meant that the company did not have the capacity for further acquisitions.  (Class Pl. Counterstatement ¶ 35.)  By June 2001, there was talk of bankruptcy if Vivendi continued on its course.  (*Id.* ¶¶ 50-52.)  At the time, Hannezo warned that "the risk of [a credit rating]

4

**SA150**

downgrade is significant." (*Id.* ¶ 53.) After narrowly avoiding just such a downgrade in

December 2001, Hannezo wrote the following to Messier:

> I told you that I would talk to you about the personal consequences that I'm
> drawing from my painful and humiliating meetings with the ratings agencies . . . .
> For the first time, I felt the wind pass by from the cannonball of something that,
> from a personal point of view, I do not want to put up with: a downgrade, which
> would have led to a liquidity crisis; the jeers of all those who have waited for us at
> the pivotal occasion, desperate for such a long time to see us stumble . . . . and the
> unpleasant feeling of being in a car whose driver is accelerating in a sharp turn
> while I'm the one in the death seat. . . . The only thing that I am asking is that it
> doesn't all end in shame.

(*Id.* ¶¶ 81-82.) Nevertheless, throughout the fall of 2001, Messier continued to boast of "strong

third quarter results" with "Year-to-date . . . EBITA increased 46%." (*Id.* ¶ 62.) Just days after

Hannezo sent his "death seat" memo, defendants reported on a conference call that "We have a

strong balance sheet and such a strong basis of earnings, which we intend to grow, that we're

confident that we will be able to keep our credit rating and to grow the business." (*Id.* ¶ 86.)

    While plaintiffs allege that Vivendi continued to make false and misleading statements to

the public in 2002, those statements were made as other events allegedly began to reveal

Vivendi's true liquidity position. Plaintiffs' analysis of these events is the heart of their case for

loss causation.

*Plaintiffs' Evidence of Loss Causation*

    The report of Dr. Blaine F. Nye purports to "provide expert opinion on the issues of

causation, materiality, market efficiency, and [damages]." (Nye Report ¶ 3.) Dr. Nye has an

M.B.A. and Ph. D. in finance from Stanford University and has frequently served as an expert in

securities actions. (Nye Report ¶ 1; Nye Report Exs. 1, 2.) Defendants do not here challenge Dr.

Nye's reliability as an expert, but rather the sufficiency of his findings to establish loss causation.

Before reaching his causal analysis, Dr. Nye makes several assumptions in his report.  He first assumes that "Vivendi Universal had progressively worsening and undisclosed liquidity risks throughout the relevant time period, which ultimately led to a liquidity crisis in the summer of 2002."  (Nye Report at 9.)  He defines liquidity as "the ability or ease with which Vivendi/Vivendi Universal could timely meet its financial obligations and fund its operations with cash on hand, assets readily convertible to cash on hand, cash from operations, or readily accessible sources of debt."  (*Id.*)  He also assumed that defendants concealed the risk of a liquidity crisis by misrepresenting or omitting the truth about the following facts, among others:  (1) Vivendi's free cash flow and EBITDA; (2) the terms of Vivendi's debt to its subsidiary Cegetel; (3) Vivendi's draw on its commercial paper backups; and (4) Vivendi's obligation to purchase an additional 16% interest in Maroc Telecom by February 28, 2002.  (*See id.* ¶ 8; *see also id.* ¶ 93.)

In his section entitled "Causation:  Class Action," Dr. Nye proceeds to explain the causal connection between Vivendi's concealment of liquidity risk and stock declines on eleven days in 2002.  Dr. Nye begins a summary of the events surrounding the fraud and identifies some of defendants' allegedly false or misleading statements, including those just summarized above.  (*Id.* ¶ 33.)  The core of Dr. Nye's report, however, is his regression analysis and event study.  The purpose of a regression analysis is to disaggregate market and industry declines from residual, company-specific share price declines.  (*Id.* ¶ 254-60.)  Regression analysis is a common mathematical tool for determining whether and to what extent a correlation exists between two variables.  (*Id.* ¶ 254.)  In this case, Dr. Nye compared the day-to-day percentage increases and decreases of Vivendi's share price to the same increases and decreases for a market-wide index and an industry-wide index.  (*Id.*)  The market-wide index is derived from a

6

**SA152**

collection of different stocks that reflect the "average" behavior of the entire market—as, for example, the Dow Jones Industrial Average does. (*Id*.) The industry-wide index is derived from a similar collection of, in this case, media and telecommunications stocks during the class period. (*Id*.) In this way, Dr. Nye could predict rises and declines in Vivendi's stock price based on the rises and declines of these indexes. Where Vivendi's stock declined in excess of the market and industry by a statistically significant margin, Dr. Nye could identify days where Vivendi's share price fell for reasons independent of market or industry forces—Vivendi-specific residual declines. (*Id*.) From his regression analysis, Dr. Nye identified eleven days on which there were Vivendi-specific residual declines: January 7, May 3, June 21, June 24, July 2-3, July 10, July 15, and August 14-16, 2002. (*Id*. ¶¶ 127, 171, 192, 195, 213, 216, 222, 225, 239, 242, 244.)

On these days, Dr. Nye conducted his event study. Dr. Nye describes "event study methodology" as used "to disentangle the effects of company-specific information from market and industry information" by associating "day-to-day information releases from sources including Vivendi/Vivendi Universal's press releases, conference calls, news reports, securities analysts' reports, and SEC filings with the daily residual returns on Vivendi/Vivendi Universal stock during the Damage Period." (*Id*. ¶ 261.) While regression analysis identifies days in which a company's value decreases net of market and industry, it does not explain why. Those declines could be due to Vivendi-specific news that is unrelated to the fraud. Dr. Nye's event study undertook to determine the extent to which the events reported to the public on these eleven days revealed Vivendi's true liquidity condition. A summary of his study follows:

- January 7, 2002: Vivendi sells certain of its treasury shares into the market, reversing its earlier-stated intention to cancel them. (*Id*. ¶ 126.) Dr. Nye opines that Vivendi's share price declined, even though Vivendi got a good deal for the shares, because the public

had started to doubt Vivendi's prospects. (*Id.* ¶¶ 127-28.) Dr. Nye does not, however, point to any evidence suggesting that this negative view of Vivendi was in any way related to liquidity and the risk that Vivendi might not be able to pay down its debt. He does distinguish the concurrent AOL-Time Warner write-down announcement as not a significant cause of the decline because the news was long expected. (*Id.* ¶¶ 131-32.)

- May 3, 2002: Moody's downgrades Vivendi, noting that its "continuing concerns that Vivendi Universal might not be able to reduce debt as quickly and comprehensively as planned by the company . . . ." (*Id.* ¶ 166.) Moody's also noted that Vivendi's weak share price had triggered its put obligations requiring major cash outlays, and that meaningful cash flow was a problem. (*Id.*) Dr. Nye opines that the downgrade revealed that Vivendi's liquidity position that was much worse than the public had thought. (*Id.* ¶¶ 167-70.)

- June 21, 2002: The market learns of a quick private sale of Vivendi Environment ("VE") shares to Deutsche Bank. (*Id.* ¶ 189.) The sale was in advance of an announced sale of VE stock. (*Id.* ¶ 186.) Dr. Nye opines that quick sales of assets suggest the need for immediate cash inflows, and hence weakened liquidity, because companies often get lower prices when they need to sell quickly. (*Id.* ¶ 20.) This was such a sale and the market reacted by punishing Vivendi's share price. (*Id.* ¶ 189.)

- June 24, 2002: Vivendi announces the pending sale of a 15.6% stake in VE. (*Id.* ¶ 193.) Dr. Nye opines that the market again interpreted the sudden announcement as a sign of needing a quick infusion of cash and therefore of weakened liquidity, pointing to commentators reaching the same conclusion. (*Id.*) Dr. Nye also distinguishes two competing causes for the same stock declines: (1) rumors that News Corp. would back

**SA154**

out of a deal with Vivendi were based on the same concerns as the sale of the VE stake, and therefore cannot be seen as an independent cause; and (2) British Telecom's announcement that it had not yet decided to sell its Cegetel stake was not new information. (*Id.* ¶ 194.)

- July 2-3, 2002: On July 1, Moody's downgrades Vivendi to junk status (Ba1) after markets close. (*Id.* ¶ 207.) The next day, S&P downgrades Vivendi to one notch above junk (BBB-). (*Id.* ¶ 209.) Moody's notes concerns over refinancing and the slow pace of asset sales coupled with lower-than-expected sales prices. (*Id.* ¶¶ 207, 211.) S&P notes a lack of transparency, the strain imposed by Vivendi's outstanding put options, and certain debt obligations, including the Cegetel loan. (*Id.* ¶¶ 209-10.) Dr. Nye opines that the downgrades again revealed a weaker Vivendi liquidity position than previously thought and caused price declines on both July 2 and 3. (*Id.* ¶¶ 213, 216.)

- July 10, 2002: Vivendi announces a new $1 billion unsecured credit line, but this positive development is overshadowed by news that French regulators had raided Vivendi's Paris headquarters as part of their investigation into possible securities fraud. (*Id.* ¶ 219.) Moody's and S&P also greeted the new credit line with caution, continuing to warn that unless Vivendi did more to pay down its debt, further downgrades were possible. (*Id.* ¶¶ 220-21.) Dr. Nye opines that the rating agencies' reaction revealed continuing liquidity concerns. (*Id.* ¶ 220.) He does not, however, attempt to distinguish any independent price decline caused by news of the investigation, opining that the information "effectively informed investors of suspicions regarding the Company's accounting practices." (*Id.* ¶ 222.)

- July 15, 2002: The French press reports that Vivendi created a shell company and share

**SA155**

agreement to control Elektrim, a Polish telecom. (*Id*. ¶ 224.) One interviewer questioned the legality of Vivendi's actions, but Vivendi denied any wrongdoing. (*Id*.) Nye opines without further explanation that "[t]hese information releases constituted a partial disclosure of Vivendi Universal's true liquidity condition . . . ." (*Id*. ¶ 225.)

- August 14-16, 2002: Vivendi announced preliminary second quarter results on August 14, 2002. The announcement included a variety of negative facts, including: (1) the need to sell an additional €10 billion worth of assets; (2) that debt was €10 billion over what it should be for Vivendi's desired credit rating; (3) that French GAAP debt stood at €35 billion; and (4) that the company was experiencing a short-term liquidity problem. (*Id*. ¶ 235.) Moody's and S&P also downgraded Vivendi again, with S&P noting Vivendi's "liquidity crisis." (*Id*. ¶ 237.) Dr. Nye opines that the announcements revealed the need for a "fire sale" of assets and the extent of Vivendi's liquidity problems. (*Id*. ¶¶ 235, 240.) The next day Bloomberg announced that Houghton Mifflin, previously acquired by Vivendi, would sell for less than one-fifth of what Vivendi paid for it, and analysts continued to discuss the repercussions of the August 14 announcements. (*Id*. ¶¶ 241, 243.) Dr. Nye opines that stock declines on August 14, 15, and 16 were all caused by the August 14 disclosures and continued reports on their consequences. (*Id*. ¶¶ 240, 242, 244.)

Dr. Nye concludes his report (at least with respect to the class plaintiffs) with a description of the two methods he used to quantitatively assess damages. He begins by stating generally that "[p]rice inflation in the ADS[5] and ordinary shares is measured by the declines in

---

[5] ADS stands for American Depository Shares and were essentially those Vivendi shares that were traded on the New York Stock Exchange. *See In re Vivendi Sec. Litig.*, 242 F.R.D. 76, 81 (S.D.N.Y. 2007).

**SA156**

those securities' prices upon disclosures related to the alleged fraud, through which investors learned Vivendi Universal's true liquidity condition." (*Id.* ¶ 250.) Equivalently, Dr. Nye maintains that while the damages due plaintiffs is the per-share inflation resulting from defendants' false or misleading statements, the appropriate method for calculating those damages is to examine the price declines that occur in reaction to disclosures of Vivendi's liquidity position. (*Id.* ¶ 251.) Of course, if particular plaintiffs sell before all of Dr. Nye's identified disclosures, they may be entitled to recover only that portion of the inflated price that they actually lost.[6] (*Id.*)

## DISCUSSION

### I. Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The plain language of

---

[6] Dr. Nye describes broadly the two alternate methods—constant-dollar (constant-euro) inflation and constant-percentage inflation—that he uses to make this calculation:

> If the magnitude of the inflation on the date the misrepresentation is made or the fraud is revealed is not expected to be influenced by market, industry, or non-fraud-related company-specific events, or indeed based on any available information, then from the standpoint of financial economics, the best estimate of the inflation on the date of purchase is simply the dollar value of the inflation on the date of the initial inflation or the date the fraud was revealed, i.e., the inflation remains constant over the relevant period (constant-dollar inflation). On the other hand, if inflation is expected to be influenced by market, industry and non-fraud-related company-specific events, as would any misrepresentations or omissions about the condition and business operations of the company and thus its earnings and earnings growth, from the standpoint of financial economics the best estimate of inflation at the time of purchase is the percentage change in share price at the point of initial inflation or at the time of revelation of the fraud, as adjusted by market, industry and non-fraud-related company-specific returns during the period between the date of purchase and the date the fraud is revealed (constant percentage inflation).

(*Id.* ¶ 185.)

Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 321 (1986); *see also Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 61 (2d Cir. 1998); *Conway v. Microsoft Corp.,* 414 F. Supp. 2d 450, 458 (S.D.N.Y. 2006). A party moving for summary judgment may discharge its burden "by 'showing'—that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325.

A fact is considered "material" for purposes of Rule 56 if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Whether a material issue is "genuine" depends on whether the evidence is of a type that would permit a reasonable jury to return a verdict in favor of that party. *Mitchell v. Shane,* 350 F.3d 39, 47 (2d Cir. 2003). In making its showing that a genuine issue of material fact exists, the nonmoving party may not rely on "the mere existence of a scintilla of evidence" to support its position, but must instead proffer "evidence on which the jury could reasonably find for the [plaintiff]." *Dawson v. County of Westchester,* 373 F.3d 265, 272 (2d Cir. 2004) (citing *Anderson,* 477 U.S. at 252).

## II.    The Law of Loss Causation

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005). It stands in contrast to transaction causation, i.e., reliance, or whether plaintiffs would not have purchased or sold their stock but for the alleged misconduct. *Id.* Proving loss causation is

**SA158**

prescribed by statute for actions under Section 10(b) and Rule 10b-5.  15 U.S.C. § 78u-4(b)(4)

("In any private action arising under this chapter, the plaintiff shall have the burden of proving

that the act or omission of the defendant alleged to violate this chapter caused the loss for which

the plaintiff seeks to recover damages.").  The same standard applies for actions under Sections

11 and 12(a)(2) except that defendants bear the burden of negating causation.  *See In re*

*Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2005 WL 375314, at *6 (S.D.N.Y. Feb 17, 2005)

("the negative causation defense in Section 11 and the loss causation element in Section 10(b)

are mirror images").  A similar requirement applies to actions for common law fraud and

negligent misrepresentation.  *See Emergent Captial Inv. Mgmt., LLC v. Stonepath Group, Inc.*,

343 F.3d 189, 197 (2d Cir. 2003) ("Similar to loss causation, the proximate cause element of

common law fraud requires that plaintiff adequately allege a causal connection between

defendants' non-disclosures and the subsequent decline in the value of [the stock].").

Owing to the great similarity of an action under Rule 10b-5 to an action for common law

fraud, courts have consistently characterized loss causation as similar to the tort concept of

proximate causation.  *See Lentell*, 356 F.3d at 172 ("We have described loss causation in terms

of the tort-law concept of proximate cause . . . ."); *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d

147, 157 (2d Cir. 2007) (same); *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 187 (2d

Cir. 2001) (same).  As when assessing proximate cause, courts assessing plaintiffs' case for loss

causation look to whether the alleged damages were reasonably foreseeable given the alleged

false or misleading statements.  *See Castellano*, 257 F.3d at 187 (looking to whether "the

damages suffered by plaintiff [were] a foreseeable consequence of any misrepresentation or

material omission").  As with proximate cause, these determinations "may often rest in part on

legal policy considerations" that "fix a . . . limit on a person's responsibility, even for wrongful

**SA159**

acts." *Id*.  However, the Court of Appeals has noted that "the tort analogy is imperfect." *Lentell*, 356 F.3d at 173.  In particular, unlike for proximate cause in tort, "it cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated." *Id*.  For this reason, among others, application of the loss causation concept "to particular facts has often been challenging." *Castellano*, 257 F.3d at 187.

The Supreme Court recently attempted to bring clarity to this area in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).  In *Dura*, the defendant had developed a spray for treating asthma and had represented that it expected the FDA to approve the device.  It also represented that its drug sales would be profitable.  Plaintiffs alleged that these representations were false, that they constituted a fraud on the market, and that they had paid inflated prices for defendant's shares as a result.  The Ninth Circuit held that these allegations were sufficient to survive a motion to dismiss.  The Supreme Court disagreed and reversed.

The Supreme Court specifically rejected the Ninth Circuit's holding that "plaintiffs were harmed when they paid more for the stock than it was worth." *Broudo v. Dura Pharms., Inc.*, 339 F.3d 933, 938 (9th Cir. 2003) (quoting *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 832 (8th Cir. 2003)).  The Ninth Circuit had reasoned that if the injury occurs at the time plaintiff purchases or sells the stock, the chain of causation ends there too, and it would therefore be unnecessary for plaintiffs to prove that a "disclosure and subsequent drop in the market price of the stock . . . actually occurred . . . ." *Id*.  In contrast, the Supreme Court reasoned that "as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value." *Dura*, 544 U.S. at 342 (emphasis in original).  Consequently, plaintiffs suffer

14

**SA160**

a loss only when the shares they possess decline in value below the purchase price. Alleging a connection between the overstated price and the false statements was therefore not enough to establish causation. Plaintiffs needed to draw a causal connection between the false statements and the subsequent decline in share value.

The disagreement between the Supreme Court and the Ninth Circuit in *Dura* was partly rooted in differing views of the likelihood of real financial loss following plaintiffs' purchase. The Ninth Circuit had held elsewhere that loss was not inevitable, admitting that plaintiffs who later sell at a profit or for the same price as the purchase price could not recover. *See Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1437 (9th Cir. 1987). Nevertheless, the Ninth Circuit considered this the exception rather than the rule and found that plaintiffs could recover after any share decline below the purchase price—including declines that occurred before the truth leaked into the market.[7] *Id*. Because some loss was inevitable in the vast majority of cases, there was no need to require plaintiffs to establish a causal chain past the inflated price. In contrast, the Supreme Court found that shareholder loss was far from inevitable. *Dura*, 544 U.S. at 342 ("If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so."). While plaintiffs may later sell at a price below the purchase price, "that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Id*. at 343. Any one of such factors may

---

[7] If, for example, a person paid $110 for a share that would have been worth $100 had the truth been known, and later sold it for $105 before the truth came out, she could still recover five of the ten dollars she overpaid regardless of why the share price declined. The Ninth Circuit described such losses as occurring "as a result of market forces operating on the misrepresentations." *Wool*, 818 F.2d at 1437; *see also* Madge S. Thorsen, Richard A. Kaplan, & Scott Hakala, *Rediscovering the Economics of Loss Causation*, 6 J. BUS. & SEC. L. 93, 105-06 (April 2006) (discussing how market forces operate on a fraud).

precede a decline in the stock price, and a reasonable fact-finder could infer that it was that factor and not the fraud that caused the decline.  For a fact-finder to conclude that the fraud caused a decline in the share price, there must at least be evidence that the truth had begun to leak out into the market and that the shares traded at lower prices as a consequence of this leak.  Accordingly, the plaintiffs who sold prior to the truth leaking out could never recover.  *See id.* at 342 ("if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss").

Unsurprisingly, the Court's principal authority for this argument was the common law of tort.  The Restatement (Second) of Torts, quoted by the Court, concludes that "one who misrepresents the financial condition of a corporation in order to sell its stock will become liable to a purchaser who relies upon the misinformation for the loss that he sustains when the facts as to the finances of the corporation become generally known and as a result the value of the shares is depreciated on the market . . . ."  RESTATEMENT (SECOND) OF TORTS § 548A, cmt. b; *see also Dura*, 544 U.S. at 344.  However, "there is no liability when the value of the stock goes down after the sale, not in any way because of the misrepresented financial condition, but as a result of some subsequent event that has no connection with or relation to its financial condition."  RESTATEMENT (SECOND) OF TORTS § 548A, cmt. b.  Similarly, the treatise known colloquially as "Prosser and Keeton," also quoted by the Court, concluded that "losses due to a subsequent decline in the market, or insolvency of the corporation brought about by business conditions or other factors in no way relate[d] to the [false] representations will not afford a basis for recovery."  W. KEETON, D. DOBBS, R. KEETON, & D. OWEN, PROSSER AND KEETON ON LAW OF TORTS § 110, at 767.[8]

---

[8] In addition to tort law, the Supreme Court also held that a closer causal relationship between the alleged false or misleading statements and plaintiffs economic losses was more consistent with Congress's intent when it enacted the

Because it had long adopted similar principles of loss causation, this Circuit felt little

impact from *Dura*. Indeed, the lead case on loss causation by the Court of Appeals, *Lentell v.*

*Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005), was decided several months before *Dura*

and remains the law today. In *Lentell*, plaintiffs sued Merrill Lynch for permitting its analysts to

publish "BUY" recommendations on stocks they knew were bad bets. Plaintiffs had, of course,

bought the recommended stocks and then lost money when their value declined. The Court of

Appeals affirmed dismissal of the suit on the grounds that plaintiffs had failed to adequately

plead loss causation.

     *Lentell* answers several questions not fully addressed in *Dura*. *Dura* holds that plaintiffs

must establish a causal connection between the fraud and stock declines that occur after the truth

begins to "leak out", but it is silent as to how plaintiffs might prove this. The Supreme Court

confirms the analogy to proximate cause, but admits differences as well. *See Dura*, 544 U.S. at

343 ("private securities fraud actions resemble in many (but not all) respects common-law deceit

and misrepresentation actions"). *Lentell* notes that the key difference is that stock prices decline

in reaction to information released into the market rather than in reaction to the fraudulent

statements themselves. When that information was previously concealed from the market by the

fraud, we can properly conclude that whatever decline in the stock price was caused by the

release of that information was also caused by the fraud. *Lentell*, 396 F.3d at 173 ("To establish

loss causation, a plaintiff must allege that . . . the misstatement or omission concealed something

from the market that, when disclosed, negatively affected the value of the security."). The Court

of Appeals called the event or events that released this previously concealed information the

"materialization of the risk." *Id*. The *Lentell* court also clarified loss causation's relation to

securities laws. *Dura*, 544 U.S. at 345 (holding that Congress's statutory scheme intended to "protect [investors]
against those economic losses that misrepresentations actually cause" rather than "provide [them] with broad
insurance against market losses").

**SA163**

foreseeability. The law required plaintiffs to establish "both that the loss [was] foreseeable *and* that the loss [was] caused by the materialization of the concealed risk." *Id*. To prove that the loss-inducing event was foreseeable, plaintiffs must establish that the risk of the event occurring "was within the zone of risk *concealed* by the misrepresentations and omissions alleged by the disappointed investor." *Id*.

The classic example of a loss-inducing event is a corrective disclosure by the company itself.[9] A corrective disclosure is traditionally an admission by the company that one or more of its previous statements were false or misleading followed by a corrected, truthful and complete version of those statements. *See In re AOL Time-Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007) (a corrective disclosure "reveal[s] an alleged misstatement's falsity or disclose[s] that allegedly material information had been omitted"); *Lentell* 396 F.3d at 175 n.4 (requiring that a corrective disclosure "reveal to the market the falsity of the prior recommendations"); *but see In re IPO Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008) ("There is no requirement that corrective disclosures emanate from the company itself, so long as the truth is disclosed in some fashion."). The event need not take this form, however. The event could be a credit ratings downgrade, *see In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897 (HB), 2006 WL 314524, at *11 (S.D.N.Y. Feb. 10, 2006) (holding that a concealed risk materialized when the ratings agencies downgraded certain bonds, and defendants had previously misrepresented the quality of the bonds' collateral), *vacated on other grounds*, *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190 (2d Cir. 2008), or the

---

[9] The Court notes that many courts in the district consider corrective disclosures to be a separate conceptual category from "materialization of the risk", *see, e.g.*, *In re IPO Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008) ("There are several possible methods of pleading loss causation, including 'direct causation,' 'materialization of risk,' and 'corrective disclosure.'"), and that other courts have stretched the notion of corrective disclosure to include all possible loss-inducing events, *see, e.g.*, *In re Bristol-Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 164-65 (S.D.N.Y. 2008) (discussing corrective disclosures and partial corrective disclosures).

collapse of the company, *see In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307 (S.D.N.Y.

2005) ("The concealed risk materialized when Parmalat suffered a liquidity crisis on December

8, 2003 and was unable to pay bonds as they came due.").  For an event to qualify as a

materialization of the risk, it need only disclose part of the truth that was previously concealed

by the fraud.  A ratings downgrade reveals the risk of deteriorating liquidity, and the failure to

obtain agency approval may reveal the risk of a non-viable product.  Unlike corrective

disclosures, these events do not identify specific company statements as false or misleading.  But

if the company had previously concealed its liquidity condition or the failure of its product by

making false or misleading statements, these events may be sufficiently related to the fraud to

qualify as materializations of the risk.

        Once an event qualifies as a materialization of the risk, plaintiffs must still prove that

their losses were caused by that event.  Admittedly, this is a potentially complicated endeavor.  A

stock's price as listed on an exchange is merely a continuous posting of thousands of individual

trades.  Moreover, as the Supreme Court in *Dura* noted, a decline in stock price can occur in

reaction to "changed economic circumstances, changed investor expectations, new industry-

specific or firm-specific facts, conditions, or other events . . . ."  *Dura*, 544 U.S. at 343.  Sorting

out which declines were caused by such extraneous factors and which were caused by a

materialization of the concealed risk is generally the province of an expert.  *See Robbins v.

Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997) (determining causation and damages in

a securities fraud action "is often done, as it was here, with the help of an expert witness").  It is

an expert that produces the almost obligatory "event study" that begins by isolating stock

declines associated with market-wide and industry-wide downturns from those specific to the

company itself.  *See In re Imperial Credit Indus., Inc. Sec. Litig.,* 252 F. Supp. 2d 1005, 1014-15

(C.D. Cal. 2003) (requiring an event study or similar analysis).  Once plaintiffs' expert has

isolated days where the stock declines were statistically significant relative to these downturns,

he must consider firm-specific events that might have caused those declines.[10]

While the plaintiffs at all times bear the burden on loss causation, it is important not to

confuse causation with damages when comparing competing causes for a stock decline.  In

theory, plaintiffs need only prove that they suffered *some* damage from the fraud.  Liability

obviously does not hinge on how much damage.  However, when there are two competing causes

for a stock decline, it is easy to argue that one caused the entirety of the decline while the other

did not cause any of it.  The Fourth and Eleventh Circuits have specifically addressed this

problem and held that to satisfy loss causation plaintiffs need only produce sufficient evidence

for a jury to conclude that the fraud-related event was a "substantial cause" of the decline.  *See*

*Miller v. Asensio & Co., Inc.*, 364 F.3d 223, 229 (4th Cir. 2004) ("when courts require a showing

of damages *proximately caused* by the defendant's conduct for liability, they require only that

the plaintiff show that the defendant's conduct was a *substantial* cause of its injury"); *Robbins*,

116 F.3d at 1447 ("Because market responses, such as stock downturns, are often the result of

many different, complex, and often unknowable factors, the plaintiff need not show that the

---

[10] The Court in *In re Enron Corp. Sec. Derivative & ERISA Litig.*, 529 F. Supp. 2d 644 (S.D. Tex. 2006), gave the following description of an event study:

> An event study is a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price. This approach assumes that the price and value of the security move together except during days when disclosures of company-specific information influence the price of the stock. The analyst then looks at the days when the stock moves differently than anticipated solely based upon market and industry factors-so-called days of "abnormal returns."  The analyst then determines whether those abnormal returns are due to fraud or non-fraud related factors.... [E]vent study methodology has been used by financial economists as a tool to measure the effect on market prices from all types of new information relevant to a company's equity valuation.

*Id.* at 720.

defendant's act was the sole and exclusive cause of the injury he has suffered; he need only show that it was 'substantial', i.e., a significant contributing cause.").  The Fourth Circuit even went so far as to uphold a verdict where the jury had found that the fraud had been a substantial cause of the loss, but awarded no damages because that loss could not be determined with sufficient certainty.  *Miller*, 364 F.3d at 225.  The Second Circuit has adopted a similar approach, requiring plaintiffs to produce sufficient evidence for the fact finder to "ascribe some rough proportion of the whole loss" to defendants' fraud.  *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007).

Similarly, the *Lentell* court noted that it was not suggesting that "plaintiffs were required to allege the precise loss attributable" to defendants' fraud.  *Lentell*, 396 F.3d at 177.  The Court of Appeals also noted that as a general matter, "the chain of causation . . . is a matter of proof at trial . . . ."  *Id*. at 174.  Because causation is fundamentally a factual matter, the relevant factors may include the time between the event and the decline, *Castellano*, 257 F.3d at 186, the prominence of the fraud-related news relative to other news, *Lattanzio*, 476 F.3d at 158, or how new the information is, *In re Omnicom Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008).  Ultimately, courts must still rely on basic summary judgment principles to determine whether a genuine issue of fact has been raised.

Summarizing the case law here discussed, plaintiffs seeking to prove loss causation must establish two causal connections:  a connection between the alleged false or misleading statements and one or more events disclosing the truth concealed by that fraud, and a connection between these events and actual share price declines.  *Lentell*, 396 F.3d at 173.  To demonstrate the connection between the statements and the events—termed "materializations of the concealed risk"—plaintiffs must show:  (1) that these events were foreseeable consequences of

the alleged fraud, *id.*; and (2) that these events revealed new information previously concealed by defendants' alleged fraud, *id.*; *see also Dura*, 544 U.S. at 342. To demonstrate the connection between the events and the share price declines, plaintiffs must: (1) show a correlation between news of the event and the declines; and (2) disaggregate the declines or some rough percentage of the declines from losses resulting from other, non-fraud-related events. *Dura*, 544 U.S. at 342-43; *Lattanzio*, 476 F.3d at 158.

## III. Dr. Nye's Report Raises a Genuine Issue of Material Fact Concerning Loss Causation

Defendants argue that plaintiffs have failed to establish both the connection between their allegedly false or misleading statements and any fraud-revealing events, and the connection between these alleged events and Vivendi stock declines. First defendants argue that, as a matter of law, the events identified by plaintiffs cannot qualify as "materializations of a concealed risk" because they do not reveal new information concealed by defendants' alleged fraud. Second, defendants argue that plaintiffs have failed to disaggregate competing causes of stock price declines.

### A. Plaintiffs' Materialization-of-the-Risk Theory Is Viable

In his report and deposition testimony, Dr. Nye identifies eleven days on which the alleged fraud caused loss by the plaintiffs. (Nye Report ¶¶ 127, 171, 192, 195, 213, 216, 222, 225, 239, 242, 244.) He identified these days by applying a regression analysis to Vivendi's share price over the class period and selecting those days on which there was a Vivendi-specific residual price decline. (*Id.* ¶ 262.) Dr. Nye then proceeded to identify and describe particular events on these days that he claims caused Vivendi's stock price to decline. (*Id.*) At least in this motion, defendants do not challenge the method by which Dr. Nye selected the eleven days.

Rather, defendants challenge whether the events on these days actually disclosed information that had previously been concealed by the fraud. *Lentell*, 396 F.3d at 173.

As a threshold matter, the Court notes that while plaintiffs argue that "[b]oth corrective disclosure and materialization of concealed risk analyses support loss causation in this case," Class Pl. Br. at 22, this is not a case of corrective disclosure. None of the eleven events include an announcement identifying specific Vivendi statements as false or misleading. *See In re AOL Time-Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007); *Lentell* 396 F.3d at 175 n.4. These events may reveal truthful information previously concealed by the fraud—as they must to satisfy the requirements of loss causation—but this alone does not qualify an event as a corrective disclosure.

Under a broader, materialization-of-the-risk theory, plaintiffs argue that defendants' false and misleading statements concealed the risk of a liquidity crisis, and that events on those eleven days gradually revealed Vivendi's deteriorating liquidity condition. Plaintiffs define liquidity as "the ability or ease with which Vivendi/Vivendi Universal could timely meet its financial obligations and fund its operations with cash on hand, assets readily convertible to cash on hand, cash from operations, or readily accessible sources of debt." (Nye Report at 9.) The subject of Vivendi's allegedly fraudulent statements therefore covers the extent of its debt, the size of its income stream, and, perhaps most importantly, how quickly Vivendi could convert assets into cash. *See Lentell*, 396 F.3d at 173 ("a plaintiff must allege … that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered").

Defendants argue that plaintiffs' conception of liquidity risk "is so amorphous and all-encompassing as to render it meaningless." (Def. Br. at 10.) Admittedly, liquidity is a broad concept, but it is not as amorphous as defendants make it out to be. Cash flow by itself, for

example, does not mean anything for liquidity, but it does mean something when combined with information concerning the debt it is intended to service. Among other things, plaintiffs argue that defendants' statements concealed specific facts regarding: (1) Vivendi's actual EBITDA and free cash flow; (2) Vivendi's debt to its subsidiary Cegetel and the terms of that debt; (3) Vivendi's drawing on its commercial paper backups; and (4) Vivendi's obligation to purchase an additional 16% interest in Maroc Telecom by February 28, 2002. (Nye Report ¶ 93.) Plaintiffs argue that Vivendi's published EBITDA and free cash flow numbers—the primary measures for cash flow available to service debt—were inflated and that the size and nature of its debt obligations were minimized. (*Id.*) Broad though it may be, the Court concludes that such a theory of liquidity risk is coherent. *See, e.g.*, *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 97-98 (2d Cir.2001) (risk of liquidity crisis concealed by edited background report omitting important negative events in executive's financial and business history); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d at 307 (risk of liquidity crisis concealed by omission of massive debt load from company's disclosures).

Assuming the legitimacy of plaintiffs' theory, defendants still argue that the information revealed by events on the eleven days was merely "bad news" rather than new information that had been previously concealed. (Def. Reply Br. at 12-15.) Except for the events identified on July 10, 2002, July 15, 2002, and August 14-16, 2002, plaintiffs identify either quick, unexpected asset sales or credit rating downgrades as the loss-inducing events. (Nye Report ¶¶ 126-128, 167-70, 189, 193, 207, 209.) Considering that credit ratings purport to assess the probability that a company will default on its obligations, there is little question that a downgrade is a sign of deteriorating liquidity. As for unexpected asset sales, Dr. Nye specifically discusses their relevance to liquidity in his report. (Nye Report at ¶¶ 19-20.) Specifically, Dr. Nye writes

that resolving a liquidity crisis "may require rapid sale of assets in which shareholders hold interests to pay the claims of debtholders, and at prices less than shareholders expected for those assets, or sale of assets important to realization of the company's strategy." (*Id.* at ¶ 19.) Put simply, maximizing shareholder value when a company sells one of its assets means negotiating the best price for it. If the company must sell the asset quickly to meet liquidity demands, it may be forced to accept a lower price for the asset than it would have but for time constraints. Accordingly, both ratings downgrades and unexpectedly quick asset sales have a reasonable relationship to liquidity risks and may be seen as materializations of such risks.

Defendants' argument runs astray when at this point they respond that, at most, plaintiffs have demonstrated that the downgrades and the quick asset sales were foreseeable from the allegedly false or misleading statements. (Def. Reply at 13.) Implicitly conceding foreseeability, defendants purport to challenge only "actual causation," citing *Lentell*. (*Id.*) But proving actual causation, at least in the way *Lentell* uses the phrase, is part of plaintiffs' burden to show a causal connection between the materialization of the risk and the stock price declines, *not* the causal connection between the allegedly false and misleading statements and the materialization of the risk. Establishing the latter connection does not, as defendants appear to believe, require plaintiffs to establish a one-to-one correspondence between concealed facts and the materialization of the risk. In other words, if a company misrepresents fact A (we have plenty of free cash flow), which conceals risk X (liquidity), the risk can still materialize by revelation of fact B (a ratings downgrade), an indication of risk X (liquidity). As discussed above, to prove the causal connection between misrepresenting fact A and the revelation of fact B, plaintiffs must establish only that the revelation of fact B was foreseeable, i.e., within the zone of risk X, and that fact B reveals information about risk X. When fact B is revealed, the market

need not be aware of fact A or that fact A had been previously misrepresented. The way defendants describe the law, only a corrective disclosure would prove loss causation.

None of defendants' attempts to distinguish the relevant case law on this point is successful. In *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001), the plaintiffs alleged that defendants concealed the company CEO's incompetence and that the risk of the CEO being unable to manage the company's liquidity risk materialized when the company had a liquidity crisis. The complaint nowhere alleged that the liquidity crisis revealed the CEO's incompetence when it occurred (presumably that was discovered later), but the Court of Appeals nevertheless allowed the claim to proceed. *Id.* at 96-98. In *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005), the court allowed a claim to proceed where bankruptcy revealed the risk of a liquidity crisis. There, the market did not know that Parmalat had been hiding massive amounts of debt when the bankruptcy occurred, but that did not stop plaintiffs from seeking recovery. *Id*. at 307.

Defendants practically ignore *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001), one of the only Court of Appeals cases to address loss causation at summary judgment rather than a motion to dismiss. In *Castellano*, defendants allegedly concealed their plans for a company restructuring even as they negotiated plaintiff's resignation from a high-level executive position. As a private company, Young & Rubicam had the right to repurchase plaintiffs' shares if he resigned. As one of the company's largest shareholders, plaintiff was therefore concerned that by resigning he might lose the projected value of his equity. Plaintiff nevertheless chose to resign based in part on defendants' representations that "nothing was going to change in the near future." The company exercised its right to repurchase plaintiff's shares only to later participate in a leveraged recapitalization that sent its shares soaring. On appeal,

SA172

defendants argued that summary judgment on loss causation grounds should be affirmed because the specific plans concealed during the resignation negotiations were merger plans with a company called True North. The ultimate transaction that caused the plaintiff's loss was a leveraged recapitalization with a company called Hellman & Friedman. Hence, defendants argued that the risk they concealed, a merger with True North, never materialized to cause plaintiff's loss. The Court of Appeals, however, rejected this argument and reversed the grant of summary judgment. The court held that defendants' concealment of the merger negotiations and other facts misled plaintiff "as to the zone of risk that [the company] might soon enter into a major corporate transaction." *Id*. at 188. Thus, defendant "disguised the very risk to which [plaintiff] fell victim." *Id*. at 189. The level of specificity with which plaintiff was held to on loss causation corresponded only to the foreseeability requirement and information ultimately disclosed. The risk was not that a particular transaction would cause a rise in value of plaintiff's shares, but that any major transaction would.

Defendants erroneously claim that "to the extent it suggests that a risk of the same type was foreseeable and thus the loss was caused by the risk . . . [*Castellano*] has been overruled by *Lentell*'s explicit requirement plaintiffs prove both foreseeability and proximate cause . . . and *Dura*'s holding that securities laws only protect 'against those economic losses that misrepresentations actually cause.'" (Def. Reply Br. at 14 n.10.) As a threshold matter, one panel of the Court of Appeals generally will not "overrule" an earlier panel, except in unusual circumstances not present here. *Consub Delaware LLC v. Schahin Engenharia Limitada*, 543 F.3d 104, 109 (2d Cir. 2008) ("[O]ne panel of this Court cannot overrule a prior decision of another panel, unless there has been an intervening Supreme Court decision that casts doubt on this Court's controlling precedent, or unless an en banc panel of this Court overrules the prior

decision."). Second, there is nothing inconsistent between *Castellano* and *Lentell*. Besides citing approvingly to *Castellano*, *Lentell* does not address the connection between the fraud and the materialization of the risk when it talks about "actual cause." As noted above, the Court of Appeals was here referring to the causal connection between the materialization and the actual decline in stock price. *Lentell*, 396 F.3d at 172-73. The causal connection between the false or misleading statements and the materialization is established if the materialization was foreseeable and if it disclosed information that was previously concealed. *Dura*, 544 U.S. at 342; *Lentell*, 396 F.3d at 173. Finally, nothing in *Dura* suggests otherwise. The word "cause" takes on a variety of meanings at different levels of generality. Defendants' *Dura* quote uses causation at a very high level of generality and does not suggest that *Lentell*'s approach is erroneous.

     As in *Castellano*, plaintiffs here allege that defendants concealed a broad risk to which the company later fell victim by misleading the public on particular facts and denying the risk. Specifically, plaintiffs argue that defendants concealed a severe liquidity risk by denying any liquidity problems, misrepresenting Vivendi's actual EBITDA and free cash flow, omitting the terms of its Cegetel debt, omitting Vivendi's draws on its commercial paper backups, and omitting Vivendi's purchase obligation in Maroc Telecom. (Class Pl. Br. at 7-21.) The events plaintiffs argue constitute a materialization of this concealed risk do not reveal Vivendi's free cash flow or the previous draws on its commercial paper backups anymore than the announcement of a leveraged capitalization by Young & Rubicam revealed its previous merger discussions with True North. They do, however, present a genuine material issue of fact with regard to whether previously concealed information—here, the tenuous liquidity position of Vivendi—was revealed to the market on those eleven days.

### B.      Plaintiffs Have Adequately Disaggregated Competing Causal Events

Defendants properly raise whether plaintiffs have established "actual causation" between the fraud-related disclosures and declines in share price.  (Def Br. at 12.)  Defendants argue that on each of the eleven days there were other potential causes competing with the fraud-related disclosures.  According to defendants, plaintiffs have failed to produce sufficient evidence for a fact finder to distinguish between the losses caused by these competing factors and the losses caused by the fraud-related events; therefore, plaintiffs have failed to demonstrate loss causation.  The Court does not find it necessary to determine whether plaintiffs have produced sufficient evidence of a causal connection on each of the identified days.  To deny summary judgment, it is sufficient for the Court to observe that on several of the days—indeed, a majority—plaintiffs have produced sufficient evidence of such a connection.

Defendants begin with *Dura*'s observation that absent evidence to the contrary, a lower stock price may reflect, "not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."  *Dura*, 544 U.S. at 343.  Plaintiffs therefore bear the burden of producing evidence establishing that the loss they suffered "was caused by the alleged misstatement as opposed to intervening events." *Lentell*, 356 F.3d at 174.  Equivalently, if we treat the difference between the purchase price and the sell price as plaintiffs' total loss, plaintiffs bear the burden of producing evidence sufficient for a fact finder to "ascribe some rough proportion of the whole loss" to defendants' fraud. *Lattanzio*, 476 F.3d at 158.

Plaintiffs' first respond by pointing to the fact that of "out of more than 440 trading days in the entire class period", Dr. Nye selected only eleven as days on which fraud-related losses occurred.  (Class Pl. Br. at 2.)  Moreover, Vivendi's stock price fell €70.36 over the course of the class period, while the aggregate decline on the eleven days identified by Dr. Nye amounts to only €27.58, i.e., 39% of the "total" loss.  (*See* Tr. of Mar. 2, 2009 Hr'g at 29-33; Nye Report Ex. 9D.)  To identify these days, Dr. Nye conducted a regression analysis to disaggregate market-wide and industry-wide effects on the share price and thus find the days on which there were Vivendi-specific residual declines.  Having identified the days on which there were potential fraud-related losses, Dr. Nye confirmed that these losses were fraud-related by analyzing disclosures made on each of the eleven days and opining both that materializations of the risk occurred and that any other company-specific information released on those days did not cause the residual declines.  Plaintiffs argue that these facts rebut defendants' argument.

Defendants respond by arguing that on these eleven days Dr. Nye has nevertheless failed disaggregate competing causal factors.  The fact that Dr. Nye has disaggregated days in which no fraud-related revelations occurred does not release him from disaggregating from competing events on each of the eleven days because *Dura* applies no matter how narrow the scope of application.  (Def. Br. at 16-17.)  Defendants point incredulously at Dr. Nye's assertion that 100% of the price decline on each of the eleven days was due to fraud-related revelations.  (*Id.* at 17.)  Surely, they argue, some part of that price decline was due to some other factor. Defendants are technically correct.  If five top Vivendi executives had resigned the same day as a ratings downgrade, it may be incumbent on plaintiffs to produce evidence establishing roughly how much of the price decline was due to the downgrade and how much to the resignations.  But the key term here is "roughly."  Indeed, given the admonishment by the Court of Appeals that

plaintiffs "were [not] required to allege the precise loss attributable" to the fraud, *Lentell*, 356 F.3d at 177, it seems logical that the shorter the time frame considered, the rougher the proportion need be. Furthermore, in most cases, "the chain of causation . . . is a matter of proof at trial." *Id*. at 174. Given that plaintiffs have produced evidence that Vivendi's liquidity risk did gradually materialize on days when the stock price declined, defendants must at least adduce competing causal events that plaintiffs have failed to disaggregate. *See Celotex,* 477 U.S. at 325.

For the most part, however, defendants do not point to an obvious competing cause on each of the eleven days. Instead, defendants make the novel argument that plaintiffs have failed to disaggregate damages caused by the risk from damages caused by the materialization of the risk. (Def. Br. at 14-15; Def. Reply Br. at 21-25.) Defendants argue that plaintiffs' causal theory is premised on Vivendi concealing the risk that it would have a liquidity crisis. For example, suppose Vivendi had concealed from the public in December 2001 a 50% risk that it would experience a liquidity crisis in May 2002. Had plaintiffs been aware of that risk, they would have paid €X less for stock. Logically, had the risk been 100%, they would have paid even less (although not necessarily €2X less). If Vivendi does experience a liquidity crisis in May 2002, the risk has become 100%, and the price decline would reflect what would have happened had a 100% risk been announced in December 2001 rather than a 50% risk. Accordingly, defendants argue, plaintiffs must disaggregate the additional damages caused by the materialization of risk from those attributable to risk itself. Defendants cite no case law for this argument, and the Court has not found any.

The first problem with defendants' argument is that Dr. Nye opines that "all the pieces were there" in December 2001 and "the probability [of a liquidity crisis] was basically a hundred percent." (Class Pl. Br. at 40.) While defendants argue that "Dr. Nye performed no analysis to

arrive at this conclusion", this is an argument better made in a challenge to Dr. Nye's credibility as an expert rather than a summary judgment motion. Dr. Nye's opinion alone creates a genuine issue of material fact on this point. Second, if the Court analyzes the problem through the lens of tort law and proximate cause, the Court reaches the same result. The Restatement (Second) of Torts concludes that plaintiffs seeking damages for fraud are entitled to seek out-of-pocket damages *and* "pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation." RESTATEMENT (SECOND) OF TORTS § 549. Prosser and Keeton concurs, noting that plaintiffs can recover for "losses which might be expected to follow from the fraud and from events that are reasonably foreseeable." W. KEETON, D. DOBBS, R. KEETON, & D. OWEN, PROSSER AND KEETON ON LAW OF TORTS § 110, at 767. Prosser and Keeton notes that "if the plaintiff stores his goods in a warehouse represented [to] him to be fireproof and they are destroyed when it burns down, he can recover, and likewise, when he invests in an automobile agency, after false assurance of profits make by similar agencies, and the agency goes bankrupt." *Id.* In the goods example, plaintiff is entitled to recover not only the inflated price he paid for a fireproof storage facility, but also the cost of the goods lost in the fire. In the agency example, the plaintiff is entitled to recover not only the inflated price he paid for equity in the agency, but also whatever portion of the bankruptcy loss that was foreseeable. Of course, the bankruptcy example is an example restricted neither to textbooks or common law fraud. *See In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005).

Finally, it is hard to see how price declines allegedly caused by the materialization of the risk should not be incorporated into plaintiffs' damages. Stocks are risky investments, and purchasers assume a variety of risks to the value of their stock. Suppose Vivendi disclosed sufficient information in December 2001 for plaintiffs to conclude that there was a 50% risk that

**SA178**

Case 15-2021, Document 85, 08/12/2015, 1574465, Page184 of 246

Jean-Marie Messier would resign as CEO of Vivendi in July 2002. In December 2001, the price would reflect that risk, and plaintiffs who bought stock then would assume the risk that the stock price would suffer if Messier did in fact resign in July 2002. Plaintiffs allege, however, that they could not have assumed the risk of a liquidity crisis because it was concealed from them. Defendants are essentially arguing that plaintiffs should bear a risk they did not assume and that was intentionally concealed from them. Imposing liability for this loss would not be downside insurance for investors. Not imposing liability, however, might be a windfall for fraudsters.

Defendants remaining arguments mostly concern problems with Dr. Nye's day-to-day analysis. On certain days, however, defendants utterly fail to point to competing causes of the price declines. On May 3, 2002, defendants point to no competing causes, arguing only that the downgrade revealed no new information. For this argument, applied to several of the eleven days, defendants rely primarily on *In re Omnicom Sec. Litig.*, 541 F. Supp. 2d 546 (S.D.N.Y. 2008), citing its statement that "[a] recharacterization of previously disclosed facts cannot qualify as a corrective disclosure." *Id.* at 552. While the Court agrees that this statement comports with the law in this Circuit, the Court does not find that no reasonable juror could conclude that the ratings downgrades disclosed no new information. In *In re Omnicom*, the company share price plummeted after a negative article in the *Wall Street Journal*, but the facts in the article had been disclosed months earlier, and the Court concluded that the negative tone of the article and subsequent commentary was responsible for the decline rather than any disclosure of concealed facts. *Id.* at 554. In contrast, the ratings agencies had previously affirmed their ratings and essentially changed their minds. Defendants argue that the facts on which the agencies based their conclusions were not new to the market, but defendants do not support this proposition. First, rating agencies have access to non-public information, and the

SA179

public could have assumed that the agencies were acting on such information. Second, facts available to the public are not necessarily well disseminated into the market. While the court in *In re Omnicom* could point to particular articles explicitly stating that the *Wall Street Journal* article disclosed no new information, Dr. Nye can point to articles noting the market's "surprise" at the downgrade. (Nye Report ¶ 168.) The analysis is identical for the July 2, 2002 declines due to downgrades. *See In re Dynex Capital, Inc. Sec. Litig.*, 2006 WL 314524, at *11.

Defendants also fail to point to any unaddressed competing causes on June 21, 2002 and June 24, 2002. While defendants argue that the Deutsche Bank transaction was announced prior to June 21, 2002, and therefore that the market had already absorbed the news, they can point to no reason why the stock declined. Defendants are also incorrect that Dr. Nye fails to account for the News Corp. rumors and British Telecom. (*See* Nye Report ¶ 194.) For the reasons discussed above, the Court concludes that there is a genuine issue of material fact as to whether these quick sales disclosed a need for cash and therefore weakened liquidity.

Finally, the only competing cause defendants can adduce on August 14, 2002 (and by implication August 15 and 16) is rating agencies' concerns over Vivendi management's "failure to explain its future strategy." However, a fact-finder could reasonably accept the inference proffered by Dr. Nye that this comment is directly related to the liquidity concerns and how management would address the problem. The Court again concludes that Dr. Nye's report raises a genuine issue of material fact for the stock declines on this day and on the two days following.

## IV. Particular Allegations, Misleading Statements, and Damages

Defendants also seek rulings from the Court that certain allegations and allegedly false or misleading statements could not possibly have contributed to plaintiffs' loss. Defendants argue

that the following allegations are unconnected to the plaintiffs' loss "regardless of how broadly plaintiffs define their theory of 'liquidity risk'":  (1) the failure to disclose the obligation to Maroc Telecom; (2) the back-dating of the Cegetel current account; (3) the repurchase of the Seagram Bonds; and (4) the failure to meet synergy targets after the merger.  (Def. Reply Br. at 15-16.)  Similarly, defendants argue that plaintiffs cannot seek damages for:  (1) any alleged misleading statements during periods where inflation did not increase; (2) any misleading statements alleged by the Class but not alleged by Liberty Media; and (3) any statements made before March 9, 2001.  Whether or not the alleged misstatements or omissions were the proximate cause of plaintiffs' losses, evidence concerning these allegations may be admissible for the purpose of showing the existence of a liquidity crisis or to establish scienter and a scheme to defraud.  Accordingly, the Court will reserve decision on these issues until trial or until the parties raise them in motions *in limine*.

Finally, defendants argue that Liberty Media is not entitled to seek rescissionary damages and that Dr. Nye's "constant percentage" method for calculating damages is invalid.  The Court finds that damage issues are not properly before it on this motion.  Defendants have moved for summary judgment on loss causation, and damage issues, while related, are quite another matter.

## CONCLUSION

For the reasons given, defendants' motion for summary judgment against the class plaintiffs, Liberty Media, and GAMCO for failure to establish loss causation [644] and defendants' motion for summary judgment against the individual plaintiffs for failure to establish loss causation [646] are DENIED apart from the Court's finding that Dr. Nye's constant-percentage method is irreconcilable with precedent and that plaintiffs may not pursue damages from certain allegations.

SO ORDERED.

Dated: New York, New York
       March 31, 2009

_____
Richard J. Holwell
United States District Judge

**SA182**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE VIVENDI UNIVERSAL, S.A.                          02 Civ. 5571 (RJH) (HBP)
SECURITIES LITIGATION

                                                       **REVISED MEMORANDUM**
This Document Relates To:                               **OPINION AND ORDER**

ALL ACTIONS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Defendants Vivendi, S.A. ("Vivendi"), Jean-Marie Messier, Guillaume Hannezo, and

Universal Studios, Inc. move for summary judgment against all plaintiffs based on a failure to

prove loss causation. Loss causation is a necessary element of plaintiffs' claims under Sections

11 and 12(a)(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k(a), 77l(a)(2) (2006), Sections

10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule

10b-5 promulgated thereunder, as well as certain plaintiffs' common law claims for fraud and

negligent misrepresentation. Defendants make a variety of arguments as to why plaintiffs have

failed to carry their burden on this element but focus largely on plaintiffs' theory that revelations

concerning Vivendi's liquidity problems caused plaintiffs' losses. In addition to claiming that

plaintiffs' theory of "liquidity" is impermissibly broad, defendants argue that plaintiffs have

failed to establish a sufficient connection between Vivendi's allegedly false or misleading

statements and these revelations, or between the revelations and declines in Vivendi's stock

price. Defendants also move the Court to rule on whether certain allegations and statements are

actionable against them, as well as on the form of, and method for calculating, damages. For the

reasons that follow, defendants' motions are denied

**SA183**

# BACKGROUND

The Court here summarizes the plaintiffs'[1] case as set forth in the class plaintiffs' Counterstatement of Material Facts[2] and the expert report of Dr. Blaine Nye.[3] In these motions, defendants challenge only the sufficiency of plaintiffs' evidence of loss causation, focusing primarily on Dr. Nye's report and testimony. For the sake of context, however, the Court first describes plaintiffs' allegations concerning the substance of defendants' alleged fraud. Because defendants were not required to dispute the facts set forth in class plaintiffs' Counterstatement, nothing in this opinion should be construed as deeming admitted or undisputed the facts asserted in that Counterstatement. In brief, plaintiffs claim that defendants Messier and Hannezo saddled Vivendi with massive amounts of debt and concealed the risk to Vivendi's liquidity through various false and misleading public statements. When that risk began to materialize in the first half of 2002, Vivendi's stock price declined as a result, causing plaintiffs' losses.

*Defendants' Alleged Fraud*

Vivendi is a publicly-traded French corporation that was known as *Compagnie Générale des Eaux* prior to 1998. (Class Pl. Counterstatement ¶ 1; Def. 56.1 Statement ¶ 1.) For the

---

[1] Defendants have traditionally distinguished four categories of plaintiffs: (1) the class plaintiffs; (2) Liberty Media Corp., LMC Capital LLC, Liberty Programming Co. LLC, LMC USA VI, Inc., LMC USA VII, Inc., LMC USA VIII, Inc., LMC USA X, Inc., Liberty HSN LLc Holdings, Inc., and Liberty Media International, Inc. (collectively "Liberty Media"); (3) GAMCO Investors, Inc. ("GAMCO"); and (4) those plaintiffs who brought separate actions after being excluded from the class (the "Individual Plaintiffs"). Defendants filed two motions for summary judgment based on a failure to prove loss causation, with one motion directed at the class plaintiffs, Liberty Media, and GAMCO, and another motion directed at the Individual Plaintiffs. The reason for defendants' separate motions appears to be the fact that the class plaintiffs, Liberty Media, and GAMCO submitted the expert reports and deposition testimony of Dr. Blaine Nye as evidence of loss causation, while the Individual Plaintiffs submitted the reports and testimony of Mr. Frank Torchio. The issues raised by defendants, however, are identical for all plaintiffs except Liberty Media, and even in the case of Liberty Media, the issues are nearly identical. Accordingly, the Court distinguishes among plaintiffs only as necessary.

[2] The Court cites to Class Plaintiffs Counterstatement of material facts as "Class Pl. Counterstatement ¶___".

[3] Without opining on the sufficiency of Mr. Torchio's report and testimony, the Court concludes that Dr. Nye's report and testimony are sufficient to deny defendants' motions for summary judgment against all plaintiffs and limits discussion accordingly.

newly-minted CEO, defendant Messier, the name change was part of a grand strategy to transform the company from a simple water utility into an international media and telecommunications conglomerate.  (Class Pl. Counterstatement ¶¶ 3-5.)  Central to that strategy was a series of acquisitions that peaked with a three-way merger with The Seagram Company, Ltd.—a U.S. company that owned both Universal Pictures and Universal Music Group—and Canal Plus S.A.—one of Europe's largest cable television operators.  (*Id*. ¶¶ 5-7.)  The acquisitions increased Vivendi's media and telecommunications debt from approximately €3 billion in early 2000 to over €21 billion in 2002.  (*Id*. ¶ 32.)

Plaintiffs allege that defendants first began to mislead the public when they were promoting the merger to Vivendi's extant shareholders.  At a shareholder meeting in anticipation of the merger vote, for example, Messier told shareholders that "[t]hanks to our free net cash flow and the opportunities to dispose of some holdings . . . we will have an additional war chest of 10 billion euros for 2001-2002 before the first euro of debt."  (*Id*. ¶ 13.)  Plaintiffs allege that Messier knew this statement was false, citing a memo from Hannezo stating that "I believe it is wrong to reason in terms of . . . free cash flow (there won't be any this year) . . . ."  (*Id*. ¶ 14.)  Nevertheless, Messier continued to tout the "Strength of [Vivendi's] Cash Flow" to shareholders throughout 2001.  (*Id*. ¶ 49 (Letter to Shareholders dated June 26, 2001).)

Plaintiffs allege that a large part of defendants' fraud appeared in Vivendi's financial statements, with detailed numbers backing up Messier's rosy descriptions of the company's liquidity position.  In particular, plaintiffs allege that defendants used purchase accounting to ensure that Messier's promises that Vivendi's EBITDA[4] would grow at 35% annually.  (*Id*. ¶¶ 15-16.)  Purchase accounting is typically used at the time of a merger and "allows the

---

[4] EBITDA is defined as Earnings Before Interest, Taxes, Depreciation, and Amortization.  (*Id*. ¶ 16.)  It is a widely-used measure of a company's earnings and its ability to service debt.  (Vasilescu Decl. Ex. 294 (Mintzer Report ¶¶ 150-52).)

**SA185**

acquiring company to provide for cash business expenses by reducing allowances and reserves on the balance sheet." (*Id.* ¶ 18.)  Because expenses accounted for in this way reduced allowances and reserves rather than net earnings, Vivendi's net earnings were correspondingly higher.  (*Id.*)  Plaintiffs allege that Vivendi knew its use of purchase accounting beyond the merger was misleading, citing an e-mail from Hannezo declaring that defendants "will benefit from a maximal flexibility in making the opening balance sheet adjustments, and the analysts will not have it easy to track the purchase accounting benefits."  (*Id.* ¶ 23.)  Internally, Vivendi employees referred to purchase accounting or PA as their "profit adder".  (*Id.* ¶ 20.)  Indeed, plaintiffs claim that 50% of Vivendi's reported EBITDA growth in the media and communications group was achieved through purchase accounting.  (*Id.* ¶ 30.)

In 2001, plaintiffs allege, Messier continued to push forward with multiple acquisitions, including a minority stake in Maroc Telecom and a secret deal for an additional stake in 2002. (*Id.* ¶ 31; Nye Report ¶ 61.)  These acquisitions translated to debt levels that began to severely test the company's liquidity.  Moreover, Vivendi's need for cash prompted it to take out large loans on unfavorable terms, including the €608 million loan from Cegetel, the French telecom in which Vivendi owned a large stake, which was repayable on demand.  (Nye Report ¶ 91.)  Other sources of debt included draw-downs on its commercial paper backstops—actions that in themselves potentially put Vivendi in default according to the prudential rules set by the rating agencies.  (Nye Report ¶ 8(f).)  Internally, Vivendi's treasury department stressed that this debt meant that the company did not have the capacity for further acquisitions.  (Class Pl. Counterstatement ¶ 35.)  By June 2001, there was talk of bankruptcy if Vivendi continued on its course.  (*Id.* ¶¶ 50-52.)  At the time, Hannezo warned that "the risk of [a credit rating]

4

**SA186**

downgrade is significant." (*Id.* ¶ 53.) After narrowly avoiding just such a downgrade in December 2001, Hannezo wrote the following to Messier:

> I told you that I would talk to you about the personal consequences that I'm drawing from my painful and humiliating meetings with the ratings agencies . . . . For the first time, I felt the wind pass by from the cannonball of something that, from a personal point of view, I do not want to put up with:  a downgrade, which would have led to a liquidity crisis; the jeers of all those who have waited for us at the pivotal occasion, desperate for such a long time to see us stumble . . . . and the unpleasant feeling of being in a car whose driver is accelerating in a sharp turn while I'm the one in the death seat.  . . . The only thing that I am asking is that it doesn't all end in shame.

(*Id.* ¶¶ 81-82.) Nevertheless, throughout the fall of 2001, Messier continued to boast of "strong third quarter results" with "Year-to-date . . . EBITA increased 46%." (*Id.* ¶ 62.) Just days after Hannezo sent his "death seat" memo, defendants reported on a conference call that "We have a strong balance sheet and such a strong basis of earnings, which we intend to grow, that we're confident that we will be able to keep our credit rating and to grow the business." (*Id.* ¶ 86.)

While plaintiffs allege that Vivendi continued to make false and misleading statements to the public in 2002, those statements were made as other events allegedly began to reveal Vivendi's true liquidity position.  Plaintiffs' analysis of these events is the heart of their case for loss causation.

*Plaintiffs' Evidence of Loss Causation*

The report of Dr. Blaine F. Nye purports to "provide expert opinion on the issues of causation, materiality, market efficiency, and [damages]." (Nye Report ¶ 3.)  Dr. Nye has an M.B.A. and Ph. D. in finance from Stanford University and has frequently served as an expert in securities actions.  (Nye Report ¶ 1; Nye Report Exs. 1, 2.)  Defendants do not here challenge Dr. Nye's reliability as an expert, but rather the sufficiency of his findings to establish loss causation.

Before reaching his causal analysis, Dr. Nye makes several assumptions in his report. He first assumes that "Vivendi Universal had progressively worsening and undisclosed liquidity risks throughout the relevant time period, which ultimately led to a liquidity crisis in the summer of 2002." (Nye Report at 9.) He defines liquidity as "the ability or ease with which Vivendi/Vivendi Universal could timely meet its financial obligations and fund its operations with cash on hand, assets readily convertible to cash on hand, cash from operations, or readily accessible sources of debt." (*Id.*) He also assumed that defendants concealed the risk of a liquidity crisis by misrepresenting or omitting the truth about the following facts, among others: (1) Vivendi's free cash flow and EBITDA; (2) the terms of Vivendi's debt to its subsidiary Cegetel; (3) Vivendi's draw on its commercial paper backups; and (4) Vivendi's obligation to purchase an additional 16% interest in Maroc Telecom by February 28, 2002. (*See id.* ¶ 8; *see also id.* ¶ 93.)

In his section entitled "Causation: Class Action," Dr. Nye proceeds to explain the causal connection between Vivendi's concealment of liquidity risk and stock declines on eleven days in 2002. Dr. Nye begins a summary of the events surrounding the fraud and identifies some of defendants' allegedly false or misleading statements, including those just summarized above. (*Id.* ¶ 33.) The core of Dr. Nye's report, however, is his regression analysis and event study. The purpose of a regression analysis is to disaggregate market and industry declines from residual, company-specific share price declines. (*Id.* ¶ 254-60.) Regression analysis is a common mathematical tool for determining whether and to what extent a correlation exists between two variables. (*Id.* ¶ 254.) In this case, Dr. Nye compared the day-to-day percentage increases and decreases of Vivendi's share price to the same increases and decreases for a market-wide index and an industry-wide index. (*Id.*) The market-wide index is derived from a

**SA188**

collection of different stocks that reflect the "average" behavior of the entire market—as, for example, the Dow Jones Industrial Average does. (*Id*.) The industry-wide index is derived from a similar collection of, in this case, media and telecommunications stocks during the class period. (*Id*.) In this way, Dr. Nye could predict rises and declines in Vivendi's stock price based on the rises and declines of these indexes. Where Vivendi's stock declined in excess of the market and industry by a statistically significant margin, Dr. Nye could identify days where Vivendi's share price fell for reasons independent of market or industry forces—Vivendi-specific residual declines. (*Id*.) From his regression analysis, Dr. Nye identified eleven days on which there were Vivendi-specific residual declines: January 7, May 3, June 21, June 24, July 2-3, July 10, July 15, and August 14-16, 2002. (*Id*. ¶¶ 127, 171, 192, 195, 213, 216, 222, 225, 239, 242, 244.)

On these days, Dr. Nye conducted his event study. Dr. Nye describes "event study methodology" as used "to disentangle the effects of company-specific information from market and industry information" by associating "day-to-day information releases from sources including Vivendi/Vivendi Universal's press releases, conference calls, news reports, securities analysts' reports, and SEC filings with the daily residual returns on Vivendi/Vivendi Universal stock during the Damage Period." (*Id*. ¶ 261.) While regression analysis identifies days in which a company's value decreases net of market and industry, it does not explain why. Those declines could be due to Vivendi-specific news that is unrelated to the fraud. Dr. Nye's event study undertook to determine the extent to which the events reported to the public on these eleven days revealed Vivendi's true liquidity condition. A summary of his study follows:

- January 7, 2002: Vivendi sells certain of its treasury shares into the market, reversing its earlier-stated intention to cancel them. (*Id*. ¶ 126.) Dr. Nye opines that Vivendi's share price declined, even though Vivendi got a good deal for the shares, because the public

SA189

had started to doubt Vivendi's prospects. (*Id.* ¶¶ 127-28.) Dr. Nye does not, however, point to any evidence suggesting that this negative view of Vivendi was in any way related to liquidity and the risk that Vivendi might not be able to pay down its debt. He does distinguish the concurrent AOL-Time Warner write-down announcement as not a significant cause of the decline because the news was long expected. (*Id.* ¶¶ 131-32.)

- May 3, 2002: Moody's downgrades Vivendi, noting that its "continuing concerns that Vivendi Universal might not be able to reduce debt as quickly and comprehensively as planned by the company . . . ." (*Id.* ¶ 166.) Moody's also noted that Vivendi's weak share price had triggered its put obligations requiring major cash outlays, and that meaningful cash flow was a problem. (*Id.*) Dr. Nye opines that the downgrade revealed that Vivendi's liquidity position that was much worse than the public had thought. (*Id.* ¶¶ 167-70.)

- June 21, 2002: The market learns of a quick private sale of Vivendi Environment ("VE") shares to Deutsche Bank. (*Id.* ¶ 189.) The sale was in advance of an announced sale of VE stock. (*Id.* ¶ 186.) Dr. Nye opines that quick sales of assets suggest the need for immediate cash inflows, and hence weakened liquidity, because companies often get lower prices when they need to sell quickly. (*Id.* ¶ 20.) This was such a sale and the market reacted by punishing Vivendi's share price. (*Id.* ¶ 189.)

- June 24, 2002: Vivendi announces the pending sale of a 15.6% stake in VE. (*Id.* ¶ 193.) Dr. Nye opines that the market again interpreted the sudden announcement as a sign of needing a quick infusion of cash and therefore of weakened liquidity, pointing to commentators reaching the same conclusion. (*Id.*) Dr. Nye also distinguishes two competing causes for the same stock declines: (1) rumors that News Corp. would back

out of a deal with Vivendi were based on the same concerns as the sale of the VE stake, and therefore cannot be seen as an independent cause; and (2) British Telecom's announcement that it had not yet decided to sell its Cegetel stake was not new information. (*Id.* ¶ 194.)

- July 2-3, 2002: On July 1, Moody's downgrades Vivendi to junk status (Ba1) after markets close. (*Id.* ¶ 207.) The next day, S&P downgrades Vivendi to one notch above junk (BBB-). (*Id.* ¶ 209.) Moody's notes concerns over refinancing and the slow pace of asset sales coupled with lower-than-expected sales prices. (*Id.* ¶¶ 207, 211.) S&P notes a lack of transparency, the strain imposed by Vivendi's outstanding put options, and certain debt obligations, including the Cegetel loan. (*Id.* ¶¶ 209-10.) Dr. Nye opines that the downgrades again revealed a weaker Vivendi liquidity position than previously thought and caused price declines on both July 2 and 3. (*Id.* ¶¶ 213, 216.)

- July 10, 2002: Vivendi announces a new $1 billion unsecured credit line, but this positive development is overshadowed by news that French regulators had raided Vivendi's Paris headquarters as part of their investigation into possible securities fraud. (*Id.* ¶ 219.) Moody's and S&P also greeted the new credit line with caution, continuing to warn that unless Vivendi did more to pay down its debt, further downgrades were possible. (*Id.* ¶¶ 220-21.) Dr. Nye opines that the rating agencies' reaction revealed continuing liquidity concerns. (*Id.* ¶ 220.) He does not, however, attempt to distinguish any independent price decline caused by news of the investigation, opining that the information "effectively informed investors of suspicions regarding the Company's accounting practices." (*Id.* ¶ 222.)

- July 15, 2002: The French press reports that Vivendi created a shell company and share

**SA191**

agreement to control Elektrim, a Polish telecom. (*Id.* ¶ 224.)  One interviewer questioned the legality of Vivendi's actions, but Vivendi denied any wrongdoing. (*Id.*)  Nye opines without further explanation that "[t]hese information releases constituted a partial disclosure of Vivendi Universal's true liquidity condition . . . ." (*Id.* ¶ 225.)

- August 14-16, 2002:  Vivendi announced preliminary second quarter results on August 14, 2002.  The announcement included a variety of negative facts, including:  (1) the need to sell an additional €10 billion worth of assets; (2) that debt was €10 billion over what it should be for Vivendi's desired credit rating; (3) that French GAAP debt stood at €35 billion; and (4) that the company was experiencing a short-term liquidity problem. (*Id.* ¶ 235.)  Moody's and S&P also downgraded Vivendi again, with S&P noting Vivendi's "liquidity crisis." (*Id.* ¶ 237.)  Dr. Nye opines that the announcements revealed the need for a "fire sale" of assets and the extent of Vivendi's liquidity problems. (*Id.* ¶¶ 235, 240.)  The next day Bloomberg announced that Houghton Mifflin, previously acquired by Vivendi, would sell for less than one-fifth of what Vivendi paid for it, and analysts continued to discuss the repercussions of the August 14 announcements. (*Id.* ¶¶ 241, 243.)  Dr. Nye opines that stock declines on August 14, 15, and 16 were all caused by the August 14 disclosures and continued reports on their consequences. (*Id.* ¶¶ 240, 242, 244.)

Dr. Nye concludes his report (at least with respect to the class plaintiffs) with a description of the two methods he used to quantitatively assess damages.  He begins by stating generally that "[p]rice inflation in the ADS[5] and ordinary shares is measured by the declines in

---

[5] ADS stands for American Depository Shares and were essentially those Vivendi shares that were traded on the New York Stock Exchange. *See In re Vivendi Sec. Litig.*, 242 F.R.D. 76, 81 (S.D.N.Y. 2007).

those securities' prices upon disclosures related to the alleged fraud, through which investors learned Vivendi Universal's true liquidity condition." (*Id.* ¶ 250.) Equivalently, Dr. Nye maintains that while the damages due plaintiffs is the per-share inflation resulting from defendants' false or misleading statements, the appropriate method for calculating those damages is to examine the price declines that occur in reaction to disclosures of Vivendi's liquidity position. (*Id.* ¶ 251.) Of course, if particular plaintiffs sell before all of Dr. Nye's identified disclosures, they may be entitled to recover only that portion of the inflated price that they actually lost.[6] (*Id.*)

## DISCUSSION

### I.    Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The plain language of

---

[6] Dr. Nye describes broadly the two alternate methods—constant-dollar (constant-euro) inflation and constant-percentage inflation—that he uses to make this calculation:

> If the magnitude of the inflation on the date the misrepresentation is made or the fraud is revealed is not expected to be influenced by market, industry, or non-fraud-related company-specific events, or indeed based on any available information, then from the standpoint of financial economics, the best estimate of the inflation on the date of purchase is simply the dollar value of the inflation on the date of the initial inflation or the date the fraud was revealed, i.e., the inflation remains constant over the relevant period (constant-dollar inflation). On the other hand, if inflation is expected to be influenced by market, industry and non-fraud-related company-specific events, as would any misrepresentations or omissions about the condition and business operations of the company and thus its earnings and earnings growth, from the standpoint of financial economics the best estimate of inflation at the time of purchase is the percentage change in share price at the point of initial inflation or at the time of revelation of the fraud, as adjusted by market, industry and non-fraud-related company-specific returns during the period between the date of purchase and the date the fraud is revealed (constant percentage inflation).

(*Id.* ¶ 185.)

Case 15-2021, Document 85, 08/12/2015, 1574465, Page199 of 246

Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 321 (1986); *see also Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 61 (2d Cir. 1998); *Conway v. Microsoft Corp.,* 414 F. Supp. 2d 450, 458 (S.D.N.Y. 2006). A party moving for summary judgment may discharge its burden "by 'showing'—that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325.

A fact is considered "material" for purposes of Rule 56 if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Whether a material issue is "genuine" depends on whether the evidence is of a type that would permit a reasonable jury to return a verdict in favor of that party. *Mitchell v. Shane,* 350 F.3d 39, 47 (2d Cir. 2003). In making its showing that a genuine issue of material fact exists, the nonmoving party may not rely on "the mere existence of a scintilla of evidence" to support its position, but must instead proffer "evidence on which the jury could reasonably find for the [plaintiff]." *Dawson v. County of Westchester,* 373 F.3d 265, 272 (2d Cir. 2004) (citing *Anderson,* 477 U.S. at 252).

## II.     The Law of Loss Causation

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005). It stands in contrast to transaction causation, i.e., reliance, or whether plaintiffs would not have purchased or sold their stock but for the alleged misconduct. *Id.* Proving loss causation is

prescribed by statute for actions under Section 10(b) and Rule 10b-5.  15 U.S.C. § 78u-4(b)(4)

("In any private action arising under this chapter, the plaintiff shall have the burden of proving

that the act or omission of the defendant alleged to violate this chapter caused the loss for which

the plaintiff seeks to recover damages.").  The same standard applies for actions under Sections

11 and 12(a)(2) except that defendants bear the burden of negating causation.  *See In re*

*Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2005 WL 375314, at *6 (S.D.N.Y. Feb 17, 2005)

("the negative causation defense in Section 11 and the loss causation element in Section 10(b)

are mirror images").  A similar requirement applies to actions for common law fraud and

negligent misrepresentation.  *See Emergent Captial Inv. Mgmt., LLC v. Stonepath Group, Inc.*,

343 F.3d 189, 197 (2d Cir. 2003) ("Similar to loss causation, the proximate cause element of

common law fraud requires that plaintiff adequately allege a causal connection between

defendants' non-disclosures and the subsequent decline in the value of [the stock].").

Owing to the great similarity of an action under Rule 10b-5 to an action for common law

fraud, courts have consistently characterized loss causation as similar to the tort concept of

proximate causation.  *See Lentell*, 356 F.3d at 172 ("We have described loss causation in terms

of the tort-law concept of proximate cause . . . ."); *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d

147, 157 (2d Cir. 2007) (same); *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 187 (2d

Cir. 2001) (same).  As when assessing proximate cause, courts assessing plaintiffs' case for loss

causation look to whether the alleged damages were reasonably foreseeable given the alleged

false or misleading statements.  *See Castellano*, 257 F.3d at 187 (looking to whether "the

damages suffered by plaintiff [were] a foreseeable consequence of any misrepresentation or

material omission").  As with proximate cause, these determinations "may often rest in part on

legal policy considerations" that "fix a . . . limit on a person's responsibility, even for wrongful

acts." *Id.* However, the Court of Appeals has noted that "the tort analogy is imperfect." *Lentell*, 356 F.3d at 173. In particular, unlike for proximate cause in tort, "it cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated." *Id.* For this reason, among others, application of the loss causation concept "to particular facts has often been challenging." *Castellano*, 257 F.3d at 187.

The Supreme Court recently attempted to bring clarity to this area in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005). In *Dura*, the defendant had developed a spray for treating asthma and had represented that it expected the FDA to approve the device. It also represented that its drug sales would be profitable. Plaintiffs alleged that these representations were false, that they constituted a fraud on the market, and that they had paid inflated prices for defendant's shares as a result. The Ninth Circuit held that these allegations were sufficient to survive a motion to dismiss. The Supreme Court disagreed and reversed.

The Supreme Court specifically rejected the Ninth Circuit's holding that "plaintiffs were harmed when they paid more for the stock than it was worth." *Broudo v. Dura Pharms., Inc.*, 339 F.3d 933, 938 (9th Cir. 2003) (quoting *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 832 (8th Cir. 2003)). The Ninth Circuit had reasoned that if the injury occurs at the time plaintiff purchases or sells the stock, the chain of causation ends there too, and it would therefore be unnecessary for plaintiffs to prove that a "disclosure and subsequent drop in the market price of the stock . . . actually occurred . . . ." *Id.* In contrast, the Supreme Court reasoned that "as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value." *Dura*, 544 U.S. at 342 (emphasis in original). Consequently, plaintiffs suffer

a loss only when the shares they possess decline in value below the purchase price.  Alleging a connection between the overstated price and the false statements was therefore not enough to establish causation.  Plaintiffs needed to draw a causal connection between the false statements and the subsequent decline in share value.

The disagreement between the Supreme Court and the Ninth Circuit in *Dura* was partly rooted in differing views of the likelihood of real financial loss following plaintiffs' purchase.  The Ninth Circuit had held elsewhere that loss was not inevitable, admitting that plaintiffs who later sell at a profit or for the same price as the purchase price could not recover.  *See Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1437 (9th Cir. 1987).  Nevertheless, the Ninth Circuit considered this the exception rather than the rule and found that plaintiffs could recover after any share decline below the purchase price—including declines that occurred before the truth leaked into the market.[7]  *Id*.  Because some loss was inevitable in the vast majority of cases, there was no need to require plaintiffs to establish a causal chain past the inflated price.  In contrast, the Supreme Court found that shareholder loss was far from inevitable.  *Dura*, 544 U.S. at 342 ("If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss.  But that is far from inevitably so.").  While plaintiffs may later sell at a price below the purchase price, "that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."  *Id*. at 343.  Any one of such factors may

---

[7] If, for example, a person paid $110 for a share that would have been worth $100 had the truth been known, and later sold it for $105 before the truth came out, she could still recover five of the ten dollars she overpaid regardless of why the share price declined.  The Ninth Circuit described such losses as occurring "as a result of market forces operating on the misrepresentations."  *Wool*, 818 F.2d at 1437; *see also* Madge S. Thorsen, Richard A. Kaplan, & Scott Hakala, *Rediscovering the Economics of Loss Causation*, 6 J. BUS. & SEC. L. 93, 105-06 (April 2006) (discussing how market forces operate on a fraud).

precede a decline in the stock price, and a reasonable fact-finder could infer that it was that factor and not the fraud that caused the decline. For a fact-finder to conclude that the fraud caused a decline in the share price, there must at least be evidence that the truth had begun to leak out into the market and that the shares traded at lower prices as a consequence of this leak. Accordingly, the plaintiffs who sold prior to the truth leaking out could never recover. *See id.* at 342 ("if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss").

Unsurprisingly, the Court's principal authority for this argument was the common law of tort. The Restatement (Second) of Torts, quoted by the Court, concludes that "one who misrepresents the financial condition of a corporation in order to sell its stock will become liable to a purchaser who relies upon the misinformation for the loss that he sustains when the facts as to the finances of the corporation become generally known and as a result the value of the shares is depreciated on the market . . . ." RESTATEMENT (SECOND) OF TORTS § 548A, cmt. b; *see also Dura*, 544 U.S. at 344. However, "there is no liability when the value of the stock goes down after the sale, not in any way because of the misrepresented financial condition, but as a result of some subsequent event that has no connection with or relation to its financial condition." RESTATEMENT (SECOND) OF TORTS § 548A, cmt. b. Similarly, the treatise known colloquially as "Prosser and Keeton," also quoted by the Court, concluded that "losses due to a subsequent decline in the market, or insolvency of the corporation brought about by business conditions or other factors in no way relate[d] to the [false] representations will not afford a basis for recovery." W. KEETON, D. DOBBS, R. KEETON, & D. OWEN, PROSSER AND KEETON ON LAW OF TORTS § 110, at 767.[8]

---

[8] In addition to tort law, the Supreme Court also held that a closer causal relationship between the alleged false or misleading statements and plaintiffs economic losses was more consistent with Congress's intent when it enacted the

Because it had long adopted similar principles of loss causation, this Circuit felt little

impact from *Dura*.  Indeed, the lead case on loss causation by the Court of Appeals, *Lentell v.

Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005), was decided several months before *Dura*

and remains the law today.  In *Lentell*, plaintiffs sued Merrill Lynch for permitting its analysts to

publish "BUY" recommendations on stocks they knew were bad bets.  Plaintiffs had, of course,

bought the recommended stocks and then lost money when their value declined.  The Court of

Appeals affirmed dismissal of the suit on the grounds that plaintiffs had failed to adequately

plead loss causation.

*Lentell* answers several questions not fully addressed in *Dura*.  *Dura* holds that plaintiffs

must establish a causal connection between the fraud and stock declines that occur after the truth

begins to "leak out", but it is silent as to how plaintiffs might prove this.  The Supreme Court

confirms the analogy to proximate cause, but admits differences as well.  *See Dura*, 544 U.S. at

343 ("private securities fraud actions resemble in many (but not all) respects common-law deceit

and misrepresentation actions").  *Lentell* notes that the key difference is that stock prices decline

in reaction to information released into the market rather than in reaction to the fraudulent

statements themselves.  When that information was previously concealed from the market by the

fraud, we can properly conclude that whatever decline in the stock price was caused by the

release of that information was also caused by the fraud.  *Lentell*, 396 F.3d at 173 ("To establish

loss causation, a plaintiff must allege that . . . the misstatement or omission concealed something

from the market that, when disclosed, negatively affected the value of the security.").  The Court

of Appeals called the event or events that released this previously concealed information the

"materialization of the risk."  *Id*.  The *Lentell* court also clarified loss causation's relation to

---

securities laws.  *Dura*, 544 U.S. at 345 (holding that Congress's statutory scheme intended to "protect [investors] against those economic losses that misrepresentations actually cause" rather than "provide [them] with broad insurance against market losses").

**SA199**

foreseeability.  The law required plaintiffs to establish "both that the loss [was] foreseeable *and* that the loss [was] caused by the materialization of the concealed risk."  *Id*.  To prove that the loss-inducing event was foreseeable, plaintiffs must establish that the risk of the event occurring "was within the zone of risk *concealed* by the misrepresentations and omissions alleged by the disappointed investor."  *Id*.

The classic example of a loss-inducing event is a corrective disclosure by the company itself.[9]  A corrective disclosure is traditionally an admission by the company that one or more of its previous statements were false or misleading followed by a corrected, truthful and complete version of those statements.  *See In re AOL Time-Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007) (a corrective disclosure "reveal[s] an alleged misstatement's falsity or disclose[s] that allegedly material information had been omitted"); *Lentell* 396 F.3d at 175 n.4 (requiring that a corrective disclosure "reveal to the market the falsity of the prior recommendations"); *but see In re IPO Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008) ("There is no requirement that corrective disclosures emanate from the company itself, so long as the truth is disclosed in some fashion.").  The event need not take this form, however.  The event could be a credit ratings downgrade, *see In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897 (HB), 2006 WL 314524, at *11 (S.D.N.Y. Feb. 10, 2006) (holding that a concealed risk materialized when the ratings agencies downgraded certain bonds, and defendants had previously misrepresented the quality of the bonds' collateral), *vacated on other grounds*, *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190 (2d Cir. 2008), or the

---

[9] The Court notes that many courts in the district consider corrective disclosures to be a separate conceptual category from "materialization of the risk", *see, e.g.*, *In re IPO Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008) ("There are several possible methods of pleading loss causation, including 'direct causation,' 'materialization of risk,' and 'corrective disclosure.'"), and that other courts have stretched the notion of corrective disclosure to include all possible loss-inducing events, *see, e.g.*, *In re Bristol-Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 164-65 (S.D.N.Y. 2008) (discussing corrective disclosures and partial corrective disclosures).

**SA200**

collapse of the company, *see In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005) ("The concealed risk materialized when Parmalat suffered a liquidity crisis on December 8, 2003 and was unable to pay bonds as they came due.").  For an event to qualify as a materialization of the risk, it need only disclose part of the truth that was previously concealed by the fraud.  A ratings downgrade reveals the risk of deteriorating liquidity, and the failure to obtain agency approval may reveal the risk of a non-viable product.  Unlike corrective disclosures, these events do not identify specific company statements as false or misleading.  But if the company had previously concealed its liquidity condition or the failure of its product by making false or misleading statements, these events may be sufficiently related to the fraud to qualify as materializations of the risk.

Once an event qualifies as a materialization of the risk, plaintiffs must still prove that their losses were caused by that event.  Admittedly, this is a potentially complicated endeavor.  A stock's price as listed on an exchange is merely a continuous posting of thousands of individual trades.  Moreover, as the Supreme Court in *Dura* noted, a decline in stock price can occur in reaction to "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events . . . ."  *Dura*, 544 U.S. at 343.  Sorting out which declines were caused by such extraneous factors and which were caused by a materialization of the concealed risk is generally the province of an expert.  *See Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997) (determining causation and damages in a securities fraud action "is often done, as it was here, with the help of an expert witness").  It is an expert that produces the almost obligatory "event study" that begins by isolating stock declines associated with market-wide and industry-wide downturns from those specific to the company itself.  *See In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014-15

(C.D. Cal. 2003) (requiring an event study or similar analysis).  Once plaintiffs' expert has

isolated days where the stock declines were statistically significant relative to these downturns,

he must consider firm-specific events that might have caused those declines.[10]

       While the plaintiffs at all times bear the burden on loss causation, it is important not to

confuse causation with damages when comparing competing causes for a stock decline.  In

theory, plaintiffs need only prove that they suffered *some* damage from the fraud.  Liability

obviously does not hinge on how much damage.  However, when there are two competing causes

for a stock decline, it is easy to argue that one caused the entirety of the decline while the other

did not cause any of it.  The Fourth and Eleventh Circuits have specifically addressed this

problem and held that to satisfy loss causation plaintiffs need only produce sufficient evidence

for a jury to conclude that the fraud-related event was a "substantial cause" of the decline.  *See*

*Miller v. Asensio & Co., Inc.*, 364 F.3d 223, 229 (4th Cir. 2004) ("when courts require a showing

of damages *proximately caused* by the defendant's conduct for liability, they require only that

the plaintiff show that the defendant's conduct was a *substantial* cause of its injury"); *Robbins*,

116 F.3d at 1447 ("Because market responses, such as stock downturns, are often the result of

many different, complex, and often unknowable factors, the plaintiff need not show that the

---

[10] The Court in *In re Enron Corp. Sec. Derivative & ERISA Litig.*, 529 F. Supp. 2d 644 (S.D. Tex. 2006), gave the following description of an event study:

> An event study is a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price. This approach assumes that the price and value of the security move together except during days when disclosures of company-specific information influence the price of the stock. The analyst then looks at the days when the stock moves differently than anticipated solely based upon market and industry factors-so-called days of "abnormal returns."  The analyst then determines whether those abnormal returns are due to fraud or non-fraud related factors.... [E]vent study methodology has been used by financial economists as a tool to measure the effect on market prices from all types of new information relevant to a company's equity valuation.

*Id.* at 720.

defendant's act was the sole and exclusive cause of the injury he has suffered; he need only show that it was 'substantial', i.e., a significant contributing cause."). The Fourth Circuit even went so far as to uphold a verdict where the jury had found that the fraud had been a substantial cause of the loss, but awarded no damages because that loss could not be determined with sufficient certainty. *Miller*, 364 F.3d at 225. The Second Circuit has adopted a similar approach, requiring plaintiffs to produce sufficient evidence for the fact finder to "ascribe some rough proportion of the whole loss" to defendants' fraud. *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007).

Similarly, the *Lentell* court noted that it was not suggesting that "plaintiffs were required to allege the precise loss attributable" to defendants' fraud. *Lentell*, 396 F.3d at 177. The Court of Appeals also noted that as a general matter, "the chain of causation . . . is a matter of proof at trial . . . ." *Id*. at 174. Because causation is fundamentally a factual matter, the relevant factors may include the time between the event and the decline, *Castellano*, 257 F.3d at 186, the prominence of the fraud-related news relative to other news, *Lattanzio*, 476 F.3d at 158, or how new the information is, *In re Omnicom Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008). Ultimately, courts must still rely on basic summary judgment principles to determine whether a genuine issue of fact has been raised.

Summarizing the case law here discussed, plaintiffs seeking to prove loss causation must establish two causal connections: a connection between the alleged false or misleading statements and one or more events disclosing the truth concealed by that fraud, and a connection between these events and actual share price declines. *Lentell*, 396 F.3d at 173. To demonstrate the connection between the statements and the events—termed "materializations of the concealed risk"—plaintiffs must show: (1) that these events were foreseeable consequences of

the alleged fraud, *id.*; and (2) that these events revealed new information previously concealed by defendants' alleged fraud, *id.*; *see also Dura*, 544 U.S. at 342. To demonstrate the connection between the events and the share price declines, plaintiffs must: (1) show a correlation between news of the event and the declines; and (2) disaggregate the declines or some rough percentage of the declines from losses resulting from other, non-fraud-related events. *Dura*, 544 U.S. at 342-43; *Lattanzio*, 476 F.3d at 158.

## III. Dr. Nye's Report Raises a Genuine Issue of Material Fact Concerning Loss Causation

Defendants argue that plaintiffs have failed to establish both the connection between their allegedly false or misleading statements and any fraud-revealing events, and the connection between these alleged events and Vivendi stock declines. First defendants argue that, as a matter of law, the events identified by plaintiffs cannot qualify as "materializations of a concealed risk" because they do not reveal new information concealed by defendants' alleged fraud. Second, defendants argue that plaintiffs have failed to disaggregate competing causes of stock price declines.

### A. Plaintiffs' Materialization-of-the-Risk Theory Is Viable

In his report and deposition testimony, Dr. Nye identifies eleven days on which the alleged fraud caused loss by the plaintiffs. (Nye Report ¶¶ 127, 171, 192, 195, 213, 216, 222, 225, 239, 242, 244.) He identified these days by applying a regression analysis to Vivendi's share price over the class period and selecting those days on which there was a Vivendi-specific residual price decline. (*Id.* ¶ 262.) Dr. Nye then proceeded to identify and describe particular events on these days that he claims caused Vivendi's stock price to decline. (*Id.*) At least in this motion, defendants do not challenge the method by which Dr. Nye selected the eleven days.

Rather, defendants challenge whether the events on these days actually disclosed information that had previously been concealed by the fraud. *Lentell*, 396 F.3d at 173.

As a threshold matter, the Court notes that while plaintiffs argue that "[b]oth corrective disclosure and materialization of concealed risk analyses support loss causation in this case," Class Pl. Br. at 22, this is not a case of corrective disclosure. None of the eleven events include an announcement identifying specific Vivendi statements as false or misleading. *See In re AOL Time-Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007); *Lentell* 396 F.3d at 175 n.4. These events may reveal truthful information previously concealed by the fraud—as they must to satisfy the requirements of loss causation—but this alone does not qualify an event as a corrective disclosure.

Under a broader, materialization-of-the-risk theory, plaintiffs argue that defendants' false and misleading statements concealed the risk of a liquidity crisis, and that events on those eleven days gradually revealed Vivendi's deteriorating liquidity condition. Plaintiffs define liquidity as "the ability or ease with which Vivendi/Vivendi Universal could timely meet its financial obligations and fund its operations with cash on hand, assets readily convertible to cash on hand, cash from operations, or readily accessible sources of debt." (Nye Report at 9.) The subject of Vivendi's allegedly fraudulent statements therefore covers the extent of its debt, the size of its income stream, and, perhaps most importantly, how quickly Vivendi could convert assets into cash. *See Lentell*, 396 F.3d at 173 ("a plaintiff must allege … that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered").

Defendants argue that plaintiffs' conception of liquidity risk "is so amorphous and all-encompassing as to render it meaningless." (Def. Br. at 10.) Admittedly, liquidity is a broad concept, but it is not as amorphous as defendants make it out to be. Cash flow by itself, for

example, does not mean anything for liquidity, but it does mean something when combined with information concerning the debt it is intended to service. Among other things, plaintiffs argue that defendants' statements concealed specific facts regarding: (1) Vivendi's actual EBITDA and free cash flow; (2) Vivendi's debt to its subsidiary Cegetel and the terms of that debt; (3) Vivendi's drawing on its commercial paper backups; and (4) Vivendi's obligation to purchase an additional 16% interest in Maroc Telecom by February 28, 2002. (Nye Report ¶ 93.) Plaintiffs argue that Vivendi's published EBITDA and free cash flow numbers—the primary measures for cash flow available to service debt—were inflated and that the size and nature of its debt obligations were minimized. (*Id.*) Broad though it may be, the Court concludes that such a theory of liquidity risk is coherent. *See, e.g.*, *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 97-98 (2d Cir.2001) (risk of liquidity crisis concealed by edited background report omitting important negative events in executive's financial and business history); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d at 307 (risk of liquidity crisis concealed by omission of massive debt load from company's disclosures).

Assuming the legitimacy of plaintiffs' theory, defendants still argue that the information revealed by events on the eleven days was merely "bad news" rather than new information that had been previously concealed. (Def. Reply Br. at 12-15.) Except for the events identified on July 10, 2002, July 15, 2002, and August 14-16, 2002, plaintiffs identify either quick, unexpected asset sales or credit rating downgrades as the loss-inducing events. (Nye Report ¶¶ 126-128, 167-70, 189, 193, 207, 209.) Considering that credit ratings purport to assess the probability that a company will default on its obligations, there is little question that a downgrade is a sign of deteriorating liquidity. As for unexpected asset sales, Dr. Nye specifically discusses their relevance to liquidity in his report. (Nye Report at ¶¶ 19-20.) Specifically, Dr. Nye writes

Case 15-2021, Document 85, 08/12/2015, 1574465, Page312 of 346

that resolving a liquidity crisis "may require rapid sale of assets in which shareholders hold interests to pay the claims of debtholders, and at prices less than shareholders expected for those assets, or sale of assets important to realization of the company's strategy." (*Id*. at ¶ 19.) Put simply, maximizing shareholder value when a company sells one of its assets means negotiating the best price for it. If the company must sell the asset quickly to meet liquidity demands, it may be forced to accept a lower price for the asset than it would have but for time constraints. Accordingly, both ratings downgrades and unexpectedly quick asset sales have a reasonable relationship to liquidity risks and may be seen as materializations of such risks.

Defendants' argument runs astray when at this point they respond that, at most, plaintiffs have demonstrated that the downgrades and the quick asset sales were foreseeable from the allegedly false or misleading statements. (Def. Reply at 13.) Implicitly conceding foreseeability, defendants purport to challenge only "actual causation," citing *Lentell*. (*Id*.) But proving actual causation, at least in the way *Lentell* uses the phrase, is part of plaintiffs' burden to show a causal connection between the materialization of the risk and the stock price declines, *not* the causal connection between the allegedly false and misleading statements and the materialization of the risk. Establishing the latter connection does not, as defendants appear to believe, require plaintiffs to establish a one-to-one correspondence between concealed facts and the materialization of the risk. In other words, if a company misrepresents fact A (we have plenty of free cash flow), which conceals risk X (liquidity), the risk can still materialize by revelation of fact B (a ratings downgrade), an indication of risk X (liquidity). As discussed above, to prove the causal connection between misrepresenting fact A and the revelation of fact B, plaintiffs must establish only that the revelation of fact B was foreseeable, i.e., within the zone of risk X, and that fact B reveals information about risk X. When fact B is revealed, the market

need not be aware of fact A or that fact A had been previously misrepresented.  The way defendants describe the law, only a corrective disclosure would prove loss causation.

None of defendants' attempts to distinguish the relevant case law on this point is successful.  In *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001), the plaintiffs alleged that defendants concealed the company CEO's incompetence and that the risk of the CEO being unable to manage the company's liquidity risk materialized when the company had a liquidity crisis.  The complaint nowhere alleged that the liquidity crisis revealed the CEO's incompetence when it occurred (presumably that was discovered later), but the Court of Appeals nevertheless allowed the claim to proceed.  *Id.* at 96-98.  In *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005), the court allowed a claim to proceed where bankruptcy revealed the risk of a liquidity crisis.  There, the market did not know that Parmalat had been hiding massive amounts of debt when the bankruptcy occurred, but that did not stop plaintiffs from seeking recovery.  *Id*. at 307.

Defendants practically ignore *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001), one of the only Court of Appeals cases to address loss causation at summary judgment rather than a motion to dismiss.  In *Castellano*, defendants allegedly concealed their plans for a company restructuring even as they negotiated plaintiff's resignation from a high-level executive position.  As a private company, Young & Rubicam had the right to repurchase plaintiffs' shares if he resigned.  As one of the company's largest shareholders, plaintiff was therefore concerned that by resigning he might lose the projected value of his equity.  Plaintiff nevertheless chose to resign based in part on defendants' representations that "nothing was going to change in the near future."  The company exercised its right to repurchase plaintiff's shares only to later participate in a leveraged recapitalization that sent its shares soaring.  On appeal,

defendants argued that summary judgment on loss causation grounds should be affirmed because the specific plans concealed during the resignation negotiations were merger plans with a company called True North.  The ultimate transaction that caused the plaintiff's loss was a leveraged recapitalization with a company called Hellman & Friedman.  Hence, defendants argued that the risk they concealed, a merger with True North, never materialized to cause plaintiff's loss.  The Court of Appeals, however, rejected this argument and reversed the grant of summary judgment.  The court held that defendants' concealment of the merger negotiations and other facts misled plaintiff "as to the zone of risk that [the company] might soon enter into a major corporate transaction."  *Id.* at 188.  Thus, defendant "disguised the very risk to which [plaintiff] fell victim."  *Id.* at 189.  The level of specificity with which plaintiff was held to on loss causation corresponded only to the foreseeability requirement and information ultimately disclosed.  The risk was not that a particular transaction would cause a rise in value of plaintiff's shares, but that any major transaction would.

Defendants erroneously claim that "to the extent it suggests that a risk of the same type was foreseeable and thus the loss was caused by the risk . . . [*Castellano*] has been overruled by *Lentell*'s explicit requirement plaintiffs prove both foreseeability and proximate cause . . . and *Dura*'s holding that securities laws only protect 'against those economic losses that misrepresentations actually cause.'"  (Def. Reply Br. at 14 n.10.)  As a threshold matter, one panel of the Court of Appeals generally will not "overrule" an earlier panel, except in unusual circumstances not present here.  *Consub Delaware LLC v. Schahin Engenharia Limitada*, 543 F.3d 104, 109 (2d Cir. 2008) ("[O]ne panel of this Court cannot overrule a prior decision of another panel, unless there has been an intervening Supreme Court decision that casts doubt on this Court's controlling precedent, or unless an en banc panel of this Court overrules the prior

decision."). Second, there is nothing inconsistent between *Castellano* and *Lentell*. Besides citing approvingly to *Castellano*, *Lentell* does not address the connection between the fraud and the materialization of the risk when it talks about "actual cause." As noted above, the Court of Appeals was here referring to the causal connection between the materialization and the actual decline in stock price. *Lentell*, 396 F.3d at 172-73. The causal connection between the false or misleading statements and the materialization is established if the materialization was foreseeable and if it disclosed information that was previously concealed. *Dura*, 544 U.S. at 342; *Lentell*, 396 F.3d at 173. Finally, nothing in *Dura* suggests otherwise. The word "cause" takes on a variety of meanings at different levels of generality. Defendants' *Dura* quote uses causation at a very high level of generality and does not suggest that *Lentell*'s approach is erroneous.

As in *Castellano*, plaintiffs here allege that defendants concealed a broad risk to which the company later fell victim by misleading the public on particular facts and denying the risk. Specifically, plaintiffs argue that defendants concealed a severe liquidity risk by denying any liquidity problems, misrepresenting Vivendi's actual EBITDA and free cash flow, omitting the terms of its Cegetel debt, omitting Vivendi's draws on its commercial paper backups, and omitting Vivendi's purchase obligation in Maroc Telecom. (Class Pl. Br. at 7-21.) The events plaintiffs argue constitute a materialization of this concealed risk do not reveal Vivendi's free cash flow or the previous draws on its commercial paper backups anymore than the announcement of a leveraged capitalization by Young & Rubicam revealed its previous merger discussions with True North. They do, however, present a genuine material issue of fact with regard to whether previously concealed information—here, the tenuous liquidity position of Vivendi—was revealed to the market on those eleven days.

Case 15-2021, Document 85, 08/12/2015, 1571465, Page216 of 246

### B.    Plaintiffs Have Adequately Disaggregated Competing Causal Events

Defendants properly raise whether plaintiffs have established "actual causation" between the fraud-related disclosures and declines in share price.  (Def Br. at 12.)  Defendants argue that on each of the eleven days there were other potential causes competing with the fraud-related disclosures.  According to defendants, plaintiffs have failed to produce sufficient evidence for a fact finder to distinguish between the losses caused by these competing factors and the losses caused by the fraud-related events; therefore, plaintiffs have failed to demonstrate loss causation.  The Court does not find it necessary to determine whether plaintiffs have produced sufficient evidence of a causal connection on each of the identified days.  To deny summary judgment, it is sufficient for the Court to observe that on several of the days—indeed, a majority—plaintiffs have produced sufficient evidence of such a connection.

Defendants begin with *Dura*'s observation that absent evidence to the contrary, a lower stock price may reflect, "not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."  *Dura*, 544 U.S. at 343.  Plaintiffs therefore bear the burden of producing evidence establishing that the loss they suffered "was caused by the alleged misstatement as opposed to intervening events." *Lentell*, 356 F.3d at 174.  Equivalently, if we treat the difference between the purchase price and the sell price as plaintiffs' total loss, plaintiffs bear the burden of producing evidence sufficient for a fact finder to "ascribe some rough proportion of the whole loss" to defendants' fraud. *Lattanzio*, 476 F.3d at 158.

Plaintiffs' first respond by pointing to the fact that of "out of more than 440 trading days in the entire class period", Dr. Nye selected only eleven as days on which fraud-related losses occurred. (Class Pl. Br. at 2.) Moreover, Vivendi's stock price fell €70.36 over the course of the class period, while the aggregate decline on the eleven days identified by Dr. Nye amounts to only €27.58, i.e., 39% of the "total" loss. (*See* Tr. of Mar. 2, 2009 Hr'g at 29-33; Nye Report Ex. 9D.) To identify these days, Dr. Nye conducted a regression analysis to disaggregate market-wide and industry-wide effects on the share price and thus find the days on which there were Vivendi-specific residual declines. Having identified the days on which there were potential fraud-related losses, Dr. Nye confirmed that these losses were fraud-related by analyzing disclosures made on each of the eleven days and opining both that materializations of the risk occurred and that any other company-specific information released on those days did not cause the residual declines. Plaintiffs argue that these facts rebut defendants' argument.

Defendants respond by arguing that on these eleven days Dr. Nye has nevertheless failed disaggregate competing causal factors. The fact that Dr. Nye has disaggregated days in which no fraud-related revelations occurred does not release him from disaggregating from competing events on each of the eleven days because *Dura* applies no matter how narrow the scope of application. (Def. Br. at 16-17.) Defendants point incredulously at Dr. Nye's assertion that 100% of the price decline on each of the eleven days was due to fraud-related revelations. (*Id.* at 17.) Surely, they argue, some part of that price decline was due to some other factor. Defendants are technically correct. If five top Vivendi executives had resigned the same day as a ratings downgrade, it may be incumbent on plaintiffs to produce evidence establishing roughly how much of the price decline was due to the downgrade and how much to the resignations. But the key term here is "roughly." Indeed, given the admonishment by the Court of Appeals that

SA212

plaintiffs "were [not] required to allege the precise loss attributable" to the fraud, *Lentell*, 356 F.3d at 177, it seems logical that the shorter the time frame considered, the rougher the proportion need be.  Furthermore, in most cases, "the chain of causation . . . is a matter of proof at trial."  *Id*. at 174.  Given that plaintiffs have produced evidence that Vivendi's liquidity risk did gradually materialize on days when the stock price declined, defendants must at least adduce competing causal events that plaintiffs have failed to disaggregate.  *See Celotex,* 477 U.S. at 325.

For the most part, however, defendants do not point to an obvious competing cause on each of the eleven days.  Instead, defendants make the novel argument that plaintiffs have failed to disaggregate damages caused by the risk from damages caused by the materialization of the risk.  (Def. Br. at 14-15; Def. Reply Br. at 21-25.)  Defendants argue that plaintiffs' causal theory is premised on Vivendi concealing the risk that it would have a liquidity crisis.  For example, suppose Vivendi had concealed from the public in December 2001 a 50% risk that it would experience a liquidity crisis in May 2002.  Had plaintiffs been aware of that risk, they would have paid €X less for stock.  Logically, had the risk been 100%, they would have paid even less (although not necessarily €2X less).  If Vivendi does experience a liquidity crisis in May 2002, the risk has become 100%, and the price decline would reflect what would have happened had a 100% risk been announced in December 2001 rather than a 50% risk.  Accordingly, defendants argue, plaintiffs must disaggregate the additional damages caused by the materialization of risk from those attributable to risk itself.  Defendants cite no case law for this argument, and the Court has not found any.

The first problem with defendants' argument is that Dr. Nye opines that "all the pieces were there" in December 2001 and "the probability [of a liquidity crisis] was basically a hundred percent."  (Class Pl. Br. at 40.)  While defendants argue that "Dr. Nye performed no analysis to

arrive at this conclusion", this is an argument better made in a challenge to Dr. Nye's credibility as an expert rather than a summary judgment motion. Dr. Nye's opinion alone creates a genuine issue of material fact on this point. Second, if the Court analyzes the problem through the lens of tort law and proximate cause, the Court reaches the same result. The Restatement (Second) of Torts concludes that plaintiffs seeking damages for fraud are entitled to seek out-of-pocket damages *and* "pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation." RESTATEMENT (SECOND) OF TORTS § 549. Prosser and Keeton concurs, noting that plaintiffs can recover for "losses which might be expected to follow from the fraud and from events that are reasonably foreseeable." W. KEETON, D. DOBBS, R. KEETON, & D. OWEN, PROSSER AND KEETON ON LAW OF TORTS § 110, at 767. Prosser and Keeton notes that "if the plaintiff stores his goods in a warehouse represented [to] him to be fireproof and they are destroyed when it burns down, he can recover, and likewise, when he invests in an automobile agency, after false assurance of profits make by similar agencies, and the agency goes bankrupt." *Id*. In the goods example, plaintiff is entitled to recover not only the inflated price he paid for a fireproof storage facility, but also the cost of the goods lost in the fire. In the agency example, the plaintiff is entitled to recover not only the inflated price he paid for equity in the agency, but also whatever portion of the bankruptcy loss that was foreseeable. Of course, the bankruptcy example is an example restricted neither to textbooks or common law fraud. *See In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005).

Finally, it is hard to see how price declines allegedly caused by the materialization of the risk should not be incorporated into plaintiffs' damages. Stocks are risky investments, and purchasers assume a variety of risks to the value of their stock. Suppose Vivendi disclosed sufficient information in December 2001 for plaintiffs to conclude that there was a 50% risk that

32

Jean-Marie Messier would resign as CEO of Vivendi in July 2002. In December 2001, the price would reflect that risk, and plaintiffs who bought stock then would assume the risk that the stock price would suffer if Messier did in fact resign in July 2002. Plaintiffs allege, however, that they could not have assumed the risk of a liquidity crisis because it was concealed from them. Defendants are essentially arguing that plaintiffs should bear a risk they did not assume and that was intentionally concealed from them. Imposing liability for this loss would not be downside insurance for investors. Not imposing liability, however, might be a windfall for fraudsters.

Defendants remaining arguments mostly concern problems with Dr. Nye's day-to-day analysis. On certain days, however, defendants utterly fail to point to competing causes of the price declines. On May 3, 2002, defendants point to no competing causes, arguing only that the downgrade revealed no new information. For this argument, applied to several of the eleven days, defendants rely primarily on *In re Omnicom Sec. Litig.*, 541 F. Supp. 2d 546 (S.D.N.Y. 2008), citing its statement that "[a] recharacterization of previously disclosed facts cannot qualify as a corrective disclosure." *Id.* at 552. While the Court agrees that this statement comports with the law in this Circuit, the Court does not find that no reasonable juror could conclude that the ratings downgrades disclosed no new information. In *In re Omnicom*, the company share price plummeted after a negative article in the *Wall Street Journal*, but the facts in the article had been disclosed months earlier, and the Court concluded that the negative tone of the article and subsequent commentary was responsible for the decline rather than any disclosure of concealed facts. *Id.* at 554. In contrast, the ratings agencies had previously affirmed their ratings and essentially changed their minds. Defendants argue that the facts on which the agencies based their conclusions were not new to the market, but defendants do not support this proposition. First, rating agencies have access to non-public information, and the

public could have assumed that the agencies were acting on such information.  Second, facts available to the public are not necessarily well disseminated into the market.  While the court in *In re Omnicom* could point to particular articles explicitly stating that the *Wall Street Journal* article disclosed no new information, Dr. Nye can point to articles noting the market's "surprise" at the downgrade.  (Nye Report ¶ 168.)  The analysis is identical for the July 2, 2002 declines due to downgrades.  *See In re Dynex Capital, Inc. Sec. Litig.*, 2006 WL 314524, at *11.

Defendants also fail to point to any unaddressed competing causes on June 21, 2002 and June 24, 2002.  While defendants argue that the Deutsche Bank transaction was announced prior to June 21, 2002, and therefore that the market had already absorbed the news, they can point to no reason why the stock declined.  Defendants are also incorrect that Dr. Nye fails to account for the News Corp. rumors and British Telecom.  (*See* Nye Report ¶ 194.)  For the reasons discussed above, the Court concludes that there is a genuine issue of material fact as to whether these quick sales disclosed a need for cash and therefore weakened liquidity.

Finally, the only competing cause defendants can adduce on August 14, 2002 (and by implication August 15 and 16) is rating agencies' concerns over Vivendi management's "failure to explain its future strategy."  However, a fact-finder could reasonably accept the inference proffered by Dr. Nye that this comment is directly related to the liquidity concerns and how management would address the problem.  The Court again concludes that Dr. Nye's report raises a genuine issue of material fact for the stock declines on this day and on the two days following.

## IV.    Particular Allegations, Misleading Statements, and Damages

Defendants also seek rulings from the Court that certain allegations and allegedly false or misleading statements could not possibly have contributed to plaintiffs' loss.  Defendants argue

that the following allegations are unconnected to the plaintiffs' loss "regardless of how broadly plaintiffs define their theory of 'liquidity risk'":  (1) the failure to disclose the obligation to Maroc Telecom; (2) the back-dating of the Cegetel current account; (3) the repurchase of the Seagram Bonds; and (4) the failure to meet synergy targets after the merger.  (Def. Reply Br. at 15-16.)  Similarly, defendants argue that plaintiffs cannot seek damages for:  (1) any alleged misleading statements during periods where inflation did not increase; (2) any misleading statements alleged by the Class but not alleged by Liberty Media; and (3) any statements made before March 9, 2001.  Whether or not the alleged misstatements or omissions were the proximate cause of plaintiffs' losses, evidence concerning these allegations may be admissible for the purpose of showing the existence of a liquidity crisis or to establish scienter and a scheme to defraud.  Accordingly, the Court will reserve decision on these issues until trial or until the parties raise them in motions *in limine*.

Finally, defendants argue that Liberty Media is not entitled to seek rescissionary damages and that Dr. Nye's "constant percentage" method for calculating damages is invalid.  The Court finds that damage issues are not properly before it on this motion.  Defendants have moved for summary judgment on loss causation, and damage issues, while related, are quite another matter.

## CONCLUSION

For the reasons given, defendants' motion for summary judgment against the class

plaintiffs, Liberty Media, and GAMCO for failure to establish loss causation [644] and

defendants' motion for summary judgment against the individual plaintiffs for failure to establish

loss causation [646] are DENIED.

SO ORDERED.

Dated: New York, New York
    April 6, 2009

                                   Richard J. Holwell
                               United States District Judge

**SA218**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8 | 18 | 09

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE VIVENDI UNIVERSAL, S.A.
SECURITIES LITIGATION

02 Civ. 5571 (RJH) (HBP)

**ORDER**
**(REDACTED)**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

On July 20, 2009, the Court heard oral argument on the scope of the upcoming trial and

defendants' motions *in limine*. In this Order, the Court confirms those rulings it made from the

bench and issues additional rulings concerning matters on which the Court reserved.

Regarding the scope of the upcoming trial, the Court concludes that it would not be

manageable to try the claims of the Class Plaintiffs with those of the Individual Plaintiffs.

Regardless of where the burden of proof lies, issues of individualized reliance would overwhelm

the trial and impermissibly distract the jury from reasoned determination of the Class claims.

The upcoming trial scheduled to start on September 29, 2009 will go forward only for the Class.

The Court will set a trial date for the claims of the Individual Plaintiffs following completion of

the Class Plaintiffs' trial.

In light of this conclusion, the Court DENIES for administrative purposes, and without

prejudice to renew following completion of the Class trial, the following *in limine* motions made

by the Individual Plaintiffs: Individual Plaintiffs' Motion for a Separate Trial Only on

Individualized Issues Relating to Damages [817]; Deutsche Asset Management

Investmentgesellschaft, DWS Investment, and DWS (Austria) Investmentgesellschaft's Motion

to Exclude Evidence or Argument Regarding any Nonpublic Knowledge or Information

Deutsche Bank AG May Have Had About Vivendi's Financial Condition; Individual Plaintiffs'

Motion to Exclude Evidence and Argument Purportedly Showing that Vivendi Securities Did
Not Trade in an Efficient Market During the Relevant Time Period [812]; Individual Plaintiffs'
Motion to Exclude Evidence that Defendants Lost Money on Transactions in Vivendi Securities
[809]; Individual Plaintiffs' Motion to Exclude Evidence or Argument Regarding Certain Facts
About the Individual Plaintiffs; Individual Plaintiffs' Motion for an Order Determining Standing;
and Individual Plaintiffs' Motion to Preclude Defendants from Arguing or Offering Evidence
Purporting to Show that Individual Plaintiffs Did Not Rely on the Integrity of the Market.

Regarding defendants' motions *in limine*, where the Court indicated at the July 20
conference that certain issues may be revisited when specific evidence is offered into the record
at trial, this Order is not dispositive. Also, should either party "open the door" at trial with
regard to certain issues, counsel may move to admit evidence here found inadmissible. With
these caveats, the Court holds as follows:

1.  For the reasons stated on the record (Tr. 6, 8), the Court GRANTS in part and
    DENIES in part defendants' Motion to Exclude Summaries and Transcripts of
    Statements made to Agencies and Foreign Tribunals [832].

2.  The Court reserves decision with regard to defendants' Motion to Exclude Certain
    Deposition Testimony of Jean Bouquot, Bernard Cattenoz, and Bernard Rabier [822],
    and directs defendants to make a proffer by September 14, 2009 on the nature of the
    evidence they will seek to rely on at trial concerning their reliance on the advice of
    their accountants.  (Tr. 18.)

3.  For the reasons stated on the record (Tr. 21-22), the Court GRANTS defendants'
    Motion to Exclude Certain Deposition Testimony of, and Other Evidence Concerning
    Florence-Helene Sanial [830]. However, the Court also grants plaintiffs leave to

2

**SA220**

proffer specific excerpts of testimony at trial so that the Court may reconsider their admissibility. (Tr. 22-23.)

4. For the reasons stated on the record (Tr. 24-25), the Court GRANTS defendants' Motion to Exclude Evidence and Argument Concerning Third Party Proceedings [833].

5. For the reasons stated on the record (Tr. 26), the Court GRANTS defendants' Motion to Exclude Evidence of the French Criminal Inquiry into Certain Events Relating to Current or Former Vivendi Employees [824].

6. For the reasons stated on the record (Tr. 44), the Court DENIES defendants' Motion to Exclude Evidence and Argument Regarding Alleged Misrepresentations that Did Not Inflate Vivendi's Share Price [827].

7. The Court GRANTS in part and DENIES in part defendants' Motion to Exclude the Expert Testimony of Dr. Blaine Nye [828]. In their motion, defendants argue that: (1) Dr. Nye fails to reliably establish that price declines were caused by fraud-related disclosures; (2) Dr. Nye offers no support for his conclusions concerning Vivendi's credit ratings, and, in any event, is not qualified to opine on this subject; (3) Dr. Nye's calculation of inflation is unreliable; and (4) Dr. Nye's "constant percentage method" for calculating damages is improper. As an initial matter, the Court concludes that, subject to certain qualifications, Dr. Nye may testify at trial. The Court rejects defendants' first argument regarding Dr.Nye's corrective disclosure analysis, largely for the reasons stated in its opinion denying defendants' summary judgment motion on loss causation. (Opinion [767] at 29-34.) His event study and regression analysis may be subject to vigorous cross-examination; however, they easily passes muster under *Daubert* and *Kumho Tire*. With regard to Dr. Nye's opinion that Vivendi's credit risk was in

3

fact "junk" level by December 2001, the Court understands this comment to be Dr.
Nye's opinion of what the defendant's credit rating would likely have been had the
"true" credit/liquidity risks allegedly faced by defendant at that time been properly
disclosed. Particularly in light of the 2002 downgrade of Vivendi credit to "junk"
status, the Court finds Dr. Nye's opinion ancillary to his opinion on causation and
safely within his qualifications as an expert.

Defendants' challenge to Dr. Nye's calculation of inflation, however, requires
more consideration. Had Dr. Nye simply opined that inflation was constant prior to
Vivendi's liquidity risk first beginning to materialize, allegedly on January 7, 2002,
defendants' challenge would likely be simpler. But Dr. Nye opined reasonably that
inflation "did not remain constant, but increased over time with Vivendi Universal's
deteriorating liquidity situation accompanied by public assurances from Defendants
to the contrary . . . ." (Nye Report ¶ 264.) Given this conclusion, defendants
challenge: Dr. Nye's determination of the dates at which inflation began and at
which inflation reached its maximum; his use of a proxy—purchase accounting—to
measure increasing inflation over time between these "anchor points"; and his
deviation from that proxy in the last 45 days before maximum inflation.

The Court concludes that the challenged aspects of Dr. Nye's analysis are
sufficiently reliable and, therefore, admissible under FRE 702. Dr. Nye has given
several justifications for his choice of "anchor points" for the beginning of stock price
inflation and the date of maximum inflation. (*See* Nye Report ¶ 265 ("I have
concluded that full inflation extends back from January 6, 2002, at least as far back at
December 12, 2001, the date of CFO Hannezo's letters to S&P and Moody's

4

itemizing commitments agreed to by the Company to maintain its credit ratings. December 12, 2001 is bracketed by dates of assurances by the Defendants of the Company's liquidity health."); *id.* ¶ 266 ("The other end of the line used to graduate inflation is anchored at October 30, 2000, the date of the Form F-4 Registration Statement and Prospectus which beings the Class Period and includes Defendants' projection of 35% CAGR EBITDA growth. Plaintiffs expect to prove at trial that on or before October 30, 2000, Defendants planned to use undisclosed purchase accounting adjustments to increase publicly reported EBITDA.")). Thus, the selection of "anchor points" by Dr. Nye was based on consideration of plaintiffs' proffered evidence and the opinion of a second expert, and, therefore, has a reasonable basis in the record. His opinion on this issue is not arbitrary may be adequately tested by cross-examination.

Selecting a date of maximum inflation is not the end of the analysis, as it is necessary to estimate the growth of inflation from the beginning of the class period. The growth of inflation, however, cannot be directly observed and some type of inflation model is required to allocate inflation over time. In constructing his model, Dr. Nye considered three separate proxies for stock price inflation and selected one, the growth in reported EBITDA arising from Vivendi's use of purchase accounting, to estimate the growth in stock price inflation during the class period. Defendants claim Dr. Nye's choice is arbitrary, but EBITDA is surely one means of assessing liquidity, and the inflationary effect of defendants' use of purchase accounting on its reported EBITDA is a central issue in this case. Defendants' experts may contend that a better proxy is available, but Dr. Nye's choice is neither unprincipled nor

5

**SA223**

arbitrary. Finally, Dr. Nye's explanation for the deviation from this proxy between October 30, 2001 and December 13, 2001, is certainly fodder for cross-examination, but the Court refuses to go so far as to say that it renders his testimony unreliable.

Defendants' reliance on the factors set out in *Daubert* is misplaced. "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999) (emphasis added). *Daubert*'s four factors are useful primarily for assessing the reliability of scientific techniques that can be tested in a laboratory setting. *See id.* at 147-50; *Daubert*, 509 U.S. at 266 ("(1) whether a theory or technique 'can be (and has been) tested,' (2) 'whether the theory or technique has been subjected to peer review and publication,'; (3) a technique's 'known or potential rate of error,' and 'the existence and maintenance of standards controlling the technique's operation,' and (4) whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community"). While quantitative theories abound concerning the appropriate manner in which damages in securities class actions should be calculated, none of them can be tested in a laboratory setting. Tellingly, defendants can cite to no academic articles or case law for the "proper" method of calculating inflation in analogous claims, let alone articles describing a method than can be measured by *Daubert*'s four factors. The only alternative that defendants propose in their brief is inapposite because it applies to claims proceeding under a corrective disclosure theory rather than a materialization of the risk theory.

6

**SA224**

(*See* Def. Br. at 7 ("Typically a damages expert calculates inflation on the date of an alleged misstatement by determining how much the share price declines—i.e., inflation dissipates—when the truth about that misstatement is revealed to the market.").)

Given that *Daubert*'s factors are not useful in assessing the reliability of Dr. Nye's proposed testimony, the Court has looked to whether Dr. Nye "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. Apart from the minor deviation highlighted by defendants, Dr. Nye is entirely consistent in pursuing his inflation analysis. Indeed, his more qualitative judgments concerning the dates of initial and maximum inflation mirror his analysis of competing causes in his event study. Similarly, modeling the variation of an unobservable quantity (inflation) on the variation of an observable quantity (the effect of purchase accounting) is a standard technique. Accordingly, at a certain level of generality, there is ample precedent for Dr. Nye's method. The fact that it lacks precedent at more specific levels does not disqualify it provided the method is applied with sufficient rigor. The Court has concluded that Dr. Nye has applied his method with sufficient rigor, and therefore declines to exclude his testimony on inflation.

Finally, with regard to Dr. Nye's use of the constant percentage method, the Court concludes that Dr. Nye's testimony must be excluded. While the Court does not agree with defendants that the constant-percentage method is irreconcilable with *Dura*, the Court does find that the constant percentage method has been implicitly rejected by this Circuit.

7

**SA225**

The constant percentage method is premised on the reasonable assumption that events can effect inflation without disclosing the fraud to the market. (*See* Nye Report ¶ 185; *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1437 (9th Cir. 1987) (describing how "market forces [could] operat[e] on the misrepresentations").) Consider, for example, the case of a telecom startup that fraudulently claims it has developed a more advanced form of voice-recognition technology. After the announcement, plaintiffs buy shares in the startup at $50. Soon afterwards, several states pass laws forbidding all cell phone use in cars, and shares in the telecom drop to $40. This event discloses nothing about the startup's fraud, but it inevitably reduces the inflation present in the shares because hands-free cell phone use is a selling point of voice-recognition technology. As time passes, the fraud remains concealed but the telecom sector suffers major losses, reducing the startup's stock price to $4. When the startup finally announces that it has not in fact developed a new voice-recognition technology, its shares drop from $4 to $2.

Under the constant-dollar method, plaintiffs' losses would be a maximum of $2 per share because that is the drop in price upon full disclosure of the fraud. In contrast, under the constant-percentage method, plaintiffs' losses would be $25 because the stock lost 50% of its value when the truth was revealed, and $25 is 50% of the original $50 purchase price. The problem is that neither method may accurately characterize losses in such a case. The $10 drop in price that followed the announcement of the new cell phone laws likely reflected a $10 reduction in inflation that arguably caused damage. In contrast, the price drop from $40 to $4 was arguably the result of a slumping telecom industry and not the specific substance of the fraud.

8

**SA226**

Hence, the constant-dollar method may underestimate the loss by ignoring a fraud-related event that does not qualify as a "materialization of the risk", while the constant percentage method may overestimate the loss by failing to account for the non-fraud-related drop due to the telecom slump.

While acknowledging the problem, the Court concludes that the solution is not, as plaintiffs suggest, to submit both theories to the jury. The Court of Appeals has rejected the idea that plaintiffs can recover for losses proximately caused by events that do not qualify as "materializations of the concealed risk". *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). This stands in clear opposition to the constant percentage method whose justification rests on a causal relationship of such events to plaintiffs' damages.

8.    The Court GRANTS in part and DENIES in part defendants' Motion to Exclude the Deposition Testimony of Guy Deslondes and Christian Rauch [823]. The Court rejects defendants' first argument that the depositions should be excluded because defendants were deprived of the opportunity to object to the limitations on the testimony to which plaintiffs agreed. Defendants could have objected to Deslondes and Rauch's refusal to answer questions and moved to compel their answers. Defendants failed to do so, however, and even now do not directly challenge the rating agencies invocation of the privilege. Rather, they claim that Deslondes and Rauch waived the privilege by giving testimony. Here, defendants are simply mistaken. The cases cited by defendants concerning "selected waiver" hold that parties may not disclose specific materials to one party and then subsequently invoke privilege to protect against disclosure of those same materials to another party. *See,*

9

*e.g.*, *In re Steinhart Partners, L.P.*, 9 F.3d 230, 235 (2d Cir. 1993) (party may not invoke work product doctrine over memorandum to prevent private discovery when it previously disclosed the memorandum to the SEC). Moreover, plaintiffs are not attempting to use privileged materials as both a sword and shield because both parties had equal access to the rating agencies. *See, e.g.*, *In re Grand Jury Proceedings*, 219 F.3d 175 (2d Cir. 2000). The rating agencies consistently invoked privilege over a certain class of questions (internal discussions) against both plaintiffs and defendants but not over another class (conversations with Vivendi). In any event, even if the rating agencies had waived privilege, defendants have slept on their rights and cannot complain at this late date. Had they felt entitled to ask such questions, they should have raised the issue within a reasonable time after the depositions were held, not two years later.

Defendants' second argument is that they did not have an adequate opportunity to develop testimony from Deslondes and Rauch by cross-examination. After reviewing the deposition transcript, the Court concludes that defendants had an adequate opportunity to cross Deslondes and Rauch with regards to their conversations with Vivendi and the conclusions that they drew from those conversations. However, the Court does not conclude that defendants had such opportunity with regards to questions concerning conclusions Deslondes and Rauch drew at least in part from other information, discussion of which was shielded by privilege. Similarly, defendants did not have adequate opportunity to cross Deslondes about his testimony before the COB. In those areas where defendants did

10

**SA228**

not have adequate opportunity to cross Deslondes and Rauch, the deposition testimony will not be admissible.

9. For the reasons stated on the record (Tr. 97), the Court GRANTS defendants' Motion to Exclude Evidence and Argument Concerning Allegations Abandoned by Plaintiffs [821].

10. For the reasons stated on the record the Court GRANTS in part and DENIES in part defendants' Motion to Exclude Evidence and Argument Regarding Allegations Unrelated to Vivendi's Liquidity [825]. Plaintiffs may offer evidence of the allegations at issue with one exception. The Court excludes evidence concerning the actual backdating of the Cegetel loan agreement under FRE 403. The fact that Vivendi began drawing on that loan before a written agreement was reached, however, is admissible.

11. For the reasons stated on the record (Tr. 101), the Court GRANTS in part and DENIES in part defendants' Motion to Exclude Evidence and Argument Concerning Dismissed Share Repurchase and Put Option allegations [831]. The Court emphasizes that while evidence concerning the share repurchase and put option allegations has been admitted for the purposes stated at the July 20 conference, plaintiffs are specifically instructed not to argue that, or elicit testimony suggesting that, defendants improperly disclosed the repurchase program and put options to the public.

12. For administrative purposes, and without prejudice to renew following completion of the Class trial, the Court DENIES defendants' Motion to Exclude the Testimony of Frank Torchio [834].

11

**SA229**

13.   The Court GRANTS in part and DENIES in part defendants' Motion to Exclude
      Evidence Relating to the July 1, 2002 Termination Agreement Between Vivendi and
      Messier [826]. The Court concludes that, under FRE 403, the "extravagant" terms of
      agreement should be excluded as well as evidence regarding Vivendi's claim that it
      was being blackmailed by Messier. Further, the Court does not intend to relitigate the
      termination dispute between Vivendi and Messier. Nevertheless, certain evidence
      concerning the circumstances under which the agreement was reached, including
      portions of the legal papers filed by Vivendi in its arbitration with Messier (and
      related court proceedings), is relevant under FRE 401and admissible under FRE 403
      and 801(d)(2)(D) provided a proper foundation is established. If Vivendi proposes to
      call as witnesses any of the lawyers who represented it in the arbitration and related
      proceedings, the proposed witnesses shall be made available for deposition prior to
      trial.

14.   For the reasons stated on the record (Tr. 115-19), the Court GRANTS in part and
      DENIES in part defendants' Motion to Exclude the Testimony of Plaintiffs' Expert
      Andrew M. Mintzer. The Court stresses that Mr. Mintzer may not testify that
      Vivendi violated SEC regulations, that Vivendi's alleged misstatements were
      "material", or that Vivendi violated any requirement "not to be misleading".

15.   For administrative purposes, and without prejudice to renew following completion of
      the Class trial, the Court DENIES defendants' Motion to Exclude the Testimony of
      Plaintiffs' and GAMCO's Use of the Fraud on the Market Presumption.

16.   For the reasons stated on the record (Tr. 130), the Court GRANTS defendants'
      Motion to Exclude the Testimony of Plaintiffs' Expert Wilbur Ross. However, the

12

**SA230**

Court also grants plaintiffs leave to make a proffer describing how Mr. Ross could testify consistent with the Court's concerns as expressed at the July 20 conference.

17. The Court DENIES defendants' Motion to Exclude the Testimony of Jean-Charles Brisard. Mr. Brisard's testimony satisfies FRE 401 and is not unfairly prejudicial under FRE 403.

18. The Court DENIES defendants' Motion to Exclude the Expert Testimony of Xavier Oustalniol [829]. Defendants argue that Mr. Oustalniol is either generally unqualified to opine on French GAAP or specifically unqualified to opine on the subjects in his report. The Court concludes that Oustalniol's prior experience with French GAAP provides sufficient expertise to support his opinion testimony. The case law cited by defendants does not stand for the proposition that courts must limit expert testimony to that offered by people with *extensive* experience or widely recognized skill. *See, e.g., Quintanilla v. Komori America Corp.*, No. 07 Civ. 2375, 2009 WL 320186, at *1 (2d Cir. Feb. 10, 2009) (holding that mechanical engineer was permissibly rejected as an expert on printing press design because "his only prior exposure to printing presses arose from visiting his father at work in a commercial printing plant and visiting printing plants as a tourist"). The Court further rejects defendants' argument that Oustalniol is not qualified to opine on the specific subjects in his report. To the extent he relies on his knowledge of US GAAP versus French GAAP, he may be an easy target for cross-examination, but his lack of familiarity with applying particular accounting principals does not render his testimony unreliable.

13

19. For the reasons stated on the record (Tr. 150), the Court GRANTS Messier and Hannezo's Motion to Exclude Evidence of Their Permitted Use of Certain Vivendi Assets.

20. For the reasons stated on the record (Tr. 153), the Court GRANTS Messier and Hannezo's Motion to Preclude References to "Insider Trading" or "Insider Information", except that the Court reserves on whether plaintiffs may use the terms in their closings.

21. For the reasons stated on the record (Tr. 153), the Court GRANTS Messier's Motion to Exclude Deposition Testimony of Jean-Charles Brisard.

22. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████

23. The Court GRANTS defendant Messier's Motion to Exclude Evidence of Samuel Minzberg's Memo. To the extent plaintiffs believe that certain excerpts of the memo are admissions by Mr. Minzberg, they may submit those excerpts to the Court for reconsideration, but the Court does not view the memo as a business record, and the Court will not permit an inflammatory narrative of various press reports to be submitted into evidence.

The following motions are not disposed of, or otherwise addressed by, this Order and remain pending: Class Plaintiffs' Motion to Exclude Certain Opinions of Dr. William Silber and All of the Testimony of Mr. Ronald Gilson [836]; Class Plaintiffs' Motion to Exclude the Testimony of Peter Walton [839]; Class Plaintiffs' Motion *in limine* [842]; defendants' Motion

14

for Partial Judgment on the Pleadings of Plaintiffs' Section 12(a)(2) Claims [896]; Hannezo's

Motion to Dismiss [900]; defendants' Motion to Exclude the Report of Special Master Neil

Cartusciello [905]; and plaintiffs letter motion for sanctions against Vivendi for failing to turn

over certain legal documents generated in the arbitration between Messier and Vivendi. The

Court will hear argument on these motions and any remaining issues on August 14, 2009 at

11:30 a.m. in Courtroom 17B, 500 Pearl Street, New York, NY 10007.


SO ORDERED.

Dated: New York, New York
     August 12, 2009

Richard J. Holwell
United States District Judge

15

**SA233**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE VIVENDI UNIVERSAL, S.A.
SECURITIES LITIGATION

This Document Relates To:

ALL ACTIONS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/13/09

02 Civ. 5571(RJH) (HBP)

**ORDER**

The Court denies, for administrative purposes, and without prejudice to renew following

completion of the Class trial, the following *in limine* motions filed in connection with *Polland, et*

*al v. Vivendi Universal, et al* (Case No. 02cv07346): Defendants' Motion to Exclude Evidence

and Argument Concerning Allegations Abandoned by the Plaintiffs [32]; Defendants' Motion to

Exclude Certain Deposition Testimony of Jean Bouquot, Bernard Cattenoz, and Bernard Rabier

[33]; Defendants' Motion to Exclude the Deposition Testimony of Guy Leslondes and Christian

Rauch [34]; Defendants' Motion to Exclude Evidence of the French Inquiry into Certain Events

Relating to Current and Former Vivendi Employees [35]; Defendants' Motion to Exclude

Evidence and Argument Regarding Allegations Unrelated to Vivendi's Liquidity [36];

Defendants' Motion to Exclude Evidence Related to the July 1, 2002 Termination Agreement

between Vivendi and Messier [37]; Defendants' Motion to Exclude Evidence and Argument

Regarding Alleged Misrepresentations That Did Not Inflate Vivendi's Share Price [38];

Defendants' Motion to Exclude the Expert Testimony of Dr. Blaine Nye [39]; Defendants'

Motion to Exclude the Expert Testimony of Xavier Oustalniol [40]; Defendants' Motion to

Exclude Certain Deposition Testimony and Other Evidence of Florence-Hélène Sanial [41];

Defendants' Motion to Exclude Evidence and Argument Concerning Dismissed Share

**SA234**

Repurchase and Put Option Allegations [42]; Defendants' Motion to Exclude Summaries and

Transcripts of Statements Made to Agencies and Foreign Tribunals [43]; and Defendants'

Motion to Exclude Evidence and Argument Concerning Third Party Proceedings [44].

SO ORDERED.

Dated: New York, New York
    October  , 2009

 

Richard J. Holwell
United States District Judge

**1/4/2010  Trial Day 046**

```
1      UNITED STATES DISTRICT COURT
1      SOUTHERN DISTRICT OF NEW YORK
2      -------------------------------x
   2
3      IN RE:
4           VIVENDI UNIVERSAL, S.A.
   4        SECURITIES LITIGATION           02 Civ. 05571 (RJH)
5
   5   -------------------------------x
6
   6                                        January 4, 2010
7                                           9:45 a.m.
   7
8      Before:
   8
9                       HON. RICHARD J. HOLWELL,
   9
10                                          District Judge
   10                                          and a Jury
11
   11                   APPEARANCES
12
   12  ABBEY SPANIER RODD & ABRAMS, LLP
13         Attorneys for Class Plaintiffs
   13  BY:  ARTHUR N. ABBEY
14          STEPHEN T. RODD
   14         RICHARD B. MARGOLIES
15          STEPHANIE AMIN-GIWNER
16
17     MILBERG LLP
   17       Attorneys for Class Plaintiffs
18     BY:  MATTHEW GLUCK
   18         MICHAEL SPENCER
19
   19  BROWNE WOODS GEORGE LLP
20         Attorneys for Class Plaintiffs
   20  BY:  BRIAN C. KERR
21          OLIVIA VASILESCU PALMER
   21
22     CRAVATH, SWAINE & MOORE LLP
   22       Attorneys for Defendant Vivendi
23     BY:  PAUL C. SAUNDERS
   23         DANIEL SLIFKIN
24          TIMOTHY G. CAMERON
25
```

**SA236**

6639

1    court's jury instructions, is satisfactory and will be the

2    easiest heading for the table for the jury to understand.

3              MR. CAMERON:  Your Honor, again, for the record, we

4    stand on our objection.

5              THE COURT:  Yes.  I am really now just ruling on

6    issues that came up today.  So I think all parties' objections

7    noted today are in the record.

8              MR. CAMERON:  Thank you, your Honor.

9              THE COURT:  There is a small change in the verdict

10   form, additional change in the verdict form that was suggested

11   today in changing the word prevail to proven, which we will do.

12             I then have reviewed the defendants' motion to

13   preclude submitting to the jury four allegedly new

14   misstatements.  Mr. Cameron, you identified it as 17-1, but I

15   believe you were referring to 17-2.

16             MR. CAMERON:  I'm sorry, your Honor.  I think that's

17   right.

18             THE COURT:  And then 29-1, 29-2 and 35-3, again using

19   our convention for identifying the misstatements.

20             With respect to 17-2, I believe that that statement

21   has been fairly in the trial of this case and that defendants

22   were fully informed that this was a claim.  It is specifically

23   referred to in Mr. Mintzer's report at paragraph 351, that

24   claim that Vivendi did not record or disclose its 1.1 billion

25   dollar alleged obligation to Maroc Telecom in the 10K dated

1    October 17, 2001.

2              With respect to the statement entered in 29-1, that

3    wasn't specifically addressed by Mr. Cameron today at the

4    hearing, but I understand the basis of the objection to that

5    being that it was not identified in the 2007 interrogatory

6    answers.  I believe, again, that this issue has been fully and

7    fairly in the trial of this case.  I note that it is

8    substantively identical to the contested statement contained in

9    entry 35-1, which is the 20-F filed on May 28, 2002, which was

10   identified in the interrogatories, and certainly this statement

11   was the subject of a lot of testimony at trial as to whether

12   EBITDA was or was not indicative of operating performance of

13   Vivendi.  So I think that that issue is fairly posed to the

14   jury.

15             With respect to the statement contained in entry 29-2,

16   I understand defendants' argument to be that not only was this

17   not identified in the interrogatories but it was an issue that

18   they raised through Mr. Hannezo and would not have done so if

19   it was thereby to become an issue in the case.  However, I note

20   that Mr. Oustalniol's report specifically quotes the very

21   statement contained in entry 29-2 and opines that the DDR is

22   misleading in this respect.  I'm referring to PX75 at page 224.

23             So again, I believe this is an issue that has been in

24   the case well before the trial began and is fairly put to the

25   jury.

**SA238**

**1/4/2010  Trial Day 046**

1          Turning to the last entry, 35-3, which contains

2    Vivendi's definition of cash in PX856, I understand defendants'

3    objection being that not only was it not identified in the

4    interrogatories but it was not a statement that was raised at

5    all during the trial.  I note in that regard that Mintzer's

6    report, at paragraph 377, explicitly quotes this passage.  In

7    the context, it can only be interpreted as an opinion that the

8    passage was misleading and that Mintzer directly testified at

9    trial, at pages 2297 to 2298, that Vivendi's statements failed

10   to disclose the existence of restrictions on the Cegetel

11   current account.

12          So with respect to this statement, I believe this

13   statement is fairly within the trial.

14          Turning to defendants' claim that a majority of the

15   statements should not be presented to the jury because they are

16   mere puffery, I have reviewed each of the statements claimed to

17   be puffery and I believe that a few of them as a matter of law

18   would constitute puffery.

19          As a general matter, I think that context is

20   everything in determining whether a statement is puffery or

21   not, and a strong argument could be made that all of these

22   statements should be placed before the jury, but I have

23   concluded that the following statements fall on the other side

24   of that line, and they are found in entry 6-2, 8-2, 9-1 and 2,

25   97 and 99, and Mr. Fourtou's statements in 39.

**SA239**                                              6739

**1/4/2010  Trial Day 046**

1           The other statements I believe the jury may consider

2      in the context of other statements being made and draw their

3      own conclusion as to whether or not they constitute mere

4      puffery.

5           MR. SPENCER:  Your Honor, request for a clarification

6      on the last one, 39.  Both of the statements in that last entry

7      are from Mr. Fourtou.  So are you excluding both of them?

8           THE COURT:  Yes.  These are his statements that he has

9      every confidence, etc.  Yes, I conclude that both of those fall

10     as a matter of law into the category of mere puffery.

11          MR. SPENCER:  Understood.  Thank you.

12          MR. ABBEY:  Your Honor, then the Table A, in addition

13     to the reorganizations we talked about before, these would be

14     omitted from it.

15          THE COURT:  That's correct.

16          With respect to defendants' objections to the

17     supplemental explanations proffered by plaintiffs on the

18     grounds that they are untimely, I deny that.

19          With respect to the dispute over the business records,

20     I conclude that plaintiffs' letter of January 3, 2009 is simply

21     too late in the day.  The court is not in a position to rule at

22     this juncture on 200 separate exhibits.  The parties are simply

23     going to have to live with the current state of the record.

24          With respect to PX334, the press release that

25     defendants allege is a draft, in light of the fact that PX407

**SA240**                                                6740

**1/4/2010 Trial Day 046**

1            THE COURT:  Yes.  I am going to deny the request to

2     make any further changes on that ground.

3            MR. CAMERON:  The second category, I believe, your

4     Honor, was the statements for which there is no inflation in

5     the stock price and therefore no loss causation.

6            THE COURT:  Yes.  That is an issue that we addressed

7     in the past and I deny that request.

8            Are there other issues that we should address this

9     evening?

10           MR. SPENCER:  Your Honor, the parties will be

11    exchanging any demonstratives pretty late this evening.  I

12    assume if there are any issues we will address them in the

13    morning.

14           THE COURT:  Yes.  I think we probably should be in

15    tomorrow morning at, say, 8:45 in case we have cleanup.

16           MR. ABBEY:  I think that is it for us, your Honor, on

17    the plaintiffs' side.

18           THE COURT:  All right.  If I have any great

19    thoughts -- I shouldn't say it that way, but any changes in my

20    rulings as I work through other issues tonight, I will e-mail

21    everyone.  That is where we are right now.

22           MR. ABBEY:  Thank you very much, your Honor.

23           THE COURT:  Thank you, counsel.

24           MR. CAMERON:  Thank you, your Honor.

25           (Trial adjourned to January 5, 2010 at 9:30 a.m.)

**SA241**                                                  6743