# 15-180(L)

## 15-208 (XAP)

## United States Court of Appeals
## for the Second Circuit

---

MIAMI GROUP, CONSISTING OF THE RETIREMENT SYSTEM FOR GENERAL EMPLOYEES OF THE CITY OF MIAMI BEACH, FRANCOIS R. GERARD, PRIGEST S.A. AND TOCQUEVILLE FINANCE S.A., PEARSON-DONIGER FAMILY, CONSISTING OF TWO SISTERS AND THEIR RESPECTIVE FAMILY MEMBERS BEATRICE DONIGER, GRANDCHILDREN'S TRUST BY BRUCE DONIGER TRUSTEE, ALISON DONIGER, MICHAEL DONIGER, EDWARD B. BRUNSWICK AND RUTH PEARSON TRUST PEARSON TRUSTEE, GAMCO INVESTORS, INCORPORATED, OPPENHEIM KAPITALANLAGEGESELLSCHAFT MBH, PLAINTIFF KBC ASSET MANAGEMENT N.V., CAPITALIA ASSET MANAGEMENT SGR, S.P.A., CAPITALIA INVESTMENT MANAGEMENT S.A., EURIZON CAPITAL SGR S.P.A., BADEN-WURTTEMBERGISCHE INVESTMENTGESELLSCHAFT MBH, BARCLAYS GLOBAL INVESTORS (DEUTSCHLAND),

*[caption continued on next page]*

---

On Appeal From The United States District Court
For The Southern District Of New York, No. 02-cv-05571-SAS

---

**JOINT APPENDIX, VOLUME II OF XIX, PAGES JA284-JA561**

---

Jeffrey A. Lamken
MOLO LAMKEN LLP
The Watergate, Suite 660
600 New Hampshire Ave., N.W.
Washington, D.C.  20037
(202) 556-2000

*Counsel of Record for
Class Plaintiffs*

Miguel A. Estrada
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
(202) 955-8500

*Counsel of Record for
Vivendi S.A.*

*[caption continued]*

COMINVEST ASSET MANAGEMENT GMBH, DEUTSCHE ASSET MANAGEMENT INVESTMENTGESELLSCHAFT MBH, DWS (AUSTRIA) INVESTMENTGESELLSCHAFT MBH, DWS INVESTMENT GMBH, ERSTE-SPARINVEST KAPITALANLAGEGESELLSCHAFT M.B.H., FORSTA AP-FONDEN, FORTIS INVESTMENT MANAGEMENT SA, KBC ASSET MANAGEMENT S.A., LANDESBANK BERLIN INVESTMENT GMBH, LBBW LUXEMBURG S.A., OPPENHEIM ASSET MANAGEMENT SERVICES S.A.R.L., PIONEER INVESTMENT MANAGEMENT LIMITED, PIONEER INVESTMENT MANAGEMENT SGRPA, PIONEER INVESTMENTS AUSTRIA GMBH, PIONEER INVESTMENTS KAPITALANLAGEGESELLSCHAFT MBH, RAIFFEISEN KAPITALANLAGE-GESELLSCHAFT M.B.H., SEB INVESTMENT MANAGEMENT AB, SKANDIA INSURANCE COMPANY LTD., UNION ASSET MANAGEMENT HOLDING AG, UNIVERSAL-INVESTMENT-GESELLSCHAFT MBH, SEB INVESTMENT GMBH, ANDRA AP-FONDEN, BAYERN-INVEST KAPITALANLAGEGESELLSCHAFT MBH, DEKA INVESTMENT GMBH, PRIGEST, S.A., TOCQUEVILLE FINANCE, S.A., ROSENBAUM PARTNERS, L.P., ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, RUTH PEARSON TRUST, DEKA INTERNATIONAL (IRELAND) LIMITED, DEKA INTERNATIONAL S.A. LUXEMBURG, DEKA FUNDMASTER INVESTMENTGESELLSCHAFT MBH, FIDEURAM INVESTIMENTI S.G.R., FIDEURAM GESTIONS S.A., INTERFUND SICA V, FRANKFURT-TRUST INVESTMENT-GESELLSCHAFT MBH, FRANKFURT-TRUST INVEST LUXEMBURG AG, HELABA INVEST KAPITALANLAGEGESELLSCHAFT MBH, HSBC TRINKAUS & BURKHARDT AG, INTERNATIONALE KAPITALANLAGEGESELLSCHAFT MBH, MEAG MUNICH ERGO KAPITALANLAGEGESELLSCHAFT MBH, MEAG MUNICH ERGO ASSET MANAGEMENT GMBH, METZLER INVESTMENT GMBH, METZLER IRELAND LTD, NORDCON INVESTMENT MANAGEMENT AG, NORGES BANK, SWISS LIFE HOLDING AG, SWISS LIFE INVESTMENT MANAGEMENT HOLDING AG, SWISS LIFE ASSET MANAGEMENT AG, SWISS LIFE FUNDS AG, SWISS LIFE (BELGIUM) S.A., SWISS LIFE ASSET MANAGEMENT GMBH, SWISS LIFE ASSET MANAGEMENT (NEDERLAND) B.V., TREDJE AP-FONDEN, WESTLB MELLON ASSET MANAGEMENT KAPITALANLAGEGESELLSCHAFT MBH, ALECTA PENSIONSFORSAKRING, OMSESIDIGT, SJUNDE AP-FONDEN, VARMA MUTUAL PENSION INSURANCE COMPANY, DANSKE INVEST ADMINISTRATION A/S, AFA LIVFORSAKRINGSAKTIEBOLAG, AFA TRYGGHETSFORSAKRINGSAKTIEBOLAG, AFA SJUKFORSAKRINGSAKTIEBOLAG, AMF PENSION FONDFORVALTNING AB, ARBETSMARKNADSFORSAKRINGAR, PENSIONSFORSAKRINGSAKTIEBOLAG, PENSIONSKASSERNES ADMINSTRATION A/S, ARBEJDSMARKEDETS TILLAEGSPENSION, INDUSTRIENS PENSIONSFORIKRING A/S, ARCA SGR S.P.A.,

*[caption continued]*

ILMARINEN MUTUAL PENSION INSURANCE COMPANY, PRIMA SOCIETA' DI GESTIONE DEL RISPARMIO S.P.A., NORDEA INVEST FUND MANAGEMENT A/S, NORDEA FONDER AB, NORDEA INVESTMENT FUNDS COMPANY I.S.A., NORDEA FONDENE NORGE AS, NORDEA FONDBOLAG FINLAND AB, SWEDBANK ROBUR FONDER AB, FJARDE AP-FONDEN, OLIVIER CHASTAN, REED S. CLARK, DAHA DAVIS, COLLEN DODI, RUTH PEARSON TRUST PEARSON TRUSTEE, EDWARD B. BRUNSWICK, MICHAEL DONIGER, ALISON DONIGER, GRANDCHILDREN'S TRUST BY BRUCE DONIGER TRUSTEE, BRUCE DONIGER, BEATRICE DONIGER, JEFFREY KURTZ, PRICE HAL, W. SCOTT POLLAND, JR., NICHOLAS A. RADOSEVICH, CAISSE DE DEPOT ET PLACEMENT DU QUEBEC, AGF ASSET MANAGEMENT, S.A., IRISH LIFE INVESTMENT MANAGERS LIMITED,

*Plaintiffs-Appellees*,

BRUCE DONIGER, GERARD MOREL, OLIVER M. GERARD, THE RETIREMENT SYSTEM FOR GENERAL EMPLOYEES OF THE CITY OF MIAMI BEACH,

*Plaintiffs-Appellees/Cross-Appellants*,

WILLIAM CAVANAGH,

*Cross-Appellant*,

v.

VIVENDI, S.A.,

*Defendant-Appellant - Cross-Appellee*,

JEAN-MARIE MESSIER, GUILLAUME HANNEZO, VIVENDI UNIVERSAL,

*Defendants*.

# TABLE OF CONTENTS

Page

## DOCKET ENTRIES, PLEADINGS, ORDERS, AND EXPERT REPORTS

Docket Sheet (No. 1:02-cv-05571-SAS-HBP), Feb. 19, 2015 ............................ JA1

Consolidation Order (Dkt. 7) (Oct. 1, 2002)..................................................... JA292

Consolidated Class Action Complaint (Dkt. 18) (Jan. 7, 2003) ...................... JA294

Hannezo's Notice of Motion to Dismiss (Dkt. 20) (Feb. 24, 2003) ................ JA410

Vivendi's Notice of Motion to Dismiss (Dkt. 23) (Feb. 24, 2003) ................. JA412

Vivendi's Memorandum in Support of Motion to Dismiss (Dkt. 26)
      (Feb. 24, 2003).......................................................................................... JA415

Messier's Notice of Motion to Dismiss (Dkt. 28) (Feb. 24, 2003).................. JA432

Vivendi's Reply Memorandum in Further Support of Motion to Dismiss
      (Dkt. 35) (Apr. 10, 2003).......................................................................... JA435

Consolidation Order, *Liberty Media Corp. v. Vivendi Universal S.A.*
      (S.D.N.Y. 03-cv-2175) (Dkt. 14) (May 13, 2003) ................................. JA443

First Amended Consolidated Class Action Complaint (Dkt. 93)
      (Nov. 24, 2003).......................................................................................... JA445

Notice of Plaintiffs' Substituted Motion for Class Certification (Dkt. 234)
      (July 15, 2005) ........................................................................................... JA560

Plaintiffs' Memorandum of Law in Support of Substituted Motion for Class
      Certification (Dkt. 235) (July 15, 2005)................................................. JA562

Bisiaux Declaration in Opposition to Plaintiffs' Motion for Class
      Certification and Exhibit 5 (Sept. 30, 2005) (Sealed) ........................... JA581

Vivendi's Memorandum in Opposition to Plaintiffs' Substituted Motion for
      Class Certification (Oct. 5, 2005) (Sealed) ........................................... JA594

Plaintiffs' Reply in Support of Their Substituted Motion for Class
      Certification (Dec. 21, 2005) (Sealed) ................................................... JA606

i

Consolidation Order (Dkt. 395) (Dec. 14, 2007).............................................JA642

Report of Andrew M. Mintzer, CPA and Exhibit C
(Dec. 21, 2007) (Sealed).........................................................................JA648

Expert Report of Blaine F. Nye, Ph.D. and Exhibits 1-9 and 13-15
(Dec. 21, 2007) (Sealed).........................................................................JA664

Expert Report of William L. Silber and Exhibits
(Mar. 7, 2008) (Sealed)..........................................................................JA1025

Memorandum in Opposition to Vivendi's Motion for Partial
Reconsideration, (Dkt. 506) (May 2, 2008) (Redacted)......................JA1177

Rebuttal Expert Report of Blaine F. Nye, Ph.D.
(May 15, 2008 ) (Sealed).......................................................................JA1180

Memorandum in Support of Defendants' Motion for Summary Judgment
Against Class Plaintiffs for Failure to Establish Loss Causation
(Aug. 15, 2008) (Sealed) ......................................................................JA1439

Statement of Undisputed and Material Facts in Support of Defendants'
Motion for Summary Judgment Against Class Plaintiffs for Failure to
Establish Loss Causation (Aug. 15, 2008) (Sealed)............................JA1473

Memorandum in Support of Defendants' Motion for Summary Judgment
Against Individual Plaintiffs for Failure to Establish Loss Causation
(Aug. 15, 2008) (Sealed) ......................................................................JA1478

Revised Memorandum Opinion and Order on Motion for Summary
Judgment for Loss Causation (Dkt. 767) (Apr. 6, 2009)......................JA1512

Notice of Defendants' Motion to Exclude the Expert Testimony of
Dr. Blaine Nye (Dkt. 828) (June 2, 2009) ...........................................JA1548

Memorandum of Law in Support of Defendants' Motion to Exclude the
Expert Testimony of Dr. Blaine Nye (June 2, 2009) (Sealed) .............JA1552

Plaintiffs' Opposition to Defendants' Motion to Exclude the Testimony of
Dr. Blaine Nye (June 30, 2009) (Sealed) .............................................JA1598

Memorandum in Support of Defendants' Motion for Judgment as a Matter of Law Against Class Plaintiffs for Failure to Establish Securities Fraud (Dkt. 971) (Nov. 23, 2009) ................................................................JA1602

Plaintiffs' Objections and Responses to the Court's Proposed Jury Instructions and Verdict Form (Dkt. 993) (Jan. 5, 2010) .....................JA1683

Exhibit C to Plaintiffs' Objections and Responses to the Court's Proposed Jury Instructions and Verdict Form (Dkt. 993-4) (Jan. 5, 2010): Plaintiffs' Requested Amendment to the Court's Proposed Verdict Form ..............................................................................................JA1688

Defendants' Revised Objections to the Court's Proposed Charge to the Jury (Dkt. 994) (Jan. 6, 2010)......................................................................JA1692

Memorandum in Support of Vivendi's Renewed Motion for Judgment as a Matter of Law (Dkt. 1022) (Mar. 26, 2010) ..........................................JA1708

Exhibit 10 to Dixon Declaration (Dkt. 1023-11) (Mar. 26, 2010): Plaintiffs' Supplemental Explanations Regarding Misstatements/Omissions Listed in Table A ...................................................................................JA1778

Exhibit 26 to Dixon Declaration (Dkt. 1023-26) (Mar. 26, 2010): Defendants' Objections to Judge Holwell's Proposed Jury Charge (Jan. 4, 2010) ........................................................................................JA1797

Exhibit 40 to Dixon Declaration (Dkt. 1023-40) (Mar. 26, 2010): Plaintiffs' Table of Misstatements and Omissions (Dec. 24, 2009)......................JA1914

Exhibit 41 to Dixon Declaration (Dkt. 1023-41) (Mar. 26, 2010): Defendants' Response to Plaintiffs' Proposed Table of Misstatements and Omissions (Dec. 28, 2009) .............................................................JA1933

Exhibit 61 to Margolies Declaration (Dkt. 1052-72–1052-76) (May 13, 2010): Plaintiffs' Responses and Objections to Defendants' Amended Second Set of Interrogatories, and Exhibit A thereto (July 27, 2007) .......................................................................................JA1941

Exhibit 62 to Margolies Declaration (Dkt. 1052-77–1052-80) (May 13, 2010): Plaintiffs' Amended Responses and Objections to Defendants' Amended Second Set of Interrogatories, and Exhibit A thereto (Oct. 29, 2007)..........................................................................JA2052

iii

Dixon Supplemental Declaration in Support of Renewed Motion for
Judgment as a Matter of Law (Dkt. 1059) (June 9, 2010)....................JA2171

Exhibit 58 to Dixon Declaration (Dkt. 1059-9) (June 9, 2010):
Court Exhibit 4, Exhibits Admitted into Evidence (Jan. 11, 2010) ..... JA2173

Exhibit 59 to Dixon Declaration (Dkt. 1059-10) (June 9, 2010): Plaintiffs'
Exhibit 310, Gibert Letter (July 18, 2000) ..........................................JA2249

Margolies Declaration in Support of Plaintiffs' Supplemental Memorandum
Concerning the Impact of *Morrison* (Dkt. 1075) (July 16, 2010)........JA2254

Exhibit 3 to Margolies Declaration (Dkt. 1075-4) (July 16, 2010): Brief for
European Aeronautic Defence & Space Co. N.V. et al. as *Amicus
Curiae* in *Morrison v. National Australia Bank Ltd.* (U.S. 08-1191)
(Feb. 26, 2010)......................................................................................JA2256

Exhibit 7 to Margolies Declaration (Dkt. 1075-8) (July 16, 2010):
Vivendi Universal, SEC Form F-6 (Nov. 3, 2000) ..............................JA2305

Exhibit 8 to Margolies Declaration (Dkt. 1075-9) (July 16, 2010):
Vivendi Universal, SEC Form 8-A (Dec. 29, 2000) ............................JA2307

Exhibit 9 to Margolies Declaration (Dkt. 1075-10) (July 16, 2010):
Vivendi Universal, Cover Pages of Annual Reports filed on Form 20-
F for 2000 (PX-701), 2001 (PX-856), and 2002 (PX-604).................JA2310

Exhibit 10 to Margolies Declaration (Dkt. 1075-11) (July 16, 2010):
Edgar M. Bronfman SEC Form SC-13D (Dec. 18, 2000) ...................JA2315

Vivendi's Supplemental Memorandum of Law Regarding *Morrison*
(Dkt. 1077) (July 16, 2010) .................................................................JA2344

Plaintiffs' Memorandum of Law in Support of Renewed Motion for
Approval of Post-Verdict Class Notice and Claims Administration
(Dkt. 1101) (Sept. 21, 2011)................................................................JA2350

Vivendi's Memorandum of Law in Opposition to Plaintiffs' Renewed
Motion for Approval of Post-Verdict Class Notice and Claims
Administration (Dkt. 1109) (Nov. 7, 2011)..........................................JA2362

Plaintiffs' Reply in Support of Their Renewed Motion for Approval of Post-
Verdict Class Notice and Claims Administration (Dkt. 1113)
(Dec. 19, 2011) ................................................................................JA2366

Notice of Case Reassignment (Dkt. 1116) (Feb. 8, 2012)............................JA2384

Exhibit 1 to Slifkin Declaration (Dkt. 1135-1) (May 9, 2012):
Vivendi Universal, SEC Form F-4 (Oct. 30, 2000).............................JA2386

Order for Administering Claims Process (Dkt. 1197) (Nov. 13, 2012) .........JA2391

Letter to Judge Scheindlin from James W. Quinn
(Dkt. 1204) (July 21, 2014) ................................................................JA2412

Proposed Order for 54(b) Judgment (Dkt. 1228) (Nov. 10, 2014)................JA2415

Notice of Appeal (Dkt. 1234) (Jan. 21, 2015) ................................................JA2465

Notice of Cross-Appeal (Dkt. 1235) (Jan. 22, 2015)......................................JA2466

## TRANSCRIPTS

Hearing Transcript (Dkt. 752) (Mar. 2, 2009) ...............................................JA2467

Trial Transcript (Dkt. 1006) (Oct. 5, 2009) ..................................................JA2470

Trial Transcript (Dkt. 1006) (Oct. 6, 2009) ..................................................JA2471

Trial Transcript (Dkt. 1006) (Oct. 8, 2009) ..................................................JA2480

Trial Transcript (Dkt. 1006) (Oct. 14, 2009) ................................................JA2496

Trial Transcript (Dkt. 1006) (Oct. 15, 2009) ................................................JA2504

Clip Report (Oct. 25, 2009) ...........................................................................JA2508

Trial Transcript (Dkt. 1008) (Oct. 26, 2009) ................................................JA2517

Trial Transcript (Dkt. 1008) (Oct. 27, 2009) ................................................JA2530

Trial Transcript (Dkt. 1008) (Oct. 28, 2009) ................................................JA2550

Trial Transcript (Dkt. 1005) (Oct. 29, 2009) ................................................JA2554

Trial Transcript (Dkt. 1005) (Oct. 30, 2009) ................................................JA2556

Trial Transcript (Dkt. 1005) (Nov. 2, 2009) ....................................................JA2576

Trial Transcript (Dkt. 1009) (Nov. 5, 2009) ....................................................JA2608

Trial Transcript (Dkt. 1009) (Nov. 6, 2009) ....................................................JA2616

Trial Transcript (Dkt. 1009) (Nov. 9, 2009) ....................................................JA2666

Trial Transcript (Dkt. 1009) (Nov. 10, 2009) ..................................................JA2686

Trial Transcript (Dkt. 1002) (Nov. 12, 2009) ..................................................JA2698

Trial Transcript (Dkt. 1002) (Nov. 13, 2009) ..................................................JA2707

Trial Transcript (Dkt. 1002) (Nov. 16, 2009) ..................................................JA2711

Trial Transcript (Dkt. 1002) (Nov. 17, 2009) ..................................................JA2715

Trial Transcript (Dkt. 1010) (Nov. 18, 2009) ..................................................JA2863

Trial Transcript (Dkt. 1010) (Nov. 19, 2009) ..................................................JA3055

Trial Transcript (Dkt. 1010) (Nov. 20, 2009) ..................................................JA3179

Trial Transcript (Dkt. 1010) (Nov. 23, 2009) ..................................................JA3184

Trial Transcript (Dkt. 1010) (Nov. 24, 2009) ..................................................JA3187

Trial Transcript (Dkt. 1003) (Nov. 30, 2009) ..................................................JA3192

Trial Transcript (Dkt. 1003) (Dec. 2, 2009) ....................................................JA3197

Trial Transcript (Dkt. 1003) (Dec. 3, 2009) ....................................................JA3296

Trial Transcript (Dkt. 1000) (Dec. 8, 2009) ....................................................JA3321

Trial Transcript (Dkt. 1000) (Dec. 9, 2009) ....................................................JA3349

Trial Transcript (Dkt. 1000) (Dec. 11, 2009) ..................................................JA3516

Trial Transcript (Dkt. 1004) (Dec. 14, 2009) ..................................................JA3522

Trial Transcript (Dkt. 1004) (Dec. 16, 2009) ..................................................JA3536

Trial Transcript (Dkt. 1004) (Dec. 17, 2009) ..................................................JA3592

Trial Transcript (Dkt. 1001) (Jan. 4, 2010)....................................................JA3601

Trial Transcript (Dkt. 1001) (Jan. 5, 2010)....................................................JA3605

Trial Transcript (Dkt. 1001) (Jan. 7, 2010)....................................................JA3614

Trial Transcript (Dkt. 1001) (Jan. 8, 2010)....................................................JA3618

Trial Transcript (Dkt. 1007) (Jan. 11, 2010)..................................................JA3625

Trial Transcript (Dkt. 1007) (Jan. 29, 2010)..................................................JA3673

Hearing Transcript (Dkt. 1080) (July 26, 2010) ............................................JA3677

Trial Transcript, *Liberty Media Corp. v. Vivendi Universal S.A.*
    (S.D.N.Y. 03-cv-2175) (Dkt. 295) (June 14, 2012) ............................JA3695

Oral Argument Transcript (Dkt. 1192) (Sept. 11, 2012) ................................JA3698

## EXHIBITS

PX 1: Book of Warnings from Guillaume Hannezo to Jean-Rene Fourtou,
    Volume I (July 30, 2002).......................................................................JA3725

PX 2: Book of Warnings from Guillaume Hannezo to Jean-Rene Fourtou,
    Volume II (July 30, 2002) (Translation) ..............................................JA3978

PX 25: E-mail from Michelle Buchalski to Victor Aviles, et al.
    (Oct. 30, 2001) ......................................................................................JA3981

PX 53: Press Release, Vivendi Universal, Vivendi Universal Media &
    Communications Reports Strong First Quarter Operational Results
    (Apr. 24, 2002) .....................................................................................JA3993

PX 102: E-mail from Karen Trickett to Laurence Daniel and Eileen
    McLauglin (Oct. 17, 2001) ...................................................................JA4000

PX 107: E-mail from Catherine Gros to Jean-Marie Messier and Guillaume
    Hannezo (Apr. 23, 2002) ......................................................................JA4032

PX 110: E-mail from Nick Henny to Karen Trickett (Jan. 31, 2001) ............JA4045

PX 112: Draft Press Release, Vivendi Universal, Vivendi Universal Announces Very Strong First Quarter 2001 Results – Ahead of Targets – With Strong Revenue and EBITDA Growth for its Media and Communications Businesses (Apr. 23, 2001) ...............................JA4047

PX 136T: Translated memorandum from Guillaume Hannezo to Jean-Marie Messier ...................................................................................JA4054

PX 148: Memorandum from Guillaume Hannezo to Jean-Marie Messier (July 17, 2001) ...................................................................JA4057

PX 168T: Translated Memorandum from Guillaume Hannezo .....................JA4059

PX 193: E-mail from Vivendi Universal (July 23, 2001, 01:44 AM)............JA4061

PX 252T: Translated Memorandum from Guillaume Hannezo to Dominique Gibert (Dec. 14, 2001) .........................................................JA4067

PX 261: E-mail from Eileen McLaughlin to Guillaume Hannezo (May 2, 2002) .......................................................................JA4069

PX 262: E-mail from Laurence Daniel to Guillaume Hannezo (May 2, 2002, 1:00 PM) .......................................................JA4070

PX 262T: Translated E-mail from Laurence Daniel to Guillaume Hannezo (May 2, 2002, 1:00 PM) .......................................................JA4071

PX 273T : Translated E-mail from Guillaume Hannezo to Jean-Marie Messier (Dec. 13, 2001) .....................................................JA4072

PX 280: Transcript of Vivendi Universal Conference Call on First Half 2001 Results: Overview (Sept. 25, 2001).....................................JA4073

PX 284T: Translated Memorandum from Guillaume Hannezo (Jan. 15, 2002) ...................................................................JA4097

PX 295: Press Release, Vivendi Universal, Vivendi Universal Reports 2001 Results (Mar. 5, 2002) .......................................................JA4101

PX 342: Press Release, Vivendi Universal, Vivendi Universal 2000 Results (Mar. 9, 2001) .......................................................JA4103

PX 376: Press Release, Vivendi Universal, Vivendi Universal
Sold 55 Million Treasury Shares for at Least 3.3 Billion Euros
(Jan. 7, 2002) ...................................................................JA4117

PX 415: Memorandum from Guillaume Hannezo to Jean-Marie Messier,
Edgar Bronfman, Jr. and Eric Licoys ...................................JA4119

PX 451: E-mail from Michelle Buchalski to Amy Barrett, et al.
(Sept. 25, 2001)...............................................................JA4122

PX 474: Vivendi Universal, Report of Foreign Private Issuer (Form 6-K)
(June 26, 2001) ...............................................................JA4132

PX 499: Transcript of Vivendi Universal Press Conference
(Dec. 17, 2001) ...............................................................JA4152

PX 506: *Moody's Affirms Ratings of Vivendi Universal SA, Outlook Is
Negative*, Moody's Investors Service (Dec. 17, 2001).........JA4164

PX 539: E-mail from Guillaume Hannezo to John Luczycki and Dominique
Gibert (Jan. 30, 2002) .....................................................JA4166

PX 618: Press Release, Vivendi Universal, Seagram's Spirits and Wines
Business Sold to Diageo and Pernod Ricard (Dec. 19, 2000)..............JA4167

PX 626: E-mail from Nick Henny to Edgar Bronfman Jr. and Zach Horowitz
(Oct. 10, 2001, 5:40 PM)...................................................JA4168

PX 654: E-mail from Edgar Bronfman Jr. to Brian Mulligan
(Sept. 17, 2000)...............................................................JA4169

PX 680: Press Release, Vivendi Universal, Vivendi Universal Preliminary
Revenues for 2000 (Feb. 14, 2001) .....................................JA4170

PX 701: Vivendi Universal, Annual Report Pursuant to Section 13
or 15(d) of the Securities Exchange Act of 1934 (Form 20-F)
(July 2, 2001) .................................................................JA4174

PX 709: E-mail from Edgar Bronfman Jr. to Nick Henny et al.
(Jan. 11, 2002) ...............................................................JA4578

PX 720: Vivendi Universal, Report of Foreign Private Issuer (Form 6-K)
(Jan. 12, 2001) ...............................................................JA4579

PX 761: Transcript of Vivendi Universal Conference Call
(June 26, 2002) ................................................................... JA4592

PX 762: Transcript of Vivendi Universal Accounting Workshop
Conference Call on US GAAP & French GAAP: A Comparison
(Mar. 6, 2002) ................................................................... JA4607

PX 769: Transcript of Vivendi Universal Conference Call on 2001
Annual Results (Mar. 5, 2002) ........................................... JA4619

PX 807T: Translated E-mail from Guillaume Hannezo to
Ariane De-Lamaze and Jean-Laurent Nabet (Sept. 21, 2001) ............. JA4622

PX 854: Press Release, Vivendi Universal, Update on Vivendi Universal's
Cash Position (May 30, 2002) ............................................. JA4623

PX 856: Vivendi Universal, Annual Report Pursuant to Section 13
or 15(d) of the Securities Exchange Act of 1934 (Form 20-F)
(May 28, 2002) ................................................................... JA4624

PX 859: Transcript of Vivendi Universal Conference Call
(Mar. 5, 2002) ................................................................... JA4638

PX 859T: Translated transcript of Vivendi Universal Conference Call
(Mar. 5, 2002) ................................................................... JA4652

PX 865: Press Release, Vivendi Universal, Elektrim (Dec. 12, 2001) ........... JA4666

PX 899: Press Release, Vivendi Universal, Vivendi Universal's Comments
on the New Moody's Rating (May 3, 2002) ......................... JA4667

PX 929: E-mail from Andrew Stokoe to John Luczycki (Sept. 12, 2001) ..... JA4668

PX 938: Press Release, Vivendi Universal, Vivendi Universal Announces
Very Strong First Quarter 2001 Results – Ahead of Targets – with
13% Revenue and 112% EBITDA Growth for its Media and
Communications Businesses (Apr. 23, 2001) ..................... JA4669

PX 1033: Vivendi Universal, Report of Foreign Private Issuer (Form 6-K)
(Apr. 15, 2002) ................................................................... JA4672

PX 1075: Vivendi Universal, Registration Statement (Form F-4)
(Oct. 30, 2000) ................................................................... JA4676

PX 1088: Merrill Lynch Analyst Report, Vivendi Universal: Limited Ad
Exposure, Performance Ahead of Targets (Mar. 27, 2001) ................. JA4699

PX 1111: Vivendi Universal, Report of Foreign Private Issuer (Form 6-K)
(Nov. 12, 2001) .................................................................................... JA4705

PX 1123: *Vivendi CEO Slams "Unfair" Share Price Fall*, Reuters
(Feb. 6, 2002) ...................................................................................... JA4717

PX 1127: Vivendi Universal, Report of Foreign Private Issuer (Form 6-K)
(Mar. 5, 2002) ...................................................................................... JA4725

PX 1131: Vivendi Universal, Report of Foreign Private Issuer (Form 6-K)
(Mar. 28, 2002) .................................................................................... JA4741

PX 1133: BusinessWeek Readers Report, Memo from Jean-Marie Messier
(Apr. 1, 2002) ...................................................................................... JA4746

PX 1154: *Vivendi Sold Shares in Water Unit to Deutsche Bank*,
Bloomberg (June 20, 2002) ................................................................. JA4749

PX 1288: Respondents Vivendi Universal, S.A., Vivendi Universal Canada
Inc., and Vivendi Universal Holding I Corp.'s Answer and Response
to Jean-Marie Messier's Statement of Claim and Counterclaims
(Dec. 16, 2002) .................................................................................... JA4751

PX 1289: Vivendi's Pre-Hearing Brief (May 9, 2003) .................................. JA4788

PX 1291: Vivendi's Memorandum of Law in Support of Motion to Dismiss
Petition to Confirm and to Vacate Arbitration Award, or Alternatively
to Stay this Proceeding (July 9, 2003) ................................................. JA4825

PX 1434: E-mail from Alexandra Fichelson to Ariane De-Lamaze and
Laurence Daniel (July 19, 2001, 12:02 PM) ....................................... JA4829

PX 1486: Plaintiffs' Daily Inflation for Vivendi Shares, Per Share;
10/30/2000 – 8/14/2002 ...................................................................... JA4838

DX 240: BNP Paribas Analyst Report, Vivendi Universal: The Losing
Streak Continues (May 3, 2002) .......................................................... JA4848

DX 253: JPMorgan Analyst Report, Vivendi Universal: 1H01 Revenue & EBITDA: Expect Mixed Results … What Would Curious George Say? (July 18, 2001) ................................................................... JA4849

DX 313: JPMorgan Analyst Report, Vivendi Universal: Preview of 2001 Results Following Meeting With Management (Feb. 5, 2002) ............ JA4851

DX 398: Merrill Lynch Analyst Report, Vivendi Universal: Accounting and Management Issues Outweigh by Growth Dynamic (Jan. 25, 2001) ................................................................... JA4855

DX 551: Deutsche Bank Analyst Report, Vivendi Universal: Will the Real Slim Vivendi Please Stand Up (Mar. 28, 2001) ................................... JA4859

DX 794: Press Release, Moody's Investors Service, Moody's Changes Direction of Review of Vivendi SA From Uncertain to Possible Downgrade (July 4, 2000) ................................................................... JA4863

DX 796: JPMorgan Analyst Report, Vivendi Universal: Are You Ready to Rock? (Apr. 18, 2001) ........................................................................ JA4865

DX 957: Morgan Stanley Dean Witter, Vivendi Universal: Initiation of Coverage (June 1, 2001) ...................................................................... JA4870

DX 1147: Standard & Poor's Analyst Report, Research: New Entry Vivendi Universal to Be Assigned 'BBB/A-2' Outlook Will Be Stable (Nov. 29, 2000) ...................................................................... JA4874

DX 1150: Standard & Poor's Analyst Report, Research: Vivendi Universal Still on Watch Neg After Company's Announcement of USA Networks Inc. Purchase (Dec. 17, 2001) .............................................. JA4876

DX 1183: Carol Matlack, *Welcome to the Real World*, Business Week (Dec. 4, 2000) ...................................................................... JA4878

DX 1191: Standard & Poor's Analyst Report, Research: Vivendi Universal S.A. (Jan. 8, 2001) ...................................................................... JA4881

DX 1193: Press Release, Moody's Investor Service, Moody's Confirms Vivendi Universal's Ratings (Jan. 18, 2001) ....................................... JA4884

DX 1249: Vivendi Universal, Report of Foreign Private Issuer (Form 6-K) (Oct. 17, 2001) ...................................................................... JA4887

DX 1277: Robert Elliott, *Vivendi, Techs Lead Paris Bourse Down*, Reuters (Jan. 7, 2002) .......................................................................JA4916

DX 1280T: Anne-Laure Julien, *Stock Market: Deutsche Bank and Goldman Sachs Required to Reclaim the Shares: No Takers for Vivendi Universal's Treasury Shares* (Jan. 9, 2002) (Translated) ...................JA4918

DX 1314: Vivendi Universal, Report of Foreign Private Issuer (Form 6-K) (Apr. 4, 2002) .......................................................................JA4919

DX 1323: Vivendi Universal, S.A., Rapport Annuel sur L'Exercice 2001 (Apr. 10, 2002) .......................................................................JA4924

DX 1328: Vivendi Universal, Report of Foreign Private Issuer (Form 6-K) (Apr. 15, 2002) .......................................................................JA4928

DX 1336T: Vivendi Universal, Excerpts of Presentation of the Company and of the Group (Translated) .............................................JA4933

DX 1411: Vivendi Universal, Report of Foreign Private Issuer (Form 6-K) (Sept. 25, 2002).......................................................................JA4937

DX 1828: Demonstrative: "Nye Price Inflation"...........................................JA4941

DX 1905: Press Release, Vivendi Universal, Deleveraging and Liquidity Details (June 26, 2002).......................................................JA4942

DX 1907: Demonstratives Used During Closing Statements on Behalf of Vivendi, S.A. .......................................................................JA4945

Case 15-208, Document 89, 08/12/2015, 1574521, Page17 of 294

| | | |
|---|---|---|
| | | ENDORSED LETTER addressed to Judge Shira A. Scheindlin from Daniel Slifkin dated 10/5/2012 re: I write on behalf of all remaining parties in the above-captioned case. After considerable discussion on how to resolve the dispute regarding how to implement the jury verdict for shares of class members who exchanged their Vivendi, S.A. and Canal + ADSs for Vivendi Universal, S.A. ADSs ("VU ADSs") as part of the three-way merger on December 8, 2000 ("Three-Way Merger Issue"), the parties have come to an agreement. ENDORSEMENT: The Clerk of the Court is directed to docket this letter. So ordered. (Signed by Judge Shira A. Scheindlin on 10/11/2012) (rjm) (Entered: 10/12/2012) |
| 10/23/2012 | 1195 | TRANSCRIPT of Proceedings re: CONFERENCE held on 8/28/2012 before Judge Shira A. Scheindlin. Court Reporter/Transcriber: Linda Fisher, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/16/2012. Redacted Transcript Deadline set for 11/29/2012. Release of Transcript Restriction set for 1/25/2013.Filed In Associated Cases: 1:02-cv-05571-SAS-HBP et al.(Moya, Goretti) (Entered: 10/23/2012) |
| 10/23/2012 | 1196 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 8/28/12 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...Filed In Associated Cases: 1:02-cv-05571-SAS-HBP et al.(Moya, Goretti) (Entered: 10/23/2012) |
| 10/25/2012 | 1198 | ENDORSED LETTER addressed to Judge Shira A. Scheindlin from Daniel Slifkin dated 10/19/12 re: Counsel writes on behalf of all remaining parties to present the Court the parties' plans for administering the class claims process. Counsel encloses the proposed notice and claim forms. ENDORSEMENT: The Notice to Class Members and the Claim form attached to this letter are hereby approved and shall be disseminated as set forth in this letter. The Clerk is directed to docket this letter and the attachments. So ordered. (Signed by Judge Shira A. Scheindlin on 10/24/2012) (mro) (Entered: 12/03/2012) |
| 11/13/2012 | 1197 | ORDER: The parties' plan for administering the class claims process, outlined in Exhibits One through Four attached hereto, is approved by this Court. The parties are directed to commence the claims administration process forthwith. (Signed by Judge Shira A. Scheindlin on 11/12/2012) (pl) (Entered: 11/13/2012) |
| 02/22/2013 | 1199 | NOTICE of Change of Firm Name. Document filed by Bruce Doniger. (Margolies, Richard) (Entered: 02/22/2013) |
| 03/28/2013 | 1200 | ORDER of USCA (Certified Copy) as to (1144 in 1:02-cv-05571-SAS-HBP, 113 in 1:07-cv-11305-SAS) Notice of Appeal, filed by AGF Asset Management, S.A., (108 in 1:07-cv-10995-SAS, 1145 in 1:02-cv-05571- |

Case 15-208, Document 89, 08/12/2015, 1574521, Page18 of 294

| | | |
|---|---|---|
| | | SAS-HBP) Notice of Appeal, filed by Irish Life Investment Managers Limited USCA Case Number 12-2231; 12-2248. IT IS HEREBY ORDERED that the unopposed motion by the appellants to hold the above-referenced appeals in abeyance pending forthcoming appeals in the consolidated class action, *In re Vivendi Universal, S.A. Securities Litigation* (District Court Docket no. 02-cv-5571), is GRANTED. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 03/28/2013. Filed In Associated Cases: 1:02-cv-05571-SAS-HBP, 1:07-cv-10995-SAS, 1:07-cv-11305-SAS (nd) (Entered: 03/28/2013) |
| 06/13/2013 | 1201 | MANDATE of USCA (Certified Copy) as to (113 in 1:07-cv-11305-SAS) Notice of Appeal, filed by AGF Asset Management, S.A., (1145 in 1:02-cv-05571-SAS-HBP) Notice of Appeal, filed by Irish Life Investment Managers Limited USCA Case Number 12-2231....that the appeal is hereby WITHDRAWN pursuant to Rule 42(b) of the Federal Rules of Appellate Procedure. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Issued As Mandate: 06/13/2013. Filed In Associated Cases: 1:02-cv-05571-SAS-HBP, 1:07-cv-11305-SAS(nd) (Entered: 06/13/2013) |
| 05/08/2014 | 1202 | LETTER addressed to Judge Shira A. Scheindlin from Richard B. Margolies dated 05/08/2014 re: Withdrawal of Counsel. Document filed by Bruce Doniger.(Margolies, Richard) (Entered: 05/08/2014) |
| 05/08/2014 | 1203 | MEMO ENDORSEMENT on re: 1202 Letter filed by Bruce Doniger. ENDORSEMENT: So ordered., Attorney Richard Barry Margolies terminated. (Signed by Judge Shira A. Scheindlin on 5/8/2014) (lmb) (Entered: 05/08/2014) |
| 07/21/2014 | 1204 | LETTER addressed to Judge Shira A. Scheindlin from James W. Quinn dated 07/21/2014 re: Request for leave to file a Rule 50(b) motion to address the impact of Halliburton II and, should the Court deem it necessary, schedule a pre-motion conference. Document filed by Vivendi Universal S.A..(Quinn, James) (Entered: 07/21/2014) |
| 07/24/2014 | 1205 | LETTER addressed to Judge Shira A. Scheindlin from Arthur N. Abbey dated 07/24/2014 re: in response to Defendant Vivendi's letter dated 7/21/2014, requesting a pre-motion conference and leave to file another Rule 50(b) motion. Document filed by Bruce Doniger.(Rodd, Stephen) (Entered: 07/24/2014) |
| 08/12/2014 | 1206 | LETTER addressed to Judge Shira A. Scheindlin from Arthur N. Abbey dated 8/12/2014 re: request for leave to file a Rule 50(b) motion for partial final judgment and to schedule a pre-motion conference. Document filed by Bruce Doniger.(Rodd, Stephen) (Entered: 08/12/2014) |
| 08/15/2014 | 1207 | LETTER addressed to Judge Shira A. Scheindlin from James W. Quinn dated 08/15/2014 re: in opposition to Class Plaintiffs' pre-motion conference letter at ECF No. 1206. Document filed by Vivendi, S.A..(Quinn, James) (Entered: 08/15/2014) |
| 08/18/2014 | 1208 | MEMORANDUM OPINION AND ORDER #104638. Halliburton II made no mention of how a plaintiff can prove price impact, and certainly did not |

**JA285**

Case 15-208, Document 89, 08/12/2015, 1574521, Page19 of 294

| | | |
|---|---|---|
| | | address the maintenance theory of inflation relied upon by plaintiffs in Vivendi. While this is surely an interesting issue, the district court has made its ruling. Vivendi's opportunity to challenge this theory of price impact, and the adequacy of the proof supporting it, lies with the Court of Appeals and perhaps the Supreme Court. Because this issue has already been fully litigated, and there being no intervening change in the law, Vivendi's request to file a new Rule 50(b) motion is DENIED. A conference to address the issues raised in the parties' most recent letters - August 12, 2014 from the plaintiffs [Dkt. No. 1206] and August 14, 2014 from the defendant [Dkt. No. 1207] - will be held on August 21, 2014 at 3:30 p.m. (Signed by Judge Shira A. Scheindlin on 8/18/2014) (lmb) Modified on 8/21/2014 (ca). (Entered: 08/18/2014) |
| 08/18/2014 | | Set/Reset Hearings: Status Conference set for 8/21/2014 at 03:30 PM before Judge Shira A. Scheindlin. (lmb) (Entered: 08/18/2014) |
| 08/21/2014 | | Minute Entry for proceedings held before Judge Shira A. Scheindlin: Status Conference held on 8/21/2014. (Bloomfield, Clifford) (Entered: 08/21/2014) |
| 09/05/2014 | 1209 | TRANSCRIPT of Proceedings re: CONFERENCE held on 8/21/2014 before Judge Shira A. Scheindlin. Court Reporter/Transcriber: Tara Jones, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/29/2014. Redacted Transcript Deadline set for 10/9/2014. Release of Transcript Restriction set for 12/8/2014. (Rodriguez, Somari) (Entered: 09/05/2014) |
| 09/05/2014 | 1210 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 8/21/14 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(Rodriguez, Somari) (Entered: 09/05/2014) |
| 09/05/2014 | 1211 | TRANSCRIPT of Proceedings re: conference held on 8/21/2014 before Judge Shira A. Scheindlin. Court Reporter/Transcriber: Tara Jones, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/29/2014. Redacted Transcript Deadline set for 10/9/2014. Release of Transcript Restriction set for 12/8/2014.Filed In Associated Cases: 1:02-cv-05571-SAS-HBP et al.(McGuirk, Kelly) (Entered: 09/05/2014) |
| 09/05/2014 | 1212 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a conference proceeding held on 8/21/2014 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the |

Case 15-208, Document 89, 08/12/2015, 1574521, Page20 of 294

| | | |
|---|---|---|
| | | transcript may be made remotely electronically available to the public without redaction after 90 calendar days...Filed In Associated Cases: 1:02-cv-05571-SAS-HBP et al.(McGuirk, Kelly) (Entered: 09/05/2014) |
| 09/05/2014 | 1213 | MOTION for Entry of Judgment under Rule 54(b) . Document filed by Vivendi, S.A..(Quinn, James) (Entered: 09/05/2014) |
| 09/05/2014 | 1214 | MEMORANDUM OF LAW in Support re: 1213 MOTION for Entry of Judgment under Rule 54(b) . . Document filed by Vivendi, S.A.. (Quinn, James) (Entered: 09/05/2014) |
| 09/05/2014 | 1215 | DECLARATION of Gregory Silbert in Support re: 1213 MOTION for Entry of Judgment under Rule 54(b) .. Document filed by Vivendi, S.A.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Quinn, James) (Entered: 09/05/2014) |
| 09/05/2014 | 1216 | LETTER addressed to Judge Shira A. Scheindlin from Arthur N. Abbey dated 09/05/2014 re: proposed Rule 54(b) judgment. Document filed by Bruce Doniger.(Rodd, Stephen) (Entered: 09/05/2014) |
| 09/08/2014 | 1217 | LETTER addressed to Judge Shira A. Scheindlin from James W. Quinn dated 09/08/2014 re: Response to Class Plaintiffs September 5, 2014 letter. Document filed by Vivendi, S.A..(Quinn, James) (Entered: 09/08/2014) |
| 09/09/2014 | | Minute Entry for proceedings held before Judge Shira A. Scheindlin: Status Conference held on 9/9/2014. (Bloomfield, Clifford) (Entered: 09/11/2014) |
| 09/17/2014 | 1218 | TRANSCRIPT of Proceedings re: conference held on 9/9/2014 before Judge Shira A. Scheindlin. Court Reporter/Transcriber: Ann Hairston, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/14/2014. Redacted Transcript Deadline set for 10/23/2014. Release of Transcript Restriction set for 12/19/2014.Filed In Associated Cases: 1:02-cv-05571-SAS-HBP et al.(McGuirk, Kelly) (Entered: 09/17/2014) |
| 09/17/2014 | 1219 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a conference proceeding held on 9/9/14 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...Filed In Associated Cases: 1:02-cv-05571-SAS-HBP et al.(McGuirk, Kelly) (Entered: 09/17/2014) |
| 09/24/2014 | 1220 | LETTER addressed to Judge Shira A. Scheindlin from James W. Quinn dated 09/24/2014 re: Request for Approval of Discovery Request. Document filed by Vivendi, S.A..(Quinn, James) (Entered: 09/24/2014) |
| 09/24/2014 | 1221 | LETTER addressed to Judge Shira A. Scheindlin from Arthur N. Abbey dated 09/24/2014 re: Class Plaintiffs' Counter Proposal for Claimant Reliance |

**JA287**

Case 15-208, Document 89, 08/12/2015, 1574521, Page21 of 294

| | | Discovery. Document filed by Bruce Doniger.(Rodd, Stephen) (Entered: 09/24/2014) |
|---|---|---|
| 10/09/2014 | | Minute Entry for proceedings held before Judge Shira A. Scheindlin: Status Conference held on 10/9/2014. (Bloomfield, Clifford) (Entered: 10/10/2014) |
| 10/15/2014 | 1222 | LETTER addressed to Judge Shira A. Scheindlin from James W. Quinn dated 10/15/2014 re: Discovery. Document filed by Vivendi, S.A.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Quinn, James) (Entered: 10/15/2014) |
| 10/20/2014 | 1223 | TRANSCRIPT of Proceedings re: conference held on 10/9/2014 before Judge Shira A. Scheindlin. Court Reporter/Transcriber: Ann Hairston, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/13/2014. Redacted Transcript Deadline set for 11/24/2014. Release of Transcript Restriction set for 1/21/2015.Filed In Associated Cases: 1:02-cv-05571-SAS-HBP et al.(McGuirk, Kelly) (Entered: 10/20/2014) |
| 10/20/2014 | 1224 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a conference proceeding held on 10/9/2014 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...Filed In Associated Cases: 1:02-cv-05571-SAS-HBP et al.(McGuirk, Kelly) (Entered: 10/20/2014) |
| 10/20/2014 | 1225 | LETTER addressed to Judge Shira A. Scheindlin from Arthur N. Abbey dated 10/20/2014 re: Plaintiffs' response to Vivendi's revised proposed discovery concerning reliance. Document filed by Bruce Doniger. (Attachments: # 1 Class Plaintiffs' blackline copy of proposed changes to Vivendi's version of discovery, # 2 Class Plaintiffs' clean copy of proposed changes to Vivendi's version of discovery)(Abbey, Arthur) (Entered: 10/20/2014) |
| 10/21/2014 | 1226 | LETTER addressed to Judge Shira A. Scheindlin from James W. Quinn dated 10/21/14 re: in response to Abbey Spanier's October 20, 2014 letter. Document filed by Vivendi, S.A..(Quinn, James) (Entered: 10/21/2014) |
| 10/29/2014 | 1227 | LETTER addressed to Judge Shira A. Scheindlin from James W. Quinn dated 10/29/2014 re: Renewal of Request for Entry of Rule 54(b) Judgment. Document filed by Vivendi, S.A..(Quinn, James) (Entered: 10/29/2014) |
| 11/10/2014 | 1228 | LETTER addressed to Judge Shira A. Scheindlin from James W. Quinn dated 11/10/2014 re: Proposed Order for 54(b) Judgment. Document filed by Vivendi, S.A..(Quinn, James) (Entered: 11/10/2014) |
| 11/12/2014 | 1229 | ORDER TO PROCEED TO ENTRY OF FINAL JUDGMENT AS TO CERTAIN CLAIMS PURSUANT TO RULE 54(b) re: 1228 Letter filed by Vivendi, S.A.: IT IS HEREBY ORDERED that: The Court finds and |

**JA288**

Case 15-208, Document 89, 08/12/2015, 1574521, Page22 of 294

| | | |
|---|---|---|
| | | concludes that this action presents more than one claim for relief, and that multiple parties are involved, such that this action is eligible for partial final judgment under Rule 54(b), subject to any objections from the holders of the Covered Claims, and as further set forth, the Court finds and concludes the following as stated herein.... Within seven (7) days of the entry of this Order, GCG shall send a "Notice of Approval of Claim," substantially in the form attached hereto as Exhibit B, to each claimant that has submitted a Covered Claim, or to such claimant's authorized representative for claim administration.... On the date that is twenty-eight (28) days after the date the Notice of Approval of Claim is sent, or the nearest business day thereafter, the parties shall submit to the Court a proposed judgment, which shall identify each Covered Claim as to which no timely objection was submitted, and the amount of each such claim inclusive of pre-judgment interest.... The Court reserves for consideration and inclusion in a future judgment all outstanding claims and issues in this action not resolved in the aforesaid Rule 54(b) judgment.... The Court understands and expects that the parties shall proceed expeditiously to resolve these and any other outstanding issues. SO ORDERED. (Signed by Judge Shira A. Scheindlin on 11/12/2014) (ja) (Entered: 11/13/2014) |
| 12/22/2014 | 1230 | LETTER addressed to Judge Shira A. Scheindlin from James W. Quinn dated 12/22/2014 re: Proposed Partial Final Judgment and Proposed Order for Stay. Document filed by Vivendi Universal S.A..(Quinn, James) (Entered: 12/22/2014) |
| 12/22/2014 | 1231 | JUDGMENT: IT IS HEREBY ORDERED, ADJUDGED, AND DECREED: 1. Pursuant to Rule 54(b ), judgment is hereby entered against Vivendi and in favor of each plaintiff identified in the Attached Exhibit A. 2. Each plaintiff identified in the attached Exhibit A shall be entitled to recover from Vivendi the principal sum, and prejudgment interest on the principal sum, (together, the "Total Sum") as set forth in Exhibit A. 3. The plaintiffs shall take nothing from defendants Messier and Hannezo, and the action is dismissed on the merits and with prejudice as to them. 4. Post judgment interest on the Total Sum plus costs shall accrue in accordance with 28 U.S.C. § 1961. (Signed by Judge Shira A. Scheindlin on 12/22/2014) (djc) (Entered: 12/23/2014) |
| 12/23/2014 | 1232 | ENDORSED LETTER addressed to Judge Shira A. Scheindlin from M. Alexander Bowie II dated 12/23/2014 re: Counsel requests leave for herself and the firm Day Pitney LLP, to withdraw as co-counsel for Vivendi in the above action. ENDORSEMENT: Leave to withdraw is granted. Attorney James George Szymanski; Morris Alexander Bowie, II and Richard Michael Lorenzo terminated. (Signed by Judge Shira A. Scheindlin on 12/23/2014) (tn) (Entered: 12/24/2014) |
| 12/24/2014 | 1233 | ORDER FOR RULE 62(D) STAY AND DEPOSIT OF FUNDS INTO AN INTEREST-BEARING ACCOUNT:IT IS HEREBY ORDERED: Vivendi may obtain a stay of execution or enforcement pending appeal of the Judgment pursuant to Federal Rule of Civil Procedure 62(d) upon the deposit of funds in the amount of $55 million (the "Security Amount") into the Court registry in an interest bearing account in lieu of a supersedeas bond. To obtain a stay, Vivendi must deposit the Security Amount within 14 days after |

**JA289**

Case 15-208, Document 89, 08/12/2015, 1574521, Page23 of 294

|  |  |  |
|---|---|---|
|  |  | the entry of the Judgment. Upon Vivendi's timely deposit of the Security Amount into the Court registry, a stay of the Judgment pursuant to Rule 62 (d) will be in effect. The Clerk is hereby ordered to invest the Security Amount in the Court registry in an interest-bearing account. The Clerk is further ordered to deduct from the income on the investment of the Security Amount a fee equal to ten percent (10%) of the income earned, but not exceeding the fee authorized by the Judicial Conference of the United States and set by the Director of the Administrative Office. The Court retains jurisdiction over the Security Amount and may take such actions with regard to the Security Amount as it deems appropriate for the security of the plaintiffs. SO ORDERED. (Signed by Judge Shira A. Scheindlin on 12/23/2014) Filed In Associated Cases: 1:02-cv-05571-SAS-HBP et al.(ama) (Entered: 12/24/2014) |
| 01/05/2015 |  | CASHIERS OFFICE CRIS DEPOSIT dated 12/23/14, from Judge Judge Shira A. Scheindlin, $55,000,000.00 from WIRE TRANSFER deposited on 12/30/14, Receipt Number 15465400127 and placed into CRIS on 12/31/14. (dig) (Entered: 01/05/2015) |
| 01/21/2015 | 1234 | NOTICE OF APPEAL from 1231 Judgment,,. Document filed by Vivendi, S.A.. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Quinn, James) (Entered: 01/21/2015) |
| 01/21/2015 |  | Appeal Fee Paid electronically via Pay.gov: for 1234 Notice of Appeal. Filing fee $ 505.00. Pay.gov receipt number 0208-10515765, paid on 1/21/2015. (tp) (Entered: 01/21/2015) |
| 01/21/2015 |  | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 1234 Notice of Appeal. (tp) (Entered: 01/21/2015) |
| 01/21/2015 |  | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files *(ONLY)* for 1234 Notice of Appeal filed by Vivendi, S.A. were transmitted to the U.S. Court of Appeals. (tp) (Entered: 01/21/2015) |
| 01/22/2015 | 1235 | NOTICE OF CROSS APPEAL from 1231 Judgment. Document filed by Bruce Doniger, Olivier M. Gerard, Gerard Morel, William Cavanagh,the Miami Beach Employees' Retirement Plan (formerly known as the Retirement System for General Employees of the City of Miami Beach). Filing fee $ 505.00, receipt number 0208-10523547. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Abbey, Arthur) Modified on 1/26/2015 (tp). (Entered: 01/22/2015) |
| 01/22/2015 |  | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 1235 Notice of Cross Appeal. (tp) (Entered: 01/22/2015) |
| 01/22/2015 |  | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files *(ONLY)* for 1235 Notice of Cross Appeal filed by Bruce Doniger were transmitted to the U.S. Court of Appeals. (tp) (Entered: 01/22/2015) |
| 01/26/2015 |  |  |

**JA290**

| | | UPDATED Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files *(ONLY)* for 1235 Notice of Cross Appeal, filed by William Cavanagh, Bruce Doniger, The retirement System for General Employees of the City of Miami Beach, Gerard Morel, Oliver M. Gerard were transmitted to the U.S. Court of Appeals. (tp) (Entered: 01/26/2015) |
|---|---|---|

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 02/19/2015 08:25:08 | | | |
| **PACER Login:** | gi0002:2554876:4036719 | **Client Code:** | 94639-00020 |
| **Description:** | Docket Report | **Search Criteria:** | 1:02-cv-05571-SAS-HBP |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

**JA291**




U.S. DISTRICT COURT
FILED
OCT - 1 2002
S. D. OF N.Y.

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE VIVENDI UNIVERSAL, S.A.,

SECURITIES LITIGATION

Civil Action

02 CV 5571

---

### ORDER OF CONSOLIDATION

It is hereby ORDERED that the following cases are consolidated (together, the "Consolidated Actions"), for all purposes, under Civil Action No. 02 CV 5571, which shall henceforth be captioned "In re Vivendi Universal, S.A., Securities Litigation":

1. Cavanagh v. Vivendi Universal, et al., No. 02 CV 6170

2. Chastan v. Vivendi Universal, et al., No. 02 CV 6500

3. Clark v. Vivendi Universal, S.A., et al., No. 02 CV 5919

4. Davis v. Vivendi Universal, et al., No. 02 CV 6738

5. Dodi v. Vivendi Universal, S.A., et al., No. 02 CV 6385

6. Doniger, et al. v. Vivendi Universal, S.A., et al., No. 02 CV 7371

7. Kurtz v. Vivendi Universal, S.A., et al., No. 02 CV 6956

8. Polland, et al. v. Vivendi Universal, S.A., et al., No. 02 CV 7346

9. Radosevich v. Vivendi Universal, et al., No. 02 CV 7677

10. Rosenbaum Partners LP v. Vivendi Universal, et al., No. 02 CV 5571

11. Rovner v. Vivendi Universal, et al., No. 02 CV 5924

12. Seid v. Vivendi Universal, S.A., et al., No. 02 CV 7017

13. Turbowitz v. Vivendi Universal, et al., No. 02 CV 5973

14. Yong Pon Kim v. Vivendi Universal, S.A., et al., No. 02 CV 7098

The Clerk of the Court is hereby directed to maintain a master docket and case file under the caption "In re Vivendi Universal, S.A., Securities Litigation", Master File No. 02 CV 5571. All orders, pleadings, motions, and other documents will, when filed and docketed in the master case file, be deemed filed and docketed in each individual case to the extent applicable.

Any action involving a common question of law or fact subsequently filed in or transferred to this Court shall be consolidated for all purposes under the Master File Number assigned to the Consolidated Actions. A party objecting to the consolidation of any such case may file for relief from this Order within ten (10) days after the date upon which a copy of this Order or the order of assignment is mailed to counsel for such party.

*The Consolidated Cases are to be removed from my docket. HB*

SO ORDERED.

_____
HAROLD BAER, JR.
UNITED STATES DISTRICT JUDGE

Dated: New York, New York,
September 20, 2002.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ------------------------------------------------x | : | Civil Action No. |
| IN RE VIVENDI UNIVERSAL, S.A. | : | 02 Civ. 5571 (HB) |
| SECURITIES LITIGATION | : |  |
|  | : |  |
| ------------------------------------------------x | : | **CONSOLIDATED CLASS** |
|  | : | **ACTION COMPLAINT** |
| This Document Relates To:   All Actions | : |  |
|  | : |  |
| ------------------------------------------------x | : | Jury Trial Demanded |

### BASIS OF ALLEGATIONS

Lead Plaintiffs, by their undersigned attorneys, on behalf of themselves and the class they seek to represent, for their Consolidated Class Action Complaint (the "Complaint"), make the following allegations against defendants based upon the investigation conducted by and under the supervision of plaintiffs' counsel, which included reviewing and analyzing information relating to the relevant time period obtained from numerous public and proprietary sources (such as LEXIS-NEXIS, Dow Jones and Bloomberg) – including, inter alia, Securities and Exchange Commission ("SEC") filings, other regulatory filings and reports, publicly available annual reports, press releases, published interviews, news articles and other media reports (whether disseminated in print or by electronic media), and reports of securities analysts and investor advisory services, in order to obtain the information necessary to plead plaintiffs' claims with particularity. Lead Plaintiffs' investigation also included interviewing or consulting with individuals, including former employees of Vivendi Universal, S.A. ("Vivendi" or the "Company") and its subsidiaries who are knowledgeable about defendant Vivendi's business.

Lead Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE COMPLAINT

1.     Lead Plaintiffs bring this securities fraud class action against Vivendi and two of its most senior former officers: defendant Jean-Marie Messier ("Messier"), Vivendi's CEO and Chairman (until he was forced to resign on July 3, 2002), and defendant Guillaume Hannezo ("Hannezo"), Vivendi's CFO (until he resigned on July 9, 2002). Lead Plaintiffs bring this action (a) on behalf of themselves and all persons who purchased or otherwise acquired the common stock and American Depository Shares ("ADSs") of Vivendi (the "Purchaser Class") between October 30, 2000 and August 14, 2002 inclusive (the "Class Period"), alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act"); (b) on behalf of themselves and all persons who acquired Vivendi's common stock or ADSs (the "Merger Subclass") pursuant to a registration statement and prospectus dated October 30, 2000 issued in connection with the three-way merger (the "Merger") of Vivendi, Seagram Company Limited ("Seagram") and Canal Plus, S.A. ("Canal Plus"), alleging violations of the Securities Act of 1933 (the "Securities Act"); and (c) on behalf of themselves and all persons who were shareholders of Vivendi or Seagram as of November 25, 2000 and entitled to vote on the Merger (the "Proxy Subclass") pursuant to the proxy/prospectus issued in connection with the Merger, alleging violations of the Exchange Act.

2.     Although defendant Vivendi started out as a small French-based water utility, immediately prior to and during the Class Period defendant Messier caused Vivendi to embark on an extraordinary $77 billion acquisition binge that transformed Vivendi into a huge international conglomerate. In particular, as a result of its three-way, $46 billion Merger with

-2-

**JA295**

Seagram (the parent of Universal Studios and Universal Music) and Canal Plus (one of Europe's largest cable TV operators) in October 2000, Vivendi instantly became one of the world's largest media and entertainment companies. At all material times during the Class Period, Vivendi's "Media and Communications" operations and its "Environmental Services" operations (which include its water utility subsidiaries) have constituted the two core areas of the Company's business.

3.     In the period leading up to the October 2000 Merger and thereafter throughout the Class Period, defendants reported strong revenue and earnings, and portrayed Vivendi as a company that was generating sufficient cash flow to satisfy its debt obligations on approximately $21 billion in debt that it had amassed in connection with financing its $77 billion acquisition spree -- even though other media and communications companies in the United States and Europe were suffering through a period of retrenchment and contraction. As a result of defendants' repeated upbeat earnings announcements and assurances concerning the Company's growth and its ability to meet its massive debt obligations, the price of Vivendi's ADSs and common stock was kept artificially inflated throughout the Class Period.

4.     However, as defendants knew but did not disclose, Vivendi's operations and financial condition were dramatically weaker than what their public statements portrayed. For example, immediately prior to and during the Class Period, Vivendi (using its increasingly inflated common stock as currency to finance many of its acquisitions) bid aggressively for several large companies, with the result that Vivendi substantially overpaid for them. Moreover, subsequent events (unbeknownst to investors) confirmed that these acquired entities could not generate sufficient cash flow to justify their high acquisition cost, with the result that Vivendi's

-3-

balance sheet was bloated with tens of billions of dollars of inflated "goodwill" whose value had
been materially impaired and should have been written down. The failure of the Vivendi
conglomerate to generate earnings in line with its publicly-touted estimates further threatened the
Company's liquidity, given that the Company needed to generate massive amounts of cash flow
from operations to satisfy its obligations on over $21 billion worth of debt.

  5.  To conceal the deteriorating state of Vivendi's newly constructed corporate
empire, Vivendi engaged in a variety of improper asset- and revenue-inflating practices during
and immediately prior to the Class Period that enabled the Company to artificially inflate its
reported assets, revenue, income and earnings per share ("EPS") at the end of the Company's
quarterly reporting periods, rendering Vivendi's publicly filed financial statements and other
communications regarding the company's financial performance complained of herein materially
false and misleading.

  6.  Vivendi's improper accounting (as detailed herein at ¶¶ 119-80) included, inter
alia, failing to take timely write-offs of over €29 billion in goodwill associated with Vivendi's
acquisitions, including its acquisitions of U.S. Filter and Canal Plus. Defendants' failure, in
violation of U.S. Generally Accepted Accounting Principles (" U.S. GAAP"), to take timely
write-offs for impaired goodwill caused Vivendi to improperly delay recognizing offsetting
charges of over €29 billion against the Company's earnings during the Class Period, with the
result that Vivendi's reported earnings and EPS were inflated under U.S. GAAP by tens of
billions of dollars during the Class Period.

  7.  In addition to its failure to properly account for impaired goodwill, Vivendi also
engaged in a variety of improper revenue recognition and expense-deflating practices, and other

-4-

**JA297**

related misconduct, to inflate its reported financial performance. These practices included, <u>inter</u> <u>alia</u>, (a) reporting and consolidating into its own financial statements billions of dollars of revenue from entities (such as Cegetel and Maroc Telecom) in which Vivendi held only a minority stake and which Vivendi did not control, in violation of U.S. GAAP (as detailed below at ¶¶ 148-68); and (b) recognizing 100% of the revenue "upfront" (*i.e.*, in contract year one) on billions of dollars of multi-year contracts in a practice known as "booking backlog," even though Vivendi had not yet performed its obligations under those multi-year contracts and U.S. GAAP required that the revenue on such contracts be recognized ratably over time as Vivendi actually performed the contracted-for services (as detailed below at ¶¶ 169-80).

8.     The foregoing improper accounting practices not only allowed Vivendi to keep its stock price artificially high, but also facilitated defendants' fraudulent efforts to conceal the Company's growing liquidity problems. For example, on December 6, 2001, defendant Messier assured the investing public that "Vivendi Universal is in a very strong position, with solid performance in virtually every business," and just a week later -- after having announced that it would raise $2.5 billion by selling a $1.5 billion interest in British Sky Broadcasting Plc ("BSkyB") and a $1.06 billion interest in Vivendi Environnement -- Vivendi stated that these asset sales would give Vivendi "room to manoeuvre" for additional acquisitions, and enable it "to cover any eventual needs from different opportunities for strategic partnerships." On December 17, 2001, Vivendi then announced that it would be acquiring USA Networks for approximately $10 billion.

-5-

9.    Unbeknownst to investors, however, Vivendi's business at that time was anything

but "strong" and decidedly lacked "room for manoeuvre." To the contrary, as the *Wall Street*

*Journal* later reported, the Company faced a potentially catastrophic liquidity crisis:

> On Dec. 13 last year [2001], [defendant] Hannezo sent [defendant] Messier,
> [Vivendi's] chairman . . . a desperate handwritten plea.
>
> *"I've got the unpleasant feeling of being in a car whose driver is accelerating in
> the turns and that I'm in the death seat," wrote Mr. Hannezo,* the company's
> chief financial officer. *"All I ask is that all of this not end in shame"*
>
> *That very day, unknown to investors and the Vivendi board, the company had
> narrowly averted a downgrade by credit-rating agencies, which would have
> made it difficult to borrow money and plunged the company into a cash crisis.*
> Mr. Hannezo . . . implored his boss and longtime friend [defendant Messier] to
> take serious steps to reduce Vivendi's ballooning debt.
>
> When [Vivendi's] board met the next day to consider whether to approve a
> roughly $10 billion acquisition of USA Network Inc.'s TV and film businesses,
> *Mr. Messier made no mention of the close call with the rating agencies.
> Instead, when a director asked about Vivendi's financial profile, Mr. Messier
> said the company had no problem,* according to two directors who were there.
>
> The board endorsed the USA Networks deal. . . . *But Vivendi was already in dire
> financial straits.* . . . [Emphasis added.]

"How Messier Kept Cash Crisis at Vivendi Hidden For Months; Media Giant Was At Risk Well

Before Investors Knew," *The Wall Street Journal,* October 31, 2002, at A1.

10.    Without publicly disclosing the adverse material facts facing the Company -- and

while affirmatively and materially misrepresenting the truth concerning the Company's actual

prospects, financial performance, improper accounting practices and liquidity situation --

defendant Messier did not hesitate to take advantage of the market's ignorance of the truth by

causing Vivendi to purchase numerous companies during the Class Period using artificially

inflated Vivendi stock as currency. By maintaining an artificially inflated price for Vivendi's

-6-

**JA299**

common stock, defendants were able, in essence, to purchase tens of billions of dollars worth of Seagram's, Canal Plus and other entities' stock at a "discount," since Vivendi was paying using a currency (Vivendi's own stock) that was really worth only a fraction of its publicly-traded price.

11.    Defendants' motive to commit fraud and to inflate the price of Vivendi shares was further increased during the Class Period as a result of defendant Messier's decision -- without consulting Vivendi's board -- to spend billions of dollars during 2001 to buy back approximately 104 million shares of Vivendi stock (or nearly 10% of the Company's equity). Moreover, defendant Messier had also made a massive bet on the Company's behalf that Vivendi shares would rise when he caused Vivendi to sell put options on Vivendi shares in late 2000 and 2001. These put options obligated Vivendi to buy back tens of millions of its shares at fixed prices in the future, so that, if Vivendi's share price were to fall, the Company could lose as much as $1.4 billion. In the end, defendant Messier's massive stock buy back scheme, though intended to help boost Vivendi's share price and to thereby further facilitate still more corporate acquisitions and reduce its put option exposure, only increased Vivendi's already massive debt by additional billions. And as Vivendi's stock price continued to fall, causing the value of Vivendi's treasury stock and put option positions to further decline, the pressure only increased for defendants to continue their fraud to "make up" for these further losses.

12.    Although defendants embarked on their fraudulent scheme to conceal the Company's financial problems no later than the beginning of the Class Period (October 30, 2000), the market did not begin to learn of the extent of Vivendi's severely weakened financial condition and deteriorated value until July 2, 2002. On that date, a credit rating agency downgrade of Vivendi's debt, according to one published report, "sparked near-panic selling in

-7-

Paris" that caused Vivendi shares to plunge 25% for the day, to a new 15-year trading low of €
17.8. The same credit agency report also disclosed that Vivendi's financial obligations in 2002
could be as much as $3 billion more than -- or approximately *twice* as large as -- what most
analysts had expected. The situation was so dire that, as disclosed only after the end of the Class
Period, Goldman Sachs had privately presented several scenarios for Vivendi's future to a group
of Vivendi board members on June 24, 2002 -- and one of those scenarios showed Vivendi going
bankrupt in as little as just three or four months (*i.e.*, in September or October of 2002).

13.     On July 3, 2002, the board forced defendant Messier to resign. The board
obtained defendant Hannezo's resignation a few days later. Messier, however, stubbornly refused
to admit any wrongdoing, stating on the day he was forced out that there were "no
underestimated liabilities" and "no overvalued assets" on Vivendi's financial statements, and that
the Company's previously reported financial results were all "true, genuine and complete."
However, the full truth remained concealed, and still worse revelations were yet to come.

14.     On August 14, 2002 (the last day of the Class Period), Vivendi reported that it had
suffered a huge loss of approximately $12 billion for the first half of 2002, and that it would have
to sell approximately $10 billion in assets in an effort to reduce its debt. Vivendi's new
chairman, Mr. Jean-Rene Fortou, also admitted that "[w]e are facing a liquidity problem." That
same day, Standard & Poor's further slashed its ratings on Vivendi's long-term corporate debt to
junk status. In response, the price of Vivendi's common stock and ADSs plunged nearly another
25% on August 14, to as low as €11.89 and $11.66, respectively.

15.     The closing price of $11.66 on August 14, 2002 for Vivendi's ADSs represented a
stunning decline of more than $44.00 per ADS (or 79 %) from the inflated levels at which they

-8-

**JA301**

had traded at the beginning of 2002, and an incredible and near-total collapse of $63.84 per ADS — or more than 85 % — from its inflated Class Period high (in January 2001) of $75.50 per ADS. The price of Vivendi's common stock suffered similarly shocking declines.

16.    In the wake of these disclosures, formal investigations into Vivendi's accounting practices and disclosures to the market have been launched on both sides of the Atlantic, including: (a) a criminal investigation by French prosecutors; (b) a criminal investigation by the U.S. Department of Justice; (c) an investigation by the Commission des Operations de Bourse ("COB"); and (d) a formal civil investigation by the U.S. Securities and Exchange Commission ("SEC"). By this Complaint, Lead Plaintiffs now seek a recovery for themselves and all other Class and Subclass members to compensate them for the billions of dollars of losses they have suffered as a result of defendants' violations of the securities laws.

## JURISDICTION AND VENUE

17.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. § 77k, 77l(a)(2), and 77o, Section 14(a) of the Exchange Act, 15 U.S.C. § 79n(a), and the rules and regulations promulgated thereunder by the Securities and Exchange Commission ("SEC"), including Rule 14a-9, 17 C.F.R. § 240.14a-9, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. § 240.10b-5.

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act, 15 U.S.C. § 77u, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

-9-

19. Pursuant to the "effect test" of extraterritorial jurisdiction this Court may properly exercise subject matter jurisdiction over the claims of (a) all investors who purchased or acquired Vivendi securities traded on U.S. Markets, and (b) American investors who purchased or acquired Vivendi securities regardless of where those securities traded.

20. This court may also properly exercise subject matter jurisdiction over the claims of foreign class members who acquired Vivendi ordinary shares traded on foreign markets under the "conduct test" articulated by the Second Circuit, which provides that a federal court has subject matter jurisdiction if (1) the defendant's activities in the United States were more than 'merely preparatory' to a securities fraud conducted elsewhere, and (2) these activities or culpable failures to act within the United States 'directly caused' the claimed losses.

21. Defendants engaged in extensive fraud-related conduct in the U.S., which was part of a single fraudulent scheme spanning the U.S. and France. The domestic conduct was not merely "preparatory" or perfunctory acts, but led directly to losses by both foreign and domestic investors. In addition to the substantial U.S. conduct in furtherance of the fraud, Vivendi has a vast U.S. presence that justifies the exercise of subject matter jurisdiction over the claims of all plaintiffs who, relying on the health and value of Vivendi's substantial U.S. businesses, acquired Vivendi securities traded on foreign markets, and were defrauded by defendants' misrepresentations.

22. In addition, there was but a single worldwide market for Vivendi shares and ADSs which traded in tandem and that market was defrauded by defendants' conduct, causing extensive effects both in this country and abroad.

-10-

23.    The fraud perpetrated on the worldwide market by Vivendi sprang directly from the Company's $77 billion acquisition spree, during which Vivendi acquired several high profile U.S. companies, spending in excess of $54 billion for its U.S. interests. For example, just prior to and during the Class Period, the following U.S. companies, amongst others, were acquired in whole or in part by Vivendi:

| COMPANY ACQUIRED | U.S. LOCATION | PURCHASE PRICE |
| --- | --- | --- |
| Waste Management, Inc. | Houston, TX | € 103.5 million |
| US Filter Corp. | Palm Desert, CA | $ 6.2 *billion* |
| Seagram Company Ltd. | Universal City, CA | $ 34 *billion* |
| Uproar.com | New York, NY | $ 128 million |
| MP3.com, Inc. | San Diego, CA | $ 400 million |
| Emusic.com | San Diego, CA | $ 24 million |
| Houghton Mifflin Co. | Boston, MA | $ 2.2 *billion* |
| EchoStar Communications Corp. | Littleton, CO | $ 1.5 *billion* |
| USA Networks | New York, NY | $ 10.3 *billion* |

24.    In addition to Vivendi's U.S. acquisition activities, a significant number of defendants' false and misleading statements were initially made in the U.S., and all were disseminated within the U.S. Vivendi also regularly filed false and misleading reports with the SEC in the U.S., including Form 20-F Annual Reports and numerous Form 6-Ks during the Class Period, as alleged herein.

25.    Prior to and during the Class Period, false and misleading statements not made in the U.S. were disseminated into the U.S. and internationally through the means and

-11-

**JA304**

instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications and the facilities of the national securities markets.

26.     According to the Company's Form 20-F for the fiscal year ended December 31, 2001, signed and filed with the SEC on May 28, 2002 (the "2001 20-F"), over 54% of Vivendi's long lived assets, valued at 53.522 billion euros, were located in the U.S. The 2001 20-F also states that Vivendi's 2001 U.S. revenue was purportedly over 7 billion euros. At a luncheon in Los Angeles on January 19, 2002, defendant Messier stated that Vivendi was "[f]orty percent within the United States, sixty percent out of the states," and in a February 17, 2002 interview on CNN, Messier stated that the Company "has 50,000 U.S. employees."

27.     Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 377u, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Vivendi is headquartered in Paris, France, but conducts business and maintains the Company's U.S. headquarters in this District. In addition, defendant Messier has resided in this District since 2001 when he moved himself and his family into a $17 million penthouse apartment in Manhattan. During his February 17, 2002 CNN interview, defendant Messier explained why he moved to New York:

> Moving to New York, yes there [were] very simple reasons. The first one Vivendi Universal has 50,000 U.S. employees. They have a boss. Where is the boss? The boss is in the U.S. He's working there. I can meet with them. I can spend time with them. He is really the boss.
>
> The second goal was Vivendi International is a new group for many U.S. investors in the media field. We need and I needed to spend more time with the U.S. Universal community to explain the Vivendi Universal story, to go through all reasons of performances of prospects, and I think that it's just better to do it being an American, than being outside.

-12-

Similarly, in an interview on "Market Call" from New York on February 27, 2001, defendant

Messier reiterated that one of the primary reasons for moving to New York was to promote

Vivendi to U.S. investors and Wall Street:

> I'm not frustrated. I'm enthusiastic about doing and continuing (ph) and
> persuading this education job [for American investors and Wall Street analysts].
> Since the merger, the level of U.S. investors in all capital has jumped from less
> than 10 percent to more than 25 percent. I have a very simple goal in mind. I
> want the level of U.S. investors, within Vivendi Universal, to reach as quickly as
> possible 50 percent of all capital. . . . I will take any necessary step to convince
> and educate Wall Street and U.S. investors.

In addition, many of the acts and practices complained of herein, including the dissemination of

materially false and misleading statements, occurred in this District.

    28.    In connection with the acts alleged in this Complaint, defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including but not limited

to the mails, interstate telephone communications and the facilities of the national securities

markets.

## THE PARTIES

    29.    The Retirement System for General Employees of the City of Miami Beach,

Oliver M. Gerard, Francois R. Gerard, Prigest S.A., Tocqueville Finance S.A., Beatrice Doniger,

Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael

Doniger, Edward B. Brunswick and the Ruth Pearson Trust were appointed as Lead Plaintiffs by

this Court on November 1, 2002. Lead Plaintiffs purchased or otherwise acquired the common

stock or ADSs of Vivendi during the Class Period at prices that were artificially inflated by

defendants' misrepresentations and omissions and suffered damages thereby, as detailed in their

certifications previously filed with the Court.

-13-

**JA306**

30.     Defendant Vivendi describes itself as a global conglomerate engaged in business focused primarily on two core areas: "Media and Communications," and "Environmental Services." Vivendi's Media and Communications business is divided into five segments: (a) Music (conducted through Universal Music Group, which produces, markets and distributes recorded music throughout the world in all major genres); (b) Publishing (purportedly Europe's premier publisher of information, which provides content across multiple platforms, including print, multimedia, on the wired Internet and to PDAs (Personal Digital Assistants) via WAP (Wireless Application Protocol) technology); (c) TV and Film (which produces, distributes and licenses motion picture, television and home video/DVD products worldwide, owns and operates a number of cable and pay TV channels, and operates theme parks and retail stores around the world); (d) Telecoms (which provides a range of telecommunications services, including mobile and fixed telephony, Internet access, and data services and transmission, principally in Europe); and (e) Internet (which manages strategic Internet initiatives and new online ventures).

31.     Vivendi Environnement, a subsidiary of Vivendi, operates the Company's worldwide environmental services business, including its water utility operations.

32.     Defendant Messier was Vivendi's Chief Executive Officer and Chairman of the Company's Board until he was forced to resign on July 3, 2002. Messier received compensation of $4.8 million in 2001 despite the Company's record loss, as well as various other perquisites (including use of a $17 million apartment the Company acquired for him in New York).

33.     Defendant Hannezo was Chief Financial Officer of Vivendi until his resignation on July 9, 2002. Hannezo was, according to the *Associated Press*, a "close collaborator" of Messier.

-14-

**JA307**

34.   Defendants Messier and Hannezo are collectively referred to herein as the "Individual Defendants."

35.   It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the Individual Defendants, by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business operations, products, growth, financial statements, and financial condition, as alleged herein. The Individual Defendants were involved in drafting, preparation and/or dissemination of the various public, shareholder and investor reports and other communications alleged herein, were aware of, or recklessly disregarded, that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

36.   Because of their Board memberships and/or executive and managerial positions with Vivendi, each of the Individual Defendants had access to the adverse non-public information about the business, operations, finances, markets, financial statements, and present and future business prospects of Vivendi particularized herein via access to internal corporate documents, conversations or communications with corporate officers or employees, attendance at management and/or Board of Directors' meetings and committees thereof and/or via reports and other information provided to them in connection therewith.

-15-

**JA308**

37.     The statements made by the Individual Defendants, as particularized below, were materially false and misleading when made. The true financial and operating condition of the Company, which was known or recklessly disregarded by the Individual Defendants, remained concealed from the investing public throughout the Class Period. The Individual Defendants, who were under a duty to disclose those facts, instead misrepresented or concealed them during the relevant period herein. As officers and directors, and controlling persons, of a publicly held company whose ADSs were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Vivendi's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

38.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company issued during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be materially misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Because of their

-16-

positions and access to material non-public information available to them but not the public, each of the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the representations concerning the Company complained of herein were then materially false and misleading. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

39.     Each of the Individual Defendants is liable as a direct participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers or acquirers of Vivendi ADSs and ordinary shares during the Class Period by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Vivendi's business, operations, management and the intrinsic value of Vivendi ADSs and ordinary shares; (ii) enabled the Company to complete numerous acquisitions in its multi-billion dollar buying spree; (iii) permitted Vivendi to maintain credit ratings so that Vivendi could accumulate more and more debt to make acquisitions on terms favorable to Vivendi; and (iv) caused Lead Plaintiffs and other members of the Class and Subclasses to purchase or otherwise acquire Vivendi ADSs and ordinary shares at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

40.     Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of: (a) the Purchaser Class consisting of all persons who purchased or otherwise acquired the common stock and ADSs of Vivendi between October

-17-

**JA310**

30, 2000 and August 14, 2002, inclusive, and were damaged thereby, alleging violations of

Section 10(b) and 20(a) of the Exchange Act; (b) the Merger Subclass consisting of all persons

who acquired the common stock and ADSs of Vivendi pursuant to the Registration Statement

and Prospectus issued in connection with the Merger, and were damaged thereby, alleging

violations of Sections 11, 12(a)(2), and 15 of the Securities Act; and (c) the Proxy Subclass

consisting of all persons who were shareholders of Vivendi or Seagram as of November 25,

2000, entitled to vote on the Merger pursuant to the registration statement incorporating a

proxy/prospectus issued in connection with the Merger, and were damaged thereby, alleging

violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 thereunder. Excluded from

the Class and Subclasses are defendants, the members of Individual Defendants' families, any

entity in which any defendant has a controlling interest, or which is a parent or subsidiary of, or

which is controlled by, the Company, and the officers, directors, affiliates, legal representatives,

heirs, predecessors, successors, or assigns of any of the defendants.

     41.     The members of the Purchaser Class, Merger Subclass and Proxy Subclass are so

numerous that joinder of all members is impracticable. Throughout the Class Period, Vivendi's

ADSs were actively traded on the NYSE, in a well-developed and efficient market. Vivendi's

ordinary shares were actively traded on the EuroNext Paris S.A. (the "Paris Bourse"), also an

efficient market. As of December 31, 2001, the Company had more than 107 million ADSs, and

more than 1 billion ordinary shares outstanding. While the exact number of Class and Subclass

members is unknown to Lead Plaintiffs at this time and can only be ascertained through

appropriate discovery, Lead Plaintiffs believe that there are hundreds, if not thousands, of

-18-

members in the proposed Class (including the Subclasses). Record owners and other members of the Class and Subclasses may be identified from records maintained by Vivendi or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42.    Lead Plaintiffs' claims are typical of the claims of the members of the Class and Subclasses they seek to represent because Lead Plaintiffs and the Class and Subclass members sustained damages which arose out of the defendants' unlawful conduct complained of herein.

43.    Lead Plaintiffs are representative parties who will fairly and adequately protect the interests of the Class and Subclass members, and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs do not have interests antagonistic to or in conflict with those of the other Class and Subclass members they seek to represent.

44.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class (including the Subclasses) is impracticable. Furthermore, as the damages suffered by individual members of the Class and Subclasses may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class (including the Subclasses) to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

45.    There are questions of law and fact common to the Purchaser Class which predominate over any questions which may affect individual members. Among the questions of law and fact common to the Purchaser Class are:

-19-

(a)     whether the Exchange Act was violated by defendants' acts as alleged

herein;

(b)     whether statements made by defendants to the investing public during the
Class Period misrepresented and/or omitted material facts;

(c)     whether defendants acted with scienter in issuing materially false and
misleading statements;

(d)     whether the market prices of securities during the Class Period were
artificially inflated due to the material nondisclosures and/or misrepresentations complained of
herein; and

(e)     whether the members of the Purchaser Class have sustained damages, and,
if so, what is the appropriate measure of damages.

46.     There are questions of law and fact common to the Merger Subclass which
predominate over any questions which may affect individual members.  Among the questions of
law and fact common to the Merger Subclass are:

(a)     whether the Registration Statement and Prospectus omitted and/or
misrepresented material facts;

(b)     whether the Securities Act was violated by defendants' acts as alleged
herein; and

(c)     whether the members of the Merger Subclass have sustained damages,
and, if so, what is the appropriate measure of damages.

-20-

**JA313**

47.     There are questions of law and fact common to the Proxy Subclass which predominate over any questions which may affect individual members.  Among the questions of law and fact common to the Proxy Subclass are:

(a)     whether the Registration Statement and Proxy/Prospectus omitted and/or misrepresented material facts;

(b)     whether the Exchange Act was violated by defendants' acts as alleged herein; and

(c)     whether the members of the Proxy Subclass have sustained damages, and, if so, what is the appropriate measure of damages.

## FACTUAL BACKGROUND

48.     In June 1996, Messier became chairman of Générale des Eaux, Vivendi's predecessor.  At that time, Générale des Eaux was -- as it had been since it was founded in the 19th century -- primarily a water utility company.  When Messier became CEO in 1996, Vivendi's stock and ADSs were trading in the €27 to €29 and $30 to $35 range, respectively.  Messier changed the name of Générale des Eaux to "Vivendi" in April 1999.

49.     After becoming CEO, Messier embarked on an extraordinarily ambitious plan to turn the Company into one of the world's largest media companies.  Prior to the Class Period, beginning in 1998, Vivendi acquired the following companies:

-21-

| COMPANY ACQUIRED | CLOSING DATE | % ACQUIRED |
|---|---|---|
| Quotidien Sante | 4/9/98 | 100% |
| Linjebuss AB | 4/15/98 | 66.7%<br>(33% owned) |
| Havas SA/Old | 6/2/98 | 70%<br>(30% owned) |
| Cia de Saneamento do Parana | 6/8/98 | 41.38% |
| Ediciones Doyma SA | 6/25/98 | 50% |
| l'Etudient | 11/10/98 | 100% |
| ScVK | 11/18/98 | 43.17% |
| OVP-Vidal | 11/23/98 | 100% |
| Vivendi Universal | 12/15/98 | 10.5% |
| ALPINA GmbH | 1/5/99 | 100% |
| Cendant Software | 1/12/99 | 100% |
| Pathe | 1/26/99 | 19.6%<br>(5% owned) |
| FCC | 3/5/99 | 28% |
| Aique | 4/20/99 | 100% |
| US Filter Corp | 4/30/99 | 100% |
| SL Tunnelbanan AB | 5/4/99 | 60% |
| MediMedia | 5/12/99 | 100% |
| 18 Litre Water Division | 5/20/99 | 100% |
| Sani Gestion Inc. | 6/11/99 | 100% |
| MUSIDISC | 6/30/99 | 99.02% |

---

[1] Pre-existing ownership interest, if any, shown in parenthesis.

-22-

| Canal Plus | 7/22/99 | 15%<br>(34% owned) |
|---|---|---|
| British Sky Broadcasting Plc | 7/22/99 | 4%<br>(20.5% owned) |
| Aqua Alliance Inc | 8/24/99 | 17%<br>(83% owned) |
| Pathe | 9/30/99 | 80.2%<br>(19.8% owned) |
| Superior Services Inc. | 11/11/99 | 100% |
| 23 GPU In. Power plants | 11/24/99 | 100% |
| Elektrim Telekomunikacja | 12/9/99 | 49% |
| Daesan Power Plant | 12/17/99 | 100% |
| The StayWell Company | 2/29/00 | 100% |
| Three V Health Inc. | 2/29/00 | 100% |
| Haniel Rohr; Kanal Service &<br>Haneil Industrie Reinigung | 3/28/00 | 100% |
| Prize Central Network | 3/29/00 | 100% |
| KD Offshore | 5/30/00 | 100% |
| Quod Bonum BV | 8/17/00 | 80% |
| Prelude et Fugue | 9/20/00 | 100% |
| Poland.Com SA | 9/21/00 | 55.01% |

50.     Messier's early growth strategy required the Company to finance its acquisitions,

which caused the Company to accumulate large amounts of debt. For example, in March 1999,

Vivendi had to finance its $6.2 billion acquisition of U.S. Filter Corp. ("U.S. Filter") by raising

approximately €5.7 billion through a convertible bond offering. Similarly, in December of 1999,

Vivendi increased its equity investment in Elektrim Telekomunikacja ("ET"), a Polish

-23-

conglomerate, to $1.2 billion (or 49% of ET's equity), by investing an additional $250 million in cash and converting an earlier $615 million loan into ET shares.

51.     In June 2000, Vivendi announced the acquisition of Seagram (which owned Universal Studios and Polygram Records) for $36 billion in Vivendi common stock and the acquisition of Canal Plus for $12 billion in Vivendi common stock. The principal owners of Seagram were Edgar Bronfman, Jr. ("Bronfman") and the Bronfman family, which became the largest shareholders of Vivendi after the merger.

## VIVENDI CONTINUES ITS ACQUISITION BINGE

52.     Following the Merger on December 8, 2000, many analysts expected Vivendi to make sure that its newly merged and recently acquired businesses were achieving desired synergies before consummating new deals. Defendants, however, pursued a different strategy. In a span of just sixteen months after the huge three-way merger with Seagram and Canal Plus, Vivendi acquired significant equity positions (or added to its existing equity positions) in the following companies, several of which Vivendi acquired outright:

| COMPANY | CLOSING DATE | INDUSTRY | % ACQUIRED |
|---|---|---|---|
| Maroc Telecom | 12/21/00 | Telecom Services | 35% |
| MUSIDISC | 1/31/01 | Multimedia | 0.98% (99.02% owned) |
| Medicine Publishing | 2/1/01 | Publishing | 100% |
| HC COM | 2/19/01 | Publishing | 100% |
| Uproar Inc. | 3/23/01 | Internet Connectivity | 100% |

-24-

| COMPANY | CLOSING DATE | INDUSTRY | % ACQUIRED |
|---|---|---|---|
| GetMusic LLC | 4/25/01 | Internet Content | 50% (50% owned) |
| Editions Juris Service | 4/25/01 | Multimedia | 100% |
| Emusic.Com Inc | 6/14/01 | E-Commerce | 100% |
| RMM Records & Video | 6/25/01 | Music | 100% |
| Scoot Europe NV | 7/27/01 | Broadcast Server | 50% (50% owned) |
| Houghton Mifflin Co. | 8/3/01 | Publishing | 100% |
| MP3.com | 8/28/01 | Internet Content | 100% |
| Elektrim Telekomunikacja | 9/4/01 | Telecom Services | 2% (49% owned) |
| Mediabright | 9/12/01 | Applications Software | 100% |
| Studio Canal | 10/12/01 | Motion Pictures Services | 14.8% (85.20% owned) |
| Multithematiques | 12/17/01 | Cable TV | 27% |
| EchoStar Communications | 1/22/02 | Satellite Telecom | 10% |
| Koch Group Recorded Music | 2/15/02 | Music | 100% |
| USA Network Entertainment | 5/7/02 | Cable TV | 93% |

53.    The vast majority of these post-Vivendi/Seagram/Canal Plus merger acquisitions were paid for either using Vivendi stock as currency, or by borrowing against future earnings. Thus, in order to sustain its growth by acquisition strategy, it was crucial for defendants to continue to report favorable financial results in order to keep Vivendi's stock price high and to maintain its favorable credit ratings and access to additional debt financing.

-25-

**JA318**

## FALSE AND MISLEADING STATEMENTS

54.    On October 30, 2000 (the first day of the Class Period), Vivendi issued a

Registration Statement and Prospectus, filed on Form F-4 with the SEC and signed by defendants

Messier and Hannezo in connection with the merger of Vivendi, Seagram, and Canal Plus. This

document -- consisting of over 700 pages plus exhibits -- purported to explain and solicit

shareholder approval for the three-way merger.  Among other information, in its Form F-4,

Vivendi presented historical financial statements for FY 1999 and the first half of FY 2000.

Vivendi reported revenue of $16.427 billion and net income of $509 million for the first half of

FY 2000, and revenue of $17.487 billion and net income of $254.6 million for the comparable

period in 1999.  Vivendi also reported shareholders' equity of $11.957 billion and total assets of

$73.611 billion as of June 30, 2000.

55.    However, for the reasons set forth in greater detail below at ¶¶ 119-80, Vivendi's

historical financial statements and balance sheets contained in Vivendi's October 30, 2000 Form

F-4 were materially false and misleading because, inter alia, the Company improperly

consolidated into its financials revenue from its Cegetel subsidiary (in which the Company had

less than 50% ownership), failed to timely write-down impaired goodwill from previous

corporate investments and acquisitions, including U.S. Filter, and overstated the Company's

revenue from its environmental division on certain multi-year contracts in violation of GAAP.

56.    On December 22, 2000, Vivendi issue a press release announcing that it had

purchased a 35% stake in Maroc Telecom S.A. ("Maroc Telecom"), Morocco's telephone

monopoly for approximately 2.3 billion euros.

-26-

57.   On February 14, 2001, Vivendi issued a press release in Paris and New York

announcing preliminary results for FY 2000:

> Vivendi Universal's preliminary total revenues for 2000 totaled 41.7 billion euros,
> with media and communications and environmental services accounting for 40.0
> billion euros, a global 36.5% increase over 1999. Jean-Marie Messier, Chairman
> and CEO of Vivendi Universal, said, "Vivendi Universal was created on
> December 8, 2000. The 2000 Vivendi Universal figures are showing the
> considerable burst of growth of our communications activities in 2000 both in
> global growth and even more important with a near 20% internal growth. *Vivendi
> Universal enters its first full year of operations with strong growth prospects
> and a very strong balance sheet. This new company is off to a fast start and we
> are very confident that we will meet the very aggressive growth targets we have
> set for ourselves both at the revenues and EBITDA levels.*" [Emphasis added.]

58.   On March 9, 2001, Vivendi issued a press release reporting "better than expected"

fourth quarter and FY 2000 results.  Vivendi announced actual revenues of 41.8 billion euros for

FY 2000 including Media and Communications revenues of 13.6 billion euros and

Environmental Services revenues of 26.5 billion euros.  The press release further stated:

> Vivendi Universal announced today that on a pro forma basis for calendar 2000,
> the Company reported 7.2 billion euros in EBITDA (earnings before interest,
> taxes, depreciation and amortization) for the period ending December 31, 2000,
> up 48 percent from 1999. Results reflect strong performance across the
> Company's business units -- Media and Communication and Environmental
> Services. Actual EBITDA for the 12 months ended December 31, 2000, was
> 6 billion euros versus 4.3 billion euros in 1999.
>
> The pro forma results were driven by growth in all business segments with the
> exception of Internet, in which development costs related to business expansion
> continued to have a negative impact on earnings. . . .
>
> Net income climbed 44 percent, before goodwill, to 2.8 billion euros or 4.4
> percent basic shares up 19% and 60 percent, after goodwill, to 2.3 billion euros,
> from 1.4 billion euros. The Board of Directors of Vivendi Universal has
> recommended to the shareholders to approve an annual dividend of one euro per
> share, which will represent a high 47 percent pay-out ratio. . . .
>
> Jean-Marie Messier, Chairman and [CEO] of Vivendi Universal, stated: "The
> strong results that Vivendi Universal has generated for calendar 2000 provide a

-27-

very solid foundation for the Company's growth prospects in 2001. *The robust performance of Vivendi Universal's business segments clearly reflects the fast pace and clear momentum that we have established as Vivendi Universal enters 2001.* The Company's unique combination of content and distribution assets paves the way for enormous growth opportunities. We have our management teams and plans in place as we moves [sic] to execute the growth strategies. The management team, in particular, has been focused on the day-to-day operational performance and increased productivity of each of the Company's business units. I am very confident that, for Media and Communications, we will reach our revenue growth target of 10 percent and our aggressive EBITDA growth target of 35 percent for the period 2000-2002 and achieve superior returns for Vivendi Universal shareholders. . . . *Our businesses are strong, our management is focused and growth prospects are real and immediate.*" [Emphasis added.]

59.    On March 12, 2001, as reported in *La Tribune*, defendant Messier stated the

Company had exceeded expectations:

Franco-Canadian media and communications group Vivendi Universal SA (VU) has announced its results for 2000, which were in line with forecasts, and has confirmed its objectives for 2001. Presenting his group's results for the year, VU chairman Jean-Marie Messier commented: *"When we merged, it was said that our aims were too ambitious. Well, we have exceeded them!"* [Emphasis added.]

60.    The statements made by defendants referenced in ¶¶ 57-59 above, were each

materially false and misleading because, inter alia, the Company was engaged in improper

accounting practices which had the effect of materially overstating Vivendi's reported earnings

(as particularized below at ¶¶ 119-80), including: (a) failing to timely write-down certain

overvalued assets from previous corporate investments and acquisitions; (b) improperly

consolidating into its financials revenue from its Cegetel subsidiary in which the Company had

less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year

contracts. In addition, the Company failed to disclose that it was suffering from a growing

-28-

liquidity crisis (as particularized below at ¶¶ 181-88) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

61. On April 23, 2001, Vivendi issued a press release announcing "very strong" first quarter 2001 results. The press release announced that Media and Communications revenues were up 10% to 5.9 billion euros, and Telecoms revenues were up 30% to 1.5 billion euros. The press release further reported that Media and Communications EBITDA increased 112% to 900 million euros and that Telecoms EBITDA more than tripled to 433 million euros. The press release quoted defendant Messier as follows:

> "I am very pleased with Vivendi Universal's outstanding performance in our first quarter as a new company. All our results meet or exceed our key operating targets. *We created significant momentum by delivering solid first quarter 2001 results in EBITDA, which more than doubled, and by generating double digit revenue growth. . . .*
>
> These results show the focus and dedication of all our management teams, in executing the unique promise of Vivendi Universal around its global strategy. This is a great beginning. With our momentum, our targets and the drive of our executive team, *I am extremely confident that, for Media and Communications, we will reach our annual EBITDA and revenue growth targets of 35% and 10%, respectively in 2001 and 2002 and achieve superior returns for Vivendi Universal shareholders. . . .*
>
> We are also ahead of targets for the synergies which indicate that the path of integration between our teams is great. My only focus is and remains execution of this compelling media merger." [Emphasis added.]

62. On April 24, 2001, defendant Messier addressed Vivendi's shareholders at the Company's shareholders' meeting:

> *The foundations of our communications-related businesses are particularly healthy and strong.* Guillaume Hannezo has just detailed our performance for you. I would just like to emphasize a few points:
>
> - *a healthy balance sheet with total equity reaching 66 billion Euro*;

-29-

- *a pro forma net debt that is practically non-existent - around three billion Euro;*
- Vivendi Universal posted record-high net income, and has cash available for investing (participation in BskyB, etc.);
- Vivendi has rapidly growing revenue, which reach the double digits annually, spread out through all the European and American markets (60% and 40%); extraordinarily large customer bases; several dozen million subscribers; business models often based on subscription - meaning loyalty, recurrence, predictable revenues, and very little dependence on the advertising market.

Financially, Vivendi Universal, concerning the communications sectors, is rock solid - very stable with high growth. . . .

In my role as the president and as an employee of the company, I owe you the company's results. Here they are. They are good. . . . Vivendi Universal, our company, your company, is solid. Today, we are a leader, strong, dynamic, and profitable. [Emphasis added.]

63.    On May 18, 2001, Vivendi filed a Form 6-K with the SEC providing total revenue

information for first quarter 2001. This Form 6-K stated in part:

*Vivendi Universal revenue for first quarter of 2001 totaled 12.6 billion euros, a global 34.5% increase over the first quarter of the prior year.* Vivendi Universal's media and communications businesses accounted for 5.9 billion euros and environmental services businesses accounted for 6.7 billion euros. [Emphasis added.]

64.    The statements made by defendants referenced in ¶¶ 61-63 above, were each

materially false and misleading because, inter alia, the Company was engaged in improper

accounting practices which had the effect of materially overstating Vivendi's reported earnings

(as particularized below at ¶¶ 119-80), including: (a) failing to timely write-down overvalued

assets from previous corporate investments and acquisitions; (b) improperly consolidating into its

financials revenue from its Cegetel subsidiary in which the Company had less than 50%

ownership; and (c) overstating the Company's revenue from certain multi-year contracts.  In

-30-

addition, the Company failed to disclose that it was suffering from a growing liquidity crisis (as particularized below at ¶¶ 181-88) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

65.    On June 1, 2001, Vivendi issued a press release announcing the acquisition of Boston-based Houghton Mifflin Company. The release, issued in Paris Boston, stated in part:

> Based on a total consideration of approximately $2.2 billion, which includes the assumption of Houghton Mifflin's average net debt of $500 million, the offer price represents 1.9 times 2001 estimated revenues of Houghton Mifflin, 7.7 times 2001 estimated EBITDA (earnings before interest, taxes, depreciation and amortization) and 10.7 times estimated EBITDA after book plate amortization.

66.    On July 2, 2001 Vivendi filed its Form 20-F for the fiscal year ended December 31, 2000 with the SEC, which was signed by defendant Hannezo. The 20-F contained Vivendi's "consolidated financial statements for the years ended December 31, 2000, 1999 and 1998 and as at December 31, 2000 and 1999."

67.    On July 23, 2001, Vivendi issued a press release announcing its "very strong" second quarter and first half 2001 Media and Communications results. Vivendi reported Media and Communications revenues were up 16% (excluding Universal Studios Group) to 6.6 billion euros, and EBITDA grew 57% to 1.3 billion euros. Concerning Vivendi's first half 2001 results for Media and Communications businesses, the press release stated in part:

> –    In the course of the first half of 2001, Vivendi Universal achieved three quarters of its full-year target of incremental EBITDA (nearly 800 million euros excluding Maroc Telecom, relative to the company's target of slightly more than 1 billion euros).

> –    In the first half of 2001, revenues increased to 12.4 billion euros (up 15% [excluding USG]), and EBITDA grew to 2.2 billion euros (up 77% over 2000 comparable period).

-31-

68.   Defendant Messier commented on the results, stating in part as follows:

The results produced by Vivendi Universal in the second quarter are well ahead of market consensus. . . . They confirm the robustness of our businesses, with limited exposure to advertising; the benefits of a truly global position; and the fast progress of the reorganization and implementation of our recent merger.

With three quarters of the 'aggressive' incremental EBITDA target for the full year 2001 [1.12 billion euros of incremental EBITDA, or 35%, over the pro forma 2000 guidance provided last October and slightly above 1 billion euros of incremental EBITDA over the final 2000 results] already achieved in the first half of the year, I can only re-emphasize our confidence. We will at least meet our stated targets.

*Obviously, our current stock price does not fully reflect this situation in terms of EBITDA multiples or Enterprise Value to EBITDA to growth. With the highest growth rates of the industry and the lowest multiples, our stock is definitely an attractive investment today.*

The first half has been a period of total operational focus in each of our businesses, while completing significant achievements in the implementation of the merger, reorganization and execution of our strategy. [Emphasis added.]

69.   Following the July 23, 2001 press release, Vivendi hosted a conference call to

discuss the second quarter 2001 results and the Company's business and prospects. During the

call, Messier and others in Vivendi management stated:

- Vivendi was able to achieve strong results even in a down market and was in fact gaining market share.

- The Company was still on track to achieve strong growth in revenues and earnings in 2001, including EBITDA growth of 35%.

70.   On July 23, 2001, Vivendi common stock increased in price to € 63.1 and the

price of Vivendi ADSs rose from $52.39 per share to $55.00 per share, representing a 5 %

increase.

-32-

**JA325**

71.    Securities analysts that followed Vivendi securities reacted positively to the

Company's announcement of second quarter 2001 results. For example, in an analyst report

dated July 23, 2001, Robertson Stephens, Inc. ("Robertson Stephens") issued a "Buy" rating

stating: "We expect the company to perform well through a sluggish economy and to emerge

strategically well-positioned." Similarly, Merrill Lynch Capital Markets ("Merrill Lynch") issued

a "Buy" rating in an analyst report dated July 26, 2001, stating in pertinent part as follows:

- Outperformance was across virtually all divisions particularly Film, Telecoms and
  Music.

- As a result, we are upgrading our 2001 OCF a second time by 2%. . . .

- Company re-confirmed its targets for 2001. In a down music market, Universal is
  gaining share and is confident of double digit EBITDA growth.

72.    The statements made by defendants referenced in ¶¶ 66-69 above, were each

materially false and misleading because, inter alia, the Company was engaged in improper

accounting practices which had the effect of materially overstating Vivendi's reported earnings

(as particularized below at ¶¶ 119-80), including: (a) failing to timely write-down overvalued

assets from previous corporate investments and acquisitions; (b) improperly consolidating into its

financials revenue from its Cegetel subsidiary in which the Company had less than 50%

ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In

addition, the Company failed to disclose that it was suffering from a growing liquidity crisis (as

particularized below at ¶¶ 181-88) and that Vivendi would necessarily need to restructure its debt

obligations in order to remain solvent and avoid bankruptcy.

73.    In early September 2001, as rumors circulated that Vivendi's earnings would be

disappointing, Vivendi's ADSs declined from the mid-$50s to the mid-$40s per share, and its

-33-

ordinary shares declined from the mid-€50s to the mid-€40s. In response, defendants

categorically denied any problems. Vivendi, after the market closed on September 5, 2001,

reiterated its targets for 2001 and 2002. Defendant Messier stated in an interview with *Reuters*

that evening, that "no profit warning of any kind needs to be feared coming from Vivendi

Universal."

74.     On September 25, 2001, Vivendi issued a press release announcing "Strong First

Half 2001" results and a "Solid Outlook for 2002." The press release reported that revenues

increased 11% to 26.4 billion euros, that EBITDA grew 42% to nearly 4 billion euros, that

operating income grew 65% to 1.9 billion euros, and that net income, before goodwill

amortization, reached 1.1 billion euros or 0.97 euros per share. With respect to Media and

Communication, the release reported that first half 2001 revenues reached 12.4 billion euros, up

15%, EBITDA reached 2.2 billion euros, up 77%, and that operating income nearly tripled to 946

million euros, up 184%. Concerning Vivendi's environment business, the release reported that

revenues were up 11% to 13.9 billion euros, that EBITDA was up 12% to 1.76 billion euros, and

that operating income was up 13% to 0.97 billion euros. Commenting on these results, the press

release further quoted defendant Messier as follows:

> *Despite the current environment, we will reach all our previously stated*
> *revenue/EBITDA objectives for the 2001 year.* I continue to express my
> confidence in achieving our more than 10% revenue growth targets for 2001 and
> our more than 35% EBITDA growth (versus the company's October 2000
> guidance) at a constant asset base. This, combined with some extensions in the
> company's asset base (i.e., Maroc Telecom and Houghton Mifflin), should result
> in full-year Media and Communications EBITDA slightly north of 5 billion euros.
> In the current environment, giving a 2002 target would not be meaningful, and we
> have yet to complete our 2002 budget and plan process. Before the recent tragedy
> [of September 11], market consensus for 2002 EBITDA was not far from 6 billion
> euros. Despite the events, looking at the trends of our businesses and our

-34-

defensive qualities, we are currently very comfortable [sic] with this expectation. [Emphasis added; footnote omitted.]

75.     On October 30, 2001, Vivendi issued a press release announcing its third quarter

2001 Media and Communications results. The release announced that Media and

Communications revenues were up 2.4 % to 7.3 billion euros, and that EBITDA was up 90% to

1.5 billion euros. The release further reported that Telecoms revenues increased by 17% to 2.1

billion euros, and EBITDA growing by 31% versus *pro forma* results for the third quarter of

2000. The release also stated in pertinent part:

- On a pro forma basis, third quarter revenue growth was 8%, and EBITDA growth was 30%. Year-to-date revenues increased 9%, and EBITDA increased 46%.

- Company reaffirms confidence in achieving its growth targets: 10% revenue growth and 35% organic EBITDA growth in 2001.

*"Our third quarter results for the media and communications businesses, with 24% revenue and 90% EBITDA growth, including organic growth of 8% and 36% respectively, are obviously strong despite the tough environment," said Jean-Marie Messier, Chairman and [CEO] of Vivendi Universal. "They reflect both our higher potential for growth and greater resiliency to recessionary environments compared to many of our peers. . . .*

"Additionally, Vivendi Universal's media and communications businesses are presently less vulnerable to recessionary environments than many of our peers because of our strong defensive qualities. . . . Having the highest resiliency and lowest sensitivity to a recessionary environment explains our ability to outperform most of our peers. . . .

"An early look at the fourth quarter indicates that we are on track to meet our targets. *I continue to express my confidence in achieving 10% revenue growth and 35% EBITDA growth in 2001 at a constant asset base.* This, combined with some expansions in the company's asset base (i.e., Maroc Telecom and Houghton Mifflin), should result in full-year Media and Communications EBITDA slightly above 5 billion euros. [Emphasis added; footnotes omitted.]

-35-

76.    Following the October 30, 2001 Press Release, Vivendi hosted a conference call
to discuss the third quarter 2001 results and the Company's business and prospects. During the
call, Messier and others in Vivendi management stated:

- Vivendi was able to achieve strong results even in a down market and was in fact gaining market share.

- The Company was still on track to achieve strong growth in revenues and earnings in 2001.

77.    Based on defendants' statements, including those made during the conference call,
securities analysts that followed Vivendi securities reacted positively to the Company's reported
financial results. For example, on October 31, 2001, Morgan Stanley Dean Witter ("Morgan
Stanley") issued an "OutPerform" rating, stating:

> We continue to accord Vivendi Universal on OutPerform-V rating with a Euro62
> twelve-month price target. Our investment thesis is based on VU's valuation, lack
> of sensitivity to economic recession, and diversity of revenue sources. In a quarter
> in which all its peers were forced to revise their 2001 and 2002 outlooks
> downward to reflect continued US economic weakness exacerbated by the events
> of Sept. 11, Vivendi Universal outperformed expectations and reiterated its full
> year guidance. The divergence between VU and its peers reflects the company's
> high level of financial predictability, a direct function of owning a number of
> internationally diversified, market share-leading businesses that have a low
> dependence on advertising.

78.    The statements made by defendants referenced in ¶¶ 73-76 above, were each
materially false and misleading because, inter alia, the Company was engaged in improper
accounting practices which had the effect of materially overstating Vivendi's reported earnings
(as particularized below at ¶¶ 119-80), including: (a) failing to timely write-down overvalued
assets from previous corporate investments and acquisitions; (b) improperly consolidating into its
financials revenue from its Cegetel subsidiary in which the Company had less than 50%

-36-

ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, the statements failed to disclose that the Company was suffering from a growing liquidity crisis (as particularized below at ¶¶ 181-88) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

79.    On December 6, 2001, Vivendi issued a press release announcing Bronfman's decision to resign from his position as Executive Vice Chairman. Commenting on Bronfman's resignation, defendant Messier assured the investing public that Vivendi "is in a very strong position, with solid performance in virtually every business." One week later -- after announcing that it would raise $2.5 billion by selling a $1.5 billion interest in BskyB and a $1.06 billion interest in Vivendi Environnement -- Vivendi stated, as reported by the *Financial Times (London)* on December 14, 2001, that these asset sales would give Vivendi "room to manoeuvre" for additional acquisitions, and enable it "to cover any eventual needs from different opportunities for strategic partnerships."

80.    On December 17, 2001, Vivendi issued a press release announcing the acquisition of USA Networks for $10.3 billion. Commenting on the acquisition, defendant Messier stated in pertinent part as follows:

> Our strategy is clearly coming together. Combining within the same operational entity, VUE, USG and the entertainment assets of USA creates a new U.S. major, which will benefit from the full integration of TV and movies activities with production and distribution.
>
>                    *    *    *
>
> ***In addition, this strategic move will significantly benefit Vivendi Universal shareholders, because of its significant value-accretion at every level - EBITDA, net income and free cash flow.*** By using mainly non-core, consolidated assets to acquire this control, we are strongly positioned to enhance performance and value to Vivendi Universal shareholders.
>
>                    *    *    *

-37-

**JA330**

> At the end of just one year following our merger with Seagram and Canal+, we
> have put the pieces together in fulfilling our strategy. In one short year, we have
> focused on integration and addressing our relative distribution weakness in the
> U.S. - and here we are today. We expect that 2002 will be a year of growth,
> without further change in perimeter.

81.    On December 17, 2001, defendant Messier held a press conference with Barry

Diller, Chairman and CEO of USA Network, from the St. Regis Hotel in New York City to

discuss the acquisition of USA Networks, creation of Vivendi Universal Entertainment ("VUE"),

and Vivendi's prospects for 2002:

> *At the end of the day, this transaction is not putting pressure on Vivendi*
> *Universal. On the reverse, what it allows us to do is to increase our [EBITDA]*
> *target for 2002 by more than ten percent. It's to increase our net income in*
> *2002 by roughly 200 million dollars. It's to increase the net free cash flow of*
> *the group in 2002 by, let's say three hundred and fifty million dollars. At every*
> *level of the [P&L] and of the cash flow that you may look at, this transaction is*
> *very positive to VUE shareholders year one.*
>                      *       *       *
> As far as the global [debt] ratio of the group is concerned, *our target is to have in*
> *'02 a [debt] to [EBITDA] ratio well below three times and especially we are*
> *focusing to reach that target ahead of the end of the first half of 2002,* which
> means that Vivendi Universal will end up its program of selling its non core asset
> in the first half of '02; it will give us very comfortable triple B credit rating targets
> that we are very comfortable with. . . . *So, no cleaning of balance sheet because*
> *the balance sheet is clean.* . . . [W]e are committed to issue full US [GAAP]
> earnings starting Q1 of '02. We already, in fact, worked on the basis of US
> [GAAP] accounting methods in '01 in order to build our track record at the time of
> this year, at the time of the release of our first full quarterly U.S. [GAAP] in '02.
> *So we are already applying all US [GAAP] methodologies, including those*
> *relating to amortization.* [Emphasis added.]

82.    The statements made by defendants referenced in ¶¶ 79-81 above, were each

materially false and misleading because, inter alia, the Company was engaged in improper

accounting practices which had the effect of materially overstating Vivendi's reported earnings

(as particularized below at ¶¶ 119-80), including: (a) failing to timely write-down overvalued

assets from previous corporate investments and acquisitions; (b) improperly consolidating into its

-38-

financials revenue from its Cegetel subsidiary in which the Company had less than 50%

ownership; and (c) overstating the Company's revenue from certain multi-year contracts.   In

addition, the Company failed to disclose that it was suffering from a growing liquidity crisis (as

particularized below at ¶¶ 181-88) and that Vivendi would necessarily need to restructure its debt

obligations in order to remain solvent and avoid bankruptcy.

83.   On February 6, 2002, *AFX News Limited* reported that in an attempt to dispel

concern about the Companies debt levels and accounting practices, a letter was distributed to the

Company's employees stating that no profit warnings were forthcoming:

> Vivendi Universal CEO Jean-Marie Messier said the media company will not
> make any change in its guidance for 2001 earnings due for release on March 5,
> although the fourth quarter was a difficult period.
>
> Messier made the comment in a letter to Vivendi's staff, addressing the recent
> volatility and losses in the company's share price. . . .
>
> "Some global markets, including the music market, declined during this period.
> But despite the difficulties, *we are the only media company not to have issued a*
> *profit warning on its operating results and there's no change to that situation*,"
> said Messier.
>                               *   *   *
> "*There are no hidden risks and no speculative instruments*," he said. [Emphasis
> added.]

84.   On February 11, 2002, Vivendi issued a press release announcing its year-end

2001 Media and Communications results.  Vivendi announced Media and Communications

"proforma revenue growth of 9% for the year ended December 31, 2001, reaching 28.9 billion

euros."  The release further reported that Vivendi's Telecoms segment achieved 24% revenue

growth in 2001, and that *"[r]evenue growth was 10% using the 2000 perimeter excluding*

-39-

*Universal Film, exactly in line with management estimates given 12 months ago."* [Emphasis added.]

85.    Commenting on the results, defendant Messier stated:

*I am pleased that we achieved our ambitious target of 10% organic revenue growth in 2001, for the businesses resulting from Vivendi's merger with Seagram and Canal +.* Organic growth is, more than ever in today's markets, the most important strength of Vivendi Universal. Achieving the highest level of growth in our industry is a big differentiation of Vivendi Universal, and the operating management deserves recognition for fulfilling their growth objectives and outperforming their peers in a difficult year. Our 2001 results give us confidence that we can achieve our growth targets again in 2002. [Emphasis added.]

86.    On February 12, 2002, in response to the Company's early release of positive results, *The New York Times* reported:

"Vivendi is one of the few companies in the global media sector which has not issued a revenue or Ebitda warning," said Mark Harrington of J.P. Morgan, referring to a common measure of gross operating profit. "So it demonstrates the structural growth of the company relative to its global media peers," he said of today's report.

87.    On March 3, 2002, Messier was quoted in the *Financial Times* as stating that "Vivendi had only two significant off-balance sheet structures, one relating to shares it is selling in BSkyB and another relating to four buildings: 'There are no hidden risks and no speculative instruments.'"

88.    On March 5, 2002, Vivendi issued a press release announcing its year-end 2001 results. Vivendi reported a charge for impairment to goodwill under French GAAP of 12.6 billion euros, including 6 billion euros for Canal Plus. Vivendi also announced that revenues were up to 10% and that operating income was up 47% to 3.795 billion euros, on a pro forma basis. The release stated that "[g]iven the excellent operational results, a 1 euro per share

-40-

dividend will be submitted to the shareholders at the annual meeting." The release further
reported Media and Communications revenues of 28.115 billion euros, representing 10% pro
forma revenue growth, EBITDA of 5.036 billion euros, representing 34% pro forma EBITDA
growth, and operating income of 1.838 billion euros, representing 89% pro forma growth. In
addition, the release reported that Telecoms pro forma revenue was up 24% to 8 billion euros,
that EBITDA increased 49% to 2.5 billion euros, Environmental Services revenue was up 11% to
29.1 billion euros and operating income increased 24% to 2.0 billion euros. The release also
stated in part:

> After having been the only large media company not to modify any of its guidance
> for the year 2001, Vivendi Universal reiterates its confidence in the strength of its
> businesses and their performance and their ability to grow. For 2002, no other
> new guidance will be expressed, apart from the company's full confidence to reach
> for its Media and Communications businesses.

89.    The March 5, 2002 press release also touted the Company's "Operating Free Cash

Flow" as being "ahead of guidance" announcing Media and Communications operating free cash

flow of 2.026 billion euros, "up 2 billion euros over 2000." Commenting on the results,

defendant Messier stated in part as follows:

> I am very pleased with the *excellent operating results* that have been achieved.
> These results confirm the strength of Vivendi Universal's businesses across the
> board despite a very difficult global economic environment.
>
> Most of our businesses improved market share, EBITDA and free cash flow
> during this period of global economic slowing. Even more important, those
> operational performances are showing improvement at every level of our P&L.
> The good EBITDA to EBIT transformation ratio: 68% of incremental EBITDA
> translating in incremental EBIT, is a strong and positive sign. The improvement of
> operational free cash-flow (FCF) at a higher rate than EBITDA indicate[s] the
> clear focus given in 2001 to cash management. We will continue this effort.
>
> *    *    *

-41-

JA334

*We stay fully committed to conveying full transparency in our financial results.* Vivendi Universal is not only transparent but is the only media and communications [company] not to change its numbers and targets, it underscores its commitment to accurate, *conservative* and consistent reporting in every area of its operations. [Emphasis added.]

90.     On March 5, 2002, during an investor conference call, defendant Messier

discussed the Company's fiscal year 2001 results and fiscal year 2002 expectations and attempted

to minimize the importance of the €12.6 billion write-down in goodwill as follows:

I just want to say a very quick points before going to your questions. And I – the first point here based on the fact that we experienced excellent operating results in the '01 and obviously that's very fortunate because this excellent operating results in '01 are also in the captive of the future and then we'll drive our future. I think that we build our operational reserve but what I want to point out is that if we continue or renewed on the EBITDA growth target results and add to our main in the quarter '01. We did all of this. Our operating pre cash flow target, we average Euro 2 million instead of the guidance of Euro 1.2 - 1.5 million [sic]. Obviously the fact that the more you go to cash the more we over this ––– the guidance that we gave to the market is a strong sign of the quality of the casual management in working above the requirements and CAPEX management in '01. That goes to the same direction is that we did overcome largely all targets in terms of cash service. We save Euro 200 million EBITDA, we reach 300 EBITDA 100 more, and close to Euro 600 million total cash savings. The operations and these business achievements, I think that we owed them to our competitive advantages that were evident in '01. That: (1) the excellent quality of management; (2) the fact that we gain market share in about every single of our business. Those gains of market shares coming from [scale and scope]; (3) the assets mix, maximize our ability to go to digitalization for delivery on the mobile devices; and (4) to our global footprint minimizes of earnings volatility. That's the business achievement.

91.     On March 6, 2002, Lehman Brothers issued a report based in part on the

statements made by Vivendi's management in the March 5, 2002 conference call:

In its post results conference call, management confirmed that the value adjustments to the US assets . . . reflected largely a change in accounting treatment and did not signal a negative outlook for the US water business.

-42-

92.   Similarly, Bear Stearns issued a report on March 6, 2002, based on the March 5,

2002 conference call, stating in pertinent part as follows:

> The company disclosed that the €19 billion of net debt has an average maturity of
> 4-years and an average cost of 4.1%. Management pointed out that the strength of
> the group's finances is underlined by a recently negotiated 5-year credit facility at
> 45 basis points over LIBOR.
>
>    * * *
>
> For '02, Management reiterated their guidance of 10% organic sales growth for all
> the Media Communications businesses. Vivendi also expects EBITDA of close to
> €6 billion (pre-USA Networks and pre-Stream).

93.   The statements made by defendants referenced in ¶¶ 83-90 above, were each

materially false and misleading because, inter alia, the Company was engaged in improper

accounting practices which had the effect of materially overstating Vivendi's reported earnings

(as particularized below at ¶¶ 119-80), including: (a) failing to timely write-down overvalued

assets from previous corporate investments and acquisitions; (b) improperly consolidating into its

financials revenue from its Cegetel and Maroc Telecom subsidiaries, in which the Company had

less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year

contracts. In addition, the statements failed to disclose that the Company was suffering from a

growing liquidity crisis (as particularized below at ¶¶ 181-88) and that Vivendi would necessarily

need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

94.   On April 24, 2002, Vivendi issued a press release announcing its "strong" first

quarter 2002 Media and Communications results. Vivendi reported a "strong surge of

operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations." The

release, issued in New York, further reported that "[n]et debt fell from approximately 19 billion

euros to approximately 17 billion euros." The release also reported Media and Communications

-43-

**JA336**

"revenue organic growth of 13% to 6.8 billion euros; strong EBITDA growth, up 18% to 1.1

billion euros; and solid operating income growth, up 37% to 408 million euros." Defendant

Messier commented on these results as follows:

> "The hard numbers in the first quarter show that Vivendi Universal has a winning
> strategy, and demonstrate our commitment to excellent management and
> delivering operating results quarter after quarter. In the first quarter, each
> operating segment delivered its revenue targets, and most segments over-delivered
> EBITDA and operating free cash flow compared with their budgets. . . .
>
> In a difficult environment, Vivendi Universal's businesses gained market share.
> Cash management improved dramatically. Finally, the revenue and cost synergies
> achieved in the quarter were significant. Further gains will be driven by
> improving businesses that currently have negative operating free cash flow:
> Canal+ and Internet operations."

95.     On April 29, 2002, Vivendi issued a press release announcing purportedly

"strong" results for the first quarter of 2002, including a 12% increase in pro forma consolidated

revenue to 13.2 billion euros. The release, issued in New York, also reported that consolidated

operating income grew 11% pro forma to 781 million euros, excluding goodwill amortization. In

the release, defendant Messier commented on the results as follows:

> The consolidated financial results for the quarter demonstrate that Vivendi
> Universal is delivering on the strategy, goals and targets that we have articulated
> to our shareholders. In the first quarter of 2002, both Media & Communications
> and Vivendi Environnement delivered their targets.
>
> The Media & Communications financial results released last week, coupled with
> our consolidated results issued today, are testimony to our ability and conviction
> to deliver strong results in operations, cash flow, EBITDA and net income. As I
> said last week, because of our strong performance in the quarter, we are lowering
> our estimate of Media & Communications year-end Debt/EBITDA ratio to less
> than 3x by December 31, 2002.
>
> In a very difficult economic environment, characterized by many market
> uncertainties, Vivendi Universal's global businesses gained market share. In

-44-

addition, strong improvement was achieved in cash management, debt reduction, synergies, management development and revenue growth.

96.     The April 29, 2002 press release further touted the Company's allegedly strong

cash flow position:

On a pro forma basis, excluding Vivendi Universal's publishing businesses to be disposed of (including the B-to-B and Health businesses whose sale is expected to be completed in the second quarter), Media and Communications reported:

- *A strong surge of operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations*;

- Strong operating results in the first quarter: revenue organic growth of 13% to 6.8 billion euros; EBITDA growth, up 18% to 1.1 billion euros; and solid operating income growth, up 37% to 408 million euros. All were significantly ahead of budget. [Emphasis added.]

97.     Following the Company's April 29, 2002 Press Release, Merrill Lynch issued a

research report dated April 30, 2002 that rated the Company a "strong buy" premised on the

Company's allegedly strong financial position. Specifically, the Merrill Lynch report stated that

the "strong buy" recommendation was based, in part, on the fact that "Vivendi has now stated its

net debt/EBITDA objective is less than 3x by the end 2002. . . ."

98.     The statements made by defendants referenced in ¶¶ 94-96 above, were each

materially false and misleading because, inter alia, the Company was engaged in improper

accounting practices which had the effect of materially overstating Vivendi's reported earnings

(as particularized below at ¶¶ 119-80), including: (a) failing to timely write-down overvalued

assets from previous corporate investments and acquisitions; (b) improperly consolidating into its

financials revenue from its Cegetel and Maroc Telecom subsidiaries in which the Company had

less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year

-45-

**JA338**

contracts. In addition, the statements failed to disclose that the Company was suffering from a growing liquidity crisis (as particularized below at ¶¶ 181-88) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

99.     On May 3, 2002, Moody's lowered the Company's long-term debt rating to Baa3 -- the lowest investment guide -- one notch above "junk" status assigned to speculative investments. According to Moody's, the ratings downgrade reflected Moody's concern that Vivendi "might not be able to reduce debt as quickly and comprehensively as planned."

100.    That same day, Vivendi issued a press release criticizing Moody's decision and attempting to downplay its significance:

> The company believes that this decision does not fully take into consideration the currently poor market conditions and the fact that the agency does not take into account immediately the whole of the debt reduction program planned by Vivendi Universal.
>
> This decision has no impact on Vivendi Universal's cash situation. It does not trigger any renegotiation clauses or advance repayments of bank credit lines. In addition, Vivendi Universal's use of commercial paper in the current amount of 1.6 billion euros is well covered by back-up lines of more than 3 billion euros, the availability of which will not be affected by the rating change.
>
> Vivendi Universal affirms that it has every confidence in its ability to meet its operating targets for 2002, as proved by its first-quarter results. The company is totally determined to carry through its debt reduction program in order to make a rapid return to a comfortable position with a Baa2 rating.

As a result of Vivendi's efforts to reassure the markets, defendants were able to limit the decline in the price of Vivendi's common stock and ADSs, and Vivendi's ADSs closed down only $1.74 (from $30.67 to $29.07) on May 3, 2002.

101.    On May 6, 2002, the *International Herald Tribune* reported:

-46-

**JA339**

Vivendi Universal SA could be forced to unwind billions of dollars in off-
balance-sheet derivatives transactions if its credit rating slips any further,
according to a detailed report of the company's accounts filed with U.S.
regulators.

A downgrade Friday by Moody's Investors Service Inc. of Vivendi's long-term
debt to Baa3 from Baa2 places the company's bonds within a notch of junk, or
non-investment-grade status. That, in turn, puts the world's second-largest media
conglomerate within a hair's breadth of triggering an immediate settlement of 3.5
billion ($3.21 billion) worth of so-called total return swaps, a kind of credit
derivative, documents filed last month with the Securities and Exchange
Commission show. Hundreds of millions of dollars in losses on total return swaps
and other esoteric derivatives deals have been the focus of at least one lawsuit
filed against Enron Corp. and its auditor, Arthur Andersen LLP, by shareholders
and employees of the bankrupt U.S. energy trader.

Derivatives are generally defined as financial instruments that derive their value
from an underlying asset such as a stock. In a total return swap, parties make
payments to each other based on an asset's appreciation and depreciation, with the
payment rate determined by a complex formula. Vivendi stressed Friday that the
rating change had no impact on its cash situation, adding that the move "does not
trigger an renegotiation clauses or advance repayments of bank credit lines." The
statement did not mention the possibility of accelerated settlement of debt or swap
agreements.

Asked about the implications of a further ratings downgrade for its total return
swap agreements, Antoine Lefort, a Vivendi spokesman, declined to answer
Sunday, saying: "This is not the subject. Our goal is to carry through the debt
reduction program in order to make a rapid return to a comfortable position with a
Baa2 rating."

But in a 100-page annual financial statement filed with the SEC on April 15,
Vivendi stated that it had entered into a number of long-term financing
agreements that provided for early redemption if Moody's cut the company's credit
rating below Baa3 or Standard & Poor's Corp. cut it below BBB-minus, its
equivalent rating. S&P currently rates Vivendi at BBB with a stable outlook.

Vivendi's SEC filing says, "Total return swap agreements set up at the time of the
sales of BSkyB and AOL Europe provide for an early unwind if Vivendi is
downgraded below BBB-minus."

The report indicates that the total notional value of the two return swap
transactions was 3.51 billion as of Dec. 31. Notional principal underlying a swap

-47-

is usually much greater than the true risk exposure of the parties to the transaction. Vivendi did not quantify its actual risk exposure in the report.

The swap transactions relate to the sale of investments in rival media companies ordered by EU regulators as a condition for approval of Vivendi's $34 billion acquisition of Seagram Co. of Canada in December 2000. Vivendi agreed to dispose within two years of its 22 percent stake in British Sky Broadcasting Group PLC, the satellite-television unit of Rupert Murdoch's News Corp. Last September, Vivendi arranged a complex transfer of the stake to Deutsche Bank AG of Germany in exchange for a four-year, 4.2 billion loan. Vivendi also said in the filing that it had entered into a separate two-year total return swap transaction in June 2001 in connection with the sale of $719 million worth of preferred shares in AOL Europe, an AOL Time Warner Inc. unit, to an unidentified financial institution. Further details were not provided.

In response to these further negative press reports, the price of Vivendi ADSs closed down at

$28.26 on May 6, 2002.

102.    On May 28, 2002, Vivendi filed its Form 20-F for the fiscal year ended December

31, 2001 with the SEC, which was signed by defendant Hannezo. The 20-F contained Vivendi's

consolidated financial statement for the year ended December 31, 2001. The 20-F also reported

as follows:

*Net Cash Flow from Operating Activities* -- Net cash flow provided by operating activities totaled €4.5 billion in 2001, an increase of €2 billion from 2000. The increase was attributed to operating earnings generating incremental cash flow of €1.1 billion and improvements in working capital of €1.5 billion, partially offset by approximately €600 million of cash payments made for the settlement of restructuring and merger-related liabilities. Of the improvements in working capital, €0.8 billion was generated by Vivendi Environnement primarily due to the implementation of a receivables securitization program. In 2000, operating activities provided net cash of €2.5 billion compared to €0.8 billion in 1999. The significant improvement was primarily due to increased earnings generated by our Telecoms, Publishing and Environmental Services businesses.

*Net Cash Flow from Investing Activities* -- Net cash flow provided by investing activities was €4.3 billion in 2001 compared to net cash flow used for investing activities of €1.5 billion in 2000. Contributing to cash from investing activities was €9.4 billion from the sale of our spirits and wine business and €4 billion from

-48-

the disposal of our investment in BSkyB, partially offset by capital expenditures
for tangible and intangible assets net of sales proceeds of €4.9 billion and the
acquisitions of Houghton Mifflin for €2.0 billion and Maroc Telecom for €2.4
billion. In 2000, net cash used for investing activities was €1.5 billion compared
to €12.9 billion in 1999. The significant decrease primarily reflects fewer
strategic acquisitions paid for in cash in 2000 compared to 1999. . . . Proceeds
from the disposal of investments and fixed assets were €6.9 billion in 2000
compared to €4.5 billion in 1999, mainly attributable to the divestiture of non-core
real estate, construction assets and GPU power generation plants.

*Net Cash Flow from* Financing *Activities* – In 2001, net cash flow used for
financing activities was €7.5 billion, the principal components of which included
a €5.9 billion repayment of long-term borrowings and other liabilities, a €1.7
billion decrease in short-term borrowings, the purchase of treasury stock for €4.3
billion and cash dividends paid of €1 .4 billion, partially offset by €5.2 billion
proceeds from the issuance of long-term borrowings and other liabilities and €0.6
billion net proceeds from the issuance of common stock. In 2000, net cash flow
used for financing activities was €0.6 billion compared to net cash provided by
financing activities of €13.7 billion in 1999. The year-on-year variance was
primarily due to the Merger Transactions. In July 2000, the sale of 37% of
Vivendi Environnement through an IPO contributed to an increase in financing
transactions of €3.8 billion.

103.  By late-May 2002, with Vivendi's ADSs now trading in the $29 to $30 range, and

its ordinary shares trading in the €31 to €33 range in response to concerns about its debt levels,

defendants once again sought to reassure financial markets by issuing the following press release

on May 30, 2002:

> Vivendi Universal confirms having obtained agreement from the banks to delete
> the clauses that linked the availability of credit lines to a rating level. The
> Company's bank credit line [is] therefore, no longer dependent on rating agencies'
> decisions.
>
> *Additionally, the Company has no reason to anticipate or fear any further*
> *deterioration in its credit rating.*
>
> Vivendi Universal has also confirmed that, after payment of the dividend and the
> acquisition of USA Networks, its available credit lines that have not been used to
> date amount to almost 3.5 billion euros. Also, its use of commercial paper is

-49-

**JA342**

limited to about 1 billion euros, and the reimbursement of expected debts during the coming months is limited.

*This cash situation, which, the Company believes, is comfortable — even assuming an extremely pessimistic market — will enable the Company to continue its debt reduction program with confidence and with a view to creating the best possible value for its shareholders.* [Emphasis added.]

On May 31, 2002, Vivendi ADSs closed up $1.23, at $31.05.

104.    During the following weeks, however, concerns about Vivendi's debt levels continued to put downward pressure on Vivendi's securities.  In response, on June 25, 2002, Vivendi issued a press release reiterating its prior statement concerning the positive steps it had taken to reduce debt and announcing that the Company's cash position was not precarious.  The release highlighted the main points of the Company's plans as follows:

- • DEBT REDUCTION:

- – The active implementation of a debt-reduction plan has enabled Vivendi Universal to collect over E5.1 billion during the first half of the year, to which can be added the disappearance of its financial risk on BSkyB shares (E2.5 billion) and the imminent sale of the B2B health activities.

- – As a consequence, net debt will be lowered in 2002 and senior management's target (under U.S. definition) is to bring it down from about E19 billion to E15 billion.

- – That level represents a net debt-to-EBITDA ratio of below 2.5 times on a consolidated basis and of around 3 times on a proportional basis (to eliminate the impact of the minority interests in telecoms).

- • CASH SITUATION:

- – Vivendi Universal has E3.3 billion available in unused credit lines, an amount that well exceeds its commercial paper of E912 million.

- – Early repayment clauses in loan agreements apply to less than E170 million and the various bank covenants will all be complied with at both June 30 and December 31, 2002.

-50-

**JA343**

— The Company will also continue its policy of increasing the average length of its debt.

\*    \*    \*

## I - CHANGE IN DEBT SITUATION

1) According to the U.S. definition of net debt (gross debt less cash), Vivendi Universal's net debt (excluding Vivendi Environnement) fell from around €19 billion at December 31, 2001 to approximately €17 billion at March 31, 2002, (and from €14.6 billion to €12.8 billion under French GAAP). The main factors that will impact debt under U.S. practices in the second quarter were or will be:

- Cash inflows:
The proceeds from the sale of the BtoB and Health activities of the publishing division (VUP) for nearly €1 billion in debt, scheduled for the end of June. The proceeds from the disposal of the Canal+ Nordic satellite platform for €270 million

- Cash outflows:
The Vivendi Universal dividend payment in May, for €1.05 billion. The payment in May of the cash portion of the USAi transaction, for €1.8 billion.

Furthermore, the restructuring of Vivendi Environnement's equity brought Vivendi Universal €1.5 billion in cash in the second quarter and will reduce net debt by the same amount at December 31, 2002. The disposal of certain real estate assets for €120 million, committed in May, will reduce debt in the third quarter.

The total value of the disposals carried out or definitively entered into during the first half of 2002 represents more than €6 billion in cash (sale of treasury stock for €3.3 billion, B2B assets for €0.9 billion, Canal+ Nordic for €0.27 billion, real property assets for €0.1 billion and proceeds from Vivendi Environnement of €1.5 billion). VU's financial risk was reduced by an additional €2.5 billion when the BskyB transaction was unwound.

2) By December 31, 2002, and with the current shareholder structure of Cegetel still in place, Vivendi Universal is lowering its net debt target to below €15 billion (in accordance with current U.S. accounting principles), corresponding to a net reduction of over €4 billion since the beginning of the year. This target represents a ratio of debt to estimated 2002 EBITDA of below 2.5 times, including Cegetel and Maroc Telecom, as is required by both U.S. and French accounting standards. Using "proportional" levels of estimated 2002 EBITDA and debt adjusted for the minority interests of Telecoms, the debt target ratio is around 3 times EBITDA.

-51-

This new debt target, which is lower than that so far announced, has been made possible by the rapid progress made in the debt-reduction plan during the first half of the year.

3) In addition to transactions already finalized and its operating free cash flow, the company expects to meet its debt target by continuing to dispose of non-core assets. Certain disposals are already under way and proceeds from them, if they are all consummated before December 31, 2002, are expected to be well in excess of the amount required to meet the year-end debt target.

·4) About half of Vivendi Universal's debt is in the form of securities, and the other half is in bank loans. Around 60% is in euros and 40% in dollars. The company's aim is to extend the average length of its debt, firstly by reducing it and allocating income from disposals to short-term debt repayment, and then by replacing the remaining short-term debt by medium- to long-term debt.

As a first step, carried out at the beginning of 2002, Vivendi Universal replaced €3 billion of short-term debt with a five-year syndicated loan at a spread of 47.5 basis points over EURIBOR. Vivendi Universal is planning a €1-2 billion bond issue during the year to replace short-term debt.

II - CASH SITUATION

1) At this point in time, Vivendi Universal has available around €3.3 billion in unused credit lines. This is available to back up its commercial paper outstanding of nearly €1 billion.

The cash situation has greatly improved since the beginning of the year. However, it should be emphasized that, even while waiting to collect the remaining proceeds from Seagram's spirits and wine business in the fourth quarter of 2001, Vivendi Universal regularly maintained an amount of unused credit lines above the value of its commercial paper.

Owing to its strong free cash flow, combined with the execution of the disposals program and potential bond issues, Vivendi Universal is confident of its capacity to meet its anticipated obligations over the next 12 months. In particular:

a. The sale of 15.6% of VE (for €1.5 billion) and the other planned disposals are expected to more than cover Vivendi Universal's anticipated commitments over the coming months, which include:
- making available to Cegetel cash to enable the company to buy TD if SNCF decides to exercise its put option during the summer;

-52-

JA345

- the cost in cash of paying for put options to VU relating to 15 million shares. Spread over the next seven months, this cost represents an amount at each payment date equal to the difference between the share price the day when the options are exercised and their average strike price of €69;
- the cost of the price guarantee given by Seagram on Rondor, in the amount of $230 million to be paid in March 2003.

b. The VUE bridge loan put in place at the beginning of 2002 might be refinanced by a VUE bond issue, and €1.7 billion in repayments of bank loans with maturities of less than 12 months are expected to be consolidated and/or refinanced by a planned VU bond issue.

c. When the time comes, the company will decide on how to maintain the 2006 due date of the issue of bonds convertible into VE shares, which has an early redemption option for March 2003 for holders willing to relinquish the bond's option value.

2) Furthermore, since the beginning of the year, Vivendi Universal has renegotiated a number of bank clauses, in particular those that placed it in the situation of certain loans being called if its credit ratings fell below BBB- /Baa3. These clauses originally involved €5.5 billion in debt, and now apply to less than €170 million. The renegotiations have led to a reduction in the average length of financing for marginal amounts of around €200 million. The cost of these unused back-up lines has increased by 110 basis points, only if used, depending on the amount drawn. Following the renegotiations, Standard & Poor's removed Vivendi Universal from its list of companies exposed to rating triggers.

The financial undertakings made by the company in the back-up lines are the same as those made for the five-year syndicated loan of €3 billion. Vivendi Universal is projecting for June 30 and December 31 that its financial ratios will meet or exceed the ratios required in these contracts.

Defendants also announced that it would implement a monthly Q & A session to "end the

constant negative rumors about the company."

105.    On June 26, 2002, defendant Messier discussed the Company's debt and liquidity

during an investor conference call as follows:

I have read, I held in the markets all certainties, question, rumors in the current environment relating to views, view for yourselves, views for your accounting and I seen that in those circumstance. *The best that we can do is to show you [that]*

-53-

**JA346**

*there is no hidden liability that's you have all the information to come back.*
[Emphasis added.]

106.  On June 26, 2002, the *Dow Jones International News* reported:

Chairman Jean-Marie Messier said late Wednesday that he plans to stay in charge of the embattled media company despite criticism of his strategy and a crumbling share price. . . .

Messier sought to counter those doubts, opening the call with a comment that the company has no hidden, off-balance sheet liabilities and adding, *"We feel very confident looking to our debt and cash analysis with all our commitments of the group for the coming 12 months."*

107.  Vivendi's June 25, 2002 press release and subsequent comments by defendant

Messier reassured a number of market analysts. For example, on June 27, 2002 Merrill Lynch

issued a "strong buy" recommendation for the Vivendi's stock, stating:

We believe the rapid share price fall of some 25% in the last two weeks is unwarranted and expect ongoing deleveraging and improving confidence in the company's short term liquidity position should begin to revive interest in the shares.

108.  However, statements made by defendants referenced in ¶¶ 100, 102-106 above,

were each materially false and misleading because, inter alia, the Company was engaged in

improper accounting practices which had the effect of materially overstating Vivendi's reported

earnings (as particularized below at ¶¶ 119-80), including: (a) failing to timely write-down

overvalued assets from previous corporate investments and acquisitions; (b) improperly

consolidating into its financials revenue from its Cegetel and Maroc Telecom subsidiaries in

which the Company had less than 50% ownership; and (c) overstating the Company's revenue

from certain multi-year contracts. In addition, the statements failed to disclose that the

Company was suffering from a growing liquidity crisis (as particularized below at ¶¶ 181-88) and

-54-

that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

109.    On July 2, 2002, Vivendi's debt was downgraded again amid reports that the Company was in danger of default. On July 2, 2002, *Bloomberg* reported that defendant Messier "told employees in an e-mail that while he may have gone 'too fast, too far,' there are 'no hidden risks' in the company's accounting." On July 3, 2002, Vivendi's CEO, defendant Messier was forced to resign. Vivendi ADSs and ordinary shares collapsed upon these revelations, falling to as low as $13.40 and €13.90, and closing at $15. 66 and €13.90, respectively, on huge volumes of 7.4 million ADSs and 43.6 million shares.

110.    On July 3, 2002, the Company, through its new management, published a press release acknowledging that the Company had "a short-term liquidity issue." The release further stated that Vivendi had to repay creditors 1.8 billion euros by the end of July 2002, and that 3.8 billion euros in credit lines were up for renegotiation:

> [I]n light of the Moody's and Standard & Poor's downgrades of Vivendi Universal debt ratings of July 1 and 2, 2002, respectively, as well as other events that have occurred over the past several days, including the resignation of Mr. Jean-Marie Messier from his positions at Vivendi Universal, Vivendi Universal believes it is important to update the investor community and the markets generally regarding its short-term cash position and liquidity. . . .
>
> As of July 3, 2002, Vivendi Universal has 1.2 billion euros of cash and 1.6 billion euros in unused credit lines of which at least 600 million euros can be used for general corporate purposes and the rest can be used as backing for certain types of its commercial paper (400 million euros of which is currently outstanding).
>
> *Payments totalling approximately 1.8 billion euros remain due by the end of July. These will be financed from resources totalling approximately 2.4 billion euros comprising cash and draw-downs on existing credit facilities.*
>
> Several of Vivendi Universal's credit lines automatically roll over at certain

-55-

**JA348**

specific dates in accordance with their terms, subject to standard material adverse change provisions. *Of those, approximately 3.8 billion euros are scheduled to roll-over in July.* In addition, Vivendi Universal has initiated discussions with its main credit banks with a view to putting in place new credit facilities as soon as feasible.

While Vivendi Universal has a short-term liquidity issue, the value of the group's broad and diversified assets by far exceed that of its debt. The new management is committed to a program of aggressive deleveraging and greater transparency in order to restore health and confidence in Vivendi Universal. [Emphasis added.]

111.   On July 3, 2002, in *The Columbian,* Messier continued to defend Vivendi's

financial statements: "There are no underestimated liabilities.  There are no overvalued assets,"

Messier said.  "Our results are true, genuine and complete."

112.   On July 5, 2002, the *Globe and Mail Metro* reported:

With new management in place, *Vivendi Universal SA finally admitted what its ousted chairman and chief executive officer, Jean-Marie Messier, had strenuously denied in recent weeks:  The media-and-utility conglomerate is in danger of a cash crunch.*

Based on a detailed liquidity statement Vivendi put out late Wednesday, credit analysts estimate that Vivendi could face a cash shortfall of 2.7 billion euros ($2.64-billion U.S.) by the end of the year, expanding to as much as 5.5 billion euros by the middle of 2003, unless it can quickly secure a new multibillion-euro credit line from its lenders.

The statement came after a three-hour board meeting late Wednesday in Paris where the Vivendi board accepted the forced resignation of Mr. Messier.  The board, as expected, chose Jean-Rene Fourtou, a top executive of Aventis SA, the Franco-German pharmaceutical giant, as its new CEO.

In its statement, Vivendi said it must repay 1.8 billion euros this month and said the payment would be financed from 2.4 billion euros in existing cash and credit lines.  It also has a 3.8-billion-euro credit line that will roll over this month unless the banks determine there has been a "material adverse change" with the company.

This grim outlook contrasts with Mr. Messier's recent assurance that the "treasury situation" at Vivendi–owner of Universal Studios, Universal Music Group, USA

-56-

Networks and minority stakes in a host of other assets–was "comfortable even in the most pessimistic market hypotheses." [Emphasis added.]

113.    The statements made by defendants referenced in ¶¶ 109-111 above, were each materially false and misleading because, inter alia, the Company was engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings (as particularized below at ¶¶ 119-80), including: (a) failing to timely write-down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc Telecom subsidiaries in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, the statements failed to disclose that the Company was suffering from a growing liquidity crisis (as particularized below at ¶¶ 181-88) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

114.    On August 14, 2002, the Company's new management stated that, pursuant to French GAAP, Vivendi suffered a €12 billion net loss for the first half of 2002 and would take an €11 billion goodwill write-down of depreciated assets. Debt-rating agency Standard & Poor's slashed Vivendi's long-term corporate credit to junk status that same day. As the *Associated Press* reported on August 14, 2002:

> Vivendi Universal, the teetering French media conglomerate, reported a massive loss of $12 billion for the first half of the year and said it will sell $10 billion in assets as it seeks to pare debt, including the U.S. publisher Houghton Mifflin. Adding insult to injury, a ratings agency downgraded the company's debt to junk. .
> . .
>
> The sale of Houghton Mifflin, which the company only bought last year for $1.7 billion, appeared to mark a first step toward breaking up the entertainment and media empire built up by Vivendi's former chairman, Jean-Marie Messier, in a whirlwind of costly acquisitions. In all, Vivendi said it hopes to dispose of at

-57-

**JA350**

least $9.8 billion worth of assets – half of them within nine months, the rest
within two years.

*"We are facing a liquidity problem,"* said chairman Jean-Rene Fourtou, who took
over July 3 after Messier's ouster. Fourtou said he would "try to avoid any fire
sale, but we have negotiations that could be concluded very soon if the price was
lowered." [Emphasis added.]

115.    In response to these further stunning developments, on August 14, 2002, Vivendi

common stock closed at 11.89 euros, down more than 4 euros (or approximately 25%) from its

close the previous day. Vivendi's ADSs suffered a similar decline, closing down $3.67 at $11.66.

116.    In recent months, defendants' improper accounting practices and failure to

disclose the truth concerning Vivendi's liquidity crisis have given rise to fraud investigations on

both sides of the Atlantic. On July 9, 2002, *Bloomberg* reported that French stock market

regulators, the COB, were reviewing statements released by Vivendi to ensure "they abide by our

rules," and on July 10, 2002, *The Wall Street Journal* reported that French regulators raided

Vivendi's Paris headquarters as part of an investigation into whether Vivendi had disclosed

relevant information to investors in the prior 18 months. In addition, on October 29, 2002,

*Bloomberg* reported that French prosecutors had opened a criminal investigation. As *Bloomberg*

reported:

The investigation will examine whether Vivendi "published false accounts for
2000 and 2001 to hide the true nature of its financial situation," a spokeswoman
for the prosecutor's office said. It will also look at whether the Paris-based
company gave misleading outlooks for 2001 and 2002.

On December 12, 2002, *Bloomberg* reported that a police team from the Finance Brigade of the

Paris Public Prosecutor's office had raided both Vivendi's headquarters in Paris as well as

-58-

**JA351**

Messier's home. The Finance Brigade raided Canal Plus' headquarters the next day, and has also

raided the homes or offices of various Vivendi directors.

    117.   In the United States, Vivendi's accounting practices and financial disclosures are

also the subject of both a formal SEC investigation and a federal criminal investigation. As the

November 5, 2002, *The Wall Street Journal* reported:

> The U.S. attorney's office is coordinating its probe with U.S. Securities and
> Exchange Commission, which already has been conducting an informal inquiry
> into Vivendi, the company said in a statement.

> The main focus of the U.S. attorney's investigation, which is in its early stages,
> remains unclear, as does whether it will lead to any charges being filed. But one
> of the issues that has come under scrutiny by French authorities is the accuracy
> and timeliness of Vivendi's financial disclosures under its former chairman, Jean-
> Marie Messier, who was ousted in early July. France's stock-market watchdog,
> the Commission des Operations de Bourse, launched a probe at that time and is
> looking to see whether Mr. Messier may have misled his board and investors with
> overly rosy assessments of Vivendi's financial health, according to people familiar
> with that probe.

> The U.S. probe also may encompass accounting, as the Paris public prosecutor's
> office has included accounting in its own investigation. Among other issues, the
> Paris prosecutor's office said it would seek to establish whether Vivendi published
> "false accounts for the fiscal years that ended on Dec. 31, 2000 and Dec. 31,
> 2001."

On November 19, 2002, *Bloomberg* reported that the SEC's informal inquiry had been upgraded

to a formal investigation.

    118.   At all relevant times, the material misrepresentations and omissions particularized

in the Complaint directly or proximately caused or were a substantial contributing cause of the

damages sustained by Lead Plaintiffs and other members of the Class (including the Subclasses).

As described herein, during the Class Period, defendants made or caused to be made a series of

materially false or misleading statements about Vivendi's business, prospects, operations and

-59-

financial condition. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Vivendi and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class and Subclasses purchasing or otherwise acquiring the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

### VIVENDI'S MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS AND RELATED FINANCIAL MISREPRESENTATIONS

119.    During the Class Period, Vivendi filed financial statements with the SEC which were represented to have been prepared in conformity with GAAP in France ("French GAAP"). The SEC allows foreign private issuers, such as Vivendi, to prepare their primary financial statements in accordance with a comprehensive body of GAAP other than U.S. GAAP, provided that an understanding of such financial statements is facilitated via a reconciliation to U.S. GAAP.

120.    The SEC requires that each annual financial statement filed on Form 20-F and each annual and interim financial statement included in an SEC registration statement be reconciled to U.S. GAAP. Vivendi's 1999, 2000 and 2001 annual financial statements filed on Form 20-F, represented to have been prepared in conformity with French GAAP, were purportedly reconciled to U.S. GAAP. In addition, Vivendi's 2001 Form 20-F, which was signed by defendant Hannezo, represented that, beginning in 2002, the Company's financial information would be communicated on a U.S. GAAP basis and be reconciled to French GAAP.

-60-

121.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. As set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, ¶ 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

122.    Regulation S-X [17 C.F.R. § 210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate. The representations by the defendants that Vivendi's financial statements were reconciled to U.S. GAAP were materially false and misleading because the financial statements materially inflated and distorted the Company's true financial performance during the Class Period, as described herein.

123.    In violation of U.S. GAAP and SEC accounting rules and regulations, Vivendi misstated its financial statements throughout the Class Period and masked the Company's liquidity crisis. Defendants caused Vivendi's employees to engage in a myriad of improper accounting practices, and/or knowingly acquiesced in and condoned such practices. These practices concealed the truth about the then current state and future prospects of the Company's business.

-61-

(a)    **Vivendi's Improper Failure to Timely Record Impaired Goodwill**

124.    Vivendi's Class Period financial statements were materially false and misleading and presented in violation of U.S. GAAP and SEC rules and regulations because the Company failed to timely record an impairment in the value of its reported goodwill. In so doing, Vivendi misled investors about cash flows it expected to receive from certain of its recent acquisitions.

125.    As noted above, prior to and during the Class Period, Vivendi engaged in an acquisition binge, which, in the aggregate, resulted in the acquisition of interests in other entities that Vivendi valued in excess of *$77 billion*. Vivendi utilized the "purchase method" of accounting for these acquisitions. The purchase method, as set forth in then existing U.S. GAAP's Accounting Principles Board ("APB") Opinion No. 16, ¶11[2] provides that:

> The acquiring corporation records at its cost the acquired assets less liabilities assumed. A difference between the cost of an acquired company and the sum of the fair values of tangible and identifiable intangible assets less liabilities is recorded as goodwill.

126.    Accordingly, for purposes of accounting for an acquisition transaction, the acquiring entity records the acquired assets (both tangible assets and identifiable intangible assets) and liabilities assumed at their respective fair values, and the difference between the cost of the acquired entity and the respective fair values of the acquired assets, less liabilities, is recorded as goodwill. Pursuant to APB Opinion No. 16, the cost of the acquired entity for accounting purposes is determined by the fair value of the consideration acquired or issued, whichever is more objectively determinable.

---

[2] APB Opinion No. 16 has been superceded by FASB's Statement of Financial Accounting Standard ("SFAS") No. 141. However, SFAS No. 141 carries forward, without reconsideration, the guidance in APB Opinion No. 16 (and certain of its amendments and interpretations) related to the application of the purchase method.

127.    Paragraphs 74-75 of APB Opinion No. 16 further provide:

The fair value of securities traded in the market is normally more clearly evident than the fair value an acquired company. Thus, the quoted market price of an equity security issued to effect a business combination may usually be used to approximate the value of an acquired company.

*    *    *

If the quoted market price is not the fair value of the stock . . ., the consideration received should be estimated even though measuring directly the fair values of the assets received is difficult.

128.    Purporting to apply these principles, Vivendi reported that it recorded goodwill as follows when it acquired US Filter, Seagrams and Canal Plus:

    a.    US Filter acquisition -   € 4.6 billion

    b.    Seagrams acquisition -   € 25.9 billion

    c.    Canal Plus acquisition - € 12.6 billion

    **(i)    Canal Plus**

129.    With respect to the acquisition of Canal Plus in December 2000, Vivendi valued the cost of Canal Plus at approximately € 12.5 billion. More than 100% of this cost, or € 12.6 billion, was recorded by Vivendi as goodwill. As required under the purchase method, Vivendi's reporting  of € 12.6 billion of goodwill on Canal Plus, when the accounting cost of Canal Plus totaled € 12.5 billion, indicated that the fair value of Canal Plus' liabilities exceeded its assets by approximately € 100 million.

130.    In the fourth quarter of 2001, Vivendi recorded a € 6.0 billion charge for an impairment in the value of Canal Plus's goodwill under French GAAP. This was followed by an additional € 3.8 billion charge under French GAAP for an impairment in the value of Canal Plus's goodwill during the quarter ended June 30, 2002. *Accordingly, by June 2002, Vivendi*

-63-

*had written off € 9.8 billion, or approximately 78%, of the total € 12.5 billion cost to acquire*

*Canal Plus under French GAAP.*

131.   However, although Vivendi recognized an initial impairment to goodwill under

French GAAP in the fourth quarter of 2001, Vivendi did not take *any* write-off for impaired

goodwill under U.S. GAAP in 2000 or 2001. As the Company purported to explain in its 2001

year-end financial statements:

> *Goodwill Impairment Charge and Impairment of Other Long-Lived Assets*
> As required under both French and U.S. GAAP [*see* SFAS No. 121], Vivendi
> Universal reviews the carrying value of long-lived assets, including goodwill and
> other intangible assets, for impairment at least annually or whenever facts, events
> or changes in circumstances, both internally and externally, indicate that the
> carrying amount may not be recoverable. Under French GAAP, measurement of
> any impairment is based on fair value. In 2001, following the recent market
> decline, particularly in the Internet, media and telecommunications industries, our
> annual review resulted in a non-cash, non-recurring goodwill impairment charge
> of €12.9 billion (€12.6 billion after €0.3 billion minority interest). Under U.S.
> GAAP, measurement of any impairment is based on the provisions of Statement
> of Financial Accounting Standards (SFAS) No. 121, *Accounting for the
> Impairment of Long-lived Assets and for Long-Lived Assets to Be Disposed Of*
> (SFAS 121). SFAS 121 requires that an impairment loss be recognized whenever
> the sum of the undiscounted future cash flows estimated to be generated from the
> use and ultimate disposal of an asset are less than the net carrying value of the
> asset. *On this basis no impairment was indicated and accordingly the goodwill
> impairment charge was reversed.* [Emphasis added.][3]

---

[3]Vivendi's December 31, 2001 financial statements also stated:

On January 1, 2002, Vivendi Universal will adopt SFAS 142, which provides new
measurement techniques for goodwill and other intangible assets resulting from
business combinations. While its evaluation is not yet complete, Vivendi
Universal expects to record a non-recurring, non-cash charge of approximately
€15 billion in the first quarter of 2002 to U.S. GAAP net income. The impairment
reflects the overall market decline which has occurred since the Vivendi, Seagram
and Canal Plus merger was announced in June 2000. The charge will be recorded
as a cumulative effect of change in accounting principle and will have no affect on
Vivendi Universal's operations.

-64-

132.    Accordingly, on March 5, 2002, when the Company initially announced its FY
2001 results and €12.6 billion goodwill impairment write-off under French GAAP, and again
May 28, 2002, when the Company filed its Form 20-F with the SEC, Vivendi – by refusing to
take any goodwill impairment write-offs under U.S. GAAP -- effectively represented to investors
that *the cash flows* Vivendi expected to receive from the assets it acquired prior to and during the
Class Period *equaled or exceeded* the carrying value of such assets.

133.    In reality, however, defendants knew or recklessly ignored from the beginning of
the Class Period that cash flows it expected from Canal Plus and other acquisitions would *not*
equal or exceed the carrying value of those entities.

134.    For example, as set forth in a complaint ("the March 2002 complaint") filed by
Canal Plus in the United States District Court for the Northern District of California in March
2002, defendants knew or recklessly disregarded that an entity known as NDS Group PLC
("NDS") had, since March 1999, "permitted and facilitated the proliferation of counterfeit smart
cards that enabled users to circumvent the security measures built into the Canal+ conditional
access system," causing Canal Plus to suffer losses over a billion dollars. According to the
March 2002 complaint:

> Through the investment of millions of dollars and thousands of man-hours into
> research and development, Canal+ was able to implement effective security
> measures in its smart cards used to control access to digital television signals.
> *These measures proved to be more than adequate to protect Canal+' smart
> cards from piracy until March 1999, when Canal+' smart card software code
> was copied and published on a web site called "DR7.com." Thereafter,
> counterfeit Canal+ smart cards began to appear on the market. The
> proliferation of these counterfeit cards resulted in massive harm to Canal+ and
> to the system operators who depend on the security of Canal+' smart cards. . . .*
>
> *If smart card pirates obtain Canal+' new software code, the damage to Canal+
> will be irreparable. What is released to the public cannot be put back in the*

-65-

bottle. *The market for counterfeit smart cards is massive and the harm from such activities is global.* [Emphasis added.]

135.  As Canal Plus has further alleged:

Canal+ seeks redress in this action for the damage caused by its competitor, NDS. Through the calculated expenditure of millions of dollars for specialized equipment and other resources, NDS sabotaged C+ Technologies' [Canal Plus Technologies'] previously unbroken security system for access to digital television signals. In apparent disregard for both the law and its own reputation, NDS caused the development of counterfeit "smart cards," permitting a theft of digital television on a massive scale. *Canal+ estimates that Defendants' illegal conduct has caused it harm in excess of $1,000,000,000.*
　　　*   *   *

C+ Technologies has spent substantial time and money developing countermeasures to combat each type of pirate smart card that resulted from the publication caused by NDS. These countermeasures are created by a team of C+ Technologies engineers and then tested and broadcast by the digital television operators to stop unlawful television viewing by counterfeit card consumers. *The countermeasures, however, are quickly made obsolete by new versions of software for the counterfeit cards that pirates make available after analyzing the countermeasures. Counterfeiters are able to quickly and effectively respond to each new countermeasure because they have access to the UserROM code published on DR7.com.* C+ Technologies cannot stop this counterfeiting without implementing a fundamental change in the design of the smart card. At enormous expense, C+ Technologies is currently developing a new smart card design and will soon transition its existing network to the new design. This transition will be consuming and expensive because each and every legitimate smart card will have to be exchanged.

*The mass production of counterfeit C+ Technologies smart cards has damaged not only Groupe Canal+'s direct revenue through its digital television operators, but has also hurt the sales efforts of C+ Technologies and Canal+ USA. Conditional access system competitors, especially NDS, use the existence of counterfeit C+ Technologies cards as a competitive weapon in the sales process among content providers and system operators.* For example, Canal+ has encountered competitors, including NDS, pointing out to customers and potential customers in the United States and elsewhere throughout the world, the breach of C+ Technologies' security schemes as evidence that Canal+ cannot guarantee the integrity of its systems. In highlighting this supposed security breach, Defendants have deceptively failed to disclose that the breach exists solely because of Defendants' own unlawful sabotage.

-66-

*As a result of the counterfeiting, Canal Plus has lost sales opportunities and has lost customers to its competitors.* NDS has also used the counterfeiting to attempt to disrupt Canal Plus' relationships with existing customers.

*Another loss occasioned by NDS to Groupe Canal Plus is the loss of pay per view subscriptions.* One common type of counterfeit access is a modification of a legitimate smart card. These cards, commonly referred to as "MOSC" cards (*i.e.* "Modified Official Smart Cards"), are legitimate cards, sometimes with valid basic subscriptions, that have been altered so they grant their owners rights that they have not purchased. Some MOSC cards grant free access to upgraded packages or to every subscription channel; others have a number of pay per view television "credits" for which the owner has not paid. These cards did not exist before the publication on DR7.com and but for that publication, they would not have been produced. *The widespread use of MOSCs has caused Group Canal Plus and pay television operators from the Canal Plus group to lose revenues from premium programs as subscribers are able to have their smart cards altered to receive premium programs without paying for them.* [Emphasis added.]

This known piracy of Canal Plus' technology confirms that Vivendi's goodwill was overstated

long before the end of FY 2001, when Vivendi first recorded a *€ 6.0 billion* impairment in the

value of goodwill on its acquisition of Canal Plus.

136.    Similarly, according to a declaration filed on May 13, 2002 in connection with

Canal Plus' action against NDS, Jean-Marc Racine, the Director of Marketing for Canal Plus, and

former CEO of Canal Plus, stated:

*[J]ust as Canal+ was getting a foothold in the U.S., the piracy of our conditional access system became known and Canal+' efforts to gain U.S. market share, based out of Milpitas and later Cupertino, were negatively impacted. A company's reputation, as well as market perception of the quality of its product, is important in order to win new business, and the piracy of MediaGuard had a negative impact on Canal+.*

I had several experiences with Canal+ customers that to me evidence the impact of the piracy of MediaGuard on Canal+' Northern California operations. For example, Canal+ Technologies, Inc. expended a great deal of resources trying to win a contract with Cablevision in New York. We lost this contract to NDS, and Cablevision told us that it was choosing NDS because NDS knew how to combat piracy better than Canal+. In another instance, I believe that NDS actively

-67-

flaunted the hacking of Canal+' conditional access system when it was in competition with Canal+ to win a full end-to-end system contract from RCN, an over-builder based in Princeton, New Jersey, which has significant operations in major U.S. cities, including San Francisco. Canal+ Technologies, Inc.'s only real competition for the RCN business was NDS. Several times, RCN, which was in contact with NDS at the time, mentioned the piracy of MediaGuard that had occurred after our codes were published on DR7. On May 29, 2001, RCN asked us to comment on several articles and other information contained on web sites regarding the hacking and counterfeiting of Canal+' smart cards. . . . This set of articles is extensive and had to take more than a few hours to prepare. It was sent by an RCN engineer who I believe was also in contact with NDS in this competition with Canal+. RCN asked us to justify why there was a piracy problem with our smart cards and told us that NDS had a much better solution and no piracy problem in Europe. RCN postponed their decision on selecting a supplier for a new end-to-end system, but I believe that the piracy problem caused confusion and created doubts at RCN about the performance and quality of Canal+' products.

*Since then, Canal+ Technologies, Inc. has successfully won only one contract in the United States*, WinFirst in Sacramento. As the piracy of MediaGuard became known, we have put management time and efforts into reassuring the customer. We had to set up a Security Committee and explain to the customer how to fight piracy, the legal actions taken in Europe, and the engineering steps that we would use and were using to combat piracy. These efforts would not have been needed if MediaGuard had remained secure. The security problems associated with our conditional access system[s] have had a negative impact on the sales efforts in the United States of Canal+ Technologies, Inc. based in Cupertino. [Emphasis added.]

137.   In addition, on March 2, 2001, *New Media Markets* reported:

Some estimates put the level of piracy as high as 30 per cent of the pay-television subscriber base in Western Europe.

\*     \*     \*

The impact of piracy was made clear last month by Spanish pay-television group Sogecable, which runs both the Canal Satelite Digital digital-satellite platform and the Canal Plus Espana premium service. The company, which has just over two million subscribers, said that pirate cards were being used by between 100,000 and 300,000 homes in Spain. *This is hurting the premium channel and pay-per-view services in particular.* [Emphasis added.]

-68-

138.   Despite the foregoing, when Vivendi reported its results for the quarter ended

March 31, 2002, the Company disclosed:

> Canal+ Premium Channel revenue fell 3% in the quarter because of lower
> advertising revenue and lower subscription revenue owing to lower average
> analogue subscribers.

In truth and in fact, Canal Plus Premium Channel revenue was materially adversely affected by

the undisclosed piracy of Canal Plus' technology noted above.

139.   Moreover, although defendants caused Vivendi to belatedly record goodwill

impairments totaling €16.6 billion in the first quarter of 2002 under U.S. GAAP -- after having

taken *no* impairment charges under U.S. GAAP in FY 2001 -- defendants downplayed the

significance of these write-offs by attributing them to the adoption of a new U.S. GAAP

accounting standard, SFAS No. 142, under which impairment is principally evaluated by

reference to cash flow impairment.[4]   By artfully delaying any recognition of goodwill impairment

under U.S. GAAP until after Vivendi had adopted SFAS No. 142, defendants artfully avoided

having to admit the fact that Vivendi's expected cash flows from its acquisitions had been

materially impaired well before its adoption of the new accounting standard.

140.   In addition, during 2000 and 2001, the world-wide economy suffered significant

contraction and retrenchment, and experienced a dramatic slowdown in the Internet, pay TV and

telecommunications sectors.   In fact, shortly after Vivendi issued its 2001 year end financial

---

[4]Pursuant to SFAS No.142, the fair value of a reporting unit is compared to its carrying
amount.   If the fair value of a reporting unit exceeds its carrying amount, goodwill of the
reporting unit is considered not impaired   If the carrying amount of reporting unit's goodwill
exceeds the implied fair value of that goodwill (as defined), an impairment loss shall be
recognized in an amount equal to that excess.

-69-

results, Moody's downgraded Vivendi's debt out of concerns about the Company's ability to service its debt as it became due.

141.  Moreover, after Messier and Hannezo left the Company, *Vivendi recorded an additional € 3.8 billion impairment in the value Canal Plus' goodwill at the end of the first half of 2002 under French GAAP, when Canal Plus actually reported revenue growth of 8% during this period.*  The fact that Vivendi's new management took additional write-offs of goodwill at Canal Plus during a period when Canal Plus' business was actually improving is further evidence that the impairment recorded in the value of Canal Plus' goodwill in the second half of 2002 should have been taken earlier.

142.  The reported value of Canal Plus' assets on Vivendi's balance sheet was also materially and improperly inflated in other respects.  For example, in 1999, Canal Plus entered into contracts with five French football (soccer) league clubs:  Monaco, Lyon, Lens, Bordeaux and Paris-St. Germain.  These agreements obligated Canal Plus to pay € 250 million over the next five years for "marketing rights" related to those teams, and these rights were reported as assets in Vivendi's financial statements.

143.  However, according to a January 29, 2001 memo that was prepared shortly after Vivendi acquired Canal Plus in December 2000, and that was reviewed by defendant Hannezo, the purported "marketing rights" had no economic benefit to Canal Plus because the rights primarily at issue turned out to belong to the football league, rather than to the individual clubs.  The memo also stated that the contracts had not been properly authorized by Canal Plus' board.  The memo further warned that, given the lack of economic benefit that could be documented in

-70-

connection with these contracts, the contracts could put Vivendi in a "difficult" position with respect to the SEC and U.S. GAAP reporting requirements.

144.    Pursuant to U.S. GAAP, assets are probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events. Concepts Statement No. 6. As described in the January 21, 2001 memo, however, there were no meaningful economic benefits flowing from these five accounts.

145.    Accordingly, the marketing rights in the amount € 250 million, reported as assets in Vivendi's financial statements were not *bona fide* "assets" at all, and were required to be written-off and charged to expense in Vivendi's year-end financial statements for FY 2000 (which were filed with the SEC on July 2, 2001). Nonetheless, Vivendi improperly failed to do so in violation of U.S. GAAP.

(ii)    **US Filter**

146.    Just as it did with Canal Plus, Vivendi also overstated its reported goodwill on its US Filter acquisition. For example, when Vivendi acquired US Filter, it paid approximately 46 times US Filter's 1998 earnings. As a result, Vivendi recorded approximately € 4.6 billion in goodwill on the US Filter acquisition. However, as defendants knew or recklessly ignored, Vivendi's reported goodwill on US Filter was materially inflated during the Class Period because, among other things (a) US Filter's operating results were much less than reported by Vivendi as US Filter was falsely inflating its revenue, as noted below at ¶¶ 169-177, and (b) because companies comparable to US Filter were sold during the Class Period at prices significantly less than that paid by Vivendi. (For example, although Vivendi paid 46.5 times US Filter's purported operating profit when Vivendi acquired it in September 1999, in 2001 the German conglomerate

-71-

RWE purchased a comparable U.S. water utility, American Water, for only about 16 times earnings before interest and taxes). These events and circumstances confirmed that US Filter's goodwill was impaired under US GAAP prior to the fourth quarter of 2001. In the end, Vivendi recorded a staggering € 2.6 billion impairment in the value of US Filter's assets, but, in violation of U.S. GAAP, did not record this impairment until the end of the fourth quarter of 2001.

147.    After Vivendi's board ousted Messier and Hannezo, Vivendi's new management also implicitly admitted that the goodwill impairments that prior management had recognized for entities other than Canal Plus and US Filter were also insufficient. For example, for the three months ended June 30, 2002, Vivendi reported additional goodwill impairments (exclusive of those pertaining to Canal Plus) totaling *€ 7.2 billion on a French GAAP basis* on August 14, 2002. In contrast, the Company's financial statements for the three months ended March 31, 2002 (prepared on a French GAAP basis) showed that no charge for goodwill impairment was recognized during the March 31, 2002 quarter.

**(b)    Vivendi's Improper Consolidation Of Investments**

148.    Vivendi also improperly inflated its 1999, 2000 and 2001 revenues and operating income by consolidating certain investments in which the Company possessed less than a 50% ownership interest.

149.    Specifically, although Vivendi only owned a minority of the shares of the French telecommunications company Cegetel and the Moroccan telecommunications company Maroc Telecom, the full results of Cegetel were included in Vivendi's consolidated financial statements for 1999, 2000 and 2001 and the full results of Maroc Telecom were included in Vivendi's consolidated financials for 2001.

-72-

150.    In the footnotes to its 1999, 2000 and 2001 financial statements filed with the

SEC on Form 20-F, Vivendi disclosed the full consolidation of the following companies:

| OWNERSHIP INTEREST | | | |
| --- | --- | --- | --- |
| Name | 1999 | 2000 | 2001 |
| Cegetel & Subsidiaries | 44% | 44% | 44% |
| Maroc Telecom | — | — | 35% |

(*See* Vivendi's 1999 20-F Pages 183-184; 2000 20-F Pages F39-F40; 2001 20-F Pages F48-F-49.)

151.    U.S. GAAP, in Accounting Research Bulletin ("ARB") No. 51, provides:

The purpose of consolidated statements is to present, primarily for the benefit of
the shareholders and creditors of the parent company, the results of operations and
the financial position of a parent company and its subsidiaries essentially as if the
group were a single company with one or more branches or divisions.  There is a
presumption that consolidated statements are more meaningful than separate
statements and that they are usually necessary for a fair presentation when one of
the companies in the group directly or indirectly has a controlling financial
interest in the other companies.

152.    ARB No. 51, as amended by FASB's SFAS No. 94, also provides, in pertinent

part, that:

The usual condition for a controlling financial interest is ownership of a majority
voting interest, and, therefore, as a general rule ownership by one company,
directly or indirectly, of over fifty percent of the outstanding voting shares of
another company is a condition pointing toward consolidation.

153.    In addition, the Emerging Issues Task Force ("EITF") of the FASB has issued

Abstract No. 96-16, which provides accounting guidance for when minority shareholders possess

certain rights which may overcome the presumption that consolidation requires a majority voting

interest in an investee.  In this regard, EITF No. 96-16 provides, in pertinent parts:

-73-

**JA366**

The Task Force believes that minority rights (whether granted by contract or by law) that would allow the minority shareholder to effectively participate in the following corporate actions should be considered substantive participating rights and would overcome the presumption that the investor with a majority voting interest should consolidate its investee:

1.   Selecting, terminating, and setting the compensation of management responsible for implementing the investee's policies and procedures

2.   Establishing operating and capital decisions of the investee, including budgets, in the ordinary course of business.

The Task Force considered the above to be illustrative of substantive participating rights, not necessarily all-inclusive. The Task Force believes that the rights noted above are participating rights because, in the aggregate, the rights allow the minority shareholder to effectively participate in decisions that occur as part of the ordinary course of the investee's business and are significant factors in directing and carrying out the activities of the business. Individual rights, such as the right to veto the termination of management responsible for implementing the investee's policies and procedures, should be assessed based on the facts and circumstances to determine if they are substantive participating rights in and of themselves. However, minority rights that appear to be participating rights but that by themselves are not substantive (see "Factors to Consider" and Exhibit 96-16A) would not overcome the presumption of consolidation by the investor with a majority voting interest in its investee. The likelihood that the veto right will be exercised by the minority shareholder should not be considered when assessing whether a minority right is a substantive participating right.

154.   In addition, under French GAAP, exclusive control and the power to direct the financial and operational policies of an enterprise is required in order to consolidate results. Furthermore, French GAAP states that enterprises are *excluded* from consolidation where severe and long lasting restrictions substantially call into question the control or influence exercised over the enterprise. (*See* Regulation 99-02 Section 1002, 101.)

155.   Vivendi did not possess controlling financial interests in, at least, its Cegetel and Maroc Telecom subsidiaries and therefore should not have consolidated the financial statements

-74-

of such companies with its own. In so doing, Vivendi overstated its reported revenue, operating

income and EBITDA and inflated its reported growth rates throughout the Class Period.

156.    Consolidating the financial statements of these investments was critical to

defendants' scheme because it allowed Vivendi to include all of the revenues and operating

income from these investments in its financial results. Indeed, this accounting practice artificially

and materially inflated Vivendi's revenues and income because Vivendi did not posses control

over such investments nor did it have access to their reported cash. As a result, not only was

Vivendi's revenue and earnings inflated, its liquidity crisis was much worse than portrayed in the

Company's publicly filed financial statements.

### Cegetel

157.    Vivendi stated in its December 31, 2000 20-F that:

The Company consolidates Cegetel . . . in which it owns less than 50% of the
voting shares. The Company has a direct and indirect ownership interest in
Cegetel totaling 44%. Cegetel is consolidated because, through a shareholders
agreement, the Company has a majority of the shareholder voting rights.

[T]he Company *only* consolidates the subsidiary if no other shareholder or group
of shareholders exercise substantive participating rights, which would allow those
shareholders to veto or block decisions taken by the Company." [Emphasis added.]

158.    This statement and the consolidation of Cegetel's 1999-2001 operating results were

false and misleading because Vivendi only owned 44% of Cegetel shares and it did not have

sufficient controlling financial interest in Cegetel. Indeed, the Shareholder Agreement between

Vivendi and Cegetel, as described in Vivendi's 2000 20-F, contained a key clause that blocked

Vivendi from making operating and capital decisions in the ordinary course of Cegetel's business.

159.    The clause states:

-75-

- If all of BT, Mannesmann and Transtel dissent, *we [Vivendi] cannot cause Cegetel Group to*:
  - create or acquire shares in any entity in which Cegetel Group or companies it controls hold less than 100% of the shares and voting rights; or
  - subject to some exceptions, *acquire, dispose of, lease or loan a material amount of assets* or significantly reduce or cease *any material business operation.* [Emphasis added.]

160. Additionally, Vivendi lacked the necessary financial control of Cegetel for it to have access to Cegetel's cash flow. When asked about the liquidity of the Company, Vivendi's CEO Jean-Rene Fourtou admitted in a June 26, 2002 conference call that "we do not have access to *Cegetel* and Maroc Telecom." In an August 14, 2002 conference call with investors, Jean-Rene Fourtou also conceded that "Vivendi cannot access the cash flow generated by the Companies it owns less than 50% of."

161. It was not until after the Class Period, on December 3, 2002, that Vivendi announced that it *would* purchase sufficient number of shares to give it *a majority stake* in Cegetel, and to finally give Vivendi the necessary financial control over Cegetel's cash flow.

162. As a result of Vivendi improperly consolidating Cegetel's financial statements, Vivendi's reported revenues were overstated by € 3.9 billion, € 5.1 billion and € 6.4 billion for the years ended 1999, 2000, and 2001, respectively.

### Maroc Telecom

163. Vivendi disclosed in its 2001 20-F that:

In the course of the partial privatization of Maroc Telecom, Vivendi Universal was chosen to be a strategic partner in the purchase of an interest in Morocco's national telecommunications operator for approximately €2.4 billion. The transaction was finalized in April 2001, at which time Maroc Telecom began to be consolidated in the accounts of Vivendi Universal, as we obtained control through majority board representation and share voting rights. As a leader in

-76-

> Moroccan telecommunications, Maroc Telecom operates 1.2 million fixed lines,
> has 3.7 million GSM clients and generated revenues of approximately €1.4 billion
> in 2001.

164.    Vivendi also disclosed in its 2001 Form 20-F that no other shareholder or groups

of shareholders exercise substantive participatory rights, which would allow them to vote or block

decisions taken by Vivendi Universal.

165.    This disclosure and the consolidation of Maroc Telecom's 2001 results were false

and misleading because Vivendi only owned 35% of Maroc Telecom, and because the remaining

65% was held by a single entity – the Moroccan government. The Moroccan government did not

conduct its operation based on the views of Vivendi.

166.    Additionally, under French GAAP, at least a 40% ownership interest is required for

consolidation (Regulation 1002), but Vivendi only had a 35% interest.

167.    As with Cegetel, Vivendi lacked the necessary financial control of Maroc Telecom

for it to have access to Moroc Telecom's cash flow. When asked about the liquidity of the

Company, Vivendi's CEO Jean-Rene Fourtou admitted in a June 26, 2002 conference call that

"we do not have access to Cegetel and *Maroc Telecom*." [Emphasis added.] In an August 14,

2002 conference call with investors, Jean-Rene Fourtou similarly stated that "Vivendi cannot

access the cash flow generated by the companies it owns less than 50 percent of."

168.    As a result of Vivendi improperly consolidating Maroc Telecom's financial

statements, Vivendi's reported revenues were overstated by € 1.4 billion in 2001.

-77-

**JA370**

**(c)    Vivendi's Improper Recognition Of Revenue**

169.    In furtherance of its scheme to inflate its operating performance, Vivendi, in

violation of U.S. GAAP, improperly recognized revenue from, at least, its US Filter subsidiary.

170.    U.S. GAAP provides that revenue should not be recognized until it is realized or

realizable and earned.  FASB Concepts Statement No. 5, ¶ 83.  The conditions for revenue

recognition ordinarily are met when persuasive evidence of an arrangement exists, delivery has

occurred or *services have been rendered*, the seller's price is fixed or determinable, collectibility

of the sales price is reasonably assured and when the entity has substantially performed the

obligations which entitle it to the benefits represented by the revenue.  Generally, revenue should

not be recognized until the earnings process is complete.  SEC Staff Accounting Bulletin

("SAB") No. 101; Concept Statement Nos. 2 and 5; SFAS No. 48; ARB No. 43; APB Opinion

No. 10; and SOP 97-2.

171.    In fact, the SEC's SAB No. 101 specifically provides that:

> Supply or service transactions may involve the charge of a nonrefundable initial fee
> with subsequent periodic payments for future products or services.  The initial fees
> may, in substance, be wholly or partly an advance payment for future products or
> services.  In the examples above, the on-going rights or services being provided or
> products being delivered are essential to the customers receiving the expected
> benefit of the up-front payment. Therefore, the up-front fee and the continuing
> performance obligation related to the services to be provided or products to be
> delivered are assessed as an integrated package.  In such circumstances, *the staff*
> *believes that up-front fees, even if nonrefundable, are earned as the products*
> *and/or services are delivered and/or performed over the term of the arrangement*
> *or the expected period of performance.*  [Emphasis added; footnotes omitted.]

172.    In its December 31, 2001 Form 20-F, the Company disclosed the following with

respect to its accounting policy associated with the recognition of environmental service revenue:

-78-

Revenues on public service contracts are recognized as services are provided. Amounts billed and collected prior to services being performed are included in deferred revenues.

173.   In violation of GAAP and its publicly disclosed revenue recognition policy, Vivendi, throughout the Class Period, improperly recognized anticipated revenue from multi-year public service contracts upon signing on the contracts. In so doing, Vivendi materially overstated its reported operating results during the Class Period in violation of U.S. GAAP and its publicly disclosed policy of revenue recognition.

174.   For example, according to a former officer of U.S. Filter, during the Class Period, Vivendi Environnemental materially overstated its operating results by employing a practice internally referred to as "booking backlog." Pursuant to such practice, *US Filter improperly recognized and reported the entire dollar amount of long-term, fixed priced contracts as revenue upon the signing of the contract. In fact, a former officer of U.S. Filter advised plaintiffs' counsel that Vivendi Environnemental's revenue was overstated due to such practice "by as much as 10 times." Vivendi Environmental accounted for approximately 51% of Vivendi's reported revenues and operating income during the year ended December 31, 2001.*

175.   U.S. GAAP, in APB No. 22, ¶7, provides that the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company, and further states that information about the accounting policies adopted by a reporting company is "essential" for financial statement users. (APB No. 22, ¶ 8) Accordingly, U.S. GAAP requires that financial statements identify and describe important judgments as to the appropriateness of principles relating to the recognition of revenue. (APB No. 22, ¶12)

-79-

JA372

176.    During the Class Period, Vivendi materially inflated its operating results and violated its stated policy of revenue recognition and U.S. GAAP when it recognized and reported revenue on such transactions because the "revenue" was not earned, services were not rendered and the Company had not yet substantially performed the obligations which entitled it to the benefits represented by the revenue. In so doing, investors were uninformed about actual accounting policies that were "essential" to an informed investment decision.

177.    Indeed, Vivendi's management directed or knowingly condoned and encouraged the process in which employees would improperly record revenue, thereby inflating reported revenue. Indeed, the term "booking to backlog" was a phrase that was widely used among US Filter personal, and the phrase was even included in monthly reports given to the Executive Board of Vivendi Environmental.

178.    In addition to the accounting improprieties stated above, Vivendi presented its financial statements during the Class Period in a manner which also violated at least the following provisions of GAAP:

(i)    The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, ¶ 34);

(ii)    The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶ 40);

-80-

**JA373**

(iii)     The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶ 50);

(iv)     The concept that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶ 42);

(v)     The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58-59);

(vi)     The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶ 79);

(vii)     The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶ 95, 97).

-81-

179.    The foregoing accounting improprieties caused Vivendi to issue financial statements that materially falsified its financial performance to the detriment of unsuspecting investors and further masked the problems the Company was experiencing during the Class Period. In filling financial statements with the SEC which did not conform to the requirements of U.S. GAAP, the defendants repeatedly disseminated financial statements of Vivendi which were presumptively misleading and inaccurate. The accounting machinations detailed herein further evidence the defendants intent to deceive investors during the Class Period and misrepresent the truth about the Company and its business, operations and financial performance to detriment of those who relied on them.

180.    The Company's Class Period  annual and interim financial statements filed with the SEC were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a materially adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations.

## DEFENDANTS' FAILURE TO DISCLOSE MATERIAL ADVERSE FACTS CONCERNING VIVENDI'S SEVERE LIQUIDITY PROBLEMS

181.    For the reasons set forth in the immediately preceding ¶¶ 119 to 180, defendants materially overstated Vivendi's financial performance during the Class Period in violation of GAAP.

182.    However, during the Class Period, defendants also repeatedly made material misstatements and omissions concerning the Company's liquidity. Unbeknownst to investors or the financial markets, and contrary to the defendants' repeated assurances that the Company was

-82-

in strong financial condition, Vivendi's implementation of its growth-by-acquisition strategy
caused it to overpay for businesses and saddled the Company with a huge debt burden that the
operations of the acquired businesses could not satisfy.

183.   As a result, Vivendi was under great strain to met its obligations in the ordinary
course as they came due. The causes of Vivendi's liquidity problems included the following:

(a)   **Inability to generate expected cash flows from acquired companies.** As
set forth in detail above in the section discussing Vivendi's failure to timely recognize
impairments to goodwill (*see* ¶¶ 124-147), cash flows from a number of Vivendi's largest
acquisitions (including, *inter alia*, Canal Plus, Universal and U.S. Filter) fell dramatically
short – by billions of dollars – of meeting the implied cash flow expectations that would
have been necessary to justify Vivendi's publicly reported valuation of its "goodwill."
Indeed, as described generally above, Vivendi's financial performance fell sufficiently
short of the expectations that defendants had fostered during the Class Period that
defendants caused Vivendi to engage in a variety of other GAAP violations to conceal the
Company's actual results.

(b)   **Vivendi's Undisclosed 2001 Stock Buybacks.** Further exacerbating
Vivendi's cash flow situation was defendant Messier's undisclosed and massive stock buy-
back program, which -- unbeknownst to investors -- caused the Company to spend
approximately $6.3 *billion* of the Company's cash on acquiring Vivendi shares. As later
reported in the *Wall Street Journal* on October 31, 2002:

> Mr. Messier, a former top investment banker with Lazard LLC, was
> famously fond of deal making. But now it turns out he pursued many more
> deals than has been publicly known. *More important, he spent billions of*

-83-

**JA376**

*dollars buying back Vivendi stock on the market last year without consulting his CFO or the board, according to people familiar with the situation. Trying to prop up the stock price, he instead only sent Vivendi's debt soaring.*

          *   *   *

The board signed off on Mr. Messier's acquisitions. But it did so without knowing the full extent of his spending spree, current and former board members say. That is because Mr. Messier didn't tell the board about his single biggest expenditure: the purchase of 104 million Vivendi shares, or nearly 10% of the company's equity, on the stock market during 2001. His purpose was to prop up the share price. The cost: $6.3 billion.

Shareholders had earlier approved a resolution allowing Vivendi to buy back up to 10% of its shares. But current and former directors say they expected to hear beforehand about such massive purchases.

          *   *   *

Mr. Hannezo opposed the stock purchases as a waste of cash. . . . This resulted in Mr. Messier trying to circumvent his CFO on the buybacks. The ex-chairman placed his stock orders by phone with two mid-level employees in the finance department, Hubert Dupont Lhotelain and Francois Blondet, according to a person familiar with the matter. . . .

In early December 2001, the CFO finally intervened by forbidding his subordinates to take Mr. Messier's phone calls, the person familiar with the situation says. Mr. Hannezo set up a formal process to slow Mr. Messier down, requiring that the chairman request buybacks in writing, along with some justification.

          *   *   *

By December, the buybacks had taken their toll: Vivendi was running out of cash, according to Mr. Hannezo's memo to the COB. [Emphasis added.]

    (c)    **Undisclosed Off-Balance Sheet Liabilities**. During the Class Period,

defendants also misled investors about an off-balance sheet liability that further threatened

Vivendi's liquidity and ultimately cost Vivendi hundreds of millions of dollars and

impaired Vivendi's liquidity crisis. In late 2000 and 2001, defendants wagered on the

future success of the Company by selling put options to raise cash to fund executive

compensation. These put options obligated Vivendi to purchase in the future at least 22.8

million of its own shares, or approximately 2% of all outstanding Vivendi stock, at an

-84-

**JA377**

average price of €69. Even as Vivendi's share price dropped during 2001 and the first half of 2002, making it increasingly likely that the Company would take a staggering loss on the options, defendants continued to conceal the true nature and extent of these liabilities, and to misrepresent Vivendi's true liquidity condition. Moreover, even when defendants finally made limited disclosures of its put obligations in the spring of 2002, the disclosures were woefully inadequate. For example:

  (i)   After being criticized by the French press for concealing the risk connected to the options, Vivendi claimed that defendant Hannezo went over the put options with analysts at an accounting workshop March 6, 2002 in Paris. However, as the May 1, 2002 edition of *The Wall Street Journal* reported, *"analysts who were present or listened in said Vivendi glossed over the issue,"* [Emphasis added] and Vivendi admitted that discussion of the puts was "easy to miss" at the accounting workshop. Moreover, the slide presentation from this workshop, belatedly filed with the SEC as an exhibit to Vivendi's May 2, 2002 Form 6-K did not mention Vivendi's put obligations.

  (ii)   On April 15, 2002, Vivendi disseminated its annual report on Form 6-K for FY 2001 which contained a translation of its 2001 year end financial statements. This translation also made only vague reference to Vivendi's put obligations:

> In connection with the sale of puts on its shares, Vivendi Universal had a commitment, at December 31, 2001, to buy 19.7 million shares at exercise prices ranging from €60.40 to €80.00 in 2002 and 3.1 million shares at an exercise price of €50.50 in January 2003.

Vivendi's annual report therefore did little to clarify the details of Vivendi's risks

-85-

and obligations in connection with the put options. For example, other than specifying that Vivendi could be forced to purchase 3.1 million shares in January 2003, the report failed to inform investors of the scope, if any, of the Company's obligations with respect to the puts after December 31, 2001. The report also failed to comment on whether the options were likely to be exercised given the decline in Vivendi's stock price, or their potential adverse impact on Vivendi's liquidity.

(iii)     On April 18, 2002 (as later reported by the May 1, 2002 *Wall Street Journal*) Laura Martin, who heads Vivendi's investor-relations departments, sent an e-mail to selected analysts that purported to clarify Vivendi's obligations with respect to the put options:

> In a sign that Vivendi itself was conscious it hadn't made clear enough the consequences of the put options, Laura Martin, who heads the company's investor-relations department, sent an e-mail to four analysts on April 18 spelling the put options out clearly.

> In the e-mail, Ms. Martin said Vivendi had 18 million put options outstanding that the company sold to undisclosed parties for 12 euros each and that carry an exercise price of 69 euros. She estimated the impact on the company's balance sheet at 50 million euros to 1.2 billion euros. The e-mail went on to say that, though previously raised at the [March 6, 2002] accounting workshop, the put options "were easy to miss."

Still, Martin's "selective disclosure" failed to state the timetable for Vivendi's future obligations, preventing analysts and investors from making a reasonable assessment with regard to Vivendi's cash flow for the immediate future. In addition, Ms. Martin's range of potential liability was rendered meaningless by its

-86-

**JA379**

impossibly large scope and failure to reference when the obligation would come

due.

      (iv)     It was therefore not until May 28, 2002, in its Form 20-F for the

year ending 2001, that Vivendi began to inform investors about its true potential

adverse effects ensuing from the put options:

> Except for one put sold in 1998, Vivendi Universal in 2001 sold
> puts to banks on 19.7 million ordinary shares at exercise prices
> ranging from €60.40 to €80.00 in 2002 and 3.1 million ordinary
> shares at an exercise price of 50.50 in January 2003. As of April
> 30, 2002, approximately 16 million of these puts remain
> outstanding. . . .

> Vivendi Universal's contingent liability relating to these puts is
> approximately €1.1 billion to settle the 16 million puts outstanding
> for cash at an average of €69 per put and approximately €540
> million to settle the 16 million puts outstanding for cash by paying
> the banks the difference between the average of €69 per put and the
> market price per ordinary share of Vivendi Universal as of April 30,
> 2002.

A later June 7, 2002 article in the *Economist* reported that Hannezo had confirmed

that Vivendi was using cash each month to buy out the costly put options.

      (v)     In its 2002 half year financial statements released August 14, 2002,

Vivendi disclosed the impact its put obligations had during the first six months of

2002 alone:

> As at June 30, 2002 and December 31, 2001, Vivendi Universal had
> outstanding obligations on 13.9 million and 22.8 million shares
> respectively. The average exercise prices were €69 and €70
> respectively, giving a potential commitment of €953 million and
> €1,597 million respectively. These put options are only exercisable
> on the specific date of the option and expire at various dates during
> 2002 and the first quarter of 2003.
>
>      *   *   *

-87-

The cost to Vivendi Universal during the first half of 2002 by
option holders exercising their rights amounted to €239 million.

## The Magnitude of the Undisclosed Liquidity Problem

184.    As subsequently reported by the *Wall Street Journal* in an article entitled "How

Messier Kept Cash Crisis at Vivendi Hidden For Months:  Media Giant Was At Risk Well Before

Investors Knew" and dated October 31, 2002, Vivendi's acquisition spree, together with the other

factors referenced in the preceding paragraphs, had put Vivendi on the brink of catastrophe:

On Dec. 13, [2001], Guillaume Hannezo sent Jean-Marie Messier, chairman of
Vivendi Universal SA, a desperate handwritten plea.

"I've got the unpleasant feeling of being in a car whose driver is accelerating in the
turns and that I'm in the death seat," wrote Mr. Hannezo, the company's chief
financial officer.  "All I ask is that all of this not end in shame."

That very day, unknown to investors and the Vivendi board, the company had
narrowly averted a downgrade by credit-rating agencies, which would have made it
difficult to borrow money and plunged the company into a cash crisis.  Mr.
Hannezo (pronounced AN-ZO) implored his boss and longtime friend to take
serious steps to reduce Vivendi's ballooning debt.

When the company's board met the next day to consider whether to approve a
roughly $10 billion acquisition of USA Networks Inc.'s TV and film businesses,
Mr. Messier made no mention of the close call with the rating agencies.  Instead,
when a director asked about Vivendi's financial profile, Mr. Messier said the
company had no problem, according to two directors who were there.

The board endorsed the USA Networks deal, buying Mr. Messier's pitch that it
would help complete Vivendi's transformation from a onetime water utility into an
entertainment giant.  He boasted that the company would be able to distribute the
movies and music made by its Universal Studios and Universal Music units by
means of cellular devices, as well as by satellite, cable and pay television.

But Vivendi was already in dire financial straits.  The USA Networks deal, along
with a $1.5 billion investment in satellite-TV operator EchoStar Communications
Corp., in fact signaled the beginning of the end for Mr. Messier.  The boy wonder
of the French business establishment was ousted seven months later in July, after
directors discovered the company was skirting close to a bankruptcy filing.

-88-

**JA381**

As new management struggles to salvage the French conglomerate, it has become clear that Vivendi came close to financial disaster far earlier than previously thought. *That picture is starkly at odds with the one repeatedly presented by Mr. Messier to investors and his board.*

185.   Similarly, citing an article first appearing in *Le Monde*, *Bloomberg* reported on

May 14, 2002 that Vivendi was close to insolvency at the end of 2001:

> Vivendi Universal SA, the world's second-largest media company, was close to insolvency at the end of 2001 after delays in planned asset sales, French daily Le Monde said, without citing anyone.

> Delays in the sale of the Seagram liquor unit and a French magazine business caused a "serious cash crisis" at the Paris-based company, which faced payments of about 10 billion euros ($9 billion) at the end of last year, the paper said. Today, Vivendi's businesses "barely produce the cash needed to pay the bills," according to the report. . . .

> Vivendi's cash woes help explain why the company sold 55 million of its own shares in January, 9 percent of Vivendi Environnement SA, as well as its stake in AOL Europe and British Sky Broadcasting Plc, Le Monde said. Since the beginning of the year, Vivendi shares have lost half their value.

186.   Although defendants' denied any pending liquidity crisis in response to the *Le*

*Monde* report and reassured investors during the spring and early summer of 2002 that Vivendi

could meet its obligations for the next 12 months, in reality the Company continued to teeter on

the edge of bankruptcy. As the October 31, 2002 *Wall Street Journal* article further reported:

> In May [2002], Fehmi Zeko, head of the media group for Citigroup's Salomon Smith Barney investment bank, met with Mr. Bronfman in New York and told him what the bank had learned during its financial analysis in Paris. By then, news of Vivendi's costly put-option obligations had surfaced in the press, and Moody's Inventors' Service had downgraded Vivendi's debt to just a notch above "junk" level.

> After the meeting, Mr. Bronfman phoned Mr. Hannezo, who denied there was a problem, according to people familiar with the conversation. Mr. Bronfman nevertheless insisted that Vivendi bring in an outside firm to analyze its cash situation. At a meeting in New York on May 29, the board hired Goldman Sachs.

-89-

*On June 24, the eve of Vivendi's next board meeting in Paris, Goldman Sachs bankers gave a detailed rundown of their conclusions to Vivendi's top executives and a handful of directors, including Mr. Bronfman, according to people familiar with the situation. The investment bank outlined four scenarios, one of which showed Vivendi having to file for bankruptcy protection as early as September or October. That day, Vivendi's share price dropped 23%.*

After Goldman Sachs' grim presentation, Mr. Messier asked Mr. Bronfman to come to his office. Mr. Bronfman told Mr. Messier he should resign, as it was now clear Vivendi faced a severe cash crisis, according to a person familiar with the conversation.

\* \* \*

At the COB's request, Mr. Messier put out a detailed debt-and-liquidity statement the next morning, June 26. *Echoing four upbeat press releases he had issued in previous weeks, Mr. Messier said, "Vivendi Universal is confident of its capacity to meet its anticipated obligations over the next 12 months."* That afternoon, he told analysts on a conference call that he planned to remain Vivendi's chairman for 15 more years.

\* \* \*

*At a French parliamentary hearing last month, Jean-Rene Fortou, Vivendi's new chairman, was asked about Vivendi's finances when he took the company's reins July 3. "Well, if Mr. Messier had stayed, the company would have gone bankrupt within 10 days," he said.* [Emphasis added.]

187. Similarly, on September 27, 2002, the *AFX News* reported:

Vivendi Universal chairman Jean-Rene Fourtou said the company would have been forced to declare bankruptcy within 10 days if Jean-Marie Messier had not resigned, according to a report in Le Figaro.

188. On December 13, 2002, the *Associated Press* reported, based on an article first

appearing in *Le Monde*, that defendant Hannezo admitted that 2001 was marked by a series of

errors, including underestimating the debt problem:

Electronic mail seized in an investigation of alleged financial irregularities at Vivendi Universal and other documents show escalating tension amid a growing debt crisis that led to the fall of flamboyant Chairman Jean-Marie Messier.

Board member Edgar Bronfman Jr. of Canada's Seagrams empire, which was purchased by Vivendi in 2000, warned Messier in an e-mail that he could be courting danger with his "very costly personal shows," according to Friday's edition of the newspaper Le Monde.

-90-

And former Financial Director Guillaume Hannezo, in a note to France's stock exchange watchdog, said Messier had turned Vivendi into a "permanent deal machine," while an "urban guerrilla atmosphere" gripped a divided board, the newspaper said.

* * *

Hannezo, the former finance director, said in his 20-page report to the COB that 2001 was marked by the "accumulation of a series of errors," including underestimating that the debt problem, according to Le Monde.

* * *

Hannezo, a key figure in the COB investigation, speculated that Vivendi could have been spared its debt mountain in 2001 "had it resolved to sell before buying. . . . Unfortunately, it oriented itself toward the inverse choice, satisfying itself with potential riches," he wrote. Vivendi's shares have tumbled around 75 percent this year.

## ADDITIONAL SCIENTER ALLEGATIONS

189.    As alleged herein, defendants acted with scienter in that defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Vivendi, their control over, and/or receipt and/or modification of Vivendi's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Vivendi, were active and culpable participants in the fraudulent scheme alleged herein. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. Indeed, defendant Messier stated on December 6, 2000:

-91-

"We are an Old World conglomerate that has grown by five times," says Messier
with obvious pride. You don't do that without concentrating on margins day by
day. At the same time we have reshaped the group and managed it on a day-to-day
basis, the French executive explained recently at a conference organised in London
by bankers Goldman Sachs."

190.    On May 31, 2002, it was reported that Vivendi's board established a corproate-
governance committee to monitor Messier's strategic and financial decisions. According to *The
National Post* on May 31, 2002, "[t]he move is an embarrassing comedown for Mr. Messier, who
once boasted he did not have to answer to anyone." The ongoing fraudulent scheme described
herein could not have been perpetrated during the Class Period without the knowledge and
complicity or, at least, the reckless disregard of the personnel at the highest levels of the
Company, including the Individual Defendants.

191.    Each defendant possessed substantial motives for misrepresenting Vivendi's
financial status, operations, and prospects throughout the Class Period. The Company's ability to
maintain positive credit ratings, and, therefore, its ability to obtain additional financing in the
future were dependent on defendants' fraudulent scheme. Defendants were further motivated to
conceal the adverse facts detailed herein in order to acquire other companies using Vivendi's
artificially inflated shares and ADSs. For example, during the Class Period, in addition to
consummating the Seagrams and Canal Plus acquisitions in late 2000 for a combined total of $46
billion in Vivendi common stock and ADSs, during the Class period Vivendi also financed (or
partially financed), its acquisitions of, at least, USA Networks (at least $1.65 billion of the
purchase price with Vivendi stock), MP3.com and Multithematiques using Vivendi's artificially
inflated stock as currency.[5]

---

[5]Although Vivendi engaged in literally dozens of other acquisitions during the Class
Period, the terms of those transactions were typically not disclosed in detail. Accordingly, the

-92-

**JA385**

192.    Defendants were further motivated to boost Vivendi's share price because Messier

made a massive bet that Vivendi shares would rise by selling put options to banks in late 2000 and

2001. The options committed Vivendi to buy back tens of millions of its shares at fixed prices in

the future. On October 31, 2002, *The Wall Street Journal* discussed Messier's stock buy-backs

and sales of put options:

> Mr. Messier had a special incentive to boost Vivendi's share price with the buy-backs: He had made a massive bet on the company's behalf that Vivendi shares would rise by selling "put options" to banks in late 2000. The options committed Vivendi to buy back tens of millions of its shares at fixed prices in the future. If Vivendi's share price were to fall, the company could lose as much as $1.4 billion on the options. Even with the buy-backs, the share price fell in the end. So far, the put options have cost Vivendi $900 million.

193.    Defendant Messier was also given a bonus for boosting Vivendi's EBITDA by

more than 30 percent in 2001. On June 6, 2002, it was reported in the *New York Post*:

> Vivendi Universal Chairman and Chief Executive Officer Jean-Marie Messier, despite the sorry state of his company's stock, was given a bonus of more than $3 million for meeting an earnings goal, a filing with the Securities and Exchange Commission said.

> Messier was given the bonus, two-and-a-half times his salary, for boosting earnings before interest, taxes, depreciation and amortization by more than 30 percent in 2001. Had earnings risen more than 35 percent, Messier would have received three times his base salary as a bonus.

> Messier earned $4.8 million in bonus and salary for 2001. The chairman also got 835,000 stock options.

---

number of Vivendi acquisitions financed in whole or in part with inflated Vivendi common stock or AdS's may well be greater than the foregoing list suggests.

-93-

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

194.    Pursuant to their claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine such that:

(a)    defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the securities of the Company traded in a open and efficient markets;

(d)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Lead Plaintiffs and the other members of the Class and Subclasses purchased or otherwise acquired their Vivendi securities between the time defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

195.    At all relevant times, the market for Vivendi's securities was efficient market for the following reasons, among others:

(a)    Vivendi's ADSs met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market.  Vivendi's ordinary shares actively traded on the Paris Bourg;

(b)    As a regulated issuer, Vivendi filed periodic public reports with the SEC and the COB;

-94-

(c)     Vivendi regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Vivendi was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

196.    As a result of the foregoing, the market for Vivendi's securities promptly digested current information regarding Vivendi from all publicly available sources and reflected such information in Vivendi's stock price. Under these circumstances, all purchasers of Vivendi's ADSs during the Class Period suffered similar injury through their purchase of Vivendi's securities at artificially inflated prices, and a presumption of reliance applies.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

197.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. Moreover, the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent that any of the statements identified herein as materially false and misleading are held by the Court to be forward-looking statements, there were no meaningful cautionary statements identifying important then-present factors that could, and

-95-

indeed did, cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those materially false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or

the forward-looking statement was authorized and/or approved by an executive officer or director of Vivendi who knew that those statements were false when made.

## COUNT I

### Violations Of Section 11 Of
### The Securities Act Against All Defendants

198.    Lead Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein, except to the extent any allegations above contain any facts which are unnecessary or irrelevant for purposes of stating a claim under this Section, including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of defendants other than strict liability or negligence.

199.    This Count is brought by Lead Plaintiffs Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust on behalf of the Merger Subclass, pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against all defendants. This claim does not sound in fraud and should be read to exclude any reference in the preceding paragraphs to recklessness, fraud, or intentional acts by the defendants.

200.    The Registration Statement in connection with the Merger, was inaccurate and misleading, contained untrue statements of material facts (including but not limited to, false

-96-

**JA389**

financial results), omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

201.   Vivendi is the registrant for the shares issued in connection with the Merger. The Individual Defendants were responsible for the contents and dissemination of the Registration Statement issued in connection with the Merger and caused it to be filed with the SEC. Each of the Individual Defendants signed the Registration Statement.

202.   Lead Plaintiffs Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust and other members of the Merger Subclass acquired Vivendi ADSs and ordinary shares issued in exchange for their Seagram or Canal Plus shares.

203.   None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus were true and without omissions of any material facts and were not misleading. Each of the defendants acted negligently in issuing the Registration Statement and Prospectus.

204.   Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public which were contained in the Registration Statement, which misrepresented or failed to disclose, inter alia, the facts set forth above. By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

205.   At the times they acquired Vivendi ADSs and ordinary shares, Lead Plaintiffs Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by

-97-

**JA390**

Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth

Pearson Trust and other members of the Merger Subclass were without knowledge of the facts

concerning the wrongful conduct alleged herein and could not have reasonably discovered those

facts.

206.    As a result of the foregoing, Lead Plaintiffs Oliver M. Gerard, Francois R. Gerard,

Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison

Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust and members of the

Merger Subclass have sustained damages. The value of Vivendi ADSs and ordinary shares has

declined substantially subsequent to and due to defendants' violations.

207.    This Count has been brought within one year after the discovery of the untrue

statements or omissions, or after such discovery could have been made by the exercise of

reasonable diligence, and within three years after the security was bona fide offered to the public.

## COUNT II

### Violations Of Section 12(a)(2) Of
### The Securities Act Against All Defendants

208.    Lead Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set

forth herein, except to the extent any allegations above contain any facts which are unnecessary or

irrelevant for purposes of stating a claim under this Section, including allegations that may be

interpreted to sound in fraud or relating to any state of mind on the part of defendants other than

strict liability or negligence.

209.    This Count is brought by Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger,

Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael

Doniger, Edward B. Brunswick and the Ruth Pearson Trust pursuant to Section 12(a)(2) of the

-98-

**JA391**

Securities Act, 15 U.S.C. § 77l, on behalf of themselves and other members of the Merger

Subclass who acquired common stock and ADSs of Vivendi pursuant to the Registration

Statement and Prospectus issued in connection with the Merger, against all defendants. This

claim does not sound in fraud and should be read to exclude any reference in the preceding

paragraphs to recklessness, fraud, or intentional acts by the defendants.

210.    Defendants were sellers and offerors of the shares offered pursuant to the

Prospectus.

211.    The Prospectus contained untrue statements of material facts, omitted to state other

facts necessary to make the statements made not misleading, and concealed and failed to disclose

material facts. Defendants' actions of solicitation included participating in the preparation of the

false and misleading Prospectus.

212.    The defendants were obligated to make a reasonable and diligent investigation of

the statements contained in the Prospectus, to ensure that such statements were true and that there

was no omission to state a material fact required to be stated in order to make the statements

contained therein not misleading. These defendants in the exercise of reasonable care should have

known of, the misstatements and omissions contained in the Prospectus as set forth above.

213.    Lead Plaintiffs Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger, Bruce

Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael Doniger,

Edward B. Brunswick and the Ruth Pearson Trust and other members of the Merger Subclass

acquired Vivendi ADSs and ordinary shares pursuant to the defective Prospectus. Lead Plaintiffs

Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by

Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth

-99-

**JA392**

Pearson Trust and the other members of the Merger Subclass did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

214.   By reason of the conduct alleged herein, the defendants violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act. Accordingly, Lead Plaintiffs Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust and members of the Merger Subclass are entitled to damages pursuant to Section 12(a)(2).

215.   This Count has been brought within one year after the discovery of the untrue statements or omissions, or after such discovery could have been made by the exercise of reasonable diligence, and within three years after the security was bona fide offered to the public.

## COUNT III

### Violation Of Section 15 Of The Securities Act Against The Individual Defendants

216.   Lead Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein, except to the extent any allegations above contain any facts which are unnecessary or irrelevant for purposes of stating a claim under this Section, including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of defendants other than strict liability or negligence.

217.   This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o against the Individual Defendants. This Count does not sound in fraud.

218.   Each Individual Defendant was a control person of Vivendi by virtue of their position as directors and/or senior officers of the Company. The Individual Defendants each had a

-100-

**JA393**

series of direct and/or indirect business and/or personal relationships with other directors and/or major shareholders of Vivendi.

219.   Vivendi, as issuer of the Registration Statement, is liable under Section 11. Each Individual Defendant was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the materially false and misleading Registration Statement and having otherwise participated in the Merger.

## COUNT IV

### Violations Of Section 14(a) Of The Exchange Act
### and Rule 14a-9 Promulgated Thereunder Against Vivendi

220.   Lead Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein, except to the extent any allegations above contain any facts which are unnecessary or irrelevant for purposes of stating a claim under this Section, including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of defendants other than negligence.

221.   This Count is brought by Lead Plaintiffs Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust on behalf of the Proxy Subclass, pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9, against Vivendi as successors in interest. This claim does not sound in fraud and should be read to exclude any reference in the preceding paragraphs to recklessness, fraud, or intentional acts by the defendants other than defendants' negligence.

-101-

222.    The Registration Statement in connection with the Merger incorporating the
Merger Proxy/Prospectus, was inaccurate and misleading, contained untrue statements of material
facts (including but not limited to, false financial results), omitted to state other facts necessary to
make the statements made not misleading, and concealed and failed adequately to disclose
material facts as described above.

223.    Lead Plaintiffs Oliver M. Gerard, Francois R. Gerard and other members of the
Proxy Subclass were shareholders of Vivendi solicited to vote on the Merger pursuant to the
defective Proxy/Prospectus as alleged above.   Lead Plaintiffs Beatrice Doniger, Bruce Doniger,
Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B.
Brunswick and the Ruth Pearson Trust and other members of the Proxy Subclass were
shareholders of Seagrams solicited to vote on the Merger pursuant to the defective
Proxy/Prospectus as alleged above.

224.    At the times they acquired Vivendi ADSs and ordinary shares, Lead Plaintiffs
Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by
Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth
Pearson Trust and other members of the Proxy Subclass were without knowledge of the facts
concerning the wrongful conduct alleged herein and could not have reasonably discovered those
facts.

225.    As a result of the foregoing, Lead Plaintiffs Oliver M. Gerard, Francois R. Gerard,
Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison
Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust and members of the
Proxy Subclass have sustained damages.

-102-

**JA395**

## COUNT V

### Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

226.    Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

227.    This Count is asserted against all defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

228.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Purchaser Class members, as alleged herein; (ii) enable Vivendi to complete several acquisitions, as described herein, using its artificially inflated securities as currency; and (iii) cause Lead Plaintiffs and other members of the Purchaser Class to purchase Vivendi's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendant Vivendi and the Individual Defendants, and each of them, took the actions set forth herein.

229.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Vivendi's ADSs and ordinary shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

-103-

**JA396**

230.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Vivendi as specified herein.

231.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Vivendi's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Vivendi and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Vivendi ADSs and ordinary shares during the Class Period.

232.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other

-104-

members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

233.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Vivendi's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' misstatements of the Company's business, financial condition, operations and growth throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

234.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Vivendi's ADSs and ordinary shares were artificially inflated during the Class Period. In ignorance of the fact that market prices of Vivendi's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements

-105-

**JA398**

by defendants during the Class Period, Lead Plaintiffs and the other members of the Purchaser

Class acquired Vivendi securities during the Class Period at artificially high prices and were

damaged thereby.

235.    At the time of said misrepresentations and omissions, Lead Plaintiffs and the other

members of the Purchaser Class were ignorant of their falsity, and believed them to be true. Had

Lead Plaintiffs and the other members of the Purchaser Class and the marketplace known the truth

regarding the problems that Vivendi was experiencing which were not disclosed by defendants,

Lead Plaintiffs and the other members of the Purchaser Class would not have purchased or

otherwise acquired their Vivendi ADSs and ordinary shares, or, if they had purchased such

securities during the Class Period, they would not have done so at the artificially inflated prices

which they paid.

236.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange

Act, and Rule 10b-5 promulgated thereunder.

237.    As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiffs

and the other members of the Purchaser Class suffered damages.

## COUNT VI

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

238.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if

fully set forth herein.

239.    The Individual Defendants acted as controlling persons of Vivendi within the

meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the

-106-

JA399

Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

240.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

241.    As set forth above, Vivendi and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Purchaser Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs, individually and on behalf of the Class and Subclasses, pray for relief and judgment, as follows:

(a) Declaring this action is a proper class action and certifying Lead Plaintiffs, among others, as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b) Declaring and determining that defendants violated the federal securities laws by reason of their conduct as alleged herein;

(c) Awarding compensatory damages in favor of Lead Plaintiffs and the other Class and Subclass members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(d) Awarding Lead Plaintiffs and the Class and Subclasses their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(e) Granting such other and further relief as the Court may deem just and proper.

-108-

**JA401**

## JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury.

Dated:  January 7, 2003

**MILBERG WEISS BERSHAD**
**HYNES & LERACH LLP**

_[signature]_

David J. Bershad (DB-9981)
Sol Schreiber (SS-5927)
William C. Fredericks (WF-1576)
Christopher M. Huck (CH-7359)
One Pennsylvania Plaza
New York, New York 10119
(212) 594-5300
(212) 868-1229 (fax)

-and-

Randi D. Bandman, Esq.
100 Pine Street, Suite 2600
San Francisco, CA 94111-5238
(415) 288-4545
(415) 288-4534 (fax)

**ABBEY GARDY, LLP**

_[signature]_

Arthur N. Abbey (AA-8074)
James S. Notis (JN-4189)
Richard B. Margolies (RM-9311)
212 East 39th Street
New York, New York 10016
(212) 889-3700
(212) 684-5191 (fax)

**Co-Lead Counsel for Lead Plaintiffs**

-109-

Sherrie R. Savett, Esq.
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, Pennsylvania  19103
(215) 875-3000
(215) 875-4604 (fax)

Mel E. Lifshitz, Esq.
Gregory M. Egleston, Esq.
**BERNSTEIN LIEBHARD & LIFSHITZ LLP**
10 East 40th Street
New York, New York  10016
(212) 907-0800
(212) 684-6083

Douglas M. McKiege, Esq.
Javier Bleichmar, Esq.
**BERNSTEIN LITOWITZ BERGER &
GROSSMANN**
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400
(212) 554-1444 (fax)

Steve J. Toll, Esq.
**COHEN, MILSTEIN, HAUSFELD & TOLL,
P.L.L.C.**
1100 New York Ave., N.W.
Suite 500
Washington, D.C. 20005-3964
(202) 408-4600
(202) 408-4699 (fax)

Leo W. Desmond, Esq.
**THE LAW OFFICES OF LEO W. DESMOND**
2161 Palm Lake Blvd.
Suite 204
West Palm Beach, Florida  33409
(561) 712-8000
(561) 712-8002 (fax)

-110-

Nadeem Faruqi, Esq.
**FARUQI & FARUQI, LLP**
320 East 39th Street
New York, New York  10016
(212) 983-9330
(212) 983-9331 (fax)

Lionel Z. Glancy, Esq.
Michael M. Goldberg,Esq.
**GLANCY & BINKOW**
1801 Avenue of the Stars
Suite 311
Los Angeles, CA 90067
(310) 201-9150
(310) 201-9160 (fax)

Marc S. Henzel, Esq.
**LAW OFFICE OF MARC S. HENZEL**
237 Montgomery Avenue
Suite 202
Bala Cynwd, Pennsylvania 19004
(610) 660-8000
(610) 660-8080 (fax)

Corey D. Holzer, Esq.
**HOLZER & HOLZER**
6135 Barfield Road, Suite. 102
Atlanta, GA 30328
(404) 847-0085
(404) 847-0036 (fax)

Leigh R. Lasky, Esq.
**LASKY & RIFKIND, LTD.**
100 Park Avenue, 12th Floor
New York, New York 10016
(212) 907-0800
(212) 684-6083 (fax)

-111-

Christopher Lovell, Esq.
Christopher J. Gray, Esq.
**LOVELL & STEWART, LLP**
500 Fifth Avenue, Suite 5800
New York, NY 10110
(212) 608-1900
(212) 719-4677 (fax)

Bruce G. Murphy, Esq.
**LAW OFFICES OF BRUCE G. MURPHY**
265 Llwyds Lane
Vero Beach, FL 32963
(561) 231-4202
(561)231-4042 (fax)

Klari Neuwelt, Esq.
**LAW OFFICE OF KLARI NEUWELT**
110 East 59th Street, 29th Floor
New York, NY 10002
(212) 593-8800
(212) 593-9131 (fax)

Marc Gross, Esq.
Andrew G. Tolan, Esq.
Patrick Dahlstrom, Esq.
**POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS, LLP**
100 Park Avenue, 26th Floor
New York, NY 10017-5516
(212) 661-1100
(212) 661-8665 (fax)

Brian Philip Murray, Esq.
**RABIN & PECKEL, LLP**
275 Madison Avenue
New York, New York  10016
(212) 682-1818
(212) 682-1892 (fax)

-112-

**JA405**

Marc A. Topaz, Esq.
Stuart L. Berman, Esq.
Darren Check, Esq.
**SCHIFFRIN & BARROWAY, LLP**
Three Bala Plaza East
Suite 400
Bala Cynwyd, Pennsylvania 19004
(610) 667-7706
(610) 667-7056 (fax)

Patrick A. Klingman, Esq.
**SCHATZ & NOBEL**
330 Main Street
Hartford, CT 06106
(860) 493-6292
(860) 493-6290 (fax)

Jules Brody, Esq.
**STULL STULL & BRODY**
6 East 45th Street
New York, New York 10017
(212) 687-7230
(212) 490-2022 (fax)

Robert C. Susser, Esq.
**ROBERT C. SUSSER, P.C.**
6 East 43rd Street, Suite 1900
New York, New York 10017
(212) 808-0298
(212) 949-0966 (fax)

Robert I. Harwood, Esq.
**WECHSLER HARWOOD, LLP**
488 Madison Avenue, 8th Floor
New York, NY 10022
(212) 935-7400
(212) 753-3630 (fax)

-113-

Joseph H. Weiss, Esq.
**WEISS & YOURMAN**
551 Fifth Avenue, Suite 1600
New York, NY 10176
(212) 682-3025
(212) 682-3010 (fax)

Daniel W. Krasner, Esq.
Gregory M. Nespole, Esq.
David Wales
**WOLF HALDENSTEIN**
**ADLER FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York   10016
(212) 545-4600
(212) 661-8665 (fax)

**Counsel for Plaintiffs**

-114-

**JA407**

## CERTIFICATE OF SERVICE

Christopher M. Huck, an attorney-at-law, duly admitted to the courts of the State of New

York, hereby certifies that on the 7th day of January 2003, caused a true copy of the annexed

Consolidated Class Action Complaint to be served by facsimile and First Class mail upon the

following named attorneys at the addresses indicated:

Glen Pomerantz
Steven Perry
**MUNGER, TOLLES & OLSON LLP**
355 South Grand Avenue, 35th Flr.
Los Angeles, CA 90071-1560
Tel. No.: (213) 683-9100
Fax. No.: (213) 687-3702

Paul Saunders
Michael Paskin
Timothy Cameron
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
Worldwide Plaza
New York, NY 10019
Tel. No.: (212) 474-1000
Fax. No.: (212) 474-3700

I certify under penalty of perjury that the foregoing is true and correct.

Dated: January 7, 2003

CHRISTOPHER M. HUCK

# MILBERG WEISS BERSHAD HYNES & LERACH LLP

One Pennsylvania Plaza
New York, New York 10119-0165
(212) 594-5300
FAX: (212) 868-1229

## MULTIPLE FAX COVER SHEET

| NAME | FIRM | CODE | FAX NO. | PHONE NO. |
|------|------|------|---------|-----------|
| Paul Saunders, Esq.<br>Michael Paskin, Esq.<br>Timothy Cameron, Esq. | CRAVATH, SWAINE & MOORE LLP | | (212) 474-1000 | (212) 474-3700 |
| Glen Pomerantz, Esq.<br>Steven Perry, Esq. | MUNGER, TOLLES & OLSON LLP | | (213) 687-3702 | (213) 683-9100 |

FROM:  Christopher M. Huck, Esq.

DATE: 1/7/2003     TIME: _____     CASE:  020323

MESSAGE: _____

TOTAL NUMBER OF PAGES (including cover sheet): 115

The information contained in this facsimile message is attorney privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited.

Return to: Chris Huck                                    No. of Copies 2

Please phone the undersigned immediately if you have not received all pages.

Copy to follow in mail  Yes
Operator:
Ismael Alvarado          _____
Jose Cepin               _____
George Figueroa          _____
Bruce Furlonge           _____
Edwin Martinez           _____
Henry Pacheco            _____

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------------X
                                                :
IN RE VIVENDI UNIVERSAL, S.A.                   :       Civil Action No.
SECURITIES LITIGATION                           :       02 Civ. 5571 (HB)
                                                :
This Document Relates To:                       :       NOTICE OF MOTION
                                                :
All Actions                                     :
---------------------------------------------------------------X
```

PLEASE TAKE NOTICE that, upon the annexed Affirmation of Michael E. Swartz,

sworn to on February 24, 2003, and the accompanying Memorandum of Law, the undersigned

counsel for Defendant Guillaume Hannezo will move this Court before the Honorable Harold Baer,

United States District Judge, United States Courthouse, 500 Pearl Street, New York, New York, at a

date and time to be determined by this Court, for an Order pursuant to Federal Rules of Civil

Procedure 8, 9(b) and 12(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C.

§ 78u-4, dismissing Plaintiffs' Consolidated Class Action Complaint with prejudice as against

Defendant Hannezo and granting such other and further relief as this Court deems just and proper.

Dated:    New York, New York
          February 24, 2003

                                                Respectfully submitted,

                                                SCHULTE ROTH & ZABEL LLP

                                        By:     _____
                                                Martin L. Perschetz (MP7299)
                                                Michael E. Swartz (MS7069)
                                                Members of the Firm
                                                Dana M. Roth (DR1438)
                                                Einat Philip (admission pending)
                                                919 Third Avenue
                                                New York, New York 10022
                                                (212) 756-2000
                                                *Attorneys for Defendant Guillaume Hannezo*

9385152.1

**JA410**

TO: David J. Bershad
Sol Schreiber
William C. Fredericks
Christopher M. Huck
MILBERG WEISS BERSHAD
HYNES & LERACH LLP
One Pennsylvania Plaza
New York, New York 10119
(212) 594-5300
(212) 868-1229 (fax)

-and-

Randi D. Bandman, Esq.
100 Pine Street, Suite 2600
San. Francisco, CA 94111-5238
(415) 288-4545
(415) 288-4534 (fax)

Arthur N. Abbey
James S. Notis
Richard B. Margolies
ABBEY GARDY, LLP
212 East 39th Street
New York, New York 10016
(212) 889-3700
(212) 684-5191 (fax)

*Co-Lead Counsel for Lead Plaintiffs*

9385152.1

**JA411**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE VIVENDI UNIVERSAL, S.A.
SECURITIES LITIGATION

---

Civil Action No.
02 Civ. 5571 (HB)

NOTICE OF MOTION

ORAL ARGUMENT REQUESTED

PLEASE TAKE NOTICE that, upon plaintiffs' Consolidated Class Action Complaint ("the Complaint"), a copy of which is attached hereto and the accompanying declarations of (1) Daniel Slifkin, executed February 24, 2003, with six volumes of exhibits thereto; (2) Frédéric Crépin, executed February 21, 2003; and (3) Antoine Lefort de Ylouses, executed February 20, 2003, defendant Vivendi Universal, S.A. will move this Court, before Hon. Harold Baer, Jr. at the United States Courthouse, 500 Pearl Street, Courtroom 23B, New York, New York, for an order dismissing the Complaint pursuant to: (1) 15 U.S.C. § 78u-4 (failure to satisfy heightened pleading requirements of the Private Securities Litigation Reform Act); (2) Fed. R. Civ. P. 8 (failure to submit short and plain statement of the claims); (3) Fed. R. Civ. P. 9(b) (failure to plead fraud with particularity); (4) Fed. R. Civ. P. 12(b)(1) (lack of subject matter jurisdiction); (5) Fed. R. Civ. P. 12(b)(6) (failure to state a claim upon which relief may be granted); and (6) Fed. R. Civ. P. 41(b) (failure to comply with Federal Rules of Civil Procedure); and granting such other and further relief as the Court deems just and proper.

February 24, 2003

CRAVATH, SWAINE & MOORE,

by _____

Paul C. Saunders (PS-0587)
Daniel Slifkin (DS-0588)
Members of the firm

Attorneys for Defendant
Vivendi Universal, S.A.
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

TO:

David J. Bershad, Esq.
    Milberg Weiss Bershad Hynes & Lerach LLP
        One Pennsylvania Plaza
           New York, New York 10119

Arthur N. Abbey, Esq.
    Abbey Gardy, LLP
        212 East 39th Street
           New York, New York 10016

Michael Malone, Esq.
    King & Spalding
        1185 Avenue of the Americas
           New York, New York 10080

Martin L. Perschetz, Esq.
    Schulte Roth & Zabel LLP
        919 Third Avenue
           New York, New York 10022

Michael Malone, Esq.
King & Spalding
1185 Avenue of the Americas
New York, New York 10080

Martin L. Perschetz, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022

by having true copies of each of the above-described documents, securely enclosed in Express Mail postage prepaid and properly addressed wrappers, delivered to an office of the United States Postal Service located within the City, County and State of New York.

_Ralph M. Dionne_
Ralph M. Dionne

Sworn to before me this

24th day of February 2003

Notary Public

KEITH S. KAPLAN
NOTARY PUBLIC, State of New York
No. 01KA6062453
Qualified in New York County
Commission Expires Aug. 6, 2005

-2-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE VIVENDI UNIVERSAL, S.A.
SECURITIES LITIGATION

Civil Action No.
02 Civ. 5571 (HB)

**MEMORANDUM IN SUPPORT OF DEFENDANT
VIVENDI UNIVERSAL S.A.'S MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT**

Paul C. Saunders (PS-0587)
Daniel Slifkin (DS-0588)
CRAVATH, SWAINE & MOORE
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant
Vivendi Universal, S.A.*

February 24, 2003.

(¶¶ 198-215);[1] (2) the Proxy/Prospectus incorporated in the October 30, 2000, Registration Statement was false and misleading in violation of Section 14(a) of the 1934 Securities Exchange Act, 15 U.S.C. § 78n(a), as well as Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9 (¶¶ 220-25);[2] and (3) 38 other statements made between October 30, 2000, and August 14, 2002, concerning Vivendi's financial performance or condition—included in press releases, newspaper articles and transcripts—were false or misleading when made, in violation of Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), as well as Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (¶¶ 226-37).[3]

Plaintiffs contend that the statements in those documents were false and misleading because Vivendi: (1) "failed to timely record an impairment in the value of its reported goodwill" thereby misleading potential investors about cash flows it expected to receive from acquisitions (¶¶ 124-47); (2) inflated its 1999, 2000 and 2001 revenues by improperly consolidating certain investments in which Vivendi possessed less than a 50 percent ownership interest (¶¶ 148-68); (3) improperly recognized revenue from its U.S. Filter subsidiary (¶¶ 169-77); and (4) failed to disclose that it was suffering from a "growing liquidity crisis" (see, e.g., ¶ 64).

Argument

## I. THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER CLAIMS BROUGHT BY FOREIGN PLAINTIFFS WHO PURCHASED VIVENDI'S ORDINARY SHARES.

Plaintiffs seek to bring claims on behalf of "foreign class members who acquired Vivendi ordinary shares traded on foreign markets". (¶ 20.)[4] Courts have adopted two tests for determining whether subject

---

[1]  Plaintiffs assert those claims on behalf of all persons who acquired Vivendi's common stock or American Depository Shares ("ADSs") pursuant to that October 30, 2000, Registration Statement. (¶ 1.)

[2]  Plaintiffs assert that claim on behalf of "all persons who were shareholders of Vivendi or Seagram as of November 25, 2000, and entitled to vote on the merger pursuant to the proxy/prospectus". (¶ 1.)

[3]  Plaintiffs assert that claim on behalf of "all persons who purchased or otherwise acquired the common stock and [ADSs] of Vivendi . . . between October 30, 2000 and August 14, 2002". (¶ 1.) Those statements are pleaded in ¶¶ 54, 57, 58, 59, 61, 62, 63, 66, 67, 68, 69, 73, 74, 75, 76, 79 (containing two statements), 80, 81, 83, 84, 85, 86, 87, 88, 89, 90, 94, 95 and 96 (together, one statement), 100, 102, 103, 104, 105, 106, 109, 110 and 111. Vivendi does not concede that class certification is appropriate in this action, or, if any class is certified, that the proper class period is October 30, 2000, through August 14, 2002. (¶ 1.) Nevertheless, for purposes of this motion to dismiss, we refer to plaintiffs' proposed class period as the "class period".

[4]  Plaintiffs have not specifically identified which of the named plaintiffs fall within the category of foreign purchasers that purchased Vivendi ordinary shares on foreign exchanges. Indeed, plaintiffs' sworn certifications provide no information as to what securities were purchased, or which exchange they were purchased on, and hence violate 15 U.S.C. § 78u-4(a)(2)(A). It is plaintiffs burden to establish subject matter jurisdiction for all plaintiffs. See McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Guadagno v. Wallack Ader Levithan Assoc., 932 F. Supp. 94, 95 (S.D.N.Y. 1996) ("no presumptive truthfulness attaches to the complaint's jurisdictional allegations; rather, the burden is on the plaintiff to satisfy the Court, as fact finder, of the jurisdictional facts") (internal citation omitted).

matter jurisdiction exists for the application of the federal securities laws to purchasers of securities on a foreign exchange: the "effects test" and the "conduct test". See Tri-Star Farms Ltd. v. Marconi, PLC, 225 F. Supp. 2d 567, 573 (W.D. Pa. 2002). It is well established, however, that the effects test does not allow for jurisdiction over claims by foreign purchasers on a foreign exchange. Such persons have no standing to assert any adverse effect on American investors or securities markets. See Koal Indust. Corp. v. Asland, S.A., 808 F. Supp. 1143, 1155 (S.D.N.Y. 1992). In the Second Circuit, a federal court has subject matter jurisdiction under the conduct test "'if the defendant's conduct in the United States was more than merely preparatory to the fraud, and particular acts or culpable failures to act within the United States directly caused losses to foreign investors abroad'". Nathan Gordon Trust v. Northgate Exploration, Ltd., 148 F.R.D. 105, 108 (S.D.N.Y. 1993) (quoting Alfadda v. Fenn, 935 F.2d 475, 478 (2d Cir. 1991)). Plaintiffs allege, in a conclusory fashion, that the conduct test is met here. (¶ 21.) However, it is clear that as a factual matter Vivendi's conduct within the United States was not sufficient to confer subject matter jurisdiction over foreign purchasers on foreign exchanges.[5]

First, Vivendi is a French corporation, headquartered in Paris. Specifically, Vivendi is registered as a "société anonyme", a type of corporation organized under the laws of France. (Declaration of Frédéric Crépin, dated February 21, 2003 ("Crépin Decl.") ¶ 4.) Vivendi's equity securities trade principally on the Paris Bourse. Indeed, Vivendi's ADSs accounted for merely 8.9 percent of the total volume of Vivendi's equity securities traded during the class period. (Id. ¶ 14.)[6] Additionally, Vivendi has never registered to do business in the United States (id. ¶ 5), and does not make quarterly filings with the SEC as is required for American corporations, see 17 C.F.R. § 240.13a-13. Vivendi rarely held Board Meetings outside Paris (Crépin Decl. ¶ 9) and always maintained approximately a three to one ratio of European to non-European directors on its Board. (Id. ¶¶ 9, 10.) Prior to September 2001, only one Vivendi corporate officer was located in the United

---

[5]     In deciding a motion to dismiss for lack of subject matter jurisdiction, courts may rely on evidence outside the pleadings, such as affidavits, and need only accept plaintiffs' uncontroverted allegations as true. See Euro Trade & Forfaiting, Inc. v. Vowell, No. 00 Civ. 8431, 2002 WL 500672, at *5 (S.D.N.Y. Mar. 29, 2002); see also Marconi, 225 F. Supp. 2d at 571.

[6]     In fact, approximately 70 percent of Vivendi's ADSs are owned by members of the Bronfman family, see Vivendi's Form 20-F for the year ended December 31, 2000, as filed with the SEC on July 2, 2001 ("2000 Form 20-F") at 83 (Exhibit 1 to the Declaration of Daniel Slifkin, dated February 24, 2003 ("Slifkin Decl.")); Vivendi's Form 20-F for the year ended December 31, 2001, as filed with the SEC on May 28, 2002 ("2001 Form 20-F") at 92 (Slifkin Decl. Ex. 2), and hence are specifically excluded from this lawsuit (see ¶ 40).

-3-

States. (Id. ¶ 11.) Although Messrs. Messier and Hannezo moved to the United States in September 2001, those executives still spent approximately half of their time in France. (Id. ¶ 12.)

Second, the alleged conduct at issue here, namely the creation and dissemination of various statements and financial data, was initiated, organized and approved in France. Specifically, every Vivendi press release at issue in this case was prepared at the request of, and with the authorization of, French executives. (Declaration of Antoine Lefort des Ylouses, dated February 20, 2003 ("Lefort Decl.") ¶ 5.) French executives were responsible for approving each press release before it was issued and Vivendi's Paris press department was responsible for the translation of those releases. (Id. ¶¶ 5, 6.) Further, every allegedly false press release was first issued in France prior to being released to the Businesswire news service for dissemination of that information in the United States. (Id. ¶ 7.) Every allegedly false financial document was prepared in accordance with French GAAP and only reconciled, if required, with U.S. GAAP. See, e.g., 2000 Form 20-F (Slifkin Decl. Ex. 1). Additionally, the corporate executives who were integral to the creation of those Vivendi press releases and financial documents—i.e., Vivendi's (1) General Counsel, (2) Chief Operating Officers, (3) Deputy CFO, (4) Head of Corporate Communication and Public Policy, (5) Head of Legal Affairs, and (6) Controller—all operated out of Paris. (Crépin Decl. ¶ 13.)[7]

Vivendi's conduct cannot form the basis of subject matter jurisdiction over claims brought by foreign purchasers and none of plaintiffs' allegations can alter that result. First, allegations that Vivendi filed Forms 20-F and 6-K with the SEC and disseminated some materials to shareholders in the United States (¶ 24) are not sufficient to confer jurisdiction over the claims of foreign purchasers. See Nathan Gordon, 148 F.R.D. at 108 ("[t]he mere filing of reports with the SEC and the dissemination of some materials to shareholders in the United States were merely incidental to the authorship, preparation and dissemination of the allegedly false

---

[7]    Further, Vivendi is currently facing lawsuits in France that make allegations similar to those here. For example, a group of minority shareholders called the "association des petits porteurs actifs" ("APPAC") filed suit against Vivendi in Paris in July 2002 alleging that shareholders who purchased Vivendi common stock on the Paris Bourse were provided with false or misleading information regarding the financial situation of the Company. (Crépin Decl. ¶ 15.) Additionally, the head of APPAC, M. Didier Cornadeau, has also filed a separate claim, as a shareholder of Vivendi. (Id. ¶ 16.) In Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 986, 996-97 (2d Cir. 1975), the Second Circuit, in the context of its subject matter jurisdiction analysis, noted that there is a "serious problem" in a class action suit regarding foreign putative class members when similar actions are also pending abroad. The foreign purchasers are parties to both lawsuits and it is questionable whether a "defendant's judgment (or a possibly inadequate plaintiff's judgment)" would have a binding effect on absent foreign plaintiffs or whether it is proper "to bind those plaintiffs by a settlement" in the United States. Id. at 996-97; see also Marconi, 225 F. Supp. 2d at 577. The same problem exists here.

information, all of which occurred in Canada"); see also In re Baan Co. Sec. Litig., 103 F. Supp. 2d 1, 10 (D.D.C. 2000); McNamara v. Bre-X Minerals Ltd., 32 F. Supp. 2d 920, 924-25 (E.D. Tex. 1999).

Second, Vivendi's alleged "vast U.S. presence" (¶ 21) is irrelevant to subject matter jurisdiction. See Baan, 103 F. Supp. 2d at 10 n.14 (stating that while the fact that defendant conducts a great deal of business in the United States "would be important to the issue of personal jurisdiction, [it is] irrelevant to subject matter jurisdiction. The conduct test requires that the fraudulent activity take place in the United States, and the fact that defendants conducted other activity in the United States is not significant.").

Third, plaintiffs' allegation that there is a single worldwide market for Vivendi ADSs and ordinary stock "which trade[] in tandem . . . causing extensive effects both in this country and abroad" (¶ 22) is insufficient to confer subject matter jurisdiction over foreign purchasers' claims. See Marconi, 225 F. Supp. 2d at 579 (rejecting the "seamless worldwide market" theory as a justification for subject matter jurisdiction because to do otherwise "would extend the jurisdictional reach of the securities laws too far" and would be a result that Congress did not intend).

Marconi is on point. There, plaintiffs brought a class action against a U.K. corporation alleging that defendants artificially inflated the market price for the corporation's securities by issuing false and misleading statements in violation of Section 10(b). 225 F. Supp. 2d at 569-71. Included within the proposed class of plaintiffs were all purchasers of Marconi ordinary shares and ADRs during the class period. Defendants moved to dismiss all allegations brought by foreign individuals who purchased Marconi ordinary shares on foreign exchanges. In determining that there was no subject matter jurisdiction over those foreign purchasers' claims, the court noted that the entirety of the allegedly fraudulent scheme was conceived overseas by foreign citizens, involved common shares in a foreign corporation traded on a foreign exchange and foreign citizens were responsible for the alleged wrongful misrepresentations. The court rejected plaintiffs' argument that the inclusion of false and misleading statements in SEC filings created subject matter jurisdiction, as the "alleged acts [were] insubstantial in comparison to the conduct that purportedly occurred in the United Kingdom and could not have played a significant role in the furtherance of any fraud perpetrated against the foreign investors". Id. at 578. Further, the court held that Marconi's extensive business operations in the United States were immaterial to the subject matter jurisdiction question as "Marconi's United States business operations were not themselves fraudulent. Rather the fraud arises from the representations defendants did or did not

-5-

make about those operations". Id.[8]   The facts alleged here are almost identical to those in Marconi, and its reasoning applies here.

## II.   PLAINTIFFS' FAILURE TO COMPLY WITH THE REQUIREMENTS OF RULE 8 OF THE FEDERAL RULES OF CIVIL PROCEDURE REQUIRES DISMISSAL OF THEIR COMPLAINT IN ITS ENTIRETY.

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief" and that each averment "be simple, concise and direct". Fed. R. Civ. P. 8(a), 8(e). The Complaint, however, is an improper "puzzle pleading"—a confusing maze of references and cross-references that makes it impossible to understand the basis for plaintiffs' allegations.

First, plaintiffs have failed to identify which specific statements are alleged to be false and misleading. With respect to plaintiffs' 1933 Act claims, plaintiffs broadly allege that Vivendi's October 30, 2000, Form F-4—a document they acknowledge consists "of over 700 pages plus exhibits" (¶ 54)—was materially false and misleading (¶ 55), but they do not identify a single number in those hundreds of pages that is false. Similarly, with respect to plaintiffs' Section 10(b) claim, plaintiffs identify 38 separate statements that are said to be false and misleading but nowhere does the Complaint identify what parts of the documents or quoted paragraphs are said to be false or misleading. Some quotations contain bold, italicized sentences but there is no explanation as to what that indicates. Those failures are alone sufficient to dismiss Counts I and II. See Cooper v. Sony Records Int'l, No. 00 Civ. 233, 2001 WL 1223492, at *3 (S.D.N.Y. Oct. 15, 2001) ("a complaint must adequately specify the statements it claims were false and misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements") (citing Cosmas v. Hassett, 886 F. 2d 8, 11 (2d Cir. 1989)); see also Williams v. WMX Techs., Inc., 112 F.3d 175, 179 (5th Cir. 1997).

Second, plaintiffs do not show why the statements are allegedly false. After three or four quotations, plaintiffs simply state:

> "The statements made by defendants referenced in ¶¶ _____ above, each were materially false and misleading because, inter alia, the Company was engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings (as particularized below at ¶¶ 119-80), including: (a) failing to timely write-down certain overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel

---

[8]   The Marconi court was following Third Circuit precedent, but noted that the standards in the Second Circuit are even harder for plaintiffs to meet. See Marconi, 225 F. Supp. 2d at 579 n. 13.

subsidiary in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, the Company failed to disclose that it was suffering from a growing liquidity crisis (as particularized below at ¶¶ 181-88) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy."

(See, e.g., ¶ 60.) That paragraph is repeated eight times. To determine which, if any, of plaintiffs' assertions of falsity applies to any particular statement, one must examine another 70 paragraphs of the Complaint (¶¶ 119-88) and try to guess which facts are applicable to the statement. That is a classic "puzzle pleading".

In In re Splash Technology Holdings Inc. Securities Litigation, plaintiffs' complaint—as here—was structured as a list of allegedly false statements followed by a separate list of alleged reasons for falsity, without tying specific statements to specific reasons. 160 F. Supp. 2d 1059, 1072-74 (N.D. Cal. 2001). Granting defendants' motion to dismiss, the court noted that plaintiffs' counsel improperly "left it up to defendants and the court to try to figure out exactly what the misleading statements are and to match them up with the reasons they are false or misleading". Id. at 1074 (internal citation omitted). The same improper style of pleading was employed in In re MCI WorldCom, Inc. Securities Litigation. 191 F. Supp. 2d 778, 781-82 (S.D. Miss. 2002). The court held that the complaint:

> "is replete with cross references and repetition. On first reading, the instinctive reaction is exactly what is intended by Plaintiffs. The numbers are so large, the stakes were so high, and the fall of the dollar value of WorldCom stock so precipitous that the reader reacts by thinking that there must have been some corporate misbehavior. However, after a thorough examination, it becomes apparent that the Complaint is a classic example of 'puzzle pleading' and that it does not attain the heightened pleading requirements for this type of case."

Id. at 781-82; see also In re Oak Tech. Sec. Litig., No. 96-20552 SW, 1997 WL 448168, at *5 (N.D. Cal. Aug. 1, 1997) (finding similar pleading to be an "unwelcome and wholly unnecessary strain on defendants and the court system" and especially egregious given the level of experience of plaintiffs' counsel).

**III.     BECAUSE VIVENDI IS EXEMPT FROM THE REQUIREMENTS OF SECTION 14(a) OF THE EXCHANGE ACT, COUNT IV MUST BE DISMISSED.**

In Count IV, plaintiffs allege that Vivendi violated Section 14(a) of the Securities Exchange Act because "[t]he Registration Statement in connection with the Merger incorporating the Merger Proxy/Prospectus, was inaccurate and misleading, contained untrue statements of material facts (including but not limited to, false financial results), omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts". (¶ 222.)

-7-

results were inflated prior to the class period—as would be required in order to show that the October 30, 2000, Form F-4 was false or misleading when issued.[14]

Accordingly, this case is, we believe, similar to Scibelli v. Roth, No. 98 Civ. 7228, 2000 WL 122193, at *3 (S.D.N.Y. Jan. 31, 2000), where plaintiffs sought to imply that defendants had knowledge of the facts in question at the time the prospectus was issued based on the fact that defendants had that knowledge eight weeks later. This Court ruled that because there were no facts to suggest that defendants had the alleged information at the time the prospectus was issued, plaintiffs' 1933 Act claims had to be dismissed. Id. The Court should do the same here.

### 3. Plaintiffs fail to allege that Vivendi was overstating revenue from its environmental division prior to issuing the Form F-4.

Plaintiffs further allege that the historical financial statements and balance sheets contained in the October 30, 2000, Form F-4 were misleading because Vivendi overstated "revenue from its environmental division on certain multi-year contracts in violation of [U.S.] GAAP". (¶ 55.) Even assuming a GAAP violation could establish a violation of the securities laws—which it cannot (see infra p. 15)—the facts plaintiffs rely upon to allege that Vivendi's violation of GAAP rendered the October 30, 2000, Form F-4 false or misleading all post-date that document. Indeed, plaintiffs' allegations as to Vivendi's alleged overstatement of revenue are the same paragraphs—paragraphs 169-177—that plaintiffs put forth as the basis for their U.S. Filter-impairment-of-goodwill argument. Accordingly, for the reasons stated (see supra p. 12) plaintiffs' allegations with regard to Vivendi's recognition of revenue cannot establish that the October 30, 2000, Form F-4 was false or misleading when made.

## V. PLAINTIFFS' CLAIM UNDER SECTION 10(b) AND RULE 10b-5 MUST BE DISMISSED.

### A. Plaintiffs Have Failed Properly to Plead That Vivendi's Financial Statements Were False and Misleading When Issued.

In Count V, plaintiffs allege that Vivendi's earnings, as reported in Vivendi's financial statements during the class period, were false and misleading. Plaintiffs' purported factual basis is as follows: Vivendi (1) failed on a timely basis to write-down goodwill from previous corporate investments and acquisitions (¶¶ 124-47); (2) improperly consolidated Cegetel and Maroc Telecom (¶¶ 148-68); and (3) overstated revenue

---

[14] While plaintiffs allege that Vivendi also failed to timely write-down an impairment of goodwill on the Canal Plus transaction (¶¶ 129-47), that allegation is irrelevant to their 1933 Act claims. The acquisition of Canal Plus had not taken place when the Form F-4 was filed—indeed, the F-4 was the Registration Statement, Prospectus and Proxy Solicitation pursuant to which Vivendi acquired Canal Plus.

-13-

from certain multi-year contracts at its U.S. Filter subsidiary (¶¶ 169-77). In addition, plaintiffs allege that Vivendi's financial statements failed to disclose a "growing liquidity crisis" during the class period. (See, e.g., ¶¶ 60, 182-88.)

1. **The allegation that Vivendi failed on a timely basis to write-down impaired goodwill is legally insufficient.**

   a. **Vivendi recognized an impairment to goodwill on a timely basis under applicable French and U.S. GAAP provisions.**

Prior to January 1, 2002, French and U.S. GAAP differed with respect to the mechanism used to identify an impairment to goodwill.[15] That difference—not any improper conduct by Vivendi—caused the timing differences cited by plaintiffs. (¶¶ 130-32, 139.) As plaintiffs concede, Vivendi fully disclosed the difference between French and U.S. GAAP and explained the basis for its recognition of an impairment under French GAAP—but not under U.S. GAAP— in 2001. (See ¶¶ 131, 139, 146; see also 2001 Form 20-F at F-51 (Slifkin Decl. Ex. 2); Vivendi Environnement's Form 20-F for the year ended December 31, 2001, as filed with the SEC on May 24, 2002 at 50 (Slifkin Decl. Ex. 5).) In addition, there is no dispute that Vivendi disclosed in its 2001 Form 20-F the anticipated effect of U.S. GAAP's transition to a fair value impairment model, pursuant to SFAS No. 142, as from January 1, 2002. See 2001 Form 20-F at F-57 (Slifkin Decl. Ex. 2); see also SFAS No. 142, "Goodwill and Other Intangible Assets" (Slifkin Decl. Ex. 6). Vivendi properly recorded an impairment of goodwill under U.S. GAAP in the first quarter of 2002—the first time that it was permitted to do so on a fair value basis. (See ¶ 139; see also 2001 Form 20-F at F-57 (Slifkin Decl. Ex. 2).)

Plaintiffs do not assert that Vivendi should have applied SFAS No. 142 prior to January 1, 2002. Nor do they allege that Vivendi applied SFAS No. 142 improperly once it was adopted. Rather, they allege that Vivendi improperly applied SFAS No. 121 by failing to take an impairment write-down prior to January 1, 2002. (¶¶ 131-32, 139.) However, plaintiffs fail to plead any facts that would support an inference that

---

[15]  Measurement of any impairment under French GAAP is based on fair value. See 2001 Form 20-F at F-51 (Slifkin Decl. Ex. 2). In contrast, prior to January 1, 2002, an impairment analysis under U.S. GAAP would only be triggered when the sum of the undiscounted future cash flows estimated to be generated from the use and ultimate disposal of an asset was determined to be less than the net carrying value of the asset. See Statements of Financial Accounting Standards ("SFAS") No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of" (Slifkin Decl. Ex. 4); see also 2001 Form 20-F at F-51 (Slifkin Decl. Ex. 2). It was more difficult to recognize an impairment under U.S. GAAP than French GAAP because under U.S. GAAP the carrying value of the asset in question was measured on an amortized historical cost as opposed to fair value basis. See SFAS No. 121 (Slifkin Decl. Ex. 4).

Vivendi should have determined prior to January 2002 that the sum of the undiscounted future cash flows estimated to be generated from the use and ultimate disposal of the assets of either Canal Plus or U.S. Filter was less than the net carrying value of those assets—the threshold test for an impairment under SFAS No. 121. See SFAS No. 121 (Slifkin Decl. Ex. 4). Plaintiffs do not explain why any of the four events they identify, including (1) the incidence of piracy at Canal Plus (¶¶ 134-38); (2) a reduction in value of certain soccer contracts at Canal Plus (¶¶ 142-45); (3) the fact that an unrelated German company purchased another unrelated U.S. company for less than Vivendi paid for U.S. Filter (¶ 146); or (4) the fact that Vivendi recognized additional impairments to goodwill in 2002 (¶¶ 141, 147), even if true, necessarily suggested to Vivendi, prior to January 2002, that the total undiscounted future cash flows of Canal Plus and U.S. Filter from all their operations were insufficient to meet the carrying value of those assets. Plaintiffs' allegations are nothing more than fair value arguments. They are irrelevant to the application of SFAS No. 121. (See, e.g., ¶ 142 (alleging that "[t]he reported value of Canal Plus' assets on Vivendi's balance sheet was also materially and improperly inflated").)

**b. Vivendi's purported failure to comply with GAAP and SEC Rules and Regulations does not give rise to liability for securities fraud.**

Even if Vivendi did not comply with U.S. GAAP because the company "failed to timely record an impairment in the value of its reported goodwill" (¶ 124), that failure, by itself, cannot create liability under the securities laws. See Chill v. General Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996) ("Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim."). Rather, plaintiffs must plead additional facts that would support a strong inference of intent. See Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999); Funke v. Life Fin. Corp., No. 99 Civ. 11877, 2002 WL 31845707, at *9 (S.D.N.Y. Dec. 10, 2002). None is pleaded here.[16]

The fact that a company, as a result of the adoption of a new accounting principle required under U.S. GAAP, is forced to take a charge, or restate financials (which Vivendi did not do), does not render the previous financials false or misleading in violation of Section 10(b). Stevelman, 174 F.3d at 81-85 (holding that a restatement of financials due to a change in GAAP does not create liability under § 10(b)); Funke, 2002 WL 31845707, at *1, *10-*11 (granting motion to dismiss 1934 Act claims because restatement of financials after

---

[16] Similarly, plaintiffs' allegations at ¶¶ 178-80 are insufficient. In those paragraphs, plaintiffs do not even attempt to provide any support for their conclusory allegations of U.S. GAAP violations. See Decker, 681 F.2d at 119-20.

-15-

FASB clarifying statement did not create 10(b) liability); In re Brightpoint, Inc. Sec. Litig., No. IP99-0870-C-H/G, 2001 WL 395752, at *28-29 (S.D. Ind. Mar. 29, 2001) (financials restated after change in accounting rules); Mortensen v. AmeriCredit Corp., 123 F. Supp. 2d 1018, 1025-27 (N.D. Tex. 2000), aff'd, 240 F.3d 1073 (5th Cir. 2000) (restatement after December 1998 clarification of FASB Statement No. 125).

### 2. Plaintiffs' allegations that Vivendi improperly consolidated Cegetel and Maroc Telecom are insufficient to establish the alleged falsity of Vivendi's financial statements.

#### a. Vivendi was required to consolidate Cegetel and Maroc Telecom under French GAAP.

(1) **Cegetel.** During the class period, Vivendi owned 44 percent of Cegetel and, pursuant to a Shareholders' Agreement with the other Cegetel shareholders (1) controlled 59 percent (a majority) of the shareholder voting rights and (2) appointed 5 of the 9 members of the Cegetel board of directors.[17] As a result, Vivendi possessed "exclusive control" ("contrôle exclusif") over Cegetel, as defined by Article L.233-16 of the French Code de commerce (Slifkin Decl. Ex. 7) and was therefore required to consolidate pursuant to paragraph 1000 of the Appendix to Regulation 99-02 of the French Comité de la Réglementation Comptable ("CRC") (Slifkin Decl. Ex. 8).[18]

Plaintiffs contend that Vivendi's consolidation of Cegetel under French GAAP was improper because (1) the Cegetel Shareholders' Agreement restricted Vivendi's ability to direct Cegetel to perform certain actions if objected to by the three minority shareholders (¶ 158-59; see also 2000 Form 20-F at 23-24 (Slifkin Decl. Ex. 1)) and (2) Vivendi did not "have access" to Cegetel's cash (¶ 160). They are wrong.

First, the clause in the Shareholders' Agreement cited by plaintiffs only precludes Cegetel, under Vivendi's control, from entering into specific transactions involving (1) the acquisition by Cegetel of a less-than-100 percent share in another entity; or (2) the acquisition or disposal of a "material amount" of Cegetel assets or the cessation of any "material business operation", if all three of the minority shareholders object.

---

[17] See Vivendi's 2000 Form 20-F at 22-23 (Slifkin Decl. Ex. 1) ("Cegetel[]'s board of directors has nine members, five of whom are nominated by [Vivendi]"); id. at 50 (disclosing "controlling interest" of 59 percent); F-9 ("Cegetel is consolidated because, through a shareholders agreement, the Company has a majority of the shareholder voting rights."); id. at F-39-F-40 n.(a) ("Vivendi Universal has majority voting rights and control of the Board of Directors of Cegetel"); see also 2001 Form 20-F at 30-31 n.2 (Slifkin Decl. Ex. 2).

[18] Vivendi, in fact, met all three tests for consolidation specified in Article L.233-16 of the French Code de commerce (Slifkin Decl. Ex. 7) and in paragraph 1002 of CRC Regulation 99-02 (Slifkin Decl. Ex. 8), in that it (1) possessed an "indirect holding of the majority of voting rights" in Cegetel; (2) designat[ed] . . . the majority of members of the administrative, managerial [and] supervisory bodies of" Cegetel and (3) possessed "the right to exercise dominant influence over a company by virtue of a contract" (i.e., the Cegetel Shareholders Agreement).

-16-

(¶ 159; see also 2000 Form 20-F at 23-24 (Slifkin Decl. Ex. 1).) The rights under that clause do not accrue to any individual minority shareholder; all three must dissent. See 2000 Form 20-F at 23-24 (Slifkin Decl. Ex. 1). On its face, the clause addresses only extraordinary transactions with the potential to affect the fundamental nature of Cegetel's business. It does not restrict Vivendi's ability to direct Cegetel's affairs in the ordinary course of its existing business. Paragraph 101 of CRC Regulation 99-02 states that enterprises are "excluded from the scope of consolidation if . . . severe and long-lasting restrictions substantially call into question . . . the control or influence exercised over said company". CRC Reg. 99-02 (Slifkin Decl. Ex. 8). But that is not what is pleaded here. Nothing in that clause, even if applied to its fullest extent, calls into question Vivendi's "dominant influence" ("influence dominante") over Cegetel under French GAAP. See id.

Second, the question of Vivendi's "access" to Cegetel's cash is irrelevant to consolidation. (¶ 160.) Under French GAAP, "access" to a subsidiary's cash flow is not part of the consolidation test. See Article L.233-16 of the French Code de commerce (Slifkin Decl. Ex. 7); paragraph 1002 of CRC Reg. 99-02 (Slifkin Decl. Ex. 8). Similarly, Vivendi's purported inability to "access" Cegetel's cash flow is not a "severe and long-lasting restriction[] [that] substantially call[ed] into question . . . the control or influence exercised [by Vivendi] over [Cegetel]". See Paragraph 101 of CRC Reg. 99-02 (Slifkin Decl. Ex. 8). Accordingly, Vivendi was required to consolidate Cegetel under French GAAP.

(2) **Maroc Telecom.** Vivendi was similarly required to consolidate Maroc Telecom under French GAAP. As disclosed in Vivendi's 2001 Form 20-F, Vivendi's purchase of a 35 percent interest in Morocco's national telecommunications operator "was finalized in April 2001, at which time Maroc Telecom began to be consolidated in the accounts of Vivendi Universal, as [Vivendi] obtained control through majority board representation and share voting rights". 2001 Form 20-F at F-15 (Slifkin Decl. Ex. 2). Vivendi further disclosed that it had obtained a "controlling interest" of 51 percent of the voting rights pursuant to a shareholders' agreement with the Kingdom of Morocco, the other shareholder. Id. at 30-31. As a result, Vivendi was required to consolidate its financials pursuant to Article L.233-16 of the French Code de commerce (Slifkin Decl. Ex. 7) and Paragraphs 1000 and 1002 of CRC Regulation 99-02 (Slifkin Decl. Ex. 8). Plaintiffs' allegations to the contrary are both legally incorrect and irrelevant to the question of consolidation.[19]

---

[19]   Plaintiffs' allegation in ¶ 166 that "a 40% ownership interest is required for consolidation" under French GAAP is incorrect. Paragraph 1000 of CRC Regulation 99-02 (Slifkin Decl. Ex. 8) states that "[a]ll controlled companies . . . must be consolidated". According to French GAAP, the requisite control is presumed when the parent company holds more than 40 percent of the voting rights, not ownership interest as plaintiffs

### b.  Vivendi's financial statements were properly reconciled to U.S. GAAP.

Vivendi reconciled certain parts of its French GAAP financial statements to U.S. GAAP in its Form 20-F filings.  See, e.g., 2001 Form 20-F at F-7 - F-8; F-51 - F-73 (Slifkin Decl. Ex. 2).  Vivendi provided a U.S. GAAP reconciliation of its reported results for Shareholders' Equity and Net Income (Loss), and a recalculated Earnings (Loss) Per Share ("EPS").  Id. at F-58, F-59.

Vivendi's consolidation of Cegetel and Maroc Telecom also complied fully with U.S. GAAP and as a result, no corresponding adjustments were needed on that basis to Vivendi's reported Shareholders' Equity, Net Income or EPS.  U.S. GAAP requires that a parent consolidate enterprises in which it has a controlling financial interest, represented by a majority voting interest.  See SFAS No. 94 ¶ 13 (Slifkin Decl. Ex. 9). Plaintiffs' allegations regarding the rights afforded to the minority shareholders in the Cegetel Shareholders' Agreement (¶¶ 158-59) do not rise to the level of "substantive participating rights" sufficient to overcome the presumption under U.S. GAAP that the investor with a majority voting interest should consolidate its investee, see EITF No. 96-16 (Slifkin Decl. Ex. 10); see also 2001 Form 20-F at F-8 (Slifkin Decl. Ex. 2).[20]  Similarly, Vivendi's ability to "access" the cash flow of either Cegetel or Maroc Telecom is irrelevant to the question of consolidation under U.S. GAAP.  (See ¶¶ 160, 167; see also SFAS No. 94 ¶ 2 (Slifkin Decl. Ex. 9).) Accordingly, plaintiffs have failed to plead any legitimate reason to suggest that Vivendi's financial statements during the class period were not properly reconciled and presented in accordance with U.S. GAAP, as a result of Vivendi's consolidation of Cegetel or Maroc Telecom.

### c.  Even if consolidation of these subsidiaries was improper, Vivendi's net income and shareholders' equity would be unaffected.

Had Cegetel or Maroc Telecom not been consolidated, Vivendi would have been required to account for its investment in both companies for U.S. GAAP purposes using the "equity method" of accounting.  See

---

contend, during two successive financial years—which Vivendi plainly did.  See paragraph 1002 of CRC Reg. 99-02 (Slifkin Decl. Ex. 8).

[20]     The Emerging Issues Task Force ("EITF") of the FASB has specifically stated that contractual rights "that would allow the minority shareholder to block . . . [a]cquisitions and dispositions of assets greater than 20% of the fair value of the investee's total assets" are "protective rights" which "would not overcome the presumption of consolidation by the investor with a majority voting interest in its investee".  EITF Abstract No. 96-16, at 4 (Slifkin Decl. Ex. 10).  Similarly, rights of minority shareholders to participate in non-routine transactions are not normally viewed as "substantive". . . . Certain minority rights may provide for the minority shareholder to participate in significant decisions that would be expected to be made . . . in the 'ordinary course of business';  however, the Task Force concluded that the existence of such minority rights should not overcome the presumption that the majority should consolidate, if it is remote that the event or transaction that requires minority approval will occur."  Id. at 6.  Here, the rights afforded the Cegetel minority shareholders under the clause are plainly not substantive.

-18-

Accounting Principles Board ("APB") Opinion No. 18 (Slifkin Decl. Ex. 11).[21] Under that method, net income during a particular period includes the investor's proportionate share of the net income reported by the investee for the periods subsequent to acquisition. Id., at ¶ 6(b). The effect of this treatment is that the investor's net income for the period and shareholders' equity at the end of the period under the equity method are the same as if the companies had been consolidated (because as part of consolidation the proportionate share of net income attributed to other investors is deducted from the total net income for the period). Id.; see also 2000 Form 20-F at F-41 (Slifkin Decl. Ex. 1) ("Th[e] difference in accounting policy [between the equity method and full consolidation] has no effect on either net income or shareholders' equity" under U.S. GAAP). Accordingly, plaintiffs' allegations that Vivendi improperly consolidated Cegetel and Maroc Telecom, and thereby purportedly inflated its income, are incoherent.[22]

### 3. Plaintiffs' allegations that Vivendi improperly recognized revenue from its U.S. Filter subsidiary are insufficient to show the falsity of Vivendi's financial statements during the Class Period.

Plaintiffs refer to a "former officer of U.S. Filter" who said U.S. Filter[23] was "booking to backlog". (¶¶ 174, 177.)[24] Based on nothing more than that, plaintiffs infer that Vivendi improperly recognized revenue. (¶¶ 174, 176-77.) That inference is unreasonable and therefore should not be drawn. See Kalnit v. Eichler, 264 F.3d 131, 138-39 (2d Cir. 2001) (only reasonable inferences are drawn in plaintiffs' favor).

---

[21]  See also 2000 Form 20-F at F-41 (Slifkin Decl. Ex. 1) ("Under U.S. GAAP, when the Company controls a subsidiary based on majority ownership or voting or other rights, the subsidiary is fully consolidated. When the Company does not exercise control over a subsidiary, but has significant influence over the entity, the Company uses the equity method to account for its investment.").

[22]  Plaintiffs' Section 10(b) allegations concerning Cegetel are also time-barred. As noted above (see supra p. 10), plaintiffs effectively concede that they were on inquiry notice that Vivendi had allegedly improperly consolidated Cegetel as of July 2, 2001; they failed to bring suit within a year thereafter. Accordingly, plaintiffs should be time-barred from asserting any misrepresentation made prior to July 2, 2001, premised on the consolidation of Cegetel, including their Section 10(b) claims. In re USEC Sec. Litig., 190 F. Supp. 2d at 818. Of course, it is essentially impossible, because of the puzzle-pleading nature of the Complaint, to determine which alleged misstatements are affected by this—but that is plaintiffs' problem, not Vivendi's or the Court's. See In re Splash, 160 F. Supp. 2d at 1072-74.

[23]  U.S. Filter is a subsidiary of Vivendi Environnement ("VE") which in turn was a subsidiary of Vivendi throughout the Class Period.

[24]  To withstand a motion to dismiss, unnamed sources should be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged". Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000). Here, plaintiffs' generic description "former officer" tells defendants and the Court nothing to suggest that this person has any relevant knowledge whatsoever about U.S. Filter's revenue recognition practices and whether that person was even employed at U.S. Filter or VE during the class period. Thus, any allegation based on this statement should be ignored.

-19-

First, "booking to backlog" refers to the accepted practice of recording and tracking, for internal management purposes, future anticipated earnings from long-term contracts that have been agreed upon, but not yet performed and for which revenue has not been recognized. See Barron's Dictionary of Finance and Investment Terms 37 (4th ed. 1995) (Slifkin Decl. Ex. 12) (describing "backlog" as the "value of unfilled orders" or unperformed contracts, such that "whether the firm's backlog is rising or falling is a clue to its future sales and earnings", not current year revenue). As such, it is unreasonable to infer that U.S. Filter was improperly recognizing anticipated future revenue from multi-year contracts upon the signing of those contracts (¶ 173), simply because the term "booking to backlog" was employed at the Company.

Second, the inference that U.S. Filter was improperly recognizing revenue is plainly unsupportable when one looks at the rest of the pleaded facts and VE's public disclosures. During 2000, VE generated €26.4 billion in revenue. See Amendment No. 1 to Vivendi Environnement's Form 20-F for the year ended December 31, 2000, as filed with the SEC on Sept. 26, 2001 at 14 (Slifkin Decl. Ex. 13). For U.S. Filter's allegedly improper accounting to have caused its parent VE's revenue to be overstated "by as much as 10 times", as plaintiffs hyperbolically contend, U.S. Filter's reported revenue alone would have to represent €23.76 billion of VE's €26.4 billion revenue in 2000. But U.S. Filter only reported €1.32 billion in total revenue in 2000. Id. at 43. Accordingly, the inference plaintiffs are seeking to draw from the phrase "booking to backlog" is, to put it charitably, not supportable.

    4.    **Allegations that Vivendi's public statements were false and misleading when made because of Vivendi's failure to disclose its "growing liquidity crisis" are legally insufficient.**

        a.    **Vivendi timely disclosed the three alleged "causes" of the supposed "liquidity crisis".**

            (1)    **Reduced cash flows from acquired companies.** As set forth above (see supra p. 14) Vivendi fully disclosed impairments to goodwill relating to previous acquisitions in a timely manner and in accordance with French and U.S. GAAP.

            (2)    **Vivendi's share repurchase program.** Vivendi fully disclosed the existence of its stock repurchase program in 2001, including the precise amount of stock repurchased. (¶ 183(b).) Pursuant to French regulations, Vivendi was required to submit a public notice regarding its "share repurchase program" to the Commission des Opérations de Bourse ("COB") prior to the commencement of any stock

purchases and to have that program authorized at a shareholders' meeting.[25] COB Regulation 98-02 requires that the share repurchase program contain specific information designed to assist investors in assessing the impact of the program on a company's financial health and liquidity. Vivendi's 2001 share repurchase program was approved by its shareholders at an annual meeting on September 21, 2000, and was disclosed to and approved by the COB as having met those requirements on October 27, 2000, in conjunction with the prospectus for the Vivendi-Seagram-Canal Plus merger. See COB Visa No. 00-1737 (Slifkin Decl. Ex. 15).[26]

French regulations further required Vivendi to file a monthly report detailing its actual share repurchases throughout 2001 with (1) the Conseil des Marchés Financiers (the "CMF")[27] and (2) the COB.[28] The CMF publishes that information in its "bulletin officiel" and makes the company's reports available to the public on the CMF's website under the section entitled "Information and Decisions". (See http://www.cmf-france.org/english/index.htm.)[29] As a result, plaintiffs were fully informed of Vivendi's stock repurchase program throughout its implementation.

(3) **Vivendi's put options.** Vivendi also disclosed in a timely fashion the existence of the put options sold in late 2000 and 2001. See Vivendi's 2000 "Document de Référence" at 168 (Slifkin Decl. Ex. 17); 2000 Form 20-F at F-32 (Slifkin Decl. Ex. 1); 2001 "Document de Référence" at 248 (Slifkin Decl. Ex. 18); 2001 Form 20-F at F-43 (Slifkin Decl. Ex. 2); and "Accounting Workshop Slides, March 6, 2002", at 33 (which was disclosed publicly on Vivendi's website and is available for review at: http://finance.vivendiuniversal.com/finance/download/pdf/accountinganalystes.pdf). In its disclosures, the Company specified both the number of options outstanding and either a weighted average exercise price or a

---

[25] See Article 2 of COB Reg. 98-02 (Slifkin Decl. Ex. 14).

[26] As noted above (see supra n.9), this Court may properly consider documents that Vivendi filed with the COB in reviewing Vivendi's motion to dismiss. These filings were publicly available and plaintiffs were on notice about these documents at the time they filed their Complaint. Press v. Quick & Reilly, Inc., 218 F.3d 121, 129 (2d Cir. 2000) (district court may consider publicly filed documents on a motion to dismiss); Kavowras, 2000 WL 1672338, at *5; Cortec, 949 F.2d at 48 (court may consider documents of which plaintiffs had notice on a motion to dismiss).

[27] See Article L.225-209 of the French Code de commerce (Slifkin Decl. Ex. 16).

[28] See Article 5 of COB Reg. 98-02 (Slifkin Decl. Ex. 14).

[29] In accordance with Article L.225-209 of the French Code de commerce, following disclosure by Vivendi, the CMF published decisions disclosing Vivendi's stock repurchases in 2001. See Information and Decisions Section of http://www.cmf-france.org/english/index.htm; Decision No. 201c0275, dated 03/12/01; No. 201c0600 dated 05/28/01; No. 201c0747 dated 06/25/01; No. 201c0875 dated 07/16/01; No. 201c1026 dated 08/13/01; No. 201c1128 dated 09/10/01; No. 201c1284 dated 10/22/01; and No. 201c1505 dated 12/24/01.

range of prices. Vivendi's investors were therefore on notice throughout 2001 and 2002 regarding Vivendi's outstanding put obligations as well as the potential range of liability under those obligations. See, e.g., Vivendi's 2000 "Document de Référence" at 168 (Slifkin Decl. Ex. 17).

As a result of those disclosures, plaintiffs were fully informed of what they now allege were the "causes" of the purported "liquidity crisis" experienced by Vivendi. As such, plaintiffs cannot now complain that they were misled.

### b. Allegations that Vivendi's public statements were false and misleading because of Vivendi's subsequent alleged "liquidity crisis" are nothing more than an attempt to plead fraud by hindsight.

The Complaint refers to newspaper articles published after the end of the class period that discuss a perceived "cash crisis" at Vivendi in early July 2002. (¶¶ 184, 186-88.) Based solely upon those articles, plaintiffs assert that Vivendi must have known during the class period that the Company was facing a liquidity problem. Such pleading is insufficient. Plaintiffs are required to provide facts that establish that Vivendi was aware of its liquidity problems at the time it made the statements at issue. See Hart v. Internet Wire, 145 F. Supp. 2d 360, 370 (S.D.N.Y. 2001) ("[t]he critical issue is what defendants knew at the time they [made their public statement]"); see also In re Health Mgmt., 1998 WL 283286, at *5 ("allegations of fraud by hindsight are not actionable under the securities laws"); Feasby v. Industri-Matematik Int'l Corp., No. 99 Civ. 8761, 2000 WL 977673, at *4 (S.D.N.Y. July 17, 2000) ("[p]laintiffs cannot prevail [on securities law claims] by using crystal balls or 20/20 hindsight"); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994) ("[w]e have rejected the legitimacy of alleging fraud by hindsight"). Plaintiffs have failed to do so.

### B. Plaintiffs Have Failed Properly to Plead That Vivendi's Other Public Statements Were False and Misleading When Made.

#### 1. Many of defendants' public statements are inactionable under the securities laws.

##### a. Many of defendants' public statements constitute inactionable puffery.

Many of the statements that are alleged to be false and misleading are so general and vague that they cannot mislead a reasonable investor and are therefore immaterial as a matter of law. See Steinberg v. PRT Group, Inc., 88 F. Supp. 2d 294, 301 (S.D.N.Y. 2000) ("[v]ague expressions of optimism constitute immaterial corporate 'puffery,' which cannot mislead the reasonable investor"); see also Schoenhaut v. American Sensors, Inc., 986 F. Supp. 785, 793 (S.D.N.Y. 1997) ("mere general expressions of optimism and anticipation of continued future success—are not the stuff of which securities fraud claims are made") (citation

-22-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE VIVENDI UNIVERSAL, S.A.
SECURITIES LITIGATION

This Document Relates To:
All Actions

Civil Action No.
02 Civ. 5571 (HB)

NOTICE OF MOTION
OF DEFENDANT JEAN-
MARIE MESSIER TO
DISMISS CONSOLIDATED
CLASS ACTION
COMPLAINT

Oral Argument Requested

PLEASE TAKE NOTICE that upon the summons and consolidated class action complaint herein and the accompanying Memorandum of Law, the undersigned will move this Court before the Honorable Harold Baer, Jr., District Judge, in Room 23B of the United States Courthouse, 500 Pearl Street, New York, New York, on April 24, 2003 at 10:00 am, or as soon thereafter as counsel can be heard, for an order dismissing the consolidated class action complaint herein with prejudice pursuant to Rules 8, 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(2), and for such other and further relief as the Court may deem just and proper.

Dated:     New York, New York
            February 24, 2003

                        KING & SPALDING LLP

                        By:    *Michael Malone*

                              Michael J. Malone (MJM-2005)
                              Scott E. Eckas (SE-7479)
                              Jennifer L. Hurley (JH-7487)
                              1185 Avenue of the Americas
                              New York, NY 10036
                              Telephone: (212) 556-2100
                              Facsimile: (212) 556-2222

                              *Counsel for Defendant*
                              *Jean-Marie Messier*

To:    Attached



## CERTIFICATE OF SERVICE

I, Jennifer L. Hurley, hereby certify that on this 24th day of February, 2003, a true copy of the foregoing Motion of Defendant Jean-Marie Messier to Dismiss the Consolidated Class Action Complaint and accompanying Memorandum of Law in Support was served upon the following counsel of record by overnight mail:

David J. Bershad, Esq.
Sol Schreiber, Esq.
William C. Fredericks, Esq.
Christopher M. Huck, Esq.
MILBERG WEISS BERSHAD HYNES
  & LERACH LLP
One Pennsylvania Plaza
New York, NY 10019

Arthur N. Abbey, Esq.
James S. Notis, Esq.
Richard B. Margolies, Esq.
ABBEY GARDY, LLP
212 East 39th Street
New York, NY 10016

Randi D. Badman, Esq.
MILBERG WEISS BERSHAD HYNES
  & LERACH LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111-5238

*Co-Lead Counsel for Lead Plaintiffs*

Paul C. Saunders, Esq.
Daniel Slifkin, Esq.
CRAVATH, SWAIN & MOORE LLP
825 Eighth Avenue
Worldwide Plaza
New York, NY 10019
*Counsel for Vivendi Universal S.A.*

Martin L. Perschetz, Esq.
Michael E. Swartz, Esq.
Dana M. Roth, Esq.
Einat Philip (admission pending)
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022
*Counsel for Guillaume Hannezo*

Jennifer L. Hurley
Jennifer L. Hurley

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE VIVENDI UNIVERSAL, S.A.
SECURITIES LITIGATION

Civil Action No.
02 Civ. 5571 (HB)

# REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANT VIVENDI UNIVERSAL, S.A.'S MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

Paul C. Saunders (PS-0587)
Daniel Slifkin (DS-0588)
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant*
*Vivendi Universal, S.A.*

April 10, 2003

**I.      THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER CLAIMS OF FOREIGN PURCHASERS OF VIVENDI ORDINARY SHARES.**

This Court lacks subject matter jurisdiction over the claims of foreign plaintiffs who purchased Vivendi's ordinary shares. (Df. Br. at 2-5.) In arguing for the existence of subject matter jurisdiction, plaintiffs all but ignore the closely analogous decision in Tri-Star Farms Ltd. v. Marconi PLC, 225 F. Supp. 2d 567 (W.D. Pa. 2002), and instead rely upon two decisions—In re Gaming Lottery Securities Litigation, 58 F. Supp. 2d 62 (S.D.N.Y. 1999) and Itoba Limited v. LEP Group PLC, 54 F.3d 118 (2d Cir. 1995)—that are inapposite. (Pl. Br. at 1-4.)

First, in In re Gaming the court exercised subject matter jurisdiction over a Section 10(b) claim on the ground that "defendant's activities within [the United States] are the very factual predicates of fraud which lie at the heart of plaintiffs' case". 58 F. Supp. 2d at 74. Here, however, the factual predicate of plaintiffs' fraud claim is Vivendi's activities in France. (Df. Br. at 3-4.) Second, in Itoba, the court conferred subject matter jurisdiction because foreign purchaser plaintiffs had established a chain of events showing that they had specifically relied on defendant corporation's SEC filings. See 54 F.3d at 123. However, Itoba was not a class action lawsuit and has been rejected in the class action context where plaintiffs allege reliance through "fraud on the market". See In re Baan Co. Sec. Litig., 103 F. Supp. 2d 1, 10 n.14 (D.D.C. 2000). Here, plaintiffs only allege reliance through the fraud on the market (¶ 194-96), making Itoba inapplicable.

Plaintiffs also argue that there is subject matter jurisdiction over those foreign purchasers by reference to factors that have been deemed insufficient by the courts. First, plaintiffs argue that Vivendi acquired "numerous well-known U.S. companies" and that "54% of [Vivendi's] long-lived assets were located in the U.S.". (Pl. Br. at 1-2.) Those types of facts, however, although going to personal jurisdiction, cannot confer subject matter jurisdiction. See In re Baan, 103 F. Supp. 2d at 10 n.14. Second, plaintiffs' argument that defendants issued fraudulent press releases in the United States (Pl. Br. at 2) has been rejected in situations such as this one, where conduct relevant to the dissemination of those press releases occurred abroad (Df. Br. at 3-4). See Nathan Gordon v.

-1-

Northgate Exploration, Ltd., 148 F.R.D. 105, 108 (S.D.N.Y. 1993). Third, the allegation that Messier and Hannezo moved to New York in order to "promote misleading communications with Wall Street" (Pl. Br. at 4) is inadequate to confer subject matter jurisdiction. See Tamari v. Bache & Co., 547 F. Supp. 309, 313 (N.D. Ill. 1982) ("[t]he residence or citizenship of the parties . . . , while relevant, is not the focus of [the subject matter jurisdiction] inquiry"). Accordingly, the claims of foreign purchaser plaintiffs must be dismissed. (Df. Br. at 2-5.)

## II.     PLAINTIFFS' COMPLAINT VIOLATES RULE 8.

In our opening brief, we detail the maze-like nature of plaintiffs' Complaint and explain the various ways in which the Complaint violates Rule 8. (Df. Br. at 5-6.) In response, plaintiffs merely assert that their Complaint satisfies Rule 8 and then quote a recent decision by Judge Scheindlin, concluding that "no one should have any trouble understanding what has been alleged"—in a totally separate and different complaint. (Pl. Br. at 30, citing In re IPO Sec. Litig., 241 F. Supp. 2d 281, 333 (S.D.N.Y. 2003).) That decision has no bearing on this Complaint, especially when plaintiffs have not even attempted to show that the two complaints are in any way similar. More importantly, plaintiffs fail to explain why it is appropriate that they have not: (1) identified the specific statements alleged to be false or misleading; or (2) specified why those statements are allegedly false. (Df. Br. at 5-6); see In re Splash Tech. Holdings Sec. Litig., 160 F. Supp. 2d 1059, 1074 (N.D. Cal. 2001) (dismissing complaint as improper puzzle pleading where plaintiffs' counsel "left it up to the defendants and the court to try to figure out exactly what the misleading statements are and to match them up with the reasons they are false and misleading" (internal citation omitted)). Plaintiffs' attempt to mask serious pleading deficiencies by forcing defendant and the Court to match up statements from one section of the Complaint with whichever facts in another section of their Complaint may be relevant (Df. Br. at 5-6) violates Rule 8 and requires dismissal.

## III.    PLAINTIFFS FAIL TO PLEAD A SECTION 14(a) CLAIM.

In our opening brief, we demonstrated that, as a foreign private issuer, Vivendi is immune from liability under Section 14(a). (Df. Br. at 6-7.) Plaintiffs do not dispute those propositions.

-2-

cannot, solely by reference to certain transactions that occurred after the issuance of the Registration Statement (¶¶ 146, 169-77), establish that facts in existence at that time also existed at the date of issuance. (Df. Br. at 10-12.) Following that reasoning, this Court should dismiss plaintiffs' 1933 Act claim.

## V. PLAINTIFFS' SECTION 10(b) CLAIMS MUST BE DISMISSED.

### A. Plaintiffs Do Not Plead Falsity With the Required Particularity.

In arguing that their Complaint has met the heightened pleading standards of Rule 9(b) and the PSLRA, plaintiffs state in conclusory fashion that the "complaint specifically identifies Vivendi's financial statements and earnings releases that are alleged to be false or misleading and the dates they were issued". (Pl. Br. at 6.) Contrary to plaintiffs' assertion, the heightened pleading requirements are not satisfied merely by alleging that Vivendi made a misstatement on a specific date. Plaintiffs are also required to explain how the alleged statements were false or misleading when issued. Plaintiffs' bald assertion that all of Vivendi's statements were false or misleading for the same general reason, "because, inter alia, the Company was engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings" (¶¶ 60, 64, 72, 78, 82, 93, 98, 108, 113), is the type of conclusory pleading that has been held to be legally insufficient under Rule 9(b) and the PSLRA. See Vogel v. Sands Bros. & Co., Ltd., 126 F. Supp. 2d 730, 738 (S.D.N.Y. 2001); In re Health Mgmt. Sys., Inc. Sec. Litig., No. 97 Civ. 1865, 1998 WL 283286, at *5 (S.D.N.Y. June 1, 1998).

### B. Plaintiffs' "Liquidity Crisis" Allegations are Fraud by Hindsight.

Plaintiffs have failed to plead any facts establishing that Vivendi knew of the purported liquidity crisis at any time during the class period, thus making their allegations an improper attempt to plead fraud by hindsight.[3] (Df. Br. at 21-22); see Hart v. Internet Wire, 145 F. Supp. 2d 360, 370 (S.D.N.Y. 2001). Plaintiffs respond by merely asserting the conclusion, without any supporting facts, that defendants knew during the class period that Vivendi was facing a liquidity crisis. (Pl.

---

[3] Plaintiffs mistakenly assert that Vivendi raised a "truth on the market defense". (Pl. Br. at 10.)

Br. at 7-10.) Such barebones assertions are insufficient under the securities laws. See Fellman v. Electro Optical Sys. Corp., No. 98 Civ. 6403, 2000 WL 489713, at *4 (S.D.N.Y. Apr. 25, 2000) (plaintiffs must "allege . . . specific facts from which . . . actual knowledge can be inferred").

## C. Vivendi Recognized an Impairment to Goodwill on a Timely Basis Under Applicable French and U.S. GAAP Provisions.

Plaintiffs fail to plead facts that would support an inference that Vivendi should have determined prior to January 2002 that goodwill for Canal Plus and U.S. Filter was overstated. (Df. Br. at 13.) Specifically, plaintiffs fail to plead how the four events alleged in their Complaint[4], even if true, would have suggested to Vivendi prior to 2002 that the total undiscounted future cash flows of Canal Plus and U.S. Filter from all of their operations were insufficient to meet the carrying value of those assets—which is the triggering event for an impairment analysis under SFAS No. 121. (Id.) Plaintiffs ignore that pleading deficiency and state in a conclusory fashion that they "have pled ample particulars" to show that Vivendi knew or should have known that the goodwill on Canal Plus and U.S. Filter was "impaired by the start of the Class Period".[5] (Pl. Br. at 12). Not only are such bald assertions inadequate, but the suggestion that Vivendi knew or should have known prior to the class period of events that only occurred after that time cannot be a proper basis for a claim.

## D. Vivendi Properly Consolidated Cegetel and Maroc Telecom.

Nothing in plaintiffs' opposition brief (Df. Br. at 14-18) refutes our assertion that Vivendi's consolidation of Cegetel and Maroc Telecom was appropriate (and thus did not operate to overstate Vivendi's earnings) (Pl. Br. at 14-16). First, while plaintiffs assert that Vivendi's current CEO "has recently made clear the [shareholder] agreements gave Vivendi only limited control over Cegetel and

---

[4] The alleged events are: (1) an incidence of piracy at Canal Plus (¶¶ 134-38); (2) a reduction in value of certain soccer contracts at Canal Plus (¶¶ 142-45); (3) an unrelated German company purchasing another unrelated U.S. company for less than what Vivendi paid for U.S. Filter (¶ 146); and (4) Vivendi recognizing additional impairment to goodwill in 2002 (¶¶ 139, 141, 147).

[5] Whether experts could possibly disagree as to when Vivendi should have taken a write-down (see Pl. Br. at 13 n.8), is irrelevant given that plaintiffs have not pled any facts suggesting Vivendi was aware that a write-down was warranted.

-6-

Maroc" (Pl. Br. at 14-15), nowhere in the Complaint is that alleged.[6] Second, EITF 96-16, which plaintiffs cite, supports Vivendi's consolidation. It states that "rights to block customary or expected dividends or other distributions may be substantive participating rights, while rights to block extraordinary distributions would be protective rights". (Slifkin Decl. Ex. 10.) As we previously demonstrated, the Cegetel Shareholders' Agreement only provides minority shareholders with the right to block extraordinary transactions. (Df. Br. at 15.) Therefore, under EITF 96-16, the Cegetel minority shareholders did not have "substantive participating rights".[7] Plaintiffs have not pled any facts demonstrating that Vivendi's consolidations were inappropriate.

## E.   **Plaintiffs Cannot Demonstrate That Vivendi Improperly Recognized Revenue From U.S. Filter.**

Based solely on the information provided by an insufficiently identified U.S. Filter employee, plaintiffs allege that Vivendi Environnement's revenue was overstated "by as much as 10 times" through U.S. Filter's "booking to backlog" practice. (¶ 174.) In our opening brief, we demonstrated that plaintiffs' allegation is inconsistent with the rest of their pleading and that "booking to backlog" is an accepted industry practice that implies nothing with respect to operating results. (Df. Br. at 19.) Plaintiffs' response either concedes or ignores that showing.

First, plaintiffs concede that paragraph 174 of the Complaint "incorrectly states" that Vivendi Environnement's revenue was overstated by ten times. (Pl. Br. at 16 n.12.) Since the issue on this motion is the sufficiency of plaintiffs' allegations as pleaded, that concession is dispositive. While plaintiffs want now to rewrite their allegations (id.), it is plain that plaintiffs may not amend their pleading in their opposition papers. See O'Brien, 719 F. Supp. at 229.

---

[6] The Complaint alleges only that the current CEO stated that Vivendi does "not have access to Cegetel and Maroc Telecom" and that "Vivendi cannot access the cash flow generated by the Companies it owns less than 50% of". (¶¶ 160, 167.) Moreover, as demonstrated in our opening brief (Df. Br. at 16), access to cash flow is not part of the consolidation test.

[7] That minority shareholders lacked "substantive participating rights" also demonstrates that those shareholders could not impose the "severe and long-lasting restrictions" necessary to exclude Cegetel from the scope of consolidation under CRC Regulation 99-02. (Slifkin Decl. Ex. 8.)

-7-

Second, by failing in any way to challenge or even respond to our argument, plaintiffs effectively concede that "booking to backlog" is an accepted practice of recording and tracking future anticipated earnings from long-term contracts. (Df. Br. at 19.)

Third, having essentially abandoned the pleaded factual support for their claim, plaintiffs nonetheless argue that because "the Complaint alleges that a former officer of U.S. Filter advised plaintiffs' counsel that . . . U.S. Filter materially overstated its operating results" (Pl. Br. at 16-17), their allegation is sufficient to survive a motion to dismiss. In fact, the Complaint does not plead that. Further, even if it had, such a conclusory pleading, in the absence of any factual support or detail, cannot meet the heightened pleading standards of Rule 9(b) and the PSLRA. See Vogel, 126 F. Supp. 2d at 738. Simply stated, there is no pleaded factual support for any allegations regarding U.S. Filter—neither with respect to material misstatements nor to scienter. Moreover, the pleading as to Vivendi Environnement is concededly "incorrect []". (Pl. Br. at 16 n.12.)

**F.    Many of Defendant's Public Statements Constitute Inactionable Puffery.**

In response to our argument that many of defendant's public statements constitute inactionable puffery (Df. Br. at 22-23), plaintiffs argue that defendant's public statements are actionable because "defendant[] allegedly knew (or should have known) they were false". (Pl. Br. at 18.) However, plaintiffs have only asserted actual knowledge in a conclusory fashion. Plaintiffs' failure to plead any facts that support their blanket assertion renders their claim of actual knowledge meaningless.[8] See Fellman, 2000 WL 489713, at *4.

**G.    Many of Defendant's Statements are Forward-Looking.**

Contrary to plaintiffs' argument, the statements identified in our opening brief (Df. Br. at 23-24) are indeed forward-looking.[9] All of those statements contain projections of Vivendi's future financial results. See Harris v. Ivax Corp., 998 F. Supp. 1449, 1453 (S.D. Fla. 1998) ("[p]laintiffs'

---

[8] The attempt to impute defendant's knowledge of the alleged liquidity crisis through subsequent news articles is an inappropriate pleading of fraud by hindsight. See Hart, 145 F. Supp. 2d at 370.

[9] Those are the statements in ¶¶ 58, 61, 80, 85, 88, 89, 94, 95, 100, 103 and 104.

argument [that defendant's representations were misstatements of present fact rather than future performance] is correct from a grammatical perspective only"). Because the cautionary language provided by defendant in each of those press releases was "meaningful"—providing specific reasons as to why actual results could differ materially from the forward-looking statements—the statements in those releases are protected under the first prong of the PSLRA safe harbor and the bespeaks caution doctrine.[10] Id. at 1454; see also Steinberg v. PRT Group, Inc., 88 F. Supp. 2d 294, 301 (S.D.N.Y. 2000). Moreover, even those statements identified in our brief (Df. Br. at 24 (citing ¶¶ 69, 73, 75, 76, 79 (Financial Times statement), 81, 106)) that were not accompanied by meaningful cautionary language are nonetheless protected under the second prong of the PSLRA safe harbor. As we have noted (supra pp. 6-8), plaintiffs' conclusory statement that "defendants knew their statements were misleading when made" is not an adequate pleading. (Pl. Br. at 19.) [11]

### H.   Plaintiffs Have Failed to Plead Scienter.

Plaintiffs have failed to identify facts that show defendant knew or recklessly disregarded that Vivendi's statements were fraudulent. First, plaintiffs allege that defendant knew of certain facts that should have led Vivendi to the conclusion that goodwill for Canal Plus was overstated. (¶¶ 134-37, 143.) However, as demonstrated in our opening brief, plaintiffs' allegation that defendant knew of those facts, even if true, does not establish that Vivendi knew or recklessly disregarded that Canal Plus's cash flows would not equal or exceed the value of its carrying costs at any point prior to the end of fiscal year 2001—the threshold requirement for a SFAS No. 121 impairment. (Df. Br. at 27-28.) Second, the Complaint fails to establish a "strong inference" that defendant knew or recklessly disregarded that Vivendi's reported goodwill on U.S. Filter was materially overstated. (Df. Br. at

---

[10] Plaintiffs mistakenly assert that the bespeaks caution doctrine applies only to forward-looking statements (Pl. Br. at 19 n.18). See Halperin v. EBanker USA.com, Inc., 295 F.3d 352, 357-60 (2d Cir. 2002); Gasner v. Bd. of Sup'rs of Dinwiddie, 103 F.3d 351, 358-60 (4th Cir. 1996).

[11] Further, we note that plaintiffs do not challenge that the statement in paragraph 86 is not attributable to Vivendi and thus inactionable. (Df. Br. at 24.) With respect to the newspaper statements (¶¶ 59, 83, 87, 106 and 109), defendant is not liable for the commentary that accompanies the direct quotes. See Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163 (2d Cir. 1980).

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LIBERTY MEDIA CORPORATION, LMC
CAPITAL LLC, LIBERTY PROGRAMMING
COMPANY LLC, LMC USA VI, INC., LMC USA
VII, INC., LMC USA VIII, INC., LMC USA X,
INC., and LIBERTY HSN LLC HOLDINGS, INC.,
and LIBERTY MEDIA INTERNATIONAL, INC.,

Plaintiffs,

-against-

VIVENDI UNIVERSAL S.A., JEAN-MARIE
MESSIER, GUILLAUME HANNEZO, and
UNIVERSAL STUDIOS, INC.,

Defendants.



Civil Action No.
03 Civ. 2175 (HB)

ORDER

WHEREAS, this Court having heard argument on May 8, 2003, by counsel for

defendants Vivendi Universal S.A., Universal Studios, Inc. and Guillaume Hannezo, and

plaintiffs Liberty Media Corporation and related entities and by counsel for plaintiffs in In re

Vivendi Universal, S.A. Securities Litigation, 02 Civ. 5571 (HB), and having concluded that

there are common questions of law and fact between the two cases and that the interests of

judicial economy and efficiency will be served thereby, it is hereby

ORDERED pursuant to Rule 42(a) of the Federal Rules of Civil Procedure that

this action be consolidated for all pretrial purposes with In re Vivendi Universal S.A. Securities

Litigation, 02 Civ. 5571 (HB); and it is further

MICROFILM
-9:00 AM
MAY 14 2003

ORDERED that all orders, pleadings, motions and other documents filed in this case shall be filed under a double caption including both case names and docket numbers; and it is further

ORDERED, that all defendants who have been served shall have until July 2, 2003, to move against or answer the complaint in this action filed on March 28, 2003.

Dated:    New York, New York
              May 1, 2003

                                     Hon. Harold Baer, Jr.
                                     United States District Judge

- 2 -

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------x
                                                            :   Civil Action No.
                                                            :   02 Civ. 5571 (RJH)
IN RE VIVENDI UNIVERSAL, S.A.                               :
SECURITIES LITIGATION                                       :
                                                            :
                                                            :   FIRST AMENDED
-----------------------------------------------------------x   :   CONSOLIDATED CLASS
                                                            :   ACTION COMPLAINT
This Document Relates To:   All Actions                     :
                                                            :
-----------------------------------------------------------x   Jury Trial Demanded
```

## BASIS OF ALLEGATIONS

Lead Plaintiffs, by their undersigned attorneys, on behalf of themselves and the class they seek to represent, for their First Amended Consolidated Class Action Complaint (the "Complaint"), make the following allegations against defendants based upon the investigation conducted by and under the supervision of plaintiffs' counsel, which included reviewing and analyzing information relating to the relevant time period obtained from numerous public and proprietary sources (such as LEXIS-NEXIS, Dow Jones and Bloomberg) – including, inter alia, Securities and Exchange Commission ("SEC") filings, other regulatory filings and reports, publicly available annual reports, press releases, published interviews, news articles and other media reports (whether disseminated in print or by electronic media), and reports of securities analysts and investor advisory services, in order to obtain the information necessary to plead plaintiffs' claims with particularity. Lead Plaintiffs' investigation also included interviewing or consulting with individuals, including former employees of Vivendi Universal, S.A. ("Vivendi" or the "Company") and its subsidiaries who are knowledgeable about defendant Vivendi's business. Lead Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**JA445**

### SUMMARY OF THE COMPLAINT

1.      Lead Plaintiffs bring this securities fraud class action against Vivendi and two of

its most senior former officers: defendant Jean-Marie Messier ("Messier"), Vivendi's CEO and

Chairman (until he was forced to resign on July 3, 2002), and defendant Guillaume Hannezo

("Hannezo"), Vivendi's CFO (until he resigned on July 9, 2002). Lead Plaintiffs bring this action

(a) on behalf of themselves and all persons who purchased or otherwise acquired the common

stock and American Depository Shares ("ADSs") of Vivendi (the "Purchaser Class") between

October 30, 2000 and August 14, 2002 inclusive (the "Class Period"), alleging violations of the

Securities Exchange Act of 1934 (the "Exchange Act"); (b) on behalf of themselves and all

persons who acquired Vivendi's common stock or ADSs (the "Merger Subclass") pursuant to a

registration statement and prospectus dated October 30, 2000 issued in connection with the three-

way merger (the "Merger") of Vivendi, S.A., The Seagram Company Limited ("Seagram") and

Canal Plus, S.A. ("Canal Plus") that created Vivendi Universal, S.A., alleging violations of the

Securities Act of 1933 (the "Securities Act"); and (c) on behalf of themselves and all persons

who were shareholders of Vivendi or Seagram as of November 25, 2000 and entitled to vote on

the Merger (the "Proxy Subclass") pursuant to the Joint Proxy Statement-Prospectus issued in

connection with the Merger, alleging violations of the Exchange Act.

2.      Although defendant Vivendi started out as a small French-based water utility,

immediately prior to and during the Class Period defendant Messier caused Vivendi to embark

on an extraordinary $77 billion acquisition binge that transformed Vivendi into a huge

international conglomerate. In particular, as a result of its three-way, $46 billion Merger with

Seagram (the parent of Universal Studios and Universal Music) and Canal Plus (one of Europe's

-2-

**JA446**

largest cable TV operators) in October 2000, Vivendi instantly became one of the world's largest media and entertainment companies. At all material times during the Class Period, Vivendi's "Media and Communications" operations and its "Environmental Services" operations (which include its water utility subsidiaries) have constituted the two core areas of the Company's business.

3.    In the period leading up to the October 2000 Merger and thereafter throughout the Class Period, defendants reported strong revenue and earnings, and portrayed Vivendi as a company that was generating sufficient cash flow to satisfy its debt obligations on approximately $21 billion in debt that it had amassed in connection with financing its $77 billion acquisition spree -- even though other media and communications companies in the United States and Europe were suffering through a period of retrenchment and contraction. As a result of defendants' repeated upbeat earnings announcements and assurances concerning the Company's growth and its ability to meet its massive debt obligations, the price of Vivendi's ADSs and common stock was kept artificially inflated throughout the Class Period.

4.    However, as defendants knew but did not disclose, Vivendi's operations and financial condition were dramatically weaker than what their public statements portrayed. For example, immediately prior to and during the Class Period, Vivendi (using its increasingly inflated common stock as currency to finance many of its acquisitions) bid aggressively for several large companies, with the result that Vivendi substantially overpaid for them. Moreover, subsequent events (unbeknownst to investors) confirmed that these acquired entities could not generate sufficient cash flow to justify their high acquisition cost, with the result that Vivendi's balance sheet was bloated with tens of billions of dollars of inflated "goodwill" whose value had

-3-

been materially impaired and should have been written down. The failure of the Vivendi conglomerate to generate earnings in line with its publicly-touted estimates further threatened the Company's liquidity, given that the Company needed to generate massive amounts of cash flow from operations to satisfy its obligations on over $21 billion worth of debt.

5.      To conceal the deteriorating state of Vivendi's newly constructed corporate empire, Vivendi engaged in a variety of improper asset- and revenue-inflating practices during and immediately prior to the Class Period that enabled the Company to artificially inflate its reported assets, revenue, income and earnings per share ("EPS") at the end of the Company's quarterly reporting periods, rendering Vivendi's publicly filed financial statements and other communications regarding the company's financial performance complained of herein materially false and misleading.

6.      Vivendi's improper accounting (as detailed herein at ¶¶ 119-80) included, inter alia, failing to take timely write-offs of over €29 billion in goodwill associated with Vivendi's acquisitions, including its acquisitions of U.S. Filter and Canal Plus. Defendants' failure, in violation of U.S. Generally Accepted Accounting Principles (" U.S. GAAP"), to take timely write-offs for impaired goodwill caused Vivendi to improperly delay recognizing offsetting charges of over €29 billion against the Company's earnings during the Class Period, with the result that Vivendi's reported earnings and EPS were inflated under U.S. GAAP by tens of billions of dollars during the Class Period.

7.      In addition to its failure to properly account for impaired goodwill, Vivendi also engaged in a variety of improper revenue recognition and expense-deflating practices, and other related misconduct, to inflate its reported financial performance. These practices included, inter

-4-

alia, (a) reporting and consolidating into its own financial statements billions of dollars of revenue from entities (such as Cegetel and Maroc Telecom) in which Vivendi held only a minority stake and which Vivendi did not control, in violation of U.S. GAAP (as detailed below at ¶¶ 148-68); and (b) recognizing 100% of the revenue "upfront" (*i.e.*, in contract year one) on billions of dollars of multi-year contracts in a practice known as "booking backlog," even though Vivendi had not yet performed its obligations under those multi-year contracts and U.S. GAAP required that the revenue on such contracts be recognized ratably over time as Vivendi actually performed the contracted-for services (as detailed below at ¶¶ 169-80).

8.      The foregoing improper accounting practices not only allowed Vivendi to keep its stock price artificially high, but also facilitated defendants' fraudulent efforts to conceal the Company's growing liquidity problems.  For example, on December 6, 2001, defendant Messier assured the investing public that "Vivendi Universal is in a very strong position, with solid performance in virtually every business," and just a week later -- after having announced that it would raise $2.5 billion by selling a $1.5 billion interest in British Sky Broadcasting Plc ("BSkyB") and a $1.06 billion interest in Vivendi Environnement -- Vivendi stated that these asset sales would give Vivendi "room to manoeuvre" for additional acquisitions, and enable it "to cover any eventual needs from different opportunities for strategic partnerships."  On December 17, 2001, Vivendi then announced that it would be acquiring USA Networks for approximately $10 billion.

9.      Unbeknownst to investors, however, Vivendi's business at that time was anything but "strong" and decidedly lacked "room for manoeuvre."  To the contrary, as the *Wall Street Journal* later reported, the Company faced a potentially catastrophic liquidity crisis:

-5-

On Dec. 13 last year [2001], [defendant] Hannezo sent [defendant] Messier, [Vivendi's] chairman . . . a desperate handwritten plea.

*"I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat," wrote Mr. Hannezo,* the company's chief financial officer. *"All I ask is that all of this not end in shame"*

*That very day, unknown to investors and the Vivendi board, the company had narrowly averted a downgrade by credit-rating agencies, which would have made it difficult to borrow money and plunged the company into a cash crisis.* Mr. Hannezo . . . implored his boss and longtime friend [defendant Messier] to take serious steps to reduce Vivendi's ballooning debt.

When [Vivendi's] board met the next day to consider whether to approve a roughly $10 billion acquisition of USA Network Inc.'s TV and film businesses, *Mr. Messier made no mention of the close call with the rating agencies. Instead, when a director asked about Vivendi's financial profile, Mr. Messier said the company had no problem,* according to two directors who were there.

The board endorsed the USA Networks deal. . . . *But Vivendi was already in dire financial straits.* . . . [Emphasis added.]

"How Messier Kept Cash Crisis at Vivendi Hidden For Months; Media Giant Was At Risk Well Before Investors Knew," *The Wall Street Journal*, October 31, 2002, at A1.

10.     Without publicly disclosing the adverse material facts facing the Company -- and while affirmatively and materially misrepresenting the truth concerning the Company's actual prospects, financial performance, improper accounting practices and liquidity situation -- defendant Messier did not hesitate to take advantage of the market's ignorance of the truth by causing Vivendi to purchase numerous companies during the Class Period using artificially inflated Vivendi stock as currency. By maintaining an artificially inflated price for Vivendi's common stock, defendants were able, in essence, to purchase tens of billions of dollars worth of Seagram's, Canal Plus and other entities' stock at a "discount," since Vivendi was paying using a currency (Vivendi's own stock) that was really worth only a fraction of its publicly-traded price.

11.    Defendants' motive to commit fraud and to inflate the price of Vivendi shares was further increased during the Class Period as a result of defendant Messier's decision -- without consulting Vivendi's board -- to spend billions of dollars during 2001 to buy back approximately 104 million shares of Vivendi stock (or nearly 10% of the Company's equity).  Moreover, defendant Messier had also made a massive bet on the Company's behalf that Vivendi shares would rise when he caused Vivendi to sell put options on Vivendi shares in late 2000 and 2001. These put options obligated Vivendi to buy back tens of millions of its shares at fixed prices in the future, so that, if Vivendi's share price were to fall, the Company could lose as much as $1.4 billion.  In the end, defendant Messier's massive stock buy back scheme, though intended to help boost Vivendi's share price and to thereby further facilitate still more corporate acquisitions and reduce its put option exposure, only increased Vivendi's already massive debt by additional billions.  And as Vivendi's stock price continued to fall, causing the value of Vivendi's treasury stock and put option positions to further decline, the pressure only increased for defendants to continue their fraud to "make up" for these further losses.

12.    Although defendants embarked on their fraudulent scheme to conceal the Company's financial problems no later than the beginning of the Class Period (October 30, 2000), the market did not begin to learn of the extent of Vivendi's severely weakened financial condition and deteriorated value until July 2, 2002.  On that date, a credit rating agency downgrade of Vivendi's debt, according to one published report, "sparked near-panic selling in Paris" that caused Vivendi shares to plunge 25% for the day, to a new 15-year trading low of €17.8.  The same credit agency report also disclosed that Vivendi's financial obligations in 2002 could be as much as $3 billion more than -- or approximately *twice* as large as -- what most

-7-

analysts had expected. The situation was so dire that, as disclosed only after the end of the Class Period, Goldman Sachs had privately presented several scenarios for Vivendi's future to a group of Vivendi board members on June 24, 2002 -- and one of those scenarios showed Vivendi going bankrupt in as little as just three or four months (*i.e.*, in September or October of 2002).

13.     On July 3, 2002, the board forced defendant Messier to resign. The board obtained defendant Hannezo's resignation a few days later. Messier, however, stubbornly refused to admit any wrongdoing, stating on the day he was forced out that there were "no underestimated liabilities" and "no overvalued assets" on Vivendi's financial statements, and that the Company's previously reported financial results were all "true, genuine and complete." However, the full truth remained concealed, and still worse revelations were yet to come.

14.     On August 14, 2002 (the last day of the Class Period), Vivendi reported that it had suffered a huge loss of approximately $12 billion for the first half of 2002, and that it would have to sell approximately $10 billion in assets in an effort to reduce its debt. Vivendi's new chairman, Mr. Jean-Rene Fortou, also admitted that "[w]e are facing a liquidity problem." That same day, Standard & Poor's further slashed its ratings on Vivendi's long-term corporate debt to junk status. In response, the price of Vivendi's common stock and ADSs plunged nearly another 25% on August 14, to as low as €11.89 and $11.66, respectively.

15.     The closing price of $11.66 on August 14, 2002 for Vivendi's ADSs represented a stunning decline of more than $44.00 per ADS (or 79 %) from the inflated levels at which they had traded at the beginning of 2002, and an incredible and near-total collapse of $63.84 per ADS -- or more than 85 % -- from its inflated Class Period high (in January 2001) of $75.50 per ADS. The price of Vivendi's common stock suffered similarly shocking declines.

-8-

16.     In the wake of these disclosures, formal investigations into Vivendi's accounting practices and disclosures to the market have been launched on both sides of the Atlantic, including: (a) a criminal investigation by French prosecutors; (b) a criminal investigation by the U.S. Department of Justice; (c) an investigation by the Commission des Operations de Bourse ("COB"); and (d) a formal civil investigation by the U.S. Securities and Exchange Commission ("SEC"). By this Complaint, Lead Plaintiffs now seek a recovery for themselves and all other Class and Subclass members to compensate them for the billions of dollars of losses they have suffered as a result of defendants' violations of the securities laws.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. § 77k, 77l(a)(2), and 77o, Section 14(a) of the Exchange Act, 15 U.S.C. § 79n(a), and the rules and regulations promulgated thereunder by the Securities and Exchange Commission ("SEC"), including Rule 14a-9, 17 C.F.R. § 240.14a-9, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. § 240.10b-5.

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act, 15 U.S.C. § 77u, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19.     Pursuant to the "effect test" of extraterritorial jurisdiction this Court may properly exercise subject matter jurisdiction over the claims of (a) all investors who purchased or acquired Vivendi securities traded on U.S. Markets, and (b) American investors who purchased or acquired Vivendi securities regardless of where those securities traded.

20.     This court may also properly exercise subject matter jurisdiction over the claims of foreign class members who acquired Vivendi ordinary shares traded on foreign markets under the "conduct test" articulated by the Second Circuit, which provides that a federal court has subject matter jurisdiction if (1) the defendant's activities in the United States were more than 'merely preparatory' to a securities fraud conducted elsewhere, and (2) these activities or culpable failures to act within the United States 'directly caused' the claimed losses.

21.     Defendants engaged in extensive-fraud-related conduct in the U.S., which was part of a single fraudulent scheme spanning the U.S. and France.  The domestic conduct was not merely "preparatory" or perfunctory acts, but led directly to losses by both foreign and domestic investors.  In addition to the substantial U.S. conduct in furtherance of the fraud, Vivendi has a vast U.S. presence that justifies the exercise of subject matter jurisdiction over the claims of all plaintiffs who, relying on the health and value of Vivendi's substantial U.S. businesses, acquired Vivendi securities traded on foreign markets, and were defrauded by defendants' misrepresentations.

22.     In addition, there was but a single worldwide market for Vivendi shares and ADSs which traded in tandem and that market was defrauded by defendants' conduct, causing extensive effects both in this country and abroad.

23.     The fraud perpetrated on the worldwide market by Vivendi sprang directly from the Company's $77 billion acquisition spree, during which Vivendi acquired several high profile U.S. companies, spending in excess of $54 billion for its U.S. interests.  For example, just prior to and during the Class Period, the following U.S. companies, amongst others, were acquired in whole or in part by Vivendi:

-10-

| COMPANY ACQUIRED | U.S. LOCATION | PURCHASE PRICE |
|---|---|---|
| Waste Management, Inc. | Houston, TX | € 103.5 million |
| US Filter Corp. | Palm Desert, CA | $ 6.2 *billion* |
| Seagram Company Ltd. | Universal City, CA | $ 34 *billion* |
| Uproar.com | New York, NY | $ 128 million |
| MP3.com, Inc. | San Diego, CA | $ 400 million |
| Emusic.com | San Diego, CA | $ 24 million |
| Houghton Mifflin Co. | Boston, MA | $ 2.2 *billion* |
| EchoStar Communications Corp. | Littleton, CO | $ 1.5 *billion* |
| USA Networks | New York, NY | $ 10.3 *billion* |

24.     In addition to Vivendi's U.S. acquisition activities, a significant number of defendants' false and misleading statements were initially made in the U.S., and all were disseminated within the U.S. Vivendi also regularly filed false and misleading reports with the SEC in the U.S., including Form 20-F Annual Reports and numerous Form 6-Ks during the Class Period, as alleged herein.

25.     Prior to and during the Class Period, false and misleading statements not made in the U.S. were disseminated into the U.S. and internationally through the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications and the facilities of the national securities markets.

26.     According to the Company's Form 20-F for the fiscal year ended December 31, 2001, signed and filed with the SEC on May 28, 2002 (the "2001 20-F"), over 54% of Vivendi's long lived assets, valued at 53.522 billion euros, were located in the U.S. The 2001 20-F also

-11-

states that Vivendi's 2001 U.S. revenue was purportedly over 7 billion euros. At a luncheon in

Los Angeles on January 19, 2002, defendant Messier stated that Vivendi was "[f]orty percent

within the United States, sixty percent out of the states," and in a February 17, 2002 interview on

CNN, Messier stated that the Company "has 50,000 U.S. employees."

    27.    Venue is proper in this District pursuant to Section 22 of the Securities Act, 15

U.S.C. § 377u, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).

Vivendi is headquartered in Paris, France, but conducts business and maintains the Company's

U.S. headquarters in this District. In addition, defendant Messier has resided in this District

since 2001 when he moved himself and his family into a $17 million penthouse apartment in

Manhattan. During his February 17, 2002 CNN interview, defendant Messier explained why he

moved to New York:

> Moving to New York, yes there [were] very simple reasons. The first one Vivendi
> Universal has 50,000 U.S. employees. They have a boss. Where is the boss? The
> boss is in the U.S. He's working there. I can meet with them. I can spend time
> with them. He is really the boss.
>
> The second goal was Vivendi International is a new group for many U.S. investors
> in the media field. We need and I needed to spend more time with the U.S.
> Universal community to explain the Vivendi Universal story, to go through all
> reasons of performances of prospects, and I think that it's just better to do it being
> an American, than being outside.

Similarly, in an interview on "Market Call" from New York on February 27, 2001, defendant

Messier reiterated that one of the primary reasons for moving to New York was to promote

Vivendi to U.S. investors and Wall Street:

> I'm not frustrated. I'm enthusiastic about doing and continuing (ph) and
> persuading this education job [for American investors and Wall Street analysts].
> Since the merger, the level of U.S. investors in all capital has jumped from less
> than 10 percent to more than 25 percent. I have a very simple goal in mind. I

want the level of U.S. investors, within Vivendi Universal, to reach as quickly as possible 50 percent of all capital. . . . I will take any necessary step to convince and educate Wall Street and U.S. investors.

In addition, many of the acts and practices complained of herein, including the dissemination of materially false and misleading statements, occurred in this District.

28.    In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

29.    The Retirement System for General Employees of the City of Miami Beach, Oliver M. Gerard, Francois R. Gerard, Prigest S.A., Tocqueville Finance S.A., Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust were appointed as Lead Plaintiffs by this Court on November 1, 2002. Lead Plaintiffs purchased or otherwise acquired the common stock or ADSs of Vivendi during the Class Period at prices that were artificially inflated by defendants' misrepresentations and omissions and suffered damages thereby, as detailed in their certifications previously filed with the Court.

30.    Defendant Vivendi describes itself as a global conglomerate engaged in business focused primarily on two core areas: "Media and Communications," and "Environmental Services." Vivendi's Media and Communications business is divided into five segments: (a) Music (conducted through Universal Music Group, which produces, markets and distributes recorded music throughout the world in all major genres); (b) Publishing (purportedly Europe's

-13-

**JA457**

premier publisher of information, which provides content across multiple platforms, including print, multimedia, on the wired Internet and to PDAs (Personal Digital Assistants) via WAP (Wireless Application Protocol) technology); (c) TV and Film (which produces, distributes and licenses motion picture, television and home video/DVD products worldwide, owns and operates a number of cable and pay TV channels, and operates theme parks and retail stores around the world); (d) Telecoms (which provides a range of telecommunications services, including mobile and fixed telephony, Internet access, and data services and transmission, principally in Europe); and (e) Internet (which manages strategic Internet initiatives and new online ventures). Defendant Vivendi Universal, S.A. is the entity created by the Merger, and is named as a defendant herein in its own right and as the sucessor entity and sucessor-in-interest to Vivendi, S.A., Seagram and Canal Plus.

31. Vivendi Environnement, a subsidiary of Vivendi, operates the Company's worldwide environmental services business, including its water utility operations.

32. Defendant Messier was Vivendi's Chief Executive Officer and Chairman of the Company's Board until he was forced to resign on July 3, 2002. Messier received compensation of $4.8 million in 2001 despite the Company's record loss, as well as various other perquisites (including use of a $17 million apartment the Company acquired for him in New York).

33. Defendant Hannezo was Chief Financial Officer of Vivendi until his resignation on July 9, 2002. Hannezo was, according to the *Associated Press*, a "close collaborator" of Messier.

34. Defendants Messier and Hannezo are collectively referred to herein as the "Individual Defendants."

-14-

35.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the Individual Defendants, by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business operations, products, growth, financial statements, and financial condition, as alleged herein. The Individual Defendants were involved in drafting, preparation and/or dissemination of the various public, shareholder and investor reports and other communications alleged herein, were aware of, or recklessly disregarded, that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

36.     Because of their Board memberships and/or executive and managerial positions with Vivendi, each of the Individual Defendants had access to the adverse non-public information about the business, operations, finances, markets, financial statements, and present and future business prospects of Vivendi particularized herein via access to internal corporate documents, conversations or communications with corporate officers or employees, attendance at management and/or Board of Directors' meetings and committees thereof and/or via reports and other information provided to them in connection therewith.

37.     The statements made by the Individual Defendants, as particularized below, were materially false and misleading when made. The true financial and operating condition of the

-15-

Company, which was known or recklessly disregarded by the Individual Defendants, remained concealed from the investing public throughout the Class Period. The Individual Defendants, who were under a duty to disclose those facts, instead misrepresented or concealed them during the relevant period herein. As officers and directors, and controlling persons, of a publicly held company whose ADSs were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Vivendi's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

38. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company issued during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be materially misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not the public, each of the Individual Defendants knew or recklessly disregarded that the adverse facts specified

-16-

**JA460**

herein had not been disclosed to, and were being concealed from, the public and that the

representations concerning the Company complained of herein were then materially false and

misleading. Accordingly, each of the Individual Defendants is responsible for the accuracy of the

public reports and releases detailed herein and is therefore primarily liable for the representations

contained therein.

      39.     Each of the Individual Defendants is liable as a direct participant in a fraudulent

scheme and course of business that operated as a fraud or deceit on purchasers or acquirers of

Vivendi ADSs and ordinary shares during the Class Period by disseminating materially false and

misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the

investing public regarding Vivendi's business, operations, management and the intrinsic value of

Vivendi ADSs and ordinary shares; (ii) enabled the Company to complete numerous acquisitions

in its multi-billion dollar buying spree; (iii) permitted Vivendi to maintain credit ratings so that

Vivendi could accumulate more and more debt to make acquisitions on terms favorable to

Vivendi; and (iv) caused Lead Plaintiffs and other members of the Class and Subclasses to

purchase or otherwise acquire Vivendi ADSs and ordinary shares at artificially inflated prices.

### CLASS ACTION ALLEGATIONS

      40.     Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of

Civil Procedure 23(a) and (b)(3) on behalf of: (a) the Purchaser Class consisting of all persons

who purchased or otherwise acquired the common stock and ADSs of Vivendi between October

30, 2000 and August 14, 2002, inclusive, and were damaged thereby, alleging violations of

Section 10(b) and 20(a) of the Exchange Act; (b) the Merger Subclass consisting of all persons

-17-

who acquired the common stock and ADSs of Vivendi pursuant to the Registration Statement

and Prospectus issued in connection with the Merger, and were damaged thereby, alleging

violations of Sections 11, 12(a)(2), and 15 of the Securities Act; and (c) the Proxy Subclass

consisting of all persons who were shareholders of Vivendi or Seagram as of November 25,

2000, entitled to vote on the Merger pursuant to the registration statement incorporating a

proxy/prospectus issued in connection with the Merger, and were damaged thereby, alleging

violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 thereunder. Excluded from

the Class and Subclasses are defendants, the members of Individual Defendants' families, any

entity in which any defendant has a controlling interest, or which is a parent or subsidiary of, or

which is controlled by, the Company, and the officers, directors, affiliates, legal representatives,

heirs, predecessors, successors, or assigns of any of the defendants.

41.    The members of the Purchaser Class, Merger Subclass and Proxy Subclass are so

numerous that joinder of all members is impracticable. Throughout the Class Period, Vivendi's

ADSs were actively traded on the NYSE, in a well-developed and efficient market. Vivendi's

ordinary shares were actively traded on the EuroNext Paris S.A. (the "Paris Bourse"), also an

efficient market. As of December 31, 2001, the Company had more than 107 million ADSs, and

more than 1 billion ordinary shares outstanding. While the exact number of Class and Subclass

members is unknown to Lead Plaintiffs at this time and can only be ascertained through

appropriate discovery, Lead Plaintiffs believe that there are hundreds, if not thousands, of

members in the proposed Class (including the Subclasses). Record owners and other members of

the Class and Subclasses may be identified from records maintained by Vivendi or its transfer

agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42.     Lead Plaintiffs' claims are typical of the claims of the members of the Class and Subclasses they seek to represent because Lead Plaintiffs and the Class and Subclass members sustained damages which arose out of the defendants' unlawful conduct complained of herein.

43.     Lead Plaintiffs are representative parties who will fairly and adequately protect the interests of the Class and Subclass members, and have retained counsel competent and experienced in class and securities litigation.  Lead Plaintiffs do not have interests antagonistic to or in conflict with those of the other Class and Subclass members they seek to represent.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class (including the Subclasses) is impracticable.  Furthermore, as the damages suffered by individual members of the Class and Subclasses may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class (including the Subclasses) to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

45.     There are questions of law and fact common to the Purchaser Class which predominate over any questions which may affect individual members.  Among the questions of law and fact common to the Purchaser Class are:

        (a)     whether the Exchange Act was violated by defendants' acts as alleged herein;

-19-

**JA463**

(b)     whether statements made by defendants to the investing public during the

Class Period misrepresented and/or omitted material facts;

(c)     whether defendants acted with scienter in issuing materially false and

misleading statements;

(d)     whether the market prices of securities during the Class Period were

artificially inflated due to the material nondisclosures and/or misrepresentations complained of

herein; and

(e)     whether the members of the Purchaser Class have sustained damages, and,

if so, what is the appropriate measure of damages.

46.     There are questions of law and fact common to the Merger Subclass which

predominate over any questions which may affect individual members.  Among the questions of

law and fact common to the Merger Subclass are:

(a)     whether the Registration Statement and Prospectus omitted and/or

misrepresented material facts;

(b)     whether the Securities Act was violated by defendants' acts as alleged

herein; and

(c)     whether the members of the Merger Subclass have sustained damages,

and, if so, what is the appropriate measure of damages.

47.     There are questions of law and fact common to the Proxy Subclass which

predominate over any questions which may affect individual members.  Among the questions of

law and fact common to the Proxy Subclass are:

(a) whether the Registration Statement and Proxy/Prospectus omitted and/or misrepresented material facts;

(b) whether the Exchange Act was violated by defendants' acts as alleged herein; and

(c) whether the members of the Proxy Subclass have sustained damages, and, if so, what is the appropriate measure of damages.

## FACTUAL BACKGROUND

48. In June 1996, Messier became chairman of Générale des Eaux, Vivendi's predecessor. At that time, Générale des Eaux was -- as it had been since it was founded in the 19th century -- primarily a water utility company. When Messier became CEO in 1996, Vivendi's stock and ADSs were trading in the €27 to €29 and $30 to $35 range, respectively. Messier changed the name of Générale des Eaux to "Vivendi" in April 1999.

49. After becoming CEO, Messier embarked on an extraordinarily ambitious plan to turn the Company into one of the world's largest media companies. Prior to the Class Period, beginning in 1998, Vivendi acquired the following companies:

| COMPANY ACQUIRED | CLOSING DATE | % ACQUIRED[1] |
|---|---|---|
| Quotidien Sante | 4/9/98 | 100% |
| Linjebuss AB | 4/15/98 | 66.7% (33% owned) |
| Havas SA/Old | 6/2/98 | 70% (30% owned) |

---

[1] Pre-existing ownership interest, if any, shown in parenthesis.

| | | |
|---|---|---|
| Cia de Saneamento do Parana | 6/8/98 | 41.38% |
| Ediciones Doyma SA | 6/25/98 | 50% |
| l'Etudient | 11/10/98 | 100% |
| ScVK | 11/18/98 | 43.17% |
| OVP-Vidal | 11/23/98 | 100% |
| Vivendi Universal | 12/15/98 | 10.5% |
| ALPINA GmbH | 1/5/99 | 100% |
| Cendant Software | 1/12/99 | 100% |
| Pathe | 1/26/99 | 19.6%<br>(5% owned) |
| FCC | 3/5/99 | 28% |
| Aique | 4/20/99 | 100% |
| US Filter Corp | 4/30/99 | 100% |
| SL Tunnelbanan AB | 5/4/99 | 60% |
| MediMedia | 5/12/99 | 100% |
| 18 Litre Water Division | 5/20/99 | 100% |
| Sani Gestion Inc. | 6/11/99 | 100% |
| MUSIDISC | 6/30/99 | 99.02% |
| Canal Plus | 7/22/99 | 15%<br>(34% owned) |
| British Sky Broadcasting Plc | 7/22/99 | 4%<br>(20.5% owned) |
| Aqua Alliance Inc | 8/24/99 | 17%<br>(83% owned) |
| Pathe | 9/30/99 | 80.2%<br>(19.8% owned) |
| Superior Services Inc. | 11/11/99 | 100% |
| 23 GPU In. Power plants | 11/24/99 | 100% |

-22-

| Elektrim Telekomunikacja | 12/9/99 | 49% |
|---|---|---|
| Daesan Power Plant | 12/17/99 | 100% |
| The StayWell Company | 2/29/00 | 100% |
| Three V Health Inc. | 2/29/00 | 100% |
| Haniel Rohr; Kanal Service & Haneil Industrie Reinigung | 3/28/00 | 100% |
| Prize Central Network | 3/29/00 | 100% |
| KD Offshore | 5/30/00 | 100% |
| Quod Bonum BV | 8/17/00 | 80% |
| Prelude et Fugue | 9/20/00 | 100% |
| Poland.Com SA | 9/21/00 | 55.01% |

50.     Messier's early growth strategy required the Company to finance its acquisitions, which caused the Company to accumulate large amounts of debt. For example, in March 1999, Vivendi had to finance its $6.2 billion acquisition of U.S. Filter Corp. ("U.S. Filter") by raising approximately €5.7 billion through a convertible bond offering. Similarly, in December of 1999, Vivendi increased its equity investment in Elektrim Telekomunikacja ("ET"), a Polish conglomerate, to $1.2 billion (or 49% of ET's equity), by investing an additional $250 million in cash and converting an earlier $615 million loan into ET shares.

51.     In June 2000, Vivendi announced the acquisition of Seagram (which owned Universal Studios and Polygram Records) for $36 billion in Vivendi common stock and the acquisition of Canal Plus for $12 billion in Vivendi common stock. The principal owners of Seagram were Edgar Bronfman, Jr. ("Bronfman") and the Bronfman family, which became the largest shareholders of Vivendi after the Merger.

-23-

**JA467**

## VIVENDI CONTINUES ITS ACQUISITION BINGE

52.     Following the Merger on December 8, 2000, many analysts expected Vivendi to make sure that its newly merged and recently acquired businesses were achieving desired synergies before consummating new deals.  Defendants, however, pursued a different strategy. In a span of just sixteen months after the huge three-way merger with Seagram and Canal Plus, Vivendi acquired significant equity positions (or added to its existing equity positions) in the following companies, several of which Vivendi acquired outright:

| COMPANY | CLOSING DATE | INDUSTRY | % ACQUIRED |
|---|---|---|---|
| Maroc Telecom | 12/21/00 | Telecom Services | 35% |
| MUSIDISC | 1/31/01 | Multimedia | 0.98% (99.02% owned) |
| Medicine Publishing | 2/1/01 | Publishing | 100% |
| HC COM | 2/19/01 | Publishing | 100% |
| Uproar Inc. | 3/23/01 | Internet Connectivity | 100% |
| GetMusic LLC | 4/25/01 | Internet Content | 50% (50% owned) |
| Editions Juris Service | 4/25/01 | Multimedia | 100% |
| Emusic.Com Inc | 6/14/01 | E-Commerce | 100% |
| RMM Records & Video | 6/25/01 | Music | 100% |
| Scoot Europe NV | 7/27/01 | Broadcast Server | 50% (50% owned) |
| Houghton Mifflin Co. | 8/3/01 | Publishing | 100% |
| MP3.com | 8/28/01 | Internet Content | 100% |
| Elektrim Telekomunikacja | 9/4/01 | Telecom Services | 2% (49% owned) |

| COMPANY | CLOSING DATE | INDUSTRY | % ACQUIRED |
|---------|-------------|----------|------------|
| Mediabright | 9/12/01 | Applications Software | 100% |
| Studio Canal | 10/12/01 | Motion Pictures Services | 14.8% (85.20% owned) |
| Multithematiques | 12/17/01 | Cable TV | 27% |
| EchoStar Communications | 1/22/02 | Satellite Telecom | 10% |
| Koch Group Recorded Music | 2/15/02 | Music | 100% |
| USA Network Entertainment | 5/7/02 | Cable TV | 93% |

53. The vast majority of these post-Vivendi/Seagram/Canal Plus merger acquisitions were paid for either using Vivendi stock as currency, or by borrowing against future earnings. Thus, in order to sustain its growth by acquisition strategy, it was crucial for defendants to continue to report favorable financial results in order to keep Vivendi's stock price high and to maintain its favorable credit ratings and access to additional debt financing.

## FALSE AND MISLEADING STATEMENTS

54. On October 30, 2000 (the first day of the Class Period), Vivendi issued a Registration Statement filed on Form F-4 with the SEC and signed by defendants Messier and Hannezo in connection with the Merger of Vivendi, Seagram, and Canal Plus. The October 30, 2000 Form F-4 included a Joint Proxy Statement-Prospectus, which was then mailed to Seagram securityholders and U.S. securityholders of Canal Plus and Vivendi, S.A. beginning on November 3, 2000. The Joint Proxy Statement-Prospectus included in the Form-4 and then mailed to stockholders -- consisting of over 700 pages plus exhibits -- purported to explain and solicit shareholder approval for the three-way merger. Among other information, in its Form F-

4, Vivendi presented historical financial statements for FY 1999 and the first half of FY 2000.

Vivendi reported revenue of $16.427 billion and net income of $509 million for the first half of

FY 2000, and revenue of $17.487 billion and net income of $254.6 million for the comparable

period in 1999. Vivendi also reported shareholders' equity of $11.957 billion and total assets of

$73.611 billion as of June 30, 2000.

55.     However, for the reasons set forth in greater detail below at ¶¶ 119-80, Vivendi's

historical financial statements and balance sheets contained in Vivendi's October 30, 2000 Form

F-4 were materially false and misleading because, inter alia, the Company improperly

consolidated into its financials revenue from its Cegetel subsidiary (in which the Company had

less than 50% ownership), failed to timely write-down impaired goodwill from previous

corporate investments and acquisitions, including U.S. Filter, and overstated the Company's

revenue from its environmental division on certain multi-year contracts in violation of GAAP.

56.     On December 22, 2000, Vivendi issue a press release announcing that it had

purchased a 35% stake in Maroc Telecom S.A. ("Maroc Telecom"), Morocco's telephone

monopoly for approximately 2.3 billion euros.

57.     On February 14, 2001, Vivendi issued a press release in Paris and New York

announcing preliminary results for FY 2000:

> Vivendi Universal's preliminary total revenues for 2000 totaled 41.7 billion euros,
> with media and communications and environmental services accounting for 40.0
> billion euros, a global 36.5% increase over 1999. Jean-Marie Messier, Chairman
> and CEO of Vivendi Universal, said, "Vivendi Universal was created on
> December 8, 2000. The 2000 Vivendi Universal figures are showing the
> considerable burst of growth of our communications activities in 2000 both in
> global growth and even more important with a near 20% internal growth. ***Vivendi
> Universal enters its first full year of operations with strong growth prospects
> and a very strong balance sheet. This new company is off to a fast start and we***

*are very confident that we will meet the very aggressive growth targets we have set for ourselves both at the revenues and EBITDA levels."* [Emphasis added.]

58.    On March 9, 2001, Vivendi issued a press release reporting "better than expected"

fourth quarter and FY 2000 results.  Vivendi announced actual revenues of 41.8 billion euros for

FY 2000 including Media and Communications revenues of 13.6 billion euros and

Environmental Services revenues of 26.5 billion euros.  The press release further stated:

> Vivendi Universal announced today that on a pro forma basis for calendar 2000,
> the Company reported 7.2 billion euros in EBITDA (earnings before interest,
> taxes, depreciation and amortization) for the period ending December 31, 2000,
> up 48 percent from 1999.  Results reflect strong performance across the
> Company's business units -- Media and Communication and Environmental
> Services.  Actual EBITDA for the 12 months ended December 31, 2000, was
> 6 billion euros versus 4.3 billion euros in 1999.
>
> The pro forma results were driven by growth in all business segments with the
> exception of Internet, in which development costs related to business expansion
> continued to have a negative impact on earnings. . . .
>
> Net income climbed 44 percent, before goodwill, to 2.8 billion euros or 4.4
> percent basic shares up 19% and 60 percent, after goodwill, to 2.3 billion euros,
> from 1.4 billion euros.  The Board of Directors of Vivendi Universal has
> recommended to the shareholders to approve an annual dividend of one euro per
> share, which will represent a high 47 percent pay-out ratio. . . .
>
> Jean-Marie Messier, Chairman and [CEO] of Vivendi Universal, stated: "The
> strong results that Vivendi Universal has generated for calendar 2000 provide a
> very solid foundation for the Company's growth prospects in 2001.  *The robust
> performance of Vivendi Universal's business segments clearly reflects the fast
> pace and clear momentum that we have established as Vivendi Universal enters
> 2001.*  The Company's unique combination of content and distribution assets
> paves the way for enormous growth opportunities.  We have our management
> teams and plans in place as we moves [sic] to execute the growth strategies.  The
> management team, in particular, has been focused on the day-to-day operational
> performance and increased productivity of each of the Company's business units.
> I am very confident that, for Media and Communications, we will reach our
> revenue growth target of 10 percent and our aggressive EBITDA growth target of
> 35 percent for the period 2000-2002 and achieve superior returns for Vivendi
> Universal shareholders. . . . *Our businesses are strong, our management is
> focused and growth prospects are real and immediate."* [Emphasis added.]

59. On March 12, 2001, as reported in *La Tribune*, defendant Messier stated the

Company had exceeded expectations:

> Franco-Canadian media and communications group Vivendi Universal SA (VU) has announced its results for 2000, which were in line with forecasts, and has confirmed its objectives for 2001. Presenting his group's results for the year, VU chairman Jean-Marie Messier commented: ***"When we merged, it was said that our aims were too ambitious. Well, we have exceeded them!"*** [Emphasis added.]

60. The statements made by defendants referenced in ¶¶ 57-59 above, were each

materially false and misleading because, <u>inter alia</u>, the Company was engaged in improper

accounting practices which had the effect of materially overstating Vivendi's reported earnings

(as particularized below at ¶¶ 119-80), including: (a) failing to timely write-down certain

overvalued assets from previous corporate investments and acquisitions; (b) improperly

consolidating into its financials revenue from its Cegetel subsidiary in which the Company had

less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year

contracts. In addition, the Company failed to disclose that it was suffering from a growing

liquidity crisis (as particularized below at ¶¶ 181-88) and that Vivendi would necessarily need to

restructure its debt obligations in order to remain solvent and avoid bankruptcy.

61. On April 23, 2001, Vivendi issued a press release announcing "very strong" first

quarter 2001 results. The press release announced that Media and Communications revenues

were up 10% to 5.9 billion euros, and Telecoms revenues were up 30% to 1.5 billion euros. The

press release further reported that Media and Communications EBITDA increased 112% to 900

million euros and that Telecoms EBITDA more than tripled to 433 million euros. The press

release quoted defendant Messier as follows:

-28-

"I am very pleased with Vivendi Universal's outstanding performance in our first quarter as a new company. All our results meet or exceed our key operating targets. *We created significant momentum by delivering solid first quarter 2001 results in EBITDA, which more than doubled, and by generating double digit revenue growth. . . .*

These results show the focus and dedication of all our management teams, in executing the unique promise of Vivendi Universal around its global strategy. This is a great beginning. With our momentum, our targets and the drive of our executive team, *I am extremely confident that, for Media and Communications, we will reach our annual EBITDA and revenue growth targets of 35% and 10%, respectively in 2001 and 2002 and achieve superior returns for Vivendi Universal shareholders. . . .*

We are also ahead of targets for the synergies which indicate that the path of integration between our teams is great. My only focus is and remains execution of this compelling media merger." [Emphasis added.]

62.     On April 24, 2001, defendant Messier addressed Vivendi's shareholders at the

Company's shareholders' meeting:

> *The foundations of our communications-related businesses are particularly healthy and strong.* Guillaume Hannezo has just detailed our performance for you. I would just like to emphasize a few points:
>
> - *a healthy balance sheet with total equity reaching 66 billion Euro*;
> - *a pro forma net debt that is practically non-existent - around three billion Euro*;
> - Vivendi Universal posted record-high net income, and has cash available for investing (participation in BskyB, etc.);
> - Vivendi has rapidly growing revenue, which reach the double digits annually, spread out through all the European and American markets (60% and 40%); extraordinarily large customer bases; several dozen million subscribers; business models often based on subscription - meaning loyalty, recurrence, predictable revenues, and very little dependence on the advertising market.

Financially, Vivendi Universal, concerning the communications sectors, is rock solid - very stable with high growth. . . .

In my role as the president and as an employee of the company, I owe you the company's results. Here they are. They are good. . . .  Vivendi Universal, our

-29-

**JA473**

company, your company, is solid. Today, we are a leader, strong, dynamic, and profitable. [Emphasis added.]

63.     On May 18, 2001, Vivendi filed a Form 6-K with the SEC providing total revenue information for first quarter 2001. This Form 6-K stated in part:

> *Vivendi Universal revenue for first quarter of 2001 totaled 12.6 billion euros, a global 34.5% increase over the first quarter of the prior year.* Vivendi Universal's media and communications businesses accounted for 5.9 billion euros and environmental services businesses accounted for 6.7 billion euros. [Emphasis added.]

64.     The statements made by defendants referenced in ¶¶ 61-63 above, were each materially false and misleading because, inter alia, the Company was engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings (as particularized below at ¶¶ 119-80), including: (a) failing to timely write-down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel subsidiary in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, the Company failed to disclose that it was suffering from a growing liquidity crisis (as particularized below at ¶¶ 181-88) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

65.     On June 1, 2001, Vivendi issued a press release announcing the acquisition of Boston-based Houghton Mifflin Company. The release, issued in Paris Boston, stated in part:

> Based on a total consideration of approximately $2.2 billion, which includes the assumption of Houghton Mifflin's average net debt of $500 million, the offer price represents 1.9 times 2001 estimated revenues of Houghton Mifflin, 7.7 times 2001 estimated EBITDA (earnings before interest, taxes, depreciation and amortization) and 10.7 times estimated EBITDA after book plate amortization.

66.     On July 2, 2001 Vivendi filed its Form 20-F for the fiscal year ended December

31, 2000 with the SEC, which was signed by defendant Hannezo. The 20-F contained Vivendi's

"consolidated financial statements for the years ended December 31, 2000, 1999 and 1998 and as

at December 31, 2000 and 1999."

67.     On July 23, 2001, Vivendi issued a press release announcing its "very strong"

second quarter and first half 2001 Media and Communications results. Vivendi reported Media

and Communications revenues were up 16% (excluding Universal Studios Group) to 6.6 billion

euros, and EBITDA grew 57% to 1.3 billion euros. Concerning Vivendi's first half 2001 results

for Media and Communications businesses, the press release stated in part:

–     In the course of the first half of 2001, Vivendi Universal achieved three
      quarters of its full-year target of incremental EBITDA (nearly 800 million
      euros excluding Maroc Telecom, relative to the company's target of
      slightly more than 1 billion euros).

–     In the first half of 2001, revenues increased to 12.4 billion euros (up 15%
      [excluding USG]), and EBITDA grew to 2.2 billion euros (up 77% over
      2000 comparable period).

68.     Defendant Messier commented on the results, stating in part as follows:

The results produced by Vivendi Universal in the second quarter are well ahead of
market consensus. . . . They confirm the robustness of our businesses, with limited
exposure to advertising; the benefits of a truly global position; and the fast
progress of the reorganization and implementation of our recent merger.

With three quarters of the 'aggressive' incremental EBITDA target for the full
year 2001 [1.12 billion euros of incremental EBITDA, or 35%, over the pro forma
2000 guidance provided last October and slightly above 1 billion euros of
incremental EBITDA over the final 2000 results] already achieved in the first half
of the year, I can only re-emphasize our confidence. We will at least meet our
stated targets.

***Obviously, our current stock price does not fully reflect this situation in terms
of EBITDA multiples or Enterprise Value to EBITDA to growth. With the***

-31-

*highest growth rates of the industry and the lowest multiples, our stock is
definitely an attractive investment today.*

The first half has been a period of total operational focus in each of our
businesses, while completing significant achievements in the implementation of
the merger, reorganization and execution of our strategy. [Emphasis added.]

69.     Following the July 23, 2001 press release, Vivendi hosted a conference call to

discuss the second quarter 2001 results and the Company's business and prospects.  During the

call, Messier and others in Vivendi management stated:

- Vivendi was able to achieve strong results even in a down market and was
  in fact gaining market share.

- The Company was still on track to achieve strong growth in revenues and
  earnings in 2001, including EBITDA growth of 35%.

70.     On July 23, 2001, Vivendi common stock increased in price to € 63.1 and the

price of Vivendi ADSs rose from $52.39 per share to $55.00 per share, representing a 5 %

increase.

71.     Securities analysts that followed Vivendi securities reacted positively to the

Company's announcement of second quarter 2001 results.  For example, in an analyst report

dated July 23, 2001,  Robertson Stephens, Inc. ("Robertson Stephens") issued a "Buy" rating

stating: "We expect the company to perform well through a sluggish economy and to emerge

strategically well-positioned."  Similarly, Merrill Lynch Capital Markets ("Merrill Lynch") issued

a "Buy" rating in an analyst report dated July 26, 2001, stating in pertinent part as follows:

- Outperformance was across virtually all divisions particularly Film, Telecoms and
  Music.

- As a result, we are upgrading our 2001 OCF a second time by 2%. . . .

-32-

- Company re-confirmed its targets for 2001. In a down music market, Universal is gaining share and is confident of double digit EBITDA growth.

72.     The statements made by defendants referenced in ¶¶ 66-69 above, were each materially false and misleading because, inter alia, the Company was engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings (as particularized below at ¶¶ 119-80), including: (a) failing to timely write-down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel subsidiary in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts.   In addition, the Company failed to disclose that it was suffering from a growing liquidity crisis (as particularized below at ¶¶ 181-88) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

73.     In early September 2001, as rumors circulated that Vivendi's earnings would be disappointing, Vivendi's ADSs declined from the mid-$50s to the mid-$40s per share, and its ordinary shares declined from the mid-€50s to the mid-€40s.  In response, defendants categorically denied any problems.  Vivendi, after the market closed on September 5, 2001, reiterated its targets for 2001 and 2002.  Defendant Messier stated in an interview with *Reuters* that evening, that "no profit warning of any kind needs to be feared coming from Vivendi Universal."

74.     On September 25, 2001, Vivendi issued a press release announcing "Strong First Half 2001" results and a "Solid Outlook for 2002."  The press release reported that revenues increased 11% to 26.4 billion euros, that EBITDA grew 42% to nearly 4 billion euros, that

operating income grew 65% to 1.9 billion euros, and that net income, before goodwill

amortization, reached 1.1 billion euros or 0.97 euros per share. With respect to Media and

Communication, the release reported that first half 2001 revenues reached 12.4 billion euros, up

15%, EBITDA reached 2.2 billion euros, up 77%, and that operating income nearly tripled to 946

million euros, up 184%. Concerning Vivendi's environment business, the release reported that

revenues were up 11% to 13.9 billion euros, that EBITDA was up 12% to 1.76 billion euros, and

that operating income was up 13% to 0.97 billion euros. Commenting on these results, the press

release further quoted defendant Messier as follows:

> ***Despite the current environment, we will reach all our previously stated
> revenue/EBITDA objectives for the 2001 year.*** I continue to express my
> confidence in achieving our more than 10% revenue growth targets for 2001 and
> our more than 35% EBITDA growth (versus the company's October 2000
> guidance) at a constant asset base. This, combined with some extensions in the
> company's asset base (i.e., Maroc Telecom and Houghton Mifflin), should result
> in full-year Media and Communications EBITDA slightly north of 5 billion euros.
> In the current environment, giving a 2002 target would not be meaningful, and we
> have yet to complete our 2002 budget and plan process. Before the recent tragedy
> [of September 11], market consensus for 2002 EBITDA was not far from 6 billion
> euros. Despite the events, looking at the trends of our businesses and our
> defensive qualities, we are currently very confortable [sic] with this expectation.
> [Emphasis added; footnote omitted.]

75.     On October 30, 2001, Vivendi issued a press release announcing its third quarter

2001 Media and Communications results. The release announced that Media and

Communications revenues were up 2.4 % to 7.3 billion euros, and that EBITDA was up 90% to

1.5 billion euros. The release further reported that Telecoms revenues increased by 17% to 2.1

billion euros, and EBITDA growing by 31% versus *pro forma* results for the third quarter of

2000. The release also stated in pertinent part:

- On a pro forma basis, third quarter revenue growth was 8%, and EBITDA growth was 30%. Year-to-date revenues increased 9%, and EBITDA increased 46%.

- Company reaffirms confidence in achieving its growth targets: 10% revenue growth and 35% organic EBITDA growth in 2001.

*"Our third quarter results for the media and communications businesses, with 24% revenue and 90% EBITDA growth, including organic growth of 8% and 36% respectively, are obviously strong despite the tough environment," said Jean-Marie Messier, Chairman and [CEO] of Vivendi Universal. "They reflect both our higher potential for growth and greater resiliency to recessionary environments compared to many of our peers. . . .*

"Additionally, Vivendi Universal's media and communications businesses are presently less vulnerable to recessionary environments than many of our peers because of our strong defensive qualities. . . . Having the highest resiliency and lowest sensitivity to a recessionary environment explains our ability to outperform most of our peers. . . .

"An early look at the fourth quarter indicates that we are on track to meet our targets. *I continue to express my confidence in achieving 10% revenue growth and 35% EBITDA growth in 2001 at a constant asset base.* This, combined with some expansions in the company's asset base (i.e., Maroc Telecom and Houghton Mifflin), should result in full-year Media and Communications EBITDA slightly above 5 billion euros. [Emphasis added; footnotes omitted.]

76.     Following the October 30, 2001 Press Release, Vivendi hosted a conference call to discuss the third quarter 2001 results and the Company's business and prospects. During the call, Messier and others in Vivendi management stated:

- Vivendi was able to achieve strong results even in a down market and was in fact gaining market share.

- The Company was still on track to achieve strong growth in revenues and earnings in 2001.

77.     Based on defendants' statements, including those made during the conference call, securities analysts that followed Vivendi securities reacted positively to the Company's reported

financial results. For example, on October 31, 2001, Morgan Stanley Dean Witter ("Morgan

Stanley") issued an "OutPerform" rating, stating:

> We continue to accord Vivendi Universal on OutPerform-V rating with a Euro62
> twelve-month price target. Our investment thesis is based on VU's valuation, lack
> of sensitivity to economic recession, and diversity of revenue sources. In a quarter
> in which all its peers were forced to revise their 2001 and 2002 outlooks
> downward to reflect continued US economic weakness exacerbated by the events
> of Sept. 11, Vivendi Universal outperformed expectations and reiterated its full
> year guidance. The divergence between VU and its peers reflects the company's
> high level of financial predictability, a direct function of owning a number of
> internationally diversified, market share-leading businesses that have a low
> dependence on advertising.

78.     The statements made by defendants referenced in ¶¶ 73-76 above, were each

materially false and misleading because, inter alia, the Company was engaged in improper

accounting practices which had the effect of materially overstating Vivendi's reported earnings

(as particularized below at ¶¶ 119-80), including: (a) failing to timely write-down overvalued

assets from previous corporate investments and acquisitions; (b) improperly consolidating into its

financials revenue from its Cegetel subsidiary in which the Company had less than 50%

ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In

addition, the statements failed to disclose that the Company was suffering from a growing

liquidity crisis (as particularized below at ¶¶ 181-88) and that Vivendi would necessarily need to

restructure its debt obligations in order to remain solvent and avoid bankruptcy.

79.     On December 6, 2001, Vivendi issued a press release announcing Bronfman's

decision to resign from his position as Executive Vice Chairman. Commenting on Bronfman's

resignation, defendant Messier assured the investing public that Vivendi "is in a very strong

position, with solid performance in virtually every business." One week later -- after announcing

-36-

that it would raise $2.5 billion by selling a $1.5 billion interest in BskyB and a $1.06 billion interest in Vivendi Environnement -- Vivendi stated, as reported by the *Financial Times (London)* on December 14, 2001, that these asset sales would give Vivendi "room to manoeuvre" for additional acquisitions, and enable it "to cover any eventual needs from different opportunities for strategic partnerships."

80.     On December 17, 2001, Vivendi issued a press release announcing the acquisition of USA Networks for $10.3 billion.  Commenting on the acquisition, defendant Messier stated in pertinent part as follows:

> Our strategy is clearly coming together.  Combining within the same operational entity, VUE, USG and the entertainment assets of USA creates a new U.S. major, which will benefit from the full integration of TV and movies activities with production and distribution.
>
> *     *     *
>
> ***In addition, this strategic move will significantly benefit Vivendi Universal shareholders, because of its significant value-accretion at every level - EBITDA, net income and free cash flow.***  By using mainly non-core, consolidated assets to acquire this control, we are strongly positioned to enhance performance and value to Vivendi Universal shareholders.
>
> *     *     *
>
> At the end of just one year following our merger with Seagram and Canal+, we have put the pieces together in fulfilling our strategy.  In one short year, we have focused on integration and addressing our relative distribution weakness in the U.S. - and here we are today.  We expect that 2002 will be a year of growth, without further change in perimeter.

81.     On December 17, 2001, defendant Messier held a press conference with Barry Diller, Chairman and CEO of USA Network, from the St. Regis Hotel in New York City to discuss the acquisition of USA Networks, creation of Vivendi Universal Entertainment ("VUE"), and Vivendi's prospects for 2002:

> ***At the end of the day, this transaction is not putting pressure on Vivendi Universal.  On the reverse, what it allows us to do is to increase our [EBITDA]***

*target for 2002 by more than ten percent. It's to increase our net income in 2002 by roughly 200 million dollars. It's to increase the net free cash flow of the group in 2002 by, let's say three hundred and fifty million dollars. At every level of the [P&L] and of the cash flow that you may look at, this transaction is very positive to VUE shareholders year one.*

*   *   *

As far as the global [debt] ratio of the group is concerned, *our target is to have in '02 a [debt] to [EBITDA] ratio well below three times and especially we are focusing to reach that target ahead of the end of the first half of 2002,* which means that Vivendi Universal will end up its program of selling its non core asset in the first half of '02; it will give us very comfortable triple B credit rating targets that we are very comfortable with. . . . *So, no cleaning of balance sheet because the balance sheet is clean.* . . . [W]e are committed to issue full US [GAAP] earnings starting Q1 of '02. We already, in fact, worked on the basis of US [GAAP] accounting methods in '01 in order to build our track record at the time of this year, at the time of the release of our first full quarterly U.S. [GAAP] in '02. *So we are already applying all US [GAAP] methodologies, including those relating to amortization.* [Emphasis added.]

82.     The statements made by defendants referenced in ¶¶ 79-81 above, were each materially false and misleading because, <u>inter alia</u>, the Company was engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings (as particularized below at ¶¶ 119-80), including: (a) failing to timely write-down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel subsidiary in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, the Company failed to disclose that it was suffering from a growing liquidity crisis (as particularized below at ¶¶ 181-88) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

-38-

**JA482**

83.     On February 6, 2002, *AFX News Limited* reported that in an attempt to dispel concern about the Companies debt levels and accounting practices, a letter was distributed to the Company's employees stating that no profit warnings were forthcoming:

> Vivendi Universal CEO Jean-Marie Messier said the media company will not make any change in its guidance for 2001 earnings due for release on March 5, although the fourth quarter was a difficult period.
>
> Messier made the comment in a letter to Vivendi's staff, addressing the recent volatility and losses in the company's share price. . . .
>
> "Some global markets, including the music market, declined during this period. But despite the difficulties, *we are the only media company not to have issued a profit warning on its operating results and there's no change to that situation*," said Messier.
>
> \*     \*     \*
>
> "*There are no hidden risks and no speculative instruments*," he said. [Emphasis added.]

84.     On February 11, 2002, Vivendi issued a press release announcing its year-end 2001 Media and Communications results.  Vivendi announced Media and Communications "proforma revenue growth of 9% for the year ended December 31, 2001, reaching 28.9 billion euros."  The release further reported that Vivendi's Telecoms segment achieved 24% revenue growth in 2001, and that "*[r]evenue growth was 10% using the 2000 perimeter excluding Universal Film, exactly in line with management estimates given 12 months ago.*" [Emphasis added.]

85.     Commenting on the results, defendant Messier stated:

> *I am pleased that we achieved our ambitious target of 10% organic revenue growth in 2001, for the businesses resulting from Vivendi's merger with Seagram and Canal +.*  Organic growth is, more than ever in today's markets, the most important strength of Vivendi Universal.  Achieving the highest level of growth in our industry is a big differentiation of Vivendi Universal, and the operating management deserves recognition for fulfilling their growth objectives

-39-

**JA483**

and outperforming their peers in a difficult year. Our 2001 results give us confidence that we can achieve our growth targets again in 2002. [Emphasis added.]

86.     On February 12, 2002, in response to the Company's early release of positive results, *The New York Times* reported:

"Vivendi is one of the few companies in the global media sector which has not issued a revenue or Ebitda warning," said Mark Harrington of J.P. Morgan, referring to a common measure of gross operating profit. "So it demonstrates the structural growth of the company relative to its global media peers," he said of today's report.

87.     On March 3, 2002, Messier was quoted in the *Financial Times* as stating that "Vivendi had only two significant off-balance sheet structures, one relating to shares it is selling in BSkyB and another relating to four buildings: 'There are no hidden risks and no speculative instruments.'"

88.     On March 5, 2002, Vivendi issued a press release announcing its year-end 2001 results. Vivendi reported a charge for impairment to goodwill under French GAAP of 12.6 billion euros, including 6 billion euros for Canal Plus. Vivendi also announced that revenues were up to 10% and that operating income was up 47% to 3.795 billion euros, on a pro forma basis. The release stated that "[g]iven the excellent operational results, a 1 euro per share dividend will be submitted to the shareholders at the annual meeting." The release further reported Media and Communications revenues of 28.115 billion euros, representing 10% pro forma revenue growth, EBITDA of 5.036 billion euros, representing 34% pro forma EBITDA growth, and operating income of 1.838 billion euros, representing 89% pro forma growth. In addition, the release reported that Telecoms pro forma revenue was up 24% to 8 billion euros, that EBITDA increased 49% to 2.5 billion euros, Environmental Services revenue was up 11% to

29.1 billion euros and operating income increased 24% to 2.0 billion euros. The release also

stated in part:

> After having been the only large media company not to modify any of its guidance
> for the year 2001, Vivendi Universal reiterates its confidence in the strength of its
> businesses and their performance and their ability to grow. For 2002, no other
> new guidance will be expressed, apart from the company's full confidence to reach
> for its Media and Communications businesses.

89.     The March 5, 2002 press release also touted the Company's "Operating Free Cash

Flow" as being "ahead of guidance" announcing Media and Communications operating free cash

flow of 2.026 billion euros, "up 2 billion euros over 2000." Commenting on the results,

defendant Messier stated in part as follows:

> I am very pleased with the ***excellent operating results*** that have been achieved.
> These results confirm the strength of Vivendi Universal's businesses across the
> board despite a very difficult global economic environment.
>
> Most of our businesses improved market share, EBITDA and free cash flow
> during this period of global economic slowing. Even more important, those
> operational performances are showing improvement at every level of our P&L.
> The good EBITDA to EBIT transformation ratio: 68% of incremental EBITDA
> translating in incremental EBIT, is a strong and positive sign. The improvement of
> operational free cash-flow (FCF) at a higher rate than EBITDA indicate[s] the
> clear focus given in 2001 to cash management. We will continue this effort.
>                              *   *   *
> ***We stay fully committed to conveying full transparency in our financial results.***
> Vivendi Universal is not only transparent but is the only media and
> communications [company] not to change its numbers and targets, it underscores
> its commitment to accurate, ***conservative*** and consistent reporting in every area of
> its operations. [Emphasis added.]

90.     On March 5, 2002, during an investor conference call, defendant Messier

discussed the Company's fiscal year 2001 results and fiscal year 2002 expectations and attempted

to minimize the importance of the €12.6 billion write-down in goodwill as follows:

-41-

I just want to say a very quick points before going to your questions. And I – the first point here based on the fact that we experienced excellent operating results in the '01 and obviously that's very fortunate because this excellent operating results in '01 are also in the captive of the future and then we'll drive our future. I think that we build our operational reserve but what I want to point out is that if we continue or renewed on the EBITDA growth target results and add to our main in the quarter '01. We did all of this. Our operating pre cash flow target, we average Euro 2 million instead of the guidance of Euro 1.2 - 1.5 million [sic]. Obviously the fact that the more you go to cash the more we over this --- the guidance that we gave to the market is a strong sign of the quality of the casual management in working above the requirements and CAPEX management in '01. That goes to the same direction is that we did overcome largely all targets in terms of cash service. We save Euro 200 million EBITDA, we reach 300 EBITDA 100 more, and close to Euro 600 million total cash savings. The operations and these business achievements, I think that we owed them to our competitive advantages that were evident in '01. That: (1) the excellent quality of management; (2) the fact that we gain market share in about every single of our business. Those gains of market shares coming from [scale and scope]; (3) the assets mix, maximize our ability to go to digitalization for delivery on the mobile devices; and (4) to our global footprint minimizes of earnings volatility. That's the business achievement.

91.　　On March 6, 2002, Lehman Brothers issued a report based in part on the

statements made by Vivendi's management in the March 5, 2002 conference call:

> In its post results conference call, management confirmed that the value adjustments to the US assets . . . reflected largely a change in accounting treatment and did not signal a negative outlook for the US water business.

92.　　Similarly, Bear Stearns issued a report on March 6, 2002, based on the March 5,

2002 conference call, stating in pertinent part as follows:

> The company disclosed that the €19 billion of net debt has an average maturity of 4-years and an average cost of 4.1%. Management pointed out that the strength of the group's finances is underlined by a recently negotiated 5-year credit facility at 45 basis points over LIBOR.
>
> *　*　*
>
> For '02, Management reiterated their guidance of 10% organic sales growth for all the Media Communications businesses. Vivendi also expects EBITDA of close to €6 billion (pre-USA Networks and pre-Stream).

-42-

93.     The statements made by defendants referenced in ¶¶ 83-90 above, were each

materially false and misleading because, <u>inter alia</u>, the Company was engaged in improper

accounting practices which had the effect of materially overstating Vivendi's reported earnings

(as particularized below at ¶¶ 119-80), including: (a) failing to timely write-down overvalued

assets from previous corporate investments and acquisitions; (b) improperly consolidating into its

financials revenue from its Cegetel and Maroc Telecom subsidiaries, in which the Company had

less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year

contracts.  In addition, the statements failed to disclose that the Company was suffering from a

growing liquidity crisis (as particularized below at ¶¶ 181-88) and that Vivendi would necessarily

need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

94.     On April 24, 2002, Vivendi issued a press release announcing its "strong" first

quarter 2002 Media and Communications results.  Vivendi reported a "strong surge of

operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations."  The

release, issued in New York, further reported that "[n]et debt fell from approximately 19 billion

euros to approximately 17 billion euros."  The release also reported Media and Communications

"revenue organic growth of 13% to 6.8 billion euros; strong EBITDA growth, up 18% to 1.1

billion euros; and solid operating income growth, up 37% to 408 million euros."  Defendant

Messier commented on these results as follows:

> "The hard numbers in the first quarter show that Vivendi Universal has a winning
> strategy, and demonstrate our commitment to excellent management and
> delivering operating results quarter after quarter.  In the first quarter, each
> operating segment delivered its revenue targets, and most segments over-delivered
> EBITDA and operating free cash flow compared with their budgets. . . .

-43-

In a difficult environment, Vivendi Universal's businesses gained market share. Cash management improved dramatically. Finally, the revenue and cost synergies achieved in the quarter were significant. Further gains will be driven by improving businesses that currently have negative operating free cash flow: Canal+ and Internet operations."

95.     On April 29, 2002, Vivendi issued a press release announcing purportedly "strong" results for the first quarter of 2002, including a 12% increase in pro forma consolidated revenue to 13.2 billion euros. The release, issued in New York, also reported that consolidated operating income grew 11% pro forma to 781 million euros, excluding goodwill amortization. In the release, defendant Messier commented on the results as follows:

The consolidated financial results for the quarter demonstrate that Vivendi Universal is delivering on the strategy, goals and targets that we have articulated to our shareholders. In the first quarter of 2002, both Media & Communications and Vivendi Environnement delivered their targets.

The Media & Communications financial results released last week, coupled with our consolidated results issued today, are testimony to our ability and conviction to deliver strong results in operations, cash flow, EBITDA and net income. As I said last week, because of our strong performance in the quarter, we are lowering our estimate of Media & Communications year-end Debt/EBITDA ratio to less than 3x by December 31, 2002.

In a very difficult economic environment, characterized by many market uncertainties, Vivendi Universal's global businesses gained market share. In addition, strong improvement was achieved in cash management, debt reduction, synergies, management development and revenue growth.

96.     The April 29, 2002 press release further touted the Company's allegedly strong cash flow position:

On a pro forma basis, excluding Vivendi Universal's publishing businesses to be disposed of (including the B-to-B and Health businesses whose sale is expected to be completed in the second quarter), Media and Communications reported:

- ***A strong surge of operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations;***

-44-

**JA488**

- Strong operating results in the first quarter: revenue organic growth of 13% to 6.8 billion euros; EBITDA growth, up 18% to 1.1 billion euros; and solid operating income growth, up 37% to 408 million euros. All were significantly ahead of budget. [Emphasis added.]

97.     Following the Company's April 29, 2002 Press Release, Merrill Lynch issued a research report dated April 30, 2002 that rated the Company a "strong buy" premised on the Company's allegedly strong financial position. Specifically, the Merrill Lynch report stated that the "strong buy" recommendation was based, in part, on the fact that "Vivendi has now stated its net debt/EBITDA objective is less than 3x by the end 2002. . . ."

98.     The statements made by defendants referenced in ¶¶ 94-96 above, were each materially false and misleading because, inter alia, the Company was engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings (as particularized below at ¶¶ 119-80), including: (a) failing to timely write-down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc Telecom subsidiaries in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, the statements failed to disclose that the Company was suffering from a growing liquidity crisis (as particularized below at ¶¶ 181-88) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

99.     On May 3, 2002, Moody's lowered the Company's long-term debt rating to Baa3 -- the lowest investment guide -- one notch above "junk" status assigned to speculative investments. According to Moody's, the ratings downgrade reflected Moody's concern that Vivendi "might not be able to reduce debt as quickly and comprehensively as planned."

-45-

**JA489**

100.     That same day, Vivendi issued a press release criticizing Moody's decision and

attempting to downplay its significance:

> The company believes that this decision does not fully take into consideration the
> currently poor market conditions and the fact that the agency does not take into
> account immediately the whole of the debt reduction program planned by Vivendi
> Universal.
>
> This decision has no impact on Vivendi Universal's cash situation. It does not
> trigger any renegotiation clauses or advance repayments of bank credit lines. In
> addition, Vivendi Universal's use of commercial paper in the current amount of
> 1.6 billion euros is well covered by back-up lines of more than 3 billion euros, the
> availability of which will not be affected by the rating change.
>
> Vivendi Universal affirms that it has every confidence in its ability to meet its
> operating targets for 2002, as proved by its first-quarter results. The company is
> totally determined to carry through its debt reduction program in order to make a
> rapid return to a comfortable position with a Baa2 rating.

As a result of Vivendi's efforts to reassure the markets, defendants were able to limit the decline

in the price of Vivendi's common stock and ADSs, and Vivendi's ADSs closed down only $1.74

(from $30.67 to $29.07) on May 3, 2002.

101.     On May 6, 2002, the *International Herald Tribune* reported:

> Vivendi Universal SA could be forced to unwind billions of dollars in off-
> balance-sheet derivatives transactions if its credit rating slips any further,
> according to a detailed report of the company's accounts filed with U.S.
> regulators.
>
> A downgrade Friday by Moody's Investors Service Inc. of Vivendi's long-term
> debt to Baa3 from Baa2 places the company's bonds within a notch of junk, or
> non-investment-grade status. That, in turn, puts the world's second-largest media
> conglomerate within a hair's breadth of triggering an immediate settlement of 3.5
> billion ($3.21 billion) worth of so-called total return swaps, a kind of credit
> derivative, documents filed last month with the Securities and Exchange
> Commission show. Hundreds of millions of dollars in losses on total return swaps
> and other esoteric derivatives deals have been the focus of at least one lawsuit
> filed against Enron Corp. and its auditor, Arthur Andersen LLP, by shareholders
> and employees of the bankrupt U.S. energy trader.

-46-

**JA490**

Derivatives are generally defined as financial instruments that derive their value from an underlying asset such as a stock. In a total return swap, parties make payments to each other based on an asset's appreciation and depreciation, with the payment rate determined by a complex formula. Vivendi stressed Friday that the rating change had no impact on its cash situation, adding that the move "does not trigger an renegotiation clauses or advance repayments of bank credit lines." The statement did not mention the possibility of accelerated settlement of debt or swap agreements.

Asked about the implications of a further ratings downgrade for its total return swap agreements, Antoine Lefort, a Vivendi spokesman, declined to answer Sunday, saying: "This is not the subject. Our goal is to carry through the debt reduction program in order to make a rapid return to a comfortable position with a Baa2 rating."

But in a 100-page annual financial statement filed with the SEC on April 15, Vivendi stated that it had entered into a number of long-term financing agreements that provided for early redemption if Moody's cut the company's credit rating below Baa3 or Standard & Poor's Corp. cut it below BBB-minus, its equivalent rating. S&P currently rates Vivendi at BBB with a stable outlook.

Vivendi's SEC filing says, "Total return swap agreements set up at the time of the sales of BSkyB and AOL Europe provide for an early unwind if Vivendi is downgraded below BBB-minus."

The report indicates that the total notional value of the two return swap transactions was 3.51 billion as of Dec. 31. Notional principal underlying a swap is usually much greater than the true risk exposure of the parties to the transaction. Vivendi did not quantify its actual risk exposure in the report.

The swap transactions relate to the sale of investments in rival media companies ordered by EU regulators as a condition for approval of Vivendi's $34 billion acquisition of Seagram Co. of Canada in December 2000. Vivendi agreed to dispose within two years of its 22 percent stake in British Sky Broadcasting Group PLC, the satellite-television unit of Rupert Murdoch's News Corp. Last September, Vivendi arranged a complex transfer of the stake to Deutsche Bank AG of Germany in exchange for a four-year, 4.2 billion loan. Vivendi also said in the filing that it had entered into a separate two-year total return swap transaction in June 2001 in connection with the sale of $719 million worth of preferred shares in AOL Europe, an AOL Time Warner Inc. unit, to an unidentified financial institution. Further details were not provided.

In response to these further negative press reports, the price of Vivendi ADSs closed down at $28.26 on May 6, 2002.

102.    On May 28, 2002, Vivendi filed its Form 20-F for the fiscal year ended December 31, 2001 with the SEC, which was signed by defendant Hannezo. The 20-F contained Vivendi's consolidated financial statement for the year ended December 31, 2001. The 20-F also reported as follows:

*Net Cash Flow from Operating Activities* -- Net cash flow provided by operating activities totaled €4.5 billion in 2001, an increase of €2 billion from 2000. The increase was attributed to operating earnings generating incremental cash flow of €1.1 billion and improvements in working capital of €1.5 billion, partially offset by approximately €600 million of cash payments made for the settlement of restructuring and merger-related liabilities. Of the improvements in working capital, €0.8 billion was generated by Vivendi Environnement primarily due to the implementation of a receivables securitization program. In 2000, operating activities provided net cash of €2.5 billion compared to €0.8 billion in 1999. The significant improvement was primarily due to increased earnings generated by our Telecoms, Publishing and Environmental Services businesses.

*Net Cash Flow from Investing Activities* -- Net cash flow provided by investing activities was €4.3 billion in 2001 compared to net cash flow used for investing activities of €1.5 billion in 2000. Contributing to cash from investing activities was €9.4 billion from the sale of our spirits and wine business and €4 billion from the disposal of our investment in BSkyB, partially offset by capital expenditures for tangible and intangible assets net of sales proceeds of €4.9 billion and the acquisitions of Houghton Mifflin for €2.0 billion and Maroc Telecom for €2.4 billion. In 2000, net cash used for investing activities was €1.5 billion compared to €12.9 billion in 1999. The significant decrease primarily reflects fewer strategic acquisitions paid for in cash in 2000 compared to 1999. . . . Proceeds from the disposal of investments and fixed assets were €6.9 billion in 2000 compared to €4.5 billion in 1999, mainly attributable to the divestiture of non-core real estate, construction assets and GPU power generation plants.

*Net Cash Flow from* Financing *Activities* -- In 2001, net cash flow used for financing activities was €7.5 billion, the principal components of which included a €5.9 billion repayment of long-term borrowings and other liabilities, a €1.7 billion decrease in short-term borrowings, the purchase of treasury stock for €4.3 billion and cash dividends paid of €1 .4 billion, partially offset by €5.2 billion

-48-

**JA492**

proceeds from the issuance of long-term borrowings and other liabilities and €0.6 billion net proceeds from the issuance of common stock. In 2000, net cash flow used for financing activities was €0.6 billion compared to net cash provided by financing activities of €13.7 billion in 1999. The year-on-year variance was primarily due to the Merger Transactions. In July 2000, the sale of 37% of Vivendi Environnement through an IPO contributed to an increase in financing transactions of €3.8 billion.

103.    By late-May 2002, with Vivendi's ADSs now trading in the $29 to $30 range, and its ordinary shares trading in the €31 to €33 range in response to concerns about its debt levels, defendants once again sought to reassure financial markets by issuing the following press release on May 30, 2002:

> Vivendi Universal confirms having obtained agreement from the banks to delete the clauses that linked the availability of credit lines to a rating level. The Company's bank credit line [is] therefore, no longer dependent on rating agencies' decisions.
>
> *Additionally, the Company has no reason to anticipate or fear any further deterioration in its credit rating.*
>
> Vivendi Universal has also confirmed that, after payment of the dividend and the acquisition of USA Networks, its available credit lines that have not been used to date amount to almost 3.5 billion euros. Also, its use of commercial paper is limited to about 1 billion euros, and the reimbursement of expected debts during the coming months is limited.
>
> *This cash situation, which, the Company believes, is comfortable -- even assuming an extremely pessimistic market -- will enable the Company to continue its debt reduction program with confidence and with a view to creating the best possible value for its shareholders.* [Emphasis added.]

On May 31, 2002, Vivendi ADSs closed up $1.23, at $31.05.

104.    During the following weeks, however, concerns about Vivendi's debt levels continued to put downward pressure on Vivendi's securities. In response, on June 25, 2002, Vivendi issued a press release reiterating its prior statement concerning the positive steps it had

-49-

**JA493**

taken to reduce debt and announcing that the Company's cash position was not precarious. The release highlighted the main points of the Company's plans as follows:

- **DEBT REDUCTION:**

  - The active implementation of a debt-reduction plan has enabled Vivendi Universal to collect over E5.1 billion during the first half of the year, to which can be added the disappearance of its financial risk on BSkyB shares (E2.5 billion) and the imminent sale of the B2B health activities.

  - As a consequence, net debt will be lowered in 2002 and senior management's target (under U.S. definition) is to bring it down from about E19 billion to E15 billion.

  - That level represents a net debt-to-EBITDA ratio of below 2.5 times on a consolidated basis and of around 3 times on a proportional basis (to eliminate the impact of the minority interests in telecoms).

- **CASH SITUATION:**

  - Vivendi Universal has E3.3 billion available in unused credit lines, an amount that well exceeds its commercial paper of E912 million.

  - Early repayment clauses in loan agreements apply to less than E170 million and the various bank covenants will all be complied with at both June 30 and December 31, 2002.

  - The Company will also continue its policy of increasing the average length of its debt.

$$* \quad * \quad *$$

I - CHANGE IN DEBT SITUATION

1) According to the U.S. definition of net debt (gross debt less cash), Vivendi Universal's net debt (excluding Vivendi Environnement) fell from around €19 billion at December 31, 2001 to approximately €17 billion at March 31, 2002, (and from €14.6 billion to €12.8 billion under French GAAP). The main factors that will impact debt under U.S. practices in the second quarter were or will be:

- Cash inflows:
The proceeds from the sale of the BtoB and Health activities of the publishing division (VUP) for nearly €1 billion in debt, scheduled for the end of June. The

-50-

proceeds from the disposal of the Canal+ Nordic satellite platform for €270 million

- Cash outflows:
The Vivendi Universal dividend payment in May, for €1.05 billion. The payment in May of the cash portion of the USAi transaction, for €1.8 billion.

Furthermore, the restructuring of Vivendi Environnement's equity brought Vivendi Universal €1.5 billion in cash in the second quarter and will reduce net debt by the same amount at December 31, 2002. The disposal of certain real estate assets for €120 million, committed in May, will reduce debt in the third quarter.

The total value of the disposals carried out or definitively entered into during the first half of 2002 represents more than €6 billion in cash (sale of treasury stock for €3.3 billion, B2B assets for €0.9 billion, Canal+ Nordic for €0.27 billion, real property assets for €0.1 billion and proceeds from Vivendi Environnement of €1.5 billion). VU's financial risk was reduced by an additional €2.5 billion when the BskyB transaction was unwound.

2) By December 31, 2002, and with the current shareholder structure of Cegetel still in place, Vivendi Universal is lowering its net debt target to below €15 billion (in accordance with current U.S. accounting principles), corresponding to a net reduction of over €4 billion since the beginning of the year. This target represents a ratio of debt to estimated 2002 EBITDA of below 2.5 times, including Cegetal and Maroc Telecom, as is required by both U.S. and French accounting standards. Using "proportional" levels of estimated 2002 EBITDA and debt adjusted for the minority interests of Telecoms, the debt target ratio is around 3 times EBITDA.

This new debt target, which is lower than that so far announced, has been made possible by the rapid progress made in the debt-reduction plan during the first half of the year.

3) In addition to transactions already finalized and its operating free cash flow, the company expects to meet its debt target by continuing to dispose of non-core assets. Certain disposals are already under way and proceeds from them, if they are all consummated before December 31, 2002, are expected to be well in excess of the amount required to meet the year-end debt target.

4) About half of Vivendi Universal's debt is in the form of securities, and the other half is in bank loans. Around 60% is in euros and 40% in dollars. The company's aim is to extend the average length of its debt, firstly by reducing it and

-51-

allocating income from disposals to short-term debt repayment, and then by replacing the remaining short-term debt by medium- to long-term debt.

As a first step, carried out at the beginning of 2002, Vivendi Universal replaced €3 billion of short-term debt with a five-year syndicated loan at a spread of 47.5 basis points over EURIBOR. Vivendi Universal is planning a €1-2 billion bond issue during the year to replace short-term debt.

II - CASH SITUATION

1) At this point in time, Vivendi Universal has available around €3.3 billion in unused credit lines. This is available to back up its commercial paper outstanding of nearly €1 billion.

The cash situation has greatly improved since the beginning of the year. However, it should be emphasized that, even while waiting to collect the remaining proceeds from Seagram's spirits and wine business in the fourth quarter of 2001, Vivendi Universal regularly maintained an amount of unused credit lines above the value of its commercial paper.

Owing to its strong free cash flow, combined with the execution of the disposals program and potential bond issues, Vivendi Universal is confident of its capacity to meet its anticipated obligations over the next 12 months. In particular:

a. The sale of 15.6% of VE (for €1.5 billion) and the other planned disposals are expected to more than cover Vivendi Universal's anticipated commitments over the coming months, which include:
- making available to Cegetel cash to enable the company to buy TD if SNCF decides to exercise its put option during the summer;
- the cost in cash of paying for put options to VU relating to 15 million shares. Spread over the next seven months, this cost represents an amount at each payment date equal to the difference between the share price the day when the options are exercised and their average strike price of €69;
- the cost of the price guarantee given by Seagram on Rondor, in the amount of $230 million to be paid in March 2003.

b. The VUE bridge loan put in place at the beginning of 2002 might be refinanced by a VUE bond issue, and €1.7 billion in repayments of bank loans with maturities of less than 12 months are expected to be consolidated and/or refinanced by a planned VU bond issue.

c. When the time comes, the company will decide on how to maintain the 2006 due date of the issue of bonds convertible into VE shares, which has an early

-52-

**JA496**

redemption option for March 2003 for holders willing to relinquish the bond's option value.

2) Furthermore, since the beginning of the year, Vivendi Universal has renegotiated a number of bank clauses, in particular those that placed it in the situation of certain loans being called if its credit ratings fell below BBB- /Baa3. These clauses originally involved €5.5 billion in debt, and now apply to less than €170 million. The renegotiations have led to a reduction in the average length of financing for marginal amounts of around €200 million. The cost of these unused back-up lines has increased by 110 basis points, only if used, depending on the amount drawn. Following the renegotiations, Standard & Poor's removed Vivendi Universal from its list of companies exposed to rating triggers.

The financial undertakings made by the company in the back-up lines are the same as those made for the five-year syndicated loan of €3 billion. Vivendi Universal is projecting for June 30 and December 31 that its financial ratios will meet or exceed the ratios required in these contracts.

Defendants also announced that it would implement a monthly Q & A session to "end the constant negative rumors about the company."

105.    On June 26, 2002, defendant Messier discussed the Company's debt and liquidity during an investor conference call as follows:

I have read, I held in the markets all certainties, question, rumors in the current environment relating to views, view for yourselves, views for your accounting and I seen that in those circumstance. *The best that we can do is to show you [that] there is no hidden liability that's you have all the information to come back.* [Emphasis added.]

106.    On June 26, 2002, the *Dow Jones International News* reported:

Chairman Jean-Marie Messier said late Wednesday that he plans to stay in charge of the embattled media company despite criticism of his strategy and a crumbling share price. . . .

Messier sought to counter those doubts, opening the call with a comment that the company has no hidden, off-balance sheet liabilities and adding, *"We feel very confident looking to our debt and cash analysis with all our commitments of the group for the coming 12 months."*

-53-

**JA497**

107.     Vivendi's June 25, 2002 press release and subsequent comments by defendant Messier reassured a number of market analysts.  For example, on June 27, 2002 Merrill Lynch issued a "strong buy" recommendation for the Vivendi's stock, stating:

> We believe the rapid share price fall of some 25% in the last two weeks is unwarranted and expect ongoing deleveraging and improving confidence in the company's short term liquidity position should begin to revive interest in the shares.

108.     However, statements made by defendants referenced in ¶¶ 100, 102-106 above, were each materially false and misleading because, inter alia, the Company was engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings (as particularized below at ¶¶ 119-80), including: (a) failing to timely write-down overvalued assets from previous corporate investments and acquisitions; (b) improperly consolidating into its financials revenue from its Cegetel and Maroc Telecom subsidiaries in which the Company had less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year contracts.   In addition, the statements failed to disclose that the Company was suffering from a growing liquidity crisis (as particularized below at ¶¶ 181-88) and that Vivendi would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

109.     On July 2, 2002, Vivendi's debt was downgraded again amid reports that the Company was in danger of default.  On July 2, 2002, *Bloomberg* reported that defendant Messier "told employees in an e-mail that while he may have gone 'too fast, too far,' there are 'no hidden risks' in the company's accounting."  On July 3, 2002, Vivendi's CEO, defendant Messier was forced to resign.  Vivendi ADSs and ordinary shares collapsed upon these revelations, falling to

as low as $13.40 and €13.90, and closing at $15.66 and €13.90, respectively, on huge volumes of 7.4 million ADSs and 43.6 million shares.

110. On July 3, 2002, the Company, through its new management, published a press release acknowledging that the Company had "a short-term liquidity issue." The release further stated that Vivendi had to repay creditors 1.8 billion euros by the end of July 2002, and that 3.8 billion euros in credit lines were up for renegotiation:

> [I]n light of the Moody's and Standard & Poor's downgrades of Vivendi Universal debt ratings of July 1 and 2, 2002, respectively, as well as other events that have occurred over the past several days, including the resignation of Mr. Jean-Marie Messier from his positions at Vivendi Universal, Vivendi Universal believes it is important to update the investor community and the markets generally regarding its short-term cash position and liquidity. . . .
>
> As of July 3, 2002, Vivendi Universal has 1.2 billion euros of cash and 1.6 billion euros in unused credit lines of which at least 600 million euros can be used for general corporate purposes and the rest can be used as backing for certain types of its commercial paper (400 million euros of which is currently outstanding).
>
> ***Payments totalling approximately 1.8 billion euros remain due by the end of July. These will be financed from resources totalling approximately 2.4 billion euros comprising cash and draw-downs on existing credit facilities.***
>
> Several of Vivendi Universal's credit lines automatically roll over at certain specific dates in accordance with their terms, subject to standard material adverse change provisions. ***Of those, approximately 3.8 billion euros are scheduled to roll-over in July.*** In addition, Vivendi Universal has initiated discussions with its main credit banks with a view to putting in place new credit facilities as soon as feasible.
>
> While Vivendi Universal has a short-term liquidity issue, the value of the group's broad and diversified assets by far exceed that of its debt. The new management is committed to a program of aggressive deleveraging and greater transparency in order to restore health and confidence in Vivendi Universal. [Emphasis added.]

111.    On July 3, 2002, in *The Columbian*, Messier continued to defend Vivendi's

financial statements: "There are no underestimated liabilities.  There are no overvalued assets,"

Messier said.  "Our results are true, genuine and complete."

112.    On July 5, 2002, the *Globe and Mail Metro* reported:

> With new management in place, ***Vivendi Universal SA finally admitted what its
> ousted chairman and chief executive officer, Jean-Marie Messier, had
> strenuously denied in recent weeks:  The media-and-utility conglomerate is in
> danger of a cash crunch.***
>
> Based on a detailed liquidity statement Vivendi put out late Wednesday, credit
> analysts estimate that Vivendi could face a cash shortfall of 2.7 billion euros
> ($2.64-billion U.S.) by the end of the year, expanding to as much as 5.5 billion
> euros by the middle of 2003, unless it can quickly secure a new multibillion-euro
> credit line from its lenders.
>
> The statement came after a three-hour board meeting late Wednesday in Paris
> where the Vivendi board accepted the forced resignation of Mr. Messier.  The
> board, as expected, chose Jean-Rene Fourtou, a top executive of Aventis SA, the
> Franco-German pharmaceutical giant, as its new CEO.
>
> In its statement, Vivendi said it must repay 1.8 billion euros this month and said
> the payment would be financed from 2.4 billion euros in existing cash and credit
> lines.  It also has a 3.8-billion-euro credit line that will roll over this month unless
> the banks determine there has been a "material adverse change" with the company.
>
> This grim outlook contrasts with Mr. Messier's recent assurance that the "treasury
> situation" at Vivendi–owner of Universal Studios, Universal Music Group, USA
> Networks and minority stakes in a host of other assets–was "comfortable even in
> the most pessimistic market hypotheses." [Emphasis added.]

113.    The statements made by defendants referenced in ¶¶ 109-111 above, were each

materially false and misleading because, inter alia, the Company was engaged in improper

accounting practices which had the effect of materially overstating Vivendi's reported earnings

(as particularized below at ¶¶ 119-80), including: (a) failing to timely write-down overvalued

assets from previous corporate investments and acquisitions; (b) improperly consolidating into its

-56-

**JA500**

financials revenue from its Cegetel and Maroc Telecom subsidiaries in which the Company had

less than 50% ownership; and (c) overstating the Company's revenue from certain multi-year

contracts. In addition, the statements failed to disclose that the Company was suffering from a

growing liquidity crisis (as particularized below at ¶¶ 181-88) and that Vivendi would necessarily

need to restructure its debt obligations in order to remain solvent and avoid bankruptcy.

114.    On August 14, 2002, the Company's new management stated that, pursuant to

French GAAP, Vivendi suffered a €12 billion net loss for the first half of 2002 and would take an

€11 billion goodwill write-down of depreciated assets. Debt-rating agency Standard & Poor's

slashed Vivendi's long-term corporate credit to junk status that same day. As the *Associated*

*Press* reported on August 14, 2002:

> Vivendi Universal, the teetering French media conglomerate, reported a massive
> loss of $12 billion for the first half of the year and said it will sell $10 billion in
> assets as it seeks to pare debt, including the U.S. publisher Houghton Mifflin.
> Adding insult to injury, a ratings agency downgraded the company's debt to junk. .
> . .
>
> The sale of Houghton Mifflin, which the company only bought last year for $1.7
> billion, appeared to mark a first step toward breaking up the entertainment and
> media empire built up by Vivendi's former chairman, Jean-Marie Messier, in a
> whirlwind of costly acquisitions. In all, Vivendi said it hopes to dispose of at
> least $9.8 billion worth of assets – half of them within nine months, the rest
> within two years.
>
> "*We are facing a liquidity problem*," said chairman Jean-Rene Fourtou, who took
> over July 3 after Messier's ouster. Fourtou said he would "try to avoid any fire
> sale, but we have negotiations that could be concluded very soon if the price was
> lowered." [Emphasis added.]

115.    In response to these further stunning developments, on August 14, 2002, Vivendi

common stock closed at 11.89 euros, down more than 4 euros (or approximately 25%) from its

close the previous day. Vivendi's ADSs suffered a similar decline, closing down $3.67 at $11.66.

116.    In recent months, defendants' improper accounting practices and failure to disclose the truth concerning Vivendi's liquidity crisis have given rise to fraud investigations on both sides of the Atlantic. On July 9, 2002, *Bloomberg* reported that French stock market regulators, the COB, were reviewing statements released by Vivendi to ensure "they abide by our rules," and on July 10, 2002, *The Wall Street Journal* reported that French regulators raided Vivendi's Paris headquarters as part of an investigation into whether Vivendi had disclosed relevant information to investors in the prior 18 months. In addition, on October 29, 2002, *Bloomberg* reported that French prosecutors had opened a criminal investigation. As *Bloomberg* reported:

> The investigation will examine whether Vivendi "published false accounts for 2000 and 2001 to hide the true nature of its financial situation," a spokeswoman for the prosecutor's office said. It will also look at whether the Paris-based company gave misleading outlooks for 2001 and 2002.

On December 12, 2002, *Bloomberg* reported that a police team from the Finance Brigade of the Paris Public Prosecutor's office had raided both Vivendi's headquarters in Paris as well as Messier's home. The Finance Brigade raided Canal Plus' headquarters the next day, and has also raided the homes or offices of various Vivendi directors.

117.    In the United States, Vivendi's accounting practices and financial disclosures are also the subject of both a formal SEC investigation and a federal criminal investigation. As the November 5, 2002, *The Wall Street Journal* reported:

> The U.S. attorney's office is coordinating its probe with U.S. Securities and Exchange Commission, which already has been conducting an informal inquiry into Vivendi, the company said in a statement.
>
> The main focus of the U.S. attorney's investigation, which is in its early stages, remains unclear, as does whether it will lead to any charges being filed. But one

of the issues that has come under scrutiny by French authorities is the accuracy and timeliness of Vivendi's financial disclosures under its former chairman, Jean-Marie Messier, who was ousted in early July. France's stock-market watchdog, the Commission des Operations de Bourse, launched a probe at that time and is looking to see whether Mr. Messier may have misled his board and investors with overly rosy assessments of Vivendi's financial health, according to people familiar with that probe.

The U.S. probe also may encompass accounting, as the Paris public prosecutor's office has included accounting in its own investigation. Among other issues, the Paris prosecutor's office said it would seek to establish whether Vivendi published "false accounts for the fiscal years that ended on Dec. 31, 2000 and Dec. 31, 2001."

On November 19, 2002, *Bloomberg* reported that the SEC's informal inquiry had been upgraded to a formal investigation.

118.     At all relevant times, the material misrepresentations and omissions particularized in the Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and other members of the Class (including the Subclasses). As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Vivendi's business, prospects, operations and financial condition.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Vivendi and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class and Subclasses purchasing or otherwise acquiring the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

-59-

## VIVENDI'S MATERIALLY FALSE AND MISLEADING FINANCIAL
## STATEMENTS AND RELATED FINANCIAL MISREPRESENTATIONS

119.    During the Class Period, Vivendi filed financial statements with the SEC which

were represented to have been prepared in conformity with GAAP in France ("French GAAP").

The SEC allows foreign private issuers, such as Vivendi, to prepare their primary financial

statements in accordance with a comprehensive body of GAAP other than U.S. GAAP, provided

that an understanding of such financial statements is facilitated via a reconciliation to U.S.

GAAP.

120.    The SEC requires that each annual financial statement filed on Form 20-F and

each annual and interim financial statement included in an SEC registration statement be

reconciled to U.S. GAAP.  Vivendi's 1999, 2000 and 2001 annual financial statements filed on

Form 20-F, represented to have been prepared in conformity with French GAAP, were

purportedly reconciled to U.S. GAAP.  In addition, Vivendi's 2001 Form 20-F, which was signed

by defendant Hannezo, represented that, beginning in 2002, the Company's financial information

would be communicated on a U.S. GAAP basis and be reconciled to French GAAP.

121.    GAAP are those principles recognized by the accounting profession as the

conventions, rules, and procedures necessary to define accepted accounting practice at a

particular time.  As set forth in Financial Accounting Standards Board ("FASB") Statement of

Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting

is that it provide accurate and reliable information concerning an entity's financial performance

during the period being presented.  Concepts Statement No. 1, ¶ 42, states:

> Financial reporting should provide information about an enterprise's financial
> performance during a period.  Investors and creditors often use information about

-60-

**JA504**

the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

122. Regulation S-X [17 C.F.R. § 210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate. The representations by the defendants that Vivendi's financial statements were reconciled to U.S. GAAP were materially false and misleading because the financial statements materially inflated and distorted the Company's true financial performance during the Class Period, as described herein.

123. In violation of U.S. GAAP and SEC accounting rules and regulations, Vivendi misstated its financial statements throughout the Class Period and masked the Company's liquidity crisis. Defendants caused Vivendi's employees to engage in a myriad of improper accounting practices, and/or knowingly acquiesced in and condoned such practices. These practices concealed the truth about the then current state and future prospects of the Company's business.

**(a)  Vivendi's Improper Failure to Timely Record Impaired Goodwill**

124. Vivendi's Class Period financial statements were materially false and misleading and presented in violation of U.S. GAAP and SEC rules and regulations because the Company failed to timely record an impairment in the value of its reported goodwill. In so doing, Vivendi misled investors about cash flows it expected to receive from certain of its recent acquisitions.

125. As noted above, prior to and during the Class Period, Vivendi engaged in an acquisition binge, which, in the aggregate, resulted in the acquisition of interests in other entities

-61-

that Vivendi valued in excess of *$77 billion.* Vivendi utilized the "purchase method" of

accounting for these acquisitions. The purchase method, as set forth in then existing U.S.

GAAP's Accounting Principles Board ("APB") Opinion No. 16, ¶11[2] provides that:

> The acquiring corporation records at its cost the acquired assets less liabilities
> assumed. A difference between the cost of an acquired company and the sum of
> the fair values of tangible and identifiable intangible assets less liabilities is
> recorded as goodwill.

126.    Accordingly, for purposes of accounting for an acquisition transaction, the

acquiring entity records the acquired assets (both tangible assets and identifiable intangible

assets) and liabilities assumed at their respective fair values, and the difference between the cost

of the acquired entity and the respective fair values of the acquired assets, less liabilities, is

recorded as goodwill. Pursuant to APB Opinion No. 16, the cost of the acquired entity for

accounting purposes is determined by the fair value of the consideration acquired or issued,

whichever is more objectively determinable.

127.    Paragraphs 74-75 of APB Opinion No. 16 further provide:

> The fair value of securities traded in the market is normally more clearly evident
> than the fair value an acquired company. Thus, the quoted market price of an
> equity security issued to effect a business combination may usually be used to
> approximate the value of an acquired company.
>                              *    *    *
> If the quoted market price is not the fair value of the stock . . ., the consideration
> received should be estimated even though measuring directly the fair values of the
> assets received is difficult.

---

[2] APB Opinion No. 16 has been superceded by FASB's Statement of Financial
Accounting Standard ("SFAS") No. 141. However, SFAS No. 141 carries forward, without
reconsideration, the guidance in APB Opinion No. 16 (and certain of its amendments and
interpretations) related to the application of the purchase method.

-62-

128.    Purporting to apply these principles, Vivendi reported that it recorded goodwill as follows when it acquired US Filter, Seagrams and Canal Plus:

      a.     US Filter acquisition -   € 4.6 billion

      b.     Seagrams acquisition -   € 25.9 billion

      c.     Canal Plus acquisition - € 12.6 billion

      **(i)**    **Canal Plus**

129.    With respect to the acquisition of Canal Plus in December 2000, Vivendi valued the cost of Canal Plus at approximately € 12.5 billion. More than 100% of this cost, or € 12.6 billion, was recorded by Vivendi as goodwill. As required under the purchase method, Vivendi's reporting of € 12.6 billion of goodwill on Canal Plus, when the accounting cost of Canal Plus totaled € 12.5 billion, indicated that the fair value of Canal Plus' liabilities exceeded its assets by approximately € 100 million.

130.    In the fourth quarter of 2001, Vivendi recorded a € 6.0 billion charge for an impairment in the value of Canal Plus's goodwill under French GAAP. This was followed by an additional € 3.8 billion charge under French GAAP for an impairment in the value of Canal Plus's goodwill during the quarter ended June 30, 2002. ***Accordingly, by June 2002, Vivendi had written off € 9.8 billion, or approximately 78%, of the total € 12.5 billion cost to acquire Canal Plus under French GAAP.***

131.    However, although Vivendi recognized an initial impairment to goodwill under French GAAP in the fourth quarter of 2001, Vivendi did not take *any* write-off for impaired goodwill under U.S. GAAP in 2000 or 2001. As the Company purported to explain in its 2001 year-end financial statements:

-63-

*Goodwill Impairment Charge and Impairment of Other Long-Lived Assets*
As required under both French and U.S. GAAP [*see* SFAS No. 121], Vivendi
Universal reviews the carrying value of long-lived assets, including goodwill and
other intangible assets, for impairment at least annually or whenever facts, events
or changes in circumstances, both internally and externally, indicate that the
carrying amount may not be recoverable. Under French GAAP, measurement of
any impairment is based on fair value. In 2001, following the recent market
decline, particularly in the Internet, media and telecommunications industries, our
annual review resulted in a non-cash, non-recurring goodwill impairment charge
of €12.9 billion (€12.6 billion after €0.3 billion minority interest). Under U.S.
GAAP, measurement of any impairment is based on the provisions of Statement
of Financial Accounting Standards (SFAS) No. 121, *Accounting for the
Impairment of Long-lived Assets and for Long-Lived Assets to Be Disposed Of*
(SFAS 121). SFAS 121 requires that an impairment loss be recognized whenever
the sum of the undiscounted future cash flows estimated to be generated from the
use and ultimate disposal of an asset are less than the net carrying value of the
asset. ***On this basis no impairment was indicated and accordingly the goodwill
impairment charge was reversed.*** [Emphasis added.][3]

132.    Accordingly, on March 5, 2002, when the Company initially announced its FY

2001 results and €12.6 billion goodwill impairment write-off under French GAAP, and again

May 28, 2002, when the Company filed its Form 20-F with the SEC, Vivendi -- by refusing to

take any goodwill impairment write-offs under U.S. GAAP -- effectively represented to investors

that ***the cash flows*** Vivendi expected to receive from the assets it acquired prior to and during the

Class Period ***equaled or exceeded*** the carrying value of such assets.

---

[3]Vivendi's December 31, 2001 financial statements also stated:

On January 1, 2002, Vivendi Universal will adopt SFAS 142, which provides new
measurement techniques for goodwill and other intangible assets resulting from
business combinations. While its evaluation is not yet complete, Vivendi
Universal expects to record a non-recurring, non-cash charge of approximately
€15 billion in the first quarter of 2002 to U.S. GAAP net income. The impairment
reflects the overall market decline which has occurred since the Vivendi, Seagram
and Canal Plus merger was announced in June 2000. The charge will be recorded
as a cumulative effect of change in accounting principle and will have no affect on
Vivendi Universal's operations.

-64-

133.     In reality, however, defendants knew or recklessly ignored from the beginning of

the Class Period that cash flows it expected from Canal Plus and other acquisitions would *not*

equal or exceed the carrying value of those entities.

134.     For example, as set forth in a complaint ("the March 2002 complaint") filed by

Canal Plus in the United States District Court for the Northern District of California in March

2002, defendants knew or recklessly disregarded that an entity known as NDS Group PLC

("NDS") had, since March 1999, "permitted and facilitated the proliferation of counterfeit smart

cards that enabled users to circumvent the security measures built into the Canal+ conditional

access system," causing Canal Plus to suffer losses over a billion dollars.  According to the

March 2002 complaint:

> Through the investment of millions of dollars and thousands of man-hours into
> research and development, Canal+ was able to implement effective security
> measures in its smart cards used to control access to digital television signals.
> ***These measures proved to be more than adequate to protect Canal+' smart
> cards from piracy <u>until March 1999,</u> when Canal+' smart card software code
> was copied and published on a web site called "DR7.com." Thereafter,
> counterfeit Canal+ smart cards began to appear on the market. The
> proliferation of these counterfeit cards resulted in massive harm to Canal+ and
> to the system operators who depend on the security of Canal+' smart cards. . . .***
>
> ***If smart card pirates obtain Canal+' new software code, the damage to Canal+
> will be irreparable.  What is released to the public cannot be put back in the
> bottle.  The market for counterfeit smart cards is massive and the harm from
> such activities is global.*** [Emphasis added.]

135.     As Canal Plus has further alleged:

> Canal+ seeks redress in this action for the damage caused by its competitor, NDS.
> Through the calculated expenditure of millions of dollars for specialized
> equipment and other resources, NDS sabotaged C+ Technologies' [Canal Plus
> Technologies'] previously unbroken security system for access to digital television
> signals.  In apparent disregard for both the law and its own reputation, NDS
> caused the development of counterfeit "smart cards," permitting a theft of digital

-65-

**JA509**

television on a massive scale. *Canal+ estimates that Defendants' illegal conduct has caused it harm in excess of $1,000,000,000.*

$$*\quad*\quad*$$

C+ Technologies has spent substantial time and money developing countermeasures to combat each type of pirate smart card that resulted from the publication caused by NDS. These countermeasures are created by a team of C+ Technologies engineers and then tested and broadcast by the digital television operators to stop unlawful television viewing by counterfeit card consumers. *The countermeasures, however, are quickly made obsolete by new versions of software for the counterfeit cards that pirates make available after analyzing the countermeasures. Counterfeiters are able to quickly and effectively respond to each new countermeasure because they have access to the UserROM code published on DR7.com.* C+ Technologies cannot stop this counterfeiting without implementing a fundamental change in the design of the smart card. At enormous expense, C+ Technologies is currently developing a new smart card design and will soon transition its existing network to the new design. This transition will be consuming and expensive because each and every legitimate smart card will have to be exchanged.

*The mass production of counterfeit C+ Technologies <u>smart cards has damaged not only Groupe Canal+'s direct revenue</u> through its digital television operators, <u>but has also hurt the sales efforts</u> of C+ Technologies and Canal+ USA. Conditional access system competitors, especially NDS, use the existence of counterfeit C+ Technologies cards as a competitive weapon in the sales process among content providers and system operators.* For example, Canal+ has encountered competitors, including NDS, pointing out to customers and potential customers in the United States and elsewhere throughout the world, the breach of C+ Technologies' security schemes as evidence that Canal+ cannot guarantee the integrity of its systems. In highlighting this supposed security breach, Defendants have deceptively failed to disclose that the breach exists solely because of Defendants' own unlawful sabotage.

*As a result of the counterfeiting, Canal Plus has lost sales opportunities and has lost customers to its competitors.* NDS has also used the counterfeiting to attempt to disrupt Canal Plus' relationships with existing customers.

*Another loss occasioned by NDS to Groupe Canal Plus is the loss of pay per view subscriptions.* One common type of counterfeit access is a modification of a legitimate smart card. These cards, commonly referred to as "MOSC" cards (*i.e.* "Modified Official Smart Cards"), are legitimate cards, sometimes with valid basic subscriptions, that have been altered so they grant their owners rights that they have not purchased. Some MOSC cards grant free access to upgraded packages or to every subscription channel; others have a number of pay per view television "credits" for which the owner has not paid. These cards did not exist

-66-

before the publication on DR7.com and but for that publication, they would not have been produced. ***The widespread use of MOSCs has caused Group Canal Plus and pay television operators from the Canal Plus group to lose revenues from premium programs as subscribers are able to have their smart cards altered to receive premium programs without paying for them.*** [Emphasis added.]

This known piracy of Canal Plus' technology confirms that Vivendi's goodwill was overstated long before the end of FY 2001, when Vivendi first recorded a *€ 6.0 billion* impairment in the value of goodwill on its acquisition of Canal Plus.

136.    Similarly, according to a declaration filed on May 13, 2002 in connection with Canal Plus' action against NDS, Jean-Marc Racine, the Director of Marketing for Canal Plus, and former CEO of Canal Plus, stated:

> *[J]ust as Canal+ was getting a foothold in the U.S., the piracy of our conditional access system became known and Canal+' efforts to gain U.S. market share, based out of Milpitas and later Cupertino, were negatively impacted. A company's reputation, as well as market perception of the quality of its product, is important in order to win new business, and the piracy of MediaGuard had a negative impact on Canal+.*
>
> I had several experiences with Canal+ customers that to me evidence the impact of the piracy of MediaGuard on Canal+' Northern California operations. For example, Canal+ Technologies, Inc. expended a great deal of resources trying to win a contract with Cablevision in New York. We lost this contract to NDS, and Cablevision told us that it was choosing NDS because NDS knew how to combat piracy better than Canal+. In another instance, I believe that NDS actively flaunted the hacking of Canal+' conditional access system when it was in competition with Canal+ to win a full end-to-end system contract from RCN, an over-builder based in Princeton, New Jersey, which has significant operations in major U.S. cities, including San Francisco. Canal+ Technologies, Inc.'s only real competition for the RCN business was NDS. Several times, RCN, which was in contact with NDS at the time, mentioned the piracy of MediaGuard that had occurred after our codes were published on DR7. On May 29, 2001, RCN asked us to comment on several articles and other information contained on web sites regarding the hacking and counterfeiting of Canal+' smart cards. . . . This set of articles is extensive and had to take more than a few hours to prepare. It was sent by an RCN engineer who I believe was also in contact with NDS in this competition with Canal+. RCN asked us to justify why there was a piracy

-67-

**JA511**

problem with our smart cards and told us that NDS had a much better solution and no piracy problem in Europe. RCN postponed their decision on selecting a supplier for a new end-to-end system, but I believe that the piracy problem caused confusion and created doubts at RCN about the performance and quality of Canal+' products.

*Since then, Canal+ Technologies, Inc. has successfully won only one contract in the United States*, WinFirst in Sacramento. As the piracy of MediaGuard became known, we have put management time and efforts into reassuring the customer. We had to set up a Security Committee and explain to the customer how to fight piracy, the legal actions taken in Europe, and the engineering steps that we would use and were using to combat piracy. These efforts would not have been needed if MediaGuard had remained secure. The security problems associated with our conditional access system[s] have had a negative impact on the sales efforts in the United States of Canal+ Technologies, Inc. based in Cupertino. [Emphasis added.]

137. In addition, on March 2, 2001, *New Media Markets* reported:

Some estimates put the level of piracy as high as 30 per cent of the pay-television subscriber base in Western Europe.

\* \* \*

The impact of piracy was made clear last month by Spanish pay-television group Sogecable, which runs both the Canal Satelite Digital digital-satellite platform and the Canal Plus Espana premium service. The company, which has just over two million subscribers, said that pirate cards were being used by between 100,000 and 300,000 homes in Spain. *This is hurting the premium channel and pay-per-view services in particular.* [Emphasis added.]

138. Despite the foregoing, when Vivendi reported its results for the quarter ended

March 31, 2002, the Company disclosed:

Canal+ Premium Channel revenue fell 3% in the quarter because of lower advertising revenue and lower subscription revenue owing to lower average analogue subscribers.

In truth and in fact, Canal Plus Premium Channel revenue was materially adversely affected by

the undisclosed piracy of Canal Plus' technology noted above.

139.     Moreover, although defendants caused Vivendi to belatedly record goodwill impairments totaling €16.6 billion in the first quarter of 2002 under U.S. GAAP -- after having taken *no* impairment charges under U.S. GAAP in FY 2001 -- defendants downplayed the significance of these write-offs by attributing them to the adoption of a new U.S. GAAP accounting standard, SFAS No. 142, under which impairment is principally evaluated by reference to cash flow impairment.[4] By artfully delaying any recognition of goodwill impairment under U.S. GAAP until after Vivendi had adopted SFAS No. 142, defendants artfully avoided having to admit the fact that Vivendi's expected cash flows from its acquisitions had been materially impaired well before its adoption of the new accounting standard.

140.     In addition, during 2000 and 2001, the world-wide economy suffered significant contraction and retrenchment, and experienced a dramatic slowdown in the Internet, pay TV and telecommunications sectors.  In fact, shortly after Vivendi issued its 2001 year end financial results, Moody's downgraded Vivendi's debt out of concerns about the Company's ability to service its debt as it became due.

141.     Moreover, after Messier and Hannezo left the Company, ***Vivendi recorded an additional € 3.8 billion impairment in the value Canal Plus' goodwill at the end of the first half of 2002 under French GAAP, when Canal Plus actually reported revenue growth of 8% during this period.***  The fact that Vivendi's new management took additional write-offs of goodwill at Canal Plus during a period when Canal Plus' business was actually improving is

---

[4]Pursuant to SFAS No.142, the fair value of a reporting unit is compared to its carrying amount.  If the fair value of a reporting unit exceeds its carrying amount, goodwill of the reporting unit is considered not impaired   If the carrying amount of reporting unit's goodwill exceeds the implied fair value of that goodwill (as defined), an impairment loss shall be recognized in an amount equal to that excess.

further evidence that the impairment recorded in the value of Canal Plus' goodwill in the second half of 2002 should have been taken earlier.

142.    The reported value of Canal Plus' assets on Vivendi's balance sheet was also materially and improperly inflated in other respects.  For example, in 1999, Canal Plus entered into contracts with five French football (soccer) league clubs:  Monaco, Lyon, Lens, Bordeaux and Paris-St. Germain.  These agreements obligated Canal Plus to pay € 250 million over the next five years for "marketing rights" related to those teams, and these rights were reported as assets in Vivendi's financial statements.

143.    However, according to a January 29, 2001 memo that was prepared shortly after Vivendi acquired Canal Plus in December 2000, and that was reviewed by defendant Hannezo, the purported "marketing rights" had no economic benefit to Canal Plus because the rights primarily at issue turned out to belong to the football league, rather than to the individual clubs.  The memo also stated that the contracts had not been properly authorized by Canal Plus' board.  The memo further warned that, given the lack of economic benefit that could be documented in connection with these contracts, the contracts could put Vivendi in a "difficult" position with respect to the SEC and U.S. GAAP reporting requirements.

144.    Pursuant to U.S. GAAP, assets are probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events.  Concepts Statement No. 6.  As described in the January 21, 2001 memo, however, there were no meaningful economic benefits flowing from these five accounts.

145.    Accordingly, the marketing rights in the amount € 250 million, reported as assets in Vivendi's financial statements were not *bona fide* "assets" at all, and were required to be

-70-

written-off and charged to expense in Vivendi's year-end financial statements for FY 2000 (which were filed with the SEC on July 2, 2001). Nonetheless, Vivendi improperly failed to do so in violation of U.S. GAAP.

        (ii)    **US Filter**

146.    Just as it did with Canal Plus, Vivendi also overstated its reported goodwill on its US Filter acquisition. For example, when Vivendi acquired US Filter, it paid approximately 46 times US Filter's 1998 earnings. As a result, Vivendi recorded approximately € 4.6 billion in goodwill on the US Filter acquisition. However, as defendants knew or recklessly ignored, Vivendi's reported goodwill on US Filter was materially inflated during the Class Period because, among other things (a) US Filter's operating results were much less than reported by Vivendi as US Filter was falsely inflating its revenue, as noted below at ¶¶ 169-177, and (b) because companies comparable to US Filter were sold during the Class Period at prices significantly less than that paid by Vivendi. (For example, although Vivendi paid 46.5 times US Filter's purported operating profit when Vivendi acquired it in September 1999, in 2001 the German conglomerate RWE purchased a comparable U.S. water utility, American Water, for only about 16 times earnings before interest and taxes). These events and circumstances confirmed that US Filter's goodwill was impaired under US GAAP prior to the fourth quarter of 2001. In the end, Vivendi recorded a staggering € 2.6 billion impairment in the value of US Filter's assets, but, in violation of U.S. GAAP, did not record this impairment until the end of the fourth quarter of 2001.

147.    After Vivendi's board ousted Messier and Hannezo, Vivendi's new management also implicitly admitted that the goodwill impairments that prior management had recognized for entities other than Canal Plus and US Filter were also insufficient. For example, for the three

-71-

months ended June 30, 2002, Vivendi reported additional goodwill impairments (exclusive of those pertaining to Canal Plus) totaling *€ 7.2 billion on a French GAAP basis* on August 14, 2002. In contrast, the Company's financial statements for the three months ended March 31, 2002 (prepared on a French GAAP basis) showed that no charge for goodwill impairment was recognized during the March 31, 2002 quarter.

     **(b)**     **Vivendi's Improper Consolidation Of Investments**

     148.     Vivendi also improperly inflated its 1999, 2000 and 2001 revenues and operating income by consolidating certain investments in which the Company possessed less than a 50% ownership interest.

     149.     Specifically, although Vivendi only owned a minority of the shares of the French telecommunications company Cegetel and the Moroccan telecommunications company Maroc Telecom, the full results of Cegetel were included in Vivendi's consolidated financial statements for 1999, 2000 and 2001 and the full results of Maroc Telecom were included in Vivendi's consolidated financials for 2001.

     150.     In the footnotes to its 1999, 2000 and 2001 financial statements filed with the SEC on Form 20-F, Vivendi disclosed the full consolidation of the following companies:

| OWNERSHIP INTEREST | | | |
|---|---|---|---|
| **Name** | **1999** | **2000** | **2001** |
| Cegetel & Subsidiaries | 44% | 44% | 44% |
| Maroc Telecom | -- | -- | 35% |

(*See* Vivendi's 1999 20-F Pages 183-184; 2000 20-F Pages F39-F40; 2001 20-F Pages F48-F-49.)

-72-

151.    U.S. GAAP, in Accounting Research Bulletin ("ARB") No. 51, provides:

The purpose of consolidated statements is to present, primarily for the benefit of the shareholders and creditors of the parent company, the results of operations and the financial position of a parent company and its subsidiaries essentially as if the group were a single company with one or more branches or divisions. There is a presumption that consolidated statements are more meaningful than separate statements and that they are usually necessary for a fair presentation when one of the companies in the group directly or indirectly has a controlling financial interest in the other companies.

152.    ARB No. 51, as amended by FASB's SFAS No. 94, also provides, in pertinent part, that:

The usual condition for a controlling financial interest is ownership of a majority voting interest, and, therefore, as a general rule ownership by one company, directly or indirectly, of over fifty percent of the outstanding voting shares of another company is a condition pointing toward consolidation.

153.    In addition, the Emerging Issues Task Force ("EITF") of the FASB has issued Abstract No. 96-16, which provides accounting guidance for when minority shareholders possess certain rights which may overcome the presumption that consolidation requires a majority voting interest in an investee. In this regard, EITF No. 96-16 provides, in pertinent parts:

The Task Force believes that minority rights (whether granted by contract or by law) that would allow the minority shareholder to effectively participate in the following corporate actions should be considered substantive participating rights and would overcome the presumption that the investor with a majority voting interest should consolidate its investee:

1.    Selecting, terminating, and setting the compensation of management responsible for implementing the investee's policies and procedures

2.    Establishing operating and capital decisions of the investee, including budgets, in the ordinary course of business.

The Task Force considered the above to be illustrative of substantive participating rights, not necessarily all-inclusive. The Task Force believes that the rights noted above are participating rights because, in the aggregate, the rights allow the

-73-

**JA517**

minority shareholder to effectively participate in decisions that occur as part of the ordinary course of the investee's business and are significant factors in directing and carrying out the activities of the business. Individual rights, such as the right to veto the termination of management responsible for implementing the investee's policies and procedures, should be assessed based on the facts and circumstances to determine if they are substantive participating rights in and of themselves. However, minority rights that appear to be participating rights but that by themselves are not substantive (see "Factors to Consider" and Exhibit 96-16A) would not overcome the presumption of consolidation by the investor with a majority voting interest in its investee. The likelihood that the veto right will be exercised by the minority shareholder should not be considered when assessing whether a minority right is a substantive participating right.

154.    In addition, under French GAAP, exclusive control and the power to direct the financial and operational policies of an enterprise is required in order to consolidate results. Furthermore, French GAAP states that enterprises are *excluded* from consolidation where severe and long lasting restrictions substantially call into question the control or influence exercised over the enterprise. (*See* Regulation 99-02 Section 1002, 101.)

155.  .  Vivendi did not possess controlling financial interests in, at least, its Cegetel and Maroc Telecom subsidiaries and therefore should not have consolidated the financial statements of such companies with its own. In so doing, Vivendi overstated its reported revenue, operating income and EBITDA and inflated its reported growth rates throughout the Class Period.

156.    Consolidating the financial statements of these investments was critical to defendants' scheme because it allowed Vivendi to include all of the revenues and operating income from these investments in its financial results. Indeed, this accounting practice artificially and materially inflated Vivendi's revenues and income because Vivendi did not posses control over such investments nor did it have access to their reported cash. As a result, not only was

-74-

Vivendi's revenue and earnings inflated, its liquidity crisis was much worse than portrayed in the

Company's publicly filed financial statements.

### Cegetel

157.    Vivendi stated in its December 31, 2000 20-F that:

The Company consolidates Cegetel . . . in which it owns less than 50% of the
voting shares. The Company has a direct and indirect ownership interest in
Cegetel totaling 44%. Cegetel is consolidated because, through a shareholders
agreement, the Company has a majority of the shareholder voting rights.

[T]he Company *only* consolidates the subsidiary if no other shareholder or group
of shareholders exercise substantive participating rights, which would allow those
shareholders to veto or block decisions taken by the Company." [Emphasis added.]

158.    This statement and the consolidation of Cegetel's 1999-2001 operating results were

false and misleading because Vivendi only owned 44% of Cegetel shares and it did not have

sufficient controlling financial interest in Cegetel. Indeed, the Shareholder Agreement between

Vivendi and Cegetel, as described in Vivendi's 2000 20-F, contained a key clause that blocked

Vivendi from making operating and capital decisions in the ordinary course of Cegetel's business.

159.    The clause states:

–    If all of BT, Mannesmann and Transtel dissent, *we [Vivendi] cannot cause Cegetel
     Group to*:
     –    create or acquire shares in any entity in which Cegetel Group
          or companies it controls hold less than 100% of the shares
          and voting rights; or
     –    subject to some exceptions, *acquire, dispose of, lease or
          loan a material amount of assets* or significantly reduce or
          cease *any material business operation.* [Emphasis added.]

160.    Additionally, Vivendi lacked the necessary financial control of Cegetel for it to

have access to Cegetel's cash flow. When asked about the liquidity of the Company, Vivendi's

CEO Jean-Rene Fourtou admitted in a June 26, 2002 conference call that "we do not have access

-75-

to *Cegetel* and Maroc Telecom." In an August 14, 2002 conference call with investors, Jean-Rene

Fourtou also conceded that "Vivendi cannot access the cash flow generated by the Companies it

owns less than 50% of."

161.    It was not until after the Class Period, on December 3, 2002, that Vivendi

announced that it *would* purchase sufficient number of shares to give it *a majority stake* in

Cegetel, and to finally give Vivendi the necessary financial control over Cegetel's cash flow.

162.    As a result of Vivendi improperly consolidating Cegetel's financial statements,

Vivendi's reported revenues were overstated by € 3.9 billion, € 5.1 billion and € 6.4 billion for

the years ended 1999, 2000, and 2001, respectively.

**Maroc Telecom**

163.    Vivendi disclosed in its 2001 20-F that:

> In the course of the partial privatization of Maroc Telecom, Vivendi
> Universal was chosen to be a strategic partner in the purchase of an interest in
> Morocco's national telecommunications operator for approximately € 2.4 billion.
> The transaction was finalized in April 2001, at which time Maroc Telecom began
> to be consolidated in the accounts of Vivendi Universal, as we obtained control
> through majority board representation and share voting rights. As a leader in
> Moroccan telecommunications, Maroc Telecom operates 1.2 million fixed lines,
> has 3.7 million GSM clients and generated revenues of approximately € 1.4 billion
> in 2001.

164.    Vivendi also disclosed in its 2001 Form 20-F that no other shareholder or groups

of shareholders exercise substantive participatory rights, which would allow them to vote or block

decisions taken by Vivendi Universal.

165.    This disclosure and the consolidation of Maroc Telecom's 2001 results were false

and misleading because Vivendi only owned 35% of Maroc Telecom, and because the remaining

-76-

65% was held by a single entity – the Moroccan government. The Moroccan government did not conduct its operation based on the views of Vivendi.

166.    Additionally, under French GAAP, at least a 40% ownership interest is required for consolidation (Regulation 1002), but Vivendi only had a 35% interest.

167.    As with Cegetel, Vivendi lacked the necessary financial control of Maroc Telecom for it to have access to Moroc Telecom's cash flow.  When asked about the liquidity of the Company, Vivendi's CEO Jean-Rene Fourtou admitted in a June 26, 2002 conference call that "we do not have access to Cegetel and *Maroc Telecom.*" [Emphasis added.]  In an August 14, 2002 conference call with investors, Jean-Rene Fourtou similarly stated that "Vivendi cannot access the cash flow generated by the companies it owns less than 50 percent of."

168.    As a result of Vivendi improperly consolidating Maroc Telecom's financial statements, Vivendi's reported revenues were overstated by  € 1.4 billion in 2001.

**(c)    Vivendi's Improper Recognition Of Revenue**

169.    In furtherance of its scheme to inflate its operating performance, Vivendi, in violation of U.S. GAAP, improperly recognized revenue from,  at least, its US Filter subsidiary.

170.    U.S. GAAP  provides that revenue should not be recognized until it is realized or realizable and earned.  FASB Concepts Statement No. 5, ¶ 83.  The conditions for revenue recognition ordinarily are met when persuasive evidence of an arrangement exists, delivery has occurred or *services have been rendered*, the seller's price is fixed or determinable, collectibility of the sales price is reasonably assured and when the entity has substantially performed the obligations which entitle it to the benefits represented by the revenue.  Generally, revenue should not be recognized until the earnings process is complete.  SEC Staff Accounting Bulletin

-77-

("SAB") No. 101; Concept Statement Nos. 2 and 5; SFAS No. 48; ARB No. 43; APB Opinion

No. 10; and SOP 97-2.

171.    In fact, the SEC's SAB No. 101 specifically provides that:

Supply or service transactions may involve the charge of a nonrefundable initial fee with subsequent periodic payments for future products or services. The initial fees may, in substance, be wholly or partly an advance payment for future products or services. In the examples above, the on-going rights or services being provided or products being delivered are essential to the customers receiving the expected benefit of the up-front payment. Therefore, the up-front fee and the continuing performance obligation related to the services to be provided or products to be delivered are assessed as an integrated package. In such circumstances, *the staff believes that up-front fees, even if nonrefundable, are earned as the products and/or services are delivered and/or performed over the term of the arrangement or the expected period of performance.* [Emphasis added; footnotes omitted.]

172.    In its December 31, 2001 Form 20-F, the Company disclosed the following with

respect to its accounting policy associated with the recognition of environmental service revenue:

Revenues on public service contracts are recognized as services are provided. Amounts billed and collected prior to services being performed are included in deferred revenues.

173.    In violation of GAAP and its publicly disclosed revenue recognition policy,

Vivendi, throughout the Class Period, improperly recognized anticipated revenue from multi-year

public service contracts upon signing on the contracts. In so doing, Vivendi materially overstated

its reported operating results during the Class Period in violation of U.S. GAAP and its publicly

disclosed policy of revenue recognition.

174.    For example, according to a former officer of U.S. Filter, during the Class Period,

Vivendi Environmental, through its U.S. Filter subsidiary, materially overstated its operating

results by employing a practice internally referred to as "booking backlog." Pursuant to such

practice, *US Filter improperly recognized and reported the entire dollar amount of long-term,*

-78-

*fixed priced contracts as revenue upon the signing of the contract, and, according to a former*
*officer of U.S. Filter, its revenue on major contracts was overstated due to such practice "by as*
*much as 10 times." Vivendi Environmental accounted for approximately 51% of Vivendi's*
*reported revenues and operating income during the year ended December 31, 2001, and its U.S.*
*Filter subsidiary reported EURO 1.32 billion in total revenue in 2000.*

175.    U.S. GAAP, in APB No. 22, ¶7, provides that the usefulness of financial
statements in making economic decisions depends significantly upon the user's understanding of
the accounting policies followed by a company, and further states that information about the
accounting policies adopted by a reporting company is "essential" for financial statement users.
(APB No. 22, ¶ 8)  Accordingly, U.S. GAAP requires that financial statements identify and
describe important judgments as to the appropriateness of principles relating to the recognition of
revenue.  (APB No. 22, ¶12)

176.    During the Class Period, Vivendi materially inflated its operating results and
violated its stated policy of revenue recognition and U.S. GAAP when it recognized and reported
revenue on such transactions because the "revenue" was not earned, services were not rendered
and the Company had not yet substantially performed the obligations which entitled it to the
benefits represented by the revenue.  In so doing, investors were uninformed about actual
accounting policies that were "essential" to an informed investment decision.

177.    Indeed, Vivendi's management directed or knowingly condoned and encouraged
the process in which employees would improperly record revenue, thereby inflating reported
revenue.  Indeed, the term "booking to backlog" was a phrase that was widely used among US

-79-

Filter personal, and the phrase was even included in monthly reports given to the Executive Board of Vivendi Environmental.

178.    In addition to the accounting improprieties stated above, Vivendi presented its financial statements during the Class Period in a manner which also violated at least the following provisions of GAAP:

(i)    The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, ¶ 34);

(ii)    The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶ 40);

(iii)    The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶ 50);

(iv)    The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those

-80-

expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶ 42);

      (v)    The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58-59);

      (vi)    The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶ 79);

      (vii)    The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶ 95, 97).

    179.    The foregoing accounting improprieties caused Vivendi to issue financial statements that materially falsified its financial performance to the detriment of unsuspecting investors and further masked the problems the Company was experiencing during the Class Period. In filling financial statements with the SEC which did not conform to the requirements of U.S. GAAP, the defendants repeatedly disseminated financial statements of Vivendi which were presumptively misleading and inaccurate. The accounting machinations detailed herein further evidence the defendants intent to deceive investors during the Class Period and misrepresent the truth about the Company and its business, operations and financial performance to detriment of those who relied on them.

180. The Company's Class Period annual and interim financial statements filed with the SEC were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a materially adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations.

## DEFENDANTS' FAILURE TO DISCLOSE MATERIAL ADVERSE FACTS CONCERNING VIVENDI'S SEVERE LIQUIDITY PROBLEMS

181. For the reasons set forth in the immediately preceding ¶¶ 119 to 180, defendants materially overstated Vivendi's financial performance during the Class Period in violation of GAAP.

182. However, during the Class Period, defendants also repeatedly made material misstatements and omissions concerning the Company's liquidity. Unbeknownst to investors or the financial markets, and contrary to the defendants' repeated assurances that the Company was in strong financial condition, Vivendi's implementation of its growth-by-acquisition strategy caused it to overpay for businesses and saddled the Company with a huge debt burden that the operations of the acquired businesses could not satisfy.

183. As a result, Vivendi was under great strain to met its obligations in the ordinary course as they came due. The causes of Vivendi's liquidity problems included the following:

(a) **Inability to generate expected cash flows from acquired companies.** As set forth in detail above in the section discussing Vivendi's failure to timely recognize impairments to goodwill (*see* ¶¶ 124-147), cash flows from a number of Vivendi's largest acquisitions (including, *inter alia*, Canal Plus, Universal and U.S. Filter) fell dramatically

-82-

## JA526

short -- by billions of dollars -- of meeting the implied cash flow expectations that would

have been necessary to justify Vivendi's publicly reported valuation of its "goodwill."

Indeed, as described generally above, Vivendi's financial performance fell sufficiently

short of the expectations that defendants had fostered during the Class Period that

defendants caused Vivendi to engage in a variety of other GAAP violations to conceal the

Company's actual results.

      (b)    **Vivendi's Undisclosed 2001 Stock Buybacks**. Further exacerbating

Vivendi's cash flow situation was defendant Messier's undisclosed and massive stock buy-

back program, which -- unbeknownst to investors -- caused the Company to spend

approximately $6.3 *billion* of the Company's cash on acquiring Vivendi shares. As later

reported in the *Wall Street Journal* on October 31, 2002:

> Mr. Messier, a former top investment banker with Lazard LLC, was
> famously fond of deal making. But now it turns out he pursued many more
> deals than has been publicly known. ***More important, he spent billions of
> dollars buying back Vivendi stock on the market last year without
> consulting his CFO or the board, according to people familiar with the
> situation. Trying to prop up the stock price, he instead only sent
> Vivendi's debt soaring.***
> *   *   *
> The board signed off on Mr. Messier's acquisitions. But it did so without
> knowing the full extent of his spending spree, current and former board
> members say. That is because Mr. Messier didn't tell the board about his
> single biggest expenditure: the purchase of 104 million Vivendi shares, or
> nearly 10% of the company's equity, on the stock market during 2001. His
> purpose was to prop up the share price. The cost: $6.3 billion.
>
> Shareholders had earlier approved a resolution allowing Vivendi to buy
> back up to 10% of its shares. But current and former directors say they
> expected to hear beforehand about such massive purchases.
> *   *   *
> Mr. Hannezo opposed the stock purchases as a waste of cash. . . . This
> resulted in Mr. Messier trying to circumvent his CFO on the buybacks. The

-83-

ex-chairman placed his stock orders by phone with two mid-level employees in the finance department, Hubert Dupont Lhotelain and Francois Blondet, according to a person familiar with the matter. . . .

In early December 2001, the CFO finally intervened by forbidding his subordinates to take Mr. Messier's phone calls, the person familiar with the situation says. Mr. Hannezo set up a formal process to slow Mr. Messier down, requiring that the chairman request buybacks in writing, along with some justification.

\* \* \*

By December, the buybacks had taken their toll: Vivendi was running out of cash, according to Mr. Hannezo's memo to the COB. [Emphasis added.]

(c) **Undisclosed Off-Balance Sheet Liabilities**. During the Class Period, defendants also misled investors about an off-balance sheet liability that further threatened Vivendi's liquidity and ultimately cost Vivendi hundreds of millions of dollars and impaired Vivendi's liquidity crisis. In late 2000 and 2001, defendants wagered on the future success of the Company by selling put options to raise cash to fund executive compensation. These put options obligated Vivendi to purchase in the future at least 22.8 million of its own shares, or approximately 2% of all outstanding Vivendi stock, at an average price of €69. Even as Vivendi's share price dropped during 2001 and the first half of 2002, making it increasingly likely that the Company would take a staggering loss on the options, defendants continued to conceal the true nature and extent of these liabilities, and to misrepresent Vivendi's true liquidity condition. Moreover, even when defendants finally made limited disclosures of its put obligations in the spring of 2002, the disclosures were woefully inadequate. For example:

(i)     After being criticized by the French press for concealing the risk connected to the options, Vivendi claimed that defendant Hannezo went over the put options with analysts at an accounting workshop March 6, 2002 in Paris.

-84-

**JA528**

However, as the May 1, 2002 edition of *The Wall Street Journal* reported,

**"analysts who were present or listened in said Vivendi glossed over the issue,"**

[Emphasis added] and Vivendi admitted that discussion of the puts was "easy to

miss" at the accounting workshop. Moreover, the slide presentation from this

workshop, belatedly filed with the SEC as an exhibit to Vivendi's May 2, 2002

Form 6-K did not mention Vivendi's put obligations.

      (ii)    On April 15, 2002, Vivendi disseminated its annual report on Form

6-K for FY 2001 which contained a translation of its 2001 year end financial

statements. This translation also made only vague reference to Vivendi's put

obligations:

> In connection with the sale of puts on its shares, Vivendi Universal
> had a commitment, at December 31, 2001, to buy 19.7 million
> shares at exercise prices ranging from €60.40 to €80.00 in 2002 and
> 3.1 million shares at an exercise price of €50.50 in January 2003.

Vivendi's annual report therefore did little to clarify the details of Vivendi's risks

and obligations in connection with the put options. For example, other than

specifying that Vivendi could be forced to purchase 3.1 million shares in January

2003, the report failed to inform investors of the scope, if any, of the Company's

obligations with respect to the puts after December 31, 2001. The report also

failed to comment on whether the options were likely to be exercised given the

decline in Vivendi's stock price, or their potential adverse impact on Vivendi's

liquidity.

      (iii)   On April 18, 2002 (as later reported by the May 1, 2002 *Wall Street

Journal*) Laura Martin, who heads Vivendi's investor-relations departments, sent

-85-

**JA529**

an e-mail to selected analysts that purported to clarify Vivendi's obligations with

respect to the put options:

> In a sign that Vivendi itself was conscious it hadn't made clear
> enough the consequences of the put options, Laura Martin, who
> heads the company's investor-relations department, sent an e-mail to
> four analysts on April 18 spelling the put options out clearly.
>
> In the e-mail, Ms. Martin said Vivendi had 18 million put options
> outstanding that the company sold to undisclosed parties for 12
> euros each and that carry an exercise price of 69 euros. She
> estimated the impact on the company's balance sheet at 50 million
> euros to 1.2 billion euros. The e-mail went on to say that, though
> previously raised at the [March 6, 2002] accounting workshop, the
> put options "were easy to miss."

Still, Martin's "selective disclosure" failed to state the timetable for Vivendi's

future obligations, preventing analysts and investors from making a reasonable

assessment with regard to Vivendi's cash flow for the immediate future. In

addition, Ms. Martin's range of potential liability was rendered meaningless by its

impossibly large scope and failure to reference when the obligation would come

due.

    (iv)    It was therefore not until May 28, 2002, in its Form 20-F for the

year ending 2001, that Vivendi began to inform investors about its true potential

adverse effects ensuing from the put options:

> Except for one put sold in 1998, Vivendi Universal in 2001 sold
> puts to banks on 19.7 million ordinary shares at exercise prices
> ranging from €60.40 to €80.00 in 2002 and 3.1 million ordinary
> shares at an exercise price of 50.50 in January 2003. As of April
> 30, 2002, approximately 16 million of these puts remain
> outstanding. . . .
>
> Vivendi Universal's contingent liability relating to these puts is
> approximately €1.1 billion to settle the 16 million puts outstanding

-86-

> for cash at an average of €69 per put and approximately €540 million to settle the 16 million puts outstanding for cash by paying the banks the difference between the average of €69 per put and the market price per ordinary share of Vivendi Universal as of April 30, 2002.

A later June 7, 2002 article in the *Economist* reported that Hannezo had confirmed that Vivendi was using cash each month to buy out the costly put options.

        (v)     In its 2002 half year financial statements released August 14, 2002, Vivendi disclosed the impact its put obligations had during the first six months of 2002 alone:

> As at June 30, 2002 and December 31, 2001, Vivendi Universal had outstanding obligations on 13.9 million and 22.8 million shares respectively. The average exercise prices were €69 and €70 respectively, giving a potential commitment of €953 million and €1,597 million respectively. These put options are only exercisable on the specific date of the option and expire at various dates during 2002 and the first quarter of 2003.
>
>              *   *   *
>
> The cost to Vivendi Universal during the first half of 2002 by option holders exercising their rights amounted to €239 million.

### The Magnitude of the Undisclosed Liquidity Problem

      184.    As subsequently reported by the *Wall Street Journal* in an article entitled "How Messier Kept Cash Crisis at Vivendi Hidden For Months: Media Giant Was At Risk Well Before Investors Knew" and dated October 31, 2002, Vivendi's acquisition spree, together with the other factors referenced in the preceding paragraphs, had put Vivendi on the brink of catastrophe:

> On Dec. 13, [2001], Guillaume Hannezo sent Jean-Marie Messier, chairman of Vivendi Universal SA, a desperate handwritten plea.
>
> "I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat," wrote Mr. Hannezo, the company's chief financial officer. "All I ask is that all of this not end in shame."

-87-

That very day, unknown to investors and the Vivendi board, the company had narrowly averted a downgrade by credit-rating agencies, which would have made it difficult to borrow money and plunged the company into a cash crisis. Mr. Hannezo (pronounced AN-ZO) implored his boss and longtime friend to take serious steps to reduce Vivendi's ballooning debt.

When the company's board met the next day to consider whether to approve a roughly $10 billion acquisition of USA Networks Inc.'s TV and film businesses, Mr. Messier made no mention of the close call with the rating agencies. Instead, when a director asked about Vivendi's financial profile, Mr. Messier said the company had no problem, according to two directors who were there.

The board endorsed the USA Networks deal, buying Mr. Messier's pitch that it would help complete Vivendi's transformation from a onetime water utility into an entertainment giant. He boasted that the company would be able to distribute the movies and music made by its Universal Studios and Universal Music units by means of cellular devices, as well as by satellite, cable and pay television.

But Vivendi was already in dire financial straits. The USA Networks deal, along with a $1.5 billion investment in satellite-TV operator EchoStar Communications Corp., in fact signaled the beginning of the end for Mr. Messier. The boy wonder of the French business establishment was ousted seven months later in July, after directors discovered the company was skirting close to a bankruptcy filing.

As new management struggles to salvage the French conglomerate, it has become clear that Vivendi came close to financial disaster far earlier than previously thought. ***That picture is starkly at odds with the one repeatedly presented by Mr. Messier to investors and his board.***

185.    Similarly, citing an article first appearing in *Le Monde*, *Bloomberg* reported on

May 14, 2002 that Vivendi was close to insolvency at the end of 2001:

Vivendi Universal SA, the world's second-largest media company, was close to insolvency at the end of 2001 after delays in planned asset sales, French daily Le Monde said, without citing anyone.

Delays in the sale of the Seagram liquor unit and a French magazine business caused a "serious cash crisis" at the Paris-based company, which faced payments of about 10 billion euros ($9 billion) at the end of last year, the paper said. Today, Vivendi's businesses "barely produce the cash needed to pay the bills," according to the report. . . .

Vivendi's cash woes help explain why the company sold 55 million of its own

-88-

**JA532**

shares in January, 9 percent of Vivendi Environnement SA, as well as its stake in AOL Europe and British Sky Broadcasting Plc, Le Monde said. Since the beginning of the year, Vivendi shares have lost half their value.

186.    Although defendants' denied any pending liquidity crisis in response to the *Le*

*Monde* report and reassured investors during the spring and early summer of 2002 that Vivendi

could meet its obligations for the next 12 months, in reality the Company continued to teeter on

the edge of bankruptcy. As the October 31, 2002 *Wall Street Journal* article further reported:

In May [2002], Fehmi Zeko, head of the media group for Citigroup's Salomon Smith Barney investment bank, met with Mr. Bronfman in New York and told him what the bank had learned during its financial analysis in Paris. By then, news of Vivendi's costly put-option obligations had surfaced in the press, and Moody's Inventors' Service had downgraded Vivendi's debt to just a notch above "junk" level.

After the meeting, Mr. Bronfman phoned Mr. Hannezo, who denied there was a problem, according to people familiar with the conversation. Mr. Bronfman nevertheless insisted that Vivendi bring in an outside firm to analyze its cash situation. At a meeting in New York on May 29, the board hired Goldman Sachs.

*On June 24, the eve of Vivendi's next board meeting in Paris, Goldman Sachs bankers gave a detailed rundown of their conclusions to Vivendi's top executives and a handful of directors, including Mr. Bronfman, according to people familiar with the situation. The investment bank outlined four scenarios, one of which showed Vivendi having to file for bankruptcy protection as early as September or October. That day, Vivendi's share price dropped 23%.*

After Goldman Sachs' grim presentation, Mr. Messier asked Mr. Bronfman to come to his office. Mr. Bronfman told Mr. Messier he should resign, as it was now clear Vivendi faced a severe cash crisis, according to a person familiar with the conversation.

                                    *    *    *

At the COB's request, Mr. Messier put out a detailed debt-and-liquidity statement the next morning, June 26. *Echoing four upbeat press releases he had issued in previous weeks, Mr. Messier said, "Vivendi Universal is confident of its capacity to meet its anticipated obligations over the next 12 months."* That afternoon, he told analysts on a conference call that he planned to remain Vivendi's chairman for 15 more years.

                                    *    *    *

*At a French parliamentary hearing last month, Jean-Rene Fortou, Vivendi's new chairman, was asked about Vivendi's finances when he took the company's reins July 3. "Well, if Mr. Messier had stayed, the company would have gone bankrupt within 10 days," he said.* [Emphasis added.]

187. Similarly, on September 27, 2002, the *AFX News* reported:

Vivendi Universal chairman Jean-Rene Fourtou said the company would have been forced to declare bankruptcy within 10 days if Jean-Marie Messier had not resigned, according to a report in Le Figaro.

188. On December 13, 2002, the *Associated Press* reported, based on an article first appearing in *Le Monde*, that defendant Hannezo admitted that 2001 was marked by a series of errors, including underestimating the debt problem:

Electronic mail seized in an investigation of alleged financial irregularities at Vivendi Universal and other documents show escalating tension amid a growing debt crisis that led to the fall of flamboyant Chairman Jean-Marie Messier.

Board member Edgar Bronfman Jr. of Canada's Seagrams empire, which was purchased by Vivendi in 2000, warned Messier in an e-mail that he could be courting danger with his "very costly personal shows," according to Friday's edition of the newspaper Le Monde.

And former Financial Director Guillaume Hannezo, in a note to France's stock exchange watchdog, said Messier had turned Vivendi into a "permanent deal machine," while an "urban guerrilla atmosphere" gripped a divided board, the newspaper said.

\* \* \*

Hannezo, the former finance director, said in his 20-page report to the COB that 2001 was marked by the "accumulation of a series of errors," including underestimating that the debt problem, according to Le Monde.

\* \* \*

Hannezo, a key figure in the COB investigation, speculated that Vivendi could have been spared its debt mountain in 2001 "had it resolved to sell before buying. . . . Unfortunately, it oriented itself toward the inverse choice, satisfying itself with potential riches," he wrote. Vivendi's shares have tumbled around 75 percent this year.

-90-

**JA534**

## ADDITIONAL SCIENTER ALLEGATIONS

189.    As alleged herein, defendants acted with scienter in that defendants knew or

recklessly disregarded that the public documents and statements issued or disseminated in the

name of the Company were materially false and misleading; knew or recklessly disregarded that

such statements or documents would be issued or disseminated to the investing public; and

knowingly and substantially participated or acquiesced in the issuance or dissemination of such

statements or documents as primary violations of the federal securities laws. As set forth

elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true

facts regarding Vivendi, their control over, and/or receipt and/or modification of Vivendi's

allegedly materially misleading misstatements and/or their associations with the Company which

made them privy to confidential proprietary information concerning Vivendi, were active and

culpable participants in the fraudulent scheme alleged herein. Defendants knew and/or recklessly

disregarded the falsity and misleading nature of the information which they caused to be

disseminated to the investing public. Indeed, defendant Messier stated on December 6, 2000:

> "We are an Old World conglomerate that has grown by five times," says Messier
> with obvious pride. You don't do that without concentrating on margins day by
> day. At the same time we have reshaped the group and managed it on a day-to-day
> basis, the French executive explained recently at a conference organised in London
> by bankers Goldman Sachs."

190.    On May 31, 2002, it was reported that Vivendi's board established a corproate-

governance committee to monitor Messier's strategic and financial decisions. According to *The*

*National Post* on May 31, 2002, "[t]he move is an embarrassing comedown for Mr. Messier, who

once boasted he did not have to answer to anyone." The ongoing fraudulent scheme described

herein could not have been perpetrated during the Class Period without the knowledge and

-91-

complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

191.    Each defendant possessed substantial motives for misrepresenting Vivendi's financial status, operations, and prospects throughout the Class Period. The Company's ability to maintain positive credit ratings, and, therefore, its ability to obtain additional financing in the future were dependent on defendants' fraudulent scheme. Defendants were further motivated to conceal the adverse facts detailed herein in order to acquire other companies using Vivendi's artificially inflated shares and ADSs. For example, during the Class Period, in addition to consummating the Seagrams and Canal Plus acquisitions in late 2000 for a combined total of $46 billion in Vivendi common stock and ADSs, during the Class period Vivendi also financed (or partially financed), its acquisitions of, at least, USA Networks (at least $1.65 billion of the purchase price with Vivendi stock), MP3.com and Multithematiques using Vivendi's artificially inflated stock as currency.[5]

192.    Defendants were further motivated to boost Vivendi's share price because Messier made a massive bet that Vivendi shares would rise by selling put options to banks in late 2000 and 2001. The options committed Vivendi to buy back tens of millions of its shares at fixed prices in the future. On October 31, 2002, *The Wall Street Journal* discussed Messier's stock buy-backs and sales of put options:

> Mr. Messier had a special incentive to boost Vivendi's share price with the buy-backs: He had made a massive bet on the company's behalf that Vivendi shares would rise by selling "put options" to banks in late 2000. The options committed

[5]Although Vivendi engaged in literally dozens of other acquisitions during the Class Period, the terms of those transactions were typically not disclosed in detail. Accordingly, the number of Vivendi acquisitions financed in whole or in part with inflated Vivendi common stock or AdS's may well be greater than the foregoing list suggests.

-92-

Vivendi to buy back tens of millions of its shares at fixed prices in the future. If Vivendi's share price were to fall, the company could lose as much as $1.4 billion on the options. Even with the buy-backs, the share price fell in the end. So far, the put options have cost Vivendi $900 million.

193. Defendant Messier was also given a bonus for boosting Vivendi's EBITDA by more than 30 percent in 2001. On June 6, 2002, it was reported in the *New York Post*:

> Vivendi Universal Chairman and Chief Executive Officer Jean-Marie Messier, despite the sorry state of his company's stock, was given a bonus of more than $3 million for meeting an earnings goal, a filing with the Securities and Exchange Commission said.

> Messier was given the bonus, two-and-a-half times his salary, for boosting earnings before interest, taxes, depreciation and amortization by more than 30 percent in 2001. Had earnings risen more than 35 percent, Messier would have received three times his base salary as a bonus.

> Messier earned $4.8 million in bonus and salary for 2001. The chairman also got 835,000 stock options.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

194. Pursuant to their claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine such that:

    (a)    defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    (b)    the omissions and misrepresentations were material;

    (c)    the securities of the Company traded in a open and efficient markets;

    (d)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

-93-

(e)     Lead Plaintiffs and the other members of the Class and Subclasses purchased or otherwise acquired their Vivendi securities between the time defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

195.    At all relevant times, the market for Vivendi's securities was efficient market for the following reasons, among others:

(a)     Vivendi's ADSs met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market. Vivendi's ordinary shares actively traded on the Paris Bourg;

(b)     As a regulated issuer, Vivendi filed periodic public reports with the SEC and the COB;

(c)     Vivendi regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Vivendi was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

196.    As a result of the foregoing, the market for Vivendi's securities promptly digested current information regarding Vivendi from all publicly available sources and reflected such

-94-

**JA538**

information in Vivendi's stock price. Under these circumstances, all purchasers of Vivendi's

ADSs during the Class Period suffered similar injury through their purchase of Vivendi's

securities at artificially inflated prices, and a presumption of reliance applies.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

197.   The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions.  Moreover, the specific statements pleaded herein were not identified as "forward-

looking statements" when made.   To the extent that any of the statements identified herein as

materially false and misleading are held by the Court to be forward-looking statements, there were

no meaningful cautionary statements identifying important then-present factors that could, and

indeed did, cause actual results to differ materially from those in the purportedly forward-looking

statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-

looking statements pleaded herein, defendants are liable for those materially false forward-looking

statements because at the time each of those forward-looking statements was made, the particular

speaker knew that the particular forward-looking statement was false, and/or

the forward-looking statement was authorized and/or approved by an executive officer or director

of Vivendi who knew that those statements were false when made.

## COUNT I

### Violations Of Section 11 Of
### The Securities Act Against All Defendants

198.   Lead Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set

forth herein, except to the extent any allegations above contain any facts which are unnecessary or

-95-

irrelevant for purposes of stating a claim under this Section, including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of defendants other than strict liability or negligence.

199.     This Count is brought by Lead Plaintiffs Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust on behalf of the Merger Subclass, pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against all defendants. This claim does not sound in fraud and should be read to exclude any reference in the preceding paragraphs to recklessness, fraud, or intentional acts by the defendants.

200.     The Registration Statement in connection with the Merger, was inaccurate and misleading, contained untrue statements of material facts (including but not limited to, false financial results), omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

201.     Vivendi is the registrant for the shares issued in connection with the Merger. The Individual Defendants were responsible for the contents and dissemination of the Registration Statement issued in connection with the Merger and caused it to be filed with the SEC. Each of the Individual Defendants signed the Registration Statement.

202.     Lead Plaintiffs Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust and other members of the Merger Subclass acquired Vivendi ADSs and ordinary shares issued in exchange for their Seagram or Canal Plus shares.

-96-

203.    None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus were true and without omissions of any material facts and were not misleading. Each of the defendants acted negligently in issuing the Registration Statement and Prospectus.

204.    Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public which were contained in the Registration Statement, which misrepresented or failed to disclose, inter alia, the facts set forth above. By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

205.    At the times they acquired Vivendi ADSs and ordinary shares, Lead Plaintiffs Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust and other members of the Merger Subclass were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.

206.    As a result of the foregoing, Lead Plaintiffs Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust and members of the Merger Subclass have sustained damages. The value of Vivendi ADSs and ordinary shares has declined substantially subsequent to and due to defendants' violations.

207. This Count has been brought within one year after the discovery of the untrue statements or omissions, or after such discovery could have been made by the exercise of reasonable diligence, and within three years after the security was bona fide offered to the public.

## COUNT II

### Violations Of Section 12(a)(2) Of
### The Securities Act Against All Defendants

208. Lead Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein, except to the extent any allegations above contain any facts which are unnecessary or irrelevant for purposes of stating a claim under this Section, including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of defendants other than strict liability or negligence.

209. This Count is brought by Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l, on behalf of themselves and other members of the Merger Subclass who acquired common stock and ADSs of Vivendi pursuant to the Registration Statement and Prospectus issued in connection with the Merger, against all defendants. This claim does not sound in fraud and should be read to exclude any reference in the preceding paragraphs to recklessness, fraud, or intentional acts by the defendants.

210. Defendants were sellers and offerors of the shares offered pursuant to the Prospectus.

211. The Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose

-98-

material facts. Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectus.

212.    The defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Prospectus, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These defendants in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Prospectus as set forth above.

213.    Lead Plaintiffs Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust and other members of the Merger Subclass acquired Vivendi ADSs and ordinary shares pursuant to the defective Prospectus. Lead Plaintiffs Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust and the other members of the Merger Subclass did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

214.    By reason of the conduct alleged herein, the defendants violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act. Accordingly, Lead Plaintiffs Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust and members of the Merger Subclass are entitled to damages pursuant to Section 12(a)(2).

-99-

215.   This Count has been brought within one year after the discovery of the untrue statements or omissions, or after such discovery could have been made by the exercise of reasonable diligence, and within three years after the security was bona fide offered to the public.

## COUNT III

### Violation Of Section 15 Of The Securities Act Against The Individual Defendants

216.   Lead Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein, except to the extent any allegations above contain any facts which are unnecessary or irrelevant for purposes of stating a claim under this Section, including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of defendants other than strict liability or negligence.

217.   This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o against the Individual Defendants. This Count does not sound in fraud.

218.   Each Individual Defendant was a control person of Vivendi by virtue of their position as directors and/or senior officers of the Company. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or major shareholders of Vivendi.

219.   Vivendi, as issuer of the Registration Statement, is liable under Section 11. Each Individual Defendant was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the materially false and misleading Registration Statement and having otherwise participated in the Merger.

-100-

## COUNT IV

### Violations Of Section 14(a) Of The Exchange Act and
### Rule 14a-9 Promulgated Thereunder Against Vivendi, as the
### successor entity, successor-in-interest, and successor-in-fact of Seagram

220.    Lead Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set

forth herein, except to the extent any allegations above contain any facts which are unnecessary or

irrelevant for purposes of stating a claim under this Section, including allegations that may be

interpreted to sound in fraud or relating to any state of mind on the part of defendants other than

negligence.

221.    This Count is brought by Lead Plaintiffs Oliver M. Gerard, Francois R. Gerard,

Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison

Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust on behalf of the

Proxy Subclass, pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC Rule

14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9, against defendant Vivendi Universal, S.A.,

as the successor entity, successor-in-interest, and successor-in-fact of Seagram. The Merger was

consummated on December 8, 2000, when Vivendi, S.A. was merged into its wholly owned

subsidiary, Sofiee, which was renamed Vivendi Universal, S.A., Seagram was combined with

Vivendi Universal, S.A., and Vivendi Universal, S.A. acquired almost all of the businesses of

Canal Pus, other than certain television businesses. At the time it violated Section 14(a) of the

Exchange Act and SEC Rule 14a-9, as alleged herein, Seagram was not a "foreign private issuer"

within the definition set forth in SEC Rule 3b-4, 17 C.F.R § 240.3b-4, and was not exempt from

Section 14(a) of the Exchange Act under SEC Rule 3a12-3(b), 17 C.F.R. § 240.3a12-3(b). This

claim does not sound in fraud and should be read to exclude any reference in the preceding

paragraphs to recklessness, fraud, or intentional acts by Seagram, other than Seagram's negligence. Among other things, Seagram was negligent by failing to exercise due care in it's due diligence investigation of Vivendi (then Vivendi, S.A.), which should have uncovered the false and untrue statements of material facts (including but not limited to, false financial results) that are set forth in the Joint Proxy Statement-Prospectus.

222.    The Joint Proxy Statement-Prospectus filed as part of the October 30, 2000 Registration Statement on Form 4 and first mailed to Seagram securityholders and U.S. securityholders of Canal Plus and Vivendi, S.A. beginning on November 3, 2000, was inaccurate and misleading, contained untrue statements of material facts (including but not limited to, false financial results), omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above. The Joint-Proxy Statement-Prospectus was used by Seagram to solicit proxies for a shareholder vote in favor of the Merger. The Joint-Proxy Statement-Prospectus was accompanied by communications from Seagram addressed to both Seagram shareholders and shareholders of Vivendi, S.A. and Canal Plus, including communications signed by Edgar Bronfman, Jr, Seagram's President and Chief Executive Officer, and Michael C.L. Hallows, the Seagram's Secretary, who signed "By Order of the Board of Directors" of Seagram.

223.    Lead Plaintiffs Oliver M. Gerard, Francois R. Gerard and other members of the Proxy Subclass were shareholders of Vivendi solicited to vote on the Merger pursuant to the defective Joint Proxy Statement-Prospectus as alleged above. Lead Plaintiffs Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust and other members of the Proxy

Subclass were shareholders of Seagrams solicited to vote on the Merger by Seagrams pursuant to the defective Joint Proxy Statement-Prospectus as alleged above.

224.     At the times they acquired Vivendi ADSs and ordinary shares, Lead Plaintiffs Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust and other members of the Proxy Subclass were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.

225.     As a result of the foregoing, Lead Plaintiffs Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust and members of the Proxy Subclass have sustained damages.

## COUNT V

### Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

226.     Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

227.     This Count is asserted against all defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

228.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Purchaser Class members, as alleged herein; (ii) enable Vivendi to complete several acquisitions, as described herein, using its artificially inflated

-103-

securities as currency; and (iii) cause Lead Plaintiffs and other members of the Purchaser Class to purchase Vivendi's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendant Vivendi and the Individual Defendants, and each of them, took the actions set forth herein.

229. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Vivendi's ADSs and ordinary shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

230. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Vivendi as specified herein.

231. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Vivendi's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Vivendi and its business operations and future prospects

-104-

in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Vivendi ADSs and ordinary shares during the Class Period.

232. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

233. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Vivendi's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.

-105-

As demonstrated by defendants' misstatements of the Company's business, financial condition, operations and growth throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

234.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Vivendi's ADSs and ordinary shares were artificially inflated during the Class Period. In ignorance of the fact that market prices of Vivendi's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Lead Plaintiffs and the other members of the Purchaser Class acquired Vivendi securities during the Class Period at artificially high prices and were damaged thereby.

235.    At the time of said misrepresentations and omissions, Lead Plaintiffs and the other members of the Purchaser Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other members of the Purchaser Class and the marketplace known the truth regarding the problems that Vivendi was experiencing which were not disclosed by defendants, Lead Plaintiffs and the other members of the Purchaser Class would not have purchased or otherwise acquired their Vivendi ADSs and ordinary shares, or, if they had purchased such

securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

236.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

237.    As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiffs and the other members of the Purchaser Class suffered damages.

## COUNT VI

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

238.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

239.    The Individual Defendants acted as controlling persons of Vivendi within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

-107-

240.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

241.     As set forth above, Vivendi and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Purchaser Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs, individually and on behalf of the Class and Subclasses, pray for relief and judgment, as follows:

(a)     Declaring this action is a proper class action and certifying Lead Plaintiffs, among others, as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Declaring and determining that defendants violated the federal securities laws by reason of their conduct as alleged herein;

(c)     Awarding compensatory damages in favor of Lead Plaintiffs and the other Class and Subclass members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(d)     Awarding Lead Plaintiffs and the Class and Subclasses their reasonable

costs and expenses incurred in this action, including counsel fees and expert fees; and

(e)     Granting such other and further relief as the Court may deem just and

proper.

## JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury.

Dated:  November 24, 2003

**MILBERG WEISS BERSHAD  
HYNES & LERACH LLP**

*William C. Fredericks /dsn*

David J. Bershad (DB-9981)  
Sol Schreiber (SS-5927)  
William C. Fredericks (WF-1576)  
Brian C. Kerr (BK-6074)  
One Pennsylvania Plaza  
New York, New York 10119  
(212) 594-5300  
(212) 868-1229 (fax)

-and-

Randi D. Bandman, Esq.  
100 Pine Street, Suite 2600  
San Francisco, CA 94111-5238  
(415) 288-4545  
(415) 288-4534 (fax)

-109-

**JA553**

**ABBEY GARDY, LLP**

Arthur N. Abbey (AA-8074)
James S. Notis (JN-4189)
Richard B. Margolies (RM-9311)
212 East 39th Street
New York, New York 10016
(212) 889-3700
(212) 684-5191 (fax)

**Co-Lead Counsel for Lead Plaintiffs**

Sherrie R. Savett, Esq.
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, Pennsylvania 19103
(215) 875-3000
(215) 875-4604 (fax)

Mel E. Lifshitz, Esq.
Gregory M. Egleston, Esq.
**BERNSTEIN LIEBHARD & LIFSHITZ LLP**
10 East 40th Street
New York, New York 10016
(212) 907-0800
(212) 684-6083

Douglas M. McKiege, Esq.
Javier Bleichmar, Esq.
**BERNSTEIN LITOWITZ BERGER & GROSSMANN**
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400
(212) 554-1444 (fax)

-110-

**JA554**

Steve J. Toll, Esq.
**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
1100 New York Ave., N.W.
Suite 500
Washington, D.C. 20005-3964
(202) 408-4600
(202) 408-4699 (fax)

Leo W. Desmond, Esq.
**THE LAW OFFICES OF LEO W. DESMOND**
2161 Palm Lake Blvd.
Suite 204
West Palm Beach, Florida 33409
(561) 712-8000
(561) 712-8002 (fax)

Nadeem Faruqi, Esq.
**FARUQI & FARUQI, LLP**
320 East 39th Street
New York, New York 10016
(212) 983-9330
(212) 983-9331 (fax)

Lionel Z. Glancy, Esq.
Michael M. Goldberg, Esq.
**GLANCY & BINKOW**
1801 Avenue of the Stars
Suite 311
Los Angeles, CA 90067
(310) 201-9150
(310) 201-9160 (fax)

Marc S. Henzel, Esq.
**LAW OFFICE OF MARC S. HENZEL**
237 Montgomery Avenue
Suite 202
Bala Cynwd, Pennsylvania 19004
(610) 660-8000
(610) 660-8080 (fax)

Corey D. Holzer, Esq.
**HOLZER & HOLZER**
6135 Barfield Road, Suite. 102
Atlanta, GA 30328
(404) 847-0085
(404) 847-0036 (fax)

Leigh R. Lasky, Esq.
**LASKY & RIFKIND, LTD.**
100 Park Avenue, 12th Floor
New York, New York 10016
(212) 907-0800
(212) 684-6083 (fax)

Christopher Lovell, Esq.
Christopher J. Gray, Esq.
**LOVELL & STEWART, LLP**
500 Fifth Avenue, Suite 5800
New York, NY 10110
(212) 608-1900
(212) 719-4677 (fax)

Bruce G. Murphy, Esq.
**LAW OFFICES OF BRUCE G. MURPHY**
265 Llwyds Lane
Vero Beach, FL 32963
(561) 231-4202
(561)231-4042 (fax)

Klari Neuwelt, Esq.
**LAW OFFICE OF KLARI NEUWELT**
110 East 59th Street, 29th Floor
New York, NY 10002
(212) 593-8800
(212) 593-9131 (fax)

-112-

**JA556**

Marc Gross, Esq.
Andrew G. Tolan, Esq.
Patrick Dahlstrom, Esq.
**POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS, LLP**
100 Park Avenue, 26th Floor
New York, NY 10017-5516
(212) 661-1100
(212) 661-8665 (fax)

Brian Philip Murray, Esq.
**RABIN & PECKEL, LLP**
275 Madison Avenue
New York, New York  10016
(212) 682-1818
(212) 682-1892 (fax)

Marc A. Topaz, Esq.
Stuart L. Berman, Esq.
Darren Check, Esq.
**SCHIFFRIN & BARROWAY, LLP**
Three Bala Plaza East
Suite 400
Bala Cynwyd, Pennsylvania  19004
(610) 667-7706
(610) 667-7056 (fax)

Patrick A. Klingman, Esq.
**SCHATZ & NOBEL**
330 Main Street
Hartford, CT 06106
(860) 493-6292
(860) 493-6290 (fax)

Jules Brody, Esq.
**STULL STULL & BRODY**
6 East 45th Street
New York, New York 10017
(212) 687-7230
(212) 490-2022 (fax)

-113-

**JA557**

Robert C. Susser, Esq.
**ROBERT C. SUSSER, P.C.**
6 East 43rd Street, Suite 1900
New York, New York 10017
(212) 808-0298
(212) 949-0966 (fax)

Robert I. Harwood, Esq.
**WECHSLER HARWOOD, LLP**
488 Madison Avenue, 8th Floor
New York, NY 10022
(212) 935-7400
(212) 753-3630 (fax)

Joseph H. Weiss, Esq.
**WEISS & YOURMAN**
551 Fifth Avenue, Suite 1600
New York, NY 10176
(212) 682-3025
(212) 682-3010 (fax)

Daniel W. Krasner, Esq.
Gregory M. Nespole, Esq.
David Wales
**WOLF HALDENSTEIN**
**ADLER FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York   10016
(212) 545-4600
(212) 661-8665 (fax)

**Counsel for Plaintiffs**

-114-

**JA558**

## CERTIFICATE OF SERVICE

RICHARD B. MARGOLIES hereby certifies that on November 24, 2003, he caused a true and correct copy of the foregoing Plaintiffs' First Amended Consolidated Class Action Complaint to be served by messenger upon the following counsel:

Paul C. Saunders
Daniel Slifkin
CRAVATH, SWAIN & MOORE LLP
825 Eighth Avenue
Worldwide Plaza
New York, New York 10019

Counsel for Defendant Vivendi Universal, S.A.

Michael J. Malone
Jennifer L. Hurley
KING & SPALDING, LLP
1185 Avenue of the Americas
New York, New York 10036

Counsel for Defendant Jean-Marie Messier

Martin L. Perschetz
Michael E. Swartz
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022

Counsel for Defendant Guillaume Hannezo

_____
RICHARD B. MARGOLIES

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED **ORIGINAL**

05 JUL 15 PM 10: 22

IN RE VIVENDI UNIVERSAL, S.A.
SECURITIES LITIGATION

Civil Action No:  COURT
02 Civ. 5571 (RJH/HBP)

# 234

---

## NOTICE OF PLAINTIFFS' SUBSTITUTED MOTION FOR CLASS CERTIFICATION

PLEASE TAKE NOTICE that, upon the accompanying memorandum of law and all prior papers and proceedings had herein, Olivier M. Gerard, the Retirement System for General Employees of the City of Miami Beach, Bruce Doniger, Gerard Morel, Capital Invest Die Kapitalanlagegegesellschaft der Bank Austria Creditanstalt Gruppe GmbH (in its capacity as manager of and attorney-in-fact for Apk EU-Big Caps Fund) and William Cavanagh, on behalf of themselves and all others similarly situated, will move this Court, before the Honorable Richard J. Holwell of the United States District Court for the Southern District of New York, 500 Pearl Street, New York, New York 10007, for an Order pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3):

(i)  certifying a class consisting of all persons who purchased or otherwise acquired the ordinary shares or American Depositary Shares of Vivendi Universal, S.A. during the period between October 30, 2000 and August 14, 2002, inclusive; excluded from the class are defendants, the members of their families, any entity in which any defendant has a controlling interest, or which is a parent or subsidiary of, or which is controlled by, Vivendi Universal, S.A., and the officers, directors, affiliates, legal representatives, heirs, predecessors, successors or assigns of any of the defendants;

(ii)  appointing Olivier M. Gerard, the Retirement System for General Employees of the City of Miami Beach, Bruce Doniger, Gerard Morel, Capital Invest Die Kapitalanlagegesellschaft der Bank Austria Creditanstalt Gruppe GmbH (in its capacity as

**JA560**

manager of and attorney-in-fact for Apk EU-Big Caps Fund) and William Cavanagh as class

representatives, and appointing Milberg Weiss Bershad & Schulman LLP and Abbey Gardy,

LLP as class counsel; and

   (iii)  granting such other relief as may be just and proper.

Dated: July 15, 2005

        MILBERG WEISS BERSHAD &
        SCHULMAN LLP

        David J. Bershad (DB-9981)
        Sol Schreiber (SS-5927)
        William C. Fredericks (WF-1576)
        Brian C. Kerr (BK-6074)
        One Pennsylvania Plaza
        New York, New York 10119
        212.594.5300

        ABBEY GARDY, LLP

        Arthur N. Abbey (AA-8074)
        James S. Notis (JN-4189)
        Richard B. Margolies (RM-9311)
        212 East 39th Street
        New York, New York 10016
        212.889.3700

        *Co-Lead Counsel for Plaintiffs*

DOCS\296835v1